CR 02-938(E)-DOC            March 15, 2006                    1

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                      - - -

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5                      - - -

6

7    UNITED STATES OF AMERICA,          )
                                        )
8              Plaintiff,               )
                                        )
9     vs.                               ) No. CR 02-938(E)-DOC
                                        )
10   BARRY BYRON MILLS; TYLER DAVIS     )    DAY 3 - VOLUME II
     BINGHAM; CHRISTOPHER OVERTON       )
11   GIBSON; EDGAR WESLEY HEVLE,        )
                                        )       **ORIGINAL**
12             Defendants.              )
     _____)

13

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              Santa Ana, California

18           Wednesday, March 15, 2006

19

20

21

     JANE C.S. RULE, CSR No. 9316
22   Federal Court Reporter
     UNITED STATES DISTRICT COURT
23   411 West Fourth Street, Room 1053
     Santa Ana, California 92701-4516
24   (714) 558-7755

25   Reporter's Reference:  06-03-15 ABD3V2

CR 02-938(E)-DOC                    March 15, 2006                          2

```
 1   APPEARANCES:

 2

 3   On behalf of the Plaintiff UNITED STATES OF AMERICA:

 4           OFFICE OF THE UNITED STATES ATTORNEY
             BY:  MICHAEL W. EMMICK
 5                JOEY L. BLANCH
                  Attorneys at Law
 6           312 North Spring Street
             Los Angeles, California 90012
 7           (213) 894-0511

 8                      - AND -

 9           OFFICE OF THE UNITED STATES ATTORNEY
             BY:  TERRI K. FLYNN
10                Attorney at Law
                  411 West 4th Street
11                8th Floor
                  Santa Ana, California 92701
12                (714) 338-3592

13
     On behalf of the Defendant BARRY BYRON MILLS:
14
             LAW OFFICES OF H. DEAN STEWARD
15           BY:  H. DEAN STEWARD
                  Attorney at Law
16           107 Avenida Miramar
             Suite C
17           San Clemente, California 92672
             (949) 481-4900
18
                        - AND -
19
             LAW OFFICES OF MARK F. FLEMING
20           BY:  MARK F. FLEMING
                  Attorney at Law
21           433 "G" Street
             Suite 202
22           San Diego, CA 92101
             (619) 652-9970

23

24

25
```

```
 1  APPEARANCES (Continued):

 2

 3  On behalf of the Defendant TYLER DAVIS BINGHAM:

 4          LAW OFFICES OF MICHAEL V. WHITE
            BY:  MICHAEL V. WHITE
 5               Attorney at Law
            1717 Fourth Street
 6          Third Floor
            Santa Monica, California 90401
 7          (310) 576-6242

 8                      - AND -

 9          STEWART & HARRIS
            ATTORNEYS AT LAW
10          BY:  WILLIAM S. HARRIS
                 Attorney at Law
11          1499 Huntington Drive
            Suite 403
12          South Pasadena, California 91030
            (626)441-9300
13

14  On behalf of the Defendant CHRISTOPHER OVERTON GIBSON:

15          LAW OFFICES OF KENNETH A. REED
            BY:  KENNETH A. REED
16               Attorney at Law
            404 West Fourth Street
17          Suite C
            Santa Ana, California 92701
18          (714) 953-7400

19

20

21

22

23

24

25
```

Jane C.S. Rule, CSR No. 9316 – Federal Official Court Reporter

```
 1   APPEARANCES (Continued):

 2

 3   On behalf of the Defendant EDGAR WESLEY HEVLE:

 4           LAW OFFICES OF BERNARD J. ROSEN
             BY:  BERNARD J. ROSEN
 5                Attorney at Law
             1717 Fourth Street
 6           Suite 300
             Santa Monica, California 90401
 7           (310) 451-4577

 8                       - AND -

 9           LAW OFFICES OF DONALD J. CALABRIA
             BY:  DONALD J. CALABRIA
10                Attorney at Law
             16133 Ventura Boulevard
11           Suite 600
             Encino, California 91436
12           (818) 990-0110

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CR 02-938(E)-DOC                March 15, 2006                          5

```
1                          I N D E X

2

3                        EXAMINATION

4

5   Witness Name        Direct   Cross   Re-Direct   Re-Cross

6   SMITH, CLIFFORD E.
       By Ms. Flynn        6
7      By Mr. White                33

8

9                         EXHIBITS

10

11  Exhibit                       Identification    Evidence

12  Plaintiff's No. 36                  --             20

13  Plaintiff's No. 48                  --             15

14

15

16

17

18

19

20

21

22

23

24

25
```

CR 02-938(E)-DOC          March 15, 2006                    6

| | | |
|---|---|---|
| 0:32 | 1 | **SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 15, 2006** |
| 10:32 | 2 | **DAY 3 - VOLUME II** |
| 10:32 | 3 | **(10:49 a.m.)** |
| 10:32 | 4 | THE COURT:  All right.  We are back in session.  The |
| 10:49 | 5 | jury is present.  The alternates are present.  All counsel are |
| 10:49 | 6 | still present, the defendants, the government. |
| 10:49 | 7 | Ms. Flynn? |
| 10:49 | 8 | And also the witness, Mr. Smith. |
| 10:49 | 9 | MS. FLYNN:  Thank you, your Honor. |
| 10:49 | 10 | **CLIFFORD EUGENE SMITH, PLAINTIFF'S WITNESS** |
| 10:49 | 11 | **DIRECT EXAMINATION (Continued.)** |
| 10:49 | 12 | BY MS. FLYNN: |
| 0:49 | 13 | **Q**   Mr. Smith, before the break we were talking about the |
| 10:49 | 14 | reorganization of the California AB system.  You indicated |
| 10:49 | 15 | something about that the California reorganization was based on |
| 10:50 | 16 | the fed system.  What do you mean by that? |
| 10:50 | 17 | **A**   Well, the Feds were operating under a commission back |
| 10:50 | 18 | then.  I don't know if it still is.  They had a commission, so |
| 10:50 | 19 | we kind of barred that. |
| 10:50 | 20 | **Q**   And this was in or about '82? |
| 10:50 | 21 | **A**   Yeah. |
| 10:50 | 22 | **Q**   And based on your membership and status as a councilor in |
| 10:50 | 23 | the AB, do you know who was in the leadership structure of the |
| 10:50 | 24 | federal system at that time? |
| 0:50 | 25 | **A**   The only three names I knew was Barry Mills, Tommy |

| | | |
|---|---|---|
| 10:50 | 1 | Silverstein and Puppet McKinney. |
| 10:50 | 2 | **Q**    Okay.  Now, I asked you about the phrase "in the hat" |
| 10:50 | 3 | before the break.  During this reorganization meeting at Palm |
| 10:50 | 4 | Hall in 1982, did you and any other members of the Council and |
| 10:50 | 5 | Commission vote people into the hat? |
| 10:51 | 6 | **A**    Yeah. |
| 10:51 | 7 | **Q**    What did you do at that time? |
| 10:51 | 8 | **A**    There would be a couple of outstanding issues that we'd |
| 10:51 | 9 | put off for a while that we needed to take care of, so we |
| 10:51 | 10 | brought them to the forefront to decide what we was gonna do |
| 10:51 | 11 | about it. |
| 10:51 | 12 | **Q**    Was Richard Andreasen one of those outstanding issues? |
| 0:51 | 13 | **A**    No. |
| 10:51 | 14 | **Q**    Okay.  What were the outstanding issues? |
| 10:51 | 15 | **A**    Tommy Lamb -- the ones we spoke of earlier. |
| 10:51 | 16 | **Q**    Okay.  And at that time did you vote Tommy Lamb into the |
| 10:51 | 17 | hat? |
| 10:51 | 18 | **A**    Yeah.  We made it official. |
| 10:51 | 19 | **Q**    Okay.  Are you familiar with why he was put into the hat? |
| 10:51 | 20 | **A**    Yeah. |
| 10:51 | 21 | **Q**    Why was he put into the hat? |
| 10:51 | 22 | **A**    For not doing what he was told to do. |
| 10:51 | 23 | **Q**    What was he told to do? |
| 10:51 | 24 | **A**    To kill a girl named Lisa Sherry. |
| 0:52 | 25 | **Q**    Why was he to kill her? |

CR 02-938(E)-DOC          March 15, 2006                    8

| | | |
|---|---|---|
| 10:52 | 1 | **A**    She was a potential witness against John Stinson and |
| 10:52 | 2 | Crofty Grajada (phonetic), a Mexican Mafia member.  They had |
| 10:52 | 3 | done a drug robbery, and somebody got killed in the process of |
| 10:52 | 4 | it.  They got found guilty.  They was going back to court on a |
| 10:52 | 5 | retrial, and she was a potential -- a potential witness. |
| 10:52 | 6 | **Q**    And so the AB wanted her killed? |
| 10:52 | 7 | **A**    Yeah, John wanted her out of the way, uh-huh. |
| 10:52 | 8 | **Q**    And at the time that Mr. Lamb was instructed to do this, |
| 10:52 | 9 | was he in prison? |
| 10:52 | 10 | **A**    Yeah.  He was getting out.  He was close to getting out. |
| 10:52 | 11 | **Q**    Do you know if when he got out of prison, he followed |
| 10:52 | 12 | through on what he was ordered to go do? |
| 0:52 | 13 | **A**    I know he didn't follow through with what he was supposed |
| 10:52 | 14 | to do. |
| 10:52 | 15 | **Q**    What did he do instead? |
| 10:52 | 16 | **A**    He fell in love. |
| 10:52 | 17 | **Q**    With who? |
| 10:52 | 18 | **A**    Lisa Sherry. |
| 10:52 | 19 | **Q**    That's the same woman he was supposed to kill? |
| 10:52 | 20 | **A**    (No audible response.) |
| 10:52 | 21 | **Q**    Is that "yes"?  I see you nodding. |
| 10:52 | 22 | **A**    Yes, yes. |
| 10:53 | 23 | **Q**    And why did that put him in the hat? |
| 10:53 | 24 | **A**    He got close to her, and they got involved, and he was |
| 0:53 | 25 | sending word back that we didn't need to do this, that he can |

| | | |
|---|---|---|
| 10:53 | 1 | control her and she wasn't going to turn.  And we sent word |
| 10:53 | 2 | back, "C'mon, man.  Do what you were supposed to do.  Quit |
| 10:53 | 3 | bullshitting."  And that really got him stitched up.  Once he |
| 10:53 | 4 | sent word back that he was going to take this to Tommy, Tommy |
| 10:53 | 5 | Silverstein, and the Feds. |
| 10:53 | 6 | Q    Mr. Lamb said that? |
| 10:53 | 7 | A    He was going to go in and around us.  He and Tommy knew |
| 10:53 | 8 | each other from sometime back, when Tommy was in the state. |
| 10:53 | 9 | Tommy was originally in California prison, then he went to the |
| 10:53 | 10 | Feds. |
| 10:53 | 11 | Q    When you say "Tommy," you mean Tommy Silverstein, correct? |
| 10:53 | 12 | A    Yeah. |
| 10:53 | 13 | Q    Mr. Lamb's first name is also Tommy? |
| 10:53 | 14 | A    Yeah. |
| 10:53 | 15 | Q    Okay.  Or was. |
| 10:53 | 16 |      And did you and the other members of the Council and |
| 10:53 | 17 | Commission vote Mr. Lamb into the hat? |
| 10:53 | 18 | A    Yes, we did. |
| 10:53 | 19 | Q    And around the time -- did Mr. Lamb come back to the state |
| 10:54 | 20 | system, to your knowledge? |
| 10:54 | 21 | A    He got arrested. |
| 10:54 | 22 | Q    Okay.  And did he go to the Feds? |
| 10:54 | 23 | A    Yes, he did. |
| 10:54 | 24 | Q    And did the California AB send word to the federal system |
| 10:54 | 25 | about Tommy Lamb being in the hat? |

CR 02-938(E)-DOC            March 15, 2006                    10

10:54  1   A    Yeah, it had already been sent.

10:54  2   Q    Do you know how that was sent?

10:54  3   A    It was sent through Ronny Slocum.

10:54  4   Q    And how do you know that?

10:54  5   A    I was there when it was sent.  I was there when Blinky

10:54  6   instructed Ronny.

10:54  7   Q    And how did Blinky instruct Ronny?

10:54  8   A    Give word to -- give word to the brothers.

10:54  9        THE COURT:  And once again, "Blinky" is --

10:54  10       THE WITNESS:  Robert Griffin, excuse me, sir.

10:54  11       THE COURT:  Robert Griffin.

10:54  12       No.  You can answer either way, you can use "Blinky"

0:54  13   or "Robert Griffin," but each time, at least at the beginning

10:54  14  of the case for both sides, let's get the characters' names

10:54  15  straight.

10:54  16  BY MS. FLYNN:

10:54  17  Q    Now, was Ronald Slocum in custody or out of custody at

10:54  18  this time?

10:54  19  A    In custody.

10:54  20  Q    And he arranged to get word to the federal system?

10:54  21  A    Yes, he did.

10:55  22  Q    Now, we were talking a little about Mr. Clark.  He's the

10:55  23  man you killed; is that correct?

10:55  24  A    Yes, he is.

0:55  25   Q    And he had been voted on the council with you in 1982,

CR 02-938(E)-DOC          March 15, 2006                    11

`0:55   1   correct?

10:55   2   A    Yes.

10:55   3   Q    Was if shortly thereafter that he was killed?

10:55   4   A    Yes, it was.

10:55   5   Q    Why did you kill him?

10:55   6   A    Well, he was a dope fiend.  He violated the drug policy.

10:55   7   He said he wasn't going to adhere to it, that he was going to

10:55   8   shoot all of the drugs that he wanted to shoot when he wanted

10:55   9   to shoot them.  He was disrespectful, and he called me a punk.

10:55  10   Q    So you also had a personal problem with Mr. Clark?

10:55  11   A    Yeah.  I wanted to be the one to kill him.

10:55  12   Q    And did you get authority from the Commission and the

 0:55  13   Council to do that?

10:55  14   A    Yes, I did.

10:55  15   Q    And what would happen if you didn't get authority for

10:55  16   that?

10:55  17   A    If I killed a brother like that without -- I'd probably --

10:55  18   I probably would be up against it, unless I can really prove my

10:55  19   case.

10:56  20   Q    So it's one of the policies of the AB that to kill another

10:56  21   brother, you'd have to get Commission approval?

10:56  22   A    Sure, sure.

10:56  23   Q    And I think you stated it was in or around June or July of

10:56  24   1982 that you killed Mr. Clark?

:0:56  25   A    I think it was July 3rd.

CR 02-938(E)-DOC          March 15, 2006                    12

| | | |
|---|---|---|
| 10:56 | 1 | Q    That you killed Mr. Clark? |
| 10:56 | 2 | A    Yeah.  It was a visiting day. |
| 10:56 | 3 | Q    After you killed Mr. Clark, was there an attempt to get a |
| 10:56 | 4 | message to Commission Member Bobby Crane? |
| 10:56 | 5 | A    Yeah.  We sent the kite from Palm Hall to San Quentin to |
| 10:56 | 6 | Bobby about a few things. |
| 10:56 | 7 | Q    Okay.  And you were in Palm Hall at the time? |
| 10:56 | 8 | A    Yes, I was. |
| 10:56 | 9 | Q    Where was Bobby Crane? |
| 10:56 | 10 | A    He was in San Quentin.  He was in North Block, |
| 10:56 | 11 | San Quentin. |
| 10:56 | 12 | Q    And why were you trying to get a message to him? |
| 10:56 | 13 | A    Well, Blinky felt that -- Blinky and Blue, those were the |
| 10:56 | 14 | two commission members that were at Palm Hall, "Blue" being |
| 10:57 | 15 | Wendell Norris and "Blinky" being Robert Griffin.  They wanted |
| 10:57 | 16 | to get word to Bobby. |
| 10:57 | 17 | Q    And he was the third commission member, correct? |
| 10:57 | 18 | A    Yeah.  Giving them a little bit of insight of what |
| 10:57 | 19 | happened with the Clark thing, because Clark was Bobby's |
| 10:57 | 20 | lapdog.  So they wanted to square that away before it got out |
| 10:57 | 21 | of proportion. |
| 10:57 | 22 | Q    And by "lapdog," what do you mean? |
| 10:57 | 23 | A    Blinky did anything he wanted to do.  First he had |
| 10:57 | 24 | Mr. Bingham, then he had Bobby Crane, and both of them guys |
| 10:57 | 25 | were really big dogs, and he could get away with a lot of stuff |

| | | |
|---|---|---|
| 10:57 | 1 | because he had them backing him up. |
| 10:57 | 2 | Q   Okay.  So you referenced Defendant Bingham there for a |
| 10:57 | 3 | member.  What do you mean he had Defendant Bingham? |
| 10:57 | 4 | A   Mr. Bingham was one of his supporters.  He thought he |
| 10:57 | 5 | could go to T.D. about anything and T.D. squared it away. |
| 10:57 | 6 | Q   And how did Defendant Bingham have the authority to square |
| 10:58 | 7 | something away in the California AB? |
| 10:58 | 8 | A   It was the power of influence, you know.  I mean, he was |
| 10:58 | 9 | that guy, "C'mon, give that guy a break." |
| 10:58 | 10 | Q   So he was fairly high up and influential? |
| 10:58 | 11 | A   Yeah.  It was never like nothing -- nothing like serious |
| 10:58 | 12 | kill.  He never ratted on nobody or did any of that stuff, |
| 10:58 | 13 | Loeser, but he was disrespectful. |
| 10:58 | 14 | Q   Okay. |
| 10:58 | 15 | A   That kind of stuff.  So it was really kind of small stuff, |
| 10:58 | 16 | but it got to the point where he just had to go. |
| 10:58 | 17 | Q   Now, how did -- how did Blinky, Robert "Blinky" Griffin |
| 10:58 | 18 | attempt to get a message to Bobby Crane? |
| 10:58 | 19 | A   We -- on the tier there was a guy named Michael |
| 10:58 | 20 | Masterson.  He was being looked at for possible membership for |
| 10:58 | 21 | some time.  He wasn't up for a vote, but he was just being |
| 10:58 | 22 | looked at.  He had done some stuff for us.  He had gotten |
| 10:59 | 23 | informed that he was going to San Quentin the next morning, so |
| 10:59 | 24 | he packed his stuff up.  He put down to be transferred.  So we |
| 10:59 | 25 | knew where he was going the next morning, so we sent a kite |

CR 02-938(E)-DOC          March 15, 2006                    14

| | | |
|---|---|---|
| 10:59 | 1 | with him to Bobby. |
| 10:59 | 2 | Q    Okay.  And do you know who wrote the kite? |
| 10:59 | 3 | A    It was wrote by two people. |
| 10:59 | 4 | Q    And who were they? |
| 10:59 | 5 | A    Robert Griffin, "Blinky," and John Stinson. |
| 10:59 | 6 | Q    And were you present when the kite was being written? |
| 10:59 | 7 | A    Yeah. |
| 10:59 | 8 | Q    And did you see the kite at the time it was being |
| 10:59 | 9 | written? |
| 10:59 | 10 | A    Yeah, I read it after it was written. |
| 10:59 | 11 | Q    And did Robert Griffin and John Stinson tell you that |
| 10:59 | 12 | Mr. Masterson was going to take it? |
| 10:59 | 13 | A    Yeah, we knew Masterson was going to take it. |
| 10:59 | 14 | Q    Can you take a look at Exhibit 48.  It should be in front |
| 10:59 | 15 | of you there. |
| 10:59 | 16 | That's in volume 1, Counsel. |
| 10:59 | 17 | And Mr. Smith, you can pull that out of the sleeve |
| 11:00 | 18 | because I believe it's two pages. |
| 11:00 | 19 | A    Yes, ma'am. |
| 11:00 | 20 | Q    And do you recognize that document? |
| 11:00 | 21 | A    Yeah. |
| 11:00 | 22 | Q    And what is that document? |
| 11:00 | 23 | A    This is what was wrote at Palm Hall in '82 to give to |
| 11:00 | 24 | Masterson to take to the leadership in San Quentin. |
| 11:00 | 25 | Q    Now, you say it was written by two people.  Page 1 until |

CR 02-938(E)-DOC          March 15, 2006                    15

| | | |
|---|---|---|
| 11:00 | 1 | about the middle of page 2, signed "Blinky" -- |
| 11:00 | 2 | A    Yeah. |
| 11:00 | 3 | Q    Do you recognize that handwriting? |
| 11:00 | 4 | A    Yeah, that's Robert Griffin's, Blinky's. |
| 11:00 | 5 | Q    And have you seen his handwriting before? |
| 11:00 | 6 | A    Oh, yeah, several times. |
| 11:00 | 7 | Q    And down below where it says "Blinky" it says "John."  Do |
| 11:00 | 8 | you recognize that handwriting? |
| 11:00 | 9 | A    Yeah. |
| 11:00 | 10 | Q    And who is that? |
| 11:00 | 11 | A    John Stinson. |
| 11:00 | 12 | Q    And have you seen his handwriting before? |
| 11:00 | 13 | A    Yes. |
| 11:00 | 14 | MS. FLYNN:  The government would move to admit |
| 11:00 | 15 | Exhibit 48. |
| 11:00 | 16 | THE COURT:  Any objection, Counsel? |
| 11:01 | 17 | Received into evidence. |
| 11:01 | 18 | MR. FLEMING:  No objection. |
| 11:01 | 19 | (Plaintiff's Exhibit No. 48 is received into |
| 11:01 | 20 | evidence.) |
| 11:01 | 21 | THE COURT:  Now, Counsel, you or Mr. Smith can read |
| 11:01 | 22 | that if you choose to.  I think you can put it up on the ELMO |
| 11:01 | 23 | also, but it's going to be hard for the jury to read.  So if |
| 11:01 | 24 | you want to, I am going to give you that time. |
| 11:01 | 25 | MS. FLYNN:  Thank you, your Honor. |

CR 02-938(E)-DOC          March 15, 2006                          16

`1:01   1   BY MS. FLYNN:

11:01   2   Q    Now, are you familiar with that kite?

11:01   3   A    Yeah.

11:01   4   Q    And what the subject of the kite was about?

11:01   5   A    Yeah.

11:01   6   Q    Can you tell me what it was about.

11:01   7   A    It's about Loeser.  It's about some trouble we were

11:01   8   expecting from the BGF.  It's about Tommy Lamb.

11:01   9   Q    Now, when you say it's about Loeser, it's about Mr. Clark,

11:01  10   the man you killed?

11:01  11   A    Yeah.

11:01  12   Q    And what was this kite telling Bobby Crane, the

 1:01  13   recipient?

11:01  14   A    That everything that could have been done was done.  They

11:02  15   tried to avoid killing him.

11:02  16   Q    Okay.  Turning your attention to page 2, it says in the

11:02  17   middle, after where it says "respect Blinky," it says "Bobby,

11:02  18   we tried everything," I think that's "Every brother here agreed

11:02  19   it needed to be done.  He was completely different from when we

11:02  20   were in L.A."

11:02  21   A    Uh-huh.

11:02  22   Q    Is that referencing the killing of Loeser Clark?

11:02  23   A    Uh-huh.

11:02  24   Q    Now, you also said this kite referred to Tommy Lamb.

 :1:02  25   A    Uh-huh.

CR 02-938(E)-DOC          March 15, 2006                    17

11:02  1  Q    I'm going to direct your attention to the bottom of
11:02  2  page 1, the last paragraph, it says "Things here are fair to
11:02  3  medaling."  I think that's what it says.  "Steve Barns is on
11:02  4  the Federal Protection Program, as is his wife.  We have
11:02  5  someone in TL and hear something soon."  I'm going to underline
11:03  6  that "We have someone in TL and hear something soon."  What
11:03  7  does that mean?
11:03  8  A    It means that we had already sent word to the brotherhood
11:03  9  in the federal system that he had to go.
11:03 10  Q    And when was this kite written?
11:03 11  A    This kite was written in '82, shortly after Clark's
11:03 12  murder.
11:03 13  Q    And so you said that was July 3rd, 1982?
11:03 14  A    I believe so, yeah.
11:03 15  Q    And by that point you had already voted Tommy Lamb into
11:03 16  the hat?
11:03 17  A    Yeah, he was through.
11:03 18  Q    Are you familiar with an individual named Richard
11:03 19  Andreasen?
11:03 20  A    Yeah, yes, ma'am.
11:03 21  Q    And what was his nickname?
11:03 22  A    Rhino.
11:03 23  Q    Why did they call him "Rhino"?
11:03 24  A    Because he was short and squat and thick like a rhino.
11:04 25  Q    And --

CR 02-938(E)-DOC          March 15, 2006                    18

| | | |
|---|---|---|
| 11:04 | 1 | **A**   Are we done with this? |
| 11:04 | 2 | **Q**   Yes, we are.  You can just put that to the side. |
| 11:04 | 3 |    Was Rhino Andreasen someone you voted into the hat? |
| 11:04 | 4 | **A**   Yeah. |
| 11:04 | 5 | **Q**   And when I say "you," does that include the Council and |
| 11:04 | 6 | Commission of the California AB? |
| 11:04 | 7 | **A**   Yes. |
| 11:04 | 8 | **Q**   Why was he voted into the hat? |
| 11:04 | 9 | **A**   He was a rat. |
| 11:04 | 10 | **Q**   Okay.  And what had he done? |
| 11:04 | 11 | **A**   Of course we didn't know this, but he had been an |
| 11:04 | 12 | associate of the brotherhood for quite sometime, had put some |
| 11:04 | 13 | work in with the brotherhood.  We found a document -- it came |
| 11:04 | 14 | to light that he told on two Mexican guys some years before on |
| 11:04 | 15 | a murder robbery. |
| 11:04 | 16 | **Q**   And to your knowledge, was that down in Orange County? |
| 11:04 | 17 | **A**   Yeah, it was Orange County. |
| 11:04 | 18 | **Q**   How did the AB find out about this? |
| 11:04 | 19 | **A**   From some discovery motion on a retrial of something or |
| 11:05 | 20 | other.  They got the information from the police report, and |
| 11:05 | 21 | they gave it to another associate member, an associate that |
| 11:05 | 22 | became a member, Ricky Rose, and Ricky Rose brought it back to |
| 11:05 | 23 | Palm Hall to show the fellows. |
| 11:05 | 24 | **Q**   And did he bring back a transcript of the information -- |
| 11:05 | 25 | **A**   Yes, did he. |

CR 02-938(E)-DOC          March 15, 2006                    19

| | | |
|---|---|---|
| 11:05 | 1 | Q   And that's of the information that Rhino had given up? |
| 11:05 | 2 | A   Yes, yes, he did. |
| 11:05 | 3 | Q   Did you personally see that transcript? |
| 11:05 | 4 | A   Yes, I did. |
| 11:05 | 5 | Q   Who else was with you? |
| 11:05 | 6 | A   Blinky Griffin, that's Robert Griffin; Ronny Slocum, |
| 11:05 | 7 | John Stinson; Rick Terflinger was there, Bobby Smith, maybe |
| 11:05 | 8 | one or two others. |
| 11:05 | 9 | Q   If you can turn to Exhibit 36 and take a look at that. |
| 11:05 | 10 | A   Yes, ma'am. |
| 11:05 | 11 | Q   And you can pull that out of its sleeve.  It's an 18-page |
| 11:06 | 12 | document.  Do you recognize that? |
| 11:06 | 13 | A   Yes. |
| 11:06 | 14 | Q   What is that? |
| 11:06 | 15 | A   This is the police report or the interview that was |
| 11:06 | 16 | conducted with Andreasen after the murder robbery. |
| 11:06 | 17 | Q   And that was brought back to Palm Hall for you to see -- |
| 11:06 | 18 | A   Yeah. |
| 11:06 | 19 | Q   -- in the early '80s? |
| 11:06 | 20 | A   Yeah. |
| 11:06 | 21 | Q   Does this document appear to be the way it was when you |
| 11:06 | 22 | saw it? |
| 11:06 | 23 | A   Yes, similar, yeah. |
| 11:06 | 24 |     MS. FLYNN:  The government would move Exhibit 36 into |
| 11:06 | 25 | evidence. |

CR 02-938(E)-DOC          March 15, 2006                    20

11:06   1          THE COURT:  Any objection by the defense?

11:06   2          MR. FLEMING:  No objection.

11:06   3          THE COURT:  It's received into evidence.

11:06   4          (Plaintiff's Exhibit No. 36 is received into

11:06   5   evidence.)

11:06   6   BY MS. FLYNN:

11:06   7   Q    And to your knowledge, does this document lay out that

11:06   8   Richard Andreasen, a.k.a. "Rhino," had provided information on

11:06   9   a robbery homicide?

11:06  10   A    Yep.

11:07  11   Q    Now, once you decided to vote Richard Andreasen, a.k.a.

11:07  12   "Rhino," into the hat, what did you -- did you all come up with

11:07  13   a plan of how to kill him?

11:07  14   A    Well, yeah.

11:07  15   Q    What was that plan?

11:07  16   A    First of all, this really wasn't necessary -- it wasn't --

11:07  17   a full vote of the Commission or Council wasn't necessary to do

11:07  18   this guy because he wasn't a brother.  He was just a close

11:07  19   associate.  So whether or not this was tip business where a

11:07  20   commission member -- or had to sanction it; do you understand?

11:07  21   Q    Yes, if he had been a full-blown member, the Commission

11:07  22   would have had to sanction it?

11:07  23   A    Absolutely.

11:07  24   Q    Okay.  So you and who else voted him into the hat; do you

11:07  25   remember?

Jane C.S. Rule, CSR No. 9316 - Federal Official Court Reporter

CR 02-938(E)-DOC          March 15, 2006                    21

```
11:07   1   A    Well, it was like this.  Ricky Rose brought the
11:07   2   information back.  I read it, Blinky read it, Robert Griffin,
11:07   3   Mike Thompson, John Stinson, Rick Terflinger.  We felt that's
11:08   4   good enough and -- well, it really wasn't a vote.  It was a
11:08   5   done deal.
11:08   6   Q    And so it became common knowledge in the California AB
11:08   7   that Rhino, Richard Andreasen, was now in the hat?
11:08   8   A    Well, it was common knowledge to us on that tier at that
11:08   9   time.
11:08  10   Q    Okay.  And did you instruct Rick Rose to do anything?
11:08  11   A    Yeah -- I didn't do it, but yes, he was instructed to do
11:08  12   it.
1:08   13   Q    Okay.  And how do you know he was instructed to do
11:08  14   something?
11:08  15   A    I was there when he was instructed.
11:08  16   Q    What was he instructed to do?
11:08  17   A    To stab the shit out of Rhino, kill Rhino when he got back
11:08  18   to Orange County Jail.
11:08  19   Q    So to your knowledge, Richard Andreasen, "Rhino," was in
11:08  20   Orange County Jail and Rick Rose was going down there?
11:08  21   A    Yeah.  He was going back and forth from Chino to Orange
11:08  22   County, back and forth.
11:08  23   Q    What were your thoughts on that plan?
11:08  24   A    I really didn't think that Ricky Rose had the balls to do
1:08   25   it.
```

11:08  1  Q     Why do you say that?

11:09  2  A     Well, because they call Ricky Rose "Ricky," and they call

11:09  3  Rhino "Rhino."  Rhino was "Rhino."  Rhino that guy.  So I

11:09  4  really wasn't sure that Ricky could do it, and he didn't.

11:09  5  Q     Did you ever learn if he attempted?

11:09  6  A     Yeah, he attempted.

11:09  7  Q     What did he do?

11:09  8  A     Oh, he stabbed him a few times.

11:09  9  Q     By "he," you mean Rick Rose stabbed Rhino Andreasen?

11:09  10  A     Yeah, he stabbed him five, six, seven times.

11:09  11  Q     But Andreasen did not die, correct?

11:09  12  A     No.  Andreasen beat the shit out of him.

11:09  13  Q     And this is in Orange County Jail?

11:09  14  A     Yep.

11:09  15  Q     To your knowledge, was Richard Andreasen -- do you know

11:09  16  why Richard Andreasen was in Orange County Jail?

11:09  17  A     No, I ain't got a clue.

11:09  18  Q     To your knowledge, did he get transferred to the federal

11:09  19  system?

11:09  20  A     Yes, he did.

11:09  21  Q     And did the State AB communicate a message to the federal

11:09  22  system about Richard Andreasen?

11:09  23  A     Yes, we did.

11:09  24  Q     And what was that message?

11:09  25  A     We sent word about what was what.

CR 02-938(E)-DOC       March 15, 2006                    23

11:10  1    Q    And how did that message get conveyed?

11:10  2    A    Through Ronny Slocum, from Michelle Scarborough to the

11:10  3    leadership in the federal system.

11:10  4    Q    And the message conveyed was what?

11:10  5    A    That he was a rat, that Rhino was a rat, that he we missed

11:10  6    him in Orange County, and he's got to go.

11:10  7    Q    So the federal system was instructed to kill him if they

11:10  8    got his hands on him?

11:10  9    A    Sure.

11:10  10   Q    Now, in or about -- or in approximately 1983, were you

11:10  11   transferred from Chino to San Quentin?

11:10  12   A    Yes, I was.

'1:10  13   Q    Why were you transferred there?

11:10  14   A    They had finally decided that Palm Hall was not sufficient

11:10  15   to house us, so they moved us all out.

11:10  16   Q    And by "us," you mean the AB?

11:10  17   A    Yeah, the AB and the mafia, the Mexican Mafia.

11:10  18   Q    Okay.  When you got to San Quentin, were there other AB

11:11  19   members there?

11:11  20   A    Yeah.

11:11  21   Q    And were you given information on an individual name

11:11  22   Jeffrey Barnett?

11:11  23   A    Jeffrey Barnett?  I don't think so.

11:11  24   Q    Okay.  You may know him by Monster Barnett?

'1:11  25   A    Oh, Monster Barnett, yeah, yeah.

CR 02-938(E)-DOC          March 15, 2006                    24

```
11:11   1   Q    And did you get information on Monster Barnett?

11:11   2   A    I got something -- I got something that -- it really

11:11   3   wasn't nothing.  He -- he didn't do what he was told to do up

11:11   4   at Folsom, and they wanted to hook him up.

11:11   5   Q    And by "hook him up," you mean put him in the hat?

11:11   6   A    Yeah, yeah, yeah.

11:11   7   Q    Kill him?

11:11   8   A    Yeah.

11:11   9   Q    Now, in or about October of 1985, were you transferred

11:11  10   from San Quentin down to Los Angeles County Jail?

11:11  11   A    Yeah, I think I was, yeah.

11:11  12   Q    And why was that?

11:12  13   A    I had dropped out.  I quit.  I defected from the Aryan

11:12  14   Brotherhood.

11:12  15   Q    And why did you decide to quit the Aryan Brotherhood?

11:12  16   A    That's a long story, but it comes down to this.  I was

11:12  17   supposed to have Rotten Richard killed, and I wouldn't do it.

11:12  18   Q    Okay.  And who is Rotten Richard?

11:12  19   A    His name is Richard Barker.  He's a Hells Angel.

11:12  20   Q    And why was Rotten Richard, Richard Barker, to be killed?

11:12  21   A    Because he didn't give the proper cut of methamphetamine

11:12  22   that he had coming into the institution.

11:12  23   Q    Now, you obviously killed a man before, as you've said

11:12  24   here today.

 1:12  25   A    Yeah, yeah.
```

CR 02-938(E)-DOC        March 15, 2006                          25

11:12   1   Q    Why didn't you kill Rotten Richard?

11:12   2   A    Well, I didn't care nothing about Rotten Richard, then or

11:12   3   now, because he had it coming.  But over the years, I got close

11:12   4   to his family, to his wife and his two little girls, especially

11:12   5   his two little girls.  They used to show me pictures they drew

11:12   6   in school.  "Uncle Smitty, look at this."  I just didn't want

11:12   7   to be the guy that killed their dad, you know?  And I was -- I

11:13   8   was kind of tired of Bobby Crane, the way he was running

11:13   9   things anyway, so I said, well, I'm through with it.

11:13   10  Q    So based on those two reasons, you dropped out of the AB?

11:13   11  A    Yeah.

11:13   12  Q    Now, as a result of your cooperation, have you received

11:13   13  benefits from the government?

11:13   14  A    Well, I've been kept alive.

11:13   15  Q    Okay.  What do you mean by that?

11:13   16  A    I've been housed safely.

11:13   17  Q    In protective custody?

11:13   18  A    Yeah.

11:13   19  Q    And that's as a result of your cooperation?

11:13   20  A    Yeah.

11:13   21  Q    And have you ever been given any money by the government?

11:13   22  A    Yeah.

11:13   23  Q    And would you say it's around a thousand dollars that you

11:13   24  received?

11:13   25  A    Maybe.

CR 02-938(E)-DOC          March 15, 2006                    26

11:13   1   Q    And is that over the 20-year period or so that you've been

11:13   2   cooperating?

11:13   3   A    It's really over the last two or three years, since this

11:13   4   case right here started.

11:13   5   Q    Okay.  And you've gotten about a thousand dollars as a

11:13   6   result?

11:13   7   A    I think so.  I'm not really sure.  It's not too much more

11:14   8   than that.

11:14   9   Q    And you also anticipate that the government will write a

11:14   10  letter to the parole board on your behalf when this case is

11:14   11  over?

11:14   12  A    We haven't talked about it.  I don't care if they do or

1:14    13  don't, frankly.

11:14   14  Q    So you have no expectations, one way or the other?

11:14   15  A    No.

11:14   16  Q    When you were in the AB from about '78 to '84, '85, about

11:14   17  how many members of the California AB were there at a given

11:14   18  time?

11:14   19  A    Maybe 35.

11:14   20  Q    And we talked about this a little bit before, but there

11:14   21  were certain rules and policies that you were to follow during

11:14   22  this -- during this period of time when you were an AB member,

11:14   23  correct?

11:14   24  A    Uh-huh.

1:15    25       If I might add something?

CR 02-938(E)-DOC          March 15, 2006                    27

11:15  1  **Q**   Yes.

11:15  2  **A**   In 1985, when I rolled out, I went through an extensive

11:15  3  debriefing from LASO, and I got a letter from a guy named

11:15  4  Robert Barner.   I think he works for Homeland Security now, but

11:15  5  he was some big dog with the federal government in this

11:15  6  district.   And he gave me immunity, what they call "blanket

11:15  7  immunity" when he's saying I testify to, and I don't know if

11:15  8  that's still in effect or not.

11:15  9  **Q**   So it's your understanding, based on that, that you can't

11:15  10  be prosecuted for things you admit on the stand here?

11:15  11  **A**   I'm really not sure, because it didn't have nothing to do

11:15  12  with this case.   It has something to do with a RICO case that

11:15  13  they were trying to put together back in 1985 that the

11:15  14  government passed on, so I don't know if it's good or not.

11:15  15  **Q**   Okay.   Was one of the policies -- or was there a policy in

11:16  16  the AB about what the AB was to do if one of the brothers was

11:16  17  attacked?

11:16  18  **A**   Well, yeah, sure.

11:16  19  **Q**   What -- what were you to do?

11:16  20  **A**   Attack back.

11:16  21  **Q**   Did the AB have a policy about brothers embarrassing other

11:16  22  brothers?

11:16  23  **A**   Oh, yeah, that was -- that was looked down upon.

11:16  24  **Q**   And what would happen to a brother if they embarrassed

11:16  25  another brother?

```
11:16   1   A     That would depend on what it was, but if it was an act of
11:16   2   cowardice, there wouldn't be no recourse but to terminate him.
11:16   3   If it was something else, he might be given a talking to, you
11:16   4   know.
11:16   5         MS. FLYNN:  Your Honor, may I have just a moment?  I
11:16   6   think I may be about done.
11:16   7         THE COURT:  Certainly.  Why don't you consult with all
11:17   8   counsel for just a moment.
11:17   9         (Attorney discussion held off the record.)
11:18  10         MS. FLYNN:  A couple of follow-up questions.
11:18  11   BY MS. FLYNN:
11:18  12   Q     You mentioned Robert Barner as who you thought was
11:18  13   Department of Homeland Security.  Was he possibly the U.S.
11:18  14   attorney at the time?
11:18  15   A     Yeah, he was some big dog down here.
11:18  16   Q     Okay.  Additionally, you had mentioned that you're not
11:18  17   expecting a letter from the parole board, one way or the
11:18  18   other?
11:18  19   A     No.
11:18  20   Q     Why is that?
11:18  21   A     Because it -- it wouldn't do no good.  I mean, it's just
11:18  22   ridiculous.  It hasn't done nobody no good anyway.  Nobody I
11:18  23   know of that's gotten a letter from the government or from the
11:18  24   Catholic Church or anywhere else, they don't get -- we don't
11:18  25   get out of prison.
```

CR 02-938(E)-DOC          March 15, 2006                    29

| | | |
|---|---|---|
| 11:18 | 1 | Q     So you're not expecting to get out of prison by testifying |
| 11:18 | 2 | here? |
| 11:18 | 3 | A     Ex-AB members do not get out of prison. |
| 11:18 | 4 |       MS. FLYNN:  One moment, your Honor. |
| 11:18 | 5 |       THE COURT:  All right. |
| 11:18 | 6 |       (Attorney discussion held off the record.) |
| 11:19 | 7 | BY MS. FLYNN: |
| 11:19 | 8 | Q     I'm going to jump back to the Lamb murder. |
| 11:19 | 9 |       Was Mr. Lamb a member of the AB -- |
| 11:19 | 10 | A     Yes, he was. |
| 11:19 | 11 | Q     Is that a "yes"? |
| 11:19 | 12 | A     Yes, he was. |
| 11:19 | 13 | Q     Okay.  And that was before he got out of prison and fell |
| 11:19 | 14 | in love with Ms. Sherry? |
| 11:19 | 15 | A     Yes. |
| 11:19 | 16 | Q     Mr. Smith, do you know an individual named Gene Bentley? |
| 11:19 | 17 | A     No. |
| 11:19 | 18 | Q     Were you ever housed with him? |
| 11:19 | 19 | A     Not that I know of. |
| 11:19 | 20 | Q     How about Al Benton; do you know him? |
| 11:19 | 21 | A     No. |
| 11:19 | 22 | Q     Richard Bernard? |
| 11:19 | 23 | A     Nope. |
| 11:19 | 24 | Q     Ronnie Chriswell? |
| 11:19 | 25 | A     No. |

| | | |
|---|---|---|
| 11:19 | 1 | Q    Leroy Crone? |
| 11:19 | 2 | A    No. |
| 11:19 | 3 | Q    Keith Cross? |
| 11:19 | 4 | A    No. |
| 11:19 | 5 | Q    Scott Cupples? |
| 11:19 | 6 | A    No. |
| 11:19 | 7 | Q    Do you know Sidney Griffin? |
| 11:19 | 8 | A    No. |
| 11:19 | 9 | Q    George Harp? |
| 11:20 | 10 | A    No.   I heard of George Harp. |
| 11:20 | 11 | Q    Okay. |
| 11:20 | 12 | A    George Harp went before me.   He was one of the old-timers. |
| 11:20 | 13 | Q    And when you say "one of the old-timers," one of the |
| 11:20 | 14 | California old-timers? |
| 11:20 | 15 | A    Yeah, yeah. |
| 11:20 | 16 | Q    In the AB? |
| 11:20 | 17 | A    Yeah. |
| 11:20 | 18 | Q    Do you know Jimmy Inman? |
| 11:20 | 19 | A    No. |
| 11:20 | 20 | Q    William Kelly? |
| 11:20 | 21 | A    No. |
| 11:20 | 22 | Q    Donny Kennedy? |
| 11:20 | 23 | A    No. |
| 11:20 | 24 | Q    Dewey Lee? |
| 11:20 | 25 | A    Who? |

CR 02-938(E)-DOC          March 15, 2006                    31

| | | | |
|---|---|---|---|
| 11:20 | 1 | Q | Dewey Lee? |
| 11:20 | 2 | A | No. |
| 11:20 | 3 | Q | James McGee? |
| 11:20 | 4 | A | No. |
| 11:20 | 5 | Q | Michael Manby? |
| 11:20 | 6 | A | No. |
| 11:20 | 7 | Q | Do you know Scott Martin? |
| 11:20 | 8 | A | No. |
| 11:20 | 9 | Q | John McGinley? |
| 11:20 | 10 | A | No. |
| 11:20 | 11 | Q | Thomas Miller? |
| 11:20 | 12 | A | No. |
| 1:20 | 13 | Q | Phil Meyers? |
| 11:20 | 14 | A | I don't think so. |
| 11:20 | 15 | Q | Stanley Pearson? |
| 11:20 | 16 | A | No. |
| 11:20 | 17 | Q | Christopher Risk? |
| 11:20 | 18 | A | No. |
| 11:20 | 19 | Q | Do you know Steve Ritter? |
| 11:20 | 20 | A | No. |
| 11:20 | 21 | Q | How about Kevin Roach? |
| 11:21 | 22 | A | No. |
| 11:21 | 23 | Q | Rick Rose? |
| 11:21 | 24 | A | Yeah. |
| 1:21 | 25 | Q | You know him? |

CR 02-938(E)-DOC          March 15, 2006                    32

```
11:21   1           And that was in relation to -- he was an associate of
11:21   2   the AB?
11:21   3   A    Yeah.
11:21   4   Q    Do you know Frank Ruopoli?
11:21   5   A    Yeah.
11:21   6   Q    And how do you know him?
11:21   7   A    He was a -- he had a brother that was in the tip.  Steve
11:21   8   Ruopoli was in the tip.  Frank Ruopoli was somebody that we
11:21   9   were trying to kill, looking to kill.
11:21  10   Q    Frank Ruopoli was?
11:21  11   A    Yeah.
11:21  12   Q    Okay.  And why were you trying to kill him?
11:21  13   A    He snitched on Michelle Crane, Michelle Crane, Flower
11:21  14   Crane, Bobby Crane's wife, for the Jack Malone killing.
11:21  15   Q    And so during your time in the AB, you knew that he was in
11:21  16   the hat?
11:21  17   A    Yeah, yeah.
11:21  18   Q    And during your time, did you ever find Frank Ruopoli?
11:21  19   A    No.
11:22  20   Q    Do you know George Sperb?
11:22  21   A    No.
11:22  22   Q    Jesse Van Meter?
11:22  23   A    No.
11:22  24   Q    Michael Wagner?
11:22  25   A    No.
```

CR 02-938(E)-DOC          March 15, 2006                    33

11:22  1  Q    Glen West?

11:22  2  A    No.

11:22  3  Q    Mark Whitehead?

11:22  4  A    No.

11:22  5  Q    Do you know Ricky Williams?

11:22  6  A    No.

11:22  7  Q    And have you ever been housed in the federal system?

11:22  8  A    No.

11:22  9         MS. FLYNN:  I have nothing further, your Honor.

11:22 10         THE COURT:  Okay.

11:22 11         All right.  Mr. Fleming, Mr. Steward,

11:22 12  cross-examination.

11:22 13         MR. FLEMING:  Mr. White is going to start, your Honor.

11:22 14         THE COURT:  All right, Mr. White.

11:22 15         This would be Mr. White, cross-examination on behalf

11:22 16  of Mr. Bingham.

11:23 17                    **CROSS-EXAMINATION**

11:23 18  BY MR. WHITE:

11:23 19  Q    Mr. Smith, I want to start with your felony convictions

11:23 20  before you became a member of the Aryan Brotherhood, okay?

11:23 21         You told us that you were convicted of a forgery; is

11:23 22  that right?

11:23 23  A    Yes, sir.

11:23 24  Q    You were convicted of -- or you're not sure whether you

11:23 25  were convicted of drug dealing?

CR 02-938(E)-DOC          March 15, 2006                    34

11:23  1  **A**    I had -- I know I was convicted of cultivating, but I

11:23  2  don't know if there was the drug dealing charge with that.   I

11:23  3  know I got convicted of cultivating.

11:23  4  **Q**    You were convicted of a burglary as a juvenile; is that

11:23  5  right?

11:23  6  **A**    Yeah, I went to YA, yeah.

11:24  7  **Q**    And you told us before you were sent to prison you shot

11:24  8  two Hispanics; is that correct?

11:24  9  **A**    Yeah.

11:24 10  **Q**    And that was in an effort by you to steal drugs from them;

11:24 11  is that correct?

11:24 12  **A**    Yes, sir, it was drug robbery.

11:24 13  **Q**    It was what?

11:24 14  **A**    A drug robbery.

11:24 15  **Q**    A drug robbery.

11:24 16         And did you, in fact, steal the drugs from them?

11:24 17  **A**    No, no.  They shot back, so I had to leave.

11:24 18  **Q**    Do you know if you shot -- do you know if you hit

11:24 19  anybody?

11:24 20  **A**    I think I hit one of them.

11:24 21  **Q**    So before you became associated with the Aryan

11:24 22  Brotherhood, you were a thief; is that right?

11:24 23  **A**    Yes, sir.

11:24 24  **Q**    You were a robber; is that right?

11:24 25  **A**    Yes, sir.

CR 02-938(E)-DOC          March 15, 2006                    35

11:24  1   Q    You were someone who was willing to kill someone; is that

11:24  2   right?

11:24  3   A    Yes, sir.

11:24  4   Q    Now, you told us that -- I think the first question asked

11:24  5   of you was whether you had, in fact, ever killed anybody.

11:24  6   A    Yes, sir.

11:24  7   Q    You told us you stabbed Loeser Clark 37 times.

11:24  8   A    Yes, sir.

11:24  9   Q    Now, how many other murders were you either directly or

11:25  10  indirectly responsible for?

11:25  11  A    Maybe -- I don't know, eight, nine maybe.

11:25  12  Q    Maybe eight or nine?

1:25   13  A    Maybe.

11:25  14  Q    So many that you really can't remember; is that it?

11:25  15  A    Well, yeah.  I mean, I can remember -- yeah, I can

11:25  16  remember.

11:25  17  Q    You can remember eight or nine?

11:25  18  A    Yeah, I think about eight or nine.

11:25  19  Q    Okay.

11:25  20  A    We can go through them if you want to.

11:25  21  Q    We can do what?

11:25  22  A    We can go through them one a time if you want to.

11:25  23  Q    Well, maybe we'll do that later.  Right now, let's just

11:25  24  stick with the number.

1:25   25  A    All right.

CR 02-938(E)-DOC          March 15, 2006                    36

| | | |
|---|---|---|
| 11:25 | 1 | **Q**    Okay.  Do you remember testifying in Oregon in 1993, |
| 11:25 | 2 | 1994? |
| 11:25 | 3 | **A**    Yes, I do. |
| 11:25 | 4 | **Q**    And you testified as a prosecution witness; is that |
| 11:25 | 5 | correct? |
| 11:25 | 6 | **A**    Yes, I did. |
| 11:25 | 7 | **Q**    Because by that time you'd left the Aryan Brotherhood; is |
| 11:25 | 8 | that right? |
| 11:25 | 9 | **A**    Yes, I have. |
| 11:25 | 10 | **Q**    Do you remember being asked how many other people you -- |
| 11:25 | 11 | were killed during that testimony? |
| 11:25 | 12 | **A**    No, not really. |
| 11:25 | 13 | **Q**    Do you remember saying that from the time you got into the |
| 11:25 | 14 | Aryan Brotherhood, "to the time I left, I was involved in 21 |
| 11:26 | 15 | murders, directly or indirectly.  I either gave the order, |
| 11:26 | 16 | passed the order along, helped set the person up, get the |
| 11:26 | 17 | person in position to be killed or actually did the killing"; |
| 11:26 | 18 | do you remember testifying to that? |
| 11:26 | 19 | **A**    Yeah, I remember, but I didn't think the number was that |
| 11:26 | 20 | high. |
| 11:26 | 21 | **Q**    So what do you remember?  Do you remember testifying to |
| 11:26 | 22 | that, or do you now remember that you were responsible for 21 |
| 11:26 | 23 | murders? |
| 11:26 | 24 | **A**    All right.  Let's -- let's put it like this.  I was |
| 11:26 | 25 | responsible for murders. |

CR 02-938(E)-DOC            March 15, 2006                    37

11:26  1    Q    And the question is --

11:26  2    A    If you're -- if you're -- if you're good with 21, I am

11:26  3    good with 21.

11:26  4    Q    No, I want to know -- I want to know what the truth is,

11:26  5    Mr. Smith.

11:26  6    A    The truth is -- the truth is from 19 -- from the time I

11:26  7    got in to the time I got out, I don't know how many people that

11:26  8    the AB killed.  They could be up around 21.

11:26  9    Q    You don't know how many people the AB killed or how many

11:26 10    people you were responsible for killing?

11:26 11    A    I know how many people I was responsible for killing.

11:27 12    Q    All right.  And are you telling us that when you were

11:27 13    asked -- when you testified "I was involved in 21 murders,

11:27 14    directly or indirectly," you weren't talking about yourself?

11:27 15    When you said, "I was involved in 21 murders," is that you?

11:27 16    When you say "I," is that you?

11:27 17    A    Uh-huh, that's me, as a member of the Aryan Brotherhood.

11:27 18    Q    Now, you told us on direct examination that you

11:27 19    demonstrated to people in the Aryan Brotherhood a willingness,

11:27 20    a lack of squeamishness to kill people; is that correct?

11:27 21    A    Yes, sir.

11:27 22    Q    And you said they were looking for sociopaths; is that

11:27 23    right?

11:27 24    A    Yeah.

11:27 25    Q    And you fit the bill; is that correct?

CR 02-938(E)-DOC          March 15, 2006                    38

```
11:27   1  A    I guess so.  I'm good with that.  I've never been involved
11:27   2  in much as a sociopath, but I don't know.
11:27   3  Q    Well, you're -- you're a man who in the '80s had no
11:27   4  conscience about killing somebody, correct?
11:27   5  A    I had no conscience about killing somebody that had
11:27   6  stepped on the Aryan Brotherhood's toes.
11:28   7  Q    You were a person in the '80s who really had no morality;
11:28   8  is that correct?
11:28   9  A    Oh, yeah, I had a strong sense of morality.
11:28  10  Q    You did?
11:28  11  A    Yes, sir.  Yes, sir.  It might not have been yours.
11:28  12  Q    Now, at some point you left the Aryan Brotherhood?
11:28  13  A    Yes, sir.
11:28  14  Q    And was that -- you told us '84, '85.  Do you know when it
11:28  15  was?
11:28  16  A    I'm thinking '84.
11:28  17  Q    Well, once you left the Aryan Brotherhood, you became, on
11:28  18  numerous occasions, a witness for the prosecution; is that
11:28  19  right?
11:28  20  A    Yes, sir.
11:28  21  Q    Prior to leaving the Aryan Brotherhood, you testified on
11:28  22  numerous occasions for fellow members of the Aryan
11:29  23  Brotherhood?
11:29  24  A    Yes, sir.
11:29  25  Q    How many times?
```

CR 02-938(E)-DOC          March 15, 2006                    39

11:29  1   A    I don't know.  I can think of one for sure, maybe two.

11:29  2   Q    Oh, just one or two?

11:29  3   A    I think so.

11:29  4   Q    And you told us that when you testified during that one

11:29  5   trial or two trials, you lied; is that correct?

11:29  6   A    Yes, sir.

11:29  7   Q    Now, when you were testifying, I assume you were trying to

11:29  8   convince the jury that you were being truthful?

11:29  9   A    Well, yes, sir.  Yes, sir.

11:29  10  Q    And how would you do that?  If you were lying, how would

11:29  11  you convince a jury or try to convince a jury that you were

11:29  12  being truthful?

11:29  13  A    Well, I would stick with the script that we had wrote and

11:29  14  try to sell whatever we was -- we were trying to sell.

11:29  15  Q    Well, how would you sell it?

11:29  16  A    I would answer your questions according to the script.

11:29  17  Q    You would try to weave in pieces of the truth so that the

11:30  18  lie would become more believable?

11:30  19  A    Well, yeah, that's -- that's -- yeah, that's always a good

11:30  20  ploy.

11:30  21  Q    That -- that -- that is always a good ploy, right?

11:30  22  A    Yeah.  The best place to hide a lie is in between two

11:30  23  truths.

11:30  24  Q    Okay.  All right.  And you know that from your experience

11:30  25  as a witness; is that correct?

CR 02-938(E)-DOC          March 15, 2006                    40

| | | |
|---|---|---|
| 11:30 | 1 | **A**    I know that from my experience as a member of the Aryan |
| 11:30 | 2 | Brotherhood, yeah. |
| 11:30 | 3 | **Q**    Well, you know that as your -- from your experience as |
| 11:30 | 4 | just a human being, correct? |
| 11:30 | 5 | **A**    Yeah, yeah. |
| 11:30 | 6 | **Q**    I mean, whether -- whether it's in prison, whether it's on |
| 11:30 | 7 | the witness stand, whether it's out on the street, the best way |
| 11:30 | 8 | to hide a lie is between two truths; is that right? |
| 11:30 | 9 | **A**    That's what I'm taught. |
| 11:30 | 10 | **Q**    Okay.  That's what you're told? |
| 11:30 | 11 | **A**    That's what I'm told. |
| 11:30 | 12 | **Q**    That's not something you know from your own personal |
| 11:30 | 13 | experience? |
| 11:30 | 14 | **A**    I know that from my own experience. |
| 11:30 | 15 | **Q**    Okay.  I'm sorry, you do know that from your |
| 11:30 | 16 | own experience or you do not know that from your own |
| 11:30 | 17 | experience? |
| 11:30 | 18 | **A**    I know from my own experience. |
| 11:30 | 19 | **Q**    Now, so pre-leaving the Aryan Brotherhood, you were a |
| 11:31 | 20 | lying witness for the Aryan Brotherhood, correct? |
| 11:31 | 21 | **A**    Yes, sir. |
| 11:31 | 22 | **Q**    All right.  Once you left the Aryan Brotherhood, you |
| 11:31 | 23 | became a witness for the prosecution? |
| 11:31 | 24 | **A**    Yes, sir. |
| 11:31 | 25 | **Q**    Okay.  How many times do you think you testified for the |

| | | |
|---|---|---|
| `1:31 | 1 | prosecution? |
| 11:31 | 2 | A    All right.  Let me see.  Not counting grand juries, I |
| 11:31 | 3 | think this is the third time. |
| 11:31 | 4 | Q    And can you tell us what trials you testified in? |
| 11:31 | 5 | A    Curtis Price, People v. Price; People v. Griffin, and this |
| 11:31 | 6 | one today. |
| 11:31 | 7 | Q    So this is the third trial for the prosecution that you've |
| 11:31 | 8 | testified at? |
| 11:31 | 9 | A    Yes, sir. |
| 11:31 | 10 | Q    Did you testify at any trials out of the State of |
| 11:31 | 11 | California? |
| 11:31 | 12 | A    Yes, sir. |
| `1:31 | 13 | Q    Was that Price or Griffin or -- |
| 11:31 | 14 | A    No, that was the -- the Hells Angels. |
| 11:31 | 15 | Q    And -- and where was that at? |
| 11:32 | 16 | A    Oregon. |
| 11:32 | 17 | Q    And how many trials did you testify to up there? |
| 11:32 | 18 | A    Two. |
| 11:32 | 19 | Q    And what were the names of the defendants in those |
| 11:32 | 20 | trials? |
| 11:32 | 21 | A    "Bug-eyed" Bob McClure and Otis "Bug" Garrett. |
| 11:32 | 22 | Q    Now, let's go over the years. |
| 11:32 | 23 |     Do you know when you testified in the Price matter; |
| 11:32 | 24 | that was '85, thereabouts? |
| `1:32 | 25 | A    Yeah.  It wasn't too long after I dropped out. |

CR 02-938(E)-DOC          March 15, 2006                    42

| | | |
|---|---|---|
| 11:32 | 1 | **Q**   And in the Griffin matter, when did you testify? |
| 11:32 | 2 | **A**   Maybe between '85 and '92, probably around '98, maybe. |
| 11:32 | 3 | **Q**   I'm sorry, between -- |
| 11:32 | 4 | **A**   I mean, '89. |
| 11:32 | 5 | **Q**   '89? |
| 11:32 | 6 | And then the Oregon trials, when did you testify in |
| 11:32 | 7 | those? |
| 11:32 | 8 | **A**   Man, I think the first one was in '90.  The second one was |
| 11:32 | 9 | in '94, '95. |
| 11:33 | 10 | **Q**   Now, once you became a witness for the prosecution, did |
| 11:33 | 11 | you become a truthful witness? |
| 11:33 | 12 | **A**   Yeah. |
| 11:33 | 13 | **Q**   So when you testified in the Price case for the |
| 11:33 | 14 | prosecution, you were telling the truth? |
| 11:33 | 15 | **A**   Yeah. |
| 11:33 | 16 | **Q**   When you testified for the prosecution in the Griffin |
| 11:33 | 17 | case, you were telling the truth? |
| 11:33 | 18 | **A**   Yes, sir. |
| 11:33 | 19 | **Q**   When you testified for the prosecution in the McClure |
| 11:33 | 20 | case, you were telling the truth? |
| 11:33 | 21 | **A**   Yes, sir. |
| 11:33 | 22 | **Q**   When you were testifying for the prosecution in the |
| 11:33 | 23 | Garrett case, you were telling the truth? |
| 11:33 | 24 | **A**   Yes, sir. |
| 11:33 | 25 | **Q**   And of course, you're telling the truth today? |

CR 02-938(E)-DOC          March 15, 2006                    43

| | | |
|---|---|---|
| 11:33 | 1 | A    Yes, sir. |
| 11:33 | 2 | Q    Now, do you know a man by the name of Tom Elliot? |
| 11:33 | 3 | A    Yes, sir. |
| 11:33 | 4 | Q    Did you meet Mr. Elliot sometime in the '90s? |
| 11:33 | 5 | A    Yes, sir. |
| 11:33 | 6 | Q    And when you met Mr. Elliot, was he working for the |
| 11:33 | 7 | California Department of Corrections involved -- involved in |
| 11:34 | 8 | the investigation of guards surrounding the Gladiator |
| 11:34 | 9 | circumstance at Corcoran? |
| 11:34 | 10 | A    I don't know. |
| 11:34 | 11 | Q    But you met him -- at the time you met him, he was an |
| 11:34 | 12 | investigator, correct? |
| 11:34 | 13 | A    Yeah, yeah. |
| 11:34 | 14 | Q    And he interviewed you; is that correct? |
| 11:34 | 15 | A    Yeah. |
| 11:34 | 16 | Q    And in fact, he interviewed you during two separate |
| 11:34 | 17 | tape-recorded sessions; is that correct? |
| 11:34 | 18 | A    I remember one. |
| 11:34 | 19 | Q    And during the -- the one that you remember, was there |
| 11:34 | 20 | some discussion about an inmate by the name of Tate? |
| 11:34 | 21 | A    No -- it could have been.  I remember the case. |
| 11:34 | 22 | Q    You remember the case that he was talking to you about? |
| 11:34 | 23 | A    I don't know if we talked about it or not. |
| 11:34 | 24 | Q    Okay. |
| 11:34 | 25 | A    I remember Mr. Elliot as a Hells Angels investigator. |

CR 02-938(E)-DOC          March 15, 2006                    44

11:34   1   Q    Okay.  Now, during one of those tape-recorded interviews

11:35   2   with Mr. Elliot, did you tell Mr. Elliot that, in fact, you had

11:35   3   lied, you had committed perjury in the trial of "Bug-eyed" Bob

11:35   4   McClure and in the trial of Otis Garrett?

11:35   5   A    Yes, I did.

11:35   6   Q    And did you go on to explain to Mr. Elliot how that

11:35   7   perjury came about?

11:35   8   A    I gave him something, yeah.  I gave him some story.  I

11:35   9   can't really remember all of the bits and pieces of it.

11:35  10   Q    Okay.  I'm getting the sense, here, Mr. Smith, that you're

11:35  11   now going to tell us that you lied to Mr. Elliot when you told

11:35  12   him you lied in the Oregon trials; is that a --

11:35  13         MS. FLYNN:  Objection, your Honor.  Irrelevant what

11:35  14   his sense is.

11:35  15         THE COURT:  Well, just --

11:35  16         MR. WHITE:  All right.

11:35  17         THE COURT:  -- reask the question.

11:35  18         MR. WHITE:  Yeah.

11:35  19   BY MR. WHITE:

11:35  20   Q    When you told Mr. Elliot that you committed perjury in

11:35  21   those two Oregon trials --

11:35  22   A    Uh-huh.

11:35  23   Q    -- were you being truthful?

11:35  24   A    No.

1:35   25   Q    You were lying?

Jane C.S. Rule, CSR No. 9316 – Federal Official Court Reporter

CR 02-938(E)-DOC          March 15, 2006                    45

| 11:35 | 1 | **A**    Yes, I was. |

11:35  1   **A**    Yes, I was.

11:36  2          MR. WHITE:  Your Honor, I have a tape --

11:36  3          THE COURT:  Okay.

11:36  4          MR. WHITE:  -- that I would like to play.

11:36  5          THE COURT:  All right.

11:36  6          MR. WHITE:  I have transcripts.  Can we do that at

11:36  7   this point?

11:36  8          THE COURT:  Yes.  I don't know if Counsel has seen the

11:36  9   transcripts, but --

11:36  10         MR. WHITE:  I will show them.

11:36  11         THE COURT:  Okay.

11:36  12         Is this the tape of the conversation between

11:36  13  Mr. Elliot and Mr. Smith?

11:36  14         MR. WHITE:  Yes.

11:36  15         THE COURT:  Okay.

11:36  16         MS. FLYNN:  Your Honor, we are going to object to the

11:36  17  improper impeachment.  He's already admitted he lied.  What's

11:36  18  the purpose of the tape?

11:36  19         MR. WHITE:  Your Honor, it's relevant because when --

11:36  20  I believe when the jury hears this tape, it will become clear

11:36  21  that Mr. Smith is not lying.  So I think the -- the tape is

11:36  22  relevant to whether, in fact, Mr. Smith was lying when he told

11:36  23  Mr. Elliot that he had committed perjury in these two Oregon

11:37  24  cases.

11:37  25         THE COURT:  So let me understand this.  This is a tape

11:37    1  between Mr. Smith and Mr. Elliot?

11:37    2          MR. WHITE:  Yes.

11:37    3          THE COURT:  And on this tape, we're going to allegedly

11:37    4  hear Mr. Smith saying he lied during the McClure testimony that

11:37    5  he gave in the Oregon Hells Angels case?

11:37    6          MR. WHITE:  Yes, and then he is going to go into a lot

11:37    7  of detail about how it came about.

11:37    8          THE COURT:  About how he lied?

11:37    9          MR. WHITE:  Yes.

11:37   10          THE COURT:  And then what's the point?  Help me.

11:37   11          MR. WHITE:  Well, the point is Mr. Smith is now

11:37   12  claiming that when he told Mr. Elliot that he lied in the

11:37   13  Oregon cases, that was a lie.  And I think the detail that

11:37   14  Mr. Smith goes into during the tape will --

11:37   15          THE COURT:  You can play the tape.

11:37   16          Overruled.

11:38   17          MS. FLYNN:  Your Honor, can we -- if Mr. White has

11:38   18  other areas, could we look at this transcript over lunch?

11:38   19  We've never seen it.

11:38   20          THE COURT:  Certainly.

11:38   21          MS. FLYNN:  Can we have a few moments before this

11:38   22  tape and the transcript are introduced?

11:38   23          THE COURT:  Certainly.

11:38   24          Counsel, can you go on in another area so that the

11:38   25  government can see this over the lunch hour?

CR 02-938(E)-DOC          March 15, 2006                    47

| | | |
|---|---|---|
| 11:38 | 1 | MR. WHITE:  Um -- |
| 11:38 | 2 | THE COURT:  Good.  That would be good. |
| 11:38 | 3 | (Laughter.) |
| 11:38 | 4 | MR. WHITE:  Would the Court consider -- consider as an |
| 11:38 | 5 | alternative, because this -- |
| 11:38 | 6 | THE COURT:  I can take the lunch hour right now, send |
| 11:38 | 7 | the jury back -- |
| 11:38 | 8 | MR. WHITE:  That would be great. |
| 11:38 | 9 | THE COURT:  -- in an hour and 15 minutes. |
| 11:38 | 10 | MR. WHITE:  That would be great. |
| 11:38 | 11 | THE COURT:  Why don't we do that.  That way |
| 11:38 | 12 | everybody can work over the lunch hour. |
| 11:38 | 13 | Let's do this.  Yesterday it took a little longer than |
| 11:38 | 14 | we expected, but we gave an hour and a half. |
| 11:38 | 15 | We gave you some forms today to fill out.  Have you |
| 11:38 | 16 | done that? |
| 11:39 | 17 | Well, then, by sending you down, there shouldn't be a |
| 11:39 | 18 | line.  And could we -- can I try an hour and 15 minutes today |
| 11:39 | 19 | and just see how that works?  If it doesn't feel good, we'll go |
| 11:39 | 20 | back to an hour and a half.  And then I can work down to an |
| 11:39 | 21 | hour and then maybe half an hour for lunch instead. |
| 11:39 | 22 | (Laughter.) |
| 11:39 | 23 | THE COURT:  I'm just joking with you, okay? |
| 11:39 | 24 | All right.  Why don't you go to lunch, then, and why |
| 1:39 | 25 | don't we resume -- let's make it simple for me, anyway.  What |

CR 02-938(E)-DOC          March 15, 2006                        48

11:39   1   about 1:00?  That's an hour and 20 minutes.

11:39   2          Now, you're admonished not to discuss this matter

11:39   3   amongst yourselves, nor to form or express any opinion

11:39   4   concerning this case.  Have a nice lunch, and leave the

11:39   5   notepads on the paper -- or on the seat you occupy.

11:39   6          Mr. Smith, if you'd remain for just a moment.

11:39   7          Counsel, I'd like to hear the tape.

11:39   8          (The following proceedings is taken outside the

11:39   9   presence of the jury.)

11:39  10          THE COURT:  And thank you, Counsel.  If I could have a

11:40  11   copy, if Mr. Smith could have a copy, please.

11:40  12          MR. WHITE:  Yes.

11:40  13          THE COURT:  The government could have copies.  Do you

11:40  14   have copies for the government?

11:40  15          MR. WHITE:  Yes.

11:40  16          THE COURT:  Good, for each -- at least two copies,

11:40  17   minimum.

11:40  18          MS. FLYNN:  Thank you.

11:40  19          THE COURT:  Thank you.

11:40  20          And Mr. Harris, I'd like a copy.  And if you'd be kind

11:40  21   enough to give me two copies, in fact.

11:40  22          And I thank you very much.

11:40  23          And Counsel, if you'd be kind enough to play the tape

11:40  24   of Mr. Smith.

1:40   25          (Interruption in the proceedings.)

| | | |
|---|---|---|
| 11:40 | 1 | THE COURT:  And Counsel, will you stipulate that the |
| 11:40 | 2 | court reporter need not take a transcription of this tape? |
| 11:40 | 3 | MR. WHITE:  Yes, your Honor. |
| 11:40 | 4 | THE COURT:  Counsel for the government? |
| 11:40 | 5 | MS. FLYNN:  Yes, your Honor. |
| 11:40 | 6 | THE COURT:  All right.  Play the tape. |
| 11:41 | 7 | MR. WHITE:  I think we may need some amplification. |
| 11:41 | 8 | THE COURT:  Ready? |
| 11:41 | 9 | (Audiotape played.) |
| 12:01 | 10 | MR. WHITE:  Your Honor, excuse me, but the rest of the |
| 12:01 | 11 | tape, which is another five or six pages, is really not |
| 12:01 | 12 | relevant.  They kind of go off into other areas.  So I mean, |
| 12:01 | 13 | I'm happy to discontinue playing it -- |
| 12:01 | 14 | THE COURT:  So in other words, you just want to play |
| 12:01 | 15 | the tape to the point you just clicked off? |
| 12:01 | 16 | MR. WHITE:  Yes. |
| 12:01 | 17 | THE COURT:  All right.  Now, the objection by the |
| 12:01 | 18 | government. |
| 12:01 | 19 | MS. FLYNN:  Your Honor, I guess the government's |
| 12:01 | 20 | confused as to -- |
| 12:02 | 21 | THE COURT:  Why. |
| 12:02 | 22 | MS. FLYNN:  -- what this is doing, yes. |
| 12:02 | 23 | THE COURT:  Yeah.  Obviously, what the defense wants |
| 12:02 | 24 | to show is that if Mr. Smith is stating -- in fact, why don't |
| 12:02 | 25 | we excuse Mr. Smith for a moment.  Why don't we take the |

CR 02-938(E)-DOC          March 15, 2006                    50

```
12:02   1   gentleman to lunch.
12:02   2           Mr. Smith, we'll see you at 1:00.  Have a nice lunch.
12:02   3           I think we can decide this issue outside Mr. Smith's
12:02   4   presence.
12:02   5           (Mr. Smith left the proceedings.)
12:03   6           THE COURT:  All right.  Mr. Smith is no longer
12:03   7   present.
12:03   8           Mr. Smith's statement is that, "I've said I lied in
12:03   9   the conversation with the investigator, but it turns out I
12:03  10   really didn't lie."  And what the defense is obviously trying
12:03  11   to show is the quality of that lie, the fact that Mr. Smith
12:03  12   can lie in detail much more just -- than just the simple
2:03   13   statement, "I lied, but I really didn't lie," which gives no
12:03  14   depth to it.
12:03  15           And what the defense obviously wants to argue is that
12:04  16   if he's capable of lying to that extent, you know, to the
12:04  17   investigator, you know, which version are you to believe.
12:04  18           Now, in the area of mass communications back in the
12:04  19   1970s, or when I was practicing, we didn't have all of this
12:04  20   audio, but it seems tentatively that you should be allowed to
12:04  21   do that because it shows the depth and the quality of that
12:04  22   lie.
12:04  23           But let me hear from the government.
12:04  24           Do you want to think about it over lunch and come back
12:04  25   at 12:45?  Right now, let's --
```

CR 02-938(E)-DOC          March 15, 2006                    51

| | | |
|---|---|---|
| 12:04 | 1 | MS. FLYNN:  Yes, your Honor. |
| 12:04 | 2 | THE COURT:  Okay. |
| 12:04 | 3 | MS. FLYNN:  If we can come back at -- |
| 12:04 | 4 | THE COURT:  Yeah, I'm going to leave it this way. |
| 12:04 | 5 | Tentatively, the ruling is you can play the tape.  It shows the |
| 12:04 | 6 | depth and the quality of that lie.  It's not just a simple |
| 12:04 | 7 | statement that a witness can get on the stand and say "I didn't |
| 12:04 | 8 | lie one time.  I lied" -- I'm sorry -- "I lied at one time. |
| 12:04 | 9 | I'm not lying now."  You know, "Believe me." |
| 12:04 | 10 | You have a lot of intricacies to that lie.  It shows |
| 12:04 | 11 | the quality of that lie, or non-lie.  And therefore, |
| 12:05 | 12 | tentatively, you're entitled to play the tape, but you're |
| 12:05 | 13 | entitled to play the tape, I think, up to page -- |
| 12:05 | 14 | And help me, Counsel, where did you end? |
| 12:05 | 15 | MR. WHITE:  I -- I -- actually, I would -- I stopped |
| 12:05 | 16 | it -- I'll tell the Court exactly where I would propose to -- I |
| 12:05 | 17 | would propose to stop the tape on page 10, after Mr. Smith |
| 12:05 | 18 | talks about the chess game, or the end game, and "We got to |
| 12:05 | 19 | know when" -- |
| 12:05 | 20 | THE COURT:  All right.  Now, just a moment.  Let me |
| 12:05 | 21 | turn back to the government. |
| 12:05 | 22 | If I allowed them to do this, you know, if that |
| 12:05 | 23 | becomes a final ruling, the problem is he doesn't lie about |
| 12:05 | 24 | many things.  Now, the other side of that is you may want |
| 12:05 | 25 | the -- the entire tape, and if you want the entire tape, then |

CR 02-938(E)-DOC          March 15, 2006                    52

| | | |
|---|---|---|
| '2:05 | 1 | I'm going to grant that.  My preference is to give you each |
| 12:05 | 2 | the entire tape, so it doesn't leave it imbalanced in any way. |
| 12:05 | 3 | So tentatively, I'm going to allow the entire tape to |
| 12:05 | 4 | be played so there's a fair balance for the jury to hear both |
| 12:06 | 5 | the lie and the non-lies, okay? |
| 12:06 | 6 | MR. WHITE:  Your Honor, I have a second tape -- |
| 12:06 | 7 | THE COURT:  Okay. |
| 12:06 | 8 | MR. WHITE:  -- that I also think is relevant. |
| 12:06 | 9 | THE COURT:  You want to play it?  Put it on. |
| 12:06 | 10 | MR. WHITE:  Yes. |
| 12:06 | 11 | THE COURT:  Okay.  Now, that's a tentative ruling, and |
| 12:06 | 12 | I'll meet you all in about 35 minutes for that.  But let me |
| '2:06 | 13 | hear the second tape now.  Where's my transcripts for the |
| 12:06 | 14 | second tape? |
| 12:06 | 15 | MR. WHITE:  Yes, I've got them. |
| 12:06 | 16 | Your Honor, this transcript is -- is 27 pages long. |
| 12:06 | 17 | However -- |
| 12:06 | 18 | THE COURT:  Okay. |
| 12:06 | 19 | MR. WHITE:  -- it doesn't begin the relevant portion |
| 12:06 | 20 | that I would propose to play.  It doesn't begin until, I |
| 12:06 | 21 | believe, page 17.  I've got to -- |
| 12:07 | 22 | THE COURT:  Okay. |
| 12:07 | 23 | MR. WHITE:  -- check my notes. |
| 12:07 | 24 | THE COURT:  Now, here's what we're going to do.  This |
| 12:07 | 25 | tape will not be played at this time.  You know, there are no |

Jane C.S. Rule, CSR No. 9316 – Federal Official Court Reporter

CR 02-938(E)-DOC          March 15, 2006                    53

| | | |
|---|---|---|
| 12:07 | 1 | surprises, okay?  That's why we're here during the evening |
| 12:07 | 2 | hours.  And no one alerted me, so we're moving on. |
| 12:07 | 3 | MR. WHITE:  I understand. |
| 12:07 | 4 | THE COURT:  And that will teach you a real quick |
| 12:07 | 5 | lesson about, "Well, did the Judge know the night before?" |
| 12:07 | 6 | That's why we're staying here. |
| 12:07 | 7 | MR. WHITE:  I just have a question. |
| 12:07 | 8 | THE COURT:  You are not going to be playing that type. |
| 12:07 | 9 | MR. WHITE:  That -- that's fine. |
| 12:07 | 10 | Is this the kind of situation that we could go in |
| 12:07 | 11 | camera to the Court with, because obviously this is something |
| 12:07 | 12 | the government knew nothing about, and we're not -- |
| 12:07 | 13 | THE COURT:  You are not required to -- |
| 12:07 | 14 | MR. WHITE:  Yes, and it would put us at a real -- |
| 12:07 | 15 | THE COURT:  Certainly. |
| 12:07 | 16 | MR. WHITE:  -- technical disadvantage. |
| 12:07 | 17 | THE COURT:  Certainly. |
| 12:07 | 18 | MR. WHITE:  So it's something we could -- |
| 12:07 | 19 | THE COURT:  You could do this in camera.  You could do |
| 12:07 | 20 | this the night before.  That's why we were here last evening. |
| 12:07 | 21 | MR. WHITE:  All right.  That was my fault. |
| 12:07 | 22 | THE COURT:  Now, eventually, you may be able to play |
| 12:07 | 23 | that tape.  I'll keep Mr. Smith on call. |
| 12:07 | 24 | MR. WHITE:  All right. |
| 12:07 | 25 | THE COURT:  But I'm bringing that jury back at -- the |

CR 02-938(E)-DOC            March 15, 2006                    54

12:07  1   big hand is on the 1 and the -- or on the 12, and the little

12:08  2   hand is going to on the 1; that's 1:00, okay?

12:08  3          So you're not precluded forever.  You're just

12:08  4   precluded now.  And therefore, if we want to recall Mr. Smith

12:08  5   later on, we'll -- we'll do that.  And that's what we'll listen

12:08  6   to this evening, we'll listen to the 27-page tape this evening

12:08  7   in detail.  That way the rulings will be fair for both sides;

12:08  8   no one's getting pushed into time constraints.

12:08  9          Now, as far as the other tape, if up to page 10 is

12:08 10   going to be played, the government has the Court's ruling that

12:08 11   the entire tape can be played.  So if you two agree to that,

12:08 12   there's no reason to be back here at 12:45.  If you don't

12:08 13   agree to that -- well, why don't you talk about it, decide how

12:08 14   much food you want to have.  Come around and talk to them

12:08 15   informally.

12:08 16          MR. WHITE:  You want me to talk to --

12:08 17          THE COURT:  Yeah, because I don't believe in lunches,

12:08 18   so -- how much you eat is not my concern.  The jury is going to

12:08 19   be back in session at 1:00.  I just need to know whether to

12:09 20   bring you back at 12:45 or to bring you back at 1:00.

12:09 21          (Attorney discussion held off the record.)

12:09 22          MR. WHITE:  Your Honor, what we've decided is --

12:09 23          THE COURT:  You and the government?

12:09 24          MR. WHITE:  Yes.

2:09 25          -- to propose to the Court --

CR 02-938(E)-DOC          March 15, 2006                    55

```
12:09   1              THE COURT:  Cooperation.

12:09   2              MR. WHITE:  See, the Court didn't allow me to finish

12:09   3   that sentence.

12:09   4              THE COURT:  All right.

12:09   5              (Laughter.)

12:09   6              MR. WHITE:  What we decided to propose to the Court

12:09   7   was that we -- that we will leave it up to the government as to

12:09   8   whether or not they want the entire tape played or they want to

12:09   9   stop during -- on page 10.

12:09  10              THE COURT:  Okay.  And that will be the government's

12:09  11   choice.  Just inform them before we start the session, okay?

12:09  12              MR. EMMICK:  We just need to read it.

12:09  13              THE COURT:  Then, do you want to meet at 12:45 or is

12:09  14   1:00 sufficient for all of you?

12:09  15              MR. WHITE:  I think 1:00 is agreed on.

12:09  16              MS. FLYNN:  1:00.

12:09  17              THE COURT:  Now, gentlemen, you'll be seated at 1:00.

12:09  18   The doors will open at 1:00.  Your counsel, I'm sure, will be

12:09  19   here, and so will the government.  The jury will enter the

12:10  20   courtroom at 1:00.  Have a nice recess.

12:10  21              (Recess.)

11:15  22   /

11:15  23   /

11:15  24   /

 1:15  25
```

CR 02-938(E)-DOC          March 15, 2006                              56

11:15   1                        _CERTIFICATE_

11:15   2

11:15   3   I hereby certify that pursuant to Section 753, Title 28 of the

11:15   4   United States Code, the foregoing is a true and correct

11:15   5   transcript of the stenographically reported proceedings held in

11:15   6   the above-entitled matter and that the transcript page format

11:15   7   is in conformance with the regulations of the Judicial

11:15   8   Conference of the United States.

11:15   9

11:15  10

11:15  11   _____        ____3/16/06____
11:15       JANE C.S. Rule, CSR NO. 9316         Date
11:15  12   Federal Official Court Reporter
11:15
 1:15  13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25