UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) No. CR 02-938(E)-DOC |
| BARRY BYRON MILLS; TYLER DAVIS BINGHAM; CHRISTOPHER OVERTON GIBSON; EDGAR WESLEY HEVLE, | ) DAY 62 - VOLUME I |
| | ) DEATH PENALTY PHASE |
| Defendants. | ) |

**ORIGINAL**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Monday, August 28, 2006

JANE C.S. RULE, CSR No. 9316
Federal Court Reporter
UNITED STATES DISTRICT COURT
411 West Fourth Street, Room 1053
Santa Ana, California 92701-4516
(714) 558-7755

Reporter's Reference:  06-08-28 ABD62V1

SACR 02-938(E)-DOC          August 28, 2006                          2

1   APPEARANCES:

2

3   On behalf of the Plaintiff UNITED STATES OF AMERICA:

4           OFFICE OF THE UNITED STATES ATTORNEY
            BY:  STEPHEN WOLFE
5                MICHAEL W. EMMICK
                 JOEY L. BLANCH
6                Attorneys at Law
            312 North Spring Street
7           Los Angeles, California 90012
            (213) 894-0511
8
                        - AND -
9
            OFFICE OF THE UNITED STATES ATTORNEY
10          BY:  TERRI K. FLYNN
                 Attorney at Law
11          411 West 4th Street
            8th Floor
12          Santa Ana, California 92701
            (714) 338-3592
13

14   On behalf of the Defendant BARRY BYRON MILLS:

15          LAW OFFICES OF H. DEAN STEWARD
            BY:  H. DEAN STEWARD
16               Attorney at Law
            107 Avenida Miramar
17          Suite C
            San Clemente, California 92672
18          (949) 481-4900

19                      - AND -

20          LAW OFFICES OF MARK F. FLEMING
            BY:  MARK F. FLEMING
21               Attorney at Law
            433 "G" Street
22          Suite 202
            San Diego, CA 92101
23          (619) 652-9970

24

25

SACR 02-938(E)-DOC          August 28, 2006                    3

```
 1   APPEARANCES (Continued):

 2

 3   On behalf of the Defendant TYLER DAVIS BINGHAM:

 4           LAW OFFICES OF MICHAEL V. WHITE
             BY:  MICHAEL V. WHITE
 5                Attorney at Law
             1717 Fourth Street
 6           Third Floor
             Santa Monica, California 90401
 7           (310) 576-6242

 8                      - AND -

 9           STEWART & HARRIS
             ATTORNEYS AT LAW
10           BY:  WILLIAM S. HARRIS
                  Attorney at Law
11           1499 Huntington Drive
             Suite 403
12           South Pasadena, California 91030
             (626)441-9300

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

# I N D E X

4

**JURY TRIAL - DAY 62, VOLUME I (DEATH PENALTY PHASE)**

5

6

**OPENING STATEMENTS**

7

<u>Page</u>

8  By Ms. Blanche                                        25

9  By Mr. Steward                                        38

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 13:01 | 1 | **SANTA ANA, CALIFORNIA, MONDAY, AUGUST 28, 2006** |
| 13:01 | 2 | **DAY 62 - VOLUME I** |
| 13:01 | 3 | **(1:06 p.m.)** |
| 13:01 | 4 | (The following proceedings is taken outside the |
| 13:01 | 5 | presence of the jury.) |
| 13:01 | 6 | THE COURT:  All right.  We are on the record. |
| 13:06 | 7 | First of all, Mr. Mills is present. |
| 13:07 | 8 | Good afternoon. |
| 13:07 | 9 | THE DEFENDANT:  Good afternoon. |
| 13:07 | 10 | THE COURT:  Mr. Fleming and Mr. Steward are present. |
| 13:07 | 11 | Good afternoon. |
| 13:07 | 12 | MR. FLEMING:  Good afternoon. |
| 13:07 | 13 | MR. STEWARD:  Good afternoon, your Honor. |
| 13:07 | 14 | THE COURT:  Mr. Bingham is present. |
| 13:07 | 15 | Good afternoon. |
| 13:07 | 16 | DEFENDANT BINGHAM:  Good afternoon. |
| 13:07 | 17 | THE COURT:  Mr. White and Mr. Harris are present. |
| 13:07 | 18 | Good afternoon. |
| 13:07 | 19 | MR. HARRIS:  Good afternoon. |
| 13:07 | 20 | MR. WHITE:  Good afternoon. |
| 13:07 | 21 | THE COURT:  Ms. Blanch is present. |
| 13:07 | 22 | Good afternoon. |
| 13:07 | 23 | Ms. Flynn is present. |
| 13:07 | 24 | Good afternoon. |
| 13:07 | 25 | MS. FLYNN:  Good afternoon. |

| | | |
|---|---|---|
| 13:07 | 1 | THE COURT:  Mr. Wolfe is present. |
| 13:07 | 2 | Good afternoon. |
| 13:07 | 3 | Mr. Emmick is present. |
| 13:07 | 4 | MR. EMMICK:  Good afternoon. |
| 13:07 | 5 | THE COURT:  While we were in recess, Kristee received |
| 13:07 | 6 | a call from Juror Number 2, and remember, that's the gentleman |
| 13:07 | 7 | who had made plane reservations, and we asked him to change |
| 13:07 | 8 | them.  He was very concerned and called Kristee the Friday |
| 13:07 | 9 | before, I think, about eight days ago -- I'm losing track of |
| 13:07 | 10 | time -- and said that the airlines wouldn't change.  He had |
| 13:07 | 11 | done everything possible.  So I had Kristee communicate back to |
| 13:07 | 12 | him to just not be concerned, that we'll make that work, to go |
| 13:07 | 13 | ahead and keep his plane reservation at 2:20 rather than -- I |
| 13:08 | 14 | mean at 12:00 or 12:20. |
| 13:08 | 15 | In addition to that, I just got a note from Juror |
| 13:08 | 16 | Number. |
| 13:08 | 17 | Kristee, 47? |
| 13:08 | 18 | THE CLERK:  (No audible response.) |
| 13:08 | 19 | THE COURT:  Kristee, what juror number is that? |
| 13:08 | 20 | THE CLERK:  He is Alternate 7. |
| 13:08 | 21 | THE COURT:  Oh, Alternate 7, and Alternate 7 is |
| 13:08 | 22 | writing this note.  "I've got an out-of-town funeral Friday, |
| 13:08 | 23 | September 1st."  So it appears to me that we've got a juror who |
| 13:08 | 24 | has to leave at 12:00 noon, or thereabouts, for a plane flight |
| 13:08 | 25 | on Friday, and we have an Alternate Number 7.  We'll just have |

SACR 02-938(E)-DOC         August 28, 2006                    7

| | | |
|---|---|---|
| 13:08 | 1 | to work around that, but everybody is aware of it. |
| 13:08 | 2 | Thank you. |
| 13:12 | 3 | And counsel, we were missing two jurors.  Number 2 has |
| 13:12 | 4 | shown up.  Number 11 is the juror who is not here at the |
| 13:12 | 5 | present time.  That's your number 236.  So Kristee is going to |
| 13:12 | 6 | try to place a call. |
| 13:16 | 7 | Counsel, on the last occasion we had that one juror |
| 13:16 | 8 | that had mistaken 1:00 -- 1:30 for 1:00, so my suggestion is to |
| 13:16 | 9 | wait until 1:30 before being too concerned. |
| 13:16 | 10 | Juror Number 11, 236, yeah. |
| 13:35 | 11 | (Recess.) |
| 13:35 | 12 | (The following proceedings is taken outside the |
| 13:35 | 13 | presence of the jury.) |
| 13:35 | 14 | THE COURT:  All right.  We are going to go back on the |
| 13:35 | 15 | record. |
| 13:35 | 16 | There were two jurors that were not here, Juror |
| 13:35 | 17 | Number 2, which you would know as Juror Number 197, and Juror |
| 13:35 | 18 | Number 11, who you would know as Juror Number 236.  Juror |
| 13:35 | 19 | Number 2 is here.  He is the gentleman who tried to change his |
| 13:35 | 20 | plane flight reservations over Labor Day.  Juror Number 236 is |
| 13:35 | 21 | the juror who is not here.  We've been able to obtain both a |
| 13:35 | 22 | home and a work number, but the phone just rings.  So Kristee |
| 13:35 | 23 | and Lisa are going to try one other option of trying to get |
| 13:35 | 24 | ahold of this person through the employer, and I just suggest |
| 13:36 | 25 | we give them 5 or 10 minutes to finalize that before we decide |

SACR 02-938(E)-DOC          August 28, 2006                    8

| | | |
|---|---|---|
| 13:36 | 1 | what course of -- what course to take. |
| 13:52 | 2 | (Recess.) |
| 13:52 | 3 | (The following proceedings is taken outside the |
| 13:52 | 4 | presence of the jury.) |
| 13:52 | 5 | THE COURT:  Counsel, we are back on the record. |
| 13:53 | 6 | The clerks were able to find the missing juror.  That |
| 13:53 | 7 | was the juror who just phoned in, and she said she'd be here in |
| 13:53 | 8 | about 20 minutes.  So why don't we meet back at quarter after |
| 13:53 | 9 | the hour; is that acceptable?  There is no reason for you to |
| 13:53 | 10 | sit here, and there is no reason to excuse the juror.  She's |
| 13:53 | 11 | been with us 7 months, so we can certainly spare an hour, since |
| 13:53 | 12 | she's given us 7 months of her time. |
| 13:53 | 13 | All right.  2:15. |
| 14:21 | 14 | (Recess.) |
| 14:21 | 15 | (The following proceedings is taken outside the |
| 14:21 | 16 | presence of the jury.) |
| 14:21 | 17 | THE COURT:  All right.  Then we are back in session. |
| 14:21 | 18 | All counsel are present, the defendants are present, and the |
| 14:21 | 19 | government is present. |
| 14:21 | 20 | I'm going to ask Lisa if you'd summon the jury, |
| 14:21 | 21 | please. |
| 14:24 | 22 | (The following proceedings is taken in the presence of |
| 14:24 | 23 | the jury.) |
| 14:24 | 24 | THE COURT:  The jury is present.  The alternates are |
| 4:24 | 25 | present.  All counsel are present on behalf of the government. |

14:24   1   Defense counsel is present.  Mr. Mills and Mr. Bingham are also

14:24   2   present.

14:24   3        "Members of the jury, you have unanimously found

14:24   4   Defendants Barry Mills and Tyler Bingham guilty of the

14:24   5   Counts 6 and 7, which charged murder in aid of racketeering as

14:24   6   to Frank Joyner and Abdul Salaam respectively.  Each of those

14:24   7   two counts is a capital count, by which I mean that the death

14:24   8   penalty is a possible punishment for the offense.

14:24   9        "Thus, we are about to begin the penalty phase of this

14:24   10  trial, where you must now consider separately with regard to

14:24   11  each defendant and each count whether imposition of a sentence

14:25   12  of death is the appropriate sentence, or whether the defendants

14:25   13  should be sentenced to life imprisonment without the

14:25   14  possibility of release.  The law leaves this decision

14:25   15  exclusively to you, the jury.  If you determine that defendants

14:25   16  should be sentenced to death, or to life imprisonment without

14:25   17  the possibility of release, the Court is required to impose

14:25   18  that sentence.  There is no parole in the federal system.

14:25   19       "The penalty phase itself amounts to a second trial,

14:25   20  and in many ways is like the trial you have just completed on

14:25   21  the issue of guilt, although now the sole issue for your

14:25   22  consideration is punishment."

14:25   23       In front of you, by the way, you should have a copy,

14:25   24  each one of you, of the instructions that I am going to read to

14:25   25  you.  And these are -- these are pre-instructions, if you will.

Jane C.S. Rule, CSR No. 9316 – Federal Official Court Reporter

14:25    1   At the end of the presentation of both sides, I'll read

14:25    2   additional instructions to you.  But do all of you have that?

14:25    3   I just want to make sure.  We put that on the seats this

14:26    4   morning.  It should be a packet that's labeled the "Court's

14:26    5   Preliminary Jury Instruction."

14:26    6          (No audible response.)

14:26    7          THE COURT:  Okay.  "You should note that, in making

14:26    8   all of the determinations you are required to make in this

14:26    9   phase of the trial, you may consider any evidence that was

14:26   10   presented during the guilt phase of the trial, as well as

14:26   11   information that is presented at this penalty phase of the

14:26   12   trial.  The term 'information' is sometimes used to describe

14:26   13   what is presented to you in these proceedings.  Understand that

14:26   14   for our purposes, the terms 'evidence' and 'information' have

14:26   15   the same meaning.  The term 'information' is used because some

14:26   16   of the rules of evidence applicable at the guilt phase of the

14:26   17   case do not apply now.  The parties are given greater latitude

14:26   18   in what may be presented for your consideration.  During the

14:26   19   penalty phase there will be opening statements, there will be

14:27   20   closing arguments and instructions from the Court.  Please

14:27   21   understand that what I am about to tell you is not a substitute

14:27   22   for my closing instructions.

14:27   23          "Obviously, it's impossible for me to overstate the

14:27   24   importance of the decision before you or the careful and

.4:27   25   thorough consideration you must give to this matter.  And I

14:27  1   remind you that at the time you were selected as jurors, each

14:27  2   of you assured me that if this case required a capital

14:27  3   punishment hearing, you would follow the law as I told you it

14:27  4   applied.  It is imperative that you do that.

14:27  5            "Although Congress has left to juries the decision

14:27  6   whether someone in defendants' situation should be sentenced to

14:27  7   death or imprisonment, it has specifically narrowed and

14:27  8   channeled your discretion by requiring certain findings to be

14:27  9   made before the death penalty is even considered.  A sentence

14:27 10   of death on a particular capital count may be considered if,

14:28 11   but only if, you have made the following three findings

14:28 12   unanimously and beyond a reasonable doubt with regard to that

14:28 13   count.

14:28 14            "First, you must unanimously and beyond a reasonable

14:28 15   doubt that the defendants were 18 years of age or older at the

14:28 16   time of the offenses.  Here, by stipulation, all counsel have

14:28 17   agreed that the defendants were over 18 at the time of the

14:28 18   offenses.

14:28 19            "Second, for each defendant and for each Counts 6 and

14:28 20   7, you must find unanimously and beyond a reasonable doubt that

14:28 21   the defendant's actions and his intent satisfied at least one

14:28 22   of the following two 'threshold eligibility factors.'"

14:28 23            And let me say that again, "two 'threshold

14:28 24   eligibility factors':

14:28 25            "1.  That the defendant intentionally participated in

14:28  1   an act, contemplating that the life of a person would be taken

14:29  2   or intending that lethal force would be used in connection with

14:29  3   a person, other than one of the participants in the offense,

14:29  4   and the victim of the offense died as a direct result of the

14:29  5   act; or

14:29  6        "2.  That the defendant intentionally and specifically

14:29  7   engaged in an act of violence, knowing that the act created a

14:29  8   grave risk of death to a person, other than one of the

14:29  9   participants in the offense, such that participation in the act

14:29  10  constituted a reckless disregard for human life, and the victim

14:29  11  of the offense died as a direct result of the act.

14:29  12       "At this point, let me pause to define for you two

14:29  13  terms which you will hear throughout this phase of the trial:

14:29  14  'aggravating factors' and 'mitigating factors.'  In general,

14:29  15  these factors relate to the circumstances of the crime or the

14:30  16  personal traits, character or background of the defendants.

14:30  17  The word 'aggravate' means to make worse or more offensive or

14:30  18  to intensify.  The word 'mitigate' means to make less severe or

14:30  19  to moderate.  An aggravating factor, then, is a fact or

14:30  20  circumstance that would tend to support imposition of the death

14:30  21  penalty.  A mitigating factor is any aspect of the defendant's

14:30  22  character or background, any circumstance of the offenses or

14:30  23  any other relevant fact or circumstance that might indicate

14:30  24  that the defendant should not be sentenced to death.

14:30  25       "The third finding you must make unanimously and

SACR 02-938(E)-DOC          August 28, 2006          13

```
14:30   1   beyond a reasonable doubt before you may consider imposition of
14:30   2   a death sentence is that the government has proved the
14:30   3   existence of at least one 'statutory aggravating factor.'  A
14:31   4   'statutory aggravating factor' is one which is specifically set
14:31   5   forth in the death penalty statute and which has been
14:31   6   explicitly identified by the government for consideration in
14:31   7   this case.
14:31   8        "As to Defendant Mills, the government alleges the
14:31   9   following statutory aggravating factors with regard to each of
14:31  10   the capital counts:
14:31  11        "One:  The death, or injury resulting in death,
14:31  12   occurred during the commission or attempted commission of an
14:31  13   offense under 18 USC Section 1118; namely, murder by a federal
14:31  14   prisoner serving a life term.
14:31  15        "Two:  Defendant committed the offenses charged after
14:31  16   having been previously convicted of a federal or state offense
14:31  17   punishable by a term of imprisonment of more than one year,
14:31  18   involving the use or attempted or threatened use of a firearm
14:31  19   against another person.
14:31  20        "Three:  The defendant committed the offense charged
14:31  21   after having been previously convicted of another federal or
14:32  22   state offense resulting in the death of a person, for which a
14:32  23   sentence of life imprisonment or death was authorized by
14:32  24   statute.
14:32  25        "Four:  The defendant, in the commission of the
```

14:32  1  offenses charged in Counts 6 and 7, knowingly created a grave

14:32  2  risk of death to one or more persons in addition to the victims

14:32  3  of the offenses.

14:32  4          "Five:  The defendant committed the offenses charged

14:32  5  in Counts 6 and 7 after substantial planning and premeditation

14:32  6  to cause the death of another person.

14:32  7          "Six:  The defendant intentionally killed or attempted

14:32  8  to kill more than one person in a single criminal episode.

14:32  9          "As to Defendant Bingham, the government alleges the

14:32  10  following statutory aggravating factors with regard to each of

14:32  11  the capital counts:

14:32  12          "One:  The defendant committed the offenses charged

14:32  13  after having been previously convicted of a federal or state

14:32  14  offense punishable by a term of imprisonment of more than one

14:33  15  year, involving the use or attempted or threatened use of a

14:33  16  firearm against another person.

14:33  17          "Two:  The defendant, in the commission of the

14:33  18  offenses charged in Counts 6 and 7, knowingly created a grave

14:33  19  risk of death to one or more persons in addition to the victims

14:33  20  of the offenses.

14:33  21          "Three:  The defendant committed the offenses charged

14:33  22  in Counts 6 and 7 after substantial planning and premeditation

14:33  23  to cause the death of a person.

14:33  24          "Four:  The defendant intentionally killed or

14:33  25  attempted to kill more than one person in a single criminal

14:33  1  episode.

14:33  2          "If, after fair and impartial consideration of all of

14:33  3  the evidence in this case, you unanimously find beyond a

14:33  4  reasonable doubt that the government has proven that defendants

14:33  5  were 18 years of age at the time of the offenses, and that at

14:34  6  least one threshold eligibility factor and at least one

14:34  7  statutory aggravating factor exists with regard to a particular

14:34  8  defendant and capital count, you will then proceed to the

14:34  9  balancing or weighing stage of your analysis.

14:34  10          "If, however, you find with regard to a particular

14:34  11  defendant and capital count that the government has not proven

14:34  12  beyond a reasonable doubt that defendants were 18 years of age

14:34  13  at the time of the offenses, and that at least one threshold

14:34  14  eligibility factor and one statutory aggravating factor has

14:34  15  been proved beyond a reasonable doubt, your deliberations will

14:34  16  be over as to that defendant and that count, and the Court will

14:34  17  impose on defendant a sentence of life imprisonment without the

14:34  18  possibility of release for that defendant and that count.

14:34  19          "If, but only if, you find unanimously and beyond a

14:34  20  reasonable doubt that the government has proven that the

14:34  21  defendants were 18 years of age at the time of the offenses,

14:35  22  and the existence of at least one threshold eligibility factor

14:35  23  and at least one statutory aggravating factor, you will proceed

14:35  24  to the balancing stage of the analysis.  At that time, you will

14:35  25  consider whether you unanimously find that the government has

14:35  1    proven beyond a reasonable doubt the existence of any

14:35  2    'non-statutory aggravating factors,' which are those

14:35  3    specifically set out in the death penalty statute but which

14:35  4    have been identified" -- strike that -- "which are those not

14:35  5    specifically set out in the death penalty statute but which

14:35  6    have been identified by the government for consideration in

14:35  7    this case.

14:35  8              "As to Defendant Mills, the government alleged the

14:35  9    following non-statutory aggravating factors with regard to each

14:35  10   of the capital counts:

14:35  11             "1.  Future Dangerousness of the Defendant.

14:35  12             "The defendant is likely to commit criminal acts of

14:35  13   violence in the future that would constitute a continuing and

14:36  14   serious threat to the lives and safety of others, as evidenced

14:36  15   by at least one or more of the following:

14:36  16             "a.  Continuing Pattern of Violence.

14:36  17             "The defendant has engaged in a continuing pattern of

14:36  18   violence, attempted violence and threatened violence, including

14:36  19   at least the crimes alleged against defendant in the

14:36  20   Indictment, and the crimes of which defendant was previously

14:36  21   convicted, as set forth previously.

14:36  22             "1-b.  Escape Risk and Institutional Misconduct.

14:36  23             "The defendant poses a future danger to the lives and

14:36  24   safety of other persons, as demonstrated by his escape risk and

14:36  25   institutional misconduct, including at least defendant's escape

SACR 02-938(E)-DOC          August 28, 2006                    17

14:36   1    from Sonoma County Honor Farm on January 29, 1968, for which

14:37   2    defendant was convicted of escape without force in Sonoma

14:37   3    County, California Superior Court, in Case Number 5373-C, and

14:37   4    repeated acts for institutional misconduct while in the custody

14:37   5    of the California Department of Corrections, United States

14:37   6    Bureau of prisons, United States Marshals Service, or other law

14:37   7    enforcement agencies.

14:37   8            "c.  Lack of Remorse.

14:37   9            "The defendant has demonstrated a lack of remorse for

14:37  10    the capital offenses committed in this case, as indicated by

14:37  11    defendant's statements and actions during the course of and

14:37  12    following the offenses alleged in the Indictment.

14:37  13            "2.  Contemporaneous Convictions.

14:37  14            "The defendant faces contemporaneous convictions for

14:37  15    multiple murders, attempted murders, and other serious acts of

14:37  16    violence.

14:37  17            "3.  Racial Animosity was a Motive for the Murders.

14:37  18            "The defendant committed the crimes charged in part

14:38  19    from racial animosity against the victims of the crimes.

14:38  20            "As to Defendant Bingham, the government alleges the

14:38  21    following non-statutory aggravating factors with regard to each

14:38  22    of the capital counts:

14:38  23            "1.  Future Dangerousness of the Defendant.

14:38  24            "The defendant is likely to commit criminal acts of

14:38  25    violence in prison in the future that would constitute a

14:38  1    continuing and serious threat to the lives and safety of

14:38  2    others, as evidenced by at least one or more of the following:

14:38  3              "a.   Continuing Pattern of Violence.

14:38  4              "The defendant has engaged in a continuing pattern of

14:38  5    violence, attempted violence, and threatened violence,

14:38  6    including at least the crimes alleged against defendant in the

14:38  7    Indictment, the crime of assault with intent to commit murder

14:38  8    of which defendant was convicted in the United States District

14:38  9    Court for the Central District of California on June 24, 1988,

14:39 10    in Case Number CR-87-629-RSWL, and the crimes of which

14:39 11    defendant was previously convicted.

14:39 12              "b.   Escape Risk and Institutional Misconduct.

14:39 13              "The defendant poses a future danger to the lives and

14:39 14    safety of other persons, as demonstrated by his escape risk

14:39 15    and institutional misconduct, including at least defendant's

14:39 16    escape from Contra Costa County Jail on July 1, 1978, for

14:39 17    which defendant was convicted of escape on October 4, 1978 in

14:39 18    California Superior Court, Contra Costa County, in Case

14:39 19    Number 22035, and repeated acts of institutional misconduct

14:39 20    while in the custody of the California Department of

14:39 21    Corrections, United States Bureau of Prisons, United States

14:39 22    Marshals Service, or other law enforcement agencies.

14:39 23              "2.   Contemporaneous Convictions.

14:40 24              "The defendant faces contemporaneous convictions for

14:40 25    murder, attempted murder and conspiracy to commit murder.

14:40  1          "3.   Racial Animosity was a Motive for the Murders.

14:40  2          "The defendant committed the crimes charged in part

14:40  3  from racial animosity against the victims of the crimes.

14:40  4          "Again, your finding that any non-statutory

14:40  5  aggravating factors exists must be unanimous and beyond a

14:40  6  reasonable doubt.

14:40  7          "In addition to considering the existence of any

14:40  8  non-statutory aggravating factors, you must determine whether

14:40  9  any of you find that a defendant has established the existence

14:40 10  of any mitigating factors by a preponderance of the evidence.

14:40 11  There are some important distinctions that I want to highlight

14:40 12  for you with respect to the proof of mitigating factors.

14:40 13          "The defendant has the burden of proving any

14:40 14  mitigating factors.  However, there is a different standard of

14:41 15  proof as to mitigating factors.  The defendant is not required

14:41 16  to prove beyond a reasonable doubt the existence of a

14:41 17  mitigating factor; he need only establish its existence by a

14:41 18  preponderance of the evidence.  That is to say, you need only

14:41 19  be convinced that it is more likely true than not true in order

14:41 20  to find that the mitigating factors exists.

14:41 21          Finally, a unanimous finding is not required.  Any one

14:41 22  of you may, individually and independently, find the existence

14:41 23  of a mitigating factor, regardless of the number of the jurors

14:41 24  who may agree, and any juror who so finds may weigh that

14:41 25  factor.  Thus, if even a single member of the jury finds that

SACR 02-938(E)-DOC        August 28, 2006                    20

14:41  1  mitigating factor has been proved, that member of the jury is

14:41  2  allowed to weigh that factor in making up his or her own mind

14:41  3  on whether or not to vote for a death sentence.

14:41  4          "Defendant Mills alleges the following mitigating

14:41  5  factors:

14:41  6          "1.  Allen Benton was an equally culpable person in

14:42  7  the offenses, and will not face death, received a nine-year

14:42  8  sentence for the killings of Salaam and Joyner, and may receive

14:42  9  a further reduction in that sentence.

14:42  10         "2.  Daily life for inmates in a federal penitentiary

14:42  11 is dangerous and violent.

14:42  12         "3.  Daily life for inmates in a federal penitentiary

14:42  13 is particularly dangerous for white inmates, as they are a

14:42  14 minority in the system.

14:42  15         "4.  Mistreatment of children at the California Youth

14:42  16 Authority from 1964 to 1967.

14:42  17         "5.  Barry Mills" --

14:42  18         I think that "has been eligible," Counsel.  We should

14:42  19 add the word "has."

14:42  20         MR. STEWARD:  Yes, your Honor.

14:42  21         THE COURT:  "Barry Mills has been eligible for release

14:42  22 on parole since 1987, so a sentence of life in prison without

14:42  23 possibility of release is substantial punishment.

14:42  24         "6.  Barry Mills has maintained a non-violent,

14:43  25 discipline-free prison record for more than seven years.

SACR 02-938(E)-DOC          August 28, 2006                    21

14:43  1           "7.  Barry Mills has often served as a peacemaker in

14:43  2    the penitentiaries in which he's been housed.

14:43  3           "8.  Barry Mills, as late as June 1997, discouraged

14:43  4    other white inmates from attacking black inmates.

14:43  5           "9.  Barry Mills, while in custody, had a positive

14:43  6    influence on others.

14:43  7           "10.  Other factors in Barry Mills' life suggest that

14:43  8    a life sentence is appropriate.

14:43  9           "Defendant Bingham alleges the following mitigating

14:43  10   factors:

14:43  11          "1.  Allen Benton, an equally culpable participant,

14:43  12   will not be punished by death.

14:43  13          "2.  The violent nature of the DC Blacks.

14:43  14          "3.  Racial tension within the Bureau of Prisons.

14:43  15          "4.  The mistreatment of children at the California

14:43  16   Youth Authority from 1962 to 1965.

14:44  17          "5.  T.D. Bingham's fatherly support and guidance of

14:44  18   his son, Tyler Bingham, and his stepsons, Gary Goni and Brian

14:44  19   Miller.

14:44  20          "6.  T.D. Bingham's life as a father, husband and

14:44  21   member of the work force from March 1981 to June 1985.

14:44  22          "7.  T.D. Bingham's scheduled 2010 release date, so a

14:44  23   sentence of life without the possibility of release is

14:44  24   substantial punishment.

14:44  25          "8.  T.D. Bingham's non-violent and discipline-free

SACR 02-938(E)-DOC          August 28, 2006                    22

14:44   1   record in prison over the last seven years.

14:44   2          "9.  Other factors in T.D. Bingham's background,

14:44   3   record or character, or any other circumstance of the offenses,

14:44   4   that mitigate against imposition of the death sentence.

14:44   5          "As you can see, the defense is entitled to present

14:45   6   evidence in mitigation of sentence which can consist of a broad

14:45   7   range of information about defendant's background, record,

14:45   8   character and the circumstances of the offense.  This evidence

14:45   9   may lead a juror to conclude that the defendant should not

14:45   10  receive the death penalty but, instead, should be punished by

14:45   11  spending the rest of his life in prison.

14:45   12         "Once this process of deciding on the existence of

14:45   13  aggravating and mitigating factors has been completed, each of

14:45   14  you must individually engage in a balancing process, in which

14:45   15  you will weigh the aggravating factor or factors, statutory and

14:45   16  non-statutory, that all 12 jurors have unanimously and beyond a

14:45   17  reasonable doubt found to exist, against any mitigating factor

14:45   18  or factors that you individually or with other jurors have by a

14:45   19  preponderance of the evidence found to exist.

14:46   20         "After weighing the aggravating and any mitigating

14:46   21  factors, the jury must consider whether all the aggravating

14:46   22  factor or" -- strike that -- "consider whether all the

14:46   23  aggravating factor or factors found to exist sufficiently

14:46   24  outweigh all of the mitigating factor or factors found to exist

14:46   25  to justify a sentence of death, or in the absence of a

SACR 02-938(E)-DOC        August 28, 2006                23

```
14:46   1   mitigating factor, whether the aggravating factor or factors
14:46   2   alone are sufficient to justify a sentence of death.
14:46   3         "In carrying out this weighing and balancing process,
14:46   4   the members of the jury are not mere fact-finders.  Instead,
14:46   5   jurors are called upon to make a unique, individualized
14:46   6   judgment about the appropriateness of sentencing another human
14:46   7   being to death.  This is not a mechanical process.  Neither is
14:46   8   the decision determined by raw numbers.  Members of a
14:47   9   death-penalty jury do not simply count factors.  Instead,
14:47  10   individual jurors consider such factors qualitatively,
14:47  11   assessing the weight and value of each factor.  Any one
14:47  12   aggravating factor proved, if sufficiently serious, may
14:47  13   outweigh several mitigating factors.  On the other hand, a
14:47  14   single mitigating factor may outweigh several aggravating
14:47  15   factors.  In short, what is called for in weighing the various
14:47  16   factors is not arithmetic, but an individual juror's careful,
14:47  17   considered and mature judgment.
14:47  18         "Again, whether or not the circumstances in this case
14:47  19   justify a sentence of death is a decision that the law leaves
14:47  20   entirely to you.  You should not take anything I may or do
14:47  21   during this phase of the trial as indicating what I think of
14:47  22   the evidence or what I think your verdict should be.
14:47  23         "As I mentioned earlier, you must deliberate and
14:47  24   determine a sentence for each of the defendants and each of the
14:48  25   capital counts separately.  You may conclude that aggravating
```

14:48  1   and mitigating factors should receive different weights in

14:48  2   conducting the separate weighing of aggravating and mitigating

14:48  3   factors applicable to each defendant and each of the capital

14:48  4   counts.

14:48  5          "As we begin this process, there are two final points

14:48  6   I wish to make, or perhaps emphasize.  The first, mentioned

14:48  7   briefly before, is that you are never required to return a

14:48  8   verdict of death.  The law provides you with guidance in making

14:48  9   a decision but, as stated earlier, your decision on this

14:48  10  question of life or death is a uniquely individual judgment

14:48  11  which the law, in the final analysis, leaves up to each of you.

14:48  12  The last thing I wish to explain is that in order to impose a

14:48  13  sentence of death, all 12 jurors must agree that death is the

14:49  14  appropriate sentence.

14:49  15         "I will repeat and elaborate on these points after you

14:49  16  have heard all of the evidence and before you begin your

14:49  17  deliberations.  Again, as in the prior proceedings, you will

14:49  18  have a special verdict form to assist you.  Because these

14:49  19  procedures are relatively new in our system of justice, I

14:49  20  thought it advisable that you have this preliminary

14:49  21  explanation.  My final and definitive instructions will be in

14:49  22  writing and available to you during your deliberations.

14:49  23         "Thank you for your patience and attention."

14:49  24         Counsel for the government, your opening statement,

14:49  25  please.

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 14:49 | 1  | **OPENING STATEMENT**                                    |
| 14:49 | 2  | MS. BLANCH:  Good afternoon.  First of all, on behalf   |
| 14:49 | 3  | of the United States Attorneys Office and on behalf of the |
| 14:49 | 4  | government, I want to thank you for your verdict of a couple of |
| 14:50 | 5  | weeks ago.  And normally that verdict would be the end of your |
| 14:50 | 6  | jury service, and I'm sure you think this is the case that's |
| 14:50 | 7  | never going to end.  We sometimes think this is the case |
| 14:50 | 8  | that's never going to end, but this is the last part.  You've |
| 14:50 | 9  | come to the end, and you are still here because the crimes |
| 14:50 | 10 | that you found Barry Mills and Tyler Davis Bingham guilty of |
| 14:50 | 11 | are so serious that the law allows us to ask for a sentence of |
| 14:50 | 12 | death. |
| 14:50 | 13 | Now, I do have some good news.  We are not -- the |
| 14:50 | 14 | government is not going to spend a lot of time presenting |
| 14:50 | 15 | evidence in this phase.  It's going to be a few hours, at most. |
| 14:50 | 16 | The reason for this is not that we don't take this phase very |
| 14:51 | 17 | seriously.  It's not that we don't mean it when we tell you we |
| 14:51 | 18 | believe a death sentence is appropriate in this case.  The |
| 14:51 | 19 | reason we are not spending a lot of time presenting additional |
| 14:51 | 20 | evidence in this phase is that we've been presenting evidence |
| 14:51 | 21 | for six months.  You've already heard evidence that Barry Mills |
| 14:51 | 22 | and Tyler Bingham are multiple murderers.  You found that |
| 14:51 | 23 | yourself.  We've spent six months presenting evidence that |
| 14:51 | 24 | these men committed murders while they were already in prison. |
| 14:51 | 25 | We've spent six months presenting evidence to show you that |

14:51   1   these men committed murders, ordered murders while they were

14:51   2   already incarcerated at the ADX, which is the most secured

14:51   3   prison in the federal system.  So we are not going to do that

14:52   4   again.  You've heard the evidence.  You were allowed to

14:52   5   consider the evidence that you've already heard.  We are not

14:52   6   going to present that to you again, but I don't want there to

14:52   7   be any confusion.  We are asking you without any reservation to

14:52   8   impose a sentence of death on Barry Byron Mills and Tyler Davis

14:52   9   Bingham.

14:52   10          Now, deciding between life and death sounds like a

14:52   11  completely impossible task.  When you think about it, it's

14:52   12  almost overwhelming, but it really isn't.  There is a legal

14:52   13  framework that the law gives you to consider the imposition of

14:52   14  a death sentence.  Just like during the guilt phase, you had a

14:52   15  special verdict form, and you had to go through and check off

14:53   16  answers to various questions in order.  The same thing here;

14:53   17  you are going to get a special verdict form, and you'll be

14:53   18  required to go through and make particular findings.  And at

14:53   19  the end of the day, it will be up to you to balance whether or

14:53   20  not the defendants deserve life in prison or a sentence of

14:53   21  death.

14:53   22          At the close of evidence, the Court's going to give

14:53   23  you more instructions about that and talk to you about it more

14:53   24  specifically.  But for now, just suffice it to say, the

14:53   25  government is going to present evidence to you to show why life

14:53   1  imprisonment is simply an insufficient sentence, to punish

14:53   2  Defendant Mills and Defendant Bingham for their past behavior,

14:53   3  and because the evidence will show that they pose a future

14:54   4  danger.  Even in prison, they will continue to pose a danger to

14:54   5  other inmates.

14:54   6           So first, I want to talk about the documents that

14:54   7  we're going to be presenting.  The evidence in this case that

14:54   8  the government will be giving you over the next few hours,

14:54   9  possibly in the morning, we are going to have a couple of

14:54  10  witnesses, but for the most part what we are going to do is

14:54  11  present some documents to you.  Some of them we are going to

14:54  12  publish, and we'll talk about them a little bit, but most of

14:54  13  them we'll just give you the documents, and you'll have the

14:54  14  opportunity, when you go over deliberations, to look over them,

14:54  15  review them and read them.

14:54  16           There is something called a "presentence report."

14:54  17  What that is, anytime or almost every time a defendant is

14:54  18  convicted, the probation office prepares a report, and it

14:54  19  summarizes a lot of different facts about the defendants; their

14:54  20  prior criminal history, some of their family information, how

14:55  21  they've done in prior prison situations, and they sometimes

14:55  22  give a recommendation to the Court about what should happen to

14:55  23  the defendant.  We have presentence reports that we're going to

14:55  24  give you and let you look at regarding Mr. Mills and

14:55  25  Mr. Bingham from their prior convictions, so you can get an

14:55  1   idea about their prior criminal history.

14:55  2            We have something called a "Judgment and Commitment

14:55  3   Order."  Essentially what that is is a document that shows an

14:55  4   individual has been convicted of a crime.  We're going to give

14:55  5   those documents to you and let you look at them.

14:55  6            We have disciplinary records from the Bureau of

14:55  7   Prisons and from the California Department of Corrections

14:55  8   showing that these individuals have been disciplined on

14:55  9   multiple occasions for misbehavior while they were

14:55  10  incarcerated.  We are going to give those to you and let you

14:56  11  look at them.

14:56  12           The documents will show you that these defendants have

14:56  13  been involved in a lifetime of criminal activity.  The

14:56  14  documents will show you that they have been convicted over and

14:56  15  over and over again.  They will show you that they've been

14:56  16  sentenced to longer and longer and longer prison sentences.

14:56  17  But ladies and gentlemen, you already know the results of those

14:56  18  prison sentences, because the evidence has already shown you

14:56  19  that these men committed their most violent crimes while they

14:56  20  were serving their prison sentences.

14:56  21           Let's talk, first, about what you'll hear about

14:56  22  Defendant Tyler Davis Bingham.

14:57  23           Now, you already know that Defendant Bingham is a

14:57  24  multiple murderer.  You, yourselves, had found him guilty of

'4:57  25  the murder of Arva Lee Ray, "Baby" Ray, Abdul Salaam and Frank

14:57   1   Joyner.  You also found him guilty of the attempted murder of

14:57   2   Ismael Benitez-Mendez and Byron Ball.  So just based on the

14:57   3   facts that you've already found, if Defendant Bingham had had

14:57   4   his way, he would have murdered five people.  But in fact, the

14:57   5   evidence is going to show that Tyler Davis Bingham has been

14:57   6   involved in crime his entire life.

14:57   7          He has an extensive juvenile record starting with his

14:57   8   first arrest of petty theft when he was 9 years old.  He was

14:57   9   committed to the California Youth Authority when he was 14.  It

14:57  10   was about this time that he started experimenting with drugs.

14:58  11   He was paroled about six months later, but he refused to stay

14:58  12   clean, was returned to custody on a number of parole

14:58  13   violations.  He has juvenile convictions for car theft, for

14:58  14   assault of a deadly weapon.  By the time he was 18, he was

14:58  15   heavily involved in heroin use.

14:58  16          The documents will show that he was paroled from the

14:58  17   California Youth Authority when he was 19 years old in 1966.

14:58  18   About six months later he was convicted for petty theft, where

14:58  19   he broke into someone's home and stole a number of items,

14:58  20   including a shotgun.

14:58  21          Two years later, when he was 21 years old, he was

14:58  22   convicted of assault with a deadly weapon.  He was high on

14:58  23   methadrine and amphetamines, and he went to a gas station where

14:59  24   he pulled a gun on the gas station attendant and robbed the gas

'4:59  25   station.  And when he was done, he took the gun and marched the

14:59  1  gas station attendant at gunpoint into the bathroom, turned him

14:59  2  around and hit him over the head with the gun.  You'll read

14:59  3  documents that show when Mr. Bingham was asked why he committed

14:59  4  this robbery, his response was "I needed money, and I took it."

14:59  5          He was sentenced to five years to life in the

14:59  6  California State Prison.  He was ultimately sent to San

14:59  7  Quentin, and you've already heard evidence that it was while he

14:59  8  was serving this sentence and spending time in San Quentin that

14:59  9  he became intimately associated with the Aryan Brotherhood.

14:59  10 And ladies and gentlemen, we've spent six months giving you

15:00  11 evidence about what that means.

15:00  12         Bingham was paroled in August of 1975.  He was 28

15:00  13 years old.  And just a month later, he was violating his parole

15:00  14 by an arrest for possession, manufacturing, selling and

15:00  15 carrying a concealed weapon.  He pleaded guilty to a

15:00  16 misdemeanor and then tried to escape from the county jail.  He

15:00  17 didn't manage to escape, and he was eventually returned to

15:00  18 prison as a parole violator.

15:00  19         Now, this is one of those times when a parole officer

15:00  20 had the opportunity to review Mr. Bingham's case and his

15:00  21 history and how well he'd done as an inmate, and remember, he's

15:00  22 28 years old at this point.

15:00  23         The parole officer said that Mr. Bingham had spent

15:00  24 almost his entire life up to that point in prison, and that he

15:00  25 wasn't a model prisoner.  He wrote, "Bingham's poor

15:01  1  institutional behavior can only be classified as poor" --

15:01  2  "prior institutional behavior can only be classified as very

15:01  3  poor.  He has spent considerable time in the segregation unite

15:01  4  and has been associated with white radical gangs."  And ladies

15:01  5  and gentlemen, you know what that means.

15:01  6              Bingham was paroled again in August of 1977, when he

15:01  7  was 30 years old.  Six months later, still age 30, he was

15:01  8  arrested for battery, served 90 days in jail, and three months

15:01  9  later, May 1977, he was convicted for selling heroin.  And in

15:01 10  July of that same year, while awaiting his sentence on the

15:01 11  heroin charge, he escaped from county jail.  He cut his way out

15:01 12  in the middle of the night.  He was recaptured about a week

15:02 13  later, and at that time, when he was being sentenced on the

15:02 14  heroin conviction, the D.A. argued to the Court that

15:02 15  Mr. Bingham was a prime candidate for a life term in prison.

15:02 16  He received four years.

15:02 17              He was paroled from the California Department of

15:02 18  Corrections in 1981, when he was 34 years old.  And this is the

15:02 19  interesting part.  He spent three and a half or four years out

15:02 20  of custody.  He had every opportunity not to commit other

15:02 21  crimes.  He got married.  He got a job, but the evidence will

15:02 22  show that by June of 1985, he was heavily involved in heroin

15:02 23  use.  He was up to about an ounce and a half a day -- or excuse

15:02 24  me, a gram and a half of heroin a day, and that cost a lot of

15:03 25  money.  And on June 6th, 1985, to support his heroin habit, he

SACR 02-938(E)-DOC          August 28, 2006                    32

15:03  1    went into a bank in *Odessa, Texas, with a gun and he robbed

15:03  2    the bank.

15:03  3          He told the teller to give her -- give him all of her

15:03  4    money, and when she wasn't fast enough, he took the gun and

15:03  5    pointed it at her through the teller window and told her to

15:03  6    hurry up.  He escaped with about $12,000 in cash, but he was

15:03  7    arrested about a week later.  He pleaded guilty and was

15:03  8    sentenced to 20 years in federal custody.

15:03  9          Now, ladies and gentlemen, you've already heard

15:03  10   evidence that while he was out, the Aryan Brotherhood were so

15:03  11   sure that he'd be returning to prison that they elected him as

15:03  12   one of the leaders --

15:03  13         MR. WHITE:  Your Honor, I would --

15:03  14         MS. BLANCH:  -- of the Federal Commission.

15:03  15         MR. WHITE:  -- object to that.  There was no -- I

15:03  16   would object.  There was no evidence to that, that the Aryan

15:03  17   Brotherhood was so sure he'd return to prison.

15:04  18         THE COURT:  This is opening statement, ladies and

15:04  19   gentlemen.  This isn't evidence.  It's a summation of what each

15:04  20   counsel believes that they will be able to show.

15:04  21         So Counsel, you may continue.

15:04  22         Overruled.

15:04  23         MS. BLANCH:  Ladies and gentlemen, you've heard

15:04  24   evidence that while he was out, he was elected as a leader of

'5:04  25   the Aryan Brotherhood.  And when he made it to federal prison

15:04  1   in 1985, he arrived as a dedicated member and leader of the

15:04  2   Aryan Brotherhood.

15:04  3          He was sent to Lompoc, and within one month, he had

15:04  4   taken a knife and tried to kill another inmate named Gary

15:04  5   Evilsizer.  This was October 23rd, 1985.  Bingham pled guilty

15:04  6   to assault with the intent to kill Gary Evilsizer and was

15:05  7   sentenced to 12 years in prison.

15:05  8          The evidence will show that Mr. Bingham has not been

15:05  9   a model prisoner.  He's urinated on police -- on correctional

15:05  10  officers.  He's spat on them.  He tested positive for drug use

15:05  11  in prison.  Sometimes he refused to give urine samples for

15:05  12  drug use.  He's gotten into fights with other inmates.  But

15:05  13  the most important evidence about Mr. Bingham's behavior in

15:05  14  prison has already been presented to you.  Mr. Bingham was a

15:05  15  member of the Aryan Brotherhood.  He was a leader of the

15:05  16  Aryan Brotherhood, and as such, was responsible for multiple

15:05  17  murders and assaults.

15:05  18         Now, let's talk about Barry Byron Mills.  You are

15:05  19  going to hear very similar evidence about his life.  Again,

15:06  20  you already know that he is a multiple murderer, because you,

15:06  21  yourselves, found that Mills murdered John Marzloff, Richard

15:06  22  Andreasen, Arva Lee Ray, Thomas Lamb, Frank Joyner and Abdul

15:06  23  Salaam.  You already found that he attempted to murder Jeffrey

15:06  24  Barnett, Joel Burkett, Jimmy Lee Inman and Byron Ball.  You

15:06  25  found that he conspired to murder Walter Johnson and Frank

15:06   1   Ruopoli.  This means that at this point, it's undisputed that

15:06   2   Mills is a 6-time multi-murderer, and that if he had been

15:06   3   successful, he would have been responsible for 12 murders.

15:06   4        In addition, over the rest of the day, you are going

15:07   5   to hear evidence that Mr. Mills has lead a life of crime.  You

15:07   6   will get documents that he has been convicted over and over

15:07   7   again, but the prison sentences did nothing to deter him from

15:07   8   his criminal behavior.  Specifically, you'll get documents that

15:07   9   show he has a lengthy juvenile and adult record.

15:07   10        As a teenager, Mr. Mills was in and out of juvenile

15:07   11   hall.  He wouldn't reform.  He was eventually committed to the

15:07   12   California Youth Authority.  He was paroled in 1965, when he

15:07   13   was 16 years old, but within five months, his parole was

15:07   14   revoked for car theft.

15:07   15        In 1967, at age 19, while he was on parole from the

15:07   16   California Youth Authority, he was convicted of another grand

15:07   17   theft auto and was sentenced to a year in county jail.  In

15:07   18   1968, still 19 years old, he was convicted of escape without

15:07   19   force and sentenced to six months to a year in the state

15:08   20   prison.

15:08   21        And you will learn that in 1969, when Mills was 20

15:08   22   years old, he was convicted of armed robbery and car theft.

15:08   23   You will learn that Mills and another man went into a small

15:08   24   store, one cashier, one employee, pointed a gun at the manager,

15:08   25   they both had guns, and forced him to lay face down on the

SACR 02-938(E)-DOC        August 28, 2006                    35

15:08  1  floor while they robbed the store.  When they found less than

15:08  2  $800 in the register, while he was on the floor, they stood

15:08  3  over him, stole his wallet and then hit him over the head with

15:08  4  the gun.  When they hit him over the head, the gun went off.

15:08  5  Fortunately, no one was injured, or at least not shot.

15:08  6       Mills was sentenced to five years to life in the

15:09  7  California State Prison system.  He served less than six years

15:09  8  of the sentence, but you'll learn that while he was in state

15:09  9  prison, he was not well-behaved.  He was written up for

15:09  10  possession of drugs, for setting items in his cell on fire, of

15:09  11  possessing a blowgun and darts, and firing the darts at other

15:09  12  inmates; general disrespect to staff, failing to follow the

15:09  13  rules.  In fact, you'll see that the officials from the

15:09  14  California Department of Corrections labeled Mr. Mills as one

15:09  15  of the worst-behaved inmates in the entire prison system.

15:09  16       And further, you have already heard evidence that it

15:09  17  was while Mills was incarcerated in the California State Prison

15:09  18  system that he became intimately familiar with the Aryan

15:10  19  Brotherhood.

15:10  20       Mills was released on parole in 1975 when he was 27

15:10  21  years old.  Less than a year later, his parole was revoked, and

15:10  22  he was sent back to the California Adult Authority.  In 1976,

15:10  23  at age 28, he was convicted of armed bank robbery and sentenced

15:10  24  to 20 years in federal prison.  And he hadn't finished his

'5:10  25  state sentence yet, so they sent him back to state prison to

15:10   1   finish up.

15:10   2        And on April 25th, 1977, he killed an inmate named

15:10   3   Garland Barry, a black inmate.  You are going to hear testimony

15:10   4   from one of the guards who saw that stabbing, and that guard

15:10   5   will testify that he saw Barry Mills kneeling over the body of

15:10   6   Garland Barry and stabbing him over and over again in the chest

15:10   7   and face.

15:11   8        By 1977 -- excuse me, 1978, he was sent to federal

15:11   9   prison to serve his 20-year-to-life sentence, his 20-year

15:11   10  federal prison sentence for the bank robbery.  And you already

15:11   11  know what happened.  He went to the United States Penitentiary

15:11   12  at Atlanta in 1978, and he was there for nine months when he

15:11   13  killed John Marzloff by stabbing him to death in the rec shack.

15:11   14  He killed John Marzloff with his own hands.  And at the time he

15:11   15  was convicted of the Marzloff murder, the probation officer

15:11   16  wrote a presentence report that you are going to see, and the

15:11   17  probation officer noted that at the time Mills was responsible

15:12   18  for killing John Marzloff, the officials at USP Atlanta

15:12   19  believed that Mr. Mills was responsible for the murders of

15:12   20  six other inmates but never had enough evidence to charge

15:12   21  him --

15:12   22        MR. FLEMING:  Objection, your Honor.  Objection.

15:12   23        MR. STEWARD:  I think the Court ruled on this.

15:12   24        THE COURT:  I believe I had.

'5:12   25        MR. FLEMING:  We have a motion to preserve.

SACR 02-938(E)-DOC       August 28, 2006                    37

15:12  1          THE COURT:  You can reserve your motion, Counsel.

15:12  2          MS. BLANCH:  The probation officer wrote in that

15:12  3  presentence report, "Mills' record would indicate that he has

15:12  4  no desire to obtain an acceptable behavior standard in the

15:12  5  community.  It would seem that Mills can only deal with his

15:12  6  problems through violence."

15:12  7          You are going to hear testimony from a correctional

15:12  8  officer who was punched in the face by Barry Mills.  You are

15:12  9  going to hear testimony from correctional officers who

15:13 10  discovered a plot to bring cyanide into the prison.  You will

15:13 11  learn that in 1986 and 1987, Barry Mills tried to introduce

15:13 12  cyanide, not once, not twice, but three times into the federal

15:13 13  system.

15:13 14          And ladies and gentlemen, that's the evidence you are

15:13 15  going to hear.  You are going to hear evidence that the best

15:13 16  predictor of future behavior is past behavior, and we are going

15:13 17  to present a lot of evidence about Barry Mills and Tyler Davis

15:13 18  Bingham's past behavior.

15:13 19          Now, ladies and gentlemen, we're not saying that

15:13 20  people can't change.  They can, and the law provides people

15:14 21  many opportunities to change.  But you are going to hear

15:14 22  evidence about the choices made by these men, and you are going

15:14 23  to hear evidence that every time these men made a choice,

15:14 24  people died.  And at some point, somebody has to stand up and

5:14 25  say, "It's enough.  It's time to stop."  And I don't know if

SACR 02-938(E)-DOC          August 28, 2006                    38

```
15:14   1   that time is one murder, two murders, three, five, twelve, but
15:14   2   for Barry Mills and Tyler Bingham, today's the day.  We're
15:14   3   standing up and we're saying, "Enough."
15:15   4        And at the end of this phase, after you've heard all
15:15   5   of the evidence about the choices these men have made, we are
15:15   6   going to come back and we are going to ask you to weigh the
15:15   7   evidence and stand up and say, "Enough."  And we're going to
15:15   8   ask you to impose a sentence of death for Barry Byron Mills and
15:15   9   Tyler Davis Bingham.
15:15   10       Thank you.
15:15   11       MR. STEWARD:  Your Honor, we'd have a matter that we'd
15:15   12  like to take up with the Court before we go on.
15:15   13       THE COURT:  I don't think this would be an appropriate
15:15   14  time.  I'll let you reserve that.  I think it's time for the
15:15   15  opening statement now, Counsel.
15:15   16       MR. STEWARD:  That would be me.
15:15   17       THE COURT:  All right.  This would be Mr. Steward on
15:16   18  behalf of Mr. Mills.  This would be the opening statement.
15:16   19                     OPENING STATEMENT
15:16   20       MR. STEWARD:  Good afternoon.  It occurred to me I
15:16   21  haven't had a chance to talk directly to you folks since March.
15:16   22  It's been an awfully long time, and I've looked forward to it.
15:16   23  This phase I get to talk to you twice.
15:16   24       Now, I'm going to give you a little bit of a road map
'5:16   25  about where the defense is going to go and what we think are
```

15:16   1   the important points.  Then my guess is maybe later this week,

15:16   2   or early next week, I'll have the chance to kind of put all of

15:16   3   it together and, hopefully, make sense of the bits and the

15:16   4   snippets that we are going to present.

15:16   5           As you've heard from the Court, this is a really,

15:16   6   really different phase for a lot of reasons.  The most obvious

15:16   7   one, of course, is what's at stake here, and I know you all

15:16   8   realize that, but there's some other things about this phase

15:16   9   that are different, too.  One is the evidentiary rules, they

15:17   10  are a lot more relaxed.

15:17   11          Government counsel just told you about submitting

15:17   12  reports and documents, that sort of thing, and we're going to

15:17   13  do that as well.  We have that opportunity, and we're not going

15:17   14  to have a witness up there to tell you exactly what's going on

15:17   15  with these documents.  Most of them I'm going to suggest to you

15:17   16  are self-explanatory, and I'll give you some examples here in

15:17   17  just a moment.  But some of the other ones we kind of need to

15:17   18  put it into a context and -- and kind of explain to you why we

15:17   19  think it's important.

15:17   20          Really what's going on here is that on behalf of

15:17   21  Mr. Mills, we are going to present eight or nine points that we

15:17   22  think are significant in your discussion, in your deliberations

15:17   23  about what's the right and the just verdict to come up with at

15:17   24  this point.  We're also going to suggest that each one of these

15:17   25  nine points, standing by itself alone, is enough for you to be

SACR 02-938(E)-DOC        August 28, 2006                    40

15:18   1   convinced that a life-without-possibility-of-release sentence

15:18   2   is the right sentence, and we're going to suggest that one or

15:18   3   two of them absolutely cements the deal, and you need go no

15:18   4   farther.  But we are going to present three, four, five, nine

15:18   5   or ten of these which, in combination, I'm going to suggest to

15:18   6   you in a couple of days is the absolute easiest decision you

15:18   7   are ever going to make.  Now, the decision itself, you know, is

15:18   8   going to be a hard one, and I'll talk more about that when we

15:18   9   get to the closing argument in all of this.

15:18   10          But let me take just a minute to give you the points

15:18   11  that we are going to go over and some of the things that we are

15:18   12  going to introduce to -- to prove to you by the preponderance

15:18   13  standard, much less than the government's standard, that these

15:19   14  factors exist, that they are mitigating, and that they should

15:19   15  weigh heavily in your balancing of what to do here at the end

15:19   16  of the case.

15:19   17          We're actually going to start with some rebuttal

15:19   18  material, and as lawyers, that's kind of a strange thing for us

15:19   19  to do.  I'm going to tell you right now about how we are going

15:19   20  to respond to some things they haven't even done yet, but I

15:19   21  thought it was important that I talk about this right now, so

15:19   22  we kind of get these out on the table.

15:19   23          I'll give you the first example.  The government is

15:19   24  going to play for you a little snippet of an audiotape, and the

15:19   25  tape is between a gentleman by the name of Matt Donohue and

15:19  1   Mr. Mills.  Mr. Mills is, obviously, in jail facing -- or

15:19  2   waiting for this trial, and I think you'll learn that he was at

15:19  3   the West Valley Detention Center out in San Bernardino awaiting

15:19  4   trial in this case.

15:19  5          The government is going to play their little

15:19  6   minute-or-two snippet, and what you are going to hear is going

15:20  7   to go something like this.  They are talking about Joanne and

15:20  8   Marty, Joanne and Marty being Joanne Guthrie and Marty Foakes,

15:20  9   two of the defendants in this case who were not before you but,

15:20  10  in fact, were indicted in this case.  They are the only two

15:20  11  women in this case.  And the discussion you are going to hear

15:20  12  is that Mr. Mills is going to say something to the effect of,

15:20  13  "Boy, I sure feel badly about Joanne and Marty, but as to

15:20  14  everybody else, that's part of the game, Jack," or "that goes

15:20  15  with the territory, Jack."

15:20  16         The government is going to suggest to you that that

15:20  17  means Mr. Mills shows no remorse for what happened in

15:20  18  Lewisburg.  On its face, I suggest it's preposterous.  All that

15:20  19  Mr. Mills and Mr. Donohue are talking about is, "It's darned

15:20  20  unfortunate that the Feds have indicted all of these guys, but

15:21  21  hey, we are in a federal penitentiary, that's part of what

15:21  22  happens."

15:21  23         And to prove to you that that's, in fact, the context

15:21  24  of what's being said, we are going to play the whole tape,

15:21  25  which runs about 25 minutes.  We thank the government for

SACR 02-938(E)-DOC          August 28, 2006                    42

15:21  1   bringing this tape up, quite frankly, because you will see that

15:21  2   their interpretation is flat wrong.  The other important thing

15:21  3   that you are going to see in this 25-minute tape is a slice

15:21  4   of Barry Mills.  You are going to get to hear his voice, his

15:21  5   words, his reaction as he speaks with a dear old friend.  You

15:21  6   are going to hear him talk about the same kind of human things

15:21  7   that all of you talk about and I talk about.  Me in particular,

15:21  8   because age-wise, I'm pretty close to Mr. Mills.  So things

15:21  9   like getting older, being a little stiff when you get up in the

15:22  10  morning, that's the sort of conversation that you're going to

15:22  11  hear between Donohue and Mills.

15:22  12         They are talking about sports.  They are talking about

15:22  13  the Oakland Raiders.  They are talking about Mr. Donohue's

15:22  14  family.  They spend a lot of time talking about Mr. Donohue's

15:22  15  son.  And at one point on the tape, you are going to hear

15:22  16  Mr. Donohue puts his 11-year-old son on the phone to talk with

15:22  17  Barry Mills, and you'll get to hear about that as well.

15:22  18         They talk about old friends, mutual friends that

15:22  19  they've known.  Mr. Mills, you will hear, talks about the

15:22  20  disadvantage of being in prison awaiting this trial and being

15:22  21  flat broke.  You are going to hear -- interestingly enough, you

15:22  22  are going to hear a little bit of Mr. Bingham, because

15:22  23  apparently what's happening on this tape is Mr. Mills is able

15:22  24  to use the phone when he is out on a recreation yard, and the

15:22  25  two people out on the rec yard are Mr. Bingham and Mr. Mills.

15:23   1   So in the background, you are going to hear Mr. Bingham do a

15:23   2   little bit of talking.  And then you'll hear discussion about

15:23   3   Mr. Bingham's sons, and how they are doing in their athletics.

15:23   4       At one point on the tape, there is a discussion about

15:23   5   Mr. Donohue's son who got in some trouble and had to go to

15:23   6   jail.  And now, he is, apparently, out of jail and doing well.

15:23   7   And you are going to hear Barry Mills say, "Man, that's good.

15:23   8   That's good.  I love to hear people, man, get out and have a

15:23   9   little life."

15:23   10      Then you are going to hear a passage that the

15:23   11  government is going to play.  It's towards the end.  It's about

15:23   12  22 minutes into a 25-minute tape, and you are going to see that

15:23   13  it has utterly nothing to do with Lewisburg, remorse about it

15:23   14  or even that subject.  You are also going to hear the depth of

15:23   15  the pain that Mr. Mills feels because the two women were

15:24   16  indicted in this case, and he's going to talk about that.

15:24   17      The second portion of rebuttal you are going to hear

15:24   18  has to do with the 1977 death of an inmate by the name of

15:24   19  Garland Barry at San Quentin 29 years ago.  Government counsel

15:24   20  gave you her version.  What you are also going to hear is that

15:24   21  the -- one of the guards who -- who saw this incident saw two

15:24   22  black inmates fighting with a white inmate.  It appeared to

15:24   23  that guard that this was a mutual combat situation.  Not only

15:24   24  that, you are going to hear that Mr. Mills himself got stabbed.

15:24   25  And perhaps most importantly, you are not going to hear how

15:24  1    this scuffle/fight with a tragic ending started, who did what,

15:24  2    what was the creation of -- of the entire incident.  You are

15:24  3    going to hear from us through California Department of

15:24  4    Corrections reports that this Garland Barry was, himself, a

15:25  5    very violent man, had stabbed another inmate at San Quentin a

15:25  6    couple of months earlier.  The year before that he had

15:25  7    assaulted and punched out another inmate because he didn't like

15:25  8    what TV schedule was going on.  And Mr. Barry, himself, had

15:25  9    escaped, robbed and tied up a couple and stole their car.  So

15:25  10   who knows what was going on then.  To say that this was some

15:25  11   sort of a murder committed by Mills, well, let's take a look at

15:25  12   that and see if the reports and the facts bear that out.  I

15:25  13   suggest they won't.

15:25  14          Also, you are going to hear that the district attorney

15:25  15   in, I think it's Contra Costa County, wherever San Quentin is,

15:25  16   reviewed all of this, looked at all of these facts and did not

15:25  17   prosecute, declined any kind of prosecution.

15:25  18          Also, Counsel -- actually didn't talk about that.

15:26  19          Okay.  Your Honor, may I have just one moment?

15:26  20          THE COURT:  Certainly.

15:26  21          (Attorney discussion held off the record.)

15:26  22          MR. STEWARD:  Thank you, your Honor.  I'm getting old,

15:26  23   forgetting things.

15:26  24          Let me talk for a moment about the defense case.

'5:26  25   The government counsel mentioned that Mr. Mills was in CYA,

15:26  1  California Youth Authority.  And you are going to hear that as

15:26  2  to both defendants, they were in CYA for two or three years.

15:26  3  Not from us, but from the Bingham team, you are going to hear

15:26  4  from an expert, a gentleman that is very, very familiar with

15:26  5  CYA, California Youth Authority, in the 1960s and what a

15:26  6  complete abdication of governmental function that department

15:26  7  was.

15:26  8          You'll hear that the -- and I -- I'm not going to go

15:27  9  into this, I'll let Mr. White do this, but I just want to give

15:27 10  you a couple of second preview.  You're going to hear that

15:27 11  legally these young men became wards of the State.  So, in

15:27 12  essence, for whatever reason, they were abandoned, they had

15:27 13  problems, they committed crimes, whatever it may be.  Their

15:27 14  parents, according to the law, became the CYA.  And they -- the

15:27 15  CYA was supposed to somehow turn these kids around, give them

15:27 16  some future, give them some hope.  The expert is going to tell

15:27 17  you that all it did was prepare these guys for the penitentiary

15:27 18  system, that everything we've heard about the convict code,

15:27 19  stand up for yourself, don't snitch, all of that started in the

15:27 20  CYA.  This is the background for both of these gentlemen.  This

15:27 21  is where in their formative years when hopefully all the rest

15:27 22  of us have got either mom and dad or mom or dad, they had the

15:27 23  State of California that failed them miserably.  And you are

15:28 24  going to see through the documentation that Mr. Mills was, in

'5:28 25  fact, in CYA for a little bit more than two years.

15:28  1         One of the things that you heard as the Court gave you

15:28  2  the instructions was the -- the mitigating factors that we've

15:28  3  listed out, the ones that we are going to present to you, and

15:28  4  that's a good guide as -- as to what we are going to do.  And

15:28  5  perhaps I have to agree with government counsel, some of the

15:28  6  most important things that -- that you need to consider, in my

15:28  7  view, you've already heard over the last six months.  And I'm

15:28  8  going to suggest to you a big one, a huge one is Allen Benton.

15:28  9  Allen Benton, who was the actual stabber of one of the two

15:28  10 people at Lewisburg, you have already heard he was allowed to

15:28  11 plead guilty to assault, not murder, but assault.  He then got

15:28  12 a 9-year sentence, and guess what, he's going to get a lower

15:28  13 sentence than that.  Remember what I said a moment ago, any one

15:29  14 of these factors standing by itself should convince you the

15:29  15 death penalty is inappropriate here, this is a big one.  If Al

15:29  16 Benton is going to hit the street in a couple of years, how can

15:29  17 you possibly put these guys to death?  One factor, one factor

15:29  18 right there that I suggest to you defeats everything that the

15:29  19 government has just told you.

15:29  20         Let me talk to you about Mr. Mills for a moment, the

15:29  21 human being.  A couple other things that you are going to see

15:29  22 document-wise are SHU progress reports.  And of course, you

15:29  23 folks all know what the SHU is.  You know the ADX better than

15:29  24 probably some people that work there at this point.  But when

15:29  25 you're in the SHU at the ADX, they have to do a -- a

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
| 15:29 | 1  | psychologist's report about how you are doing.  And you are      |
| 15:29 | 2  | going to see three of them starting in '99 -- two of them in     |
| 15:29 | 3  | '99, and I think one of them in 2000 that reviewed Mr. Mills.    |
| 15:29 | 4  | And in these reports -- you are going to actually get to look    |
| 15:30 | 5  | at them -- they tell you the psychologist at the ADX says,       |
| 15:30 | 6  | "Mr. Mills is not a danger to others.  He is not a danger to     |
| 15:30 | 7  | himself."                                                        |
| 15:30 | 8  | And you'll see that in three different reports.  And             |
| 15:30 | 9  | keep in mind, the report that you are going to look at is        |
| 15:30 | 10 | authored by a Bureau of Prisons psychologist.  We -- we suggest  |
| 15:30 | 11 | to you and will suggest later in the week or next week that      |
| 15:30 | 12 | that's absolutely huge.                                          |
| 15:30 | 13 | There's also a progress report in 2002 right before             |
| 15:30 | 14 | the indictments in this case were handed down, and you could     |
| 15:30 | 15 | see how Mr. Mills is doing.  And I -- I suggest to you -- I'm    |
| 15:30 | 16 | going to suggest to you in a few days, he was doing fine.  That  |
| 15:30 | 17 | those people, the Bureau of Prisons people were not worried      |
| 15:30 | 18 | about future dangerousness.  You are going to hear, again,       |
| 15:30 | 19 | about danger in prison, and we're going to put on three or four  |
| 15:30 | 20 | witnesses for you.  One of the witnesses that we're going to     |
| 15:30 | 21 | put on for you is a young man by the name of Brandon Kitchen,    |
| 15:31 | 22 | and I don't think we've heard that name before.  You are going   |
| 15:31 | 23 | to hear that Mr. Kitchen has been for a period of time at U.S.   |
| 15:31 | 24 | Penitentiary in Marion.  Mr. Kitchen is a white inmate.  He's    |
| 15:31 | 25 | small and slight and looks very young.  He's going to tell you   |

| | | |
|---|---|---|
| 15:31 | 1 | what it's like to be an inmate in the federal prison system |
| 15:31 | 2 | when you are small and white and slight, and how it is that he |
| 15:31 | 3 | survives on a daily basis, and he's going to give you a couple |
| 15:31 | 4 | of examples and some stories about the danger and how anyone in |
| 15:31 | 5 | that position needs to protect themselves. |
| 15:31 | 6 | You are also going to hear, specifically, about the |
| 15:31 | 7 | dangerousness of Salaam and Joyner.  You heard a little bit of |
| 15:31 | 8 | that in the examination by Mr. Fleming of Matt Edinger, who was |
| 15:31 | 9 | SIS at Lewisburg.  You heard at that point about these |
| 15:32 | 10 | gentlemen being serial rapists, both of them, and that one of |
| 15:32 | 11 | them was a child killer.  That's just the kind of danger that's |
| 15:32 | 12 | experienced on a daily basis.  You are also going to hear Al |
| 15:32 | 13 | Benton's own words about the two men that died.  He's going to |
| 15:32 | 14 | tell you from his sentencing transcript when he got his nine |
| 15:32 | 15 | years that these two were extremely dangerous.  We are going to |
| 15:32 | 16 | have a reprise of the testimony from two gentlemen that you've |
| 15:32 | 17 | already heard, Duck and Doc.  Doc Holliday and Lesester |
| 15:32 | 18 | McDaughtery.  And I apologize, I did the examination of |
| 15:32 | 19 | Lesester McDaughtery, and I think in closing argument, |
| 15:32 | 20 | everybody kept calling him "Duck."  I don't think I ever asked |
| 15:32 | 21 | him if that -- that's his nickname.  I promise you, we'll -- |
| 15:32 | 22 | we'll get that straightened out.  But he's the gentleman that |
| 15:33 | 23 | had the dreadlocks and apologized for his outfit and then had a |
| 15:33 | 24 | spirited discussion with Mr. Wolfe.  He's going to come back |
| 15:33 | 25 | and talk to you about some subjects that -- that we didn't go |

15:33  1  into before, and we are going to suggest are a lot more

15:33  2  important at this point.  He also had some specific instances

15:33  3  of interaction with Mr. Mills, and of course, remember that

15:33  4  Duck is -- is a black inmate, which is important, obviously, at

15:33  5  this point.

15:33  6          James Doc Holliday is also going to cover a couple of

15:33  7  subjects that we didn't get into before, and we're going to

15:33  8  suggest are a lot more important now at this time.

15:33  9          Now, another factor that you're going to hear is that

15:33  10 Mr. Mills and Mr. Bingham in 1997 were semi-retired, and that,

15:33  11 in fact, today they are completely and fully retired, no matter

15:33  12 what happens here.  As you know, they are both in their late

15:34  13 50s.  You've heard what it's like to be in prison in the

15:34  14 penitentiary system when you are in your late 50s.  Doc

15:34  15 Holliday, James Holliday, is 61, and he's going to give you a

15:34  16 little bit more insight about that.  You already know it's a

15:34  17 dangerous and violent world, but it's a different dangerous and

15:34  18 violent world, you are going to learn, when you are in your

15:34  19 late 50s and your early 60s.

15:34  20          In terms of punishment, government counsel said, "When

15:34  21 is 'enough' enough?"

15:34  22          The question is, how about punishment in this case?

15:34  23 Well, one of the things that we are going to establish is that,

15:34  24 in fact, Mr. Mills has been eligible for parole under the old

'5:34  25 law since 1987, and we've got a couple of documents that will

| | | |
|---|---|---|
| 15:34 | 1 | show you that.  He could have been freed at the discretion of |
| 15:34 | 2 | the federal parole board in a couple of years, in 10 years, |
| 15:35 | 3 | whatever.  What you are going to learn, and you've already |
| 15:35 | 4 | learned, is that he cannot now be released because of your |
| 15:35 | 5 | verdict in Counts 6 and 7.  That will never happen.  So that, |
| 15:35 | 6 | we suggest, is -- is punishment.  It's significant punishment |
| 15:35 | 7 | as to him.  I do agree with government counsel, we really have |
| 15:35 | 8 | two issues here, future dangerousness and punishment.  I just |
| 15:35 | 9 | talked to you about punishment.  The future dangerousness are a |
| 15:35 | 10 | lot of the other factors that we talked about. |
| 15:35 | 11 | One of the things that's important to note in terms of |
| 15:35 | 12 | the testimony that you have already heard, and I'm going to |
| 15:35 | 13 | remind you in closing argument, is the testimony of Brad |
| 15:35 | 14 | Anderson.  And Brad Anderson, as you'll recall, is a |
| 15:35 | 15 | corrections officer at the ADX.  We didn't even call him for |
| 15:35 | 16 | this, but he told you that he's interacted on a daily basis |
| 15:35 | 17 | with Barry Mills since the facility opened in '94, through the |
| 15:35 | 18 | time that Mr. Mills left in 2002.  And you recall what the |
| 15:36 | 19 | testimony was, "Respectful, never had a problem with him, no |
| 15:36 | 20 | violence, nothing like that." |
| 15:36 | 21 | And that's the kind of thing that we're going to point |
| 15:36 | 22 | to in a couple of days as important points.  I agree with the |
| 15:36 | 23 | government, this process is going to go a lot faster than |
| 15:36 | 24 | probably everybody expected it to, and we're going to be back |
| 15:36 | 25 | talking to you in closing argument. |

SACR 02-938(E)-DOC        August 28, 2006                    51

15:36  1        Given the gravity of this case and what you must

15:36  2  decide, I can't tell you how anxious I am to start that closing

15:36  3  argument and to try and put that together.  I'd like to do it

15:36  4  right now, quite frankly.  I'd like to do it two or three

15:36  5  times, because this is an important a process as maybe any of

15:36  6  you will ever be through in your lives.  You hold somebody's

15:36  7  life, literally, in your hands.  I look forward to the chance

15:36  8  to talk to you some more about that in a few days.

15:36  9        Thank you.

15:36 10        THE COURT:  Mr. White or Mr. Harris, opening

15:37 11  statement?

15:37 12        MR. WHITE:  Your Honor, we wish to reserve until we

15:37 13  begin our defense.

15:37 14        THE COURT:  All right.  Ladies and gentlemen, why

15:37 15  don't we take a brief recess.

15:37 16        You're admonished not to discuss this matter amongst

15:37 17  yourselves, nor form or express an opinion concerning this

15:37 18  case.

15:37 19        I'll come and get you, though, no later than 4:00.

15:37 20  I'm just going to ask if we can stay in session until about

15:37 21  6:00 this evening.  If you would excuse yourselves for just a

15:37 22  moment.

15:37 23        (The following proceedings is taken outside the

15:37 24  presence of the jury.)

15:37 25        THE COURT:  All right.  Counsel, the jury is no longer

15:37   1   present.  I've tried to fit that in as it would be a normal

15:38   2   recess.

15:38   3         Now, I know, technically, you wanted to speak to the

15:38   4   Court, obviously, about the comment about Mr. Mills and five or

15:38   5   six other murders.  My judgment on that was that I didn't

15:38   6   intend to highlight that, but you can make whatever motions are

15:38   7   appropriate, and you can also make a motion that it's untimely

15:38   8   on the Court's part.  My view of that is it would have simply

15:38   9   highlighted and called even more attention with an abrupt

15:38   10  recess, but there is a motion in this regard.  Let me turn,

15:38   11  first of all, to counsel for the government.

15:38   12        I thought that that portion had been excluded and that

15:38   13  I had allowed the government to go forward, you know, on the

15:38   14  Barry murder or whatever murders.  My greatest concern in

15:38   15  making my Crawford decision was this.  Whether it's Crawford or

15:38   16  3593, whether you call it the Sixth Amendment confrontation

15:38   17  clause or call it under the old discretionary rulings that I

15:38   18  made in state court under what we call 352, which is your 3593,

15:39   19  the greatest danger is that someone will get up and say the

15:39   20  following:  From a report, someone reads or testifies, "I am

15:39   21  reading as an FBI agent from the report, and in 1997" -- strike

15:39   22  that -- "in 1977, an unnamed prisoner," usually a confidential

15:39   23  informant, "saw Mr. Mills stab Mr. Barry."

15:39   24        Let's just assume you had that hypothetical for a

5:39    25  moment.  There were two dangers, from my perspective.  You are

15:39  1   in no way precluded from presenting evidence concerning

15:39  2   uncharged murders, but since they are uncharged murders, we

15:39  3   know in a common sense fashion that there must not have been

15:39  4   enough evidence for the government to charge those to begin

15:39  5   with, you know, beyond a reasonable doubt, your case in chief.

15:40  6   And therefore, it creates two problems for the Court.  While

15:40  7   I'm in federal court, it creates the same problems that it had

15:40  8   for me in state court, and that is, that we don't even know

15:40  9   who the conveyor of the information is.  We don't even know

15:40  10  who the conveyor of the information is.  We don't even have a

15:40  11  name.

15:40  12          Second, part of the problems of this case and what

15:40  13  makes this case so unique is the ability of the government, you

15:40  14  know, from your perspective, a good ability to bring to justice

15:40  15  from your standpoint murders over 30 years.  But that's also

15:40  16  part of the weakness of your case, and that is, I'm not

15:40  17  precluding you in any way concerning future dangerousness.  I

15:40  18  just -- and I'm not requiring a standard when you're -- when

15:40  19  you get to that point.  I'm not saying you have to prove that

15:40  20  other than beyond a reasonable doubt concerning that one

15:40  21  category.

15:40  22          So my concern is with the five or six murders that you

15:40  23  mentioned, how is that going to come in from the government's

15:41  24  perspective; am I missing something?

5:41   25          MR. WOLFE:  Your Honor, it's -- it's going to come in

15:41  1  from a sentence not much -- there is no more detail, really,

15:41  2  than was, essentially, read into the record in the opening

15:41  3  statement.   It's a sentence in the evaluation section of one of

15:41  4  the presentence reports.   My recollection is that it was

15:41  5  specifically addressed and allowed in, because the Court said

15:41  6  that evaluation, that is, the opinions of parole and probation

15:41  7  authorities were not testimonial.   If your Honor --

15:41  8          THE COURT:   I see.

15:41  9          MR. WOLFE:   -- thinks that we shouldn't put it in, I

15:41  10  can draw the Court's attention to the position, and we'll

15:41  11  strike it from --

15:41  12          THE COURT:   Well, let's see.   I am not saying that

15:41  13  yet.   I want to hear from the defense, and I want to have them

15:41  14  make their record, and then let me think about that for a

15:41  15  while.

15:41  16          But I think, Counsel, the unwisest thing the Court

15:41  17  could have done was simply jump up right before your opening

15:42  18  statement, Mr. Steward, and -- and highlight what had just

15:42  19  occurred.   If there is eventually a cure or an admonition from

15:42  20  the Court, I think that should come in the course of whatever

15:42  21  we thoughtfully decide -- decide outside the presence of the

15:42  22  jury first.   And we should get to that, you know, in a moment

15:42  23  or a day or whatever, but let me hear from Mr. Steward and

15:42  24  Mr. Fleming, and then we'll go back and get that transcript and

15:42  25  see if we'd addressed that, and you can call that to my

15:42  1  attention.

15:42  2        MR. STEWARD:  Yes, your Honor, our -- our motion would

15:42  3  be for a mistrial of the penalty portion of this case.  I -- I

15:42  4  just -- I thought this was absolutely clearly laid out by the

15:42  5  Court, certainly the spirit of it.  If there is a murder or a

15:42  6  serious assault, government, you need to put on witnesses.

15:42  7  We've got --

15:42  8        THE COURT:  Or prior testimony in a confrontational

15:42  9  sense.

15:42 10        MR. STEWARD:  Right, and -- and obviously, that hasn't

15:42 11  happened.  Our view is it cannot happen, and there is no way to

15:43 12  unring this bell.  This is not some small little point.  It's

15:43 13  an allegation of five or six other murders.

15:43 14        By the way, we would note that factually that could

15:43 15  not have happened.  During the period of time when Mr. Mills

15:43 16  was at Atlanta, there were only three murders, so that wouldn't

15:43 17  have happened.  But that doesn't matter.  What does matter is

15:43 18  how do we get that out of the heads of these jurors when the

15:43 19  government's position is repeatedly, he's a multiple murderer.

15:43 20  If the Court will recall Mr. Wolfe's imitation of Mr. Fleming,

15:43 21  I could do that right now, but that's the way they are pitching

15:43 22  this, and this presentence report throws gasoline on that fire.

15:43 23  There is no way to unring this bell.  There is no curative

15:43 24  instruction.  We suggest we need to start this part of the

15:43 25  trial over again.

15:43   1          THE COURT:  All right.

15:43   2          Mr. Fleming?

15:43   3          MR. FLEMING:  I agree 100 percent, your Honor.  I

15:44   4    think your ruling was absolutely clear.  That was the whole

15:44   5    point of what we did over the last three weeks, is to go

15:44   6    through each of these allegations one by one and determine

15:44   7    what's admissible and what's not admissible.

15:44   8          THE COURT:  All right.  Here's what I'm going to do.

15:44   9    I'm going to take the motion under submission.  I'm tentatively

15:44   10   inclined to deny the motion, but to cure it by instruction, and

15:44   11   the question is how glaring that instruction is.  In other

15:44   12   words, I don't want to exacerbate a situation that's already

15:44   13   arisen, but I may invite you to draft a curative instruction or

15:44   14   leave the record as it is.  I'd like you to call, or go back in

15:44   15   the transcripts with me this evening or tomorrow, and let's see

15:44   16   what occurred here.

15:44   17         And once again, the whole point is this.  The

15:44   18   government is not precluded from presenting the Barry murder.

15:44   19   In fact, now it's apparent that you've found a witness to the

15:44   20   Barry murder, and so I'm allowing you to put on that one

15:44   21   witness.  I am not requiring you to prove that Barry murder

15:44   22   beyond a reasonable doubt.  I am requiring you to prove future

15:44   23   dangerousness beyond a reasonable doubt.  But that gives us the

15:45   24   ability to cross-examine that witness.

15:45   25         The danger and what concerned me so much about

SACR 02-938(E)-DOC        August 28, 2006        57

15:45  1  Crawford is what's occurred here, and that is that I believe

15:45  2  the Sixth Amendment right to confrontation arises during the

15:45  3  penalty phase because the jury has a hybrid faction.  It's

15:45  4  neither fish nor fowl.  It's still a fact-finder up to a

15:45  5  certain point.  And when we get to the balancing test, it goes

15:45  6  through the selection phase, although Mr. Wolfe and I have a

15:45  7  disagreement about that.

15:45  8        And as such, my greatest fear along the way has been

15:45  9  that scenario that I just gave you, that we couldn't even find

15:45  10  the witness in some of these reports, that in the reports that

15:45  11  I read that you gave to me, a number of prison guards had seen

15:45  12  Mr. Mills in close proximity.  In fact -- in fact, I said I'd

15:46  13  work with you in that regard in terms of time, and apparently,

15:46  14  you've been able to find one of those guards.

15:46  15        My greatest concern were the prisoners, because in the

15:46  16  reports, the reports read that a confidential informant or a

15:46  17  confidential prisoner, unnamed, had seen Mr. Mills, you know,

15:46  18  involved in this -- in this murder.  And it was the same

15:46  19  concern that the district attorney had when they refused the

15:46  20  prosecution of the case, and they based that refusal -- if my

15:46  21  memory is correct from a couple weeks ago, they based that

15:46  22  refusal on the fact that these were anonymous, unnamed

15:46  23  witnesses.

15:46  24        So I think this, I think we should proceed on today.

5:46  25  I'll take your motion under submission.  By now, I'm really

SACR 02-938(E)-DOC        August 28, 2006                    58

15:46  1   required to -- to rule now, and if you ask me to rule now, I --

15:46  2   I will, but I think we should sort it out through the

15:46  3   transcript this evening, and I think if I do hold to my

15:46  4   tentative, then I'm going to give you a number of options.

15:47  5   It won't be the perfect cure, but a mistrial is not called for

15:47  6   at the present time, tentatively.

15:47  7          Now, Mr. Wolfe, I see you're eager to speak, and I

15:47  8   want you to speak.

15:47  9          MR. WOLFE:  Your Honor, I'd just like to make clear

15:47  10  the -- this incident, this has nothing to do with the Barry

15:47  11  murder or any other incident in the California Department of

15:47  12  Corrections.  There were no reports about this.  It's a

15:47  13  sentence from an evaluation section of the federal presentence

15:47  14  report.  I've got nothing against your Honor excluding it, but

15:47  15  my belief is that when it was discussed, your Honor did not,

15:47  16  and so I may be able to take it out.  We gave it to the

15:47  17  defense.  They pointed out one mistake I had made in the same

15:47  18  presentence report, but they didn't say anything about this,

15:47  19  and we went ahead in good faith.

15:47  20         THE COURT:  We focus so much on Crawford,

15:47  21  unfortunately.  Under 3593, I would have excluded the mention

15:48  22  of the five or six murders, so let's deal with that this

15:48  23  evening.  You've got witnesses in the hallway.  I don't think

15:48  24  the defense wants me to make a definitive ruling right now, and

5:48   25  we can sort it out this evening, okay?

SACR 02-938(E)-DOC        August 28, 2006                    59

15:48   1           MR. WOLFE:  Very well, your Honor.

15:48   2           THE COURT:  Now, Mr. White?

15:48   3           MR. WHITE:  Yes, your Honor.

15:48   4           One other matter, and it could wait until this

15:48   5   evening, but I'm afraid that when the government puts their

15:48   6   case on, its going to come up again.  And that is, it was

15:48   7   stated that Mr. Bingham was convicted of an assault with a

15:48   8   deadly weapon as a juvenile.  Number one, that's absolutely

15:48   9   factually inaccurate.  I searched to find out where that came

15:48   10  from, because there are two presentence reports, one in '85 and

15:48   11  one in '88 that talk about his juvenile record and indicated

15:48   12  that his one conviction as a juvenile was the auto theft that

15:48   13  resulted in a commitment to the youth authority.

15:48   14          THE COURT:  Is there another conviction as a juvenile?

15:49   15          MS. BLANCH:  We are looking for it, your Honor.

15:49   16          THE COURT:  Okay.

15:49   17          MR. WHITE:  Well, I -- I think I found what they're

15:49   18  referring to.

15:49   19          THE COURT:  Well, just a moment, so I can look for it.

15:49   20  In fact, you can walk over and help them and show it to them.

15:49   21          And once again, if you are correct, I'm glad to cure

15:49   22  that now if you request that.  By the same token, that's a

15:49   23  tactical decision on your part, I can cure it later on.  So

15:49   24  I -- if that's incorrect information, we can cure that right

5:49    25  away, or you can wait.  But the one thing that I'm fairly

SACR 02-938(E)-DOC        August 28, 2006                    60

15:49  1  certain of is that I didn't want to take a recess, Mr. Steward

15:49  2  and Mr. Fleming, right at that point.  It would just put a big

15:49  3  red beacon on that issue, so I hope that has each of your

15:49  4  gentlemen's consent.

15:49  5          Mr. Fleming or Mr. Steward?

15:49  6          And if you gentlemen want me to cure it now, I'll

15:49  7  attempt to cure it now.

15:49  8          MR. FLEMING:  Your Honor, I think we should spend a

15:49  9  little time thinking this through.

15:49  10          THE COURT:  I do, too.  I think that -- you know I'm

15:49  11  inclined not to grant a mistrial at this point.  And then the

15:49  12  decision is, if I hold to that, you're going to want a better

15:50  13  record looking back at this record.  You want to put me in a

15:50  14  box if you can, and I am not affronted by that.

15:50  15          And second, if -- if I hold to my ruling, then you

15:50  16  want to tactically decide what are you asking the Court to do

15:50  17  about it, if anything.  You may decide if Mr. Mills gets the

15:50  18  death penalty, you're in a better position for appeal with the

15:50  19  record as it is.  You may decide, no, we want that cured.  We

15:50  20  don't want to get to the death penalty phase and have that

15:50  21  lingering out there, so we want the Court to cure it.  Then I'm

15:50  22  going to have you draft an instruction, okay?  And that takes

15:50  23  some plot.

15:50  24          Now, remember also, as they are discussing that, I am

15:50  25  a product of death work in the state level where the rules are

15:50   1   much more stringent from my view of what's occurring in the

15:50   2   federal courts.  For instance, this information would have

15:50   3   never come in in the state -- in the state court death penalty

15:51   4   case.  It would have come out of the 3593 or what we call 352,

15:51   5   so --

15:51   6          Now, remember, to some extent, also, these rules

15:51   7   are -- are so unclear, so new to all of us that we're going to

15:51   8   get through this somehow as fairly as we can to both sides.

15:51   9          Mr. White, Ms. Blanch?

15:51  10          MR. WHITE:  Yes, your Honor.

15:51  11          I think we have agreed that the Court can inform the

15:51  12   jury that he did not suffer a juvenile conviction for an

15:51  13   assault with a deadly weapon.

15:51  14          THE COURT:  Okay.

15:51  15          MR. WHITE:  And I just might indicate that I missed

15:51  16   it.  It's not -- there was no bad faith on the part of the

15:51  17   government.  It's buried in some report, but it's mistaken,

15:51  18   so --

15:51  19          THE COURT:  So how -- how do we reach that?  Do you

15:51  20   want, by stipulation, me to do that immediately when the jury

15:51  21   comes out and just say that counsel misspoke, there was no 246

15:52  22   or 245?  Do you want me to do that at a later time, do you want

15:52  23   to highlight this now, do you want to get rid of it now?

15:52  24          MS. FLYNN:  Your Honor, the government would rather

5:52  25   have it phrased as the Court has ruled, that there will be no

SACR 02-938(E)-DOC        August 28, 2006                    62

15:52  1   mention, no consideration of an assault with a deadly weapon.

15:52  2         THE COURT:  Well, that's not right.  If it wasn't --

15:52  3   no, I don't think so.  That sounds like it was committed, but

15:52  4   the Court is, you know, keeping it out.  The point is it didn't

15:52  5   occur; is that right?

15:52  6         MS. FLYNN:  No, we don't know that it didn't occur.

15:52  7   There's a reference to it in the document that says "ADW at age

15:52  8   14."

15:52  9         It looks like a conviction to the government.

15:52  10        THE COURT:  Well, aren't they going to have that rap

15:52  11  sheet?

15:52  12        MS. FLYNN:  But we don't have any other reference in

15:52  13  any other presentence report to this assault with a deadly

15:52  14  weapon conviction.

15:52  15        THE COURT:  May I suggest we sort that out, again,

15:52  16  this evening and have --

15:52  17        MR. WHITE:  That's fine.

15:52  18        THE COURT:  Is that fine by Mr. White?

15:52  19        MR. WHITE:  Absolutely.

15:52  20        THE COURT:  Let's really take a look at it after we

15:52  21  let the jury go.

15:52  22        MR. WHITE:  Absolutely.  As long as we don't go back

15:52  23  into it, that's fine.

15:52  24        THE COURT:  Okay.  Then I'll see you in 10 minutes.

5:52  25   At 3:00 I'm going to bring the jury back in.

15:52   1          If you'd take the gentlemen out for a restroom break.

2          (Recess.)

3   /

4   /

5   /

6                          **CERTIFICATE**

7

8   *I hereby certify that pursuant to Section 753, Title 28 of the*

9   *United States Code, the foregoing is a true and correct*

10  *transcript of the stenographically reported proceedings held in*

11  *the above-entitled matter and that the transcript page format*

12  *is in conformance with the regulations of the Judicial*

13  *Conference of the United States.*

14

15

16  _____    8/29/06_____

*JANE C/S. Rule, CSR NO. 9316*       *Date*

17  *Federal Official Court Reporter*

18

19

20

21

22

23

24

25