CR 02-938(E)-DOC          August 29, 2006

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

SEP 2 1 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|                Plaintiff, | ) |
|   vs. | ) No. CR 02-938(E)-DOC |
| BARRY BYRON MILLS; TYLER DAVIS | ) |
| BINGHAM; CHRISTOPHER OVERTON | ) DAY 63 - VOLUME IV |
| GIBSON; EDGAR WESLEY HEVLE, | ) |
|                Defendants. | ) DEATH PENALTY PHASE |

# **ORIGINAL**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Tuesday, August 29, 2006

JANE C.S. RULE, CSR No. 9316
Federal Court Reporter
UNITED STATES DISTRICT COURT
411 West Fourth Street, Room 1053
Santa Ana, California 92701-4516
(714) 558-7755

Reporter's Reference:  06-08-29 ABD63V4

DOCKETED ON CM

OCT - 3 2006

BY

CR 02-938(E)-DOC          August 29, 2006                    2

```
 1  APPEARANCES:

 2


 3  On behalf of the Plaintiff UNITED STATES OF AMERICA:

 4           OFFICE OF THE UNITED STATES ATTORNEY
             BY:   STEPHEN WOLFE
 5                 MICHAEL W. EMMICK
                   JOEY L. BLANCH
 6                 Attorneys at Law
             312 North Spring Street
 7           Los Angeles, California 90012
             (213) 894-0511
 8
                       - AND -
 9
             OFFICE OF THE UNITED STATES ATTORNEY
10           BY:   TERRI K. FLYNN
                   Attorney at Law
11           411 West 4th Street
             8th Floor
12           Santa Ana, California 92701
             (714) 338-3592
13

14  On behalf of the Defendant BARRY BYRON MILLS:

15           LAW OFFICES OF H. DEAN STEWARD
             BY:   H. DEAN STEWARD
16                 Attorney at Law
             107 Avenida Miramar
17           Suite C
             San Clemente, California 92672
18           (949) 481-4900

19                     - AND -

20           LAW OFFICES OF MARK F. FLEMING
             BY:   MARK F. FLEMING
21                 Attorney at Law
             433 "G" Street
22           Suite 202
             San Diego, CA 92101
23           (619) 652-9970

24

25
```

```
 1   APPEARANCES (Continued):

 2


 3   On behalf of the Defendant TYLER DAVIS BINGHAM:

 4           LAW OFFICES OF MICHAEL V. WHITE
             BY:  MICHAEL V. WHITE
 5                Attorney at Law
             1717 Fourth Street
 6           Third Floor
             Santa Monica, California 90401
 7           (310) 576-6242

 8                    - AND -

 9           STEWART & HARRIS
             ATTORNEYS AT LAW
10           BY:  WILLIAM S. HARRIS
                  Attorney at Law
11           1499 Huntington Drive
             Suite 403
12           South Pasadena, California 91030
             (626)441-9300
13

14

15

16

17

18

19

20

21

22

23

24

25
```

CR 02-938(E)-DOC          August 29, 2006                    4

```
 1                        I N D E X

 2

 3

 4        JURY TRIAL - DAY 63, VOLUME IV (DEATH PENALTY PHASE)

 5

 6

 7                       EXAMINATION

 8

 9   Witness Name          Direct   Cross   Re-Direct   Re-Cross

10   KITCHEN, BRANDON
          By Mr. Fleming      6
11        By Mr. Emmick              24

12   MC DAUGHTERY, LESESTER
          By Mr. Fleming     43
13        By Mr. Wolfe               67

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 15:00 | 1 | **SANTA ANA, CALIFORNIA, TUESDAY, AUGUST 29, 2006** |
| 15:00 | 2 | **DAY 63 - VOLUME IV** |
| 15:00 | 3 | **(3:02 p.m.)** |
| 15:00 | 4 | (The following proceedings is taken outside the |
| 15:00 | 5 | presence of the jury.) |
| 15:00 | 6 | THE COURT:  All right.  Then we are back in session. |
| 15:02 | 7 | All counsel are present, the defendants, defense counsel, the |
| 15:02 | 8 | government. |
| 15:02 | 9 | And Counsel, can I summon the jury? |
| 15:02 | 10 | MR. FLEMING:  Yes. |
| 15:02 | 11 | THE COURT:  Thank you. |
| 15:02 | 12 | If you'd summon the jury, please? |
| 15:02 | 13 | (The following proceedings is taken in the presence of |
| 15:02 | 14 | the jury.) |
| 15:03 | 15 | THE COURT:  All right.  The jury is present.  The |
| 15:03 | 16 | alternates are present, all counsel, the defendants, the |
| 15:03 | 17 | government. |
| 15:03 | 18 | Mr. Fleming, your next witness, please. |
| 15:03 | 19 | MR. FLEMING:  Your Honor, Mr. Mills calls Brandon |
| 15:03 | 20 | Kitchen. |
| 15:03 | 21 | THE COURT:  Mr. Kitchen, would you raise your right |
| 15:03 | 22 | hand, please?  Kristee, who is our clerk, will administer the |
| 15:03 | 23 | oath to you. |
| 15:03 | 24 | **BRANDON KITCHEN, DEFENDANT'S WITNESS, SWORN** |
| 15:03 | 25 | THE WITNESS:  Yes, I do. |

CR 02-938(E)-DOC          August 29, 2006                    6

15:03  1              THE CLERK:  Thank you.

15:03  2              THE COURT:  Thank you, sir.

15:03  3         Would you state for the jury your full name?

15:03  4              THE WITNESS:  Okay.  Brandon Nelson Kitchen.

15:03  5              THE COURT:  And would you spell your last name, sir?

15:03  6              THE WITNESS:  K-i-t-c-h-e-n.

15:03  7              THE COURT:  Thank you.

15:03  8         And this is direct examination by Mr. Fleming of

15:03  9  Mr. Kitchen on behalf of Mr. Mills.

15:03 10              MR. FLEMING:  Thank you, your Honor.

15:03 11                    **DIRECT EXAMINATION**

15:03 12  BY MR. FLEMING:

15:03 13  Q    Mr. Kitchen, let me -- let me start by asking you this.

15:03 14  Are you currently in federal custody?

15:03 15  A    Yes, I am.

15:03 16  Q    Okay.  And would you mind telling the jury what crime

15:04 17  you're in federal custody for?

15:04 18  A    Okay.  I've got a weapons charge as carjacking

15:04 19  and interstate transport of a stolen car.

15:04 20  Q    How old are you, sir?

15:04 21  A    I'm 31.

15:04 22  Q    And when did you begin serving the sentence that you're

15:04 23  now serving?

15:04 24  A    January of 1994.

5:04 25  Q    How old were you when you first entered the federal prison

CR 02-938(E)-DOC          August 29, 2006                    7

15:04  1  system?

15:04  2  A     18.

15:04  3  Q     And where were you living at the time?

15:04  4  A     Georgia, Middle District of Georgia.

15:04  5  Q     Tell us briefly, if you would, what institutions you've

15:04  6  spent time in since you first entered the federal system at age

15:04  7  18.

15:04  8  A     Okay.  I started out in the county jails.  I was in a few

15:04  9  of those.  I ended up getting sentenced and went through

15:04  10 Atlanta USP as hold over.  FCI Talladega for a couple of months

15:04  11 and Atlanta again, and then USP Allenwood in Pennsylvania.

15:04  12          THE COURT:  Allenwood?

`5:04  13          THE WITNESS:  Yes, in Pennsylvania.

15:04  14          THE COURT:  Okay.

15:04  15 BY MR. FLEMING:

15:04  16 Q     And then after Allenwood?

15:05  17 A     I went to Marion, USP Marion in Illinois.  And from there,

15:05  18 I went to ADX --

15:05  19 Q     All right.

15:05  20 A     -- just a couple weeks ago.

15:05  21 Q     Now, time frame, what years were you in Allenwood?

15:05  22 A     I got there February of '96 to December of '97, so 22

15:05  23 months.

15:05  24 Q     All right.  And then from there, you went to Marion

 5:05  25 from --

CR 02-938(E)-DOC          August 29, 2006                    8

15:05   1   A      Yes.

15:05   2   Q      -- '97 until just --

15:05   3   A      Until four weeks ago, yes.

15:05   4   Q      We're going to have to wait, one after the other.

15:05   5   A      Okay.

15:05   6   Q      We're getting some indication from the court reporter.

15:05   7   A      All right.

15:05   8   Q      Why -- why were you moved to ADX, by the way, just several

15:05   9   weeks ago?

15:05   10  A      They are changing the security level of Marion.  They're

15:05   11  turning it into an FCI.  The whole joint has got to be empty

15:05   12  within a couple months, so everybody that's there is being

15:05   13  shipped to various institutions throughout the country.

15:05   14  Q      Okay.  So you weren't shipped there for any type of

15:05   15  disciplinary problem?

15:05   16  A      No, no disciplinary.

15:05   17  Q      While you've been incarcerated in federal prison, have you

15:05   18  become familiar with various groups that reside in these

15:05   19  prisons?

15:06   20  A      Yes.

15:06   21  Q      Okay.  Are you -- are you a member of any particular

15:06   22  group, by the way?

15:06   23  A      Group -- I mean, I've got friends.

15:06   24  Q      Specifically, are you a member of the Aryan Brotherhood?

5:06   25   A      No, I'm not.

CR 02-938(E)-DOC          August 29, 2006                    9

15:06  1   Q    All right.  Do you know people who are or are suspected

15:06  2   members of the Aryan Brotherhood?

15:06  3   A    People I believe to be, yes.

15:06  4   Q    Okay.  And where did you meet these people?

15:06  5   A    At Marion.

15:06  6   Q    But do you know T.D. Bingham?

15:06  7   A    No.

15:06  8   Q    Have you ever met T.D. Bingham?

15:06  9   A    No, I haven't.

15:06 10   Q    And Mr. Mills, Barry Mills, have you ever met Mr. Mills?

15:06 11   A    No.

15:06 12   Q    All right.  As far as you know, have you ever been in the

5:06 13    same institution with either of these gentlemen at any

15:06 14   particular time?

15:06 15   A    No, I haven't.

15:06 16   Q    Are you familiar with a prison gang known as the DC

15:06 17   Blacks?

15:06 18   A    Yes.

15:06 19   Q    Okay.  I'd like you to explain to the jury how you know

15:06 20   about the DC Blacks and what interaction you've had with them

15:06 21   in the time that you've spent in prison.  I'd like to start

15:06 22   with your time at Allenwood, and again, the time reference

15:06 23   would be 1996 through part of '97?

15:07 24   A    Most of '97, yes.

5:07 25    Q    All right.  Please describe for the jury your experience

15:07  1  with the DC Blacks, your understanding of who they are and what

15:07  2  interaction you've had with them.

15:07  3  **A**    Okay.  Basically, they are black guys out of DC, there's a

15:07  4  whole lot of them.  They don't really have a state joint.

15:07  5  They used to have Lorton, which was in Virginia, I believe,

15:07  6  which was closed down.  There's many of them, there's hundreds

15:07  7  of them throughout the system.  They are in every federal

15:07  8  institution I've ever been to.  There's large concentrations of

15:07  9  them throughout the east coast prisons, though, Atlanta,

15:07  10  Lewisburg, Allenwood.  They run in packs, they are very

15:07  11  aggressive, they are loud, noisy.  They just act in a way most

15:07  12  people in prison don't act.

15:07  13  **Q**    Now, when you first went into prison, you said you were

15:07  14  18.  Were you a slight -- slightly built, were you bigger --

15:07  15  **A**    Yeah.

15:08  16  **Q**    -- than you are now or --

15:08  17  **A**    Yeah, maybe a little smaller.

15:08  18  **Q**    Okay.  Coming into prison as somebody as young as you were

15:08  19  at the time and the -- and the size you were, did that present

15:08  20  any potential problems for someone like yourself?

15:08  21  **A**    Well, sure.  I mean, prison is a dangerous place to begin

15:08  22  with for anybody regardless of your build, but being younger

15:08  23  and -- and white didn't really help either, so, I mean, you

15:08  24  know, you got -- you got to pay attention a little more, that's

15:08  25  all.

CR 02-938(E)-DOC          August 29, 2006                    11

```
15:08   1   Q    When you say being white didn't help, in your experience
15:08   2   at Allenwood and at Marion, were white inmates there a minority
15:08   3   in terms of the overall prison population?
15:08   4   A    Yes, whites are a minority, yes, in Allenwood for sure.
15:08   5        THE COURT:  Just one moment.  Make sure you wait until
15:08   6   he finishes the question.
15:08   7        THE WITNESS:  Okay.
15:08   8        THE COURT:  Because if the two of you talk over the
15:08   9   top of each other, I can't get a record, okay?
15:08  10        THE WITNESS:  Yes, sir.
15:08  11        THE COURT:  Thank you very much.
15:08  12        THE WITNESS:  Yes, sir.
15:08  13   BY MR. FLEMING:
15:08  14   Q    Now, by the way, Allenwood, you mentioned it's in
15:08  15   Pennsylvania.  Are you familiar with Lewisburg?
15:08  16   A    Yes, I am.
15:08  17   Q    And have you ever spent any time in Lewisburg?
15:08  18   A    A little bit, going there for court, yes.
15:09  19   Q    Okay.  What's the distance between Lewisburg and
15:09  20   Allenwood?
15:09  21   A    Not far, maybe 25 miles, half-hour drive.  It's not far at
15:09  22   all.
15:09  23   Q    In your time at Allenwood, were there occasions when
15:09  24   inmates were transferred from Lewisburg to Allenwood?
5:09   25   A    Yes.
```

CR 02-938(E)-DOC        August 29, 2006                    12

15:09  1  Q     Did that happen in the time frame of '96 and '97 --

15:09  2  A     Yes.

15:09  3  Q     -- on a fairly regular basis?

15:09  4  A     Yes, it happens all the time.

15:09  5  Q     And would you receive information through these inmates

15:09  6  about what was happening there in -- in Lewisburg?

15:09  7  A     Yes.

15:09  8  Q     Let's go back to the DC Blacks.  You mentioned that they

15:09  9  run in packs.

15:09  10  A     Yes.

15:09  11  Q     Are they a predatory group?

15:09  12  A     I would say so.  Everybody hangs out with somebody.  It's

15:09  13  prison, so everybody is affiliated with some group.  Not

15:09  14  necessarily affiliated, but you got friends you hang out with.

15:09  15  These guys seem to run in hoards, which helps them get away

15:10  16  with things that other people wouldn't even attempt.

15:10  17  Q     Such as?

15:10  18  A     Extortion, you know, pressing people out of money, rolling

15:10  19  up on people and making them pay for protection, things of that

15:10  20  nature, trying to chase people off the yard if they didn't pay,

15:10  21  sexual assault.

15:10  22  Q     If -- if there is a single -- just a young, white inmate

15:10  23  in a place like Allenwood where there are a number of DC

15:10  24  Blacks, is it important for that inmate, that -- that young

5:10  25  inmate to form friendships and alliances as a means of

15:10  1  self-preservation?

15:10  2  **A**    It's mandatory for survival.

15:10  3  **Q**    I'd like you to describe what you mean by that, and -- and

15:10  4  please tell the jury in your own words what -- what that means.

15:10  5  **A**    When you get there, someone is going to approach you.  If

15:10  6  you are walking by yourself, irregardless who you talk to,

15:10  7  somebody is watching no matter where you're at.  People are

15:10  8  looking for weakness.  So someone might just start by saying

15:10  9  hello to you a couple times.  You don't know what their

15:10  10  intentions are, you say hello back.  The whole time they're --

15:11  11  they're kind of feeling you now, wondering how far they can go

15:11  12  with you.  They might ask you if you need anything.  You say

15:11  13  "no."  You know, you may be a little leery.  They just feel you

15:11  14  out.  Maybe after a while, they ask if you can by them

15:11  15  something from the store, you know.  If you do, you're never

15:11  16  getting it back, you know.  This is by yourself, if you're

15:11  17  running around by yourself.  Yeah, that's just kind of subtle,

15:11  18  some of the subtle games that go on.  It could be a lot more

15:11  19  direct than that.  You can just get rolled up on it, say you're

15:11  20  either paying or you're leaving.  If they think you've got

15:11  21  money, it's that simple, you know.

15:11  22          "You are going to go to the store and give us this

15:11  23  much every month, or you are getting off the yard.  We are

15:11  24  going to -- we're going to send somebody after you."

5:11  25          They've both the numbers to get away with it, so

CR 02-938(E)-DOC          August 29, 2006                    14

15:11   1  that's -- that's how they do things.

15:11   2  Q    Now, how do you avoid becoming a victim?

15:11   3  A    Well, it helps -- it helps if you've got friends,

15:11   4  obviously.  If they think they are going to get serious

15:11   5  resistance then, you know, they might look for somebody who is

15:12   6  not going to put up such a fight.  Also, you've got to fight if

15:12   7  it comes down to it.  Irregardless of what you think about

15:12   8  that, you have to fight.

15:12   9  Q    Okay.  At this time back in '96, '97, were you learning

15:12  10  information through people who had been at Lewisburg about the

15:12  11  racial tension developing there at Lewisburg?

15:12  12  A    Yes, we were hearing about what was going on on the yard

15:12  13  there, yes.

15:12  14  Q    What were you hearing?

15:12  15  A    We were hearing things weren't too good.  We're were

15:12  16  hearing there was a lot of racial tension going on, a lot of

15:12  17  problems between the DC guys and some of the whites there.

15:12  18  Q    Was that unique to Lewisburg, or have you been hearing

15:12  19  rumors about this problem in other institutions?

15:12  20  A    We've been hearing about it in other institutions as well.

15:12  21  Q    Now, when you gather this information, what -- what is the

15:12  22  purpose of -- of learning that information, why is it helpful

15:12  23  to have that information?

15:12  24  A    Well, because word travels from one prison to the next,

5:12  25  wherever you're at.  Even if you're on the other side of the

15:12  1  country, word is going to get there on what's going on.  And

15:12  2  even though it's all rumors -- a lot of it's true -- it causes

15:13  3  tension on the yard wherever you are at.  People start looking

15:13  4  at each other a little more mistrustfully.  It causes tension

15:13  5  on the yard, so people want to know what's going on, obviously,

15:13  6  you know.

15:13  7  Q    When -- when you were learning information about Lewisburg

15:13  8  back in this time frame, did you specifically learn about

15:13  9  the -- the killing of a white inmate known as Tennessee?

15:13  10  A    Yes.

15:13  11  Q    What did you learn about that?

15:13  12  A    Okay.  What I heard was -- what I heard was DC guys took

15:13  13  over one of the ranges in one of the blocks, and their goal was

15:13  14  to kill every white dude that was on the tier.  This guy

15:13  15  happened to be the first white guy they came across, so they

15:13  16  absolutely butchered the dude.  Before they went on to the next

15:13  17  guy, I guess the deuces went off, the cops came and arrested

15:13  18  everybody at the scene, but he -- he didn't make it.

15:13  19  Q    Do you know why he was killed?

15:13  20  A    Well, he was a white guy.  He was in the first cell.  That

15:13  21  was their intent, was to kill every white dude, that's what I

15:13  22  heard.

15:13  23  Q    Now, did this news, once it reached you in Allenwood, have

15:14  24  any impact on what was happening at your institution?

5:14  25  A    Yes.  Yes, it did have an impact.  It made things a lot

CR 02-938(E)-DOC          August 29, 2006                    16

15:14  1  more tense.  All the races started looking at each other, you

15:14  2  know, a little more mistrustfully.  There is always tension.

15:14  3  There is always tension in prison, but this just made the

15:14  4  problem a little worse for that time frame.

15:14  5  Q    Now, you mentioned the races looked at each other a little

15:14  6  more distrustfully.  Have you formed friendships with black

15:14  7  inmates through the time that you've spent in prison?

15:14  8  A    Yes.

15:14  9  Q    All right.  And close friendships with some?

15:14  10 A    Yes.

15:14  11 Q    Is there a difference in your mind between the way that

15:14  12 the DC Blacks operate and the way that other black inmates and

15:14  13 other black groups operate?

15:14  14 A    Yes, absolutely.  These DC guys act different from anyone,

15:14  15 anyone who's ever met, irregardless of skin color or anything

15:14  16 else.  They just -- it's something about the way they grow up,

15:14  17 their system.  They are completely insane even in the context

15:14  18 of everything that goes on in prison.

15:14  19 Q    Are they known for sexual assaults?

15:15  20 A    Yes, they are.

15:15  21 Q    And -- and tell us what you know about that.

15:15  22 A    From what I heard, it was rampant in Lorton amongst each

15:15  23 other.  There weren't a whole lot of white guys there, but

15:15  24 they'd pray on each other, on themselves, whoever they could

15:15  25 get ahold of.  And that goes down the same way they press

15:15   1    people for money.  If you're by yourself, if you display any
15:15   2    type of weakness or you don't fight when the situation presents
15:15   3    itself, you are a potential victim, you know.
15:15   4    Q    I want to ask you about a comment you made earlier, and
15:15   5    that is that the DC Blacks would sometimes tell someone to "get
15:15   6    off the yard," or there was a comment about getting off the
15:15   7    yard, and I'd -- I'd like to focus your attention on that
15:15   8    comment.
15:15   9             During the guilt phase of the trial, the jury heard
15:15   10   about a comment that apparently was made to a suspected Aryan
15:15   11   Brotherhood member named Wayne Bridgewater while on the yard at
15:15   12   Lewisburg.  And according to the testimony of Eugene Bentley, a
15:16   13   witness who testified during the guilt phase, Mr. Bridgewater
15:16   14   was told by a member -- an influential member of the DC Blacks
15:16   15   the following while out on the yard:  "You and your brothers
15:16   16   need to get off this yard."
15:16   17            Now, I'd like to ask you whether, first of all, that
15:16   18   statement means -- has some significance to you having spent
15:16   19   the years that you've spent in prison?
15:16   20   A    Yes, absolutely.
15:16   21   Q    Tell the jury, first of all, what that statement means,
15:16   22   why it's significant -- let's start there, what it means and
15:16   23   why is it significant?
15:16   24   A    Okay.  If somebody tells you to "get off the yard,"
5:16   25    basically, what they are saying is they want you to request

15:16    1   protective custody, go to the correctional officer and say, "I

15:16    2   can't be here anymore.  I have to go to the hole."

15:16    3          If you do that, then they're -- they're obligated to

15:16    4   lock you up, they've got to.  They put you in the hole, you go

15:16    5   somewhere else.  Now, that's what's in the book.

15:16    6          What really happens in prison, you get told that, it's

15:17    7   a threat.  It's a threat on your life, your well-being and

15:17    8   everything that you can ever hope to accomplish there.  It's

15:17    9   the end of your time there.  You've either got to act or you've

15:17   10   got to leave.  And leaving really isn't an option either,

15:17   11   because then you're marked as a victim wherever you go anyway,

15:17   12   so --

15:17   13   Q    When you say that's a -- that's a threat to "get off the

15:17   14   yard," first of all, what does that mean, "get off the yard"?

15:17   15   A    "Get off the yard" means, basically -- basically, what it

15:17   16   says, get off the yard.  You have to go tell the correctional

15:17   17   officer to move you.  You are not wanted in this penitentiary

15:17   18   anymore, you know what I'm saying?

15:17   19          "We don't want you anymore, you have to go."

15:17   20          It's a threat.  If a person tells you that, they are

15:17   21   prepared for violence.  That's one of the things that are --

15:17   22   the few things in prison that can automatically require

15:17   23   something to take place, and that is one of them, "get off the

15:17   24   yard."

5:17    25   Q    Is there any other way to interpret that on a -- in a

15:17  1   prison setting, "get off the yard"?

15:18  2   A    No, there is no other way to interpret that.  That --

15:18  3   that's a threat.  That's a personal threat.

15:18  4   Q    And would -- would an inmate consider that to be a threat

15:18  5   against one's life?

15:18  6   A    Yeah, absolutely.

15:18  7   Q    And if checking in is not an option, what other option is

15:18  8   left for you?

15:18  9   A    If you don't "get off the yard," and you don't do

15:18  10  anything, then more than likely something is going to happen to

15:18  11  you.  Either they are going to move on you physically, send one

15:18  12  of their guys after you, or maybe they just see you, they think

15:18  13  you're weak, they start pressing you for commissary like we

15:18  14  talked about before and that sort of thing.  But the really

15:18  15  only option to ensure your safety is moving on them.

15:18  16  Q    Is there any other way to deal with that situation aside

15:18  17  from what you've just described?

15:18  18  A    No, not really, there isn't.

15:18  19  Q    If you were on the receiving end of that threat and the

15:18  20  threat was made by a person that you knew to be an influential

15:18  21  member of the -- of the DC Blacks, would you take that threat

15:19  22  seriously?

15:19  23  A    Absolutely.  It doesn't matter who it comes from.  If

15:19  24  somebody says that threat, especially the DC guys who are as

5:19   25  numerous as they were in Lewisburg, you've got to take it

CR 02-938(E)-DOC        August 29, 2006                    20

15:19   1   seriously.  You can't hope something doesn't happen, because in

15:19   2   prison things happen so often it makes no sense to think,

15:19   3   "Maybe it won't happen to me.  I hope it doesn't happen to me."

15:19   4   Q    And based on their history and their known history of --

15:19   5   of violence, the threat is one that you would certainly take

15:19   6   seriously?

15:19   7   A    Absolutely.

15:19   8   Q    At some point, you were then moved over to -- to Marion,

15:19   9   and that was in mid-'97?

15:19   10  A    Yeah, December of '97, late '97.

15:19   11  Q    Let's talk about your experience at Marion, and again, I'd

15:19   12  like you to tell us about interaction with the DC Blacks

15:19   13  during, let's say, December of '97 --

15:19   14  A    Yes.

15:19   15  Q    -- on through 2002 or so, 2003.

15:19   16  A    Okay.

15:19   17  Q    First of all, tell the jury whether you knew of any DC

15:20   18  Blacks there at Marion during this time frame.

15:20   19  A    No, I didn't.  When I got to Marion, I didn't know

15:20   20  anybody, black or white or anybody.  We had heard about some of

15:20   21  the problems that were going on at Marion, as we had heard

15:20   22  about them going on at Lewisburg.  So I get to Marion in the

15:20   23  hole, and I'm hearing the stories about them jumping on white

15:20   24  dudes.

15:20   25            January 2nd, 1997, previous to me getting there, there

CR 02-938(E)-DOC        August 29, 2006                    21

15:20  1  was a real big incident on the yard there.  So I heard about

15:20  2  that, and now, I'm hearing the talk in the hole.  There is not

15:20  3  a whole lot of white guys there.  I think I was like one or two

15:20  4  in the hole there.  So I'm hearing them talk amongst themselves

15:20  5  and each other about what had been going on and what was going

15:20  6  to continue to be going on.

15:20  7  Q    This is -- I'm sorry, this is between the black inmates

15:20  8  there?

15:20  9  A    Yes.

15:20 10  Q    The DC Blacks?

15:20 11  A    Yes.

15:20 12  Q    What were you hearing them say?

15:20 13  A    Well, just that it had been on to the white dudes, and now

15:20 14  it was going to keep being on.  This is shortly after -- right

15:20 15  after I got there.

15:20 16  Q    Okay.  And what was the racial tension like through the

15:20 17  year 1997?

15:20 18  A    Well, I got there at the end.  I can only speak for the

15:20 19  hole, because I was put in a unit after this that was pretty

15:21 20  much segregated because of the racial tensions that had been

15:21 21  going on there.  But when I was there in the hole, I mean, I

15:21 22  heard what I heard, which was the reason that everything was

15:21 23  segregated.

15:21 24  Q    Now, were there other black groups there at Marion in late

5:21 25  '97 and through the time you spent there in '98, '99 and on?

CR 02-938(E)-DOC          August 29, 2006                    22

15:21  1   A     Yes.

15:21  2   Q     All right.  Could you just give us the names of a few of

15:21  3   these different groups?

15:21  4   A     Everybody is there, Latin Kings, Crips, Bloods, BGF, Vice

15:21  5   Lords, Nietas, 27s.

15:21  6              (Interruption in the proceedings.)

15:21  7              THE WITNESS:  Nietas, it's N-e-t-a (sic).  Pronounce

15:21  8   it, "T," kind of --

15:21  9   BY MR. FLEMING:

15:21  10  Q     And -- and once again, did the DC Blacks stand out in

15:21  11  terms of their level of violence and their inability to get

15:21  12  along with people among these other groups that you've just

15:21  13  identified for us at Marion?

15:21  14  A     Yes, they always do.  I've been housed with just about

15:21  15  everybody except them, them on -- on rare occasions, also, but

15:22  16  they stand out.

15:22  17  Q     Now, you mentioned that you -- you met people, white

15:22  18  inmates there at Marion who may have been affiliated with the

15:22  19  Aryan Brotherhood; is that right?

15:22  20  A     Yes, I've overheard the guys that I believe are, that say

15:22  21  that, but I kind of believe them to be that.

15:22  22  Q     All right.  And other -- other white groups as well there

15:22  23  at Marion; do you know some other?

15:22  24  A     Yes.

15:22  25  Q     Such as?

15:22  1   **A**    There's a couple skinheads there, Dirty White Boys.

15:22  2   **Q**    Okay.  You're not -- you're not affiliated directly with

15:22  3   any particular group or not a member?

15:22  4   **A**    Right, not a member.

15:22  5   **Q**    All right.  In -- in your experience there at Marion, did

15:22  6   there appear to be an effort by the members of these white

15:22  7   groups to get along, for the most part, with the black groups

15:22  8   excluding for now the DC Blacks?

15:22  9   **A**    Yes, yes.  After -- after '97, they reintegrated.  We

15:22  10  lived on the tier together, and never any problems.

15:23  11  **Q**    Okay.  Were you ever made aware by anyone there that there

15:23  12  had been some kind of a war declared against the DC Blacks by

15:23  13  the Aryan Brotherhood?

15:23  14  **A**    No.

15:23  15  **Q**    I'm sorry?

15:23  16  **A**    No.

15:23  17  **Q**    Is that something you would have heard about, you think,

15:23  18  if -- if such a war --

15:23  19  **A**    Well, I was in the unit with most of the white guys that

15:23  20  were there, so I think I probably would have heard, yes.

15:23  21  **Q**    You never heard anything like that?

15:23  22  **A**    No.

15:23  23           MR. FLEMING:  May I have a moment, your Honor?

15:23  24           THE COURT:  (No audible response.)

'5:23  25           MR. FLEMING:  Mr. Kitchen, I want to thank you for

```
15:23   1   coming in today.

15:23   2           That's all I have.

15:23   3           THE COURT:  Thank you.

15:23   4           Cross-examination by Mr. Emmick on behalf of the

15:23   5   government of Mr. Kitchen.

15:23   6           MR. EMMICK:  Thank you, your Honor.

15:23   7                      CROSS-EXAMINATION

15:23   8   BY MR. EMMICK:

15:23   9   Q    Good afternoon, sir.

15:23  10   A    Good afternoon.

15:23  11   Q    My name is Mike Emmick.  I'm an Assistant United States

15:23  12   Attorney here in Los Angeles.

15:23  13   A    Okay.

15:23  14   Q    Or the Los Angeles area.

15:23  15           You and I have not spoken before, have we?

15:23  16   A    No, we have not.

15:24  17   Q    All right.  Now, earlier you mentioned some convictions

15:24  18   that you had suffered; is that right?

15:24  19   A    That's correct.

15:24  20   Q    Now, you didn't tell the jury all the convictions that you

15:24  21   suffered, did you?

15:24  22   A    No, no, I didn't.

15:24  23   Q    Because there was a lot of them?

15:24  24   A    Yes, there are.

15:24  25   Q    For example, in 1993 you were convicted of attempted
```

CR 02-938(E)-DOC          August 29, 2006                    25

15:24  1   burglary there in Georgia, right?

15:24  2   A     Yes.

15:24  3   Q     And you were also convicted in 1993 of actual burglary,

15:24  4   right?

15:24  5   A     That's correct.

15:24  6   Q     And then you were given probation at the time, a period of

15:24  7   three years probation, right?

15:24  8         It started with boot camp?

15:24  9   A     Yes, that's right.

15:24 10   Q     It started with boot camp, yes, because they thought if

15:24 11   you went to boot camp, you'll show that you deserve to turn

15:24 12   your life around and then be on probation, right?

15:24 13   A     That's right.

15:24 14   Q     And then you were let out of boot camp, and the month

15:24 15   later you committed another crime?

15:24 16   A     Yes.

15:24 17   Q     All right.  So the crime that you committed was a crime

15:24 18   that actually had four separate felonies in connection with it,

15:24 19   right?

15:24 20   A     That's correct.

15:24 21   Q     There was a carjacking, right?

15:24 22   A     Yes.

15:24 23   Q     That's a felony, right?

15:25 24   A     (No audible response.)

5:25 25    Q     Yes?

15:25  1   A    Yes.

15:25  2   Q    And you were, at the time, using a gun, and so you were

15:25  3   using a gun in connection with a carjacking, right?

15:25  4   A    Well, I was convicted of those counts, but I didn't

15:25  5   personally use the weapon myself, no.

15:25  6   Q    Right.  There were two people, you were working in tandem

15:25  7   with somebody else.  He had a gun, and you were helping, right?

15:25  8   A    Yes.

15:25  9   Q    Is that correct?

15:25  10  A    Yes.

15:25  11  Q    So the two of you working together had a gun?

15:25  12  A    Yes.

15:25  13  Q    All right.  And you were, also, at the time a felon, so it

15:25  14  was felon in possession of a firearm, right?

15:25  15  A    That's right.

15:25  16  Q    All right.  And then the car was taken interstate, and

15:25  17  then that's interstate transportation of a stolen vehicle,

15:25  18  right?

15:25  19  A    Yes.

15:25  20  Q    So that was four felonies right there.

15:25  21       Now, you got an 18-year sentence.

15:25  22  A    18-and-a-half.

15:25  23  Q    18-and-a-half, all right.

15:25  24       Now, you didn't mention a conviction that you suffered

15:25  25  in 1999 for possession of an 11-inch knife there at Allenwood.

CR 02-938(E)-DOC          August 29, 2006                    27

```
15:25   1   You did get that felony conviction, didn't you?
15:25   2   A    Yes, I did.  I think it was 2000, though.
15:25   3   Q    In fact, it was 2000.  And in fact, you got 57 months in
15:26   4   addition, because you had actually used that knife to stab
15:26   5   another inmate, right?
15:26   6   A    That's correct.
15:26   7   Q    All right.  Now, let me understand what it is among the
15:26   8   things that you are saying.  Among the things that you are
15:26   9   saying, I guess, is that inmates who are young and not big
15:26   10  people are at risk of sexual assaults, and therefore, have to
15:26   11  protect themselves?
15:26   12  A    Well, it's prison.  Everybody has to protect themselves,
15:26   13  but what you are saying is pretty much true, yes.
15:26   14  Q    But that's some of the -- one of the points that you were
15:26   15  trying to emphasize, in a manner of speaking, because you are a
15:26   16  youngster?
15:26   17  A    I am not sure if that's what I'm trying to emphasize.  I
15:26   18  know that's what goes on in prison.
15:26   19  Q    Fair enough.
15:26   20       Now, you were never at the California Youth Authority,
15:26   21  right?
15:26   22  A    No, I wasn't.
15:26   23  Q    You were never in the California prison system, right?
15:27   24  A    No.
15:27   25  Q    All right.  And you were not at Marion at the same time
```

CR 02-938(E)-DOC          August 29, 2006                    28

15:27  1   that either Mr. Mills or -- at the same time that Mr. Mills

15:27  2   was, right?

15:27  3   A    That's correct.

15:27  4   Q    So you've never celled with him, you've never been on a

15:27  5   tier with him, you've never been in a prison with Mr. Mills,

15:27  6   correct?

15:27  7   A    That's correct.

15:27  8   Q    In fact, when you started in '94 in the federal system, he

15:27  9   was already in the ADX, right?

15:27 10   A    Possibly, I don't know.

15:27 11   Q    All right.  But he wasn't with you?

15:27 12   A    He wasn't with me.

15:27 13   Q    All right.  And you haven't been to the ADX until very

15:27 14   recently, the last couple of weeks or so?

15:27 15   A    That's correct.

15:27 16   Q    All right.  Now, you talk about a person in your position,

15:27 17   let's say, being more vulnerable, because you are a bit young,

15:27 18   and perhaps, not a big guy; is that right?

15:27 19   A    I wouldn't say more vulnerable, but I mean, everybody is

15:27 20   vulnerable.  Everybody is at risk to these things, but --

15:28 21   Q    Right, but you did testify about the fact that you are

15:28 22   young, and I'm not sure what the word was, slight or something

15:28 23   like that?

15:28 24   A    Yes.

15:28 25   Q    Do you remember that?

CR 02-938(E)-DOC          August 29, 2006                    29

15:28   1   A     Yes.

15:28   2   Q     All right.  Now, you are 31 now, right?

15:28   3   A     Yes.

15:28   4   Q     Mr. Mills is 58, right, or do you know?

15:28   5   A     I don't know.

15:28   6   Q     You don't know.  All right.

15:28   7         Now, Mr. Mills went to prison starting in California

15:28   8   in the mid-'60s, late '60s.  Now, where were you in the

15:28   9   mid-'60s and late '60s?

15:28  10   A     I don't think I was even thought of then.

15:28  11   Q     Yeah, you were not even born yet, were you?

15:28  12   A     No, not yet.

15:28  13   Q     All right.  And when he started in federal prison in 1977,

15:28  14   you were --

15:28  15   A     Two -- two years old.

15:28  16   Q     Two years old.

15:28  17   A     That's right.

15:28  18   Q     All right.  Now, your connection to Mills, then, is that

15:28  19   you were at Marion sometime after he was at Marion?

15:29  20   A     Yeah, I guess.

15:29  21         What are you asking?  I am not sure what you are

15:29  22   asking.

15:29  23   Q     I'm just trying to -- in a sense, your answer is the

15:29  24   answer I was looking for, "I guess."  You don't really know

5:29  25   what the connection is between you and Mr. Mills?

CR 02-938(E)-DOC          August 29, 2006                              30

15:29   1   A    No.

15:29   2   Q    All right.  Now, you do have, though, a connection --

15:29   3           MR. FLEMING:  I objection to that question.  There is

15:29   4   no connection.

15:29   5           MR. EMMICK:  That's part of the point we would make,

15:29   6   yes.

15:29   7           THE COURT:  Overruled.

15:29   8           MR. FLEMING:  I'll stipulate to that.

15:29   9           THE COURT:  Overruled.

15:29   10  BY MR. EMMICK:

15:29   11  Q    All right.  Now, you do have, though, some connections to

15:29   12  the Aryan Brotherhood; is that right?

15:29   13  A    I've been on the tier with people who I believed were,

15:29   14  yes.

15:29   15  Q    All right.  And one of those people, for example, is

15:29   16  Mr. Sahakian?

15:29   17  A    That's correct.

15:29   18  Q    And you're friends with Mr. Sahakian, who is a leader of

15:29   19  the Aryan Brotherhood there at Marion, right?

15:29   20  A    I consider him a friend.  I don't know him to be a leader

15:29   21  or of his position.

15:29   22  Q    All right.  But you certainly know he's with the Aryan

15:29   23  Brotherhood?

15:29   24  A    I believe that.  Again, I've never heard him say that,

5:29    25  specifically, but I've never heard him deny it.  People don't

CR 02-938(E)-DOC          August 29, 2006                    31

15:29   1   really advertise that sort of thing, and you certainly don't

15:29   2   ask it either, so --

15:29   3   Q    Of course, now, when your cell was searched in 2003, there

15:30   4   was a list found in that cell, and that list contained the

15:30   5   names of several members of the Aryan Brotherhood; is that

15:30   6   right?

15:30   7   A    2003?

15:30   8   Q    2003.

15:30   9   A    I'm not sure.  2003?  What month?

15:30   10  Q    I believe it was March.  I believe it was March 4th of

15:30   11  2003.

15:30   12  A    (No audible response.)

15:30   13  Q    Well, did you have a list containing --

15:30   14  A    Back then I don't think I was there in 2003.  I think I

15:30   15  was at Lewisburg going to court.

15:30   16  Q    All right.  But you did at some point in your cell have a

15:30   17  list containing the names of members -- of some members of the

15:30   18  Aryan Brotherhood, right?

15:30   19  A    Yes, yes.  I know what you are referring to.  I had a list

15:30   20  of friends of mine, their names and their number.

15:30   21  Q    Right, and on that list are several people who are members

15:30   22  of the Aryan Brotherhood?

15:30   23  A    I don't know about several.  They are just friends of

15:30   24  mine.  I had a list of their names and their numbers.

5:30    25  Q    All right.

```
15:30   1   A     It's a common thing.

15:30   2   Q     Right.  And whether it's several or a few or more than

15:31   3   one, there are Aryan Brotherhood members on that list, right?

15:31   4   A     Well, there's one guy, there again, I said I believe was.

15:31   5   I've never heard him deny it.  I've never heard him say it, but

15:31   6   I believe him to be, so --

15:31   7   Q     And you're also friends with John Gotti; is that right?

15:31   8   A     Yes, John was a friend of mine, that -- that's correct.

15:31   9   Q     All right.  You're friends with him, and your family is

15:31  10   friends with Mr. Gotti; is that right?

15:31  11   A     I don't know about friends.  They've met before.

15:31  12   Q     They've met before, and they've visited before?

15:31  13   A     In the visiting room.

15:31  14   Q     Okay.  So you have at least some sort of a connection with

15:31  15   John Gotti as well; is that right?

15:31  16   A     Well, they put me in the cell right next to him.  No rules

15:31  17   that I can't talk to the guy.  We ended up talking and becoming

15:31  18   friends.

15:31  19   Q     And you'd come to be friends with John Gotti?

15:31  20   A     Yes.

15:31  21   Q     All right.  Now, you mentioned that you don't know

15:31  22   Mr. Bingham either, never met him, never in prison with him?

15:31  23   A     That's correct.

15:31  24   Q     If I could ask you, have you ever testified before?

15:31  25   A     Yes.
```

CR 02-938(E)-DOC          August 29, 2006                    33

```
15:31  1   Q    How many times?

15:32  2   A    Twice.

15:32  3   Q    One of those times was in the case against Mr. Sahakian?

15:32  4   A    That's correct.

15:32  5   Q    And what was the other time?

15:32  6   A    A case against Mr. Odriscol (phonetic) in Pennsylvania.

15:32  7   Q    Did you testify in any of your own trials?

15:32  8   A    No.

15:32  9   Q    You didn't testify in the 1994 trial involving the

15:32 10   carjacking?

15:32 11   A    No, I didn't.

15:32 12   Q    All right.  Now, you mentioned a -- a number of different

15:32 13   factors that can lead to violence in prison, but violence in

15:32 14   prison is not limited to any particular race, it's not limited

15:32 15   to any kind of person, is it?

15:32 16   A    No, it's not.

15:32 17   Q    Tall people, short people, young people, old people, they

15:32 18   are all capable of violence in prison, right?

15:32 19   A    Yes, and being victims.

15:32 20   Q    And being victims as well.

15:32 21        Now, you are not trying to suggest, are you, that your

15:32 22   crimes were committed out of concern for a possible sexual

15:33 23   assault by members of the DC Blacks or others in prison?

15:33 24   A    Now, which crimes?

5:33 25    Q    Any of the crimes that you've committed?
```

15:33   1   **A**      You mean on the street?

15:33   2   **Q**      Either on -- well, certainly not on the street, because

15:33   3   you are not in prison at the time.

15:33   4   **A**      I am not sure what you are saying.

15:33   5   **Q**      Well, for example, the year 2000 conviction that you

15:33   6   suffered for having the 11-inch steel knife.

15:33   7   **A**      Okay.

15:33   8   **Q**      All right.  Now, you are not suggesting that that's

15:33   9   because of any concern about some sexual assault, are you?

15:33  10   **A**      Potentially, yes.  That's concern for the nature of

15:33  11   prison.  These are the general type of things that go on at

15:33  12   prison, and that was just part of it.

15:33  13   **Q**      Uh-huh.  Well, the person you stabbed was a white man,

15:33  14   right?

15:33  15   **A**      Yes, a white man, correct.

15:33  16   **Q**      And you did that stabbing with another person, a guy by

15:33  17   the name of Huff; is that right?

15:33  18   **A**      That's correct.

15:33  19   **Q**      All right.  Now, the two of you were stabbing Mr. -- I

15:33  20   think it was --

15:33  21   **A**      Beckwith.

15:33  22   **Q**      Beckwith, good memory.  So the two of you were stabbing

15:33  23   Mr. Beckwith.  You had an 11-inch knife, and Mr. Huff had a

15:34  24   7-inch knife; is that right?

15:34  25   **A**      Yes.

CR 02-938(E)-DOC        August 29, 2006                    35

15:34   1    Q    All right.  And that had nothing to do with some sexual
15:34   2    advances or anything like that, you did that because you
15:34   3    thought he was a snitch?
15:34   4    A    No, that's not correct.
15:34   5    Q    Well, you did say to one of the correctional officers
15:34   6    afterwards that you did it because you thought he was a snitch?
15:34   7    A    That's not correct, either.  I believe he made that
15:34   8    statement, but that's not ultimately why that happened.
15:34   9    Ultimately, why it happened was because he had threatened me.
15:34   10   He had threatened harm to me, told me I had better watch it,
15:34   11   which is why it happened.
15:34   12   Q    But you do acknowledge that at least a correctional
15:34   13   officer has said that you said it was that you did the assault
15:34   14   because it was a snitch?
15:34   15   A    That's what the correctional officer said, yes.
15:34   16   Q    All right.  And I believe it was in 1999, perhaps, that
15:34   17   you were caught with Mr. Sahakian and a number of other people
15:35   18   with knives, and the like, that had been keistered; is that
15:35   19   right?
15:35   20   A    Yes, cutting tool, weapon.
15:35   21   Q    A cutting --
15:35   22   A    A cutting tool slash weapon, yes.
15:35   23   Q    All right.  And -- and that happened May 19th of 1999.  I
15:35   24   think it was a dozen or so people were x-rayed, because they
5:35    25   were suspected of having some sort of items on them, right?

CR 02-938(E)-DOC          August 29, 2006                    36

15:35  1  A    That's correct.

15:35  2  Q    And you were one of the persons who were x-rayed, right?

15:35  3  A    Yes.

15:35  4  Q    And it was found that you had a couple of shims, a cutting

15:35  5  tool and a hit list with 29 names on it, right?

15:35  6  A    I had a list, it wasn't a hit list.

15:35  7  Q    A list of names?

15:35  8  A    It was a list of names, yes.

15:35  9  Q    And it was a -- a list that you certainly agree could be

15:35 10  characterized as a hit list?

15:35 11  A    It -- I think it had been characterized as that at some

15:35 12  point, but I had also stated that that's not what it was

15:35 13  intended to be.

15:35 14  Q    All right.  And it was at that time that your cell was

15:36 15  searched, and again, just to go back, I was wrong about the

15:36 16  date.  It wasn't in 2003, it was in 1999, and that's when the

15:36 17  list of names with AB members and associates was --

15:36 18  A    Right.

15:36 19  Q    -- found in your possession?

15:36 20  A    That's right.  I do remember them saying --

15:36 21  Q    All right.

15:36 22  A    -- that.

15:36 23  Q    All right.

15:36 24  A    Okay.

5:36 25  Q    That was 1999?

15:36  1  A      '99, right.

15:36  2  Q      Another thing that you had with you was paperwork on how

15:36  3  to make a bomb --

15:36  4  A      Yes.

15:36  5  Q      -- is that right?

15:36  6  A      Yes.

15:36  7  Q      All right.  So you had paperwork on how to make a bomb.

15:36  8  This was not some kind of a defensive bomb, was it?

15:36  9  A      No, it was just some goofy paperwork somebody found and

15:36  10 passed it down a tier, and I happened to have it when they

15:36  11 searched my cell before I could throw it away or pass it even

15:36  12 farther.

15:36  13 Q      It just so happened that you had the paperwork?

15:36  14 A      Yes, that's correct.

15:36  15 Q      All right.  And when the FBI tried to interview you about

15:36  16 that, do you remember what you said?

15:36  17 A      Yes, "I have nothing to say."

15:36  18 Q      Well, they might say it a little differently.  Isn't it

15:36  19 true that what you said was, "Fuck you.  Get the fuck off my

15:37  20 tier"?

15:37  21 A      No, I said, specifically, to him when he was standing

15:37  22 directly in front of my cell, "I have nothing to say to you."

15:37  23 Q      Well, you -- have you seen reports about this --

15:37  24 A      Yes.

15:37  25 Q      -- that say that you said, "Fuck you.  Get the fuck off my

| | | |
|---|---|---|
| 15:37 | 1 | tier"? |
| 15:37 | 2 | **A**    There was a lot of people on the tier.  I've seen reports |
| 15:37 | 3 | where he heard that, and he wasn't sure where it came from. |
| 15:37 | 4 | **Q**    So he's just mistaken.  He was standing right in front of |
| 15:37 | 5 | you, and he's just mistaken about -- |
| 15:37 | 6 | (Interruption in the proceedings.) |
| 15:37 | 7 | MR. EMMICK:  Sorry. |
| 15:37 | 8 | BY MR. EMMICK: |
| 15:37 | 9 | **Q**    He was mistaken about who spoke those words? |
| 15:37 | 10 | **A**    Yes. |
| 15:37 | 11 | **Q**    All right. |
| 15:37 | 12 | **A**    If somebody spoke them at all. |
| 15:37 | 13 | **Q**    All right.  And in fact, you were -- you were x-rayed |
| 15:37 | 14 | again in 2003.  You were, again, found with items that had been |
| 15:37 | 15 | keistered, let's say, and these were shims, cutting devices and |
| 15:37 | 16 | lock-picking devices, right? |
| 15:37 | 17 | **A**    Cutting devices, no lock-picking devices. |
| 15:37 | 18 | **Q**    Right, but devices that could be used to cut restraints, |
| 15:38 | 19 | right? |
| 15:38 | 20 | **A**    Yeah, I guess so. |
| 15:38 | 21 | **Q**    And that's one of the reasons that the Bureau of Prisons |
| 15:38 | 22 | was concerned about this.  If you can cut restraints, that's of |
| 15:38 | 23 | concern? |
| 15:38 | 24 | (Interruption in the proceedings.) |
| 15:38 | 25 | THE COURT:  All right.  Just one moment, Counsel. |

| | | |
|---|---|---|
| 15:38 | 1 | MR. EMMICK:  All right.  Thank you. |
| 15:38 | 2 | BY MR. EMMICK: |
| 15:38 | 3 | Q    You've also had a number of run-ins with the Bureau of |
| 15:39 | 4 | Prisons generally, not ones that resulted in convictions, but |
| 15:39 | 5 | resulted in incident reports, right? |
| 15:39 | 6 | A    Yes. |
| 15:39 | 7 | Q    That includes drug possession? |
| 15:39 | 8 | A    Drug possession? |
| 15:39 | 9 | Q    Uh-huh. |
| 15:39 | 10 | A    No. |
| 15:39 | 11 | Q    All right. |
| 15:39 | 12 | A    I tested dirty one time for marijuana, I think it was in |
| 15:39 | 13 | 1995. |
| 15:39 | 14 | Q    All right.  Alcohol possession? |
| 15:39 | 15 | A    Yes. |
| 15:39 | 16 | Q    Lying and falsifying statements? |
| 15:39 | 17 | A    No, I don't think. |
| 15:39 | 18 | Q    Refusing to obey orders? |
| 15:39 | 19 | A    Yes, I had a couple of those. |
| 15:39 | 20 | Q    Group demonstrations? |
| 15:39 | 21 | A    I've been written an incident report for that, yes. |
| 15:39 | 22 | Q    All right.  Now, let me just try to bring us back a little |
| 15:39 | 23 | bit to the -- the crimes involved in this case, because you |
| 15:39 | 24 | weren't even in the federal system until 1994, right? |
| 15:39 | 25 | A    That's correct. |

CR 02-938(E)-DOC          August 29, 2006                    40

15:39  1  Q    All right.  So you don't know anything about murders of

15:39  2  Garland Barry?

15:39  3  A    Never heard of him.

15:40  4  Q    John Marzloff?

15:40  5  A    Nope.

15:40  6  Q    Richard Andreasen?

15:40  7  A    Nope.

15:40  8  Q    Tommy Lamb?

15:40  9  A    No.

15:40 10  Q    Arva Ray?

15:40 11  A    No.

15:40 12  Q    Jeffrey Barnett?

15:40 13  A    No.

15:40 14  Q    Joel Burkett?

15:40 15  A    No.

15:40 16  Q    Jimmy Lee Inman?

15:40 17  A    No.

15:40 18  Q    And these would be murders or attempted murders.

15:40 19       Do you know anything about Frank Ruopoli?

15:40 20  A    No.

15:40 21  Q    And you weren't at the ADX to know anything about the

15:40 22  Michael Nevergall case, do you?

15:40 23  A    No.

15:40 24  Q    And you were at Marion in 1997 when Byron Ball and Frank

5:40 25  Joyner and Abdul Salaam were assaulted, so you weren't at

| | | |
|---|---|---|
| 15:40 | 1 | Lewisburg, right? |
| 15:40 | 2 | A    When, when was that? |
| 15:40 | 3 | Q    1997, August of 1997. |
| 15:40 | 4 | A    I was in Allenwood. |
| 15:40 | 5 | Q    All right.  You were in Allenwood. |
| 15:40 | 6 | A    Right. |
| 15:40 | 7 | Q    But you weren't at Lewisburg? |
| 15:41 | 8 | A    No, I wasn't. |
| 15:41 | 9 | Q    And you weren't at the ADX, which is where Mills and |
| 15:41 | 10 | Bingham were? |
| 15:41 | 11 | A    That's correct. |
| 15:41 | 12 |         MR. EMMICK:  Just one moment, your Honor. |
| 15:41 | 13 |         THE COURT:  Uh-huh. |
| 15:41 | 14 |         (Attorney discussion held off the record.) |
| 15:41 | 15 |         MR. EMMICK:  Nothing further. |
| 15:41 | 16 |         THE COURT:  Redirect? |
| 15:41 | 17 |         MR. FLEMING:  No, your Honor.  Thank you. |
| 15:41 | 18 |         THE COURT:  All right.  Ladies and gentlemen, you are |
| 15:41 | 19 | going to be up and down just a couple of times today. |
| 15:41 | 20 |         I'm going to admonish you not to discuss this matter. |
| 15:41 | 21 | We are going to come get you, though, very, very quickly, |
| 15:41 | 22 | within five minutes, okay? |
| 15:41 | 23 |         Please don't discuss this matter.  Don't form or |
| 15:41 | 24 | express an opinion. |
| 5:41 | 25 |         (The following proceedings is taken outside the |

15:42   1   presence of the jury.)

15:42   2          THE COURT:  All right.  Mr. Kitchen, we are going to

15:42   3   excuse you from this matter.

15:42   4          Counsel, may the gentleman be excused?

15:42   5          MR. EMMICK:  Yes, your Honor.

15:42   6          THE COURT:  Counsel?

15:42   7          MR. FLEMING:  Yes, your Honor.

15:42   8          THE COURT:  All right.  You are excused.

15:42   9          You may take the gentleman out.

15:42   10         Who is the next witness, Counsel?

15:42   11         MR. FLEMING:  Mr. McDaughtery is up next.

15:42   12         THE COURT:  Mr. McDaughtery, and we'll need to bring

15:42   13  Mr. McDaughtery in before the jury comes back into court.

15:42   14         Mr. Fleming, if you want to get set up for just a

15:42   15  moment, this will just take about two minutes to make the move.

15:43   16         Then after that, I assume that it will be Doc

15:43   17  Holliday, and he is the founder of the BGF?

15:50   18         MR. FLEMING:  That's right.

15:50   19         THE COURT:  All right.  Will you summon the jury,

15:51   20  please?

15:51   21         (The following proceedings is taken in the presence of

15:51   22  the jury.)

15:51   23         THE COURT:  All right.  The jury is present.  The

15:51   24  alternates are present, all counsel, the defendants, defense

'5:51   25  counsel, government counsel.

15:51  1          And Mr. Fleming, would you like to call your next

15:51  2  witness?

15:51  3          MR. FLEMING:  Mr. Mills calls Mr. Lesester

15:51  4  McDaughtery.

15:51  5          THE COURT:  Thank you, sir.

15:51  6          Would you be kind enough to raise your right hand?

15:51  7  Lisa will administer the oath to you as the clerk of the court.

15:51  8          **LESESTER MC DAUGHTERY, DEFENDANT'S WITNESS, SWORN**

15:51  9          THE WITNESS:  I do, ma'am.  I --

15:51  10          THE COURT:  Thank -- I'm sorry?

15:52  11          Would you be kind enough to state your full name for

15:52  12  the jury?

15:52  13          THE WITNESS:  Yes, sir.

15:52  14          Ladies and gentlemen of the jury, my name is Lesester

15:52  15  Duva McDaughtery.

15:52  16          THE COURT:  And would you spell the last name?

15:52  17          THE WITNESS:  M-c-D-a-u-g-h-t-e-r-y.

15:52  18          THE COURT:  Thank you, sir.

15:52  19          And this is direct examination by Mr. Fleming on

15:52  20  behalf of Mr. Mills of Mr. McDaughtery.

15:52  21                    **DIRECT EXAMINATION**

15:52  22  BY MR. FLEMING:

15:52  23  Q    Mr. McDaughtery, welcome back.

15:52  24  A    Good afternoon.

15:52  25  Q    I see you have a new hairstyle today.

CR 02-938(E)-DOC          August 29, 2006                        44

```
15:52  1   A     I finally got ahold of an afro pick over there in the

15:52  2   jail, right.

15:52  3           (Laughter.)

15:52  4   BY MR. FLEMING:

15:52  5   Q     Mr. McDaughtery, recognizing that you've testified before

15:52  6   this jury during the guilt phase of the trial --

15:52  7   A     Yes, sir.

15:52  8   Q     -- I am going to focus your attention on some slightly

15:52  9   different areas that we were not able to get into during your

15:52 10   last time here, okay?

15:52 11   A     Yes, sir.

15:52 12   Q     And just by way of quick summary, you are serving a

15:52 13   sentence in federal prison; is that right?

15:52 14   A     Yes, sir.

15:52 15   Q     And that is out of L.A. District Court?

15:53 16   A     Yeah, in Central District of California, federal -- yeah,

15:53 17   U.S. District Court, Central District of California.

15:53 18   Q     And if I recall correctly, you're 19 years into a 23-year

15:53 19   sentence?

15:53 20   A     I'm 25.

15:53 21   Q     All right.

15:53 22   A     Well, actually, 24 and one month, so I just round it off,

15:53 23   right.

15:53 24   Q     Okay.

 5:53 25   A     Yeah, 289 months.
```

CR 02-938(E)-DOC          August 29, 2006                    45

15:53  1  Q     When is your release date, sir?

15:53  2  A     November of 2009.

15:53  3  Q     You told us last time that you are associated with the

15:53  4  Crips out of Los Angeles?

15:53  5  A     Yes, sir.

15:53  6  Q     And you have a familiarity with prison gangs in the

15:53  7  federal system based on your years there; is that right?

15:53  8  A     Yes, sir.

15:53  9  Q     All right.  I want to -- I'd like to ask you about your

15:53  10 personal relationship with Barry Mills, and I'd like to focus

15:53  11 your attention to the first time you ever met Mr. Mills back in

15:53  12 Marion in -- was it 1992?

15:53  13 A     '92, sir.

15:53  14 Q     All right.  This is an area that we did not discuss with

15:53  15 you the last time, and so I'd like you to explain to the jury

15:54  16 what you recall from the very first meeting you had the first

15:54  17 time that you and Mr. Mills met.

15:54  18 A     Well, actually, it was a quite impressionable meeting,

15:54  19 because I -- I heard so much about Marion, and this was my

15:54  20 first time coming here, all right.  I had gotten in some

15:54  21 trouble at Leavenworth USP, and they had designated --

15:54  22 designated me to USP Marion.  And part of my release from the

15:54  23 hole, they placed me on the range, and you know, I didn't know

15:54  24 if I knew anybody there, and you know, these are 16-men ranges,

5:54  25 16 cells per range, right?

15:54  1          And so once I arrived on the range and they opened the

15:54  2   doors for recreation, one of the first people who greeted me

15:54  3   was Barry Mills, right?  And he's -- "Hey, homeboy, you -- you

15:54  4   all right, you need anything?"

15:54  5          I was like -- you know, I didn't know him at the time,

15:54  6   but like, "No, I'm cool."  I said, "I'm cool," right?

15:54  7          And he said, "Well, I got some, you know, coffee,

15:54  8   smokes, whatever you need," right, you know.

15:54  9          At the time, I -- I smoked, and I also drank coffee at

15:55 10   that time, right?  And so I'd say he gave me a care package,

15:55 11   right, you know, some chips, some cookies, and you know,

15:55 12   tobacco, coffee, you know.

15:55 13          And at the time, I wasn't aware that, you know -- you

15:55 14   know, this was, you know, anything -- I thought it was, you

15:55 15   know, just really, really great of him to do that at the time,

15:55 16   right.  And I wasn't aware of any ulterior motives or anything

15:55 17   like that, because like I said, at first I had refused, which

15:55 18   is convict -- convict etiquette, right?  But upon his

15:55 19   insistence, and I really wanted a cigarette at that time, too,

15:55 20   right.  And -- I found that that stuck with me.  It was -- it

15:55 21   was really -- like I said, it made an impression on me, right?

15:55 22   Q    Now, did there come a time when Barry Mills asked you for

15:55 23   anything in return for the care package that he had given you?

15:55 24   A    No, sir.  No, sir.

5:55 25    Q    Did he ever indicate to you that you owed him anything for

CR 02-938(E)-DOC          August 29, 2006                    47

15:55   1   --

15:55   2   A    Never, never.

15:56   3   Q    Okay.

15:56   4   A    Never.

15:56   5   Q    And did you accept it then, and do you, looking back on it

15:56   6   now believe that that was simply an act of kindness on his

15:56   7   part?

15:56   8   A    Well, I mean, you know, just the right thing to do, right,

15:56   9   you know, under the circumstances under prevailing etiquette at

15:56   10  the time.  I don't know if it's still in effect now, but at the

15:56   11  time was that, you know, you -- you know, you greeted a person,

15:56   12  and you accepted them at face value at that time, right?  And I

15:56   13  didn't know Mr. Mills, and I was familiar -- me and Mr. Bingham

15:56   14  had been in Leavenworth together, and I didn't know he was on

15:56   15  the tier at that time, either, right.  And like I said, the

15:56   16  first person that greeted me was Mr. Mills, right?  And like I

15:56   17  said, looking back in retrospective, it was just an act of

15:56   18  kindness, right?

15:56   19  Q    Now, was this something in your experience, though, with

15:56   20  Mr. Mills unique just to you, or was this something that

15:56   21  Mr. Mills would do for other inmates who arrived --

15:56   22  A    Yeah, for other inmates, also, yes.

15:56   23  Q    Did you through your initial meeting with Mr. Mills

15:56   24  develop a mutual respect for one another?

15:57   25  A    Yes, sir.

15:57  1  Q    And do you consider Mr. -- how do you consider Mr. Mills

15:57  2  in your personal life?

15:57  3  A    A friend.

15:57  4  Q    Okay.

15:57  5  A    Yeah, a personal friend of mine.  Through my experiences

15:57  6  with him, you know, there's several things we use to judge each

15:57  7  other in the -- in the context of, you know, our world, so to

15:57  8  speak.  And I mean, you know, principles, I mean, matters of

15:57  9  principle, of honor, always respectful, always cordial, right?

15:57 10  Never imposes upon a man as far as his particular morals or

15:57 11  your beliefs, codes or creeds, right?  I mean, you know,

15:57 12  willing to let you be what you are, you know, as long as you

15:57 13  let -- you know, everyone's got to let everyone be what they

15:57 14  are, right?  And like I said, that to me was really one of

15:57 15  the -- I don't know -- I don't know, really, it was -- it was a

15:57 16  revelation to me as far as Marion went at that time, right,

15:58 17  because I had heard so much about it, right?  And I -- I

15:58 18  thought, well, you know, you got to experience this for

15:58 19  yourself before you make any rash decisions, right?

15:58 20           And so it came to me that Mr. Mills was -- if he was

15:58 21  representative of the population at that time at Marion, then,

15:58 22  you know, there was a chance that we could coexist in, you

15:58 23  know, in a chaotic environment, right?

15:58 24  Q    In terms of your relationship with Mr. Mills throughout

15:58 25  the time that you've known him, were you able to coexist

15:58   1   before?

15:58   2   A    Yes, sir, definitely.

15:58   3   Q    All right.  This morning the government read from a --

15:58   4   some document.  I believe it was from the California Department

15:58   5   of Corrections.

15:58   6   A    Uh-huh.

15:58   7   Q    And within the statement that they read to the jury this

15:58   8   morning was a quote from an individual within the CDC who spoke

15:58   9   of "Mr. Mills' hatred of blacks," end quote.

15:58   10          Now, what's been your experience regarding Mr. Mills'

15:59   11   feelings toward -- toward blacks, black inmates, yourself and

15:59   12   others?

15:59   13   A    Well, being a black man in America we -- you know, there's

15:59   14   a specific history to this country, I am sure we are all aware

15:59   15   of that, right?  We're very -- as African Americans, we are

15:59   16   very sensitive to racial issues, right?  There is not a lot

15:59   17   European America can do to, per se, mask hatred of blacks,

15:59   18   right?  I mean, you know, it's just that, you know, in my

15:59   19   experience -- from my experience, I've been around a lot of --

15:59   20   you know, I've come from Southern California, and you know,

15:59   21   been around the block a time or two, right?  And people try to

15:59   22   master their -- their emotions and wear masks, right?  But one

15:59   23   of the things that give white people away is their blushes,

15:59   24   right?  You guys can't hide that, you blush, right?  You know,

5:59   25   you can't hide that, right?

15:59  1          (Laughter.)

15:59  2          THE WITNESS:  And so, I mean, invariably when I run

16:00  3  into a person of European descent that really was antagonistic

16:00  4  towards a black, you could see, you know, the blood rush to

16:00  5  their ears and their face and their neck, right?  And they -- I

16:00  6  mean, it showed, right, you know?

15:00  7  BY MR. FLEMING:

16:00  8  Q    Right.

16:00  9  A    And I never experienced that with Mr. Mills, right?  And

16:00 10  like I said, invariably in my meetings, in my experience, when

16:00 11  I ran across that specific hatred, right, not necessarily bias

16:00 12  or prejudice, but hatred, right, then it would invariably show,

16:00 13  it would manifest because it's basically impossible to hide.

16:00 14  Q    And did you ever even detect a hint of any type of hatred

16:00 15  toward you or any other black as a group --

16:00 16  A    No, sir.

16:00 17  Q    -- from Mr. Mills?

16:00 18  A    No, sir.  No, sir.  Never.

16:00 19  Q    And you think you've discovered that in somebody?

16:00 20  A    Well, I mean, like I said, I've been around the block a

16:00 21  time or two and, you know, life is an experience, right?  And

16:00 22  like I said, after so many meetings -- I've come from Southern

16:01 23  California, right?  I grew up in Manhattan Beach, you know.

16:01 24  Even at the height of my gangbanging career, I was down there

6:01 25  smoking pot with the surfers, right?  You know what I mean?  So

CR 02-938(E)-DOC          August 29, 2006          51

16:01   1  like I said, I know -- I've been around, you know, people a

16:01   2  lot, and invariably I can -- you know, vibes -- aside from

16:01   3  vibes, I just think the physical aspect of it is very hard --

16:01   4  if someone hates you, it's very hard to hide, right?

16:01   5  Q    While you were at -- I want to shift gears slightly.  I

16:01   6  asked you about your observations, your opinion of Mr. Mills

16:01   7  as, for a lack of a better word, a peacemaker there at Marion

16:01   8  back in the time you knew him, '92, '93 --

16:01   9  A    Right.

16:01  10  Q    -- and I assume '94, part of '94?

16:01  11  A    Yes, sir.

16:01  12  Q    All right.  First of all, did you consider Mr. Mills to be

16:01  13  a peacemaker at Marion?

16:01  14  A    Always.  In my experience, I had -- I had had several

16:01  15  experiences where I personally observed him intervene in

16:02  16  situations that could have gotten out of hand, right?

16:02  17  Q    Now, I know you and I -- you've shared those with me --

16:02  18  A    Yes, sir.

16:02  19  Q    -- and I'll ask you to share those with the jury now.

16:02  20  A    Well, the first one I remember was in 1992, the

16:02  21  Los Angeles Raiders were playing the Kansas City Chiefs, and

16:02  22  one of the ways -- in the federal system, it's very, very

16:02  23  geographically orientated, right?  And one of the ways these

16:02  24  guys use to insult each other is they will take your sports

6:02  25  franchise and insult your sports franchise, and it's a backhand

CR 02-938(E)-DOC          August 29, 2006                    52

```
16:02   1  insult to you.  So if I say -- some guys from Chicago, and I
16:02   2  say, "Hey, well, 'F' the Bears," you know?  And then all of the
16:02   3  Chicago guys are saying, "Well, what you're saying in actuality
16:02   4  is 'F' us, right?" you know?
16:02   5          So there was a black guy and a Mexican guy and -- a
16:02   6  Mexican guy from California, and at the time the Raiders were
16:03   7  the Los Angeles Raiders, right, and a black guy out of Kansas
16:03   8  City, and the game was going on and, you know, a couple of
16:03   9  words was said, and the black guy from Kansas City said, "Well,
16:03  10  man, 'F' the Raiders," you know?  And so the Mexican guy took
16:03  11  great exception to this, right, and he said, "Well, hey, you
16:03  12  know, 'F' the Chiefs," right?
16:03  13  Q    Mr. McDaughtery, let me interrupt you.
16:03  14  A    Yeah.
16:03  15  Q    Did he say "F," or did he use another word?
16:03  16  A    No.
16:03  17  Q    Tell us the word that he used.
16:03  18  A    "Fuck the Raiders," you know, and the other guy said "Fuck
16:03  19  the Chiefs," right?  You know, I mean, words got exchanged and
16:03  20  it got heated, and at the time this particular Mexican guy was
16:03  21  a pretty, you know, respected gentleman, right?  And there
16:03  22  weren't a whole lot of people that could tell him what to do or
16:03  23  ask him what to do or anything like that on the tier, right,
16:03  24  because of his specific station, right?  And one of the few
16:03  25  people that could talk to him was Mr. Mills or Mr. Bingham.
```

16:04  1   Mr. Mills approached him and, you know, a voice of reason, and

16:04  2   told him to think it out, and hey, you know, the consequences

16:04  3   of what could happen, you know, and basically it could have

16:04  4   been a bloodbath, you know what I mean?

16:04  5        And through Mr. Mills' voice of reason, this guy

16:04  6   calmed down, and they were able to talk, right, and apologize

16:04  7   to each other and promise they will show each other they would

16:04  8   not cross that line again.

16:04  9   Q    Now, it may be a little hard for some of us to imagine how

16:04  10  that exchange that you've just described could possibly end in

16:04  11  a bloodbath.  The reality is, in the environment that you've

16:04  12  described to us back at Marion in '92, what was the potential

16:04  13  for something like what you've just described to escalate into

16:04  14  a bloodbath and perhaps even a killing?

16:04  15  A    Well, you have to understand that inherently, we are

16:05  16  violent, most of us.  You know, we choose our lifestyle, right?

16:05  17  We come up through violence.  We have basically, you know,

16:05  18  small, very low reserve in, you know, committing violence, so

16:05  19  in these types of environment -- and it's a product of the

16:05  20  environment.  You must understand that.  But in these types of

16:05  21  environment, men that say things that are insulting in a manner

16:05  22  say them with the understanding that if you say it, you might

16:05  23  have to suffer the consequences, and your peers -- if you are

16:05  24  the one that's insulted, your peers are going to say, "Hey, you

16:05  25  need to address that."

16:05  1        And so like I said, it's very geographically

16:05  2   orientated in the Feds.  You've got, you know, guys from

16:05  3   various parts of the countries, and they bring all their

16:05  4   sub-cultures to the table, right?  You know, whatever part of

16:06  5   the country they're from, they bring the specific sub-culture

16:06  6   from that particular area, right?  And if I say, well, "Hey,

16:06  7   you know, fuck the Chiefs," right?  Then the guys out of Kansas

16:06  8   City, they take it personal, literal, and say "Okay.  What you

16:06  9   are saying, in essence" -- "What you are saying, in essence, is

16:06  10  fuck us, right?"  And like I say, it's the way the guys use to

16:06  11  insult each other.  It's true, right?  But the -- the -- the

16:06  12  exacerbating factor is that insults in the convict environment

16:06  13  must be addressed.  You can't let anybody insult you and not

16:06  14  address it, right?

16:06  15  Q    Why not?

16:06  16  A    Why not?  Well, it's a matter of -- it's a matter of are

16:06  17  you going to stand, are you a man?  Are you going to stand?

16:06  18  Are you going to let anybody talk to you any kind of way?  It's

16:06  19  kind of like, you know, if you -- if you allow a man to talk to

16:07  20  you in a manner that's disrespectful, unbecoming, so to say,

16:07  21  then you know, and then -- you know, it excels from there, and

16:07  22  the next thing you know, he might try to put hands on you,

16:07  23  right, or he might try to invariably take something from you,

16:07  24  right?

6:07   25        And so like I said, if you don't address these types

CR 02-938(E)-DOC          August 29, 2006                    55

16:07  1   of things, because insults are considered words to be more --

16:07  2   in our environment -- in our environment, words can be more

16:07  3   last -- have a more lasting effect than you punching the guy in

16:07  4   the mouth.  I might come and punch a guy in the mouth, and we

16:07  5   can, afterwards, you know, sit down and say, "Hey, man, we had

16:07  6   a good tussle," right?  Or I might tell a guy, "Hey, you slimy

16:07  7   piece of crap, you.  I think you're a rat," this, that and the

16:07  8   other, and that's unforgivable.  It would never be forgiven,

16:07  9   and that man will always have malice in his heart for me,

16:08  10  right?

16:08  11          So I say words, a lot of times, can have a more

16:08  12  lasting effect than actual physical combat, right?

16:08  13  Q    Let's turn to another example, another memory that you

16:08  14  have in another --

16:08  15  A    Yes, sir.

16:08  16  Q    And you shared this with me last week as well, and I am

16:08  17  going to ask you to share it with the jury.

16:08  18  A    Yes, sir.

16:08  19  Q    A young white guy landed on the tier --

16:08  20  A    Yes, sir.

16:08  21  Q    -- and there was a comment that he made in the presence of

16:08  22  a number of people.

16:08  23  A    Yes, sir.

16:08  24  Q    I think Barry was there, and there were some black inmates

16:08  25  there.

16:08   1   A     Yes, sir.

16:08   2   Q     Do you recall what I'm now talking about?

16:08   3   A     Yes, sir, I do.

16:08   4   Q     Tell the jury about that night, about what happened.

16:08   5   A     Well, this kid had come on the range, and he had a few

16:08   6   cups, right?

16:08   7   Q     What do you mean, "had a few cups"?

16:08   8   A     Jailhouse wine, right?

16:08   9   Q     Gotcha.

16:08  10   A     And you know, he's full of himself, right?  And some of

16:08  11   the guys -- some of the white guys were kidding him, right,

16:09  12   because blacks, we have, you know, certain particular grooming

16:09  13   characteristics, right?  At the time, you know, and still

16:09  14   today, a lot of blacks braid their beard, right?  They braid it

16:09  15   down like this (indicating), right?  So this guy came down the

16:09  16   tier, and he had his little goatee braided, right?  He was

16:09  17   drunk and everything, so a white guy started teasing him,

16:09  18   right?  You know, "Are you a brother now, or something?"  And

16:09  19   so he got kind of upset.  And after he got drunk, he kind of

16:09  20   came out and he was like, "Hey, lookie hear, man, I ain't got

16:09  21   no nigger characteristics," right?  And even though it was said

16:09  22   in a manner like, "Hey, man," you know, not really directed at

16:09  23   anyone, right, but still it was over a tier, and you've got 36

16:09  24   people on this tier, right, and --

6:09   25   Q     Mr. McDaughtery?

CR 02-938(E)-DOC          August 29, 2006                    57

16:09  1  A     Yeah.

16:09  2  Q     Can you just take a breath for a minute?

16:09  3  A     Yeah.

16:09  4  Q     Okay.  We need to let the court reporter catch up.

16:09  5  A     Okay.

16:09  6           THE COURT:  Yeah, why don't we rest for a moment.

16:09  7  It's a good idea.

16:10  8  BY MR. FLEMING:

16:10  9  Q     All right.  So he made this comment in the presence of

16:10  10  black inmates as well as some white inmates?

16:10  11  A     Well, I mean, it's a closed-in environment, and if you say

16:10  12  something over tier, it can be heard by all, right?  Yes, sir.

16:10  13  Q     What are the potential consequences of a statement like

16:10  14  that being made in the manner that you described?

16:10  15  A     Uh-huh.

16:10  16  Q     What are the potential consequences?

16:10  17  A     Well, I mean, you know, invariably bloodshed, right?  The

16:10  18  thing is, you know, that particular word right there, in that

16:11  19  context, it, you know -- most black people would get offended,

16:11  20  right?  Me personally?  Not me, but, you know, most black

16:11  21  people would, right, because, like I said, given the historical

16:11  22  context, right?  So the potential of that escalating into

16:11  23  something that could have been, you know, violent was great.

16:11  24  Q     Did Mr. Mills play any role in reducing that possibility

16:11  25  or eliminating that possibility of violence?

CR 02-938(E)-DOC          August 29, 2006                    58

16:11  1  A    Well, I think -- I think he nipped it in the butt right

16:11  2  off, right?

16:11  3  Q    Tell the jury how he nipped it in the butt?

16:11  4  A    Well, I mean, right off, as soon as things were put out

16:11  5  there like that on the tier, he just made one simple statement.

16:11  6  He said, "Hey, man, we don't talk like that," and you know,

16:11  7  "Okay, man," and basically that was it, right?  So what that

16:12  8  told everybody was that "Look man, you know, people around here

16:12  9  aren't going to stand for that," right?  You know, he's been

16:12 10  checked.  He's been warned, so it's not going to happen again,

16:12 11  right?

16:12 12  Q    So by Mr. Mills making that comment biblically in the way

16:12 13  that he did --

16:12 14  A    Yes, sir.

16:12 15  Q    -- did he also educate other people on the tier who may

16:12 16  not be aware that they're not going to use that kind of

16:12 17  language?

16:12 18  A    Exactly.  I would believe so.  I would think that people

16:12 19  took the meaning to mean that, "Look, it's not going to be

16:12 20  stood for, and he is going to address it if it ever comes up,"

16:12 21  right?

16:12 22  Q    Are these two examples, among other examples, the way that

16:12 23  Barry Mills, and the time that you spent with him, interacted

16:12 24  on a daily basis there at Marion?

6:12 25  A    Yeah, I would say so, I would say so, per se, right?  Like

```
~6:12   1   I said, I'm always respectful.  I've never, in my association
16:13   2   with these two gentlemen, I've never, ever seen them, like I
16:13   3   said, impose on a man because of his color, creed, beliefs,
16:13   4   morals, codes, or whatever, right?  And to me, that's the --
16:13   5   that's when the ultimate signs of being -- I -- I don't know,
16:13   6   for lack of a better word, you know, in touch with their
16:13   7   humanity, right?  Humanity, right?
16:13   8           You understand that there are differences in the
16:13   9   world, and everybody has a right to their own particular
16:13  10   beliefs, their own particular ways of life, their own
16:13  11   particular morals, codes, and I won't -- I won't impose upon
16:13  12   you about that.  In other words, I respect that.  If you, you
~6:13  13   know, whatever your particular codes are, your particular
16:13  14   creeds are, I respect that to the point that I let you do your
16:13  15   thing, you know, and you let me do my thing, and we can
16:13  16   coexist, right?
16:14  17   Q    And in the time that you spent with Barry Mills back at
16:14  18   Marion, was he able to contribute to an atmosphere where the
16:14  19   racial tension was at a low manageable level?
16:14  20   A    I would believe so.  I would believe so, yes.
16:14  21   Q    And by the way, everything that you've described about
16:14  22   Barry Mills, does that apply with equal force to T.D. Bingham
16:14  23   as well?
16:14  24   A    Yes, sir.  In my experience, yes, sir.
6:14   25   Q    And you may have already told us this last time, but is he
```

`6:14   1   also a good friend of yours?

16:14   2   A    Yes, sir.

16:14   3   Q    All right.  I want to shift gears and go back to an area

16:14   4   that you did touch on the last time you were here and ask you

16:14   5   some more specific questions about it, and that involves the DC

16:14   6   Blacks.

16:14   7   A    Yes, sir.

16:14   8   Q    I believe you told us last time that your experience with

16:14   9   the DC Blacks is that they are a very violent, highly predatory

16:14  10   group; is that right?

16:14  11   A    Yes, sir.

16:14  12   Q    All right.  How did they interact with other black groups

6:14   13   during the years that you've known them?

16:15  14   A    Well, I mean, these guys, like I said, from a -- if you

16:15  15   understood it from a historical prospective, these guys

16:15  16   basically don't get along with anyone.  And the reason -- I

16:15  17   think I touched on the reason last time.  I'll go over it again

16:15  18   for you.  It's not real convoluted.  It's just not real

16:15  19   complicated.

16:15  20          The federal system in the '70s, before the

16:15  21   Comprehensive Crime Control Act was enacted, was basically a

16:15  22   place where I would say white-collared criminals resided,

16:15  23   right?  You had your mob figures, you know.  You had, you know,

16:15  24   your extortionists and all your embezzlers, you know, and

6:15   25   things like that, right?  So what you had was you had a lot of,

CR 02-938(E)-DOC          August 29, 2006                    61

```
16:15   1  like I said, white-collared criminals in the federal system.
16:15   2  You didn't have a garden variety street thug, right?  The only
16:16   3  district that had the corner-street thug in the federal system
16:16   4  was the DC Blacks because it's the District of Columbia, and
16:16   5  they don't have a state pen.  So when they snatch a purse or
16:16   6  did a robbery, they could wind up in the federal system, right?
16:16   7          So then you had these street-corner thugs running --
16:16   8  just running roughshod over these white-collared criminals for
16:16   9  so many years, right?  But after the enactment of the
16:16  10  Comprehensive Crime Control Act, and it took effect on
16:16  11  November 1st, 1987, you started getting your street-corner
16:16  12  thugs from all over the nation, right?  Los Angeles, Chicago,
16:16  13  New York, everywhere, right, you know, Texas, everywhere.  And
16:16  14  so now they are not just dealing with white-collared criminals.
16:16  15  They are dealing with their own kind, their peers, now --
16:16  16  street thugs, whatever -- murder, robbery, whatever, right?
16:17  17  And so now they are saying, okay, you know, the tied is
16:17  18  shifting, right?  I mean, you know, over the past, you know, 20
16:17  19  years, they've been into it with everybody, you know, because
16:17  20  they don't want to let go.
16:17  21  Q    They are into it with black groups, other black groups?
16:17  22  A    Yes, sir.
16:17  23  Q    They are into it with white groups?
16:17  24  A    Yes, sir.
16:17  25  Q    And do they prey on individuals who are not associated
```

CR 02-938(E)-DOC          August 29, 2006                    62

16:17  1   with any group?

16:17  2   **A**     Yes, sir.  Definitely.

16:17  3   **Q**     I want to ask you about a particular incident involving a

16:17  4   guy known as Arizona Dave.

16:17  5   **A**     Yes, sir.

16:17  6   **Q**     Could you tell us about that in relation to the DC Blacks?

16:17  7   **A**     Well, Arizona Dave came up to Marion, a real gullable guy,

16:17  8   right?  He's got all these tattoos, right?

16:17  9   **Q**     A white guy or black guy?

16:17  10  **A**     A white guy.

16:17  11         He's got these sleeves, the whole sleeves, the fires

16:17  12  and everything, you know, the sculls and everything.  And they

16:17  13  put him on a tier, F-8 to be exact, which at the time F-8 was a

16:17  14  designated DC tier, right, but they also had California

16:18  15  Mexicans on their tier, so everybody -- it was about eight DC

16:18  16  Blacks over there, about six, seven California Mexicans.  John

16:18  17  Gotti was on the tier also.  And so they put Arizona Dave on

16:18  18  the tier.  And so indiscriminately, they see this guy with all

16:18  19  these tattoos, and they think, "Okay, this guy is one of them,"

16:18  20  right, the Aryan Brotherhood, right?  And so they took the

16:18  21  first available opportunity attacking -- I mean, you know, kind

16:18  22  of rudely attacked him, right?

16:18  23  **Q**     Attacked him how?

16:18  24  **A**     With knives, physically attacked him.  They started

6:18   25  stabbing him.

CR 02-938(E)-DOC        August 29, 2006                    63

| | | |
|---|---|---|
| 16:18 | 1 | Q    And this is because they thought mistakenly that he was a |
| 16:18 | 2 | member of the Aryan Brotherhood? |
| 16:18 | 3 | A    Yes, sir. |
| 16:18 | 4 | Q    What year did this occur? |
| 16:18 | 5 | A    2000. |
| 16:18 | 6 | Q    I want to ask you about a comment that we heard about |
| 16:18 | 7 | earlier, and it involves something said to suspected Aryan |
| 16:18 | 8 | Brotherhood member Wayne Bridgewater -- |
| 16:19 | 9 | A    Uh-huh. |
| 16:19 | 10 | Q    -- who, based on a witness during the trial, was told |
| 16:19 | 11 | while on the yard at Lewisburg by an influential DC Black |
| 16:19 | 12 | member that he and his brothers "needed to get off the yard" |
| 16:19 | 13 | was the quote.  Now, tell us if that has any significance to |
| 16:19 | 14 | you, those words, and why. |
| 16:19 | 15 | A    Well, in prison, if I'm -- if I come to you and say, "Hey, |
| 16:19 | 16 | man, lookie here.  You need to get up off this yard," right? |
| 16:19 | 17 | What I'm saying to you, in essence, is if you don't get up off |
| 16:19 | 18 | this yard, I'm going to kill you, right?  You -- you put that |
| 16:19 | 19 | in context.  There is no other way you can interpret that, |
| 16:19 | 20 | right? |
| 16:19 | 21 | I don't know.  It's -- it's just like the -- it's an |
| 16:19 | 22 | ultimate -- it's an ultimatum, and right there, that guy is |
| 16:20 | 23 | letting you know that "I will try take your life if you don't |
| 16:20 | 24 | get up off this yard," right?  Because if I tell you, "Hey, you |
| 6:20 | 25 | know, you need to get up off this yard," what I'm saying to you |

CR 02-938(E)-DOC          August 29, 2006                          64

16:20   1   is, "Look, I don't respect you.  You are going to do what the

16:20   2   hell I tell you, or else you are going to suffer dire

16:20   3   consequences," right, in the prison context, because there is

16:20   4   no where else for us to go.

16:20   5          And then, you know, if you run from one yard and --

16:20   6   you can't run -- you can't keep running, especially if you are

16:20   7   in the USP, and they only had three or four of them, right?

16:20   8   You can't keep running from yard to yard.  If you do, then

16:20   9   invariably you ain't going to have nowhere to go, right?  So

16:20   10  when those ultimatums are brought to you, someone addresses you

16:20   11  like that, you know, invariably what they are saying is "Look,

16:20   12  man, I am going to kill you if you don't get up off this yard."

16:21   13  Q    And if the comment is directed to you and your brothers,

16:21   14  what significance does that have, if any?

16:21   15  A    It's for you and whoever you are associated with, yeah.

16:21   16  Q    So would the threat be directed not just to the person

16:21   17  receiving the threat, but to whoever his associates --

16:21   18  A    Whoever his associates are, yes, sir.

16:21   19  Q    Is there anything that you can think of more serious,

16:21   20  something more serious that could be said to another inmate by

16:21   21  another inmate, than this?

16:21   22  A    The only thing more serious than you can -- I don't think

16:21   23  so, not in the language context.  I mean, if you -- and I don't

16:21   24  mean to make light of this, but the best analogy I can give you

6:21    25  is, say, 1850, a tombstone somewhere, and one gunfighter says

16:21  1   to another gunfighter, "Hey, get out of town by sundown.  This

16:21  2   town ain't big enough for the both of us," right?  I mean,

16:21  3   that's it right there.  I mean, this guy -- there ain't two

16:21  4   ways to interpret it.  "If you ain't out of town by sundown, I

16:22  5   am going to come gunning for you," right?  This is the same

16:22  6   thing.  I mean, the same principle is involved here.

16:22  7         If someone tells you, "Hey, man, get up off this yard,

16:22  8   you need to get up off this yard," there ain't no -- it's plain

16:22  9   and simple.  It's cut and dry that we are coming for you,

16:22  10  right?  So like I said, the only thing that's worse than that

16:22  11  is actually doing the deed, start stabbing you, right, because

16:22  12  he's letting you know he's coming for you, right?  He's giving

16:22  13  you a heads up, as a matter of fact.

16:22  14  Q    Hypothetically, if this was said to you, what would be

16:22  15  your response?

16:22  16  A    Hypothetically?

16:22  17        (Laughter.)

16:22  18        THE WITNESS:  Hypothetically, yes, sir, I would --

16:22  19  BY MR. FLEMING:

16:22  20  Q    Hypothetically.

16:22  21  A    If he allowed me -- if he said that to me and allowed me

16:22  22  to walk away, I would immediately go get two knives, strap one

16:22  23  on each hand, and at the first available opportunity, strategy

16:22  24  permitting, you know, trying to, you know -- because whatever

16:22  25  we do, we try to get away with it, right?  In other words, you

CR 02-938(E)-DOC          August 29, 2006                    66

16:23  1  don't get caught unless you got no choice, right?

16:23  2  Q    Hypothetically.

16:23  3  A    Hypothetically.  And at the first available opportunity, I

16:23  4  would -- I would seek to do something to him because, I mean,

16:23  5  you know, it's -- it's what my environment dictates.  I have to

16:23  6  do it.

16:23  7  Q    Is that a general understanding among anyone who spent any

16:23  8  amount of time in federal prison?

16:23  9  A    Yes, yes, sir.  Federal, state, any.  You have to do it.

16:23  10 God knows you've got two choices.  Either you do it, or you

16:23  11 check off the yard, and if you check off the yard -- if you

16:23  12 check in -- "check in" is tantamount to ratting.  If you are a

16:23  13 PC, you are a rat; same thing, you know.  There is no -- there

16:23  14 is no -- there is no difference between the two in our

16:23  15 terminology, right?

16:23  16        So I mean, if you do that, if you go to the cops and

16:23  17 say, "Lookie here, man, lock me up," then you got nowhere to

16:23  18 go.  I mean, you know, your sentence from then on out will be

16:24  19 pure hell, you know.  You would just -- you would live boxed in

16:24  20 and caged in for the rest of your sentence, right, because

16:24  21 you'd be an outcast, you'd ostracized, right?

16:24  22        No one wants to live like that, man.  Everybody needs

16:24  23 friends.  Everybody wants to be social.  If you just want to go

16:24  24 play basketball, right, you don't want to be locked in a PC

16:24  25 cage for 20, 30 years, right?  Do you know what I mean?

16:24  1    Especially if you have a lot of time to do, right?

16:24  2    Q    In your mind, would you have any choice, really, if

16:24  3    someone was to tell you to get off the yard?

16:24  4    A    I wouldn't.  Any -- any man that's worth half his salt

16:24  5    wouldn't.

16:24  6    Q    It's been a pleasure talking to you, again.  Thank you

16:24  7    very much, Mr. McDaughtery.

16:24  8    A    You're welcome.

16:24  9         THE COURT:  Cross-examination.  This is Mr. Wolfe on

16:24  10   behalf of the government.  This is cross-examination of

16:24  11   Mr. McDaughtery.

16:24  12        And before you start, just a moment.

16:24  13        Okay, Counsel.  Cross-examination.

16:25  14        MR. WOLFE:  Thank you, your Honor.

16:25  15                    **CROSS-EXAMINATION**

16:25  16   BY MR. WOLFE:

16:25  17   Q    Good afternoon, Mr. McDaughtery.

16:25  18   A    Good afternoon, Mr. Wolfe.  How are you?

16:25  19   Q    I'm fine, thank you, sir.  How are you?

16:25  20   A    I'm fair to middling.

16:25  21        (Laughter.)

16:25  22   BY MR. WOLFE:

16:25  23   Q    Mr. McDaughtery, have you ever known of any incidences

16:25  24   where Barry Mills was not a peacemaker?

16:26  25   A    Not a peacemaker?  Do you mean by that that he instigated

CR 02-938(E)-DOC          August 29, 2006                    68

16:26   1   some type of altercation or --

16:26   2   Q    Let's say he ordered someone killed?

16:26   3   A    No, sir, I've never known him of anything like that.

16:26   4   Q    Would the fact that he's done that make a difference in

16:26   5   your opinion of him as a peacemaker generally?

16:26   6   A    Would it make a difference?

16:26   7   Q    Yes, sir.

16:26   8   A    It would depend on the circumstances involved, what -- you

16:26   9   know, why it was done, right?

16:26   10  Q    What kind of killings could Defendant Mills order without

16:26   11  lowering his position, in your opinion?

16:26   12  A    Are we speaking theoretically?  Because I don't know if

16:26   13  Defendant Mills can order killings.  I don't know that.

16:26   14  Q    Actually, since you were here --

16:26   15  A    Okay.

16:26   16  Q    -- it's established that Mr. Mills killed, with his own

16:26   17  hands, John Marzloff in 1979.

16:26   18  A    I'm aware of that.

16:26   19  Q    He ordered the murder of Richard Andreasen in 1983.  He

16:27   20  ordered the murder of Thomas Lamb in 1988.  He ordered the

16:27   21  murder of Arva Ray in 1989.  He ordered the attempted murder of

16:27   22  Jeffrey Barnett in 1990.  He ordered the attempted murder of

16:27   23  Joel Burkett in 1992.  That was at Marion.  Were you there

16:27   24  then?

16:27   25  A    Yes, sir.

CR 02-938(E)-DOC          August 29, 2006                    69

16:27   1   Q     March 1st of 1992?

16:27   2   A     No, sir, I wasn't there yet.

16:27   3   Q     He ordered the murder of Jimmy Lee Inman at Marion on

16:27   4   September 30th of 1993.  Were you there then?

16:27   5   A     Yeah, I was there, yeah.

16:27   6   Q     He conspired to have Walter Johnson murdered after

16:27   7   August -- I'm sorry, after July of 1996.  He conspired to have

16:27   8   Frank Ruopoli murdered during the 1990s, and in mid 1997, he

16:27   9   ordered a race war against the DC Blacks and lead to the

16:28   10  killings of two others at Lewisburg.

16:28   11  A     Let me say --

16:28   12  Q     Those things have been established as true since you were

16:28   13  here last.

16:28   14  A     When you say "established," I surmise that you mean that

16:28   15  the jury has found this?

16:28   16  Q     Yes.

16:28   17  A     Okay.  Okay.

16:28   18  Q     So those are the kind of killings that I have in mind, but

16:28   19  you're welcome to answer hypothetically.

16:28   20        What kinds of murders could Defendant Mills order that

16:28   21  would not lower his esteemed position in your eyes?

16:28   22  A     Well, like I said, I -- I don't know of any esteem, right,

16:28   23  not to that effect, right?

16:28   24        Now, hypothetically speaking, right, if you are asking

16:28   25  me if I know of any instances that Mr. Mills -- as you say this

CR 02-938(E)-DOC          August 29, 2006                    70

16:28   1   has been established, right?  However, I have no knowledge of

16:28   2   that.  I'll take your word for it, right?  And I imagine maybe

16:29   3   the ladies and gentlemen of the jury also understand that,

16:29   4   right?  But I have no knowledge, whatsoever, of any killings

16:29   5   that were ordered by Mr. Mills, so I couldn't -- you're asking

16:29   6   me to, what, surmise?

16:29   7   Q    Well, no.  I take it you are saying that you don't know of

16:29   8   him having ordered anyone killed.

16:29   9   A    Right, right, I don't know that.

16:29   10  Q    But knowing that, would it have any bearing on your

16:29   11  opinion that he's a peacemaker?

16:29   12  A    No, no, it wouldn't.  It wouldn't.

16:29   13  Q    Mr. McDaughtery, is one of the reasons that you regard

16:29   14  Mr. Mills and Mr. Bingham as your friends is you find that it's

16:29   15  sort of a geopolitical axiom that "the enemy of my enemy is my

16:30   16  friend"?

16:30   17  A    Not -- no, that's not one of the reasons.

16:30   18  Q    No?

16:30   19  A    No.

16:30   20  Q    Isn't it one of the reasons that you're friends with them

16:30   21  that West Coast Blacks, like the Crips, for instance, yourself,

16:30   22  are generally aligned with the Aryan Brotherhood against East

16:30   23  Coast Blacks, the DC Blacks?

16:30   24  A    No, we don't have an alliance, sir.

16:30   25  Q    No?

| | | |
|---|---|---|
| 16:30 | 1 | **A**    No, no alliance. |
| 16:30 | 2 | **Q**    But it is true that your affiliation with the Crips is |
| 16:30 | 3 | generally at odds with the DC Blacks? |
| 16:30 | 4 | **A**    Yes, sir. |
| 16:30 | 5 | **Q**    I think you told us the last time you were here that |
| 16:30 | 6 | you've had trouble with DC Blacks in the past; is that correct? |
| 16:30 | 7 | **A**    Yes, sir. |
| 16:30 | 8 | **Q**    I think you came to Marion as a disciplinary transfer |
| 16:31 | 9 | because you've been involved in -- not to put too fine a point |
| 16:31 | 10 | on it -- a riot between DC Blacks and West Coast Blacks at |
| 16:31 | 11 | Leavenworth? |
| 16:31 | 12 | **A**    Yes, sir. |
| 16:31 | 13 | **Q**    And doesn't the fact that the DC Blacks are your enemies |
| 16:31 | 14 | and that they are the enemies of the Aryan Brotherhood, |
| 16:31 | 15 | including individually Mr. Bingham and Mr. Mills, isn't that |
| 16:31 | 16 | one of the reasons that you are comfortable with being friends |
| 16:31 | 17 | with them, leaving aside their many fine personal qualities? |
| 16:31 | 18 | **A**    No, sir, that's not one of the reasons.  My -- my -- my |
| 16:31 | 19 | reasons -- my reason, strictly and solely, for being friends |
| 16:31 | 20 | with these people, with this man (indicating) and this man |
| 16:31 | 21 | (indicating), is my personal relationship with them; pure and |
| 16:31 | 22 | simple.  I've met these guys.  I've lived on a tier with them. |
| 16:31 | 23 | Now, these tiers are just 70-by-8-foot long, right, and I |
| 16:31 | 24 | walked up and down tiers with these guys for years, so these -- |
| 16:31 | 25 | these friendships developed as a consequence of proximity and |

16:32  1   relation, not because of any common enemy or anything like

16:32  2   that.

16:32  3   Q    Well, isn't it true, then, that your personal

16:32  4   friendship --

16:32  5   A    Yes, sir.

16:32  6   Q    -- with Defendant Mills and Defendant Bingham isn't much

16:32  7   of a guide for the jury on whether they should received the

16:32  8   death penalty?

16:32  9         MR. FLEMING:  Objection, your Honor.  It's a confusing

16:32  10  question --

16:32  11        THE COURT:  Well, I think it's more argumentative.

16:32  12        Just rephrase the question.  The error may be proper,

16:32  13  but --

16:32  14  BY MR. WOLFE:

16:32  15  Q    I understand you to be saying that your relationship with

16:32  16  Defendant Mills, Defendant Bingham is based on your personal

16:32  17  interactions with them, and it's, therefore, necessarily

16:32  18  limited, to your knowledge, based on those personal

16:32  19  interactions, isn't it?

16:33  20  A    I would say so.

16:33  21  Q    It didn't -- it doesn't make a difference, I believe, you

16:33  22  said.  It does not make a difference to your evaluation of them

16:33  23  that they ordered murders and attempted murders?

16:33  24  A    Again, I want to qualify that, if I might, all right?

16:33  25  Q    Yes.

16:33  1   A     In the outlaw circle, so to speak, right?  Now, if I --

16:33  2   let's say you -- how do you judge this, right?  Here is a guy

16:33  3   that raises his hand and says, "Look, I am an outlaw.  I am

16:33  4   going to live by the gun, I am going to die by the gun, and

16:33  5   that's how I am, right?  I put dudes, I put action away.  I

16:33  6   kill.  I rob.  I steel, you know?  So in the 33rd" -- and

16:33  7   that's a term we use "later on," right?  "Later on I meet my

16:33  8   demise at the hands of my peers.  Are you shocked by that?  Are

16:34  9   you appalled by that?  Are you outraged by that, that all --

16:34  10  here I am, I raised my hand.  I said I was going to live by the

16:34  11  gun and die by the gun.  To me it's honored to die by the gun

16:34  12  because I made that choice.  I'll go ahead and admit it.  I

16:34  13  made that choice."

16:34  14        So let's say you -- here is a man who raises his hand,

16:34  15  accepted that of his creed, and then later on he robs, he

16:34  16  steals, he kills, and then later on he meets his demise at the

16:34  17  hands of his peers, how do you view that?  Do you view that as,

16:34  18  you know, are you shocked by that?  You got what you had

16:34  19  coming.  That's the life he lives.

16:34  20        Now, you are saying that Mr. Mills ordered the

16:34  21  execution of these type of men, then what's the big deal?  They

16:34  22  got what they are asking for, right?  You are saying Mr. Mills

16:34  23  ordered the execution of some citizens or something, that's a

16:34  24  different thing, really.  But if you are talking about a man

16:34  25  that raised their hands and said, "Hey, lookie here, man.  I am

16:34  1   an outlaw, man.  I am going to live by the gun and die by the

16:35  2   gun," right?  Well, you have to accept the consequences of

16:35  3   that.  In society -- jail, they say, "Hey, lookie here, man.

16:35  4   If you guys keep that thing over there, we won't ask you to pay

16:35  5   the ultimate price, right?  You just keep it over there amongst

16:35  6   yourselves, right?"

16:35  7          You know, I'm a Crip.  We are from Southern

16:35  8   California.  How many people are on death row?  About 600 in

16:35  9   California?  I would say there's a good 50 Crips on death row

16:35  10  right now.  Not one of them are in there for gang murders.

16:35  11  Why?  Because law enforcement generally says, "Hey, okay.  Who

16:35  12  did he kill?"  "He killed another gang member in a gang war."

16:35  13  "Okay.  Give him a life sentence, right?"

16:35  14         Now, so I'm saying when you -- now, by the same token,

16:35  15  I've got a couple of Crip homeboys on a tier on death row

16:35  16  for -- I don't know if you remember the Coleman Alexander

16:35  17  (phonetic) case.  The guy was a Crip.  Okay.  He got the death

16:35  18  penalty, right?  Anytime -- they gave him the death penalty.

16:35  19         So the thing I'm trying to say here is, if these guys

16:36  20  take up the creed, the code, and say "Hey, lookie here, I'm

16:36  21  going to live by the gun, I am going to die by the gun," when

16:36  22  it happens, there is no -- there is no societal outrage, there

16:36  23  is no societal -- you know, our conscience isn't shocked.  I

16:36  24  mean, you know, these guys -- he got what he got caught for.

16:36  25  That's the lifestyle he wanted to live, okay?  He got it.

```
16:36   1        By the same token, now, when he crosses that line,
16:36   2   then we'll tell him, "Lookie here, you are going to pay the
16:36   3   ultimate price on this one, buddy," and then you said Mr. Mills
16:36   4   ordered the execution on these types of men, then I have no
16:36   5   compunction whatsoever, no reserve, no resolve whatsoever and
16:36   6   say "Hey, big deal."
16:37   7   Q    Mr. McDaughtery, you talked about Arizona Dave --
16:37   8   A    Yes, sir.
16:37   9   Q    -- being attacked in the year 2000 by DC Blacks.  You
16:37  10   thought he was AB.
16:37  11   A    Yes, sir.
16:37  12   Q    Are you aware of any occasion where any member of the
16:37  13   Aryan Brotherhood has been killed by a member of another gang?
16:37  14   A    Pardon me?
16:37  15   Q    Are you aware of any occasion when a member of the Aryan
16:37  16   Brotherhood in federal prison has been killed by a member of
16:37  17   another gang?
16:37  18   A    No, but I'm aware of many attacks.  I don't think any of
16:37  19   them have been fatal, that I'm aware of.
16:38  20   Q    Are you aware of any occasion when the Aryan Brotherhood
16:38  21   ever left the yard anywhere after --
16:38  22   A    No, sir.
16:38  23   Q    -- being urged to by a member of another gang?
16:38  24   A    No, sir.
16:38  25        THE COURT:  Just a moment.
```

CR 02-938(E)-DOC          August 29, 2006                    76

16:38  1          Did you get that?

16:38  2          You two talked over the top of each other.

16:38  3          Okay.

       4          (Live reporter switch.)

       5          (Further proceedings reported by Debbie Gale in

       6  Volume V.)

       7  /

       8  /

       9  /

      10                        __CERTIFICATE__

      11

      12  *I hereby certify that pursuant to Section 753, Title 28 of the*

      13  *United States Code, the foregoing is a true and correct*

      14  *transcript of the stenographically reported proceedings held in*

      15  *the above-entitled matter and that the transcript page format*

      16  *is in conformance with the regulations of the Judicial*

      17  *Conference of the United States.*

      18

      19

      20  _____        ___8/30/06___
          JANE C.S. Rule, CSR NO. 9316   Date

      21  Federal Official Court Reporter

      22

      23

      24

      25

Jane C.S. Rule, CSR No. 9316 – Federal Official Court Reporter