# ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

APR — 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING


UNITED STATES OF AMERICA,
            Plaintiff,
   vs.

                                    CR-02-938(C)
BARRY BYRON MILLS;                  DAY 2, Vol. 1
TYLER DAVIS BINGHAM;
CHRISTOPHER OVERTON
GIBSON; EDGAR WESLEY
HEVLE,
            Defendants.

----------------------------


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

December 29, 2005


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

DOCKETED ON CM

5

5445

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   DEBRA W. YANG
     United States Attorney
 4   STEVEN D. CLYMER
     Special Assistant United States Attorney
 5   Chief, Criminal Division
     GREGORY W. JESSNER
 6   STEPHEN WOLFE
     JOEY L. BLANCH
 7   Assistant United States Attorneys
     1400 United States Courthouse
 8   312 North Spring Street
     Los Angeles, CA  90012
 9   (213) 894-0511

10

11   For Defendant BARRY BYRON MILLS:

12   H. DEAN STEWARD
     LAW OFFICES OF H. DEAN STEWARD
13   107 Avenida Miramar, Suite C
     San Clemente, CA
14   (949) 481-4900

15   MARK F. FLEMING
     LAW OFFICES OF MARK F. FLEMING
16   433 "G" Street, Suite 202
     San Diego, CA  92101
17   (619) 652-9970

18

19   For Defendant TYLER DAVIS BINGHAM:

20   MICHAEL  V. WHITE
     LAW OFFICES OF MICHAEL V. WHITE
21   1717 Fourth Street, Third Floor
     Santa Monica, CA  90401
22   (310) 576-6242

23   WILLIAM S. HARRIS
     STEWART & HARRIS
24   1499 Huntington Drive, Suite 403
     South Pasadena, CA  91030
25   (626) 441-9300
```

```
 1   For Defendant CHRISTOPHER OVERTON GIBSON:

 2   KENNETH A. REED
     LAW OFFICES OF KENNETH A. REED
 3   404 West 4th Street, Suite C
     Santa Ana, CA  92701
 4   (714) 953-7400

 5   For Defendant EDGAR WESLEY HEVLE:

 6   BERNARD J. ROSEN
     LAW OFFICES OF BERNARD J. ROSEN
 7   1717 Fourth Street, Suite 300
     Santa Monica, CA  90401
 8   (310) 451-4577

 9   DONALD J. CALABRIA
     LAW OFFICES OF DONALD J. CALABRIA
10   16133 Ventura Boulevard, Suite 600
     Encino, CA  91436
11   (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; THURSDAY, DECEMBER 29, 2005; 9:00

2    A.M.

3              THE COURT:  First, let me go through the role call

4    once again this morning.  Mr. Bingham is present.  Mr.

5    Harris and Mr. White is present.  Mr. Mills is present.  Mr.

6    Fleming and Mr. Steward is present.  Mr. Hevle is present.

7    Mr. Calabria and Mr. Rosen are present.  Mr. Gibson is

8    present.  Mr. Reed is present, and once again Mr. Scalisi

9    has been excused.

10             Mr. Gibson, does this meet with your consent?

11             DEFENDANT GIBSON:  Yes.

12             THE COURT:  Mr. Wolfe is present.  Mr. Beckwith is

13   present.

14             The gentleman from Wit Sec is present, Jeff

15   Jamison.  It's a pleasure to see you again.  Why don't you

16   have a seat next to Mr. Wolfe for just a minute.  It's nice

17   to be working with you again, sir.

18             There is a gentleman named Mr. Houston who is part

19   of the larger Indictment, and there is apparently an

20   attorney in New Mexico whose name is Donatelle.  There was a

21   representation made to me yesterday that there was an effort

22   to have Mr. Ray Oechsle brought to some location on the

23   dates of January 11th, 12th, and 13th, and of course that

24   location would be undisclosed.

25             These four or eight attorneys would like to be able

1    to speak to Mr. Oechsle also, and it became apparent to me

2    yesterday that the person driving this interview is somebody

3    not connected with the case before me, which is the case

4    that will lead off the series of prosecutions, so the wrong

5    horse is driving the cart.

6              Can you tell me what arrangements have been made --

7    not the location but what arrangements have been made?  Has

8    the paperwork been done, and is this going to proceed on the

9    11th, 12th, and 13th?

10             MR. JAMISON:  Yes.  There has been a location

11   identified to have the neutral site.  It's just a matter of

12   setting it up.  From what I heard yesterday, there is some

13   concern about doing that from the Court.

14             THE COURT:  I want to discuss that and find out

15   what the problems would be.  For instance, I can anticipate

16   that minimally one attorney representing each defendant will

17   want to be present from this case -- Mr. Mills, Mr. Bingham,

18   Mr. Hevle, and Mr. Gibson -- and see if Mr. Oechsle is

19   willing to speak to them and if he is willing to speak to

20   them what he has to say, but behind this case are a series

21   of other cases where different attorneys may be interested

22   in what Mr. Oechsle has to say if he is willing to speak to

23   any of the defense attorneys.  Apparently Mr. Donatelle has

24   been the moving force on behalf of Mr. Houston setting up

25   the meeting.

1     If the meeting is outside the district -- I am not

2  asking for a location yet -- what didn't make sense to me

3  yesterday was why I would in a sense have the taxpayers pay

4  for the investigators to go to let's say hypothetically

5  Pennsylvania or New Jersey or Tennessee or wherever and why

6  Mr. Oechsle couldn't be brought to this district because all

7  the attorneys are present, and you may have over 30

8  attorneys who want to speak to him sometime during this day

9  or two.  You can see the obvious cost of 30 attorneys flying

10  someplace.

11     Now, if it's already in this district, I am not

12  concerned.  If it's not in this district, then I want to

13  discuss with you why that couldn't be accomplished because

14  Mr. Oechsle is going to come here eventually anyway.  He is

15  going to come and testify, so I don't see why the secret

16  meeting has to be set up anyplace outside the district.

17  That costs an incredible amount to the taxpayers.

18     MR. JAMISON:  If we brought him to the district in

19  order to facilitate the attorneys meeting with him, we could

20  do it.  It will take a little bit of time to arrange.  Also,

21  that gentleman can't be flown commercially, so I would have

22  to do a charter flight to bring him into the district which

23  is a cost to the taxpayers.

24     THE COURT:  But you understand I am weighing the

25  cost.  I am flying 30 attorneys compared to one witness who

1   is going to be here anyway.  When I balance those costs,

2   they didn't seem reasonable the way that Mr. Donatelle was

3   setting this up with Wit Sec.  I am going to want it here.

4   The more I'm listening this there is some duty to protect

5   the taxpayers also.

6           MR. JAMISON:  Do you want it done here in the

7   courtroom?

8           THE COURT:  Yes.  I will make the accommodations

9   that day, but I want to work with you in that regard.  Of

10  course I am concerned about security.  I am not an expert,

11  but it doesn't seem reasonable when Oechsle is going to be

12  here anyway that I wouldn't get him here.  I understand the

13  Wit Sec program.  I understand your concerns, but he ends up

14  here a couple of times anyway.

15          I want to work with you in terms of a time frame.

16  Right now it's set up for the 11th, 12th, and 13th.  I can

17  change it to a week later if you need that.

18          MR. JAMISON:  That's fine.

19          THE COURT:  Are you sure, the 11th, 12th, and 13th?

20  Are you positive?

21          MR. JAMISON:  Yes.

22          THE COURT:  What has to be done to set that in

23  motion?  What help do you need frome me so that somebody

24  above you isn't giving you a difficult time in asking why?

25  I can cut a Court order that simply says that Oechsle is

1   ordered into the district, which would protect your position

2   in explaining to a superior.  Tell me what you need.

3          MR. JAMISON:  Mr. Wolfe has already made a request

4   to --.

5          THE COURT:  But it's for a different location.  The

6   people who actually get the work done are the people like

7   you --

8          MR. WOLFE:  Actually, the government does not make

9   a request.  The United States Attorney's Office does not

10  request a location.  It's always up to the Marshal's Service

11  and the Bureau of Prisons to choose the location.

12         THE COURT:  If you didn't want that to take place

13  inside the court, if this court wasn't secure from your

14  perspective -- and I am not sure how that would be handled

15  here -- if you had another location, that's agreeable to me.

16         Do you want to think about that for a while and get

17  back to me today, make some calls?

18         MR. JAMISON:  Yes.

19         THE COURT:  What time is convenient to meet?

20         MR. JAMISON:  By noon.

21         THE COURT:  Better yet, you come and see me

22  whenever you want to.  We will be here until late tonight,

23  so don't be concerned about that.  You can come back at 5:00

24  or 8:00 tonight.  Thank you very much.

25         Do we need to get Mr. Donatelle on the phone

1  because what I am going to do is call Judge King who has the

2  remainder of these cases at the present time and ask if he

3  would like to send out an order notifying other counsel

4  because they are not in my court?  I think it's

5  inappropriate for me to send Houston's counsel a notice, but

6  I think the location is obviously going to be changed to

7  here, and I think there is another good reason.  Each of you

8  have records here.  When you are talking to the gentleman,

9  you will have records in your own offices, and you can get

10  to them very quickly.

11       Would all of you feel comfortable if he can't find

12  a suitable location having it here in the courthouse?

13       MR. FLEMING:  Yes.

14       THE COURT:  How would that be set up?  The marshals

15  would be present.  Your clients aren't going to be sitting

16  with Mr. Oechsle by himself present and all of you without

17  marshals present.  In the past when I have done that with

18  the Mexican Mafia, we placed the marshals under oath, but no

19  information would be shared.  That is a discussion that

20  would be private.  You tell me how that is to be conducted

21  because it will probably be the most secure facility.  You

22  should have your records here, and your clients may be

23  present if you desire.

24       MR. STEWARD:  We think it should proceed the way

25  any normal witness interview would occur in this case.  Mr.

```
 1    Mills would not be present for -- frankly, I think it's
 2    beneficial that he not be here.  I don't believe Mr. Mills
 3    has even met the gentleman, and I don't see any advantage to
 4    having Mr. Mills physically here.
 5              THE COURT:  Is that acceptable, Mr. Mills?
 6              DEFENDANT MILLS:  It's acceptable by me.
 7              MR. WHITE:  We share that feeling.
 8              THE COURT:  Is that acceptable to you, Mr. Bingham?
 9              DEFENDANT BINGHAM:  Yes.  My lawyer knows better
10    than I do.
11              THE COURT:  Mr. Hevle, is that acceptable to you?
12              DEFENDANT HEVLE:  Yes.
13              THE COURT:  Mr. Gibson, is that acceptable to you?
14              DEFENDANT GIBSON:  Yeah, that's fine.
15              THE COURT:  And the government should find that
16    acceptable, so just the attorneys would be present with
17    Mr. Oechsle, which wouldn't cause a security concern other
18    than Mr. Oechsle being in custody of course.  If that's
19    acceptable, then if we can get ahold of the Wit Sec
20    gentleman again, that might cause some lessened security
21    concerns.
22              MR. WOLFE:  Your Honor, I have a telephone number
23    for him.  I expect I can find him.
24              THE COURT:  He might be looking for an alternate
25    location.  If he knew he wasn't going to be in the position
```

1    of having the defendants present at the same time as the

2    witness, maybe that makes the courthouse a much more viable

3    option for him.

4            MR. WOLFE:  If Your Honor takes a break --

5            THE COURT:  I will take a break right now.  Let me

6    get this resolved first.

7            MR. WOLFE:  Thank you, Your Honor.

8            (Recess.)

9            THE COURT:  We are back on the record.  All counsel

10   are present, and the defendants are present, and the

11   gentleman from Wit Sec.

12           Mr. Jamison, just after you left, we were

13   discussing the viability of using the courthouse, and none

14   of the defendants will be present.  They personally waive

15   their presence in any discussion with Mr. Oechsle.  The

16   attorneys will be present.  If I supply this room, it would

17   cut down the Wit Sec concerns I hope a little bit because

18   the defendants will not be present when Mr. Oshel is being

19   spoken to by counsel.

20           Would that be acceptable to you?

21           MR. JAMISON:  It would work out very well.

22           THE COURT:  Okay.  Then I will make this courtroom

23   available on January 11th, 12th, and 13th.

24           Why do we need three days by the way?

25           MR. FLEMING:  I don't believe we are going to need

1    three days.  This group here will need one day.

2         THE COURT:  Why am I asking you to remain in this

3    area for three days?

4         MR. WOLFE:  Mr. Donatelle asked the government to

5    arrange for three days because I believe that they wish to

6    accommodate the number of defense counsel who are likely to

7    be talking to Mr. Oshel.

8         THE COURT:  Thank you.

9         Do you have Mr. Donatelle's phone number?

10        MR. WOLFE:  Yes.

11        THE COURT:  Could you get that for me?

12        Let's call him, Christy.

13        Do we have a speakerphone?

14        THE CLERK:  Yes.

15        THE COURT:  Let's call Mr. Donatelle.

16        In other words, if I don't need you here for three

17   days, I don't want to have you here for those security

18   arrangements for those days.  If we really need you, let's

19   find out why.  I would think if the attorneys are present on

20   my case I don't see why the other attorneys couldn't be

21   present unless Mr. Oshel is going to say one thing to you as

22   a group of attorneys and another thing to another group of

23   attorneys, which I don't think he is, so all of the

24   attorneys could be here on the 11th.

25        MR. STEWARD:  Certainly, Your Honor.

1        THE COURT:  Let's do this.  Let's call

2    Mr. Donatelle.

3        Christy, could you call him and tell him the

4    federal court is calling him.  I would like to put him on

5    the speakerphone.

6        You are also going to have two pro pers, McElhiney

7    and Schwyhart, so, therefore, we should extend that to two

8    days because the attorneys being present won't present the

9    same security concern except by the volume of attorneys.

10   There could be up to 30 attorneys present.  Mr. McElhiney

11   and Mr. Schwyhart, if they are pro per, then we have got a

12   problem because I am sure -- the clerk with Judge King just

13   informed me they may make a motion to be present.

14       MR. JAMISON:  We would make those separate times

15   then?

16       THE COURT:  Separate times, even separate days.

17   Why don't we do this.  Maybe we should just leave the three

18   days as it is and if we are done in two transport him out.

19   Let me talk to Mr. Donatelle so he is in the loop.  He seems

20   to be the driving force behind this as a courtesy to him.

21       MR. DONATELLE:  This is Mark Donatelle.

22       THE COURT:  Hi, Mark.  This is Judge Carter out in

23   California.

24       How are you?

25       MR. DONATELLE:  Just fine.

```
 1              THE COURT:  Listen, we are in session right now,
 2    and our conversation is being recorded.  Your name came up
 3    yesterday.
 4              I believe you represent Mr. Houston; is that
 5    correct?
 6              MR. DONATELLE:  Yes, sir.
 7              THE COURT:  First of all, let me introduce you.
 8    Mr. Fleming is present and Mr. Steward who represent Mr.
 9    Mills.  They are in the courtroom listening to our
10    conversation.  Mr. White and Mr. Harris are present who
11    represent Mr. Bingham.  Mr. Rosen and Mr. Calabria are
12    present who represent Mr. Hevle.  Mr. Reed is present who
13    represents Mr. Gibson.  Mr. Wolfe is present who represents
14    the United States Attorney's Office, and Mr. Jamison is
15    present from Wit Sec.
16              You were the moving force in an effort to have an
17    interview with Ray Oechsle, and my understanding is that
18    that interview was set up for January 11th, 12th, and 13th.
19    Is that your understanding also?
20              MR. DONATELLE:  Yes, it is.  There was no location
21    designated, but we were told to keep those dates open.
22              THE COURT:  Those will be the dates of the
23    interview.  It will be conducted here in the Central
24    District of California in the Southern Division in Orange
25    County in Santa Ana.  I know you are down in New Mexico.  I
```

1    am going to have Mr. Oechsle present in the courtroom with

2    counsel if the want to speak to Mr. Oechsle and if Mr.

3    Oechsle wants to speak to counsel.  I will ask Judge King to

4    send out a notice for the remaining counsel because we are

5    not going to transport him a number of times.

6              Is there any difficulty in you attending here in

7    Orange County on that date?

8              MR. DONATELLE:  No, Your Honor.  I can be there on

9    those days, as well as I wanted to have an investigator

10   present, so I wasn't put in the position of being a witness

11   to the interview.

12             THE COURT:  How long do you think you would need

13   with Mr. Oechsle?  A full day if he is willing to speak to

14   you?

15             MR. DONATELLE:  Yes.  Just to give you some

16   background, the request came from Mr. Oechsle, and the

17   people that were listed on the letter that I sent to

18   Assistant United States Attorney Steve Wolfe were actually

19   the people that Mr. Oechsle requested to talk to.  He

20   specifically requested counsel for specific defendants and

21   had been in touch with another counsel, so we only put the

22   people on the list that he asked to talk to.

23             THE COURT:  Thank you.

24             MR. DONATELLE:  In talking to those people about

25   the topics that we thought we needed to talk to him about,

1   given that they usually limit us to somewhere around five or

2   six hours a day, we thought that it would take three days to

3   conduct the interview on a number of topics.

4        He has written us a letter and has given us a

5   number of topics that he wants us to talk about, and given

6   the length of time that he has been a witness and the number

7   of incidents that he wanted to talk to us about, we

8   reasonably believed it would be a three-day process to

9   complete the interview.

10       THE COURT:  That's fabulous information for me.  I

11  really appreciate it.  I was going to cut back that time,

12  but after listening to you, that seems reasonable so the

13  11th, 12th, and 13th here in Orange County.

14       Could you give me a list of the specific people

15  that he wanted to talk to?  In other words, there may be a

16  request from other persons or parties, but I also don't want

17  to spoil Mr. Oechsle as a witness for the government or for

18  the defense.  If he is requesting certain people be present,

19  then I am a little concerned that a multitude of people

20  might change his position for either the government or for

21  you.  Do you have that list in front of you?

22       MR. DONATELLE:  Your Honor, I don't, and I have to

23  return the compliment.  I greatly appreciate your concern

24  about that.  Given my experience with witnesses of that

25  type, I didn't want to intimidate him with a group of

1   people.  I only wanted those people there who he had

2   requested.  In fact, initially he had been requesting a

3   smaller group.  In this last letter, he requested a few

4   more.

5          He is in the witness protection program.  He claims

6   to have protection problems.  There may be certain

7   individuals that he does not want to assist and people that

8   he is concerned about getting information, so that's why I

9   wanted if at all possible limited to the list of people that

10  he requested to talk to.

11         If it turns out during that interview that he is

12  willing to talk to other people, I would certainly pass that

13  information on, but I didn't want to overwhelm him and

14  intimidate him with people who he had not requested to talk

15  to.

16         THE COURT:  Let me tell you two concerns I have.

17  The first is I am very appreciative to the Wit Sec program

18  in terms of changing whatever the undisclosed location was

19  to Orange County because it really appeared to me that we

20  were going to pay for anywhere from a few attorneys to up to

21  30 or more attorneys flying to another location.

22  Hypothetically, if that was in Tennessee or Minnesota or New

23  Jersey, that's an incredible expense, plus if an

24  investigator was going to go along, I could see literally

25  the taxpayers paying for 50 people to fly to a location.

1    Since Mr. Oechsle may appear as a witness anyway,

2   it seemed a lot more cost beneficial if he was brought to a

3   secure facility like the courthouse and if I had the

4   courtroom available for counsel and/or an investigator on

5   that day, so that was my first concern.

6    My second concern is I agree with you.  By the same

7   token, I don't know with the four defendants I have why I

8   would exclude one of the counsel if they were requesting to

9   be present, so let's just assume that Mr. Oechsle was

10  willing to speak to Mr. Mill's counsel but for some reason

11  he wasn't willing to speak to Mr. Hevle's counsel or hadn't

12  made that known to you.

13   I don't know how with due process rights I would

14  say to Mr. Calabria and Mr. Rosen who represent Mr. Hevle

15  that they are excluded from the conversation, but Mr. Mills

16  is included.

17    MR. WOLFE:  Your Honor, wouldn't the witness have

18  the right to speak to all or none at any time?

19    THE COURT:  I'm not worried about the all or none.

20  I am worried about the in between.

21    MR. WOLFE:  Isn't the witness free to speak to 1,

22  3, 5, and 7 and exclude 2, 4, 6, and 8?

23    THE COURT:  Yes, but I am also concerned if I have

24  to retransport him if he makes another request in the

25  future.  That's why I have got Mr. Donatelle on the phone

1    who represents Mr. Houston.

2         Who represents Mr. Oechsle?

3         MR. DONATELLE:  I don't believe he has ever had

4    counsel appointed.  At least I'm not aware of him having

5    counsel, and he has never told me that he had counsel

6    appointed to represent him.

7         THE COURT:  Could I see if I have a problem?  Do

8    you know if Mr. Mills's counsel is on the list, if he is

9    willing to speak to either Mr. Steward or Mr. Fleming?

10        MR. DONATELLE:  Did you ask me a question?

11        THE COURT:  Yes.  Could you check -- I want to see

12   if I even have a problem.  Is he willing to Mr. Mills's

13   counsel, Mr. Steward and/or Mr. Fleming?  In other words, I

14   don't have that list, so I am a little in the blind right

15   now.

16        MR. DONATELLE:  Let me change phones.  I am having

17   a difficult time hearing you.

18        THE COURT:  Thank you.  If we get cut off, I will

19   call you right back.

20        (Pause in proceedings.)

21        THE COURT:  While we are waiting, Mr. Beckwith

22   could you ask Mr. Wolfe if he would show you Mr. Mills's

23   latest discovery request which came to us yesterday?  Can

24   you start reading that?

25        Let's discuss with the worst possible scenario and

 1    see if we can deal with it first while we are waiting for

 2    Mr. Donatelle to get on the line.  I want to assume that

 3    Mr. Oechsle didn't include any of you on that list.

 4    Mr. Wolfe is right that Mr. Oechsle can speak to whoever he

 5    wants to.  Of course, you would prefer to get the

 6    information from whatever source than not to get the

 7    information, so if that scenario presents itself to us, then

 8    I am going to ask you if you are unwilling to attend but

 9    have Mr. Donatelle attend and other counsel and get

10    information in that form.

11         The second scenario if he has requested one and

12    either through neglect or decides he doesn't want to speak

13    to counsel or another attorney for some reason -- if that

14    occurs, then I would ask if each of you are satisfied, for

15    instance, if Mr. Fleming and Mr. Steward were the counsel --

16    if Mr. Harris and Mr. White not be satisfied not attending

17    because the information would be available to all concerned.

18         The third scenario is that he is willing to speak

19    to everybody upon reflection, and I would then ask Judge

20    King to send out an order notifying all counsel to be

21    present, so let's go slowly and see what his requests are to

22    begin with because I don't think anyone wants to see him

23    frightened away if he wants to speak to either the

24    government or the defense, and he may be a little

25    overwhelmed if 30 attorneys are sitting there and decide

1     that he is just not talking to anybody.

2             While we are waiting, let's continue until

3     Mr. Donatelle rejoins us.

4             Mr. Reed, you have requested from an August 26,

5     1997, chronology summary of events ADX forms at USP Marion.

6     You have noticed the August 26 date where it states, "Drops

7     out of stepdown program and debriefs regarding Aryan

8     Brotherhood activities," and from that, you would obviously

9     like to know if there was either word out or no word out,

10    especially if there is no word about a war because if this

11    is an AB dropout of some type, you would expect that he'd

12    know that the war was going to go down if Mr. Mills or

13    Mr. Bingham had sent a message.

14            MR. REED:  Yes.

15            THE COURT:  I don't what that that debrief says,

16    and I haven't seen it in the information presented to me.

17            Have you gotten any information through discovery

18    channels about this debrief?

19            MR. REED:  No.

20            THE COURT:  Mr. Beckwith, could you come up and

21    join me?

22            Mr. Donatelle is back on the line.

23            Mr. Donatelle, could you share with me if

24    Mr. Oechsle had requested Mr. Mills's counsel to be present

25    in the interview?

```
 1            MR. DONATELLE:  I don't have the letter here, but
 2   based on his letter, I have the list that I sent to
 3   Mr. Wolfe if that will due.
 4            THE COURT:  Could you help me with that list?
 5            MR. DONATELLE:  Yes.  He asked to speak to counsel
 6   for Michael Houston, which is me and Michael Proctor, and my
 7   investigator, Constance Lindsey.  He requested to speak to
 8   counsel for Mills, and I had Dean Steward and Mark Fleming
 9   listed.  He requested to speak counsel for Wayne
10   Bridgewater, and I had Richard Steingard and David Evans
11   listed, as well as their investigator, Mary Stewart.  He
12   requested to speak to Rick Sindel, who is one of the
13   attorneys in the Marion case who actually cross-examined him
14   and had some exchanges with him in correspondence, and his
15   investigator, Mark Reeder.
16            He requested that he speak to counsel for
17   Mr. McElhiney who is pro se, and I had advisory counsel
18   James Bisnow on the list and their investigator, Danny
19   Milliken, and then I had Mr. Mills's investigator, Terry
20   Rearick, on the list to accompany Mr. Steward and Mr.
21   Fleming.
22            THE COURT:  Excellent.
23            Does that complete the list?
24            MR. DONATELLE:  That completes the list.
25            THE COURT:  Let me read that back to you.  On the
```

1  list, would be counsel for Mr. Houston, yourself,

2  Mr. Donatelle, and Mr. Proctor, and an investigator whose

3  name is?

4          MR. DONATELLE:  Constance Lindsey.

5          THE COURT:  The list would include Mr. Mills's

6  counsel, Mr. Steward and Mr. Fleming, and the investigator,

7  Mr. Rearick; counsel for Mr. Bridgewater, Mr. Steingard and

8  Mr. Evans.

9          Is that David Evans?

10         MR. DONATELLE:  Yes.

11         THE COURT:  And the investigator's name?

12         MR. DONATELLE:  Mary Stewart.

13         THE COURT:  And then counsel, Mr. Sindel, who

14  cross-examined him.

15         Mr. Sindel represented who?

16         MR. DONATELLE:  I believe it was Mr. Sahakian, but

17  I may be wrong.  It was one of the Marion defendants.

18         THE COURT:  I will just put down Marion defendants.

19         Was there an investigator included also?

20         MR. DONATELLE:  Yes, Mark Reeder.

21         THE COURT:  And Mr. McElhiney is a pro per at the

22  present time, but does he have standby counsel?

23         MR. DONATELLE:  Yes.  That's James Bisnow.

24         THE COURT:  And an investigator?

25         MR. DONATELLE:  Danny Milliken.

1          THE COURT:  I am not willing to mix a pro se at the

2    present time with Mr. Oechsle, and I don't have any

3    authority over Mr. McElhiney.  He is not my case.  Let me

4    speak to counsel while you are on the phone and see if we

5    can work something out.

6          Mr. Mills, your counsel has been included, so let

7    me turn to Mr. Bridgewater.

8          If Mr. Steward and Mr. Fleming were present along

9    with Mr. Rearick, would you still be demanding to be present

10   at that time?

11         DEFENDANT BINGHAM:  No.

12         THE COURT:  Would you waive your presence?

13         DEFENDANT BINGHAM:  Yes.

14         MR. WHITE:  If Mr. Oechsle does not wish to speak

15   us, that's fine.

16         THE COURT:  It may also just be inadvertence, but

17   it may also be a little overwhelming and could have

18   absolutely the opposite effect that you are hoping for.  Let

19   me turn back to Mr. Bingham.

20         Mr. Bingham, is that satisfactory?

21         DEFENDANT BINGHAM:  That's fine.

22         THE COURT:  Mr. Rosen, Mr. Calabria, are either one

23   of you requesting to be present?

24         MR. ROSEN:  We could ask, but if he declined,

25   that's fine.

1        THE COURT:  At the present time, he is not asking

2    you to be present.  Why don't you speak to Mr. Mills's

3    counsel for just a minute.  That might be helpful.

4        Mr. Steward, and, Mr. Fleming, why don't you speak

5    to Mr. Rosen for just minute.  That might be helpful.

6        MR. ROSEN:  It will be okay, Your Honor.

7        THE COURT:  Mr. Calabria.

8        MR. CALABRIA:  Yes, that's fine.

9        THE COURT:  Is that okay with you, Mr. Hevle?

10       DEFENDANT HEVLE:  Yes.

11       THE COURT:  Mr. Reed, is that acceptable to you?

12       MR. REED:  That's fine, Your Honor.

13       THE COURT:  Mr. Gibson, is that acceptable to you?

14       DEFENDANT GIBSON:  That's fine, Your Honor.

15       THE COURT:  Let me turn back to Wit Sec.  The only

16   people that would be present on January 11 would be counsel

17   for Mr. Houston, Mr. Proctor and Mr. Donatelle, an

18   investigator named Constance Lindsey, Mr. Steward and Mr.

19   Fleming, a gentleman named Mr. Rearick, Mr. Steingard,

20   Mr. Evans, an investigator named Stewart, Mr. Sindel, who I

21   am going to ask Judge King to send notice out to, and an

22   investigator named Mark Reeder.

23       My concern is Mr. McElhiney, the pro se.  I am just

24   not going to put a pro se in a situation with all the

25   attorneys at the same time.

1          MR. DONATELLE:  It would be helpful if I could add

2     we not planned to have more than three or four people in the

3     room with Mr. Oechsle at one time simply out of courtesy to

4     him and also for the circus factor.  I will do it howenever

5     the Court wishes, but I'm just telling you we weren't

6     requiring a large group be accommodated all at one time.

7     We were going to work a schedule amongst ourselves that the

8     witness would be comfortable with.

9          THE COURT:  I wouldn't interfere with that in any

10    way.  I really respect the wisdom the government and the

11    defense bar in that regard.  It's not my place to step in

12    and tell you how to conduct that interview.

13          My concern is I never want Mr. McElhiney mixed with

14    the attorneys.  Therefore, if you set that up and he says

15    something different to one group of attorneys compared, you

16    are going to have to share that information, but my guess is

17    if you have the same group of attorneys on the defense side

18    that are trusted in terms of their competency and you go

19    through that conversation, it just seems to me if you do

20    keep that number small you are going to get the same amount

21    of information in a much more comfortable setting if he is

22    willing to talk.  Why don't I leave that in your sound

23    hands.  My only concern is to just inform you that it will

24    be here in the Central District.

25          What time would you like to start?  You are coming

```
 1   out from New Mexico.  If you want to come out Sunday, we
 2   will start early on Monday morning.  If you want to come out
 3   a little later, we can start later in the day.
 4            MR. DONATELLE:  I will be there whenever we can be
 5   accommodated.  I planned on traveling on the 10th to be
 6   there for the 11th, 12th, and 13th.
 7            THE COURT:  I want to be courteous because you are
 8   coming the farthest distance along with maybe Mr. Sindel.
 9   If each of you are willing to travel on Sunday, let me turn
10   back to Wit Sec because I want to meet their needs.
11            What time is comfortable for you to have
12   Mr. Oechsle present on January 11?
13            MR. JAMISON:  8:00.
14            THE COURT:  8:00 then.  I am simply informing Mr.
15   Steward and Mr. Fleming that it will be 8:00 on January 11.
16            MR. DONATELLE:  That is a Wednesday, Your Honor.
17            THE COURT:  Wednesday.  It's a wonderful day.  That
18   way you won't be traveling on Sunday.  You will come out on
19   Tuesday.
20            So I don't need to give you gentlemen any further
21   notice.  As far as the other gentlemen, they are not part of
22   this trial.  I am going to call Judge King and ask if
23   through his chambers --
24            Do you think notice needs to be sent to -- well, no
25   notice needs to be sent to you or Mr. Proctor.  Is Steingard
```

1   and Evans and Sindel and James Bisnow -- that group -- do

2   you think notice should be sent out to them by the Court?

3          MR. DONATELLE:   Judge, I will be happy to arrange

4   notification and get in contact with them.   They are relying

5   on me to let them know where and when, so if that's all

6   right to you, I will be happy to take the responsibility for

7   notifying that group.

8          THE COURT:   It's okay with me.   I just don't want

9   to hear a later complaint, and the other thing I don't want

10  to do is I don't want to bring Mr. Oechsle back out.   I will

11  make him available him those three days, but I am not going

12  to transport him back and forth.   I don't think Judge King

13  will be willing to do that either.

14          Mr. Steward, can you think of a better plan?

15          MR. STEWARD:   No.

16          THE COURT:   Mr. Donatelle is quite capable of

17  handling that then, so no formal notice needs to go out.

18          Mr. Donatelle, it's been a pleasure talking to you.

19          MR. DONATELLE:   I appreciate the opportunity to be

20  involved.

21          I have one question.   I heard yesterday the

22  possibly was raised that Mr. Bridgewater and Mr. Houston

23  might be transported from ADX to California.   Is that still

24  a possibility?

25          THE COURT:   I don't know.   It's not my case.   It's

1    Judge King's case.

2         MR. DONATELLE:  We had gotten an order entered to

3    keep them there at ADX for cost-saving measures.  The Court

4    had appointed an attorney and an investigator who can drive

5    to ADX, and it would cause some hardship to have Mr. Houston

6    moved to California.

7         THE COURT:  Where are Mr. Houston and

8    Mr. Bridgewater housed?  Are they in a medical facility?

9         MR. DONATELLE:  No.  They are at the ADX maximum

10   security facility in Florence, Colorado.

11        THE COURT:  I see.  Why -- I am just talking for a

12   moment.  I have no idea what I am about to say, so let me

13   just ramble.  Why isn't it easier -- why shouldn't some of

14   these groups have a judge preside over them in let's say

15   Denver, Colorado, which is closer to ADX, or is that really

16   a cost saving?  Why wouldn't the Court preside over the

17   trial back in the Southern District of Illinois or in

18   Chicago, or is that really a cost savings?  In other words,

19   this is an incredibly expensive trial the way the Indictment

20   has been brought.

21        MR. DONATELLE:  Your Honor, it's well-beyond my

22   expertise to give you a cost analysis of this situation.

23        THE COURT:  I am just trying to sort out -- let's

24   say that Judge King and Judge Carter and Judge Klausner are

25   involved in the first series of cases where they have been

1    divided out, and let's just say Judge Klausner wasn't

2    exhausted at the end of his trial or Judge King or Judge

3    Carter.

4              Would there be any cost benefit to one of those

5    three judges traveling to Chicago to conduct a trial or to

6    the Southern District of Illinois, or is it just no cost

7    savings in your opinion, and everybody is brought out here

8    to the Central District?  For instance, I have heard rumors

9    that some of the gentlemen have Hepatitis C.  I don't know

10   what the medical care is out here compared back there, but

11   I have heard some rumors about West Valley which weren't up

12   to the standards I would expect.

13             Could you see any cost savings if there were

14   additional trials because this may be severed out in seven

15   to eight different trials of a judge or judges willing to go

16   back if they were to preside over a case in a different part

17   of the country?

18             MR. DONATELLE:  Your Honor, knowing some of the

19   information from the Marion trial, it seems to me one of the

20   major considerations would be who the witnesses were going

21   to be in a particular case and the location of the

22   witnesses.  I don't know where most of the government

23   witnesses are.  The defense witnesses are spread all over

24   the country, and I don't know that there would be any

25   significant cost savings by having one location as opposed

1    to the other.

2         THE COURT:  Listen, it's been a pleasure talking to

3    you.  We look forward to seeing you on January 11 at 8:00 in

4    the morning.

5         MR. DONATELLE:  Thank you.

6         THE COURT:  Mr. Jamison.  I want to thank you.

7         Does this meet with your approval?

8         MR. JAMISON:  Yes.

9         THE COURT:  Hopefully that satisfies your security

10   concerns.  Thank you very much.  I don't have any further

11   questions.  Have a good day now.

12        Back to Mr. Reed's request for the disclosure of

13   this dropout, Mr. Beckwith has handed me a debrief that's 13

14   pages long.  I am going to go read that for a moment, and

15   that will tell me if he has relevant information or not, and

16   therefore, now I can make a relatively quick ruling today

17   one way or the other about this disclosure.

18        I was about to ask for this debrief, read it over

19   the weekend, reassemble you again tomorrow.  Maybe that's

20   not necessary.

21        Would you mind if I took a recess?  I think we can

22   resolve Mr. Reed's issue very quickly in terms of this

23   informant.  I will need at least 20 minutes to read.  Why

24   don't you do this, a quarter to the hour.  We are in recess

25   until a quarter to the hour.

1            (Recess.)

2            THE COURT:  We are back on the record.  All counsel

3    are present.  The defendants are present.

4            Mr. Beckwith, is there an earlier report -- this

5    debrief was conducted on January 8, 1998.  Mr. Reed is

6    concerned about an August 26, 1997, report that states,

7    "Drops out of stepdown program and debriefs regarding Aryan

8    activities."  Do you know of any other report?

9            MR. BECKWITH:  No.  I believe that was the date

10   that the initial interview took place when the MA requested

11   to come out.

12           THE COURT:  On August 26?

13           MR. BECKWITH:  Yes.  I believe this is the date

14   that the actual report was written and debriefed, that the

15   interview was actually conducted.

16           THE COURT:  On January 8?

17           MR. BECKWITH:  Yes.

18           THE COURT:  So you know of no other report before

19   January 8 concerning the debrief?

20           MR. BECKWITH:  No.

21           THE COURT:   Now, Mr. Reed, in this 13-page report,

22   there is nothing about the August 19, 1997, incident except

23   there is an opinion.  One statement concerning Mr. Mills is,

24   "I know Mills had problems with blacks for a while.  Here he

25   used to yell at one of the shot callers for the blacks."  I

1    will leave the name of the shot caller out for a moment..

2         The only other thing that I can find is, "The AB

3    want to get away from the blacks because they know they are

4    going to come after them and beat them in numbers.  They

5    know it's going to be a big problem."

6         The preceding paragraph doesn't pertain to the

7    Lewisburg incident.  It's a generalized statement.  The

8    thing in Lewisburg I personally think was behind drugs.

9    There is nothing, though, that corroborates that.  There was

10   no statement that says so and so is doing something at

11   Lewisburg that leads to this.  It's just a blank statement.

12        "Barry and Chant never make any moves themselves.

13   They are used to giving orders, and regardless of what they

14   say, they never want to leave here."  ..

15        That's it in all 13 pages, so at least concerning

16   the debrief, I am going to order that this be placed in a

17   sealed condition not to be opened other than by the District

18   Court, and I am going to go back then to Mr. Reed's motion,

19   and there are two letters, June 5th and 13th.

20        You want to inquire where those letters are>

21        MR. REED:  No.  We have them.  I'm not concerned

22   with that.  It actually opens up to a bunch of different

23   things.

24        THE COURT:  This is the best I can do with what I

25   have got.  I know that on August 26, 1997, someone writes on

1   a chronology summary of events that there is a "dropout

2   stepdown program and debriefs regarding Aryan Brotherwood

3   activities."  Mr. Bechwith is correct.  I have that debrief,

4   but it's January 8, 1998..

5        Whether there is another debrief, Mr. Beckwith

6   doesn't know about it.  In this debrief, I have read to you

7   every conceivable part concerning anything about Leavenworth

8   or even any racial animosity between Mills and black

9   inmates.  There is nothing else.  I represent to you he is

10  not dropping out because of any racial conflict.  He is

11  dropping out even if he is a member because of an entirely

12  different reason totally nonrelated.

13       Now, let me go back.  You want to show in front of

14  the jury this prior -- these prior letters of June 5 from

15  let's say the white side and the June 13 from the black

16  side.  No matter how suspicious you are, if you and I don't

17  have that debrief -- the government is on notice in the

18  future that's a pretty important debrief, so everybody has

19  heard that now -- the only way to get that in or the best

20  way to get that in if you want that evidence is through the

21  SIS or whoever confiscated that letter, and, therefore, your

22  request is going to be find out who they are..

23       MR. REED:  The letters -- I know who they are

24  because they are written by SIS.

25       THE COURT:  Who are they?

1          MR. REED:  I don't have them in front of me.  I am

2     not worried about it now.

3          THE COURT:  You have the officers?

4          MR. REED:  Yes.

5          MR. REED:  Assuming for the sake of argument that

6     the person that wrote the summary isn't the person who

7     talked to the person that debriefed on the 26th, how

8     else would --

9          THE COURT:  What you don't know is when the

10    chronology of the summary of events -- I don't know when

11    this was prepared, so what's happening my guess is that you

12    get to the tail end of the dog someplace after Lewisburg,

13    and you get somebody who sits down with this material, and

14    they put together what you and I have been looking at as the

15    chronology summary of events, and they list all of these

16    things that have happened from what I call the back side.

17         Unless Mr. Beckwith knows of something else,

18    everybody is on notice that if there is another debrief it's

19    pretty important, and if it's Brady material, that's pretty

20    important.  Mr. Beckwith understands that.  Mr. Wolfe does.

21    It's being represented to me right now that there's not.

22    That's the best I can do right now.

23         MR. REED:  I appreciate that.  My next request

24    would be -- some officer or some person at the BOP talked on

25    the 26th to --

1    THE COURT:  You want to know that officer's name?

2    MR. REED:  Exactly.

3    THE COURT:  Okay.  We can find that for you.

4    All we need is the person who talked to the

5    gentleman when he allegedly dropped out.  I wouldn't be too

6    concerned about the word "dropout."  I'm not sure he is a

7    member.

8    MR. REED:  That's not as important.

9    THE COURT:  Can we find that name?

10   MR. BECKWITH:  Yes.  I believe anytime that this

11   takes place just procedurally there is an initial contact

12   with a person that is requesting protective custody or

13   separation -- there is initial contact with a staff member,

14   and on somebody that is indicating they are providing

15   in-depth information, then somebody else will come back and

16   reinterview them.

17   THE COURT:  So what we will do is we will find the

18   name, and that way your investigator can talk to that

19   person.  You will know who that name is.

20   MR. REED:  Okay.

21   THE COURT:  Let me take a brief recess now.  I need

22   to take a phone call.  I'll be back in 15 minutes.

23   (Recess.)

24   THE COURT:  We are about back on the record.  All

25   counsel are present.  The defendants are present.

1    There is a 13-page report, Christy, identified as a

2  report of January 8, 1998.  I want to order that report

3  placed under seal.  Also, I would like to get a copy of the

4  chronology of summary of events, Christy, and place it with

5  so the Circuit knows what Mr. Reed was referring to because

6  it doesn't have a Bates stamp number on it.  This is one of

7  the documents that just didn't have that number.

8    MR. REED:  That's a portion of the chronology.  It

9  was 14 or 15 pages.

10    THE COURT:  I will attach the chronology along with

11  the debriefing report that I have examined in-camera, and

12  that was as a courtesy to the Circuit they can see what you

13  are referring to on August 27, 1997, and they can look at

14  the report.

15    MR. REED:  Thank you.

16    THE COURT:  No. 2, Mr. Beckwith is going to be kind

17  enough to find the SIS officer for the initial debrief or

18  whether he is dropping out, whatever, on August 26.  You

19  supply the name to Mr. Wolfe, and counsel will supply it to

20  Mr. Reed.  That way you can double-check and see if there is

21  any further conversation at that time that might be helpful.

22    MR. REED:  I think the Court may have covered this.

23  Once I get the guy's name, the first thing I am going to ask

24  is if there was a report, something written up on the 26th.

25  One of the problems is we don't know who put together the

```
 1    chronology, but there is discovery consistent with someone
 2    dropping out of the AB on that day.  That's the reason --
 3    that was my concern.
 4              THE COURT:  Whoever summarized this in terms of
 5    dropping out of the AB used the wrong term.
 6              MR. REED:  There is a discovery page that says
 7    someone dropped out.  That's why --
 8              THE COURT:  I don't believe he was ever  a member.
 9              Now, we are going to have a number of under seal
10    filings.  I haven't referred to those by number yet.  I am
11    not sure how the Circuit is going to start reviewing this.
12    Any suggestions?  Shall we start assigning numbers like
13    Court No. --
14              MR. STEWARD:  Yes.
15              THE COURT:  We had a prior filing under seal.  Does
16    anybody remember?
17              MR. HARRIS:  You did.  It was Court No. 1.
18              THE COURT:  Mr. Harris, thank you for your memory.
19              So this will be Court No. 2?
20              MR. HARRIS:  Yes.
21              THE COURT:  Okay, this will be Court No. 2.
22              Mr. Beckwith, out of your presence yesterday, I had
23    read the following into record, and it was a tentative
24    ruling.  First, out of your presence, I had previously heard
25    that the defense was aware of Confidential Informant No. 14
```

1    and No. 16, and those names were given to me on two

2    occasions.  No. 14 was believed to be Keith Sageen, and No.

3    16 was believed to be Steve Ritter..

4         MR. BECKWITH:  Since the last time I was in court,

5    I have received some further notification from USP - Marion

6    with a correction on some of those numbers which I have

7    available for the Court today.

8         THE COURT:  Let's go back to the ones that the

9    defense already believes were disclosed.

10        Is No. 14 still Keith Sageen?

11        MR. BECKWITH:  That would actually be 15 now, Your

12   Honor.

13        THE COURT:  I am working off of the report.  You

14   have to stay with my report.  I am not going to cause the

15   disclosure of No. 15.  I think we just did.

16        MR. BECKWITH:  What I am saying is the CI number

17   that was referenced according to him is a statement made

18   under 14.

19        MR. WOLFE:  Your Honor, let me try to make it more

20   clear.  The two names disclosed are both mistaken in the

21   current opinion of Mr. Beckwith and the Bureau of Prisons.

22   No. 14 is not Keith Sageen.  No. 16 is not Steven Ritter.

23        THE COURT:  Okay.

24        Do you have that report in front of you?

25        MR. BECKWITH:  Yes.

1    THE COURT:  Let's turn to A01624.  In-camera could

2 you simply write in for me in pencil for a moment the name

3 next to Confidential Informant No. 10, who you believe that

4 is.

5    MR. WOLFE:  I might also add all four of the names

6 given to you yesterday are also currently believed to be

7 incorrect.

8    THE COURT:  Thank you.

9    You are writing in No. 11.

10    Do you have those names, Mr. Wolfe?

11    MR. WOLFE:  Yes.

12    THE COURT:  I want you to turn without disclosing

13 it for a moment to Confidential Informant No. 16 who appears

14 on A01628.  In the grid I have so far of the potential

15 cooperators, that grid may not be complete when Mr. Jessner

16 went through the list count by count, but I don't see that

17 person's name in any of the information given to me thus

18 far.

19    Do you know if this person has been disclosed to

20 the defense?

21    MR. WOLFE:  Not so far since, Your Honor, the

22 government has never expected that person to be a witness in

23 any of these cases.

24    THE COURT:  So we just need to deal with Brady.

25    I want to turn to No. 14.  This is a new name for

1    me.   Do you know if this witness has ever been disclosed to

2    the defense?

3             MR. WOLFE:   Not so far as I know.

4             THE COURT:   Are you planning on calling him?

5             MR. WOLFE:   No, Your Honor.

6             THE COURT:   No. 15 I was not going to disclose, and

7    I made a ruling concerning that yesterday, but this person

8    is known to the defense.

9             Counsel, any objection?   I think it's already

10   known.   He was previously No. 14 you told me.

11            MR. WOLFE:   No, Your Honor.   All things being

12   equal, the government would prefer if the name is irrelevant

13   that it not be disclosed, but the government doesn't

14   perceive any special safety concerns about that name.

15            THE COURT:   And you already know.   No. 15 is Keith

16   Sageen.   All you would have to do is look back in the

17   transcript and realize that.

18            Now, out of your presence yesterday, I had informed

19   counsel that tentatively concerning the disclosure of four

20   informants, Nos. 10 through 13, in the H Unit discovery date

21   No. A01623-27 that the Court well-understood that the Court

22   must balance first the degree of the informant's involvement

23   in the criminal activity; second, the relationship between

24   the defendant's asserted defense and likely testimony of the

25   informant; and, third, the government's interest in

1    nondisclosure.  The Court cited United States versus Beltran

2    and United States versus Gill yesterday and read the cites

3    into the record.

4         I also stated yesterday outside of your presence,

5    Mr. Beckwith, that the Court also found relevant in the

6    balance the fact that defendants Mills and Bingham

7    potentially faced the death penalty and the sweeping breadth

8    of the crimes charged in this Indictment.  I also cited

9    Ramirez-Rango (phonetic) which allowed consideration of

10   other relevant factors..

11        After considering all of these factors, I had come

12   to a tentative belief that the government may continue to

13   hold the identities of Informants No. 12 and No. 13 in

14   confidence.  I found that it was highly probable that the

15   testimony of these witnesses would largely be redundant of

16   material already available to the defense, and the value of

17   the testimony in this particular matter would be outweighed

18   by the potential danger to these witnesses resulting from

19   disclosure of their identities.

20        However, as to Informants Nos. 10 and 11, I

21   tentatively found that these informants can provide relevant

22   and helpful testimony for the defense.  As to these

23   witnesses, the defendants' interests in obtaining a fair

24   trial outweigh the government's interest in protecting the

25   identity of these witnesses.  Thus, the government's

1    qualified immunity to withhold the identities of these

2    witnesses must give way.

3          Now, yesterday I counseled the defense that if

4    anything inappropriate happened that this well could be

5    used, or I might allow the introduction in the death phase,

6    but I will understand that this harm may not come from the

7    Aryan Brotherhood because it's already been represented on

8    the record to me that these are two black inmates, that the

9    harm could potentially come from Black Muslims or the D.C.

10   Blacks.

11         The difficulty is that the higher the person in the

12   organization the more valuable and material it is to the

13   defense, so if these gentlemen whose names are somewhat

14   unfamiliar to me represent some hierarchy, then I have got

15   this awful dichotomy of potential harm versus relevance, and

16   unlike the Group 1 and Group 2 people who were divulged,

17   that was the a general sweep of the prison.  That was

18   general conversations.  I think when the defense and the

19   government talk to these people if they will they will find

20   it's of diminimus value.  These are just opinions cast about

21   because everyone at Marion was spoken to, but of course I am

22   concerned.

23         By the same token, not to explain my decision but

24   to impart on you I am concerned that Mr. Mills and

25   Mr. Bingham may be executed.  People die.  I am concerned

1    that the continuing activity and retaliation in the prison

2    system, which counsel for the government has wisely brought

3    to my attention on a number of occasions -- of course, I am

4    concerned if this continues on either the black or white

5    side, which is a horrible way to speak of these different

6    groups.

7            In balancing this, I had actually thought that one

8    of these informants was a person that I was already familiar

9    with.  It turned out not to be.  If the government is going

10   to proceed, which I assume that they are, certainly against

11   Mr. Mills in the death phase, subject to hearing something

12   else from the government today and listening again to the

13   defense, I am going to cause the disclosure, and I am want

14   to talk to you in a few minutes about time period.

15           Then I need to go back and look at 14 and 16 who I

16   already thought the defense knew about, so you will know

17   where the persons are located.  In a few minutes remind me

18   to talk to you before lunch or after lunch about some time

19   frame.

20           Mr. Wolfe, let me look to you for just a moment.  I

21   am not willing in this ruling to cut the baby in half.  I

22   could disclose No. 10 and not disclose No. 11.  If I did

23   that, I am choosing which of these two informants, which I

24   think have relevant and potentially exculpatory --

25   exculpatory information for the defense, and if one of them

1   doesn't talk, then there is not a complete defense.

2          I can take Mr. Rosen's suggestion, and I can bring

3   Mr. Rosen into court and conduct an in-camera hearing, but

4   if they tell me that they are not willing to testify, you

5   still have the option of having those persons because you

6   can put them on the stand, and if you put them on the stand,

7   and they state that they can't recall and I find that that's

8   not credible, you are able to impeach them through the

9   officer or SIS agent who interviewed them, so even if I

10  follow your process, it seems to me I still get back after a

11  week or month or whatever to the same back side of the

12  circle where these people are going to be known.

13         Let me turn to Mr. Wolfe.  I know your position is

14  the balance should go the other way.  I respectfully

15  disagree with that.

16         Can you think of anything else that along the way

17  would help protect these other than the decision that the

18  Court is going to make in this regard?

19         MR. WOLFE:  No, Your Honor.  The government submits

20  on the remarks previously made, and we would ask -- I

21  believe Your Honor spoke yesterday of directing the

22  disclosure on January 9.

23         THE COURT:  I can delay that.

24         MR. WOLFE:  January 9 I believe would be

25  satisfactory because it would allow us the experience of

1   having these identities changed and makes the government

2   desirous of having next week to make further inquiry before

3   the disclosures are actually made and perhaps notify the

4   inmates that they might be approached.

5        THE COURT:  Mr. Beckwith, you are inside the prison

6   system.  How long would you like?

7        MR. BECKWITH:  Your Honor, right now these

8   individuals are being informed that their names may be

9   disclosed.  We have requested that each one of our

10  investigators at the locations these inmates are at

11  personally notify them, so that's currently ongoing.  I

12  would say by January 9 would be very reasonable to have that

13  notification in place.

14       THE COURT:  January 9 will be the order of the

15  Court.  The names will be disclosed by that date concerning

16  Confidential Informant No. 10 and No. 11.  I want to be very

17  clear that 12 and 13 are not to be disclosed.  They are

18  redundant.   15 is already known to the defense.

19       Now I need to spend a little time on re-reading

20  what I have already glossed over, and that's No. 14 and No.

21  16.  I will make those decisions this afternoon on 14 and

22  16.

23       Let me ask again it makes a tremendous different in

24  the decisions what groups these people line up with, so let

25  me take No. 14.

1          Is he -- I hate to use black and white.  It's such

2     a racist term.  What about -- is he affiliated with the

3     Muslim D.C. Blacks, or is he in what I would call the AB

4     Dirty White Boys, or is it white/black?

5          MR. BECKWITH:  I believe he is a white male.

6          THE COURT:  Then let me reread that because it may

7     be the same ruling as 12 and 13.

8          MR. BECKWITH:  Let me verify that.

9          THE COURT:  I will ask the same question about 16

10    in just a moment.  If you want to step down and talk to

11    anybody in the back from the Bureau of Prisons you can.

12          MR. WOLFE:  Your Honor, there are some difficulties

13    in being certain about the attributes of CI 14, but the

14    government's belief now is that he is a white inmate.

15          THE COURT:  I am not going to cause the disclosure

16    of No. 14.  First, the information is not only redundant,

17    but you have this from the defense perspective from so many

18    witnesses, and to allay any concerns, this is simply a

19    description that two blacks inmates approached inmate Tokash

20    and the fight began.  One of the inmates who started the

21    fight with Tokash was inmate Robert Scott.

22          Would someone remind me of Robert Scott.  He is a

23    black inmate?

24          MR. BECKWITH:  Robert Scott is a black male, Your

25    Honor.

1          THE COURT:  CI 14 stated that "The incident was the
2     result of a previous incident which occurred between Tokash
3     and a black inmate."  You are going to have that in
4     Confidential Informants No. 10, and No. 11.  If you aren't
5     satisfied, you have the option of coming back.  You know it
6     exists, but at the present time, it's redundant.
7          Let me look at 16.  Possibly we can make a ruling
8     before we go to lunch.
9          (Pause in proceedings.)
10         THE COURT:  As to No. 16, this provides relevant
11    and helpful testimony for the defense.  The government's
12    qualified immunity to withhold the identities of these
13    witnesses must give way.  I will delay that until January 9
14    also.  You will know the content of this person.  I will
15    simply read you a portion of the content because it won't
16    disclose who the person is until the 9th.
17         No. 16 "reported that there was increased tension
18    in F Unit" -- it could be "E Unit."  My copy is bad --
19    "because of the incident between Gardner and Dunn which
20    occurred on January 8, 1997."
21         Who are Gardner and Dunn?  That's an incident that
22    follows Tokash a couple days earlier.  Somebody tell me
23    about Gardner and Dunn.
24         MR. WOLFE:  It's described in the paragraph
25    immediately above on the same page.

1    THE COURT:  Thank you.

2    So on January 8, 1997, inmate Gardner was

3  transferred from E unit to F Unit.  This move was made to

4  reduce the number of black inmates in E unit who associated

5  with the black inmates from the Washington, D.C." --

6    So Gardner would obviously be a black inmate.

7    MR. WOLFE:  Yes, Your Honor.

8    THE COURT:  On January 9, inmate Gardner assaulted

9  white inmate Dunn.  It is the belief of this investigator

10  that this assault by Gardner on Dunn was committed in order

11  for Gardner to show his continued support of the D.C. Black

12  inmates against white inmates and gain a transfer to I Unit

13  with his home boys.

14    Concerning Confidential Informant No. 16, this

15  informant reported that there was increased tension in F

16  Unit because of the incident between Gardner and Dunn which

17  had occurred on January 8, 1997.  Informant No. 16 stated

18  that Clarence Bryant and Anthony Fields who are both black

19  inmates from the Washington, D.C., area were upset about the

20  incident involving their homeboy Gardner.

21    According to this informant, Edward Cahill

22  approached inmate Dunn while he was being assaulted by

23  Gardner and stepped in front of Dunn to keep Gardner from

24  kicking Dunn in the face.  Now, Cahill, Williams, and some

25  of the other white guys are pissed off at the black guys,

1    and some of the whites have made statements, so everyone is

2    trying to steal razors or find something to work as a

3    weapon.

4         In addition to Bryant and Fields both being from

5    the Washington, D.C., area, inmate Richard Williams is an

6    Aryan Brotherhood suspect and a very strong supporter of

7    Michael McElhiney.  While at USP Florence, Williams was

8    believed to be the enforcer for Wayne Bridgewater, Aryan

9    Brotherhood member, currently housed at USP Lewisburg.

10        That disclosure can wait also until January 9, so

11   for redaction purposes, the Court agrees with the other

12   redactions in these documents generally speaking, but as to

13   No. 10 and No. 11 that needs to be unredacted.

14        As to No. 16, those need to be unredacted.

15        Now, this is a clean copy.

16        In A01616, is there any reason, Mr. Wolfe, that the

17   names shouldn't be unredacted just on that one page?

18        MR. WOLFE:  On 1616, no, Your Honor.

19        THE COURT:  Are all these people on A01616 simply

20   people who are named in the series of assaults in January

21   through --

22        MR. BECKWITH:  No.  Those are the names of the

23   people that were involved in that particular incident.

24        THE COURT:  Is there any reason why these

25   names shouldn't be unredacted?

1             MR. WOLFE:  No.

2             THE COURT:  And then 1617, 1618, 1619, 1620, 1621,

3    and 1622 -- besides the reg numbers -- and 1623 down to

4    confidential information, any reason why those names

5    shouldn't be unredacted?

6             MR. WOLFE:  No, Your Honor.

7             THE COURT:  All right, they will be unredacted.

8             MR. WOLFE:  Your Honor, before we leave those

9    pages, may I ask about one other item?

10            THE COURT:  Sure.

11            MR. WOLFE:  Your Honor, on pages 1617 through 1622,

12   I believe from the context that they are not interviews.

13            THE COURT:  They are not interviews?

14            MR. WOLFE:  I don't believe so.

15            THE COURT:  If they aren't interviews, then there

16   is no reason for disclosure.

17            MR. WOLFE:  It's a uniform format describing the

18   same Bureau of Prisons information about each defendant, his

19   age, perceived race, the sentence he was serving, his

20   projected release date, his security level classification --

21            THE COURT:  What page?

22            MR. WOLFE:  Beginning at 1617, all of them through

23   the first entry on 1622 I believe follow the same format.

24            THE COURT:  These are the persons involved, the

25   information about their sentence and the release date --

1    these aren't personal interviews?

2         MR. WOLFE:  I don't believe so, Your Honor.

3         THE COURT:  That takes us over to 1623.  This

4    document is to be given to the defense on January 9.  I want

5    you to unredact Confidential Informant No. 10 and unredact

6    the remainder of the paragraph on 1623 all the way through

7    1625 because that's Confidential Informant No. 11, the two

8    that I am disclosing.  You can strike the reg numbers of

9    course.

10        16, which starts on page 1628 -- that paragraph

11   starting "January 14" would be unredacted continuing through

12   Confidential Informant No. 16's discussion.  I suggest also

13   on the same page that you unredact the Gardner and Dunn

14   incident at the top of the page on January 9.

15        Now we are over to inmate interviews.  On A01628,

16   you redacted this person who continues over to A01629.  This

17   person would seem to be absolutely critical to the defense.

18        MR. WOLFE:  Since the first proposed redactions

19   were submitted to the Court, I have given this document

20   additional thought as Your Honor directed, and as to that

21   name, the government believes that the name should be

22   revealed, although there is one line that concerned the

23   government as well.

24        THE COURT:  Without stating it for the record, I

25   can point to the line.

1          MR. WOLFE:  Your Honor, on page 1629, at the bottom

2  of the first full paragraph, the last long sentence, it

3  begins, "The inmate also stated there are" --

4          THE COURT:  Redact that.  It's not relevant to this

5  case.

6          MR. WOLFE:  Very well, Your Honor.

7          THE COURT:  Now, does this person need to be warned

8  in any way?

9          MR. WOLFE:  I would think so, Your Honor.  Your

10  Honor has already directed the disclosure of the document on

11  January 9.

12          THE COURT:  By January 9.

13          The next person after that on A01629 does not need

14  to be disclosed.  The next paragraph referring to

15  Confidential Informant No. 15 is already known.  Just

16  unredact it.

17          MR. WOLFE:  Your Honor said to to unredact No. 15?

18          THE COURT:  Yes.  It's already known.

19          MR. WOLFE:  Very well, Your Honor.

20          THE COURT:  The next person doesn't seem to have

21  any personal information.  It's simply an opinion.  Do you

22  see that?

23          MR. WOLFE:  Yes.

24          THE COURT:  Now, the incident report, there is no

25  reason that those names shouldn't be unredacted.  The

1    incident report for assault and the related incident

2    reports, there is no reason unless I hear of one why that

3    shouldn't be unredacted.

4          MR. WOLFE:   No objection, Your Honor.

5          THE COURT:   Concerning the summary and conclusions,

6    I don't want to make a mistake in having made those rulings

7    and then come back and miss a name in the summary and

8    conclusions in not causing a redaction to take place.   This

9    is an after-action report, which is really a product of the

10   Bureau of Prisons and some recommendations concerning the

11   disciplinary process.   I don't see why from that point on

12   that there is any reason for the Court to unredact this.

13         MR. WOLFE:   Yes, the government agrees.

14         THE COURT:   Go over that again very carefully at

15   lunch to see if there is anything I have missed.

16         All right, that should resolve your matter, Mr.

17   Reed, at least for the time being.

18         I received a second supplement to discovery motions

19   by the defense, and I propose to go over this with you

20   today, tonight, and tomorrow, or however long it takes.

21         Do you want to eat lunch now and come back to it?

22         MR. STEWARD:   That would be great.

23         THE COURT:   How long would you like?

24         MR. STEWARD:   An hour would be fine.

25         THE COURT:   How long would you like to go this

1   evening?

2        MR. STEWARD:  I think we can get through this

3   fairly quickly.

4        THE COURT:  I will let you take the lead.  I will

5   listen to you first, and if I am not satisfied, we will come

6   back and do it by the numbers.

7        THE COURT:  Have a nice lunch.  We will see in you

8   an hour.

9        (Lunch recess.)

1

2                          CERTIFICATE

3        I HEREBY CERTIFY THAT PURSUANT TO SECTION 753

4        TITLE 28, UNITED STATES CODE, THE FOREGOING IS A

5        TRUE AND CORRECT TRANSCRIPT OF THE

6        STENOGRAPHICALLY.   RECORDED   PROCEEDINGS HELD IN

7        THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT

8        PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

9        OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

10                                                    12/30/05
         Sharon A. Seffens              12/30/05

11

12

13       SHARON A. SEFFENS

14       COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25