# ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

AUG – 2007

CENTRAL DISTRICT
BY                    DEPUTY

1

2              UNITED STATES DISTRICT COURT

3              CENTRAL DISTRICT OF CALIFORNIA

4                    SOUTHERN DIVISION

5                       - - -

6      UNITED STATES OF AMERICA,
                  Plaintiff,
7         vs.
                                    CR-02-938(C)
8      BARRY BYRON MILLS;           DAY 1, VOL. 1
       TYLER DAVIS BINGHAM;         HOVEY VOIR DIRE
9      CHRISTOPHER OVERTON
       GIBSON; EDGAR WESLEY
10     HEVLE,

11              Defendants.

12     ---------------------------

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            Santa Ana, California

17            February 7, 2006

18

19

20        SHARON A. SEFFENS, RPR
          United States Courthouse
21        411 West 4th Street, Suite 1-1053
          Santa Ana, CA  92701
22        (714) 543-0870

23

24

25

DOCKETED ON CM

5 27

5447

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   DEBRA W. YANG
     United States Attorney
 4   STEVEN D. CLYMER
     Special Assistant United States Attorney
 5   Chief, Criminal Division
     STEPHEN WOLFE
 6   MICHAEL EMMICK
     TERRI FLYNN
 7   Assistant United States Attorneys
     1400 United States Courthouse
 8   312 North Spring Street
     Los Angeles, CA  90012
 9   (213) 894-0511

10   For Defendant BARRY BYRON MILLS:

11   H. DEAN STEWARD
     LAW OFFICES OF H. DEAN STEWARD
12   107 Avenida Miramar, Suite C
     San Clemente, CA
13   (949) 481-4900

14   MARK F. FLEMING
     LAW OFFICES OF MARK F. FLEMING
15   433 "G" Street, Suite 202
     San Diego, CA  92101
16   (619) 652-9970

17   For Defendant TYLER DAVIS BINGHAM:

18   MICHAEL  V. WHITE
     LAW OFFICES OF MICHAEL V. WHITE
19   1717 Fourth Street, Third Floor
     Santa Monica, CA  90401
20   (310) 576-6242

21   WILLIAM S. HARRIS
     STEWART & HARRIS
22   1499 Huntington Drive, Suite 403
     South Pasadena, CA  91030
23   (626) 441-9300

24

25
```

```
1    For Defendant CHRISTOPHER OVERTON GIBSON:

2    KENNETH A. REED
     LAW OFFICES OF KENNETH A. REED
3    404 West 4th Street, Suite C
     Santa Ana, CA  92701
4    (714) 953-7400

5    For Defendant EDGAR WESLEY HEVLE:

6    BERNARD J. ROSEN
     LAW OFFICES OF BERNARD J. ROSEN
7    1717 Fourth Street, Suite 300
     Santa Monica, CA  90401
8    (310) 451-4577

9    DONALD J. CALABRIA
     LAW OFFICES OF DONALD J. CALABRIA
10   16133 Ventura Boulevard, Suite 600
     Encino, CA  91436
11   (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1    SANTA ANA, CALIFORNIA; TUESDAY, FEBRUARY 7, 2006; 7:30 A.M.

2             THE COURT:  We are in session.

3             Why don't we start with Mr. Mills who is present.

4             Mr. Steward, would you make your appearance and,

5    Mr. Fleming.

6             MR. STEWARD:  Dean Steward for Mr. Mills.

7             MR. FLEMING:  Mark Fleming for Mr. Mills.

8             THE COURT:  Mr. Bingham is present.

9             Mr. White, and, Mr. Harris, would you make your

10   appearances.

11            MR. WHITE:  Michael White for Mr. Bingham.

12            MR. HARRIS:  William Harris for Mr. Bingham.

13            THE COURT:  Mr. Hevle, you are unexpectedly

14   present this morning, and I want to have a discussion with

15   you and your counsel in just a moment.

16            Mr. Rosen, and, Mr. Calabria, would you make your

17   appearances.

18            MR. ROSEN:  Bernard Rosen for Edgar Hevle.

19            MR. CALABRIA:  Donald Calabria for Edgar Hevle.

20            THE COURT:  Mr. Gibson, you are present.

21            Mr. Reed, would you make your appearance.

22            MR. REED:  Kenneth Reed on behalf of Mr. Gibson.

23            THE COURT:  Your appearances are unexpected, Mr.

24   Hevle, and, Mr. Gibson.  Let me explain why because I want

25   to continually give you choices.  The first issue that has

1  come up is my nonclarity about the use of the

2  questionnaires.  Gentlemen, I want you to participate.  You

3  should have access to the questionnaires, and you should be

4  able to share those with counsel while we were in a

5  proceeding.  The difficulty, though, is I don't one of the

6  jurors to ask because there can be a chilling effect, well,

7  gee, do the defendants have our questionnaire?

8          So, for instance, Mr. Gibson, or, Mr. Hevle, I

9  don't know what you have requested from your attorneys, but

10 I don't want the questionnaires taken down to Terminal

11 Island or whatever facility you are in.

12         So my thought is if you want to be present and

13 share the questionnaires during the Hovey voir dire -- we

14 are going through those jurors one at a time.  By the time

15 token, you gentlemen may not need those questionnaires right

16 now.  This pertains to Mr. Mills and Mr. Bingham.  These

17 questions are centered around the death qualification or the

18 penalty phase of this trial.

19         When we bring the jurors back together, when we

20 cut this number down from let's say 214 to 170, then we are

21 going to go through the voir dire again, and we're going to

22 mix these jurors' names up, and we are going to call 12

23 jurors to the box, and you are going to know who those 12

24 jurors are a day beforehand.

25         Do you understand that, Mr. Gibson?

1          DEFENDANT GIBSON:  Yes.

2          THE COURT:  Mr. Hevle?

3          DEFENDANT HEVLE:  Yes.

4          THE COURT:  So far your decision might not have

5    changed.  Here is what may change.  In going through these

6    questionnaires, there may be some jurors who are so

7    obviously biased against either your position or the

8    government's position that we automatically want to exclude

9    them.  For instance, let's take a particular juror as you go

10   through the first day.  I don't know if it's the first day

11   or second day.  I am getting the days mixed up, but there

12   are a couple of jurors who are so obviously biased that the

13   government may concede or the defense may concede that they

14   will automatically execute one of you without fairly

15   weighing the aggravating and mitigating factors, or they

16   would never, and it's so obvious that that juror can't sit

17   that it's just a waste of time.

18          If that occurred, my concern after reading some of

19   the questionnaires is that I would be ruling based upon

20   Mr. Bingham's request and Mr. Mills' request that that juror

21   would be excluded without being put before the two of you.

22   Now, I can't imagine you would think that they were a good

23   juror, but you might, and I need to have a clear record on

24   this.

25          So once again, I am offering you the opportunity

1   of being present.  If you want to slow down and go through

2   with us one juror at a time -- we are going through Juror

3   Nos. 1 through 214 over the next few days, and you can look

4   at the questionnaires as we go through those jurors.  If you

5   don't think that that's necessary, then I need to work out

6   some kind of accommodation because I don't want to bring

7   some of these jurors back if it's just obvious that some

8   juror just doesn't belong sitting on this trial.

9          For instance, we already have one hardship.  One

10  juror didn't understand -- I think it's in the second day

11  tomorrow -- that this was going to be a nine-month trial.

12  That juror said if I am selected this would be an extreme

13  hardship, and that juror has a job.  Now, I am going to

14  excuse that juror if each of you stipulate because that

15  juror just didn't understand it was nine months, but I can't

16  do that without you being present or working out some

17  accommodation with you and your attorney, so that's the

18  first issue.

19         No. 2, how are we doing with the production of the

20  documents from the FBI?

21         MR. WOLFE:  Your Honor, there have been a little

22  more than 5,000 pages produced in the last two weeks.

23         THE COURT:  Not 50,000?

24         MR. WOLFE:  No, Your Honor.

25         THE COURT:  Oh, that's wonderful.  I'm just

1  kidding you.  We started with 200,000.  We're down to 5,000.

2         Are they shredding them?  I'm just joking with

3  you.  It's a bad joke.

4         MR. WOLFE:  The estimate was 50,000 to 200,000

5  pages.  I believe that the FBI actually received from the

6  field about 50,000 pages, but on review, more than half

7  really are not relevant to the case, so the review has cut

8  the number considerably.

9         THE COURT:  You see we came in here with the

10  spector from the Bureau of Prisons that they have this much,

11  and they had some significant number that we started with in

12  December.  When we finally got down to it, it was a

13  relatively small group, but some of it was very important.

14  We started working on that in early January, and we have had

15  a lot of continuous sessions, but, frankly, you know -- I

16  have made the record -- there hasn't been a material change

17  in your theory thus far.  What I am looking is a material

18  change, something that doesn't cause a little bit more work

19  but something that might change your opening statement or

20  your tactics on either side.  That's of concern to me.

21         Now, I can't make that determination unless I am

22  also seeing what has been turned over to you.  What I am

23  really afraid of is -- I know that the government feels with

24  the change in Mr. Jessner that they want more time.  I know

25  that you feel that you want more time, and I know that there

1 was a stipulation for six months initially, which on

2 hindsight and after looking at this was way too long, at

3 least initially. I have been patiently waiting for the FBI

4 documents. I can't make a determination of whether a

5 continuance is necessary and how long unless I have them.

6 So far we have decided that you will transfer the

7 documents if they are in redacted form -- strike that. If

8 they don't need redaction or an in-camera hearing, the

9 stipulation has been that the government will transfer those

10 directly to the defense.

11 MR. WOLFE: Yes.

12 THE COURT: And I wouldn't see those.

13 MR. WOLFE: That's what we discussed before.

14 THE COURT: I want to read them. That way I know

15 because I am not depending upon either one of your

16 representations. I can make an independent evaluation if

17 you need a continuance why and how long. That causes a lot

18 more work for me, but at least I really know how long I am

19 sending this jury away.

20 Right now I know the government is reluctant --

21 not reluctant -- you are ready to go to trial, but I know

22 there has been a sea change, and I know that that's

23 difficult, and I know that you would like more time. I know

24 that the defense would like some more time at least up to

25 this point. How much, though, I am not going to be

1   depending upon your representation.  I want an independent

2   look myself.

3           So how many of these documents have you received

4   thus far of the 5,000?

5           MR. STEWARD:  2,000.

6           THE COURT:  2,000 from the FBI?

7           MR. STEWARD:  Yes, and there is another 3,000 that

8   are available today for us.

9           THE COURT:  Excellent.  I would like a copy.

10          MR. WOLFE:  Very well, Your Honor.

11          THE COURT:  I want to go through those.  That's

12  every one of my nights, my weekends, maybe more than that,

13  but I want to look at that so I really know and I am making

14  an intelligent guess because I am not acceding to each of

15  your agreements right now.

16          No. 2 --

17          MR. WOLFE:  Your Honor --

18          THE COURT:  Just a moment.  I'm on a roll.  You'll

19  enjoy this.  If I don't see it, you are going to trial --

20  and I don't want you to be misled -- probably with a week's

21  continuance after the jury selection.  I'm going to be

22  courteous about that.  I'm not going to just get the jury

23  and then demand an opening statement from you the next day.

24  I will always give that week from both sides, but if you do

25  need a continuance, then I'm able to say, look, it's April

1   11 that we reconvene or it's May 15, and I have no basis for

2   that right now unless I look and see what is new.  I'm

3   almost going to guarantee there will be some new things, but

4   it won't be a material change.  It will be somebody else you

5   have to find.

6          Then I want to get Mr. Beckwith in here if we need

7   to find that person.  If there is something in the FBI

8   documents like Confidential Informant No. 10, I want to get

9   Mr. Beckwith in here very quickly and find out who that

10  person is, so we are not chasing around and around the

11  documents flowing and knowing suddenly the result.

12         So can I get the first 2,000 documents that you

13  have given to the defense by tomorrow?

14         MR. WOLFE:  Well, the first 2,000 I would think

15  so, Your Honor.  We have a copy in our office, and it's just

16  a matter of how quickly someone can produce it.

17         THE COURT:  Just the first 2,000 because I can't

18  read 5,000 between now and the weekend.  I probably will be

19  skimming a lot of it.  I want to see what's redacted, if

20  they are just numbers, and if there is something

21  substantive, I want you reading it also.  I want you to tell

22  me what's missing.

23         So the first 2,000 pages by tomorrow?

24         MR. WOLFE:  Very well.

25         THE COURT:  The next 3,000 pages have been

```
 1    released, so let's just say I get those by -- how about the
 2    following Monday so you have all weekend?  Is that okay?
 3              MR. WOLFE:  Yes, Your Honor.
 4              MS. FLYNN:  Yes, Your Honor.
 5              MR. WOLFE:  Your Honor, there are 7,500 more or
 6    less -- 7,500 to 8,000 more pages that we have received that
 7    we --
 8              THE COURT:  But you haven't looked at redundancy
 9    or if they are irrelevant yet.
10              MR. WOLFE:  Yes.
11              THE COURT:  I understand that.  I'm just trying to
12    get a handle on if we are going to grant a continuance how
13    long do I have to hold the jury together, and what's my
14    basis for that?  This initial six-month continuance by both
15    of you was probably taken in good faith, but it was kind of
16    a panic situation where documents were arriving initially
17    from the Bureau of Prisons, and you didn't know what they
18    were.  When we went over them, we all stipulated on the
19    record that there is no material change.
20              Now, Mr. Steward, I am going to read to you --
21    here is Mr. Steward's press conference.
22              "Newsweek, MSNBC.com, February 13, 2006, issue -
23    Barry Byron Mills is a bank robber who will spend the rest
24    of his life in prison."
25              Have you read this yet, Mr. Mills?
```

```
1              DEFENDANT MILLS:  Not yet.

2              THE COURT:  I'll read it to you.  Now, this is the

3    press talking.  This isn't me.

4              "An alleged leader of the notorious Aryan

5    Brotherhood prison gang, Mills stabbed a fellow inmate to

6    death with a handmade knife 27 years ago, adding two life

7    sentences to his time.  Now 57, he likes to project a softer

8    side.  He spends his spare time crocheting and writes love

9    letters to lonely women on the outside who have a weak spot

10   for prison toughs.

11             "But in those same letters, prosecutors say, Mills

12   passed along secret instructions to Aryan Brotherhood

13   members, enabling him to help run a nationwide extortion and

14   drug-trafficking enterprise from behind bars.  Now Mills and

15   three other alleged members are the first set of defendants

16   facing multiple counts of murder, conspiracy and

17   racketeering in the most sweeping Indictment to date of the

18   Aryan Brotherhood.  Rather than chase down the members one

19   by one, frustrated officials are hoping to take down the

20   enterprise en masse, the way prosecutors once did with the

21   Mafia.  Forty alleged members have been charged in the case.

22   About half have pleaded guilty.  Jury selection for the

23   trial of the rest began last week.  Prosecutors say they

24   will seek the death penalty against at least eight of the

25   defendants -- including Mills -- making it one of the
```

1    largest capital cases in U.S. history.  (Dean Steward, a
2    lawyer for Mills, says his client, who pleaded not guilty to
3    all pending charges, was just doing what it took to survive
4    in prison.  'Federal penitentiaries are dangerous, violent
5    places,' he says.  'My client and these others are small
6    minorities within the system.'
7          Then it goes on, "After a six-year investigation,"
8    et cetera.  If you want it, I will give you copies of it.
9          What we have all known because of the cooperative
10   effort trying to get the material from the Bureau of
11   Prisons, FBI, DEA, ATF, CIA, whatever, to the government who
12   wasn't aware of much of the information, the prosecutors,
13   and then to you -- we have always known, quite frankly, from
14   the very beginning what one of the primary defenses was.
15   That's why I captured on the record intentionally that there
16   hadn't been a material change with the Bureau of Prisons
17   documents that initially came to us in these 5,000 pages.
18   In other words, the confidential informants we had to
19   wrestle with, and we still are with No. 11.
20         It's obvious from your statement that there is no
21   change again.  You can say whatever you want to, but there
22   is no change.  Then it goes onto say that I said something
23   about you not talking to the press.  You can talk to the
24   press all you want to.  They also make a statement --
25         Do you want me to read their part?

1      MR. STEWARD:  Please.

2      THE COURT:  "After a six-year investigation, now

3  comes the next challenge for law enforcement:  how to hold a

4  fair trial while protecting lives of the judge, jurors,

5  witnesses and lawyers in the courtroom.  Five years ago an

6  Aryan Brotherwood member on trial broke free of his

7  handcuffs, seized a television and hurled it at the judge.

8  Another stabbed his own attorney with a metal shank he'd

9  smuggled into the courthouse.

10      "Prosecutors acknowledge they're taking a risk by

11  bringing so many of the men into a courtroom together, but

12  they say they have no choice.  'There really was an idea

13  that it should be a body blow against the gang,' says a

14  government employee close to the case who requested

15  anonymity because the judge asked all participants not to

16  speak to the press."

17      Let me stop there.  Talk to them as much as you

18  want to.  I will just speed up the trial.  I will protect my

19  jury that way.  I'll protect the information, so you have

20  carte blanche.  Go out and hold press conferences outside

21  the courtroom door.  I'll be working six or seven days a

22  week, and I'll protect my jury and any outside influence.

23  So right now I'm really being kind.  I take a very unusual

24  approach.  If you notice, I'm slowing down the voir dire.

25  I'm granting weeks of continuances to let us catch up with

 1    discovery, try to let you get prepared in this time frame.

 2    So talk to the press.  Talk to them.  I encourage you to.

 3            Now, let's finish this article out.

 4            "The defendants will be tried in small groups at

 5    Santa Ana, Calif.'s federal courthouse, in a tiered

 6    courtroom built especially for high-threat cases.  Federal

 7    marshals won't discuss security details, but attorneys

 8    confirm that the defendants' shackles will be bolted to the

 9    floor, their restraints hidden from the jury by panels.

10    Prosecutors will call several Aryan Brotherhood members

11    turned informants, now hidden away in the prison system

12    under protective custody, to testify against Mills and the

13    others.

14            "Even if prosecutors win their case, it may not be

15    enough to shut down the gang for good.  'Typically,

16    prosecution does disrupt the group,' says Tony Delgado, a

17    gang expert with the Ohio Bureau of Prisons.  But you've

18    just got to keep plugging away at them.'  Just ask Mikey

19    Lando.  An Aryan Brotherwood member since 1984," et cetera.

20            Once again, talk to the press as much as you want.

21    The way I'll resolve that is I will speed up the trial and

22    not slow it down.  That will protect my jury pool from

23    outside influence.

24            Now, what are we going to do, Mr. Hevle, and,

25    Mr. Gibson, with you?  I want you to participate.  Certainly

1    Mr. Mills and Mr. Bingham are going to have these

2    questionnaires in front of them, but when one of the jurors

3    asks, which they're going to, well, gee, did the defendants

4    have access to our jury questionnaires, I'm going to be able

5    truthfully to say, well, in court they help their counsel.

6    They look at them.   The juror is an anonymous juror.

7            There may be some very good jurors that this has a

8    chilling effect on for the government or for you who

9    suddenly don't want to sit if they think that their

10   questionnaires are being carried around, and they haven't

11   put together that these are still anonymous questionnaires.

12   The most we know about these people is where they live in

13   terms of location.   We don't have the name.   That always

14   gets confused.

15           No. 2, I am going to start excusing some people

16   because I think Mr. Fleming and Mr. Steward and Mr. Harris

17   and Mr. White and the government are very quickly going to

18   reach accommodations on many of these people who are just so

19   obviously biased, and if it's a death qualification issue

20   where I am going to excuse the juror on either side that say

21   automatically or if there is a substantially likelihood that

22   they would or wouldn't find for death, it still potentially

23   affects you because you might think that's a good juror, or

24   I might make a judgment call under the substantial

25   likelihood test and not under the automatic test and exclude

1   a juror who the defense thinks is favorable.

2           So you can either join in all the requests and not

3   be present -- I am not going to ship the questionnaires down

4   to Terminal Island.  You can have the questionnaires here

5   and go through them one by one.

6           Mr. Gibson, why don't you talk to Mr. Reed.

7           Mr. Hevle, why don't you talk to Mr. Rosen and Mr.

8   Hevle Mr. Calabria and decide what you would like to do.

9           MR. CALABRIA:  I have spoken to Mr. Hevle on this

10  issue, and it's his request that he not be here during

11  Hovey.  We agree with whoever is excluded for cause or for

12  whatever for reason is hardship if the Court feels they

13  should be excused, and we feel --

14          THE COURT:  And if the defense disagrees with my

15  call, you will place yourself in the same position

16  obviously?.  You will join in that, so you have a record.

17          MR. CALABRIA:  That's exactly what we will do.

18          THE COURT:  Let's go through what would happen.  I

19  know you are not going to try this, but if you do -- you

20  won't.  You're too experienced.  The way it usually gets

21  played is this.  In Hovey voir dire, it's supposed to be

22  fair, but judges have a difficult time, frankly, because

23  typically a tactic can be used -- and this is the tactic --

24  there is a substantial likelihood question asked of a juror,

25  and the juror is just -- it seems is defense-oriented, is

1    less likely to find for death.

2            When that happens, if the judge makes a mistake

3    and excludes that juror and the Circuit disagrees with this,

4    oftentimes the defense -- not in this trial certainly but in

5    other trials -- have used all the preemptories, all 30, and

6    then made a record that their juror pool wasn't sufficient

7    because this one juror was excused way back when.   Now,

8    that's a difficult concept.   The Courts are most subject to

9    reversal when we make a mistake in that regard, and it never

10   comes with the automatically always finding for life without

11   possibility of release and not death.   The mistake usually

12   is in the substantial likelihood area.

13           Now, what I have done in the past is I have just

14   thrown open more preemptories, and that just stops it, and

15   we can go on forever.   So I will check with you along the

16   way, but right now it's 30.

17           Do you want 40?   Do you want 45?   Remember this.

18   We are only getting rid of the obvious here.   You still have

19   30 preemptories per side.   What we usually get into is a

20   power struggle over one juror.   Quite frankly, because of

21   the number of preemptories I am giving you, it doesn't

22   matter because I am giving you so many preemptories.

23           Well, Mr. Hevle, you have heard your counsel.

24           Have you had enough time to talk to Mr. Rosen and

25   Mr. Calabria?

1        DEFENDANT HEVLE:  Yes.

2        THE COURT:  Are you comfortable not being present

3  and allowing these jurors to be excused for cause or bias or

4  no shows, quite frankly?  For instance, Juror No. 6 has a

5  serious issue concerning a loved one and has had to fly off

6  to another state because there was a heart attack in the

7  family.  Other jurors may be excused who just filled out the

8  questionnaire incorrectly, that they just didn't realize it

9  was a nine-month trial, and now they are saying extreme

10  hardship.  Those jurors I think obviously are going to be

11  excused.

12        That would take place outside your presence.  You

13  would still have a reassembling of this penalty phase

14  qualified jury, and you still have what I call a jury trial

15  voir dire in the sense that we will bring all those jurors

16  together again and go through the regular process.

17        Do you understand all that?

18        DEFENDANT HEVLE:  Yes.

19        THE COURT:  Is it your desire to be present, or do

20  you still wish to be excused?

21        DEFENDANT HEVLE:  Excused.

22        THE COURT:  Mr. Rosen?

23        MR. ROSEN:  We join in that.

24        THE COURT:  Mr. Calabria?

25        MR. CALABRIA:  I join in that?

1          THE COURT:  Do you have any questions?  I want to

2    perfect the record because later on the Circuit could

3    disagree with that process, but obviously they are weighing

4    potential prejudice during this penalty phase questioning

5    and their desire not to present with Mr. Mills and Mr.

6    Bingham against their right to be present, and they are

7    balancing that and making a decision not to be present.

8    They are also willing to stipulate that whatever decision

9    Mr. Mills' and Mr. Bingham's counsel make is acceptable to

10   them.  Are you comfortable with that?

11          MR. WOLFE:  Yes, Your Honor.

12          THE COURT:  Any other questions you would like me

13   to ask them?  If you are successful, this goes up on appeal.

14   If there is some question you have, I want to be courteous

15   and listen to your wisdom.

16          MR. WOLFE:  No, Your Honor.

17          THE COURT:  Mr. Gibson, you have had a chance to

18   talk to Mr. Reed?

19          DEFENDANT GIBSON:  Yes.

20          THE COURT:  Mr. Reed, what is the desire of your

21   client?

22          MR. REED:  We would agree with Mr. Hevle's

23   attorneys, and for the record, I think it's a tactical

24   decision.

25          THE COURT:  It is a tactical decision.  It's

1  obvious.   Is that correct, Mr. Reed?

2           MR. REED:   Yes.

3           THE COURT:   Let me go through the same litany,

4  though.   We are going over these questionnaires one at a

5  time, so in a sense, Mr. Bingham and Mr. Mills will see

6  jurors one at a time, 20 today, 25 tomorrow.   It gives them

7  a chance to look at the jury questionnaires, but we all

8  getting back together on the 22nd, and one day before we are

9  going to have at least 12, probably 18, maybe even 24 -- I

10 don't know yet -- of these jurors who are selected the day

11 before, and I am going to actually give that out to both

12 sides, so you will know who the first 12 people are who are

13 called.

14          So Mr. Reed is either going to come down to

15 Terminal Island, or if you would like to be transported up,

16 Mr. Hevle, or, Mr. Gibson, I will transport you up the day

17 before even if we're not in session, and you can go over the

18 questionnaires so Mr. Reed doesn't have to drive down if you

19 want but there is going to be some decisions made outside

20 your presence again.

21          Although I am repeating myself -- I'm now talking

22 to you, Mr. Gibson -- Mr. Bingham's counsel may decide to

23 exclude a particular juror or I may make a decision on Hovey

24 voir dire and exclude a juror that you might think is even

25 favorable to your position.   It's a very close call on the

1    Court's part.  I want to make sure you're comfortable in

2    making a tactical decision not to be present.

3              Is this your desire, sir?

4              DEFENDANT GIBSON:  Yes.

5              THE COURT:  You understand that this is going to

6    affect the jury pool in some way?  You wouldn't have input?

7    You would simply be relying on Mr. White, Mr. Harris, Mr.

8    Fleming, and Mr. Steward?

9              DEFENDANT GIBSON:  Yes.  That's fine.

10             THE COURT:  Mr. Hevle, do you join?

11             MR. REED:  Yes.

12             THE COURT:  Any other questions that the

13   government would like me to ask?

14             MR. WOLFE:  No.

15             THE COURT:  Comfortable as far as Mr. Gibson also

16   not being present?

17             MR. WOLFE:  Yes.

18             THE COURT:  It's obviously a tactical decision.

19             Gentlemen, thank you for your courtesy.  I'm sorry

20   to run you in so quickly, but I needed to get a further

21   record.  I am a little concerned that there would ever be in

22   the sense of nonparticipation or the feeling on either of

23   your part that you weren't given the same courtesy in being

24   allowed to give the same input that Mr. Mills and Mr.

25   Bingham are.

1          We will see you on the 22nd.  If I have to call

2     you again, it's because there is an emergency, but I'll try

3     to give you more notice.

4          I want to thank you also, Counsel.

5          (Recess.)

6          (Defendant Hevle and Defendant Gibson.

7          not present.)

8          THE COURT:  Counsel, is there anything further

9     before I call the jurors in?

10         MR. WOLFE:  I wanted to let the Court know that

11    the government's plan is that Mr. Emmick and Ms. Flynn will

12    do the death qualification voir dire, except for this Friday

13    afternoon when Mr. Emmick has a medical appointment.  Both

14    Ms. Flynn and I will be here that afternoon.

15         THE COURT:  You can change off.  I just want the

16    same attorneys from each of the parties talking, for

17    instance, to the first juror.

18         So let's say we have the first juror.  Mr.

19    Steward, you would be the only one questioning

20    hypothetically.  Now, if you want to assign Juror No. 2 to

21    Mr. Fleming for questioning, that's fine.

22         It's the same for the government.  You can trade

23    off in any way you would like to because we are bringing in

24    jurors one at a time.

25         Ms. Flynn, if you want to take Juror No. 1, that's

1    fine.

2              Mr. Emmick, if you want to take Juror No. 2 -- in

3    fact, I would just for the experience of it.  I would just

4    change around.

5              Thank you, Mr. Wolfe.  We will see -- will you be

6    here today?

7              MR. WOLFE:  No.  I will be back Friday afternoon.

8              MR. EMMICK:  I had one other question.  Earlier

9    you talked about possibly reaching stipulations.  We haven't

10   had a chance to speak with the other side about

11   stipulations.

12             Should we handle that on a juror by juror basis?

13             THE COURT:  Juror by juror.

14             MR. EMMICK:  Should it be before each juror comes

15   or, or should it be after?  We may be able to reach some

16   stipulations even prior to the jurors coming in.

17             THE COURT:  We don't know.  Let's just start.  The

18   first day is always a little rough.

19             I think in looking at Juror No. 1 that the first

20   thing that we should look at -- we have general voir dire,

21   so it's not relevant now -- is what do they say about their

22   employment?  Their employment is going to tell us -- if

23   they're self-employed, they may have filled out this

24   questionnaire incorrectly.  If they are working -- I want to

25   take sure -- you know, have you checked with your employer

1    at Boeing, for instance?

2            A lot of people like the idea of serving on jury

3    service.  They just haven't check with their employer who

4    later on threatens them with termination.  The rest of this

5    we save for general voir dire until we get to, for instance,

6    something that we may have marked that's an obvious bias.

7            Let me tell you the way I have organized my stack.

8    The green is today.  The purple is Wednesday.  The yellow is

9    Thursday.  We don't know what color Friday is yet.  The

10   red -- I'm seeing in that first stack some obvious problem

11   or question that I know I want to ask.  I would really

12   appreciate that you not voir dire, that I do the work,

13   because I don't know what you are going to ask, and I don't

14   want to turn it into a free-for-all.  Hovey voir dire is

15   very limited.  By the same token, I want to give us enough

16   room so that some of the death questions that are tough

17   don't have to be asked by me being too narrowing.

18           Question No. 70 is an interesting question.  You

19   have in question No. 63 a lot of people who could have

20   strong feelings for or against the death penalty, but I

21   think in Question --

22           "68:  Could you set aside your own personal

23   feelings about what the law ought to be and follow the law

24   as the Court explains it to you?

25           "Yes."

1        Then when we get down to Question 73 -- I said
2   Question 70.   I mean 73.
3        "Do you believe anyone who has committed multiple
4   murders should automatically, without consideration of any
5   other circumstances, be sentenced to death?"
6        Juror No. 1 has checked "No," but on the face of
7   it, Juror No. 1 would look like a fairly fair-minded juror
8   in my opinion for both sides.
9        Now, what you all know is you are going to see
10  some confusion about that.   You are going to see some jurors
11  who actually appear to be relatively good jurors from the
12  defense perspective who literally give you the wrong answer.
13  Their initial answers are might have a substantial
14  difficulty maybe carrying out the death penalty, and then
15  they get down to 73 and they automatically check -- "Do you
16  believe anyone who has committed multiple murders should
17  automatically, without consideration of any other
18  circumstances, be sentenced to death?" and they check "Yes."
19  The questionnaire is tricky, and it was designed that way I
20  think by both of you to really get them to focus on the
21  issue.
22        I am going to come back and ask some of the
23  obvious questions.   There are going to be jurors that each
24  of you disagree with my judgment call, but they go into the
25  jury pool, and you have got so many preemptories.   I bet by

1    the time that we are done there is five on each side, maybe

2    ten, that you really strenuously disagree with me on.  They

3    are still in that jury pool.

4            The only thing I'm concerned about is -- you will

5    have enough preemptories to get rid of those jurors.  I just

6    want to make certain -- if we don't have 30, I just want a

7    stipulation before we start with the general voir dire what

8    that number is.  If you need 40, I will give you 40.  If you

9    need 45, I will give you 45.

10           Anything further before we bring a juror in?

11           MR. WHITE:  I have a question.  Some of these

12   jurors obviously have expressed a bias that goes beyond the

13   death penalty issue.

14           How does the Court want to handle that?

15           THE COURT:  Just have them come in and briefly

16   talk to them, ask them if they are still uncomfortable.  If

17   their answer is still the same, I'm not going to waste time.

18   I'll get a stipulation from both of you and move on.

19           The other thing is -- this is what is happening

20   behind the scenes logistically.  All ten jurors should be

21   now back in the jury room.  With your consent, I am going to

22   give them back their own questionnaire.  The other nine

23   should be reading their own questionnaire, so we can see if

24   there are any changes.

25           I would also like to instruct Christy that if they

```
 1   have changes to make those in red so we know what the
 2   questionnaire changes are and the Circuit has a clear
 3   record.  For instance, if there is confusion over Question
 4   73 or 64, we know what they are now writing before they ever
 5   come out.  I would like to have them focus, frankly, on the
 6   questions beginning with Questions 61 through 73 because
 7   everything else is left for voir dire.
 8            Now, if you have a question, I would appreciate it
 9   if you would just write it down.
10            Mr. White, just put it on the table.  Let me see
11   what it is, and I will probably ask it.
12            If you have a question from the government, just
13   put it here on the side of the table.
14            Lastly, this questionnaire is once again designed
15   to make the juror really think.  It's a hard questionnaire
16   when you read it.  Automatically or substantial likelihood,
17   those are the two tests, so I am going to focus on that.
18   I'm going to start with would you automatically, or is there
19   a substantial likelihood and get answers to those questions
20   because you have the questionnaire in addition to that.
21            Any other questions?  Mr. Emmick.
22            MR. EMMICK:  One thought, if you are going to be
23   inviting the jurors to reread especially the death penalty
24   questions, that is, starting on 61, I noticed that a number
25   of them had death penalty sort of answers that were repeated
```

1    in the concluding portion, so it may be that --

2        THE COURT:  Point that out to me.  If I missed

3    that, just tell me, Judge, would you look back at Question

4    No. 76, for instance.

5        MR. EMMICK:  I was thinking perhaps if they were

6    invited to read that as well that might help because there

7    is sometimes a connection between those death penalty

8    answers and the concluding answers.

9        THE COURT:  Okay.

10       Lisa, do I have your permission to have them go

11   back and instruct the jury that if they have a change would

12   they focus on Questions No. 61 through the conclusion of the

13   questionnaire?  If they have any changes, would they make

14   those in red ink and then bring the questionnaire to court

15   with them when we summon then.

16       Let's just start cold with Juror No. 1.

17       Would you ask Juror No. 1 to come out and join us.

18       (Prospective Juror No. 1 enters courtroom.)

19       THE COURT:  Good morning.  Come on in.  If you

20   would be kind enough to just come over here and have a seat

21   across the table from me.

22       How are you this morning?

23       PROSPECTIVE JUROR NO. 1:  Pretty good.

24       THE COURT:  I am going to focus in the

25   questionnaire on Questions 61 to the end of the

1   questionnaire.

2          PROSPECTIVE JUROR NO. 1:  Okay.

3          THE COURT:  Would you take a moment just to read

4   that over once again and see if there are any changes or if

5   you are satisfied with what you have put down before I'm

6   going to ask you questions?  The rest of the jurors are

7   going over their questionnaires.  We just called you out, so

8   take a moment.

9          (Pause in proceedings.)

10          PROSPECTIVE JUROR NO. 1:  Okay.

11          THE COURT:  Are you satisfied with your answers?

12          PROSPECTIVE JUROR NO. 1:  I guess, yes.

13          THE COURT:  First, I want to explain to you this

14   nine-month estimate that you got in the letter we sent

15   you -- we really don't believe that the trial is nine

16   months.  There may be tremendous lopes in time.  We don't

17   know yet.  We may be in session, and we have to recess for a

18   week or even a month.  We're just not certain, but we were

19   cautious because we didn't want any of the jurors to be

20   surprised, but we think actually the time that we spend in

21   trial will be significantly less than that.

22          We will be in trial probably four days a week.

23   There are some possibilities occasionally that there will be

24   a fifth day, or we may have to change the days around during

25   the week, but we will always check with those of you who are

1    eventually selected to sit on the jury.

2              PROSPECTIVE JUROR NO. 1:  Okay.

3              THE COURT:  In cases where the government is

4    seeking the death penalty against the defendant as they are

5    against Mr. Mills, who is the gentleman to the far right and

6    Mr. Bingham, the gentleman to the left, the law provides for

7    a two-stage trial.  However, at this time, I don't want you

8    to assume by my questions that this second trial or this

9    second stage or sometimes we refer to this as a penalty

10   phase trial will take place, but if it did, it's necessary

11   to ask you a couple of questions now.

12              In the first trial, the jury's job is the same as

13   it would be in any other criminal case, to decide if the

14   accused, Mr. Mills and/or Mr. Bingham, are guilty or not

15   guilty.  If, and only if, the jury returns a verdict of

16   guilty against either Mr. Mills or Mr. Bingham as to the

17   counts alleged against them which potentially carries a

18   sentence of death, the same jury would be called upon to

19   consider the penalty.

20              In that case, you may hear additional evidence and

21   arguments, and you will be asked to weigh aggravating and

22   mitigating factors, which I will eventually explain to you

23   but not now, only if we reach that phase.  Based upon those

24   considerations, the juror by unanimous vote shall recommend

25   whether the defendant should be sentenced to death or to

1    life imprisonment without the possibility of release or some

2    other lesser sentence.

3            In any case in which the charge carries the

4    possible penalty of death, the law requires you to answer

5    questions regarding your thoughts, feelings, and opinions

6    about the possible penalties, which is why you struggled

7    through as the other jurors have Question 61 to the end of

8    the questionnaire.

9            What I think that we are concerned about is that

10   those jurors by virtue of reaching a verdict in the first

11   trial would automatically or have a substantial likelihood

12   of doing one of two extremes:  That is, you would either

13   automatically find for death or there is a substantial

14   likelihood that you would find for death without fairly

15   weighing the aggravating and mitigating factors in the

16   second trial, or that you would never have the ability to

17   find for death for moral, religious, or for whatever reason

18   for either side, or there is a substantial likelihood you

19   could never find for death.  What both sides are truly

20   looking for is that juror who if we do get to the penalty

21   phase is willingly to listen to those aggravating and

22   mitigating factors.

23           Would you automatically find for death by virtue

24   of reaching a verdict in the first trial?

25           PROSPECTIVE JUROR NO. 1:  No, I don't believe so.

34

1    I would have to wait until you instructed us and --

2           THE COURT:  Is there a substantial likelihood --

3    it's another way of asking the same question -- or would you

4    fairly weigh the aggravating and mitigating factors?

5           PROSPECTIVE JUROR NO. 1:  I think that would be

6    your duty.

7           THE COURT:  The opposite question, would you

8    automatically never have the ability to find for death?

9           PROSPECTIVE JUROR NO. 1:  No.

10           THE COURT:  Same question on the opposite side, a

11   substantial likelihood you would automatically never be able

12   to find for death?

13           PROSPECTIVE JUROR NO. 1:  No.  My answer is the

14   same.

15           THE COURT:  As to this particular juror based upon

16   the questionnaire, do you have any additional questions?

17   Otherwise, I am satisfied.  I am going to thank and excuse

18   her otherwise.

19           MR. EMMICK:  Nothing from the government.

20           THE COURT:  Ms. Flynn?

21           MS. FLYNN:  No.

22           THE COURT:  Mr. White?

23           MR. WHITE:  No.

24           THE COURT:  Mr. Steward?

25           MR. STEWARD:  No.

1          THE COURT:  I want to thank you.  I hope we do as

2     well with the other 214.

3          Lisa is going to pick up your questionnaire.  On

4     your way out, just bring it with you.

5          (Prospective Juror No. 1 exits courtroom.)

6          THE COURT:  Would you call in Juror No. 2.

7          (Prospective Juror No. 2 enters courtroom.)

8          THE COURT:  How are you, sir?  Would you be kind

9     enough to come in and have a seat across the table from me?

10    How are you this morning?

11         PROSPECTIVE JUROR NO. 2:  All right.

12         THE COURT:  First of all, did you have an

13    opportunity to reread your questionnaire, in particular,

14    Question 61 to the end of the questionnaire?

15         PROSPECTIVE JUROR NO. 2:  Yes.

16         THE COURT:  I would like to go over a couple of

17    questions with you.  First, you are an inventory controller,

18    and your business activity is manufacturing.  You have been

19    involved in your employment for 15 months.  You must have a

20    boss or supervisor.

21         Are they going to give you that nine-month period

22    of time to sit with us?  I am not sure if will or not, but

23    this is my duty, so either way -- if they don't, then I have

24    to find another job or do something.

25         THE COURT:  So, in other words, you haven't been

36

1   able to talk to them about the length of potential jury

2   service yet have you?

3            PROSPECTIVE JUROR NO. 2:  No.

4            THE COURT:  So they are not aware of this yet?

5            PROSPECTIVE JUROR NO. 2:  No.

6            THE COURT:  What happens if they came to you and

7   said that they couldn't financially support your jury

8   service because of the extraordinary length, and they had to

9   terminate you?

10           PROSPECTIVE JUROR NO. 2:  Because I still live

11  with my parents, I don't really need to pay the rent.

12           THE COURT:  You feel strongly this is jury service

13  on your part?

14           PROSPECTIVE JUROR NO. 2:  Yes.

15           THE COURT:  Well, thank you.

16           Let me ask just a couple of questions.  In cases

17  where the government is seeking the death penalty against

18  the defendant -- and they are seeking the death penalty

19  against Mr. Mills, who is the gentleman at the far end who

20  just nodded to you, and Mr. Bingham, the gentleman in the

21  white and striped shirt who nodded to you.  This is the

22  government.  There is one other attorney who has been

23  excused for today, but he will be here.

24           Where the government is seeking the death penalty,

25  the law provides for a two-stage trial.  However, when I ask

1   these questions, I don't want you to assume that we will

2   reach by virtue of my questions the second trial or what we

3   call a penalty phase trial, but if we do, then it's

4   necessary to ask you a couple of questions.  In the first

5   trial, the jury's job is the same as it would be in any

6   other criminal case, to decide if the accused, Mr. Mills

7   and/or Mr. Bingham, is guilty or not guilty.  If, and only

8   if, the jury returns a verdict of guilty against either Mr.

9   Mills or Mr. Bingham as to the counts alleged against them,

10  it would potentially carry a sentence of death.  The same

11  jury will have the task of considering the penalty.  That's

12  why we call this second trial a penalty phase trial.

13          In that case, the jury may hear additional

14  evidence and arguments and will be asked to weigh

15  aggravating and mitigating factors that I will explain to

16  you if we get to that second penalty phase trial.  Based

17  upon these considerations, the jury by unanimous vote shall

18  recommend whether the defendant should be sentenced to

19  death, to life imprisonment without the possibility of

20  release, or some other lesser sentence.

21          Now, in any case in which the charge carries a

22  possible penalty of death, the law requires the jurors to

23  answer questions which you have done regarding their

24  thoughts, feelings, and opinions about the possible

25  penalties.

1          What we are most concerned about are jurors who

2      would automatically do something by virtue of the verdict in

3      the first trial without fairly weighing these aggravating

4      and mitigating factors that may be presented to you in a

5      second trial.  In particular, if you would automatically

6      find for death or if there is a substantial likelihood that

7      you would find for death just by virtue of your verdict of

8      guilty in the first trial without weighing the aggravating

9      and mitigating factors, or if you would never find for

10     death, or there is a substantial likelihood that you would

11     never find for death, then I would like to ask you about

12     that.

13          If you reached a verdict of guilt in the first

14     trial and you were called upon to weigh these aggravating

15     and mitigating factors in a penalty trial, would you

16     automatically find for death without fairly weighing these

17     aggravating and mitigating factors?

18               PROSPECTIVE JUROR NO. 2:  I would not.

19               THE COURT:  There is another way of asking that,

20     a little less standard.

21          Is there a substantial likelihood that you would

22     automatically find for death, or would you fairly weigh the

23     aggravating and mitigating factors?

24               PROSPECTIVE JUROR NO. 2:  No, I would not

25     automatically.

1          THE COURT:  You would not.

2          The other side of the question, just as the

3    defense would be concerned about anybody who would

4    automatically find for death or a substantial likelihood

5    without weighing the factors, the government is equally

6    concerned about a juror who would never find for death for

7    whatever reason, moral, religious, or have a substantial

8    likelihood.

9          Would you never have the ability to find for

10   death -- that's a poorly worded question.

11         Would you automatically never find for death?

12         PROSPECTIVE JUROR NO. 2:  No.

13         THE COURT:  You would weigh these aggravating and

14   mitigating factors?

15         PROSPECTIVE JUROR NO. 2:  Yes.

16         THE COURT:  Is there a substantial likelihood that

17   you would automatically --strike that -- a substantial

18   likelihood that you would never find for death, or would you

19   fairly weigh the aggravating and mitigating factors?

20         PROSPECTIVE JUROR NO. 2:  I would fairly weigh the

21   factors.

22         THE COURT:  Thank you very much.

23         Mr. Steward, any other questions?

24         MR. STEWARD:  No, Your Honor.

25         THE COURT:  Mr. White?

1              MR. WHITE:  No, Your Honor.

2              THE COURT:  Let me turn to the government.

3         Ms. Flynn?

4              MS. FLYNN:  No, Your Honor.

5              MR. EMMICK:  Nothing further, Your Honor.

6              THE COURT:  Sir, I want to thank you very much.  I

7    am going to ask you to take your questionnaire with you.

8    Give it to Lisa who is at the door, and you will return to

9    us on February 22.  On that date, we will all join together,

10   and we will have jury selection and see if you are sitting

11   on that day.  Thank you very much.  I appreciate it.

12             (Prospective Juror No. 2 exits courtroom.)

13             THE COURT:  Before we call the next juror --

14             Just a moment.  Lisa, hold up the next juror.

15             I just want to take a moment for all of us to look

16   at this juror.

17             (Pause in proceedings.)

18             THE COURT:  Thank you very much.

19             If you would bring in Juror No. 3.

20             MS. FLYNN:  Your Honor can we bring up one issue

21   before Juror No. 3 comes in, just a general issue regarding

22   the questions?

23             THE COURT:  Yes.

24             MS. FLYNN:  Are you going to ask the question if

25   you have any religious or moral views that prevent you from

1    imposing the death penalty?

2              THE COURT:  I can.

3              MS. FLYNN:  I guess the government would feel we

4    would like that question and then asking a follow-up --

5              THE COURT:  If I do that, then I want to ask the

6    same question about imposing the death penalty.

7              MS. FLYNN:  Yes, that's what we would ask and then

8    following up with:  Would those views substantially impair

9    your ability to perform your duties as a juror?

10             MR. WHITE:  Could we be heard on that?

11             THE COURT:  I know that the case law also says

12   "substantially impair."  I like "substantial likelihood" for

13   some reason, but I can use "substantially impair."

14             Now, what's your concern?

15             MR. WHITE:  That question is specifically asked in

16   66.  It seems to me that in the course of the questioning of

17   juror and the juror expressing some reluctance to have the

18   ability to vote for the death penalty, then that question

19   would naturally follow, but absent an expression of that --

20             THE COURT:  I think I am going to stay with what I

21   am doing.  If there is a follow-up -- just submit it to me

22   if you are concerned, but I don't want to fall into that

23   habit pattern.  I think it's pretty well-balanced right now.

24             I think that 66 from memory --

25             MR. EMMICK:  It's a similar question.

1          THE COURT:  It's very similar.

2          "66.  Are your views expressed above, as set forth

3    in Questions 62 through 65, based on religious

4    considerations?"

5          That doesn't get me into either extreme.  Usually

6    the Bible comes up in that regard.  I think that covers it.

7    If you have any concerns, you have lots of preemptories on

8    both sides.  If you want more preemptories, tell me also.

9          Juror No. 3.

10         (Prospective Juror No. 3 enters courtroom.)

11         THE COURT:  How are you, sir?

12         PROSPECTIVE JUROR NO. 3:  Fine.

13         THE COURT:  Would you be kind enough to come over

14    and have a seat just across the table from me.

15         First of all, all of us want to thank you for

16    filling out the questionnaire.

17         You are retired at the present time?

18         PROSPECTIVE JUROR NO. 3:  That's correct.

19         THE COURT:  I want to assure you that we were

20    cautions.  When we sent out the questionnaire, we estimated

21    nine months, but we don't believe the trial will fill nine

22    months.  There just could be many interruptions, and some of

23    those could be for long periods of time.  We just don't know

24    yet, so your actual sitting time will be far less than nine

25    months, but we didn't want any of you to be surprised, so we

1    are being very cautious.

2            Is there anything on the questionnaire that you

3    read through -- in particular, we have asked you to look at

4    Question 61 through the end of the questionnaire -- that you

5    would like to change, or are you satisfied?

6            PROSPECTIVE JUROR NO. 3:  I don't think there were

7    any after 61, but there were a couple before.

8            THE COURT:  What were some of those that you would

9    like to elaborate on?

10           Counsel, do you mind if I go a little bit beyond

11   the questions and take those at this time?

12           MR. STEWARD:  No, Your Honor.

13           MR. EMMICK:  That's fine.

14           PROSPECTIVE JUROR NO. 3:  No. 22, I misread the

15   question.  I have served on a jury before one time.  It was

16   a criminal case, and we did reach a verdict.  It was so long

17   ago I had forgotten about it.

18           On No. 23, my wife did work for the IRS.  I have

19   to plead guilty to reading the question too fast.  I thought

20   it just meant law enforcement.  I believe that was it.

21           THE COURT:  Thank you very much.

22           In cases where the government is seeking the death

23   penalty against a defendant, the law provides for a

24   two-stage trial.  However, at this time by asking these

25   questions, I don't want to you assume that this trial will

1 reach the second stage or what we will oftentimes refer to

2 as a penalty phase trial.

3 　　　　In the first trial, the jury's job is the same as

4 as it would be in any other criminal case, to decide if the

5 accused is guilty or not guilty.  If, and only if, the jury

6 returns a verdict of guilty against the defendant, either

7 Mr. Mills, who is the gentleman who just nodded his head, or

8 Mr. Bingham, the gentleman over here who just nodded his

9 head, as to the counts alleged against them which

10 potentially carry a sentence of death, the same jury will

11 have the task of considering the penalty in the second

12 trial.  In that case, the jury may hear additional evidence

13 and arguments and will be asked to weigh various aggravating

14 and mitigating factors that I will explain to you if we get

15 to a second or penalty phase trial.

16 　　　　Based upon these considerations, the jury by

17 unanimous vote shall recommend whether the defendant shall

18 be sentenced to death, to life imprisonment without

19 possibility of release, or some other lesser sentence.  In

20 any case in which the charge carries a possible penalty of

21 death, the law requires that jurors answer questions

22 regarding their thoughts, feelings, and opinions about the

23 possible penalties, and that's why we have intruded on you

24 with these personal questions.

25 　　　　Both sides are equally concerned about a juror who

1   would automatically reach a verdict in the second phase or

2   have a substantial likelihood of reaching a verdict in the

3   second phase without fairly weighing the aggravating and

4   mitigating factors.  So if you had a juror who would by

5   virtue of hypothetically reaching a verdict of guilt in the

6   first phase automatically find for death or have a

7   substantial likelihood of finding for death, you could

8   understand how the defense is not receiving a fair trial.

9   By the same token, if the government has a juror who would

10   never find for death or have a substantial likelihood of

11   never finding for death, then the government wouldn't have a

12   fair trial.

13          Would you automatically find for death by virtue

14   of reaching a guilty verdict in the first trial, or would

15   you fairly weigh the aggravating and mitigating factors in

16   the second trial?

17          PROSPECTIVE JUROR NO. 3:  I would weigh the

18   factors.

19          THE COURT:  Another way of asking that, a little

20   less standard, is there a substantial likelihood that you

21   would find for death?

22          PROSPECTIVE JUROR NO. 3:  No.

23          THE COURT:  You would weigh those mitigating and

24   aggravating factors?

25          PROSPECTIVE JUROR NO. 3:  I would weigh the

```
 1    factors.
 2            THE COURT:  The opposite extreme, that is, would
 3    you automatically never find for death for moral, religious,
 4    or whatever reason?
 5            PROSPECTIVE JUROR NO. 3:  No.
 6            THE COURT:  Is there a substantial likelihood that
 7    you would never find for death?
 8            PROSPECTIVE JUROR NO. 3:  No.
 9            THE COURT:  I am hearing that you would fairly
10    weigh those aggravating and mitigating factors.
11            PROSPECTIVE JUROR NO. 3:  Yes.
12            THE COURT:  You would follow my instructions at
13    that time?
14            PROSPECTIVE JUROR NO. 3:  Yes.
15            THE COURT:  Counsel, I want to make certain -- if
16    I am misstating, or if you think I am using the incorrect
17    standard, if you want something more asked -- Mr. White?
18            MR. WHITE:  Your Honor, I think you are doing just
19    great.
20            THE COURT:  Thank you.
21            Mr. Steward?
22            MR. STEWARD:  I second that, Your Honor.
23            THE COURT:  Ms. Flynn?
24            MS. FLYNN:  You are doing fine.
25            THE COURT:  Mr. Emmick?
```

1           MR. EMMICK:  Nothing further, Your Honor.

2           THE COURT:  Thank you, sir.  I am going to ask you

3    to return on Wednesday, February 22.  If you would just take

4    your questionnaire with you and just give it to Lisa so we

5    can recollect those.

6           (Prospective Juror No. 3 exits courtroom.)

7           THE CLERK:  We need to skip No. 4.  They are

8    arriving late.  They will be here.

9           THE COURT:  Okay.

10          I want to make certain I am not using the

11   incorrect standard.  "Substantially impaired" is the

12   technical phrase that is used.  I want to make certain that

13   the Circuit later on doesn't come back and criticize me or

14   criticize counsel for using "substantial likelihood."  I can

15   use "substantially impaired."

16          Would you be more comfortable with that?

17          MR. WHITE:  I think substantial likelihood is more

18   common sensical.

19          THE COURT:  It's easier for me over the years, but

20   I want to make sure that you are comfortable with it.

21   Anytime I have used the word "substantial" that's probably

22   good enough, but -- I'm just kidding you.

23          MR. EMMICK:  We think it's very close, and as long

24   as the defense is happy with it, then won't come back to

25   haunt us later.

```
1            THE COURT:  Is that all right, Mr. Steward?

2            MR. STEWARD:  Yes.

3            THE COURT:  Mr. White?

4            MR. WHITE:  Yes.

5            MR. EMMICK:  I just have a couple more thoughts as

6    we're working through this process.  I have a couple of

7    questions that I just want to put on the table by way of

8    procedure.  One is when you ask the jurors the question

9    about aggravating and mitigating circumstances, I wonder

10   whether they are necessarily clear on what that means.

11           THE COURT:  They're not, and about the time we get

12   into that, then I will have a power struggle between the two

13   of you, and it will usually start this way.  You will point

14   out an aggravating factor, and the defense will point out a

15   mitigating factor.  That's where I don't want this

16   conversation going.

17           MR. EMMICK:  My point I think is more a smaller

18   point than that.  I just want to make sure they understand

19   what the words mean.  If everybody is satisfied that those

20   words are clear to the jurors, then I am satisfied, but I

21   wonder whether the words are more sophisticated than all the

22   jurors would understand.

23           THE COURT:  They are.  Quite frankly, if we are

24   really honest on this record, what's happening is they don't

25   know what aggravating and mitigating means.  We would almost
```

1  have to preinstruct them because those factors are used in

2  different ways also.  Those factors are weighted towards the

3  defense in a sense, and the standard can be weighted towards

4  the defense when you look at the instructions.  I don't know

5  what else to say about aggravating and mitigating.  I'm just

6  trying to create the impression that there is going to be a

7  balance that comes, and there may be more that comes.

8          MR. EMMICK:  Having placed that issue on the

9  table, if no one else is concerned about it, then that's

10 fine with me.

11         The only other issue I wanted to raise had to do

12 with the process of follow-up questions.  I have a possible

13 suggestion.  I wonder rather than submitting follow-up

14 questions in writing to the Court for the Court to ask the

15 questions -- frankly, I like the idea of the Court asking

16 the questions.  I think it avoids the attorneys injecting

17 themselves too much.  I wonder if there might be a way for

18 us to identify for the Court some possible follow-ups

19 beforehand.  We could do that orally, and then if you

20 thought it was appropriate, you would at least have the

21 issue in mind, and it would be easier than us trying to

22 write it out.

23         THE COURT:  Juror No. 5.

24         MR. STEWARD:  On Question 61, a key question --

25 we're on No. 5 now.  On 61, it doesn't seem to relate to

*SHARON SEFFENS, U.S. COURT REPORTER*

1    general feelings.  It seems to be a statement of what they

2    believe the law to be.  I would ask for some follow-up on

3    that question.

4            THE COURT:  I don't know what to follow up on.

5    The question is general feelings.

6            MR. STEWARD:  What are your general feelings?

7            THE COURT:  They just explained it to you.  I am

8    going to decline to follow up on that.  It may make you

9    uncomfortable, but you have preemptories.  They have given

10   you their general feelings quite honestly and candidly.

11           The question I am looking at is Question 68.  It

12   seems to be appropriate, and Question 73 seems to be

13   appropriate.

14           Juror No. 5.

15           MR. EMMICK:  We have no suggested questions.

16           (Prospective Juror No. 5 enters courtroom.)

17           THE COURT:  How are you today, sir?  Would you

18   come over and have a seat just across the table from me.

19           PROSPECTVE JUROR NO. 5:  Good morning.

20           THE COURT:  You are Juror No. 5.

21           PROSPECTVE JUROR NO. 5:  Correct.

22           THE COURT:  Have you had a chance to relook at the

23   questionnaire, in particular, Question 61 to the end of the

24   questionnaire?

25           PROSPECTVE JUROR NO. 5:  Yes.

```
 1              THE COURT:  Are there any answers that you would
 2    like to change, or are you satisfied with your answers that
 3    you gave before I ask some questions?
 4              PROSPECTVE JUROR NO. 5:  I added to No. 76.
 5              THE COURT:  You added that in red?
 6              PROSPECTVE JUROR NO. 5:  Correct.
 7              THE COURT:  Could I just read that for a moment
 8    into the record so counsel know?
 9              PROSPECTVE JUROR NO. 5:  Sure.
10              THE COURT:  "Question 76.  What is it about
11    yourself that makes you feel you can be a fair and impartial
12    juror?"
13              His original answer was:
14              "I am always a good listener wanting to know the
15    facts."
16              Then the juror added in red ink "and making
17    decisions based on the known facts."
18              Sir, thank you very much.
19              Your job description is management.  We were very
20    cautious.  When we sent out the jury summons, we estimated
21    nine months.  We don't believe we are going to be in trial
22    for nine months.  There are going to be periods of time, and
23    they could be for long periods of time.  They could be a
24    month or month or days or weeks.  We weren't certain, and we
25    wanted you to know that.  We wanted to be cautious because
```

1    we didn't want somebody to be surprised by overextending it.

2         In cases where the government is seeking the death

3    penalty against a defendant, the law provides for a

4    two-stage trial.  However, when I ask you these questions, I

5    don't want you to assume that this trial will reach what we

6    call this second stage trial.  Sometimes you will hear us

7    refer to that as a penalty phase trial.

8         In the first trial, the jury's job is the same as

9    it would be in any other criminal case, to decide if the

10   accused is guilty or not guilty.  If, and only if, the jury

11   returns a verdict of guilty against either defendant Mr.

12   Mills, who is the gentleman in the green shirt who just

13   nodded, and Mr. Bingham, who is the gentleman in the white

14   shirt, as to the counts alleged against them in this first

15   trial which potentially carries a sentence of death, you,

16   the same jury, will be asked to consider the appropriate

17   penalty.

18        In that case, in that second penalty phase trial

19   if we got there, the jury may hear additional evidence and

20   arguments and will be asked to weigh various aggravating and

21   mitigating factors that I will explain to you if we get to

22   that second penalty phase trial at that time.  Based upon

23   these considerations, the jury by unanimous vote shall

24   recommend whether the defendant should be sentenced to

25   death, to life imprisonment without possibility of release,

1    or some other lesser sentence.

2          In any case in which the charge carries a possible

3    penalty of death the law requires that jurors answer

4    questions regarding their thoughts, feelings, and opinions

5    about the possible penalty, which is why we have intruded on

6    you and asked these rather personal questions.

7          I think the easiest way to talk about this subject

8    is just how both sides feel that a fair trial should take

9    place.  If we got to that second trial and we had a juror

10   who would automatically find for death and not fairly weigh

11   these aggravating and mitigating factors that would be

12   presented in the second trial or there is a substantial

13   likelihood that a juror would find for death without fairly

14   weighing these aggravating and mitigating factors, the

15   defendants would not be receiving a fair trial.

16         The opposite is true for the government.  If we

17   had a juror who could never find for death, in other words,

18   automatically never find for death by virtue of whatever

19   reason, or there is a substantial likelihood they could

20   never find for death and not fairly weigh these aggravating

21   and mitigating factors, then the government wouldn't be

22   receiving a fair trial.

23         So the question I have for you is if you found the

24   defendants guilty in the first trial of those crimes that

25   would lead to a second penalty phase trial, would you

1    automatically find for death, or would you be willing to

2    weigh the aggravating and mitigating factors?

3              PROSPECTVE JUROR NO. 5:  I would have to weigh all

4    the circumstances.

5              THE COURT:  And the same way of asking the

6    question, a little less standard, is there a substantial

7    likelihood that you would find for death, or would you weigh

8    the aggravating and mitigating factors?

9              PROSPECTVE JUROR NO. 5:  My answer is the same.

10             THE COURT:  Let me ask you the opposite question

11   from the government's perspective.

12             Would you automatically never find for death and

13   not weigh these aggravating and mitigating factors?

14             PROSPECTVE JUROR NO. 5:  No.

15             THE COURT:  Is there a substantial likelihood that

16   you would never find for death and not weigh these

17   aggravating and mitigating factors?

18             PROSPECTVE JUROR NO. 5:  No.

19             THE COURT:  I'm satisfied.

20             Mr. Steward?

21             MR. STEWARD:  We're satisfied.

22             THE COURT:  Mr. White?

23             MR. WHITE:  We have no questions.

24             THE COURT:  Mr. Emmick?

25             MR. EMMICK:  Nothing further.

```
 1              THE COURT:  Ms. Flynn?

 2              MS. FLYNN:  Nothing further.

 3              THE COURT:  Let me ask you to take your

 4    questionnaire.  If you give the questionnaire to Christy.

 5              Would you return on Wednesday, February 22?  We

 6    will meet on that day.

 7              Is the jury commissioner going to call each of the

 8    jurors when we are done?

 9              THE CLERK:  He is probably going to call them on

10    Tuesday, the 21st.

11              THE COURT:  And we will give you the time.  It

12    will be either 8:00 or 8:30.  Thank you very much.

13              (Prospective Juror No. 5 exits courtroom.)

14              THE COURT:  Juror No. 6 I hope you know has become

15    ill.  I am not certain about Juror No. 6, if this juror

16    needs to be permanently excused or what we are doing with

17    Juror No. 6.

18              THE CLERK:  Juror No. 6 will be reporting on

19    February 17.

20              THE COURT:  So juror No. 6 will come back to us on

21    February 17.

22              MR. WHITE:  The answer to No. 75 for this juror

23    was his company only pays for five days.

24              THE COURT:  I know.  We'll bring him in anyway and

25    just double-check.  Also, this is a juror who has a mother
```

```
 1   or someone out of state who had a heart attack.  It seems to
 2   me a rather obvious call, but we will bring them in and just
 3   make sure.
 4              Who is the next one?
 5              THE CLERK:  No. 7.
 6              THE COURT:  Let's just take a moment and look at
 7   No. 7.
 8              (Pause in proceedings.)
 9              THE COURT:  Now, this is the first juror who has
10   answered Question 73 about an automatic finding concerning
11   multiple murders.  I'm not certain if they misunderstand it
12   because it's a complex questionnaire or if their is this
13   feeling.  It may be their absolute feeling because their
14   general attitude is, "I support the death penalty if they
15   are accused and have been proved beyond a reasonable doubt
16   to be guilty of rape or murder" -- here we don't have rape,
17   but here we do have allegations of murder -- "and the
18   federal government ruling in whichever state I reside."
19              MR. STEWARD:  76 also.  It's the second -- the
20   last couple lines of that.
21              THE COURT:  "I don't know for certain what my
22   limits or strengths might be if I'm presented with such
23   responsibility, but I believe I have a duty as a citizen and
24   a desire to live in a community, nation, that be criminally
25   free as possible, so much so that I should try my best."
```

1          Remember that this juror may disqualify himself in

2    just a few moments.  We met get jurors who are, frankly pro

3    defense or pro prosecution.  That's not our job at this

4    stage.  It's only to weed out those who would automatically

5    or have a substantial likelihood or be substantially

6    impaired.

7          Would you ask Juror No. 7 to join us.

8          (Prospective Juror No. 7 enters courtroom.)

9          THE COURT:  Good morning.  How are you today?

10         PROSPECTIVE JUROR NO. 7:  Fine.  Thank you.

11         THE COURT:  If you would come and join me.  Good

12   morning.  Would you have a seat just across the table from

13   me.

14         First of all, thank you for filling out the

15   questionnaire.  We asked you to go back over the

16   questionnaire but, in particular, I think from Question 61

17   to the end and if you had any changes or any additional

18   thoughts to note that in red ink.

19         Have you changed your questionnaire?

20         PROSPECTIVE JUROR NO. 7:  I did have an insertion

21   having to do with a priority.

22         THE COURT:  Would you show me where that is?  Let

23   me see that for just a minute.

24         "Question 75:  Is there anything that you would

25   like to bring to the Court's attention that might in any way

1    affect your ability to be a fair and impartial juror in this

2    case?

3            You have answered:  "A recent development in the

4    family requires my services in taking care of my year old

5    grandson.  Not being available to do that could be a

6    distraction and deterrent to my focus of the trial."

7            Therefore, would this create some hardship now in

8    terms of service for nine months?

9            PROSPECTIVE JUROR NO. 7:  Yes.

10           THE COURT:  Is it a relatively serious matter?

11           PROSPECTIVE JUROR NO. 7:  It's only serious in

12   that it would cause quite a bit of concern for my family and

13   my daughter.

14           THE COURT:  Because they are going to need your

15   support in this regard?

16           PROSPECTIVE JUROR NO. 7:  Yes.

17           THE COURT:  Before I ask you these questions,

18   could I ask you to go back to the jury room for just one

19   moment.  It may not be necessary to ask you some questions.

20   It may.  Give us a few moments by ourselves.  We will

21   probably get you in less than five minutes.

22           (Prospective Juror No. 7 exits courtroom.)

23           THE COURT:  I can go through the questions, but

24   each of you have to tactically decide how stringent we are

25   going to be with jurors serving nine months or nonstringent.

1    She is indicating and sending us a message she doesn't want

2    to sit or she can't sit.  We can go behind that and probe,

3    but I suggest that maybe we should just take jurors at their

4    word and move on.

5            Let me turn to the government first.  Ms. Flynn,

6    Mr. Emmick, what are your thoughts?

7            MS. FLYNN:  That's fine.

8            MR. EMMICK:  We will accept a stipulation to

9    excuse her for hardship if the defense is so inclined.

10           THE COURT:  Mr. Steward?

11           MR. STEWARD:  We will stipulate.

12           THE COURT:  Mr. White?

13           MR. WHITE:  We will stipulate.

14           THE COURT:  Ask Juror No. 7 to rejoin us would

15    you, please.

16           (Prospective Juror No. 7 enters courtroom.)

17           THE COURT:  We are going to thank and excuse you.

18    Both sides have stipulated outside your presence because of

19    the hardship created by your grandson.  We want to thank you

20    very much.  We will keep this confidential.  Give this back

21    to the court clerk.

22           Would you just indicate a hardship.

23           Thank you very much for joining us.

24           (Prospective Juror No. 7 excused.)

25           THE COURT:  Before we call in the next juror who

1   would be Juror No. 7, Counsel --

2            MR. STEWARD:  No. 8, Your Honor.

3            THE COURT:  That was No. 7.  Thank you very much.

4   My apologies.

5            Did any of the parties notice any particular

6   portion that you wanted me to question No. 8 about?  I

7   didn't make any notations about a concern I had at least on

8   the questionnaire.

9            Mr. Steward, are you satisfied?

10           MR. STEWARD:  Yes.

11           THE COURT:  Mr. White, are you satisfied?

12           MR. WHITE:  Yes.

13           THE COURT:  Mr. Emmick?

14           MR. EMMICK:  Nothing particular from the

15   government.

16           THE COURT:  Would you ask Juror No. 8 to come in,

17   Christy.

18           (Prospective Juror No. 8 enters courtroom.)

19           THE COURT:  Good morning, sir.  How are you?  If

20   you would come and join me.  If you would have a seat just

21   across from me for a moment.

22           First, let me say to you that we have

23   overestimated.  When we sent out that jury summons, we said

24   nine months.  We did that purposely.  None of us believe

25   that we are going to be in session for nine months.  There's

1    in fact going to be potentially short continuances.  There

2    may even be a long continuance, but we didn't want anybody

3    to be surprised, so I can assure you it's not nine months of

4    actual jury service.  It's going to be broken up I think.

5              PROSPECTIVE JUROR NO. 8:  Okay.

6              THE COURT:  Concerning Question No. 14, your

7    current occupation, you are a data engineer, a programmer.

8    I am of course concerned about employers, what their

9    attitude and position will be.

10             Do you believe that you will be able to serve this

11   period of time?

12             PROSPECTIVE JUROR NO. 8:  Well, my employer does

13   pay for as long as it takes.

14             THE COURT:  Thank him for us.  I can assure you

15   when you are here you will be working hard.

16             Is there anything about the jury questionnaire --

17   we have asked you to particularly focus on 61 to the end --

18   that you have changed or added information to?

19             PROSPECTIVE JUROR NO. 8:  There are a few things I

20   added to, but I don't think in 61 on.

21             THE COURT:  Tell me those few others things in the

22   questionnaire.

23             PROSPECTIVE JUROR NO. 8:  No. 23.  It's regarding

24   anyone that I know -- the friend that I have works for the

25   Department of Education.

1          THE COURT:  Any other changes?

2          PROSPECTIVE JUROR NO. 8:  I noticed that I hadn't

3   marked 28.  I couldn't think of anything, so I just mark

4   "No" for that one.

5          31, I wasn't sure whether to include political

6   party membership.  I am a member of a political party.

7   Other than that, no.

8          THE COURT:  Counsel, do you want the political

9   party?

10         MR. WHITE:  It's not necessary.

11         MR. STEWARD:  Agreed.  It's not necessary.

12         THE COURT:  Government?

13         MR. EMMICK:  Agreed.

14         PROSPECTIVE JUROR NO. 8:  No. 55, I hadn't

15   answered the source.  It's just radio or television.  I

16   wasn't sure.  That's it.

17         THE COURT:  Thank you very much.

18         PROSPECTIVE JUROR NO. 8:  Sure.

19         THE COURT:  In cases where the government is

20   seeking the death penalty against a defendant, the law

21   provides for a two-stage trial.  However, by my asking you

22   these questions, I don't want you to assume by my questions

23   that we will get to this second stage that we sometimes

24   refer to as a penalty phase trial, but in a first trial, the

25   jury's job is the same as it would be in any other criminal

1    case, to decide if the accused is guilty or not guilty.

2           If, and only if, the jury returns a verdict of

3    guilty against either the defendant Mr. Mills or the

4    defendant Mr. Bingham -- this is Mr. Mills, the gentleman

5    farthest, Mr. Bingham the gentleman farthest this way -- as

6    to the counts alleged against them which potentially carry a

7    sentence of death, then the same jury will have the task of

8    considering the penalty in this second penalty phase trial.

9    In that case, the jury may hear additional evidence and

10   arguments, and you will be asked to weigh various

11   aggravating and mitigating factors, which I will explain to

12   you if we get to that second phase.

13          Based upon these considerations, the jury by

14   unanimous vote shall recommend whether the defendant should

15   be sentenced to death, to life imprisonment without

16   possibility of release, or some other lesser sentence.   In

17   any case in which the charge carries a possible penalty of

18   death, the law requires that jurors answer questions

19   regarding their thoughts, feelings, opinions about the

20   possible penalties.

21          I think the easiest way I have of shaping this

22   question is what's fair to both sides in a trial?   Of

23   course, from the defense side, they would have an unfair

24   trial if we had a juror who automatically or if a juror had

25   a substantial likelihood of finding for death in the second

1    penalty phase trial without fairly weighing the aggravating

2    and mitigating factors.

3            The same applies to the government.  It's the

4    opposite, and, that is, the government would not be

5    receiving a fair trial if we had a juror who automatically

6    would never find for death, or there is a substantial

7    likelihood that they could never find for death.  The

8    government wouldn't receive a fair trial.

9            I just have those four simple questions to ask

10   you, although I have got the indication of your feelings on

11   the form.

12           That is, would you automatically find for death

13   without weighing these aggravating and mitigating factors in

14   a second penalty phase trial if we got there, or would you

15   weigh these aggravating and mitigating factors?

16           PROSPECTIVE JUROR NO. 8:  I would.

17           THE COURT:  Is there a substantial likelihood that

18   you would find for death without weighing these aggravating

19   or mitigating factors, or would you weigh these factors?

20           PROSPECTIVE JUROR NO. 8:  You would have to weigh

21   the factors.

22           THE COURT:  The same -- it's an opposite question

23   from the government's perspective.  That is, would you never

24   find for death and not weigh these aggravating and

25   mitigating factors?

65

1          PROSPECTIVE JUROR NO. 8:  No, I would not.

2          THE COURT:  Is there a substantial likelihood that

3   you would never find for death and not weigh the aggravating

4   and mitigating factors?

5          PROSPECTIVE JUROR NO. 8:  I would try to weigh

6   them.

7          THE COURT:  Anything additional?  Mr. Steward?

8          MR. STEWARD:  No, Your Honor.

9          THE COURT:  Mr. White?

10          MR. WHITE:  No, Your Honor.

11          THE COURT:  Mr. Emmick?

12          MR. EMMICK:  No, Your Honor.

13          THE COURT:  Ms. Flynn?

14          MS. FLYNN:  No, Your Honor.

15          THE COURT:  I thank you very much.  We are going

16   to ask you to return on February 22.  I know you are calling

17   in on the 21st.  We will have the time at that time for you

18   when you call in.  At the time, we will continue with the

19   jury selection process.

20          Would you return the questionnaire.

21          (Prospective Juror No. 8 exits courtroom.)

22          THE COURT:  Let's look at Juror No. 9.  Before we

23   bring that juror out, I had a red notation in 61.

24          "61.  What are your general feelings regarding the

25   death penalty?"

1     He states:  "I do not support the death penalty."

2     "62.  Are your views concerning the death penalty

3  such that you would have substantial difficulty in voting

4  for a verdict of not guilty even if the proof presented at

5  trial by the government did not convince you beyond a

6  reasonable doubt of the guilt of death eligible defendants

7  because you would want to make a decision regarding

8  penalty?"

9     The juror marked "Yes."

10     "63.  Are your views concerning the death penalty

11  such that you would have substantial difficulty in voting

12  for a verdict of guilty even if the proof presented at trial

13  by the government convinced you beyond a reasonable doubt of

14  the guilt of death eligible defendants because you would

15  want to avoid making a decision regarding penalty?"

16     They marked "Yes."

17     "64.  Are your views concerning the death penalty

18  such that, if you were to reach a penalty phase in this

19  case, you would have substantial difficulty in voting for

20  death as the appropriate penalty?"

21     The answer is "Yes."

22     "65.  Are your views concerning the death penalty

23  such that, if you were to reach a penalty phase in this

24  case, you would have substantial difficulty in voting for

25  life imprisonment as the appropriate penalty?"

1          "No."

2          Then turning to Question 68, it says:

3          "68.  Could you set aside your own personal

4    feelings about what the law ought to be and follow the law

5    as the Court explains it to you?"

6          "Yes."

7          "73.  Do you believe anyone who has committed

8    multiple murders should automatically, without consideration

9    of any other circumstances, be sentenced to death?"

10         "No."

11         This is going to be I think the first difficult

12   one we get into.

13         Mr. Emmick.

14         MR. EMMICK:  I guess my general request to this

15   one is if could reach a stipulation that might be

16   appropriate.  I want to point out in addition to the

17   numbered questions that the Court was discussing they also

18   seem to have a hardship issue identified in No. 75 and in

19   No. 77 indicated he had some bias -- I'm not sure whether he

20   really meant bias or not, but he certainly uses the word

21   "bias," so

22         THE COURT:  Let me look at 75 again.

23         "75.  Is there anything that you would like to

24   bring to the Court's attention that might in any way affect

25   your ability to be a fair and impartial juror in this case?"

1        His answer is:  "In the process of delivering a

2    justification and recommendation to the company for which I

3    work on the potential layoff of a group of long-term

4    employees, I need to focus on their status and welfare, and

5    taking me away for this trial will keep me from being able

6    to focus on overturning this layoff action.  I owe it to my

7    employees to make them my priority.  The action is to be

8    reevaluated within the next two months."

9        Then you have Question No. --

10       MR. EMMICK:  No. 77, although ambiguous at least

11   suggests a possible bias.  I also wanted to circle back to

12   No. 69.

13       THE COURT:  "69.  Will you have any difficulty in

14   not discussing the case with anyone until it is submitted to

15   you for your decision and then discussing the case only with

16   the other jurors in the jury room?"

17       He answered "Yes."

18       MR. EMMICK:  If a stipulation might be arrived at,

19   I think this might be a pretty clear one.

20       THE COURT:  "If the person is guilty beyond a

21   shadow of a doubt, they should be put to death."

22       He answered 62, 63, 64, and 73 appropriately, and

23   68 -- well, with a "No."

24       You know something, I'm not going to put either

25   one of you in that position.  I want to go through each one

1    of these.  I want to have a really good record.

2              Would you get No. 9.

3              (Prospective Juror No. 9 enters courtroom.)

4              THE COURT:  Good morning.  Come over and join me.

5    How are you today?

6              PROSPECTIVE JUROR NO. 9:  Fine.  Thank you.

7              THE COURT:  If you would be kind enough to have a

8    seat here in this chair right across the table from me.  We

9    have asked all of you while you were waiting to go back over

10   your jury questionnaire.

11             Are there any changes that you made to the jury

12   questionnaire or any questions would you like to modify

13   before I ask a few questions of you?

14             PROSPECTIVE JUROR NO. 9:  I did make some changes.

15             THE COURT:  Could you tell me what changes those

16   are.  Just tell me the question, the number, and then we

17   will go to that question.

18             PROSPECTIVE JUROR NO. 9:  The first one is No. 51.

19             THE COURT:  Thank you.

20             "How often do you use the Internet?"

21             Can you tell me your change?

22             PROSPECTIVE JUROR NO. 9:  I just added to clarify

23   that I communicate with my coworkers and management through

24   the Internet.  That's why I'm on the Internet so long.

25             THE COURT:  10 to 12 hours a day.

70

1              PROSPECTIVE JUROR NO. 9:  Right.

2              THE COURT:  And the next change.

3              PROSPECTIVE JUROR NO. 9:  Item B, work assignments

4    and on work-related reports.  Item C, no chat rooms visits.

5              THE COURT:  Okay.

6              PROSPECTIVE JUROR NO. 9:  The next with one that I

7    changed was No. 68.

8              THE COURT:  All right.

9              On 68, what did you change that to?  You

10   previously marked "Yes."

11             PROSPECTIVE JUROR NO. 9:  I previously marked it

12   "Yes."  I have now marked it "No," and I have add the

13   qualifier "as it relates to the death penalty."

14             The last change was on No. 77.

15             THE COURT:  Thank you.

16             Could you tell me the change as to No. 77?

17             PROSPECTIVE JUROR NO. 9:  I added the words at the

18   end.  Just to read it again, "Just about all that was read

19   has already acted to plant a bias against the defendants."

20             THE COURT:  Let me take you through a couple of

21   questions for just a moment.  First of all, when we sent out

22   this jury summons, we estimated nine months, but in reality

23   this will not be a nine-month trial.  You won't be working

24   for nine months.  There can be continuances that can be

25   short or lengthy right at the beginning of the case and

1    potentially at different stages of the case.

2            In cases where the government is seeking the death

3    penalty against the defendant, the law provides for a

4    two-stage trial.  However, when I ask you these questions in

5    a few moments, you are not to assume that you will get to

6    this second trial.  You will sometimes hear us refer to that

7    as a penalty phase trial, but in the first trial, the jury's

8    job is the same as it would be in any other criminal case,

9    to decide if the accused is guilty or not guilty.

10            If, and only if, the jury returns a verdict of

11   guilty against defendant Mr. Mills or defendant

12   Mr. Bingham -- Mr. Mills is the gentleman here.  Mr. Bingham

13   is the gentleman here -- the same jury will be asked to

14   consider the penalty.  In that case, the jury may hear a

15   additional evidence and arguments and will be asked to weigh

16   various aggravating and mitigating factors that I will

17   explain to you by law if we get to that second or penalty

18   phase.

19            PROSPECTIVE JUROR NO. 9:  I understand.

20            THE COURT:  Now, based upon these considerations,

21   the jury by unanimous vote shall recommend whether the

22   defendant should be sentenced to death, or life imprisonment

23   without possibility of release, or some other lesser

24   sentence.  In any case in which the charge carries a

25   possible penalty of death, the law requires that jurors

1  answer questions regarding their thoughts, feelings, and

2  opinions about the possible penalty, which is why we have

3  intruded in a very personal way in the juror's life.

4          I want to start with just a fair trial and

5  speaking for both sides.  If we got to a penalty phase trial

6  and we had a juror who would automatically find for death

7  and not weigh the aggravating and mitigating factors, or

8  there is a substantial likelihood -- a little less standard

9  but a substantial likelihood -- that they would find for

10  death and not fairly weigh the aggravating and mitigating

11  factors, it would be unfair to the defendant, and the

12  opposite is true if we had a juror who would never find for

13  death, or there is a substantial likelihood that that juror

14  would never find for death.  It would be unfair to the

15  government.

16          Would you automatically -- let me start with the

17  defense side.  Would you automatically find for death if we

18  got to the second phase, or would you fairly weigh the

19  aggravating and mitigating factors?

20          PROSPECTIVE JUROR NO. 9:  I would not

21  automatically issue a death penalty, no.

22          THE COURT:  Is there a substantial likelihood that

23  you would find for death, or would you weigh these

24  aggravating and mitigating factors?

25          PROSPECTIVE JUROR NO. 9:  I probably wouldn't -- I

1    probably wouldn't weigh them.  I just wouldn't find for

2    death.  That's not something that I can do.

3           THE COURT:  You can't do that?

4           PROSPECTIVE JUROR NO. 9:  No.

5           THE COURT:  Would you automatically never find for

6    death and not weigh the aggravating and mitigating factors?

7    I think you just answered that, but I want to ask again.

8           PROSPECTIVE JUROR NO. 9:  Absolutely I would not

9    find for death.

10          THE COURT:  Then there is a substantial likelihood

11   you would not find for death?

12          PROSPECTIVE JUROR NO. 9:  Yes.

13          THE COURT:  That was a silly question on my part,

14   but -- I want to thank you very much.

15          If you want any follow-up questions, Mr. Steward,

16   Mr. White, Mr. Emmick, Ms. Flynn, I would be happy to have

17   you submit those to me.

18          MR. STEWARD:  No.

19          MR. WHITE:  No.

20          MR. EMMICK:  Nothing further.

21          MS. FLYNN:  No, Your Honor.

22          THE COURT:  Would you wait just a moment in the

23   jury room.  We are probably going to bring you back in just

24   a moment.  Let me talk to counsel for a moment.

25          (Prospective Juror No. 9 exits courtroom.)

1          THE COURT:  The government's request is?

2          MR. EMMICK:  To excuse for cause, Your Honor, or

3    perhaps for a stipulation from the other side.

4          THE COURT:  I don't think the other side would

5    ever be in a position of stipulating.  I'm not going to put

6    you in that position, and I don't think I am going to put

7    you in the position of stipulating from now on either.  Let

8    me go through one by one.

9          MR. EMMICK:  We move to excuse for cause then,

10   Your Honor.

11         THE COURT:  I am going to grant that unless I hear

12   a strenuous argument.

13         Mr. White?

14         MR. WHITE:  We agree.

15         THE COURT:  Mr. Steward?

16         MR. STEWARD:  The same.

17         THE COURT:  I am going to bring the juror back in.

18   I don't there is any reason we have to bring him back.

19   Let's thank him also.  I don't want any juror to feel that

20   by their appearing here that there is any issue -- in fact,

21   we should be thanking them for their honesty.

22         Would you ask Juror No. 9 to return for a moment,

23   please, Lisa.

24         (Prospective Juror No. 9 enters courtroom.)

25         THE COURT:  Sir, we want to thank you.  I am going

1    to excuse you for cause, and I want to thank you for going

2    through this entire process.  Thank you for being so candid.

3    I appreciate it.  You don't have to return, sir.  Thank you.

4                   (Prospective Juror No. 9 excused.)

5                   MR. EMMICK:  Your Honor, if this would be a

6    convenient time for a break, we have been at it for a few

7    hours.

8                   THE COURT:  This is the last juror for the

9    morning.

10                  THE CLERK:  We have No. 4 after No. 11.

11                  THE COURT:  Then we will take a break.  Why don't

12   we take a break for 15 minutes.

13                  (Recess.)

14                  THE COURT:  Let's go back back on the record.  All

15   counsel are present.  The parties are present.

16                  If we could summon Juror No. 10, please.

17                  (Juror No. 10 enters courtroom.)

18                  THE COURT:  Good morning.

19                  JUROR NO. 10:  Good morning.

20                  THE COURT:  How are you today?  It's a pleasure to

21   meet you.  Would you have a seat right across the table from

22   me.

23                  While you were waiting for you us this morning as

24   we were talking to other jurors, we asked you to go over

25   your jury questionnaire paying particular attention to

1   Question No. 61 through the end of the questionnaire.

2           Have you made additions or modifications, or are

3   you satisfied with your answers, and if you have

4   modifications, we will start on page one.

5           PROSPECTIVE JUROR NO. 10:  I made a couple.

6           THE COURT:  Would you please tell us what those

7   are so we know?

8           PROSPECTIVE JUROR NO. 10:  Question 5.

9           THE COURT:  "How big a problem is crime in your

10  neighborhood?"

11          PROSPECTIVE JUROR NO. 10:  I really never have

12  seen a crime, but I just hear about it, so it's no big thing

13  with crime.

14          THE COURT:  The next one.

15          PROSPECTIVE JUROR NO. 10:  "What is the most

16  important issue we face today?"  I just put "budget

17  deficit."

18          THE COURT:  That would be No. 19?

19          PROSPECTIVE JUROR NO. 10:  Yes.

20          THE COURT:  And the next number?

21          PROSPECTIVE JUROR NO. 10:  No. 53.

22          THE COURT:  "Do you like to read books?"

23          PROSPECTIVE JUROR NO. 10:  Yes.  I just added

24  "business and landscaping reading material."

25          THE COURT:  And then?

1               PROSPECTIVE JUROR NO. 10:  No. 62.

2               THE COURT:  "62.  Are your views concerning the

3   death penalty such that you would have substantial

4   difficulty in voting for a verdict of not guilty even if the

5   proof presented at trial by the government did not convince

6   you beyond a reasonable doubt of the guilt of death eligible

7   defendants because you would want to make a decision

8   regarding penalty?"

9               PROSPECTIVE JUROR NO. 10:  I wrote "Yes."

10              THE COURT:  You changed that from "No" to "Yes"?

11              PROSPECTIVE JUROR NO. 10:  Correct.

12              No. 65.

13              THE COURT:  "65.  Are your views concerning the

14   death penalty such that, if you were to reach a penalty

15   phase in this case, you would have substantial difficulty in

16   voting for life imprisonment as the appropriate penalty?"

17              PROSPECTIVE JUROR NO. 10:  I changed it to "Yes."

18              THE COURT:  So you changed that from "No" to

19   "Yes"?

20              PROSPECTIVE JUROR NO. 10:  Yes.

21              No. 67.

22              THE COURT:  "67.  Are your views expressed above,

23   as set forth in Questions 62 and 65, based on other reasons,

24   such as social or political considerations?"

25              You originally wrote "No."

1           PROSPECTIVE JUROR NO. 10:  I had an explanation

2  that I forgot to put down.

3           THE COURT:  Would you tell me what that is?

4           PROSPECTIVE JUROR NO. 10:  I wrote, "I believe if

5  you kill someone intentionally you should be killed, too."

6           THE COURT:  Thank you.

7           Any other changes?

8           PROSPECTIVE JUROR NO. 10:  No. 70.

9           THE COURT:  "70.  Do you feel that the death

10  penalty is used too often?  too seldom?  Randomly?"

11          You circled "too seldom" and then in an

12  explanation stated, "There's too many people on Death Row."

13           PROSPECTIVE JUROR NO. 10:  I added the words, "If

14  used more often, there would be less crime."

15           THE COURT:  Any other changes?

16           PROSPECTIVE JUROR NO. 10:  Yes, No. 75.

17           THE COURT:  "75.  Is there anything that you would

18  like to bring to the Court's attention that might in any way

19  affect your ability to be a fair and impartial juror in this

20  case?"

21           PROSPECTIVE JUROR NO. 10:  I wrote, "When I see

22  the gang graffiti on the walls, it makes me wish I could put

23  them on a secluded island."

24           THE COURT:  Did you mention what island?

25           PROSPECTIVE JUROR NO. 10:  No.  No, I didn't.

79

1    Sorry.

2              THE COURT:   I'm just kidding.

3              PROSPECTIVE JUROR NO. 10:   I know.

4              One more thing, when I was in junior high, I was

5    attacked by a bunch of Mexicans for something I didn't do,

6    and later on they realized I was the wrong person and

7    apologized for it.

8              On No. 76, "and also I would give my honest

9    opinion and hold nothing back."

10             THE COURT:   "76.  What is it about yourself that

11   makes you feel you can be a fair and impartial juror?"

12             You previously answered, "I believe in God, and

13   I'm a God-fearing Christian," and you added, "I would be" --

14             PROSPECTIVE JUROR NO. 10:   Like I said, after --

15   that's the same thing.   "And also I would give my honest

16   opinion and hold nothing back."

17             THE COURT:   Thank you.

18             PROSPECTIVE JUROR NO. 10:   That's it.

19             THE COURT:   Now, when we originally sent out the

20   jury questionnaire to you, we were being cautions.   We

21   didn't want any of the jurors that they had been hoodwinked

22   in some way.   We have estimated a nine-month trial.   We

23   actually believe that the trial will be shorter than that,

24   but it's difficult for us to know.   There may be

25   continuances right at the beginning or a portion of the way

1   through the trial.

2             PROSPECTIVE JUROR NO. 10:   Okay.

3             THE COURT:   I want to start by telling you that in

4   cases where the government is seeking the death penalty

5   against a defendant the law provides for a two-stage trial.

6   However, by me asking you these questions, I don't want you

7   to assume that we are going to get to the second stage.   You

8   will hear us sometimes refer to that as a penalty phase

9   trial.

10            In the first trial, the jury's job is the same as

11  it would be in any other criminal case, to decide if the

12  accused is guilty or not guilty.   If, and only if, the jury

13  returns a verdict of guilty against either Mr. Mills, which

14  is the gentleman who is nodding his head, or Mr. Bingham,

15  the gentleman who is nodding his head, as to the counts

16  alleged against them which potentially carry a sentence of

17  death, the same jury will have the task of considering the

18  penalty.

19            In that case, the jury may hear additional

20  evidence and arguments and will be asked to weigh various

21  aggravating and mitigating factors that I will explain to

22  you if in fact we get to that second or penalty phase.

23  Based upon these considerations, the jury by unanimous vote

24  shall recommend whether the defendant shall be sentenced to

25  death, to life imprisonment without possibility of release,

1   or some other lesser sentence.

2          In any case in which the charge carries a possible

3   penalty of death, the law requires the jurors answer

4   questions regarding their thoughts and feelings and opinions

5   about the possible penalty, which is why we have intruded on

6   you and asked these rather personal questions.

7          Now, each of the sides has a perspective, but in

8   obtaining an absolutely fair juror, there are four questions

9   I want to reask you that you have already partially answered

10  on the form.

11         Would you automatically find for death without

12  fairly weighing the aggravating and mitigating factors if we

13  got to this second penalty trial by virtue of your finding

14  of guilt in the first trial?  Do you want me to ask that

15  again?

16         PROSPECTIVE JUROR NO. 10:  Yes.  I want to make

17  sure I understand you correctly.

18         THE COURT:  Let me approach it a different way.

19  From the defendants' perspective, they would be concerned of

20  course with a juror who might find automatically for death

21  without fairly weighing the aggravating and mitigating

22  factors if we got to the second trial.

23         PROSPECTIVE JUROR NO. 10:  Correct.

24         THE COURT:  Or if there is a substantial

25  likelihood that there would be a finding for death without

1   fairly weighing these aggravating and mitigating factors, a

2   little less standard.  I used the word "automatic" to begin

3   with, and now I have switched back to substantial

4   likelihood.

5           PROSPECTIVE JUROR NO. 10:  Okay.

6           THE COURT:  From the government's perspective, of

7   course they might be concerned that there is a juror who

8   would automatically never find for death without fairly

9   weighing the aggravating and mitigating factors if we got to

10  the second trial, this penalty trial, or if there is a

11  substantial likelihood that a juror would never find for

12  death without fairly weighing the aggravating and mitigating

13  factors.

14          First, will you automatically find for death in

15  this second penalty phase trial if we got there without

16  fairly weighing the aggravating and mitigating factors?  Are

17  you feelings that you would automatically do this?

18          PROSPECTIVE JUROR NO. 10:  Would it be wrong for

19  me to say --

20          THE COURT:  There is no wrong answer here.

21          PROSPECTIVE JUROR NO. 10:  If there is on both

22  sides aggravated --

23          THE COURT:  And mitigating factors.

24          PROSPECTIVE JUROR NO. 10:  It would depend on the

25  facts.

1          THE COURT:  Is there a substantial likelihood that

2     you would find for death without fairly weighing these

3     aggravating and mitigating factors if we got to the second

4     penalty phase?

5          PROSPECTIVE JUROR NO. 10:  No.

6          THE COURT:  Would you automatically never find for

7     death without fairly weighing the aggravating and mitigating

8     factors?  Let me ask that again.  Would you automatically

9     never find for death without fairly weighing these

10    aggravating and mitigating factors?

11         PROSPECTIVE JUROR NO. 10:  That I would never find

12    for death?

13         THE COURT:  Never find for death?

14         PROSPECTIVE JUROR NO. 10:  Like you say, it

15    depends on the facts.

16         THE COURT:  Is there a substantial likelihood that

17    you would never find for death without fairly weighing the

18    aggravating and mitigating factors?  Do you want me to say

19    it again?

20         PROSPECTIVE JUROR NO. 10:  Yes.

21         THE COURT:  Is there a substantial likelihood that

22    you would never find for death?

23         PROSPECTIVE JUROR NO. 10:  Yes.

24         THE COURT:  That you believe you would never find

25    for death?

1      PROSPECTIVE JUROR NO. 10:  Correct.

2      THE COURT:  Now, I want to go back to the changed

3  answer for just a moment.

4      "62.  Are your views concerning the death penalty

5  such that you would have substantial difficulty in voting

6  for a verdict of not guilty even if the proof presented at

7  trial by the government did not convince you beyond a

8  reasonable doubt of the guilt of death eligible defendants

9  because you would want to make a decision regarding

10  penalty?"

11      You answered, "Yes."

12      PROSPECTIVE JUROR NO. 10:  I changed my mind.

13      THE COURT:  "65.  Are your views concerning the

14  death penalty such that, if you were to reach a penalty

15  phase in this case, you would have substantial difficulty in

16  voting for life imprisonment as the appropriate penalty?"

17      You changed from "No" to "Yes."

18      Would you tell me more about your answer "Yes" in

19  Question 65 and, that is, that you have a substantial

20  difficulty in voting for life imprisonment as the

21  appropriate penalty?  Tell me your thoughts and feelings.

22  There is no right answer.

23      PROSPECTIVE JUROR NO. 10:  If there is a good --

24  if there is a good reason why it was done -- it shouldn't

25  have been done, but if there are aggravating

1  circumstances -- it shouldn't be done, but if there were

2  circumstances that led to that -- everybody screws up and

3  makes mistakes, so if there is enough aggravation to cause

4  that to happen -- maybe this could happen in prison.

5          THE COURT:  All right, at the present time, I have

6  no further questions.  I am going to ask you to wait back in

7  the jury room.  We are going to come back probably in a

8  half-hour and ask you a few more questions.

9          Would you take that questionnaire with you, and

10  thank you very much.

11          (Prospective Juror No. 10 exits courtroom.)

12          THE COURT:  There has been a number of changes

13  that have gone back and forth, and it makes it difficult for

14  the Court because of some of the answers now.  Therefore, I

15  have delayed him because we can go through two other jurors

16  and come back to this gentleman in half an hour, and it will

17  give all of you time to think if there are additional

18  questions you want to write down.  Is that acceptable?

19          MR. EMMICK:  Yes.

20          MS. FLYNN:  Yes.

21          MR. STEWARD:  Yes.

22          MR. WHITE:  Yes.

23          THE COURT:  Let's take a look at Juror No. 11 who

24  is the next juror.  The person once again is retired.  On

25  Questions No. 62 through 65, the answers seem to be

86

1    appropriate, and on Questions 78 and 73, the two questions

2    that I am looking at seem to be appropriate.

3            Any additional concerns before I call this juror

4    in?  Mr. Emmick?

5            MR. EMMICK:  None from the government.

6            THE COURT:  Ms. Flynn.

7            MS. FLYNN:  No.

8            THE COURT:  Mr. Steward?

9            MR. STEWARD:  No.

10           THE COURT:  Mr. White?

11           MR. WHITE:  The only question we have -- maybe

12   this is more appropriate at the time of voir dire.  The

13   individual is retired and does not indicate what they are

14   retired from.

15           THE COURT:  It's more appropriate at the time of

16   voir dire.  Remember this is Hovey, but if you want me to

17   ask, I can ask now.  It will save time.  Let me ask what he

18   is retired from.

19           Would you get Juror No. 11, please.  Thank you,

20   Christy.

21           (Prospective Juror No. 11 enters courtroom.)

22           THE COURT:  Good morning.  How are you today?  If

23   you would have a seat just across from me at the table for a

24   moment.

25           PROSPECTIVE JUROR NO. 11:  Okay.

1          THE COURT:  First of all, I want to thank you for

2     filling out the questionnaire.  When we sent out the jury

3     summons to you, we estimated nine months.  In fact, you are

4     not going to be in session for nine months.  There may be

5     continuances during the trial sometimes for lengthy period

6     of time, but we wanted to be cautions, so in a sense, we

7     probably overestimated the time.

8          Have you made any changes to the questionnaire,

9     and if so, could you indicate the question that was changed

10    so we can all mark those down?

11         PROSPECTIVE JUROR NO. 11:  On question No. 3, I

12    amended that and put "Caucasian."

13         On Question No. 9, I added something, that my wife

14    is a member of a club called the Santa Ana Assistance

15    League.

16         On Question 14, I put in some detailed information

17    of what I did for a living since I did put retired.  I sold

18    medical devices.

19         THE COURT:  Thank you.  Let me write that down.

20         PROSPECTIVE JUROR NO. 11:  Length of employment:

21    25 years.  Job description:  Regional manager.  Do you have

22    supervisory responsibility?  Yes.  What other types of jobs

23    have you held as an adult?  I owned a business.  I worked at

24    a copper smeldering plant, worked for Western Electric as an

25    installer, and I worked for the Federal Reserve Bank.

1           THE COURT:  Excellent.

2           PROSPECTIVE JUROR NO. 11:  On Question 26, I was

3    all confused when I answered that originally, but in Part B

4    of that question, I put "No" where originally I put a "Yes."

5           On Question 35, my oldest son had a real problem

6    with drugs.

7           On Question 29, Part B, "I have never watched any

8    of the above-mentioned shows."

9           On Question No. 50 where you ask about listening

10   to radio, I just added onto that "while driving a car."

11          Those are the only things I made.

12          THE COURT:  Thank you very much for your attention

13   to that questionnaire.

14          PROSPECTIVE JUROR NO. 11:  Okay.

15          THE COURT:  Let me begin by saying to you that we

16   could have kind of brought you in as a group, but we think

17   we will get a lot more candid answers in discussing these

18   questions with each juror, so that other jurors don't play

19   off of the answers that other jurors may be giving.

20          In cases where the government is seeking the death

21   penalty against a defendant, the law provides for a

22   two-stage trial.  However, at this time by me asking you

23   questions, I don't want to you assume that the trial will

24   reach the second stage.  Sometimes we call the second stage

25   also a penalty phase trial, and you will hear that

1  terminology used.

2          In the first trial, the jury's job is the same as

3  it would be in any other criminal case, to decide if the

4  accused is guilty or not guilty.  If, and only if, the jury

5  returns a guilty verdict against either Mr. Mills or

6  Mr. Bingham -- Mr. Mills is the gentleman to my left that

7  just nodded his head.  Mr. Bingham is the at the far end

8  that just nodded his head -- as to the counts alleged

9  against them which potentially carry a sentence of death,

10  the same jury will have the task of considering penalty.

11          In that case, the jury may hear additional

12  evidence and arguments and will be asked to weigh various

13  aggravating and mitigating factors that I will explain to

14  you at that time if we get to the penalty phase or second

15  stage trial.  Based upon these considerations, the jury by

16  unanimous vote shall recommend whether the defendant shall

17  be sentenced to death, to life imprisonment without

18  possibility of release, or some other lesser sentence.

19          In any case in which the charge carries the

20  possible penalty of death, the law requires that jurors

21  answer questions regarding their thoughts, feelings, and

22  opinions about the possible penalty.

23          Would you automatically find for death without

24  fairly weighing the aggravating and mitigating factors if we

25  got to the second stage trial or this penalty phase trial?

1        PROSPECTIVE JUROR NO. 11:   No, I would not.

2        THE COURT:   So then you would weigh these

3   aggravating and mitigating factors?

4        PROSPECTIVE JUROR NO. 11:   That's correct.

5        THE COURT:   Is there a substantial likelihood, a

6   little less standard, that you would find for death without

7   fairly weighing the aggravating and mitigating factors, or

8   would you still weight the aggravating and mitigating

9   factors?

10       PROSPECTIVE JUROR NO. 11:   I would still weigh the

11   aggravating and mitigating factors.

12       THE COURT:   Now, from the opposite perspective,

13   would you automatically never find for death without fairly

14   weighing the aggravating and mitigating factors?

15       PROSPECTIVE JUROR NO. 11:   No.

16       THE COURT:   By that, you would weigh the

17   aggravating and mitigating factors?

18       PROSPECTIVE JUROR NO. 11:   That's correct.

19       THE COURT:   Is there a substantial likelihood that

20   you would never find for death without fairly weighing the

21   aggravating and mitigating factors?

22       PROSPECTIVE JUROR NO. 11:   I would not.

23       THE COURT:   I don't have any further questions.

24   Let me just check with counsel.

25       Mr. Steward?

1          MR. STEWARD:  No.

2          THE COURT:  Mr. White?

3          MR. WHITE:  No questions.

4          THE COURT:  Mr. Emmick?

5          MR. EMMICK:  Nothing further.

6          THE COURT:  Ms. Flynn?

7          MS. FLYNN:  Nothing.

8          THE COURT:  Sir, I am going to ask you to return

9    on February 22.  You will be calling in on February 21, and

10   we will reassemble the entire jury panel that remains.

11          Sir, if you will be kind enough, would you return

12   the questionnaire to Lisa.

13          (Prospective Juror No. 11 exits courtroom.)

14          THE COURT:  Next is Juror No. 4.

15          Counsel, we will go back to Juror No. 4 who was

16   not here earlier this morning.  Let's take another look back

17   through -- there are numerous portions that haven't been

18   filled out that we are going to spend some time with now.

19   If you want, I think it would save a lot of time if we do

20   that now instead of in front of the juror.

21          Acceptable?

22          MR. WHITE:  Yes.

23          MR. STEWARD:  Yes.

24          MS. FLYNN:  Yes.

25          MS. FLYNN:  Your Honor, if you could also ask him

1    about 59.  He says he has lower back problems regarding
2    prolonged sitting.
3              THE COURT:  Also, I am not quite sure what his
4    general feelings are regarding death.  "Death is not a
5    penalty.  It's part of life," but he has answered 62 through
6    65 seemingly appropriately.  He answered Question 68
7    appropriately and has answered 73 appropriately.  I saw
8    nothing to the end of the questionnaire that caused me
9    concern.
10             Mr. Steward.
11             MR. STEWARD:  We are only concerned about 61.
12             MR. WHITE:  As are we.  I think our concern is if
13   the person doesn't believe that death is the ultimate
14   punishment.
15             THE COURT:  I will get him talking a little bit
16   about that and see if he wants to add anything.
17             Mr. Emmick.
18             MR. EMMICK:  That's fine.
19             THE COURT:  Ms. Flynn.
20             MS. FLYNN:  That's fine.
21             THE COURT:  Would you be kind enough to get Juror
22   No. 4, please.
23             (Prospective Juror No. 4 enters courtroom.)
24             THE COURT:  Good morning.  It's a pleasure meeting
25   you.  If you will come over with me and have a seat just

1    across the table from me.  How are you this morning?

2           PROSPECTIVE JUROR NO. 4:  Pretty good.

3           THE COURT:  We gave you your questionnaire as we

4    have all of the other jurors to look at again.

5           Are there any additions or modifications?

6           PROSPECTIVE JUROR NO. 4:  I had a few.

7           THE COURT:  Would you tell us what they are?

8           PROSPECTIVE JUROR NO. 4:  No. 5, "Traffic.  Beach

9    Boulevard id s busy street."

10          THE COURT:  Any other questions you have added to?

11          PROSPECTIVE JUROR NO. 4:  No.

12          THE COURT:  When we sent out the jury summons, we

13   estimated nine months, but I can assure you we are not going

14   to be in trial constantly for nine months.  There are going

15   to be breaks, stops, and starts, but we wanted to be

16   cautious and make certain we hadn't underestimated, so we

17   overestimated in all likelihood.

18          PROSPECTIVE JUROR NO. 4:  Okay.

19          THE COURT:  I want to thank you for filling out

20   the questionnaire and letting us intrude into your life.

21          I want to start by telling you that in cases where

22   the government is seeking the death penalty against a

23   defendant the law provides for a two-stage trial.  However,

24   by me asking you some of the questions I am about to ask

25   you, I don't want you to assume that we are going to

1   necessarily get to this second stage trial which we

2   sometimes refer to as a penalty trial.

3           In the first trial, the jury's job is the same as

4   it would be in any other criminal case, and that is to

5   decide if the accused is guilty or not guilty.  If, and only

6   if, the jury returns a verdict of guilty against either

7   defendant Mr. Mills, who is the gentleman who just nodding

8   to you at the present time, or Mr. Bingham, the gentleman in

9   the white shirt, as to the counts alleged against them which

10  potentially carry a sentence of death, then the same jury

11  will have the task of considering the penalty.

12          In that case, the jury in this second stage trial

13  or penalty phase trial may hear additional evidence and

14  arguments and will be asked to weigh various aggravating and

15  mitigating factors that I will explain to you if we get to

16  this second stage or penalty phase trial.  Based upon these

17  considerations, the jury by unanimous vote shall recommend

18  whether the defendant shall be sentenced to death, life

19  imprisonment without possibility of release, or some other

20  lesser sentence.

21          In any case in which the charge carries a possible

22  penalty of death, the law requires that jurors answer

23  questions regarding their thoughts, feelings, and opinions

24  about the possible penalty, and that's why I have intruded

25  in your personal life in asking these rather personal

1    questions.

2            Would you automatically find for death without

3    fairly weighing these aggravating and mitigating factors if

4    we got to this second penalty trial?

5            PROSPECTIVE JUROR NO. 4:  No.

6            THE COURT:  I am going to change the standard and

7    ask is there a substantial likelihood that you would find

8    for death without fairly weighing these aggravating and

9    mitigating factors if we got to a second or penalty trial?

10            PROSPECTIVE JUROR NO. 4:  I would balance it out.

11            THE COURT:  So you would fairly weigh the

12    aggravating and mitigating factors?

13            PROSPECTIVE JUROR NO. 4:  Yes.

14            THE COURT:  I just moved from automatic to the

15    words "substantial likelihood," a little bit lesser

16    standard.

17            PROSPECTIVE JUROR NO. 4:  Okay.

18            THE COURT:  This is the opposite.  Would you

19    automatically never find for death without fairly weighing

20    these aggravating and mitigating factors?

21            PROSPECTIVE JUROR NO. 4:  I would balance it out.

22            THE COURT:  Let me say it again.  Would you

23    automatically never find for death without fairly weighing

24    the aggravating and mitigating factors?

25            PROSPECTIVE JUROR NO. 4:  No.

1          THE COURT:   Is there a substantial likelihood that

2    you would never find for death without fairly weighing the

3    aggravating and mitigating factors?

4          PROSPECTIVE JUROR NO. 4:   No.

5          THE COURT:   Now, there is a question that you

6    answered that I am wondering if you could help me with and

7    expound upon just a little bit.   I think it was Question No.

8    61.

9          "61.   What are your general feelings regarding the

10   death penalty?"

11         You stated, "Death is not a penalty.   It is a part

12   of life."

13         Could you just talk to me a little bit and tell me

14   what your thoughts are about your general feelings are

15   concerning the death penalty?

16         PROSPECTIVE JUROR NO. 4:   When you die, it's just

17   part of life.

18         THE COURT:   Your current occupation is a retail

19   department store.   I can imagine how thrilled your employer

20   is going to be if they hear that you are sitting on a

21   nine-month case.   What we don't want is a problem later if

22   you are selected to me a member of the jury where there is

23   some hardship brought upon you.

24         Do you believe that you could sit for this period

25   of time?

1          PROSPECTIVE JUROR NO. 4:  Yes.

2          THE COURT:  Okay.

3          Let me turn to Mr. White.  Any additional

4   questions?

5          MR. WHITE:  No.

6          THE COURT:  Mr. Steward?

7          MR. STEWARD:  No, Your Honor.

8          THE COURT:  Ms. Flynn?

9          MR. EMMICK:  Just the follow-up we had, the

10  possible back problem.

11         THE COURT:  Do you have a back problem?

12         PROSPECTIVE JUROR NO. 4:  I have a back problem.

13         THE COURT:  How long can you sit each day?  We are

14  in session probably from 8:00 in the morning until about

15  4:30 or 5:00.  Those are long days.  You are more than

16  welcome to stand up in the jury box and move around.

17         PROSPECTIVE JUROR NO. 4:  If I can just stretch

18  out a little bit, I'm fine.

19         THE COURT:  Okay.

20         Any other questions?

21         Sir, I will ask you to return to us on

22  February 22.  It's a Wednesday and call in on the 21st, and

23  you know that you are going to join us at probably 8:00 in

24  the morning, but I just want to make sure it's not 8:30.

25  Thank you very much.  Would you give your questionnaire to

1    Lisa.

2              (Prospective Juror No. 4 leaves courtroom.)

3              THE COURT:  We still have the discussion on Juror

4    No. 10 in just a moment, but Juror No. 1, Juror No. 2, Juror

5    No. 3, and Juror No. 5, have all been invited back.  Juror

6    No. 7 was excused for hardship.  Juror No. 8 was invited

7    back.  Juror No. 9 was excused for cause.  Juror No. 11 and

8    Juror No. 4 have been invited back, so thus far we have

9    seven jurors out of the nine that we have discussed.

10             Juror No. 10 is going to be a difficult call.  He

11   has answered the questions appropriately, but his initial

12   answers cause some concern for the defense.  This is the

13   time where I think that I am going to allow the voir dire to

14   open up and let you ask some questions.  I think I will let

15   the government ask questions in this regard also and see how

16   it goes.  If it doesn't turn out to be appropriate, there is

17   no prejudice to the rest of the panel.  It's one juror who

18   is potentially tainted, but I would like to try that and see

19   how far we go.

20             Mr. Steward, are you prepared to go forward and

21   the gentleman a few questions?

22             MR. STEWARD:  Yes.

23             THE COURT:  Mr. White?

24             MR. WHITE:  Yes.

25             THE COURT:  Ms. Flynn?

1          MS. FLYNN:  Yes.

2          THE COURT:  Mr. Emmick?

3          MR. EMMICK:  Yes.

4          THE COURT:  Ask Juror No. 10 to come in.  Remember

5     that this is a tongue-twisting questionnaire in some ways,

6     so let's see how he responds.

7          (Prospective Juror No. 10 enters courtroom.)

8          THE COURT:  Thank you very much.  If you would

9     come back and have a seat.

10         Counsel for both sides may ask a few questions for

11    just a few moments.  If you would have a seat for just a

12    second.  Why don't we begin with the defense for just a

13    moment.  Then we will have the government ask some

14    questions.

15         THE CLERK:  I believe the juror would like to

16    change an answer.

17         PROSPECTIVE JUROR NO. 10:  I made a stupid

18    mistake.  I want to apologize for that.

19         THE COURT:  Just a moment.  I made many of them

20    already today, so join the crowd.  Don't ever apologize for

21    that, and I thank you for making any modification.

22         PROSPECTIVE JUROR NO. 10:  On Question No. 22, I

23    was a juror for a trial, but the trial never went to --

24    never went -- the case never went to trial.  We were sitting

25    there for a whole week.  The lawyers were there, and the

1    last day -- I think Friday -- they said dismissed.

2              THE COURT:   Thank you very much.

3              PROSPECTIVE JUROR NO. 10:   I apologize.

4              THE COURT:   That's fine.

5              Mr. Steward.

6              MR. STEWARD:   I want you to take a look at

7    Question 62.   You changed that.   Can you tell us why?

8              PROSPECTIVE JUROR NO. 10:   If a person is guilty

9    beyond a shadow of a doubt that they did it, they should get

10   the death penalty.

11             MR. STEWARD:   Same question for the other one you

12   changed on this page, No. 65.   Let us know why you changed

13   your answer on 65.

14             PROSPECTIVE JUROR NO. 10:   If the evidence in the

15   case -- if it weighs out to where there is a lot involved

16   with aggravating evidence, maybe they should not get the

17   death penalty.

18             MR. STEWARD:   So you would listen to all of that

19   evidence; is that right?

20             PROSPECTIVE JUROR NO. 10:   Yes.

21             MR. STEWARD:   And that's kind of why you made that

22   change?

23             PROSPECTIVE JUROR NO. 10:   Yeah.

24             MR. STEWARD:   Nothing further, Your Honor.

25             THE COURT:   Mr. White?

1          MR. WHITE:  Juror No. 10, thanks for answering

2   that question.  We know this is hard.  Again, thank you for

3   answering the questions.  We know this is difficult.

4          The question I have for you is you changed your

5   answer to No. 67.  If you could look at that just briefly.

6          As I understand it, you wrote, "If you kill

7   someone intentionally, you should be killed, too."

8          PROSPECTIVE JUROR NO. 10:  Correct.

9          THE COURT:  Is that how you feel?

10         PROSPECTIVE JUROR NO. 10:  Yes.  I know my answers

11  are contradictory.  I know the one you are asking me.  They

12  are contradictory.

13         MR. WHITE:  Let me ask you another question.

14         As the judge has told you, you only get to this

15  decision of life or death if you find Mr. Bingham and/or Mr.

16  Mills guilty of murder.  Do you understand that?

17         PROSPECTIVE JUROR NO. 10:  Yes.

18         MR. WHITE:  Now, if you find them guilty of

19  murder, it's going to be an intentional murder.

20         PROSPECTIVE JUROR NO. 10:  Right.

21         MR. WHITE:  So you are only going to go to this

22  question about life or death if you decide that Mr. Bingham

23  and/or Mr. Mills are guilty of intentionally killing

24  someone.

25         PROSPECTIVE JUROR NO. 10:  Life without the

102

1   possibility of release or death.

2           MR. WHITE:  Thank you.

3           You are only going to get to that decision if you

4   find them guilty of murder which would be an intentional

5   premeditated murder.

6           PROSPECTIVE JUROR NO. 10:  Correct.

7           MR. WHITE:  So the question is if you find

8   Mr. Bingham and/or Mr. Mills guilty of an intentional

9   premediated murder -- two of them in fact -- are you going

10  to therefore automatically vote for the death penalty

11  without weighing the aggravating and mitigating factors,

12  not weigh the aggravating and mitigating factors?

13          PROSPECTIVE JUROR NO. 10:  Is it bad if I go back

14  on my word?

15          MR. WHITE:  No.  We appreciate you trying to --

16          PROSPECTIVE JUROR NO. 10:  I am trying to be

17  honest with myself.  I don't want to get up and be a juror

18  and change my mind.

19          THE COURT:  The only thing bad you coud do is not

20  tell us your actual thoughts and feelings.  You can change

21  your mind as much as  you like.

22          PROSPECTIVE JUROR NO. 10:  To be honest, I think I

23  made a mistake.  In re-reading my answer for the death

24  penalty, if he intentionally killed someone, I believe that

25  he should be killed, too, put to death.

103

1      MR. WHITE:  That's how you believe?

2      PROSPECTIVE JUROR NO. 10:  Yes.  I'm sorry.

3      MR. WHITE:  No, no.  That's -- people have all

4   kinds of feelings about it, so thank you.

5      THE COURT:  Does the government have any

6   questions?

7      MR. EMMICK:  Just one follow-up, and it would be

8   somewhat similar, but I just want to get clear about this.

9      It is apparent that you have some feelings about

10  the death penalty.  Yes?

11      PROSPECTIVE JUROR NO. 10:  Yes.

12      MR. EMMICK:  The bottom-line question is if the

13  judge instructs you that you should consider aggravating and

14  mitigating circumstances in the death penalty phase, are you

15  going to be able to put aside those personal feelings and

16  consider aggravating and mitigating circumstances?

17      PROSPECTIVE JUROR NO. 10:  The more I think about

18  it, I don't think I could.

19      MR. EMMICK:  Thank you.

20      PROSPECTIVE JUROR NO. 10:  I apologize.

21      THE COURT:  The last question I wanted to ask

22  about is Question No. 69.

23      "69.  Will you have any difficulty in not

24  discussing the case with anyone until it is submitted to you

25  for your decision and then discussing the case only with the

104

1    other jurors in the jury room?"

2            You answered "No, you could not discuss this case

3    with anybody else"?

4            PROSPECTIVE JUROR NO. 10:  Yes.

5            THE COURT:  Thank you very much.

6            Would you wait for just a moment in the jury room.

7    I want to discuss with counsel, and then we will come right

8    back to you.

9            (Prospective Juror No. 10 exits courtroom.)

10           THE COURT:  Counsel on behalf of the defense.

11           MR. WHITE:  We believe that Juror No. 10 should be

12   excused.

13           MR. STEWARD:  Join.

14           THE COURT:  Mr. Emmick.

15           MR. EMMICK:  No objection.

16           THE COURT:  Submitted?

17           MR. EMMICK:  Yes.

18           THE COURT:  The Court makes the same findings.

19   The juror is substantially impaired, and the Court will

20   thank and excuse Juror No. 10.  I want to personally thank

21   him, though.

22           Would you ask Juror No. 10 to rejoin us, please.

23           (Prospective Juror No. 10 enters courtroom.)

24           THE COURT:  Sir, we want to thank you very much.

25   We are going to thank and excuse you.  We want to thank you

105

1    for your candidness and honesty.  Thank you very much.

2                   (Prospective Juror No. 10 excused.)

3                   THE COURT:  All right, Counsel, for the afternoon

4    session then, we will start with Juror Nos. 12, 13, 14, 15,

5    16, 17, 18, 19, and 20.  I have asked them to bring in

6    additional jurors.

7                   Lisa, when we get to Juror No. 20, who else do we

8    have coming in this afternoon?  That gives us --

9                   THE CLERK:  You have 12 to 21.

10                  THE COURT:  12 to 21.

11                  On juror No. 12, I have a question on No. 61.

12                  "61.  What is your general feelings regarding the

13   death penalty?"

14                  "It is against my religious beliefs."

15                  The person has gone onto state in Question 64:

16                  "64.  Are your views concerning the death penalty

17   such that, if you were to reach a penalty phase in this

18   case, you would have substantial difficulty in voting for

19   death as the appropriate penalty?"

20                  The answer to that was "Yes."

21                  I call that to each of your attention.

22                  Juror No. 13, I didn't see anything unless you did

23   except Question 33, which was hilarious:

24                  "33.  Have you or any family members or friends

25   ever had a gun pointed at you, been shot at, or otherwise

1    had a bad experience with a firearm?"

2            "Yes."

3            "If so, please explain.

4            "When I was a kid, I let my brother shoot a apple

5    off top of my head with his beebee gun.  Not bad experience,

6    just dumb..

7            14, did you see anything else you wanted to --

8    save a lot of time this afternoon.  14 is the person who

9    expressed, "I don't agree with the death penalty because I

10   think that no one should have the right to decide for the

11   life or" -- I can't read the next word.

12           MR. STEWARD:  "The right to decide."

13           THE COURT:  "To decide for the life of someone,

14   only God.

15           It's No. 61 for Juror No. 14, but the answers are

16   appropriate from 62 through 65, and the answers are

17   appropriate in 68 and 73.  I didn't see any other mention,

18   so I just call that to each of your attention also.

19           Anybody else see something of concern before we

20   bring in 14 this afternoon?

21           Let me suggest something else to you.  The first

22   day I think I will proceed this way.  At some point, you

23   might want to try another technique.  We can change this

24   around.  I could bring in all 13 jurors in the morning and

25   12 in the afternoon and go over the general questions we are

asking them and send them back and then bring them back quickly for the four questions.  Let's do one more day, and then if you want to, I can substantially speed up the process and accomplish the same thing.  I would rather start easy the first day.

On 15, I noticed on 61 he stated that these are all hard decisions, and he answered 62 with a question mark. He answered Questions 63, 64, and 65 all with a "Yes."  I don't want to predetermine this, but I am not certain whether he understood the question.

16, on Question 62, "What is the question?"  These questions are difficult.  They are designed to really make the jurors think.

On 17, I had some nonqualifying questions, but I hadn't seen anything that caused initial concern unless one of you has.

On 18, the same, no real concern.

On 19, there were some attitudes expressed. Question 73 is not consistent.  Would you look at 73 and 69? There is some concern.

"73.  Do you believe anyone who has committed multiple murders should automatically, without consideration of any other circumstances, be sentenced to death?"

That will require some additional questioning.

No. 69, they would have difficulty in not

1    discussing the case with anyone until it is submitted to

2    them.   That should be inquired into.

3            No. 20, this person has answered "Yes" as to

4    Question 62, which will cause one of the parties difficulty,

5    and they have answered "Yes" as to Question 73, which will

6    cause some further questioning.

7            MR. STEWARD:  It may be a language problem.

8            THE COURT:  It may be a language problem.  He is

9    from Afganistan, so there may be.

10           Beyond the three or four jurors that are going to

11   require at least on the face of these questionnaires some

12   additional questions, do you have anything further this

13   morning?  If not, I would like to give you as much time as

14   possible to prepare.

15           I get my 2,000 documents tomorrow morning at?

16           MR. EMMICK:  I am not sure what time.

17           THE COURT:  7:30.

18           And I get my 3,000 documents from the FBI --

19           MR. EMMICK:  Monday.

20           THE COURT:  At 7:30.

21           MR. EMMICK:  We will do everything we can.

22           THE COURT:  They are here.  Not the check is in

23   the mail.  I will have the 2,000 pages read over the

24   weekend.

25           Any questions before we take a recess?  Mr. White?

109

1          MR. WHITE:  No.

2          THE COURT:  Mr. Harris?

3          MR. HARRIS:  No.

4          THE COURT:  Mr. Bingham?

5          DEFENDANT BINGHAM:  No.

6          THE COURT:  Mr. Mills?

7          DEFENDANT MILLS:  No.

8          THE COURT:  Mr. Fleming?

9          MR. FLEMING:  No.

10         THE COURT:  Mr. Steward?

11         MR. STEWARD:  No.

12         THE COURT:  Mr. Emmick?

13         MR. EMMICK:  No.

14         THE COURT:  Ms. Flynn?

15         MS. FLYNN:  None.

16         THE COURT:  Have a nice recess.  We will start

17    promptly at 1:00.

18         Marshals, have the defendants seated at 1:00.

19         (Proceedings concluded.)

20

21                         -oOo-

22

23

24

25

110

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

7/26/07
SHARON SEFFENS, U.S. COURT REPORTER