1

FILED
CLERK, U.S. DISTRICT COURT

CENTRAL DIST...
BY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

              Plaintiff,

    vs.

                         CR-02-938(C)

BARRY BYRON MILLS;           Vol. 1
TYLER DAVIS BINGHAM;
CHRISTOPHER OVERTON
GIBSON; EDGAR WESLEY
HEVLE,

              Defendants.

---------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

February 8, 2006

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

DOCKETED ON CM

AUG 1 5 2007

BY

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    DEBRA W. YANG
      United States Attorney
 4    STEVEN D. CLYMER
      Special Assistant United States Attorney
 5    Chief, Criminal Division
      MICHAEL EMMICK
 6    TERRI FLYNN
      JOEY BLANCH
 7    Assistant United States Attorneys
      1400 United States Courthouse
 8    312 North Spring Street
      Los Angeles, CA  90012
 9    (213) 894-0511

10    For Defendant BARRY BYRON MILLS:

11    H. DEAN STEWARD
      LAW OFFICES OF H. DEAN STEWARD
12    107 Avenida Miramar, Suite C
      San Clemente, CA
13    (949) 481-4900

14    MARK F. FLEMING
      LAW OFFICES OF MARK F. FLEMING
15    433 "G" Street, Suite 202
      San Diego, CA  92101
16    (619) 652-9970

17    For Defendant TYLER DAVIS BINGHAM:

18    MICHAEL  V. WHITE
      LAW OFFICES OF MICHAEL V. WHITE
19    1717 Fourth Street, Third Floor
      Santa Monica, CA  90401
20    (310) 576-6242

21    WILLIAM S. HARRIS
      STEWART & HARRIS
22    1499 Huntington Drive, Suite 403
      South Pasadena, CA  91030
23    (626) 441-9300

24

25
```

```
1    APPEARANCES (Continued):

2    On behalf of the Defendant HENRY MICHAEL HOUSTON:

3
                         LAW OFFICES OF MARK F. FLEMING
4                 By:   MARK F. FLEMING
                       Attorney at Law
5                 433 "G" Street
                  Suite 202
6                 San Diego, California 92101
                  (619) 652-9970
7

8                 -AND-

9

10                ROTHSTEIN, DONATELLI, HUGHES,
                  DAHLSTROM & SCHOENBURG & FRYE, LLP
11                BY:   MARK H. DONATELLI
                       Attorney at Law
12                P.O. BOX 8180
                  Santa Fe, New Mexico 87504
13                (505) 988-8004

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    SANTA ANA, CALIFORNIA; WEDNESDAY, FEBRUARY 8, 2006; 8:00
2    A.M.
3              THE COURT:  We are on the record.  Mr. Bingham is
4    present.  Mr. Harris is present.  Mr. White is present.  Mr.
5    Steward is present.  Mr. Fleming is present.  Mr. Emmick and
6    Ms. Flynn  are present.
7              Lisa told me Juror No. 47 appeared this morning,
8    and so did 32 and 33.  They are scheduled for this
9    afternoon, so we are going to take them this morning also,
10   and we are missing No. 24, but we are working on that.
11             THE CLERK:  22 is here.
12             THE COURT:  Let's take a look at 22 again.  Let's
13   go over that questionnaire before we bring in No. 22.  The
14   persons works in security in aerospace.  I have a question
15   on No. 77.
16             "77. Is there anything about the charges against
17   the defendants that might bias you against or toward them?"
18             "I'm of Jewish background.  When Aryan is brought
19   up, I think of Hitler."
20             Also, 73 and 65.
21             Any other particular areas?
22             MR. WHITE:  75, Your Honor.
23             THE COURT:  You remind me if I forget that.
24             MR. EMMICK:  I might suggest -- and these are all
25   related in a manner of speaking -- 68 and also 76.  76 is
```

1    the one we talked about being judge, jury, and executioner.

2    I'm not sure exactly how to take that.

3              THE COURT:   Hopefully, he is being facetious.

4              Would you ask No. 22 to join us, please.

5              (Prospective Juror No. 22 enters courtroom.)

6              THE COURT:   Hello.  How are you today?  Come over

7    and join us.  Would you please be seated here in this chair

8    right across the table from me.  Good morning.

9              PROSPECTIVE JUROR NO. 22:  Good morning.

10             THE COURT:   Let me start you by thanking you for

11   not only filling out the questionnaire but for responding.

12   When we sent out the jury summons to you, we estimated nine

13   months, but that's not true.  We wanted to overestimate so

14   that no one was angry at me.  You are not going to be in

15   session nine months, but the case could take place over a

16   period of nine months.  We could have a short or lengthy

17   continuance as early as after the jury is selected.

18             I plan to take some odd times during the trial as

19   breaks with no other particular reason than I want counsel

20   for both sides just to catch up, just to keep marshaling

21   their resources.  I'm not sure when those will be yet, but I

22   am planning on eight or nine-day breaks at different times.

23             We gave you your questionnaire to read back, and I

24   asked if there was anything that you wanted to change or

25   modify, and if they was, if you would tell me what questions

1    they were.

2              PROSPECTIVE JUROR NO. 22:  Just No. 69.

3              THE COURT:  Let me turn to that for just a moment.

4         "69.  Will you have any difficulty in not

5    discussing the case with anyone until it is submitted to

6    you," et cetera.  You have answered "Yes."

7              Are you now answering "No"?

8              PROSPECTIVE JUROR NO. 22:  Yes.  I misread that.

9              THE COURT:  In cases where the government is

10   seeking the death penalty against the defendant, the law

11   provides for a two-stage trial in front of the same jury.

12   In asking these questions, I don't want you or any of the

13   other jurors to assume that we are going to get to the

14   second stage of these proceedings.  We sometimes may call

15   that a penalty phase trial.  If we got to that stage, that's

16   why it's necessary that I talk to each of you.

17             In the first trial, the jury's job is the same as

18   it would be in any other criminal case.  You decide if the

19   accused is either guilty or not guilty.  If, and only if,

20   the jury returns a verdict of guilty against either

21   defendant Mr. Mills, who is the gentleman here, or

22   Mr. Bingham, the gentleman there, as to the counts alleged

23   against them which potentially carry a sentence of death,

24   then the same jury will have the task of considering the

25   penalty in the second trial or penalty phase trial.  In that

1  case, the jury may hear additional evidence and arguments

2  and will be asked to weigh various aggravating and

3  mitigating factors.  I will explain those factors to you if

4  we get to the second penalty phase.

5         Based upon these considerations, the jury by

6  unanimous vote shall recommend whether the defendant should

7  be sentenced to death, life imprisonment without possibility

8  of release, or some other lesser sentence.

9         Now, in any case in which the charge carries a

10  possible penalty of death, the law requires that jurors

11  answer questions regarding their thoughts, feelings, and

12  opinions about the possible penalties.  That's why we have

13  intruded into a very personal area, quite frankly.

14         I have just four initial basic questions with you,

15  and then I want to talk to you a little bit about your form.

16         Would you automatically find for death without

17  fairly weighing the aggravating and mitigating factors if we

18  got to the second or penalty phase?

19         PROSPECTIVE JUROR NO. 22:  No, I wouldn't.

20         THE COURT:  Is there a substantial likelihood that

21  you would find for death without fairly weighing the

22  aggravating and mitigating factors if we got to the penalty

23  phase?

24         PROSPECTIVE JUROR NO. 22:  I don't believe so.

25         THE COURT:  Now, the opposite side of the coin,

1  would you automatically never find for death without fairly

2  weighing the aggravating and mitigating factors if we get to

3  the penalty phase?

4          PROSPECTIVE JUROR NO. 22:  No.

5          THE COURT:  Is there a substantial likelihood that

6  you would never find for death without fairly weighing the

7  aggravating and mitigating factors if we get to the second

8  stage?

9          PROSPECTIVE JUROR NO. 22:  No.

10          THE COURT:  Now, let me talk to you about your

11  questionnaire.

12          Could you turn back to the portion that we are

13  most interested in with all of you as jurors -- on Question

14  65, it says:

15          "65.  Are your views concerning the death penalty

16  such that, if you were to reach a penalty phase in this

17  case, you would have substantial difficulty in voting for

18  life imprisonment as the appropriate penalty?"

19          You marked "Yes."

20          Would you talk to me a little bit about that?

21          PROSPECTIVE JUROR NO. 22:  I guess it goes along

22  the lines you were just asking me.  An automatic death

23  penalty, no.

24          THE COURT:  Here we just changed the word.  We

25  used "substantial difficulty" or substantial likelihood.

1          PROSPECTIVE JUROR NO. 22:  I don't believe that I

2  would have a problem stopping at that point and deciding

3  which way to go, not having an automatic -- going in with

4  the first thought of it being the death penalty and only

5  that.

6          THE COURT:  It's a tough question, by the way.

7          PROSPECTIVE JUROR NO. 22:  It is.  I thought about

8  it only because of cases that have come up in the news and

9  things like that.  Yes, sometimes it is hard to stop and not

10  jump to conclusions or think there is one and only one way

11  to go.  I'm pro death penalty, but --

12          THE COURT:  I saw that in Question 61.

13          PROSPECTIVE JUROR NO. 22:  But not so much that I

14  am close-minded.  I have an open mind to it.  It is hard to

15  put in words.  You are right.

16          THE COURT:  It is, but eventually you understand

17  if we get to that second phase?

18          PROSPECTIVE JUROR NO. 22:  Yes.  Everything is

19  there, and we have to weigh it.

20          THE COURT:  Exactly.  I expect many jurors to

21  start into the case pro death penalty, others being opposed

22  to the death penalty, but when we get to that second phase,

23  we have got to get that jury pool -- we have got a lot of

24  cases that jurors can sit in, but we have to get to that

25  second phase with an open-minded jury regardless of whether

1    they are pro or against or whatever their initial readings

2    are.  They literally become a judge at that point.  You are

3    in a sense handing down the sentence.

4            On Question No. 77, I thought it was very helpful

5    to me personally, and I appreciate your telling me that you

6    are of Jewish background, and when the word "Aryan" is

7    brought up, you think of Hitler.

8            PROSPECTIVE JUROR NO. 22:  Yes.  Basically, that's

9    the first thought.

10           THE COURT:  And you have raised your family?  You

11   have been judge, jury, and executioner?

12           PROSPECTIVE JUROR NO. 22:  After I put that --

13   with my kids, I am the law.  I have done it alone, so

14   sometimes I am a mean mother.

15           THE COURT:  By that, you mean they appreciate mom

16   I take it.

17           PROSPECTIVE JUROR NO. 22:  Yes.  I am a single

18   mom.

19           THE COURT:  You have a hardship with five children

20   and no spouse, and you are working graveyard.  Let me just

21   say wow, w-o-w.  That's pretty hectic.

22           How are you going to be able to sit for nine

23   months?  First of all, you responded, and we thank you for

24   that, but by the same token, we are not trying to create a

25   hardship.

1          PROSPECTIVE JUROR NO. 22:  I can only cut down on

2   some of the hours.

3          You said it would be four days a week?

4          THE COURT:  Yes, four days a week, but sometimes

5   we will vary that.  Some days -- we will try for four days

6   every week mostly because the attorneys need to remain

7   focused, and it's hard for them to go five.  I used to

8   preside over five-day trials in the '80's, and they were

9   just too hard.  No. 2, I want to give them that day to

10   marshal their resources.  There day will just begin when all

11   of us recess at night.  I don't think the government or the

12   defense attorneys will get more than four or five hours of

13   sleep, so I am watching them carefully also.

14          I have got to watch the jurors, and what I can't

15   have is a surprise part way through where the employer comes

16   back and says we are going to fire you, or there are such

17   problems that all of a sudden I have to lose that juror.  We

18   will have alternates, but we'll only have --

19          PROSPECTIVE JUROR NO. 22:  I work graveyard.  I

20   start at 11:00, 11:00 to 7:00.  I do work weekends.  They

21   are two of my five-day workdays.

22          THE COURT:  You work from 11:00 in the morning --

23          PROSPECTIVE JUROR NO. 22:  11:00 at night until

24   7:00 the next morning.

25          THE COURT:  So you would come in here at 8:00?

1    PROSPECTIVE JUROR NO. 22:  Except my weekends, and

2    my weekends vary.

3    THE COURT:  Counsel --

4    I thank you for very much for replying to this,

5    but just a moment.  I wish all the jurors were as civic

6    minded as you are, but I need to talk to counsel for just a

7    moment.

8    Do I need to go any further?

9    MR. STEWARD:  No.

10    MR. WHITE:  No.

11    MR. EMMICK:  No.

12    THE COURT:  The government agrees, and the defense

13    agrees.

14    Could we have you wear a sign out in front of the

15    parking lot --

16    PROSPECTIVE JUROR NO. 22:  Believe it or not,

17    yesterday this was my surprise.

18    THE COURT:  Once we have got you, we have really

19    got you.  Oh, the Superior Court.  I spent 17 years over

20    there.  You can just ignore them.

21    PROSPECTIVE JUROR NO. 22:  This is my fifth one in

22    five years.

23    THE COURT:  I joke around about it, but I need to

24    be careful.  That was a joke for the record.

25    First of all, you have to respond.

1    We are going to thank and excuse you.  We won't
2  keep you any longer.  They have short cases over there,
3  usually four or five days, and you do have to obey the
4  summons, by the way.
5    PROSPECTIVE JUROR NO. 22:  I often wondered about
6  that, but I am not going to push my luck.
7    THE COURT:  Thank you very much.  If you would be
8  kind enough, would you give your questionnaire back to Lisa.
9    Counsel, stipulate for cause?
10    MR. EMMICK:  Yes.
11    MR. STEWARD:  Yes.
12    MR. WHITE:  Yes.
13    THE COURT:  Counsel have stipulated for cause.
14    You have a good day.
15    (Prospective Juror No. 22 excused.)
16    THE COURT:  Do we have 23?
17    MR. EMMICK:  If I might offer one thought before
18  we get to No. 23, yesterday we were thinking about how the
19  process went, and I have a very minor suggested adjustment.
20    THE COURT:  Sure.  Let me ask if we can improve
21  upon yesterday.
22    MR. EMMICK:  If we do get to the penalty phase,
23  there will be two options, the death penalty or life without
24  release.
25    THE COURT:  I have taken the literal code reading,

14

1    and I don't understand what the lesser sentence is that is

2    referred to.

3              MR. EMMICK:  I don't believe there is one referred

4    to.

5              THE COURT:  There is not.

6              MR. EMMICK:  In a sense that is the underpinning

7    for my suggestion.  When you ask the four core questions,

8    the third and fourth are whether you will automatically

9    never find the death penalty, or there is a substantial

10   likelihood that you will never find the death penalty.

11             THE COURT:  Would you automatically find for death

12   with fairly weighing --

13             MR. EMMICK:  My suggestion or thought for your

14   consideration is whether or not we can modify it so that it

15   says never find life without possibility of release or a

16   substantial likelihood that you will find life without

17   possibility of release without considering those factors?

18   You won't have the awkwardness of having automatically never

19   and substantial likelihood never, which I think cause some

20   of the jurors to be a little confused.

21             So, in a sense, what I am suggesting is that the

22   first two be directed at this death penalty option and the

23   second two be directed at the life without possibility of

24   release option.  I think it's clearer, and in a way, it

25   better parallels No. 65, which talks about life without the

1    possibility of release.

2            THE COURT:  Are you suggesting that I take them in

3    categories then --

4            MR. EMMICK:  Yes.

5            THE COURT:  -- of automatic and substantial

6    likelihood and just change the order around?

7            MR. EMMICK:  Well --

8            THE COURT:  Let me read it to you for a moment.

9    Then you can write visually for a moment.

10           THE COURT:  "Would you automatically find for

11   death without fairly weighing the aggravating and mitigating

12   factors?"

13           "Would you automatically never find for death

14   without fairly weighing the aggravating and mitigating

15   factors?"

16           Now, the only reason I have used automatic even

17   though it's cumbersome is because that's what the case law

18   was originally designed to do.  Then it came out with the

19   substantial impairment, which with the stipulation of all

20   you thus far changed to substantial likelihood, but I will

21   use the actual words.

22           MR. EMMICK:  I am okay with automatic and with

23   substantial likelihood.  My suggestion is rather than saying

24   death penalty, death penalty, never death penalty, never

25   death penalty, we say death penalty, death penalty, life

1    without possibility of release, life without possibility of

2    release.  Then you don't have the --

3              THE COURT:  Write it down for me.

4              While he is writing it down, is there something

5    yesterday that we can improve on, something that you are

6    uncomfortable with, Mr. White?  If so, let's work together

7    and make sure we get what you all think would be

8    appropriate.  Remember this, though, the more cumbersome we

9    make it, the more confusing it becomes.  The essence of this

10   has to be simplicity.  If we make it cumbersome, you are

11   going to get into a myriad of problems.

12             MR. WHITE:  We are all agreed that it went very

13   well yesterday, and we're happy with the way it's being

14   done.

15             THE COURT:  Mr. Harris.

16             MR. HARRIS:  I just had a syntax suggestion.

17             THE COURT:  Why don't you work with Mr. White.  He

18   was happy, and I want to make sure you are happy.  Happy

19   means consenting, by the way.

20             Mr. Steward, are you now driving the ship?

21             MR. STEWARD:  No, Your Honor.  Mr. Fleming and I

22   think with one brain, and between the two of us, I think we

23   only have one brain.

24             THE COURT:  One of you two come over and take a

25   look at Mr. Emmick's suggestion.

1          Mr. Harris, and, Mr. White.

2          MR. WHITE:  We're fine.

3          THE COURT:  Why don't you step over and see what

4    Mr. Emmick is drafting and have an informal discussion.  If

5    you are all agree, I'm more than amenable to taking any

6    suggestions, but I want it to be stipulated.

7          You have to remember my emphasis is on death

8    because it's unweighted in a sense.  The reality has to be

9    that death can occur.  If there is a better way of conveying

10   that, so be it, but really the essence of the questions are

11   designed to make sure that we don't get these automatics and

12   now substantially impaired or likelihood jurors.

13          (Counsel conferring.)

14          THE COURT:  I haven't looked at the document

15   Mr. Emmick drafted yet.

16          What are your thoughts?

17          MR. WHITE:  I think I can speak for all of us.  We

18   are actually opposed to the change.  We are happy with the

19   way it went yesterday.

20          THE COURT:  Okay.  Let me consider that this

21   evening.  I want to keep moving today.  It may be a very

22   well-taken change.  If you don't mind, I will probably take

23   another look.  You may be absolutely right unless you see

24   error being created.  If you see error or some issue where

25   you feel your side is being prejudiced, then I will slow

1     down and take a half hour or so today.

2              MR. EMMICK:  I don't think it's a matter of error.

3     I think it's a matter of possibly being a little more clear

4     and possibly just separating the two options.

5              THE COURT:  Is there a bias, though, to your side

6     in the way it's being conducted at the present time?

7              MS. FLYNN:  The only thing we are concerned about

8     is a couple of times in your intro speech you say three

9     options:  death penalty, life with possibility of release,

10    or some other option.  I don't think there is some other

11    option.

12             THE COURT:  There is no other option that I know

13    of, and I'm just wondering if I can get a situation -- I

14    have been reading right from the code, and I don't really

15    understand -- in the second phase, there are only two

16    options.  There is no lesser sentence.

17             MR. FLEMING:  I think we agree with that, and we

18    would prefer that we limit it to those two options.

19             THE COURT:  Okay.

20             Now, would you like me to bring each one of the

21    jurors back from yesterday -- I would be more than happy --

22    if you think error is created or there is a bias to one side

23    and reread that portion?

24             MR. FLEMING:  I think probably with the Court's

25    permission we can do that during general voir dire with the

1    jurors that you already spoke to.

2             THE COURT:  Mr. White.

3             MR. WHITE:  That's fine.

4             THE COURT:  So if you want to rectify it, you can

5    do it at that time.  Is that satisfactory?

6             MR. FLEMING:  Yes.

7             MR. WHITE:  Yes.

8             THE COURT:  Same for the government?

9             MR. EMMICK:  Yes.

10            THE COURT:  Let's take that portion out.

11        Does anybody have any idea what the code means in

12   that regard?  I don't either.

13            No. 23, I didn't see anything on No. 23 that

14   caused me concern.

15            (Prospective Juror No. 23 enters courtroom.)

16            THE COURT:  Sir, come forward.  Thank you for your

17   patience.  If you would have a seat in the chair just across

18   from me.

19            First of all, I want to thank you for showing up

20   today.  Second, when we sent you that jury summons, we

21   estimated nine months.  You are not going to be in session

22   nine months, but the case could take place over a prolonged

23   period of time, and I was concerned that I didn't mislead

24   any of you, and you were angry with me later on.

25            Also, I wanted you to take a look at your

1    questionnaire, and if you had any changes or modifications,

2    I want to go over those with you before I ask any questions

3    today.

4              PROSPECTIVE JUROR NO. 23:  I changed No. 37.

5              THE COURT:  No. 37.  Thank you.

6              "37.  Have you, or anyone close to you, ever been

7    involved in any way in a drug-related crime?"

8              PROSPECTIVE JUROR NO. 23:  One of my closest

9    friends used to sell at the same place.  He never got caught

10   by law enforcement, but it was a crime.

11             THE COURT:  A close friend?

12             PROSPECTIVE JUROR NO. 23:  He was using and

13   selling even before.

14             THE COURT:  Anything else?

15             PROSPECTIVE JUROR NO. 23:  That's it.

16             THE COURT:  In cases where the government is

17   seeking the death penalty against the defendant, the law

18   provides for a two-stage trial.  In asking you some of the

19   questions I will ask you in a few moments, I don't want you

20   to assume that we will get to the second stage, but we

21   might.  If we did -- I just don't know yet, and neither do

22   you because the jury hasn't weighed the evidence yet, but if

23   we did, I need to be certain I ask you certain questions now

24   about your thoughts and feelings concerning the death

25   penalty, and I don't want you to assume that we are getting

1   there at this stage.   We sometimes call that second stage a

2   penalty phase.

3        In the first trial, the jury's job is the same as it

4   would be in any other criminal matter.   It's to decide if

5   the accused is guilty or not guilty.   If, and only if, the

6   jury returns a verdict of guilty against either defendant

7   Mr. Mills or defendant Mr. Bingham as to the counts alleged

8   against them which carry potential carry a sentence of

9   death, the same jury will have the task of considering the

10  penalty.   In that case, the jury may hear additional

11  evidence and arguments, and you will be asked to weigh

12  various aggravating and mitigating factors that I will

13  explain to you if we get to that second stage or penalty

14  phase trial.

15       Based upon these considerations, the jury by unanimous

16  vote shall recommend whether the defendant should be

17  sentenced to death or to life imprisonment without

18  possibility of release.   In any case in which the charge

19  carries a possible penalty of death, the law requires that

20  the jurors answer questions regarding their thoughts,

21  feelings, and opinions about the possible penalties, and

22  that's why we have intruded into your personal life.

23       I just have four questions for you, and, that is, would

24  you automatically find for death without fairly weighing the

25  aggravating and mitigating factors if we got to this penalty

1  phase trial?

2      PROSPECTIVE JUROR NO. 23:   It depends on the

3  evidence.

4      THE COURT:   Is there a substantial likelihood that

5  you would find for death without fairly weighing the

6  aggravating and mitigating factors if we got to this penalty

7  phase trial?

8      PROSPECTIVE JUROR NO. 23:   No.

9      THE COURT:   Now, on the opposite side, would you

10  automatically never find for death without fairly weighing

11  the aggravating and mitigating factors if we got to the

12  penalty phase?

13      PROSPECTIVE JUROR NO. 23:   No.

14      THE COURT:   Is there a substantial likelihood that

15  you would never find for death without fairly weighing the

16  aggravating and mitigating factors if we got to the penalty

17  phase?

18      PROSPECTIVE JUROR NO. 23:   No.

19      THE COURT:   Now, let me turn to each counsel.   I

20  don't have any further questions.

21      Mr. Steward.

22      MR. STEWARD:   Only that the explanation sheet

23  indicates a scheduling conflict.

24      THE COURT:   Okay.   Let's see -- what question is

25  that?

1   MR. STEWARD:  At the very end.

2   THE COURT:  A trip to Taiwan between February 10

3   and the 27th.  We are reassembling on the 22nd.

4   THE COURT:  I don't think I can turn the other

5   jurors around because we have 140 jurors.  If I could, I

6   would.  He would have to cancel his trip to Taiwan.

7   You already have got the trip planned?

8   PROSPECTIVE JUROR NO. 23:  Yes, actually because

9   my grandfather just had open heart surgery.

10   THE COURT:  Counsel, what are your thoughts?

11   MR. EMMICK:  We stipulate.

12   MR. WHITE:  We stipulate.

13   MR. STEWARD:  Yes, Your Honor.

14   THE COURT:  All the parties are stipulating.

15   Thank you very much.  If you would give your

16   questionnaire to Lisa, please.

17   (Prospective Juror No. 23 excused.)

18   THE COURT:  Let me stop a moment.  On paper, he

19   would have been a very good potential juror for both sides.

20   It's too bad that he isn't literally by stipulation one of

21   your alternates.  I think we are going to some very good

22   jurors who just don't fit in the time frame, but that's just

23   the best we can do.

24   Do we have 24?

25   THE CLERK:  We do.

24

1    THE COURT:  Would you ask No. 24 to come in.

2    MR. EMMICK:  Would you like us to identify some of

3    the questions?

4    THE COURT:  I have a couple of them actually.  One

5    of them I think would be No. 68.  I think I will just start

6    there.  There are others, too.

7    MR. EMMICK:  There are.

8    THE COURT:  Good morning.  How are you today?

9    PROSPECTIVE JUROR NO. 24:  Good morning.

10   THE COURT:  We refer to you as Juror No. 24.

11   First of all, I want to thank you for filling out

12   the questionnaire.  When you received the jury summons, we

13   estimated nine months.  I can assure you we won't be in

14   trial every day for nine months, but I wanted to

15   overestimate the time so that I didn't have any misgivings

16   on the jury part about how long it could take.  The total

17   duration may cover nine months, but there are going to be

18   numerous interruptions, numerous continuations, along the

19   way.

20   When you filled out the questionnaire, I have

21   given the opportunity for anyone who wanted to modify the

22   questionnaire or change an answer to do so in red ink.

23   Have you made any changes to your questionnaire?

24   PROSPECTIVE JUROR NO. 24:  Yes.

25   THE COURT:  Would you tell me which questions you

25

1    changed so counsel will know?

2            PROSPECTIVE JUROR NO. 24:   Question No. 63.   Quite

3    frankly, a couple of weeks ago when I read 62 and 63, for

4    the life of me I couldn't devine what the heck was being

5    asked.   I do suggest that whoever writes these up takes a

6    course in syntax.

7            THE COURT:   I certainly will.   I take full

8    responsibility.

9            PROSPECTIVE JUROR NO. 24:   Well, consider yourself

10   flagellated.   I'm sorry.   Today looking at 63 I became even

11   more confused, so I said -- I answered it simply by saying,

12   "I will not vote for a death penalty."

13           THE COURT:   Let's start there.   It may save a lot

14   of questions.

15           Counsel, could I just drive right to the heart of

16   this rather than go into the process?

17           MR. STEWARD:   Yes.

18           MR. WHITE:   Yes.

19           MR. EMMICK:   Yes.

20           THE COURT:   A case like this may have two

21   different trials.

22           PROSPECTIVE JUROR NO. 24:   Yes, I understand that.

23           THE COURT:   And the first trial would be like any

24   other criminal trial.   By asking the questions I have asked

25   most of the jurors and you, I never want you to assume that

1   we would get to the second trial, a penalty phase trial, in

2   front of the same jury, but if we did, it's necessary to

3   know the thoughts and feelings about the jury.

4          In that second trial, there would be only one of

5   two options.  You would in a sense become a sentencing jury.

6   You would be making a recommendation to the Court, and the

7   two options are life without the possibility of release or

8   death.

9          I think you category stated to me not only today

10  but in the form that you could never vote for death.  Is

11  that true?

12         PROSPECTIVE JUROR NO. 24:  That is absolutely

13  true.

14         THE COURT:  Now, I can spend a lot of time with

15  this, Counsel.

16         Mr. Steward, would you like to ask any questions?

17         MR. STEWARD:  No, Your Honor.

18         THE COURT:  Mr. White?

19         MR. WHITE:  No, Your Honor.

20         THE COURT:  The government?

21         MR. EMMICK:  We're satisfied.

22         THE COURT:  Is there a motion by the government?

23         MR. EMMICK:  There is.

24         THE COURT:  Is there any objection to that?

25         MR. STEWARD:  Submitted.

1          MR. WHITE:  Submitted.

2          THE COURT:  I'm going to thank and excuse you.

3   Thank you very much.

4          PROSPECTIVE JUROR NO. 24:  You have lifted a great

5   burden from my soul.

6          THE COURT:  Well, we have lots of cases.  We'll

7   get you back next time.

8          Would you be kind enough to give the form to Lisa.

9          (Prospective Juror No. 24 excused.)

10          THE COURT:  Do you know how I actually feel right

11   now?  I'm just kidding you.

12          Let's take No. 25 if No. 25 is here.

13          Question No. 64 was of some concern to me.

14          (Prospective Juror No. 25 enters courtroom.)

15          PROSPECTIVE JUROR NO. 25:  Good morning.

16          PROSPECTIVE JUROR NO. 25:  Good morning.

17          THE COURT:  Why don't you come on in and join us

18   today.  Would you be kind enough to have a seat right here

19   across the table from me.

20          First of all, thank you for filling out the jury

21   questionnaire.

22          Second, when we sent out the jury summons we

23   estimated nine months.  I can assure you that we will not be

24   in trial every day for nine months.  We overestimated the

25   time so no one had any misgivings because it could take a

1    long duration, but there are going to be numerous recesses

2    and continuances without explanation probably to the jury.

3            PROSPECTIVE JUROR NO. 25:  Thank you.

4            THE COURT:  We wanted to give each of you a chance

5    to go over the questionnaire and see if there are any

6    changes that you would like to make.

7            Have you modified the questionnaire?

8            PROSPECTIVE JUROR NO. 25:  A little bit.  I found

9    A few things.

10           THE COURT:  First of all, let me see for just a

11   second.

12           "5.  What type of a crime is seen most often?"

13           You have added "Robbery."

14           PROSPECTIVE JUROR NO. 25:  Yes.

15           THE COURT:  It's on Question No. 14(a), you put

16   for length of employment 27 years, and then that was the

17   last job.

18           PROSPECTIVE JUROR NO. 25:  Yes.

19           THE COURT:  On Question No. 16 under "Medicine,"

20   in the blank, you filled in "Nursing."

21           PROSPECTIVE JUROR NO. 25:  Yes.

22           THE COURT:  On Question 19, you have added,

23   "Danger to our country from terrorism, war, et cetera, and

24   the economy."

25           PROSPECTIVE JUROR NO. 25:  Yes.

1        THE COURT:  "22(c).  Was a verdict reached?"

2        Initially, you put "Yes."  Now you crossed that

3    out and put "Not applicable."

4        PROSPECTIVE JUROR NO. 25:  That's why I changed

5    it.  A verdict was reached, but I wasn't the foreperson, so

6    I couldn't answer the question.

7        THE COURT:  Let's leave that then.  A verdict was

8    reached.

9        PROSPECTIVE JUROR NO. 25:  Yes.

10       THE COURT:  On Question No. 30, you volunteer with

11   the Red Cross and served in Katrina, and you were down at

12   Lake Charles, Lousiana.

13       PROSPECTIVE JUROR NO. 25:  Yes.

14       THE COURT:  I have heard from some people that the

15   devastation is even greater than it shows on the news.

16       PROSPECTIVE JUROR NO. 25:  Oh, it is.  When you

17   see it in person -- I mean, I saw pictures and all that.

18   It's so much like what you see, but it's so much wider.  It

19   kind of makes me sad every time I see more about it.

20       THE COURT:  ?Have you ever known anyone else who

21   was involved in drugs??  You changed that from a "No" on

22   Question 35 to a "Yes."

23       PROSPECTIVE JUROR NO. 25:  Only the fact that I

24   work with patients who were on drugs.  It wasn't personal.

25       THE COURT:  So in your work in nursing?

1          PROSPECTIVE JUROR NO. 25:  Yes.

2          THE COURT:  On Question 41, you said "and at USC

3    Med Center."  You have added that?

4          PROSPECTIVE JUROR NO. 25:  Yes.

5          THE COURT:  "44.  Have you ever seen any TV

6    programs or movies about gangs?"

7          You say, "I probably have.  Cannot at this moment

8    recollect any particular one."

9          On 47, you added to your reading "Nursing

10   journals"?

11         PROSPECTIVE JUROR NO. 25:  Yes.

12         THE COURT:  On 48, you have just added "et

13   cetera."

14         "49.  How many hours of TV do you watch?"

15         You added "TV, two to three hours."

16         On 53, your preference is for biographies or some

17   novels.

18         PROSPECTIVE JUROR NO. 25:  Yes.

19         THE COURT:  On Question 64 where you previously

20   answered "Yes," you have changed that answer to "No," and

21   you have written, "I personally prefer not to see death

22   penalty imposed but would take all factors presented in

23   court of law into consideration by the evidence given."

24         PROSPECTIVE JUROR NO. 25:  Sometimes it's a little

25   hard to be specific on some of those questions.

1    THE COURT:  On 66, you previously had checked

2    "Yes."  You have changed that, and now you have put "No."

3    PROSPECTIVE JUROR NO. 25:  I don't remember the

4    question.

5    THE COURT:  "66.  Are your views expressed above,

6    as set forth in Questions 62 through 65, based on religious

7    considerations?"

8    You changed that to "No."

9    PROSPECTIVE JUROR NO. 25:  Yes, I did.

10    THE COURT:  "70.  Do you feel that the death

11    penalty is used too often?  too seldom?  randomly?"

12    You previously put "too often," and you left that,

13    and then you put "(in some areas of the USA) I understand

14    each state or locol or federal are approaching differently."

15    PROSPECTIVE JUROR NO. 25:  Yes.

16    THE COURT:  Thank you very much.  I don't see any

17    other changes.  Let me give you your questionnaire back.

18    Thank you for spending the time.

19    In cases where the government is seeking the death

20    penalty against the defendant, the law provides for a

21    two-stage trial.  However, I am going to ask you questions,

22    and I don't want you to assume that this trial will

23    necessarily reach the second stage for a penalty phase

24    trial.  We call the second stage trial a penalty phase

25    trial, and the same jury is involved in both trials.

1          In the first trial, the jury's job is the same as

2     it would be in any other criminal case, to decide if the

3     accused is guilty or not guilty.  If, and only if, the jury

4     returns a verdict of guilty against either defendant Mr.

5     Mills or defendant Mr. Bingham as to the counts alleged

6     against them which potentially carry a sentence of death,

7     the same jury will have the task of considering the penalty.

8     In that case, the jury may hear additional evidence and

9     arguments, and you will be asked to weigh various

10    aggravating and mitigating factors that I will explain to

11    you if we get to that second or penalty phase.

12          Based upon the jury's considerations, by unanimous

13    vote, the jury shall recommend whether the defendant shall

14    be sentenced to death or life imprisonment without the

15    possibility of release.  In any case where the charge

16    carries a possible penalty of death, the law requires jurors

17    to answer questions regarding their thoughts, feelings and

18    opinions about the possible death penalty, which is why we

19    have intruded into an area that we normally would never

20    inquire about.

21          My questions are relatively brief.

22          Would you automatically find for death without

23    fairly weighing the aggravating and mitigating factors if we

24    got to this second or penalty phase trial?

25          PROSPECTIVE JUROR NO. 25:  Would I

1   automatically --

2           THE COURT:  Would you automatically find for death

3   without fairly weighing the aggravating --

4           PROSPECTIVE JUROR NO. 25:  No, I wouldn't.

5           THE COURT:  I will change the standard a little

6   bit.

7           Is there a substantial likelihood that you would

8   find for death without fairly weighing the aggravating and

9   mitigating factors if we got to the second trial?

10           PROSPECTIVE JUROR NO. 25:  I still think you would

11   have to weigh the factors on both sides.

12           PROSPECTIVE JUROR NO. 25:  Let me change the

13   scenario just a little bit.

14           Would you automatically never find for death

15   without fairly weighing the aggravating and mitigating

16   factors?  Let me say it to you again.  Would you

17   automatically never find for death without fairly weighing

18   these aggravating and mitigating factors?

19           PROSPECTIVE JUROR NO. 25:  I think I should weigh

20   them.  I still think it should be weighed.

21           PROSPECTIVE JUROR NO. 25:  Is there a substantial

22   likelihood that you would never find for death without

23   fairly weighing the aggravating and mitigating factor?

24           PROSPECTIVE JUROR NO. 25:  No.

25           THE COURT:  Now, you stated in the questionnaire

1    that you are personally opposed to the death penalty because

2    there has been occasions where an innocent person has been

3    executed.   You think a defendant can be punished with life

4    without possibility of parole, and it may be a greater

5    punishment.

6              I expect that I am going to get throughout the

7    discussion people who are what's been labeled pro death or

8    against death.   I don't think that that's the relevant

9    consideration unless it causes them to automatically reach a

10   conclusion or there is a substantial likelihood that they

11   would reach a conclusion without fairly weighing these

12   aggravating and mitigating factors.

13             PROSPECTIVE JUROR NO. 25:   I think you should

14   always weigh the mitigating factors.   At least, that's my

15   opinion.

16             THE COURT:   And would you weigh the aggravating

17   factors?

18             PROSPECTIVE JUROR NO. 25:   And the aggravating,

19   yes.

20             THE COURT:   Okay, just so I'm certain, do you have

21   any questions, Mr. Steward?

22             MR. STEWARD:   No, Your Honor.

23             THE COURT:   Mr. White?

24             MR. WHITE:   No, Your Honor.

25             THE COURT:   The government?

1          MR. EMMICK:  Yes, we do have a few more questions

2     as follow-ups.

3          THE COURT:  Okay.

4          MR. EMMICK:  My name is Mike Emmick.  I'm a

5     government attorney.

6          I wonder if you could tell us a little bit about

7     why you oppose the death penalty.

8          THE COURT:  In other words, your religious grounds

9     or moral grounds?

10          PROSPECTIVE JUROR NO. 25:  Well, as I said in my

11     answer before, I feel like many mistakes have been made in

12     the past, so that weighs on my -- I personally don't

13     particularly like the death penalty, but I suppose in some

14     cases, there is no other answer, so generally, I could

15     accept the death penalty if there was a strong reason for

16     it.

17          MR. EMMICK:  In Question No. 76, you were talking

18     about your feelings having sat on criminal juries in other

19     cases.

20          THE COURT:  Why don't read that question to her.

21          Would you turn to Question 76 more a moment?

22          MR. EMMICK:  I will read it outloud.

23          "76.  What is it about yourself that makes you

24     feel you could be a fair and impartial juror?"

25          You said, "I have served on many juries and always

1    go in with an open mind.  I have had to rule with fellow

2    jurors against the defendant, although I felt sad to have to

3    make that particular decision."

4            The question that I wanted to ask based on that is

5    that I wonder whether you will feel sadder if the facts and

6    the evidence indicate to you that death is appropriate and

7    whether that sadness would influence you in a way that would

8    have an effect on your decision?

9            MR. WHITE:  I'm going to object to the question.

10   I don't think it's relevant.

11           THE COURT:  I'm going to sustain it.

12           MR. EMMICK:  Would you be sadder in view of the

13   fact that it's a death penalty that you are considering?

14           PROSPECTIVE JUROR NO. 25:  Well, I think I would

15   have some normal feeling in that direction, yes, but I could

16   still I think make the decision that needs to be made

17   depending on what the factors are, but I personally would

18   feel sad about it, yes, I think so in general.

19           MR. EMMICK:  We are satisfied, Your Honor.

20           THE COURT:  Thank you.

21           Satisfied, Mr. White?

22           MR. WHITE:  Yes.

23           THE COURT:  Mr. Steward?

24           MR. STEWARD:  Yes.

25           THE COURT:  We are going to ask you to come back

1   on February 22.  We are going to write that down for you.

2   We are going to make that at 8:30 in the morning.  Let me

3   explain what is going to happen.  We are bringing back all

4   the jurors who are acceptable to both sides, so it's going

5   to be a large jury pool, and in the next two days, we

6   believe we are going to get a jury, Wednesday and Thursday.

7   Maybe we will go over to Friday, but I think counsel will

8   know you well enough to go through the process pretty

9   quickly, and we are going to get a number of alternates

10  also, and that will be our jury.  So you will know if you

11  are one of those selected jurors or not very quickly.

12          So thank you very much.  If you could return the

13  questionnaire to Lisa.

14          You are also supposed to call us on the 21st, but

15  don't worry about that.  No matter what, come the 22nd.  I

16  never trust the mechanical voice.

17          PROSPECTIVE JUROR NO. 25:  They usually even call

18  us personally the day before, and then we call in again.

19  They keep reminding us.

20          THE COURT:  We are going to call and make sure we

21  keep reminding everybody, but it's going to be 8:30 on

22  Wednesday no matter what.

23          Thank you very much.  It's been a pleasure meeting

24  you.

25          (Prospective Juror No. 25 exits courtroom.)

1      THE COURT:  Counsel, with 26, I didn't see

2  anything filled out on Question No. 14.  I thought in

3  reading the questionnaire that the person had obviously made

4  a mistake on 62, that they didn't really understand the

5  question.  This isn't a person who -- it appears at least on

6  the face of the questionnaire that the person is fairly --

7  pretty much right down the middle at least on the paper.  I

8  can confuse the issue more if you like by going back to 62,

9  but it just seems to me by the other answers that I didn't

10  intend to inquire.

11      Now, after the questions, I'll turn to each of

12  you, and if you really want to, we can backtrack, so we

13  always have the option.

14      Let's bring out No. 26, please.

15      (Prospective Juror No. 26 enters courtroom.)

16      THE COURT:  Good morning.  How are you today?

17  Would you come over and join me.  It's nice meeting you.

18      PROSPECTIVE JUROR NO. 26:  You, too.

19      THE COURT:  Why don't you have a seat here in this

20  chair.

21      Let me begin first of all by thanking you for

22  filling out the questionnaire.

23      PROSPECTIVE JUROR NO. 26:  Certainly.

24      THE COURT:  Second, when we sent you that jury

25  summons, we estimated nine months.  I'm being very cautious.

1   The case will not take nine months of your life in trial,

2   but it could cover a long period of time.   There may be

3   numerous interruptions and continuances even without

4   explanation to the jury, and I apologize to you beforehand.

5           You know, in my mind, I have got to watch all the

6   attorneys and make certain they are prepared.   Part way

7   through they probably have to get a gasp of air in the sense

8   that they have a lot of witnesses on each side and a lot

9   that they are going to be involved with.   Their days will

10  just begin, frankly, when all of us go home.   The witnesses

11  are coming from different locations.   There is a lot of

12  things that could happen, and you just won't get an

13  explanation.   There will just be a continuance.   Sometimes I

14  can't negotiate the dates with people.   I'll just set a

15  time.

16          I want to thank you for responding to the

17  questionnaire.

18          Now, we wanted to give each juror time to go

19  through this questionnaire and see if there was anything

20  that they wanted to change or modify.   If so, could you just

21  tell us the question.

22          PROSPECTIVE JUROR NO. 26:   On page one, basically

23  just different communities I have lived in.   After thinking

24  about it, I probably omitted them, just forgot really.

25          THE COURT:   So you have North Hollywood, North

40

1    Ridge, Walnut.

2              PROSPECTIVE JUROR NO. 26:  And I can add also

3    Pomona, Milwaukee.

4              THE COURT:  Excellent.

5              PROSPECTIVE JUROR NO. 26:  Moving down, I just

6    added a couple of other things for No. 9, my spouse.  I

7    added "hiking and movies."

8              Moving to the second page, I mentioned on No. 14

9    that I was unemployed at this time.  I had not done that

10   before.  I just put "NA."  I just wanted to explain that.

11             Then also under (d), I did list other types of

12   jobs that I have had.

13             THE COURT:  Give me an example.

14             PROSPECTIVE JUROR NO. 26:  Laboratory medical

15   assistant, receptionist, hotel reservations, advertising

16   window display.

17             THE COURT:  Thank you.

18             PROSPECTIVE JUROR NO. 26:  On No. 49, I just

19   mentioned there how many hours a day.  Looking over there, I

20   realized I hadn't filled that out.  I just put one or two

21   hours.  I am not a real TV watcher.

22             Back on No. 72 --

23             THE COURT:  "If a person is sentenced to death, do

24   you believe that in fact the person will be put to death?"

25             PROSPECTIVE JUROR NO. 26:  I had put "No," but I

1  have also added "unsure."

2          That would be it.

3          THE COURT:  Thank you very much.

4          PROSPECTIVE JUROR NO. 26:  You're welcome.

5          THE COURT:  Not so fast, though.  You're not

6  leaving.

7          PROSPECTIVE JUROR NO. 26:  I thought I was done.

8          THE COURT:  I saw you getting your purse and --

9  I'm just joking with you.

10         In cases where the government is seeking the death

11  penalty against a defendant, the law provides for a

12  two-stage trial in front of the same jury.  However, when I

13  ask the following questions, I don't want you to assume that

14  this trial will necessarily reach this second stage, but if

15  it did, it's important that I ask you questions now about

16  your thoughts and feelings concerning the death penalty.

17         In the first trial, the jury's job is the same as

18  it would be in any other criminal case, to decide if the

19  accused is guilty or not guilty.  If, and only if, the jury

20  returns a verdict of guilty against either defendant Mr.

21  Mills or defendant Mr. Bingham as to the counts alleged

22  against them which potentially carries a sentence of death,

23  the same jury will have the task of considering the penalty

24  in that second or penalty phase trial.  We oftentimes refer

25  to it as the penalty phase trial.  In that case, the jury

1  will hear additional evidence and arguments, and you will be

2  asked to weigh various aggravating and mitigating factors

3  that I will explain to you if we get to that second trial.

4       Based upon these considerations, the jury by

5  unanimous vote shall recommend whether the defendant should

6  be sentenced to death or to life imprisonment without

7  possibility of release.

8       Now, in any case in which the charge carries a

9  possible penalty of death, the law requires that jurors

10 answer questions regarding their thoughts, feelings and

11 opinions about the possible penalties.  That's why there is

12 a significant intrusion by us into your personal thoughts,

13 which are not really any of our concern otherwise.

14      My questions are really very few.

15      Would you automatically find for death without

16 fairly weighing the aggravating and mitigating factors if we

17 got to this second trial or penalty phase trial?

18      PROSPECTIVE JUROR NO. 26:  Absolutely not.  I

19 would weigh all the evidence, and at that time -- everything

20 that was posed to the Court.

21      PROSPECTIVE JUROR NO. 26:  Is there a substantial

22 likelihood -- I have changed the standard from automatic to

23 substantial likelihood.  Is there a substantial likelihood

24 that you would find for death without fairly weighing the

25 aggravating and mitigating factors?

1          PROSPECTIVE JUROR NO. 26:   No.

2          THE COURT:   Let me reverse that for a moment and

3    take the opposite of the coin.

4          Would you automatically never find for death

5    without fairly weighing the aggravating and mitigating

6    factors?

7          PROSPECTIVE JUROR NO. 26:   No.

8          THE COURT:   Is there a substantial likelihood that

9    you would never find for death without fairly weighing the

10   aggravating and mitigating factors?

11         PROSPECTIVE JUROR NO. 26:   No.

12         THE COURT:   I don't think that I have any further

13   questions.

14         Counsel, you can inquire about Question 62 if you

15   would like to.   It's up to you.

16         MR. STEWARD:   No, Your Honor.

17         THE COURT:   Mr. White?

18         MR. WHITE:   No, thank you, Your Honor.

19         THE COURT:   Mr. Emmick?

20         MR. EMMICK:   Nothing from the government, Your

21   Honor.

22         THE COURT:   Is everyone satisfied?

23         MR. STEWARD:   Yes, Your Honor.

24         MR. WHITE:   Yes, Your Honor.

25         MR. EMMICK:   Yes, Your Honor.

```
 1              THE COURT:  Ms. Flynn?

 2              MS. FLYNN:  It's fine.

 3              THE COURT:  We are going to invite you to come

 4    back on Wednesday, February 22, and we are also going to ask

 5    you to call the clerk on the 21st, but I don't trust that

 6    mechanical voice.  So we are going to resume February 22 no

 7    matter what anybody tells you at 8:30 in the morning.  If

 8    you would be kind enough to leave your questionnaire with

 9    the clerk.

10              Also, on that day, we are bringing all of you back

11    that both sides are accepting, and that's when we really

12    start the jury.  We will get a jury I think within two days

13    on Wednesday and Thursday.  We could go to Friday because of

14    the number of people, but you will know if you are a juror

15    or alternate in that period of time.  Thank you very much.

16              (Prospective Juror No. 26 exits courtroom.)

17              THE COURT:  I didn't see anything significant on

18    Juror No. 27 except on question -- there are some personal

19    opinions, but I didn't see anything --

20              MR. STEWARD:  73, Your Honor.

21              THE COURT:  The multiple murders.

22              Would you ask 27 to join us, please.

23              (Prospective Juror No. 27 enters courtroom.)

24              THE COURT:  Good morning.  How are you, sir?  Come

25    and join us.
```

1        PROSPECTIVE JUROR NO. 27:  Okay.

2        THE COURT:  Have a seat over here.

3        First of all, I want to thank you for filling out

4   the jury questionnaire, and we tried to give sufficient time

5   if you wanted to change the questionnaire to make any

6   notations in red ink so we knew what the changes were.

7        Have you made any changes?

8        PROSPECTIVE JUROR NO. 27:  No.

9        THE COURT:  Second, when we sent you that jury

10  summons, we said we were going to take you for nine months

11  in a jury trial.  I can assure you that this is not going to

12  be a nine-month trial.  I wanted to be cautious and

13  overestimate the time so that you weren't concerned that I

14  somehow misled you.  There are going to be numerous

15  continuance and probably interruptions without explanation

16  to the jury, but I am making sure that each side can marshal

17  their witnesses, and they have got to remain focused.  Their

18  day will just start when all of us go home.

19       Let me go over a couple of thoughts with you for

20  just a moment.

21       In cases where the government is seeking the death

22  penalty against a defendant, the law provides for a

23  two-stage trial in front of the same jury.  When I ask you

24  the questions I am about to ask you, I don't want you to

25  assume that this trial will necessarily reach this second

1    stage.  We sometimes call it a penalty phase, this second

2    stage.  In the first trial the jury's job is the same as it

3    would be in any criminal case, to decide if the accused is

4    guilty or not guilty.  If, and only if, the jury returns a

5    verdict of guilty against either Mr. Mills, the gentleman

6    here, or Mr. Bingham, the gentleman here, as to the counts

7    alleged against them which will potentially carry a sentence

8    of death, the same jury will have the task of considering

9    the penalty.  In that case, the jury may hear additional

10   evidence and arguments and would be asked to weigh various

11   aggravating and mitigating factors in the second penalty

12   trial, and I will explain what those factors are to you if

13   we ever get to that second phase trial.

14          Based upon these considerations, the jury in a

15   second penalty phase trial by unanimous vote shall recommend

16   whether the defendant shall be sentenced to death or to life

17   imprisonment without the possibility of release.

18          Now, my questions are very, very few to you, sir.

19          Would you automatically find for death without

20   fairly weighing the aggravating and mitigating factors if we

21   get to a second or penalty phase trial?

22          PROSPECTIVE JUROR NO. 27:  Would I?

23          THE COURT:  Yes.

24          Would you automatically find for death --

25          PROSPECTIVE JUROR NO. 27:  Not automatically.

1      THE COURT:  Is there a substantial likelihood -- I

2   have changed that from automatic now to substantial

3   likelihood.  Is there a substantial likelihood that you

4   would find for death without fairly weighing these

5   aggravating and mitigating factors if we got to the penalty

6   phase?

7      PROSPECTIVE JUROR NO. 27:  No.  I would have to

8   weigh them.

9      THE COURT:  Now I am going to change it to the

10   opposite side.

11      Would you automatically never find for death

12   without fairly weighing these aggravating and mitigating

13   factors?

14      PROSPECTIVE JUROR NO. 27:  No.

15      THE COURT:  Is there a substantial likelihood that

16   you would never find for death without fairly weighing the

17   aggravating and mitigating factors?

18      PROSPECTIVE JUROR NO. 27:  No.

19      THE COURT:  On Question No. 73, would you turn

20   there for just a moment?  It states:

21      "73.  Do you believe anyone who has committed

22   multiple murders should automatically, without consideration

23   of any other circumstances, be sentenced to death?"

24      You checked "Yes."

25      THE COURT:  Now, that may be a factor, but there

1    may be mitigating factors, and it would be called upon you

2    to weigh and balance those.

3                So my question is are you capable of weighing and

4    balancing these aggravating and mitigating factors fairly,

5    or would you automatically find for death if in the first

6    phase you heard let's say two or more murders that one or

7    more of the defendants had committed?

8                PROSPECTIVE JUROR NO. 27:  What was the question

9    again?

10               THE COURT:  Would you fairly weigh those

11   aggravating and mitigating factors, or would you

12   automatically find for death?

13               PROSPECTIVE JUROR NO. 27:  I would weigh them.  I

14   probably should have changed that.

15               THE COURT:  Let me have some follow-up questions,

16   so I am not concerned.

17               Mr. White.

18               MR. WHITE:  Good morning, sir.

19               PROSPECTIVE JUROR NO. 27:  Good morning.

20               MR. WHITE:  Sir, I would ask you to turn to

21   Question No. 61.  It's on the page before.  When asked about

22   your general feelings regarding the death penalty, you said,

23   "Yes, if the crime fits."

24               Do you have in mind certain kinds of crimes that

25   you think should get the death penalty?

```
 1              THE COURT:  The emphasis is on should, not
 2   automatically --
 3              MR. WHITE:  I would like to say should.
 4              MR. WHITE:  Do you have certain kinds of crimes
 5   that you had in mind when you answered No. 61?
 6              PROSPECTIVE JUROR NO. 27:  Yes.  If somebody
 7   committed murder, I think they should -- if they are found
 8   guilty of it, they should get the death penalty.  Sure.
 9              MR. WHITE:  I would assume that when you say
10   commit murder you are talking about an intentional,
11   deliberate killing; is that correct?
12              PROSPECTIVE JUROR NO. 27:  Correct.
13              MR. WHITE:  Under that -- if that's the crime that
14   a person has been found guilty of, do you believe under that
15   circumstance that a person should get the death penalty?
16              PROSPECTIVE JUROR NO. 27:  I do.
17              MR. WHITE:  Now referring you back to No. 73 and
18   asking 73 -- asking you if you find a person guilty of more
19   than one -- two or more -- of intentional killings, do you
20   think that's the kind of case that in your mind should
21   automatically be a death penalty case?
22              PROSPECTIVE JUROR NO. 27:  Yes.
23              MR. WHITE:  Now, the question is -- the judge
24   talked about fairly weighing factors in aggravation and
25   mitigation.  The question we have for you is if you find a
```

1   person guilty -- if you are convinced beyond a reasonable

2   doubt that they committed two or more intentional,

3   deliberate murders, would factors in aggravation or

4   mitigation be the kind of thing that could cause you to

5   change your mind and decide that life without the

6   possibility of release is the appropriate punishment rather

7   than death?  Is that too long a question?

8            PROSPECTIVE JUROR NO. 27:  No.  I believe in the

9   death penalty.

10            Does that answer your question?

11            MR. WHITE:  In that circumstance where you found

12   somebody guilty of two or more intentional premeditated

13   murders, you are not going to be interested in factors in

14   mitigation or aggravation?  Is that correct?

15            PROSPECTIVE JUROR NO. 27:  That's correct.

16            MR. WHITE:  Nothing further.

17            THE COURT:  Mr. Steward?

18            MR. STEWARD:  No, Your Honor.

19            THE COURT:  Mr. Emmick?

20            MR. EMMICK:  Ms. Flynn.

21            THE COURT:  Ms. Flynn.

22            MS. FLYNN:  Putting aside your beliefs on the

23   death penalty that -- you seem to have an inclination of

24   being pro death penalty.  Could you put those beliefs aside

25   and weigh aggravating and mitigating factors in deciding

1   whether the death penalty or life without the possibility of

2   release should be imposed?

3               PROSPECTIVE JUROR NO. 27:  No, I don't think so.

4               MS. FLYNN:  Nothing further.

5               THE COURT:  Thank you very much.

6               Is there a motion?

7               MR. STEWARD:  Yes, Your Honor.

8               THE COURT:  Is there opposition?

9               MR. EMMICK:  We will submit.

10              THE COURT:  Sir, we are going to thank you and

11  excuse you.  We want to thank you for your very candid

12  answers with us.  If you would be kind enough to give the

13  questionnaire to the clerk.  You don't have to come back and

14  see us.  We are going to get you on another case, though.

15  Thanks a lot.  It was a pleasure meeting you.

16              (Prospective Juror No. 27 excused.)

17              THE COURT:  No. 28, I didn't see anything on 28

18  until -- I didn't see anything on 28.

19              MR. EMMICK:  We have nothing, Your Honor.

20              (Prospective Juror No. 28 enters courtroom.)

21              THE COURT:  How are you?  Come and join us.  It's

22  nice meeting you.  It's a pleasure.  Why don't you have a

23  seat across the table from me.

24              First of all, I want to thank you for filling out

25  the questionnaire.

```
 1          Secondly, when you received the jury summons, we

 2     estimated nine months.  I have been overly cautious in that

 3     regard.  I don't believe the case will take nine months.

 4     Certainly if it does, it may take place over a long duration

 5     of time.  There are going to be numerous continuances.

 6     Unfortunately, you won't get an explanation from the Court,

 7     but I'm watching how counsel are holding up, and there are

 8     witnesses are coming from numerous locations.

 9          I wanted to give each of the jurors time to fill

10     out this questionnaire again or to look at it again.

11          Have you made any modifications or changes?

12          PROSPECTIVE JUROR NO. 28:  Yes.

13          THE COURT:  We asked you to do that in red ink.

14          Could you go through those changes?

15          PROSPECTIVE JUROR NO. 28:  There were just two

16     changes.  No. 28.

17          THE COURT:  "28.  Have you or any family members

18     or close friends ever had a positive experience involving

19     the police or other law enforcement agencies?"

20          PROSPECTIVE JUROR NO. 28:  The recovery of

21     personal items that were stolen.

22          No. 67.

23          THE COURT:  "67.  Are your views expressed above

24     as set forth in 62 through 65 based on other reasons such as

25     social or political considerations?"
```

1              You checked "No."

2              PROSPECTIVE JUROR NO. 28:   The change is a "Yes."

3    Really the explanation is after reviewing No. 66 it seemed

4    to me it either needed to be yes for one of those two

5    questions.

6              THE COURT:   Okay.

7              Let me begin by saying that in cases where the

8    government is seeking the death penalty against a defendant,

9    the law provides for a two-stage trial in front of the same

10   jury.   This second stage we often refer to or you will hear

11   us refer to it as a penalty phase trial.   However, in asking

12   you some of the questions I am about to ask you, I don't

13   want you to assume by my questions that I believe that we

14   are going to get to a second trial.   I just don't know.

15             In the first trial, the jury's job is the same as

16   it would be in any other criminal case, to decide either the

17   guilty or innocence of the defendant or defendants.   If, and

18   only if, the jury returns a verdict of guilty against either

19   defendant Mr. Mills or defendant Mr. Bingham as to the

20   counts alleged against them which potentially carry a

21   sentence of death, then the same jury will have the task of

22   considering the penalty.   In that case, the jury may hear

23   additional evidence and arguments that will -- you will be

24   asked to weigh various aggravating and mitigating factors,

25   and I will explain those to you at that time if we get to

1   this second penalty phase trial.

2          Based upon those considerations in the second or

3   penaly phase trial, by unanimous vote, the jury shall

4   recommend whether the defendant should be sentenced to death

5   or life without the possibility of release.

6          Now, in any case where the charge carries the

7   possible penalty of death, the law requires that jurors

8   answer questions regarding their thoughts, feelings and

9   opinions about the possible penalties.  That's why we have

10   intruded into the very private and personal part of your

11   life.  Otherwise, this is of no concern to us.

12          I just have four basic questions that you probably

13   answered on the sheet, but I wanted the opportunity to speak

14   with each of you over the next couple of days individually

15   because I don't want other jurors to pick up other jurors'

16   answers, and I don't think it's other jurors' business,

17   quite frankly, about this personal discussion.

18          Would you automatically find for death without

19   fairly weighing the aggravating and mitigating factors if we

20   get to a penalty phase trial?

21          PROSPECTIVE JUROR NO. 28:  No.

22          THE COURT:  Is there a substantial likelihood that

23   you would find for death without fairly weighing the

24   aggravating or mitigating factors if we got to the second

25   trial?

1          PROSPECTIVE JUROR NO. 28:  No.

2          THE COURT:  Now the opposite side of the question,

3    would you automatically never find for death without fairly

4    weigh the aggravating and mitigating factors in a second

5    phase trial?

6          PROSPECTIVE JUROR NO. 28:  No.

7          THE COURT:  Is there a substantial likelihood that

8    you would never find for death without fairly weighing the

9    aggravating and mitigating factors?

10         PROSPECTIVE JUROR NO. 28:  No.

11         THE COURT:  Thank you very much.

12         Let me make sure counsel doesn't have any

13   questions.

14         Any questions?

15         MR. STEWARD:  No, Your Honor.

16         THE COURT:  Mr. White?

17         MR. WHITE:  No, Your Honor.

18         THE COURT:  Mr. Emmick?

19         MR. EMMICK:  No, Your Honor.

20         THE COURT:  We are going to ask you to return to

21   us on February 22 -- it's a Wednesday -- at 8:30 in the

22   morning.  I don't care what the mechanical voice says that

23   calls you.  I don't trust that mechanical voice.  I'm just

24   kidding you.  We are going to give you a slip in that

25   regard.  It will say to call in, and we will ask you to call

1   in, but we are starting February 22 no matter what at 8:30.

2           Now, here is what will happen, though.  You are

3   going to join a group of jurors who have gone through the

4   same process that both sides are finding acceptable.  That's

5   when we really get the jury, so from that, we will select 12

6   jurors and maybe 8 to 12 alternates, but we believe because

7   of this process that we are going through now that can get

8   the jury Wednesday and Thursday, maybe at the outside

9   Friday, but you will know who is sitting at that time.

10          Thank you very much.  Would you be kind enough to

11  return the questionnaire to Lisa.

12          PROSPECTIVE JUROR NO. 28:  Thank you.

13          (Prospective Juror No. 28 leaves courtroom.)

14          THE COURT:  Juror No. 29, the only oddity I

15  noticed was 73 and 68.

16          MR. EMMICK:  Your Honor, I think he indicated he

17  has back problems.

18          THE COURT:  Remind me of that.

19          (Prospective Juror No. 29 enters courtroom.)

20          THE COURT:  Good morning.  How are you?  Why don't

21  you come and join me.  If you would be kind enough to have a

22  seat in this chair right across from me.  How are you today?

23          PROSPECTIVE JUROR NO. 29:  Fine.

24          THE COURT:  First of all, I want to thank you very

25  much for filling out the questionnaire.

1    PROSPECTIVE JUROR NO. 29:  All right.

2    THE COURT:  I wantED to also provide the

3    opportunity for you and the other jurors if you had

4    modifications or changes to make those in red ink before I

5    ask you a few questions.

6    Second, I want to say to you that when you

7    received the jury summons is stated nine months.  I am being

8    overly cautious.  I don't believe the case is going to take

9    nine months, but it could be over a long duration of time.

10   There may be numerous continuances where I am just not

11   allowed to give the jury any explanation.  You are just out

12   of session for a week or three weeks or a month.  I just

13   don't know yet.  As such, I wanted to be cautious.  I didn't

14   want you to be misled.

15   Have you made any changes?  If so, I would like to

16   go over the number of the questions so the attorneys will

17   know what those changes are on the questionnaire.

18   PROSPECTIVE JUROR NO. 29:  Yes.  The changes -- I

19   just added to 19.  I have "Family, money, and work."

20   20, God and family basically.

21   23, I was thinking more current, but in like 1970,

22   I tried out for the Orange County Sheriff's Department.  I

23   don't know how far I got in that because I was a student in

24   college, and they wanted -- they didn't want a student, so I

25   don't know how far that went.

1          THE COURT:  Could I ask you about 27 for just a

2     moment?

3          PROSPECTIVE JUROR NO. 29:  Ask it.

4          THE COURT:  On 27, was that your brother?

5          PROSPECTIVE JUROR NO. 29:  That was my brother.

6     My brother -- my brother was convicted and sentenced for

7     drugs, trafficking or selling.  I'm not sure which one.  He

8     was incarcerated in I think Lompoc for like a year.

9          What happened here is he was having dinner.  He

10    had been out a couple of years.  He was having dinner in

11    Anaheim, and he had an aneurysm attack.  The police came in

12    and handcuffed him in the restaurant.  He was unconscious.

13    They pulled him out and threw him in the backseat of the

14    car, and two hours later he died.

15         THE COURT:  Died from the aneurysm?

16         PROSPECTIVE JUROR NO. 29:  He died from

17    asphyxiation, and that was caused by the aneurysm that --

18         THE COURT:  I'm sorry to inquire into that, but

19    the Ninth Circuit --

20         PROSPECTIVE JUROR NO. 29:  Yes.

21         THE COURT:  What's the next area that you changed?

22         PROSPECTIVE JUROR NO. 29:  33, clarification,

23    "Yes."  At a college party, somebody pointed a gun at me.

24    Nothing happened.

25         34, at a park, somebody pulled a knife on me.

1   They wanted my money.  No big thing.

2          36, I said "No," but when I go back to the history

3   on that, I was out of high school.  My best friend got

4   involved in heroin.  I basically kept away from him when he

5   got involved in heroin?

6          THE COURT:  Did your brother also have a drug

7   problem initially?

8          PROSPECTIVE JUROR NO. 29:  No -- marijuana.  I

9   don't think marijuana is a drug problem, but -- that's my

10  opinion.  It wasn't that much.

11         48, Channel 4 plus other channels.

12         75, basically my brother died at police hands.  I

13  just learned about a week ago -- over the holidays, I have

14  located family and cousins and stuff like like that.  I

15  found out one of my cousins is in San Quentin and has been

16  there like ten years.  I don't really know him, but I

17  thought I had to bring that up.

18         THE COURT:  Thank you very much.

19         In cases where the government is seeking the death

20  penalty against a defendant, the law provides for a

21  two-stage trial in front of the same jury.  When I ask you

22  these questions, I don't want you to necessarily assume that

23  we will get to this second stage in front of the same jury.

24  We call that a penalty phase trial, but if we did, I'm

25  required to required by law to ask questions now.

1        In the first trial, the jury's job is the same as

2   it would be in any other criminal case, to decide if the

3   accused is guilty or not guilty of the offense.  If, and

4   only if, the jury returns a verdict of guilty against either

5   defendant Mr. Mills or defendant Mr. Bingham as to the

6   counts alleged against them which potentially will carry a

7   sentence of death, the same jury will have the task of

8   considering the penalty.  In that case, the jury may hear

9   additional evidence and arguments and will be asked to weigh

10  various aggravating and mitigating factors that I will

11  explain to you if we get to that second penalty phase trial.

12       Based upon these considerations, the jury by

13  unanimous vote shall recommend whether the defendant should

14  be sentenced to death or to life imprisonment without

15  possibility of release.  In any case in which the charge is

16  carry this possible penalty of death, the law requires me to

17  ask jurors and the jurors to answer questions regarding

18  their thoughts, feelings and opinions about the possible

19  penalties.  Otherwise, no one should be intruding into that

20  very personal part of your life.

21       I just have four basic questions for you.  Then I

22  will see if counsel have any additional questions.

23       Would you automatically find for death without

24  fairly weighing the aggravating and mitigating factors if we

25  get to this penalty phase?

1          PROSPECTIVE JUROR NO. 29:  I'm not opposed to the

2    death penalty.

3          THE COURT:  I saw that.  I expect I'm going to

4    have people pro and people opposed.  In other words, I'm

5    going to have both sides when I talk to the jurors.  That's

6    not my question.

7          My question is if you would automatically find for

8    death without fairly weighing these aggravating and

9    mitigating factors if we got to the second or penalty phase

10   trial?

11         PROSPECTIVE JUROR NO. 29:  I would weigh the

12   differences.

13         THE COURT:  You would weigh the aggravating and

14   mitigating factors?

15         PROSPECTIVE JUROR NO. 29:  Yes.

16         THE COURT:  Is there a substantial likelihood -- I

17   have changed that from automatic.  I have just changed now

18   to substantial likelihood.  Is there a substantial

19   likelihood that you would find for death without fairly

20   weigh these aggravating and mitigating factors in a penalty

21   phase trial?

22         PROSPECTIVE JUROR NO. 29:  No.

23         THE COURT:  The opposite side of the coin now is

24   would you automatically never find for death without fairly

25   weigh these aggravating and mitigating factors?

1         PROSPECTIVE JUROR NO. 29:  No.

2         THE COURT:  Is there a substantial likelihood that

3 you never find for death without fairly weighing the

4 aggravating and mitigating factors?

5         PROSPECTIVE JUROR NO. 29:  No.

6         THE COURT:  Can you turn to Question No. 68?  It

7 says:

8         "68.  Could you set aside your own personal

9 feelings about what the law ought to be and follow the law

10 as the Court explains it to you?"

11         You marked "No."

12         If that's a correct answer, could you talk to me a

13 little bit about that.

14         PROSPECTIVE JUROR NO. 29:  If I hear a case, I

15 would vote on my own what I feel should happen.

16         THE COURT:  Would you follow my instructions on

17 the law, though, if I gave you certain aggravating and

18 mitigating factors that you were to consider and ask you to

19 fairly balance those?

20         PROSPECTIVE JUROR NO. 29:  I would try.  It would

21 be hard, but I would try.

22         THE COURT:  What would your inclination be?  Why

23 don't you follow up and tell me what you are thinking when

24 you have a concern about following my instructions in that

25 regard.

1        PROSPECTIVE JUROR NO. 29:  I'm not familiar with

2   the criminal system and all that stuff, only in that it

3   is -- if I heard a case and my feeling is this should be the

4   result, I'm going to go with my beliefs.  If you say, no,

5   you can't go with those beliefs, then we are going to be in

6   opposition.  Sorry.  Nothing personal.

7        THE COURT:  I would never tell you what to do.

8   You're the jury.  I would give you instructions, though,

9   about how to go about it.

10       PROSPECTIVE JUROR NO. 29:  I would have no problem

11  in being --

12       THE COURT:  Question 72, if you could turn to

13  that, it says:

14       "72.  Do you believe anyone who has committed

15  multiple murders should automatically, without consideration

16  of any other circumstances, be sentenced to death?"

17       The question is designed to ask if you would

18  automatically find for death without weighing other

19  circumstances, if there were circumstances for

20  considering -- there might be mitigating factors, and you

21  would be called upon to balance those.

22       The question is if you would automatically find

23  for death without fairly weighing the mitigating factors.

24  Then we need you to tell us that.

25       PROSPECTIVE JUROR NO. 29:  No.  I would listen to

```
 1    the factors.  I could be swayed because of the
 2    circumstances.
 3              THE COURT:  Let me go back just a moment to
 4    Question No. 75.
 5              Did I see something about a back issue?
 6              MR. EMMICK:  That was 59.
 7              PROSPECTIVE JUROR NO. 29:  I have a curvature of
 8    the spine.  Maybe these chairs would be convenient.  Those
 9    chairs are real uncomfortable.
10              THE COURT:  You can stand up anytime and stretch
11    if you are selected to be a juror.
12              PROSPECTIVE JUROR NO. 29:  That would be fine.
13              THE COURT:  Electronic engineer, design.  I don't
14    want to know who you work for or where you work, but my
15    guess is you haven't talk to your employer yet, or if you
16    are independent, so be it, but nine months is a long time.
17              Are you going to have any difficulty --
18              PROSPECTIVE JUROR NO. 29:  I would have major
19    difficulty because I am 60 years old.  I am the only person
20    in the department.  The department needs me because I'm,
21    multi-faceted in many different aspects of it.  If I took
22    the job and got involved in the thing, I would be -- it
23    would be difficult.  I would lose the job because I -- at 60
24    years old, I would have to find another job.  I work for a
25    company, but --
```

```
 1              THE COURT:  You would lose your job?

 2              PROSPECTIVE JUROR NO. 29:  I would lose my job.

 3    They would have to get somebody else to bring in.

 4              THE COURT:  Counsel.

 5              MR. WHITE:  We would stipulate.

 6              THE COURT:  Mr. Emmick, do you want to follow up

 7    with questions?

 8              MR. EMMICK:  We would agree to stipulate.

 9              THE COURT:  We are going to thank and excuse you.

10    I want to compliment you for responding.  None of us want

11    anybody to lose their job.  It's very civic minded for you

12    to go up to this point, but we don't want you to be placed

13    in that hardship position.

14              PROSPECTIVE JUROR NO. 29:  It would be difficult.

15              THE COURT:  Sir, thank you very much.  If you

16    would please leave your questionnaire with Lisa.  Thank you.

17              (Prospective Juror No. 29 excused.)

18              THE COURT:  Counsel, the next juror is No. 30.  I

19    didn't see anything until I got to No. 33.  I'm not going to

20    allow questioning now -- it's general voir dire -- but his

21    son was shot at work in Irvine last April.  Apparently the

22    person has not been located who committed the crime.  In all

23    other particulars, including the death qualification

24    questions, the person seemingly answered appropriately.

25              Did you see anything on behalf of the government?
```

1        MR. EMMICK:  The only thing we noted was his

2  comment in 61 about "Because of what he did was very, very

3  bad."  It just seemed strong, but I'm not sure it even

4  warrants further inquiry.

5        THE COURT:  I don't think so at this time.  I'll

6  leave that for general voir dire.  I'm looking for obvious

7  bias or prejudice.

8        Do you see anything you want clarified at this

9  time?

10        MR. WHITE:  No, Your Honor.

11        THE COURT:  Would you bring Juror No. 30 in,

12  please.

13        (Prospective Juror No. 30 enters courtroom.)

14        THE COURT:  Hello, how are you today.  Why don't

15  you come over and join me.  It's nice meeting you.  Would

16  you be kind enough to have a seat in this chair opposite

17  from me.

18        First of all, I want to thank you for filling out

19  the questionnaire.

20        When we sent out the jury summons to you, we

21  estimated a nine-month trial.  I can assure you that you

22  won't be in trial every day for nine months.  I wanted to be

23  overly cautious so that you didn't have any anger or feeling

24  that you were misled.  The case can take nine months over

25  the duration of time, but there are going to be numerous

1    continuances during the trial.  I need to make certain the

2    witnesses get here from different locations.  I need to be

3    careful that the attorneys are holding up to the stress, so

4    you will get these periods of time, and you'll never know

5    why.  I can assure you that's going to occur.

6            Have you made any modifications or changes to the

7    jury questionnaire?  I asked you to use a red pen.  Why

8    don't I have you go through it.

9            On No. 10, you listed a son - warehouse?

10           PROSPECTIVE JUROR NO. 30:  Yes.

11           THE COURT:  What's the next question you made

12   changes to?

13           PROSPECTIVE JUROR NO. 30:  No. 16.

14           THE COURT:  "16.  Have you had any training or

15   education in the following fields?"

16           PROSPECTIVE JUROR NO. 30:  Homemaking.

17           THE COURT:  Okay.  What's the next question?

18           PROSPECTIVE JUROR NO. 30:  22.  I have served

19   before, but I forget where it was, in which court.

20           53.

21           THE COURT:  "Do you like to read books?"

22           PROSPECTIVE JUROR NO. 30:  Yes, church books,

23   magazines, and some novels.

24           That's it.

25           THE COURT:  Thank you very much.

1        I want to start by explaining to you that where

2    the government is seeking the death penalty against the

3    defendant the law provides for a two-stage trial in front of

4    the same jury.  The second stage is often called a penalty

5    phase trial.  By asking you the questions I am going to ask

6    you, I don't want you to assume that we are going to

7    necessarily get to this second or penalty phase trial, but

8    in case we do, it's important that I ask you questions now

9    about your thoughts and feelings concerning the death

10   penalty.

11       In the first trial, the jury's job is the same as

12   it would be in any other criminal case, to decide if the

13   accused is guilty or not guilty.  If, and only if, the jury

14   returns a verdict of guilty against either defendant Mr.

15   Mills or defendant Mr. Bingham as to the counts alleged

16   against them which potentially carry a sentence of death,

17   the same jury will have the task of considering the penalty

18   in a second trial, what we call this penalty phase trial.

19   In that case, the jury may hear additional evidence and

20   arguments and will be asked to weigh various aggravating and

21   mitigating factors.  Now, I will explain that to you if we

22   get to a second or penalty phase trial.

23       Based upon these considerations, by unanimous

24   vote, the jury shall recommend whether the defendant shall

25   be sentenced to death or to life imprisonment without the

1    possibility of release.

2           In any case in which the charge carries a possible

3    penalty of death, the law requires that jurors answer

4    questions regarding their thoughts, feelings and opinions

5    about the possible penalties.  That's why we are inquiring

6    into a very personal part of your life.  Otherwise, it's

7    none of our business, frankly.

8           I have just a few questions.  I think you have

9    already answered them already on the questionnaire, but we

10   wanted to be sure.  We are talking to each of you

11   individually because you will give us more thoughtful

12   answers, and it will be unfluenced and unbiased without

13   other jurors sitting around you.  I don't want them to pick

14   up your answers.

15          Would you automatically find for death without

16   fairly weighing the aggravating and mitigating factors if we

17   get to a second or penalty phase trial?  Would you

18   automatically find for death without fairly weighing these

19   aggravating and mitigating factors if we get to a penalty

20   phase trial?

21          PROSPECTIVE JUROR NO. 30:  No.

22          THE COURT:  I am going to ask the same question

23   but with a little bit different standard.  I am going to use

24   the words "substantial likelihood."

25          Is there a substantial likelihood that you will

 1    find for death without fairly weighing the aggravating and

 2    mitigating factors in a penalty phase trial?

 3              PROSPECTIVE JUROR NO. 30:  No, I don't think so.

 4              THE COURT:  Now the opposite of those two

 5    questions.

 6              Would you automatically never find for death

 7    without fairly weighing the aggravating and mitigating

 8    factors in a penalty phase trial?

 9              PROSPECTIVE JUROR NO. 30:  No.

10              THE COURT:  Is there a substantial likelihood that

11    you would never find for death without fairly weighing the

12    aggravating and mitigating factors in a penalty phase trial?

13              PROSPECTIVE JUROR NO. 30:  I don't think so.

14              THE COURT:  Okay.  I don't think I have any

15    questions, but let me check with counsel.

16              Mr. Steward?

17              MR. STEWARD:  No questions.

18              THE COURT:  Mr. White?

19              MR. WHITE:  No questions.

20              THE COURT:  Mr. Emmick, and, Ms. Flynn?

21              MR. EMMICK:  No questions.

22              THE COURT:  Thank you very much.  We are going to

23    have you come back on February 22, and Lisa is going to give

24    you a reminder in just a moment when you walk out that door.

25    I know the jury commissioner has instructed you to phone in

1   on the 21st.  We want you follow all those instructions, but
2   I don't trust a mechanical device, so no matter what, we are
3   starting on February 22 at 8:30 in the morning.
4           What you know so there is no mystery we are
5   inviting back a number of jurors that both sides are
6   agreeing to, and on that day, we will actually get the jury.
7   We will start on Wednesday, and I think we will have a jury
8   by Thursday, so within two days, we will know who the 12
9   jurors and possibly 12 alternates who are sitting.
10          Thank you.  It's been a pleasure meeting you.  If
11  you would give that to Lisa.
12          (Prospective Juror No. 30 exits courtroom.)
13          THE COURT:  Remember we have some jurors who came
14  in unexpectedly which were for the afternoon session.  We
15  are just going to proceed with them.  Then the last jury I
16  think we will take is No. 47.  He came in today, and he is a
17  little incensed because he needs to take his wife someplace
18  tomorrow which is his normal day.  Instead of fighting with
19  the gentleman, let's just take him today.
20          We will be in recess for about 20 minutes.
21          (Recess.)
22          THE COURT:  We are back in session.  All counsel
23  are present.  The defendants are present.  The parties are
24  present.
25          Is 31 next, Lisa?

1          THE CLERK:  Yes.

2          THE COURT:  Counsel, can you see anything

3    concerning 31?  The answers seemed to be appropriate at

4    least on paper.  Any indications in any particular area?

5          MR. EMMICK:  No, Your Honor.

6          THE COURT:  Would you ask 31 to come in and join

7    us, please.

8          (Prospective Juror No. 31 enters courtroom.)

9          THE COURT:  How are you today?  Come and join me

10   for just a moment.  It's a pleasure meeting you.  Would you

11   have a seat for just a second.  You are going to be from now

12   on Juror No. 31.

13         We wanted to give you an opportunity to go back

14   over your jury questionnaire, and if you had any

15   modifications or different answers than the ones you

16   previously had given to write those in red ink so we could

17   keep a record on that.  I see you have one change already.

18         PROSPECTIVE JUROR NO. 31:  I clarified my wife's

19   occupation.

20         THE COURT:  Okay, and that is?

21         PROSPECTIVE JUROR NO. 31:  She reads books.  She

22   babysits my grandchildren and shuttles them back and forth

23   to school.

24         THE COURT:  Any other changes in the

25   questionnaire?

```
 1              PROSPECTIVE JUROR NO. 31:  No, except for
 2    clarification on Item 23.
 3              THE COURT:  "Daughter just started dating a young
 4    man which I believe works for" -- well, first of all, do you
 5    like him?
 6              PROSPECTIVE JUROR NO. 31:  I don't really know
 7    him.
 8              THE COURT:  I'm just kidding.  The fathers never
 9    like young men.
10              PROSPECTIVE JUROR NO. 31:  The mothers know them.
11    The fathers are the last ones to find out.
12              THE COURT:  But you believe he might work in the
13    California Department of Corrections?
14              PROSPECTIVE JUROR NO. 31:  Yes.
15              THE COURT:  Anything else?
16              PROSPECTIVE JUROR NO. 31:  I added down that I
17    have a friend that worked for the Police Department, but he
18    is retired.
19              THE COURT:  Anything else?
20              PROSPECTIVE JUROR NO. 31:  The only change I had
21    was on Item 35.
22              THE COURT:  "35.  Have you ever known anyone who
23    was involved with drugs?"
24              PROSPECTIVE JUROR NO. 31:  Yes, I rewrote there
25    "my youngest brother who is 24 years old."
```

1        Item 37, I just put down, "All his life he has

2   been in and out of the prison system."

3        THE COURT:  Once again, I don't want to know his

4   name.

5        56.

6        THE COURT:  "56.  Based on what you have seen or

7   heard or read, do you have an impression of the alleged

8   Aryan Brotherhood or the AB?"

9        PROSPECTIVE JUROR NO. 31:  I just put down the

10  "woodpack theory."  To me the woodpack theory is weak when

11  you're alone, strong when in a group.  That applies to most

12  all groups.

13        There are no other changes.

14        THE COURT:  Thank you very much, sir.

15        When you got the jury summons, we said that the

16  trial might last for nine months.  I want to assure you,

17  though, that we won't be in session every day for those nine

18  months.  I wanted to make sure I estimated a sufficient

19  period of time so that no juror was being misled.

20        There may be periods of time during which there is

21  an unexplained recess.  It could come very early in the

22  trial in fact.  I just don't know.  As such, you won't get

23  an explanation.  You just be in recess for a week or maybe a

24  month.  I am not certain.  Along the way, I need to be make

25  sure that the attorneys are holding up.  All their days will

1    just begin when all of us go home at 5:00.  Also, witnesses

2    are coming from different locations, so there may be

3    numerous starts and stops.

4              PROSPECTIVE JUROR NO. 31:  I understand.

5              THE COURT:  Now, I want to begin by saying that in

6    cases where the government is seeking the death penalty

7    against a defendant, the law provides for a two-stage trial

8    in front of the same jury.  By asking you the questions I am

9    going to ask you in a few moments, I don't want you to

10   believe that necessarily by virtue of my questions that we

11   are going to get to this second stage trial or what we often

12   refer to as a penalty stage trial, but if we did, it's

13   important that I ask you questions concerning your thoughts

14   and feelings about the death penalty now.

15             In the first trial, the jury's job is the same as

16   it would be in other criminal case, to decide if the accused

17   is guilty or not guilty.  If, and only if, the jury returns

18   a verdict of guilty against either defendant Mr. Mills or

19   defendant Mr. Bingham as to the counts alleged against them

20   which potentially carry a sentence of death, the same jury

21   will then be asked to consider the penalty.  In that case,

22   in this second penalty phase trial in front of the same

23   jury, that jury will hear additional evidence and arguments

24   and will be asked to weigh various aggravating and

25   mitigating factors, and I explain that to you if we get to

1  the second penalty phase trial.

2          Based upon these considerations, the jury by

3  unanimous vote shall recommend whether the defendant should

4  be sentenced to death or to life imprisonment without the

5  possibility of release.  In any case in which the charge

6  carries a possible penalty of death, the law requires that

7  the jurors answer questions regarding their thoughts and

8  feelings and opinions about the possible penalty.  That's

9  why we have intruded into a highly personal part of your

10  life.

11          My questions are very brief, and then I will turn

12  to counsel for just a moment.

13          Would you automatically find for death without

14  fairly weighing the aggravating and mitigating factors in

15  the second penalty phase trial?

16          PROSPECTIVE JUROR NO. 31:  No.

17          THE COURT:  I am going to change that just a

18  little bit and use a different standard.

19          Is there a substantial likelihood that you would

20  find for death without fairly weighing the aggravating and

21  mitigating factors in a penalty phase trial?

22          PROSPECTIVE JUROR NO. 31:  No.

23          THE COURT:  Now I am going to go to the opposite

24  side of the coin.

25          Would you automatically never find for death

1  without fairly weighing the aggravating and mitigating

2  factors in this penalty phase trial?

3          PROSPECTIVE JUROR NO. 31:  No.

4          THE COURT:  Is there a substantial likelihood that

5  you would never find for death without fairly weighing the

6  aggravating and mitigating factors in a penalty phase trial?

7          PROSPECTIVE JUROR NO. 31:  No.

8          THE COURT:  Sir, I don't believe I have any other

9  questions.  Let me check.

10          Does the government have any questions?

11          MR. EMMICK:  Nothing, Your Honor.

12          MS. FLYNN:  No, Your Honor.

13          THE COURT:  Mr. White, any questions?

14          MR. WHITE:  No, Your Honor.

15          THE COURT:  Mr. Steward?

16          MR. STEWARD:  No, Your Honor.

17          THE COURT:  I am going to have you return on

18  February 22 at 8:30 in the morning.  So there is no mystery

19  you are going to join the other jurors that both sides find

20  acceptable.  In that regard, we are going to start the jury

21  selection process, and because of the individual voir dire

22  that we are going through, the individual discussion with

23  each of you, I think we will get a jury that Wednesday or

24  Thursday.  We will have 12 jurors and probably 12

25  alternates.

1           Now, the jury commissioner is instructing you to

2    phone in.  I don't know what the mechanical voice says.  I

3    don't trust that mechanical voice.  We are going to start

4    February 22, Wednesday, and Lisa is going to give you

5    notification here.  I still want you to call in, but we are

6    here, and we are starting.  Thank you very much.  It's been

7    a pleasure.  If you would give your questionnaire to Lisa.

8           PROSPECTIVE JUROR NO. 31:  Thank you.

9           (Prospective Juror No. 31 exits courtroom.)

10           THE COURT:  Lisa, would No. 32 be the next one?

11           THE CLERK:  Yes.

12           THE COURT:  Don't bring that person out yet.

13           Counsel, I notice that on Question No. 68 the

14    answer is "No."  On Question No. 73, the multiple murders,

15    the answer is "Yes."  There was a comment by an eye for an

16    eye.  I didn't know if that was biblical, and I would like

17    to follow up on a few questions about that.

18           MR. STEWARD:  On 70, Your Honor?

19           THE COURT:  On 70, yes.

20           MR. STEWARD:  Also, 74(b), press coverage.  Will

21    you notify the Court?  "No."

22           THE COURT:  There won't be anything significant

23    probably.

24           MR. FLEMING:  59, too.  He may have a hearing

25    problem.

1          THE COURT:   What?

2          Thank you very much.

3          (Prospective Juror No. 32 enters courtroom.)

4          THE COURT:   Hello, sir.  How are you today?  Come

5     onever here.  Why don't you have a seat right here across

6     the table from me.  I am going to refer to you as Juror No.

7     32.

8          We wanted to give each of you an opportunity to go

9     back over the jury questionnaire and see if there were any

10    modifications or changes and, if so, to make those notations

11    in red ink.

12         Are there any changes?

13         PROSPECTIVE JUROR NO. 32:  Yes.

14         THE COURT:   Would you go through those question by

15    question?

16         PROSPECTIVE JUROR NO. 32:  68.

17         THE COURT:   Okay.

18         "68:  Could you set aside your own personal

19    feelings about what the law ought to be and follow the Court

20    explains it to you?"

21         You previously checked "No."

22         PROSPECTIVE JUROR NO. 32:  I changed it to "Yes."

23    I just didn't understand the question.

24         One more, 75.  I just added something to 75.

25         THE COURT:   Thank you.

1          PROSPECTIVE JUROR NO. 32:  I added, "Being on the

2    jury from three to four months might be a problem for me

3    financially and personally."  One month or less is fine with

4    me.

5          THE COURT:  Okay.  Now, this could be a nine-month

6    trial.

7          PROSPECTIVE JUROR NO. 32:  That would be --

8          THE COURT:  That would be a hardship?

9          PROSPECTIVE JUROR NO. 32:  Yes, it really would.

10         THE COURT:  Counsel, I can keep going.

11         MR. STEWARD:  We are prepared to stipulate.

12         MR. WHITE:  We would also stipulate.

13         MR. EMMICK:  We are prepared to stipulate as well.

14         THE COURT:  I want to thank you for volunteering.

15   We sent out a number of subpoenas and got responses, but we

16   are not trying to create a financial or personal hardship.

17         PROSPECTIVE JUROR NO. 32:  Thank you.

18         THE COURT:  We are going to thank and excuse you

19   by stipulation of all counsel.  Would you give this to Lisa

20   on your way out.

21         (Prospective Juror 32 excused.)

22         THE COURT:  Counsel, on 33, on paper, the answers

23   seem to be appropriate.  I didn't see anything that stood

24   out.

25         (Prospective Juror No. 33 enters courtroom.)

1          THE COURT:  Hello.  Come over and join me for a

2    second.  I am going to shake your hand and not worry about

3    that piece of paper.  If you would have a seat across the

4    table from me.  How are you?

5          PROSPECTIVE JUROR NO. 33:  Fine.

6          THE COURT:  First of all, I want to thank you for

7    filling out the jury questionnaire.

8          PROSPECTIVE JUROR NO. 33:  Okay.

9          THE COURT:  Second, I wanted to provide you an

10   opportunity if there were any portions of that questionnaire

11   that you wanted to change or modify, and I asked you and all

12   the other jurors to make those notations in red.

13          Have you made any modifications?

14          PROSPECTIVE JUROR NO. 33:  Yes.

15          THE COURT:  Could we go those by numbers?  The

16   first one?

17          PROSPECTIVE JUROR NO. 33:  "2.  Age"?

18          PROSPECTIVE JUROR NO. 33:  71.  I had a birthday.

19          THE COURT:  You went from 55 to 71.

20          PROSPECTIVE JUROR NO. 33:  Yes.

21          THE COURT:  That's quite a birthday.

22          PROSPECTIVE JUROR NO. 33:  No. 9.  I added

23   "church," and I have a B.S. Degree.

24          Then 20.  I left that blank before, but I added

25   Admiral Rickover.

1          THE COURT:  Maybe I have got the wrong one.

2          You are Juror No.?

3          PROSPECTIVE JUROR NO. 33:  33.

4          THE COURT:  I have got the wrong one.  Thank you

5     very much.  My apologies.  No wonder these didn't match up.

6          Counsel, we found 31 to be acceptable, didn't we?

7          MR. WHITE:  Yes.

8          THE COURT:  Thank you.

9          Where were we again?

10         PROSPECTIVE JUROR NO. 33:  Do you want to start

11    over?

12         THE COURT:  Yes.

13         PROSPECTIVE JUROR NO. 33:  No. 2, 71.

14         THE COURT:  No wonder.  I was looking at Juror No.

15    31.  You may have thought I was kidding you --

16         PROSPECTIVE JUROR NO. 33:  I thought you were

17    kidding.

18         THE COURT:  You jumped from 55 to 71.  I said,

19    well, that's quite a jump.

20         PROSPECTIVE JUROR NO. 33:  No. 9.  I added

21    "church" and a "B.S. Degree."

22         Then it was 20, "Admiral Rickover."  Then I wrote

23    under that, "Got things done."

24         That's it.

25         THE COURT:  Thank you very much.

1          THE COURT:  Now, you received a jury summons in

2     the mail, and we estimated nine months.  I want to assure

3     you we are not going to be in trial for nine months, but the

4     case could place over a long period of time.  I just don't

5     know yet how the case unfolds.  The witnesses are coming

6     from different locations of the country.  I need to be very

7     careful that counsel hold up, that they marshal their

8     resources so we are getting things done.  I also need to

9     watch their ability to present the case on both sides.

10    Their days will just begin as we get in trial -- as we got

11    home at 5:00, they are just beginning.

12          There is going to be I am quite certain

13    continuances during different portions of the trial, and

14    they will come to you without explanation.  You just won't

15    know why.

16          I want to start with a little overview.  In cases

17    where the government is seeking the death penalty against

18    the defendant, the law provides for a two-stage trial in

19    front of same jury.  Sometimes we refer to this second stage

20    as a penalty phase trial, and when we ask you questions

21    about this second trial, this penalty phase trial, I don't

22    want you to assume that I believe or even know if we will

23    necessarily get to that.

24          In the first trial, the jury's job is the same as

25    it would be in any other criminal case, to decide if the

 1    accused is guilty or not guilty.  If, and only if, the jury

 2    returns a verdict of guilty against either defendant Mr.

 3    Mills or defendant Mr. Bingham as to the counts alleged

 4    against them which potentially carry a sentence of death,

 5    the same jury will have the task of considering the penalty

 6    in this second or penalty phase trial.  In that case, the

 7    jury will hear additional evidence and arguments and will be

 8    asked to weigh the various aggravating and mitigating

 9    factors that I will explain to you if we get to that penalty

10    phase trial.

11          Based upon these considerations, the jury in this

12    second or penalty phase trial by unanimous vote shall

13    recommend whether the defendant shall be sentenced to death

14    or to life imprisonment without the possibility of release.

15    In any case in which the charge carries a possible penalty

16    of death, the law requires that jurors answer questions

17    regarding their thoughts, feelings and opinions about the

18    possible penalties.  That's why we have intruded into what I

19    consider a very private area of your life.

20          My questions are very few, and then I will check

21    with counsel in just a few moments to see if they believe we

22    have covered all the areas, but the first question is would

23    you automatically find for death without fairly weighing the

24    aggravating and mitigating factors?

25          PROSPECTIVE JUROR NO. 33:  I would waive

85

1    everything.

2          THE COURT:  Is there a substantial likelihood that

3    you would find for death without fairly weighing the

4    aggravating and mitigating factors?

5          PROSPECTIVE JUROR NO. 33:  No.

6          THE COURT:  Now the opposite side of the question,

7    would you automatically never find for death without fairly

8    weighing the aggravating and mitigating factors?

9          PROSPECTIVE JUROR NO. 33:  I would just listen to

10   the facts.

11         THE COURT:  Is there a substantial likelihood that

12   you would never find for death without fairly weighing the

13   aggravating and mitigating factors?

14         PROSPECTIVE JUROR NO. 33:  I would weigh the

15   facts.

16         THE COURT:  I am satisfied then.  Let me turn to

17   counsel then.

18         Mr. Steward?

19         MR. STEWARD:  No questions.

20         THE COURT:  Mr. White?

21         MR. WHITE:  No questions.

22         THE COURT:  Mr. Emmick?

23         MR. EMMICK:  Nothing further.

24         THE COURT:  Ms. Flynn?

25         MS. FLYNN:  No questions.

1      THE COURT:   I am going to have you come back to us

2   on February 22.   It's a Wednesday, and Lisa is going to give

3   you a note to remind you.   You are supposed to call the jury

4   commissioner on February 21.   I don't care what the

5   mechanical voice says.   On February 22 at 8:30 in the

6   morning, we are going to start our jury selection.

7         Now, I don't want you to not know what we are

8   doing.   As to the jurors who both sides are finding

9   acceptable at this point, we are bringing all of you back,

10  and from that pool of jurors, we are going to select 12

11  jurors and probably 12 alternates, so we will know I think

12  by the end of the week, probably even by Thursday, who those

13  jurors and alternates are.

14        Thank you very much.   We will see you on

15  February 22 on a Wednesday at 8:30.   Give your questionnaire

16  back to Lisa on the way out.   Thank you very much.

17        (Prospective Juror No. 33 exits courtroom.)

18        THE COURT:   Counsel, with 34, I didn't see

19  anything.

20        MR. STEWARD:   75.

21        THE COURT:   Thank you.

22        MR. STEWARD:   I'm not worried about the scheduling

23  conflict as much as the entity.

24        THE COURT:   134 has also come down today.   We will

25  get the questionnaire.   I will give you plenty of time to

1    look at it.  I don't know why she is here.

2              Counsel, with 34, I think I will talk to her about

3    hardship, but the employment is really a general voir dire

4    question.

5              Juror No. 34.

6              (Prospective Juror enters courtroom.)

7              THE COURT:  How are you today?

8              PROSPECTIVE JUROR NO. 34:  Fine.  Thank you.

9              THE COURT:  Would you be kind enough to have a

10   seat in the chair right across the table from me.

11             Let me start by thank you for filling out jury

12   questionnaire.

13             Also, I wanted to give you a chance as well as the

14   other jurors to go back over the questionnaire and if you

15   wanted to make any modifications or changes to do that in

16   red ink so I have a record of that.

17             Would you go through those questions?

18             PROSPECTIVE JUROR NO. 34:  On Question No. 10, I

19   added that my son is in preschool.  I forgot the second

20   person that I mentioned in No. 8.

21             THE COURT:  Then let's go to -- any other

22   questions that you changed?

23             PROSPECTIVE JUROR NO. 34:  23.

24             PROSPECTIVE JUROR NO. 34:  Now I am employed with

25   the Department of Corrections.

```
 1              THE COURT:  I don't want to know where.

 2              What type of job do you have?

 3              PROSPECTIVE JUROR NO. 34:  I'm a supervising

 4    registered nurse.

 5              THE COURT:  I don't know want to know the

 6    institution.

 7              Are you working inside a penal institution?

 8              PROSPECTIVE JUROR NO. 34:  Yes.

 9              THE COURT:  So since the questionnaire, you have

10    actually obtained employment?

11              PROSPECTIVE JUROR NO. 34:  Yes.

12              THE COURT:  Could I excuse you for just a moment?

13    Let me talk to counsel for just a minute.

14              THE COURT:  Lisa, if you could take Juror No. 34

15    out, I may save a number of questions here.

16              (Prospective Juror No. 34 exits courtroom.)

17              THE COURT:  First, the murders involving Mr. Mills

18    are alleged to have occurred in Atlanta's Bureau of Prisons

19    system, Lewisburg; the conspiracy, Mr. Bingham, Marion,

20    Leavenworth, Lompoc and ADX, and we don't have CDC.

21              The problem is I'm not sure where the conspiracy

22    counts lead concerning evidence because the complaint is so

23    broadly drafted and the Indictment is.  I'm not sure if it

24    would lead into the California Department of Corrections

25    eventually, and I don't know who is going to testify as a
```

1   cooperating witness or who testifies from the defense

2   perspective who is incarcerated or has been.  Mr. Mills and

3   Mr. Bingham I assume at some point has also passed through

4   as well as Mr. Gibson and Mr. Hevle the California

5   Department of Corrections.

6           So before I ask any question, I am just wondering

7   if we aren't taking an incredible chance because I can end

8   up making the correct legal ruling and find there is no

9   cause, and then we run into problems, or somebody in her

10  employment says by the way.

11          What are your thoughts, Mr. Emmick?

12          MR. EMMICK:  I think it's more of a question of

13  whether we handle it now or we handle it in general voir

14  dire.

15          THE COURT:  I would rather handle it now is there

16  is a stipulation.  If we are going to excuse her, let's not

17  bring her back.  This is one I will expand a little bit.

18          MR. EMMICK:  There will certainly be witnesses who

19  have been through the California Department of Corrections.

20  There is no question about that.  She hasn't got much

21  experience yet, but we just don't know what's going to

22  happen over the next --

23          THE COURT:  She is in an institution.  I don't

24  want to know which one, who taps her on her on the shoulder

25  or who doesn't.  You just don't know.

1    And you gentlemen might not have anything to do

2  with that, you know, if somebody out there tries to help.

3  It all falls back.

4        MR. EMMICK:  We would offer to stipulate.

5        THE COURT:  Would you stipulate?

6        MR. STEWARD:  Us, too, Your Honor.

7        MR. WHITE:  We also will stipulate.

8        THE COURT:  I think it's a wise decision on

9  everybody's part.

10        Let's ask the juror to come back in.

11        (Prospective Juror No. 34 excused.)

12        THE COURT:  We are going to thank and excuse you.

13  Some of the evidence may apply to the Department of

14  Corrections, and we just don't want you in that position by

15  virtue of employment.  Otherwise, I think both sides were

16  ready to accept you and would like you to potentially sit.

17  It's just the employment that causes them to have a little

18  discomfort.

19        PROSPECTIVE JUROR NO. 34:  I am thankful because I

20  have to relocate.

21        THE COURT:  Well, we would have just brought the

22  trial to wherever you are going.  I'm just kidding.  Thank

23  you very much.

24        (Prospective Juror No. 34 excused.)

25        THE COURT:  We would have a hardship difficulty

1   regardless, Counsel.

2          That took care of 32 and 34.

3          Who is the next juror back there?

4          MR. EMMICK:  47.

5          THE COURT:  Lisa?

6          THE CLERK:  47.

7          THE COURT:  This is the juror who had a missing

8   page that wasn't filled in.  We are going to spend quite

9   awhile with the missing page.  Question 65 should be

10  inquired into.

11         MR. EMMICK:  73 as well.

12         THE COURT:  73.

13         Have you had enough time to look at 47?

14         MR. STEWARD:  Yes.

15         MR. WHITE:  Yes.

16         MS. FLYNN:  Yes.

17         THE COURT:  47, please.

18         (Prospective Juror No. 47 enters courtroom.)

19         THE COURT:  How are you today, sir?  Why don't you

20  come up and join me.  I heard you had come down today, so I

21  talked to the commissioner to see if he would bring you up

22  to court this morning.  Have a seat.

23         First of all, I want to thank you for filling out

24  the questionnaire.  I gave all of the jurors the option of

25  going back over the questionnaire and adding any information

1  to it or changing any information so I have a record of it.

2  If you would be kind enough, would you go through that

3  questionnaire with me if you have may changes?  Let's do

4  that question by question.

5           What's your first question?

6           PROSPECTIVE JUROR NO. 47:  No. 5 down at the

7  bottom there, I wrote, "In my area, burglary.  Theft is very

8  seldom, shooting of people, and robbery."

9           No. 10 is housewife.

10          No. 14, I added "Retired in 1965."

11          14(c), I don't have none.

12          No. 20, I added "Ronald Reagan."

13          No. 22, I was on a trial.  Is that Garden Grove

14  over here?

15          THE COURT:  You were probably over at Westminster

16  Court.

17          PROSPECTIVE JUROR NO. 47:  It's never finished.

18  We went in and --

19          THE COURT:  Counsel, he would have served in West

20  Orange County Court, Westminster Branch.

21          PROSPECTIVE JUROR NO. 47:  23, I added, "My

22  brother is a prison guard."

23          No. 38, I didn't mark that whole page.  "No" on

24  38.  "No" on 39.  "No" on 40.  "No" on 41.  "No" on 42.

25  43, 44, and 45 are all "No."

1          No. 47, I just added Reader's Digest."

2          No. 50, "Seldom do I listen to radio, mostly

3    music."

4          No. 52 -- it's funny this morning I drew a blank

5    on a lot of things -- "Larry king, Channel 30."

6          No. 53, "Military battle."

7          No. 54, I read the "Orange County Register."

8          I believe that's it.

9          THE COURT:  Thank you very much.

10          Now, when you received the jury summons, we

11    indicated that the trial could take nine months, but we

12    overestimated that I think.  I wanted to be very careful

13    about the time estimate so no juror felt that they were

14    being misled.  In fact, the trial could take a nine-month

15    span of time, but you won't be in trial every day for nine

16    months.  There will be numerous continuances.  I will

17    probably call what I call rest continuances for no other

18    reason than just to let counsel catch up, just to marshal

19    their resources on both sides, so that when we are here, the

20    witnesses are ready to go in a block of time.  So when you

21    are here, you are really working.  When you're not, it's not

22    a half day or an hour even.  You won't get an explanation

23    for that.  I will just say you are on a recess for a week or

24    two, and I don't know when or how those will occur yet.

25          I want to talk to you a little bit about the

1    process, and I want to start by explaining to you as the

2    questionnaire did that in cases where the government is

3    seeking the death penalty against the defendant, the law

4    provides for a two-stage trial or two trials in a sense by

5    the same jury.

6            I'm going to ask you a couple of questions about

7    what I am going to call the second trial that we often refer

8    to as a penalty phase trial in a few moments, but by asking

9    these questions, I don't want you to assume that I believe

10   that we will or will not get to that trial.  I don't know,

11   but in case we do, it's important that I ask you these

12   questions now.

13           In the first trial, the jury's job is the same as

14   it would be in any other criminal case, to decide if the

15   accused is guilty or not guilty.  If, and only if, the jury

16   returns a verdict of guilty against either Mr. Mills and/or

17   Mr. Bingham as to the counts alleged against them which

18   potentially carry a sentence of death, the same jury will

19   have the task of considering the penalty in this penalty

20   phase trial.  In that case, the jury may hear additional

21   evidence and arguments and will be asked to weigh various

22   aggravating and mitigating factors that I will explain to

23   you.

24           Based upon these considerations, the jury by

25   unanimous vote shall recommend whether the defendant shall

1  be sentenced to death or to life imprisonment without the

2  possibility of release.  In any case in which the charge

3  carries a possible penalty of death, the law requires that

4  jurors answer questions regarding their thoughts, feelings

5  and opinions about the possible penalties.  That's why we

6  made what I considered a pretty invasive inquiry into a

7  private matter.  The law requires that when we are looking

8  for jurors.

9          Now, I have just four beginning questions and then

10  maybe a couple of follow-up questions.

11          Would you automatically find for death without

12  fairly weighing these aggravating and mitigating factors in

13  a penalty phase trial?

14          PROSPECTIVE JUROR NO. 47:  I would weigh the

15  factors.

16          THE COURT:  Is there a substantial likelihood that

17  you would find for death without fairly weighing these

18  aggravating and mitigating factors?

19          PROSPECTIVE JUROR NO. 47:  No, I wouldn't.

20          THE COURT:  Now let me change the question to the

21  opposite side of the coin.

22          Would you automatically never find for death

23  without fairly weighing these aggravating and mitigating

24  factors if we get to a penalty phase trial?

25          PROSPECTIVE JUROR NO. 47:  No.

1          THE COURT:   Is there a substantial likelihood that
2     you would never find for death without fairly weighing the
3     aggravating and mitigating factors if we get to a penalty
4     phase trial?
5          PROSPECTIVE JUROR NO. 47:   Say that again.
6          THE COURT:   Is there a substantial likelihood that
7     you would never find for death without fairly weighing the
8     aggravating and mitigating factors?
9          PROSPECTIVE JUROR NO. 47:   No, I wouldn't.
10          THE COURT:   Let me turn to your questionnaire.
11     Would you look at Question No. 65 because it may be in
12     conflict with what you have said here, and it may not be.
13     I'm not sure yet.
14          "65.  Are your views concerning the death penalty
15     such that, if you were to reach a penalty face in this case,
16     you would have substantial difficulty in voting for life
17     imprisonment as the appropriate penalty?"
18          You checked "Yes."
19          Could you explain that?
20          PROSPECTIVE JUROR NO. 47:   No, I wouldn't.
21          THE COURT:   So your answer would be changed then?
22          PROSPECTIVE JUROR NO. 47:   Yes.
23          THE COURT:   Now, let me turn to Question 73.
24          "73:  Do you believe anyone who has committed
25     multiple murders should automatically, without consideration

1    of any other circumstances" -- and that means these

2    aggravating and mitigating factors -- "be sentenced to

3    death?"

4              There you checked "Yes."

5              PROSPECTIVE JUROR NO. 47:  72?

6              THE COURT:  73.

7              PROSPECTIVE JUROR NO. 47:  Okay.

8              THE COURT:  "73:  Do you believe anyone who has

9    committed multiple murders should automatically, without

10   consideration of any other circumstances, be sentenced to

11   death?"

12             PROSPECTIVE JUROR NO. 47:  No.

13             THE COURT:  So you have changed that answer also.

14   Is that correct?

15             PROSPECTIVE JUROR NO. 47:  Correct.

16             THE COURT:  Counsel, was there another question

17   you were concerned about?

18             MR. EMMICK:  None from the government.

19             MR. STEWARD:  I think 59 on the hearing.

20             THE COURT:  You said, "I wear hearing aids.  Today

21   I have no problems hearing."

22             PROSPECTIVE JUROR NO. 47:  I don't have any in me

23   right now.

24             THE COURT:  So you are having no problems hearing

25   now?

1            PROSPECTIVE JUROR NO. 47:   No.

2            THE COURT:   Certainly you have hearing aids if you

3    are chosen to sit?

4            PROSPECTIVE JUROR NO. 47:   I will have them, yes.

5            THE COURT:   Mr. Steward?

6            MR. STEWARD:   Nothing further.

7            THE COURT:   Mr. White.

8            MR. WHITE:   Yes, I have some questions with the

9    Court's permission.

10            THE COURT:   Mr. White, just a moment.

11            I want you to go with Lisa for just a moment.

12    I'll come back to you in just a second.

13            (Prospective Juror No. 47 exits courtroom.)

14            THE COURT:   I want to make certain what those

15    follow-up questions are.   Why don't you write them down.

16    That way you have a record.

17            (Pause in proceedings.)

18            MR. WHITE:   They appear rather lengthy in the

19    writing.

20            THE COURT:   Assume that the defendants have been

21    convicted of two or more intentional premeditated murders,

22    under those circumstances, do you believe the only

23    appropriate punishment is death?

24            MR. EMMICK:   We object to that question.

25            THE COURT:   I am going to sustain the objection.

1    I will let you get into the area, but I only want the

2    aggravating and mitigating factors included in the question.

3    I'm not saying it's inappropriate.  I just don't think it's

4    a fair question.

5            If convicted of two or more murders, would factors

6    in aggravation or mitigation not affect your belief that

7    that's inappropriate?

8            The last question I don't understand.  Just

9    redraft it.

10           (Pause in proceedings.)

11           MR. WHITE:  We made another attempt.

12           THE COURT:  Read it.

13           MR. WHITE:  If convicted of two or more murders,

14   could factors in aggravation or mitigation affect your

15   decision as to whether or not death is appropriate?

16           THE COURT:  That would be an appropriate question.

17           MR. EMMICK:  I think it's an appropriate question.

18   I --

19           THE COURT:  I am going to sustain the objection.

20           MR. WHITE:  What I would propose to do --

21           THE COURT:  I will allow to you ask that question.

22           MR. WHITE:  What I would ask is to allow me to set

23   the stage, which is to assume that these gentlemen have been

24   convicted of two or more murders.  I am asking him to assume

25   that and then ask this question.

100

1          THE COURT:  You can.  You can say assuming that

2     Mr. Bingham or Mr. Mills was convicted of two or more

3     murders and then the question.  That's appropriate.

4          Ask the gentleman to come back in.

5          (Prospective Juror No. 47 enters courtroom.)

6          THE COURT:  Thank you very much.  I am going to

7     have one of the attorneys ask you one question for just a

8     moment.  You will need to speak up just because that

9     microphone doesn't seem to work as well as I want it to.

10          MR. WHITE:  Good morning, sir.

11          PROSPECTIVE JUROR NO. 47:  Good morning.

12          MR. WHITE:  Sir, the question I have for you is

13     assuming that Mr. Bingham and/or Mr. Mills have been

14     convicted of two or more murders could factors in

15     aggravation or mitigation affect your decision as to whether

16     or not the death penalty is appropriate?

17          THE COURT:  In other words, would you fairly weigh

18     those aggravating or mitigating factors?

19          MR. WHITE:  Yes.

20          PROSPECTIVE JUROR NO. 47:  Would you repeat that?

21          THE COURT:  Hypothetically -- assuming as Question

22     No. 72 -- 73 states -- assuming for a moment that you

23     believe -- that you find that either Mr. Mills or

24     Mr. Bingham were convicted of two or more murders.  Could

25     factors in aggravation or mitigation -- meaning would you be

 1   be willing to weigh the factors in aggravation and

 2   mitigation -- would these factors affect your decision as to

 3   whether or not death is appropriate?

 4          PROSPECTIVE JUROR NO. 47:  Unless there is some

 5   other circumstances or something of that nature, I --

 6          THE COURT:  Well, you are going to have these

 7   aggravating and mitigating factors.

 8          PROSPECTIVE JUROR NO. 47:  It depends upon the

 9   mitigating factors of whether I would or not.

10          THE COURT:  Okay.

11          MR. WHITE:  Can I ask one follow-up?

12          THE COURT:  Mr. White, you can ask one follow-up,

13   but if there is an objection -- I'll give you that

14   discretion.

15          MR. WHITE:  Sir, what kind of factors or

16   circumstances do you have in mind that could cause you to

17   vote for life?

18          MR. EMMICK:  We object to that question.

19          THE COURT:  Unnecessary.

20          MR. WHITE:  May I try one more time?

21          THE COURT:  All right.

22          MR. WHITE:  Are the type of factors you are

23   thinking about like self-defense?

24          MR. EMMICK:  Your Honor, I object to that

25   question.

1          THE COURT:  I don't want to get back and forth in

2     between what the mitigating and aggravating factors could

3     be.

4          I am going to find there is sufficient cause for

5     the juror to sit.

6          I am going to ask the following, that you return

7     of Wednesday, February 22, at 8:30, but you don't have to

8     write that down because we are going to take the

9     questionnaire back from you in just a moment.  Lisa is going

10    to give you a reminder slip.  I know that you are supposed

11    to call the jury commissioner on the 21st.  I still want you

12    to do that.  I don't care what the mechanical voice says.

13    We are starting on February 22 at 8:30 no matter what

14    anybody tells you.

15         PROSPECTIVE JUROR NO. 47:  Sure.

16         THE COURT:  I just don't trust the mechanical

17    apparatus.

18         PROSPECTIVE JUROR NO. 47:  I don't have good luck

19    with it either.

20         THE COURT:  Now, on that date, there will be a

21    whole pool of jurors which both sides find acceptable.  Each

22    side may want a little bit of follow up, but we will get

23    that jury on Wednesday and Thursday I believe, and I think

24    we will know by Friday who our 12 jurors are and potentially

25    our 12 alternate jurors are, so you will know if you are

1     sitting or not.

2            Thank you very much.  I appreciate it.  It's a

3     pleasure meeting you.  Be care with these wires.

4            (Prospective Juror No. 47 exits courtroom.)

5            THE COURT:  Let's spend some more time on the

6     record with this.  Let me give you my explanation.  You can

7     argue with me.  If I'm wrong, I can always excuse him.  Of

8     course he appears to be inclined to what I call the pro

9     death category.  In and of itself, that's not sufficient to

10    excuse him.  We both know yet.

11           I am going to get jurors on your side that are

12    towards the pro life category.  That's not a sufficient

13    reason to excuse them.

14           At this stage, the only inquiry is the weighing of

15    these factors fairly.  You may have some suspicions that he

16    just isn't the kind of juror you want and that, you know,

17    the multiple murders would lead to either the automatic or a

18    substantial likelihood.  I understand your misgivings about

19    that.

20           By the same token, I am allowing that question

21    because, yes, we could get into a multiple murder situation,

22    and I am also concerned about anybody automatically or

23    having a substantial likelihood, but once he states to me

24    without prompting and as fairly as I can go through these

25    questions for both sides and he does that on his own -- you

104

1   can disagree with the way the question is asked or whatever,

2   but that's a juror who is voluntarily changing that, and

3   they are not subject to either the whims of my questions or

4   yours or the government's.

5          What I'm not going to do is this.  If I allow you

6   to focus too much -- this is indicator.  Why aren't I

7   turning to the government and saying, well, gee, if it's two

8   murders, well, what about if the person had a bad childhood,

9   or, well, Mr. Mills had hasn't had any violent conduct in

10  "X" period of time?

11         I'm glad to open the box if you really want that.

12  I will let the government come back.  I promise you by the

13  time we are done we are probably going to get to the same

14  result I just reached.  You have go 30 preemptories.  If you

15  want five more, I will give you five more.  If you want ten,

16  I'll give you ten.  You aren't going to have any problems

17  getting rid of this juror if you want to.

18         Make your record.  The only way it has any value

19  is if we use all preemptories, and then I am in the box

20  where some defense counsel or government counsel decides to

21  put me to task, and they say, oh, Judge, this one juror is

22  unfair.  I will give you more.

23         MR. WHITE:  This is more by way of trying to

24  explain what I was attempting to do.  The reason I asked him

25  the question about what kind of factors he might be thinking

1     about was not to try to influence him, but, rather, I had a

2     suspicion -- maybe I was wrong --

3                THE COURT:  No, I don't know if you are.

4                MR. WHITE:  I know the Court has seen you have to

5     deal with what kind of a factor would you take into

6     consideration as a factor in mitigation.  Well, if the

7     defendant was acting in self-defense.

8                THE COURT:  I have let you do that in the past on

9     numerous occasions.  You are probably wondering why not on

10    this occasion.  It was because he changed his opinion

11    without any prompting.  If he hadn't changed that opinion

12    without prompting, I would have let you go into that, and I

13    have let you go into that in the past, and I may in the

14    future.

15               As to this particular juror, it seemed to me once

16    he changed that volitionally without the whipsaw back and

17    forth, then I have great credence in his answer.  Now,

18    whether I would accept him from the defense or the

19    government's perspective, I don't know.  My guess is you are

20    going to kick him, but I think each of us could get the jury

21    on either side to say what we wanted the juror to say

22    because the questions can become so convoluted.

23               I'm saying on this occasion that's why I am not

24    providing you the additional opportunity.  I find him to be

25    credible.  I find he's willing to weigh the aggravating and

 1    mitigating factors.  I also find he changed that answer

 2    volitionally.  "Oh, no, I meant the opposite."  That still

 3    may not give you a comfortable level, but you are not going

 4    to be stuck with this juror.

 5         In the future, come back to me again.  Don't be

 6    discouraged.  I'll probably let you ask questions and let

 7    the government ask questions.  I have been liberal about

 8    that, but I don't want to see him whipsawed back and forth.

 9    I think by the time you are done that two things can happen.

10    If you decide to use him -- you don't know.  Strange things

11    happen -- I don't want him destroyed by either side.

12         I am going to take your very well-written and very

13    virtuous and well-intentioned questions -- it's so

14    nonreadable I am going to attach them -- the scribbling --

15    I'm just kidding a little bit -- to the back of the right

16    questionnaire, which is going to be No. 47 and staple it.

17    That way for appellate purposes they have it.

18         I have looked through 134.  I don't find anything

19    remarkable right now.

20         MR. EMMICK:  We have some points.

21         THE COURT:  64 was one.

22         MR. EMMICK:  61.  The juror says, "I don't believe

23    I have the right to judge someone for anything that they may

24    have done."

25         THE COURT:  So you don't know if they can reach a

1    decision?

2              MR. EMMICK:   66 says that those views are for

3    religious reasons.  Those two together make us concerned

4    that this may be someone who believes that only God can make

5    a decision about death.

6              THE COURT:  I will inquire a little bit.

7              MR. EMMICK:  Also, 62 was answered "Yes."  63 was

8    answered "Yes."  64 was answered "Yes."  Those I suppose

9    would be disqualifying answers.  I think those are the ones.

10             THE COURT:  We will take a close look.

11             Would you get Juror No. 134.

12             (Prospective Juror No. 134 enters courtroom.)

13             THE COURT:  How are you today?  Would you come in

14   and join me and have a seat right across the table from me,

15   please.  You are Juror No. 134.

16             First of all, let me thank you for having filled

17   out the questionnaire.

18             Are there any changes that you have made to any of

19   the answers or modified any answers?  If so, would you point

20   me to the question or tell me which question number it is?

21             PROSPECTIVE JUROR NO. 134:  61.

22             THE COURT:  Thank you.  Let me go to 61 for just a

23   moment.

24             What have you stated in 61"

25             PROSPECTIVE JUROR NO. 134:  If I have to sit in as

1     a juror, I would not feel guilty about the death penalty

2     based on the evidence.

3                THE COURT:  That means you would not feel guilty

4     about imposing it?

5                PROSPECTIVE JUROR NO. 134:  Correct.

6                MR. EMMICK:  Maybe I just misheard.  I wasn't sure

7     if she said I would not vote guilty, or I wouldn't feel

8     guilty if I voted for it.

9                THE COURT:  Why don't you read it.

10               PROSPECTIVE JUROR NO. 134:  "If I have to sit in

11    as a juror, I would not feel guilty about facing my decision

12    on the death penalty based on the evidence."

13               THE COURT:  Are there any other additions or

14    changes?

15               PROSPECTIVE JUROR NO. 134:  Question No. 75.

16               THE COURT:  "75.  Is there anything that you would

17    like to bring to the Court's attention that might in any way

18    affect your ability to be a fair and impartial juror in the

19    case?"

20               PROSPECTIVE JUROR NO. 134:  The only thing would

21    be at the end -- I have never sat as a juror.  If 11 were

22    partial to guilty and I had that where I wanted to decide

23    not guilty, I think I would feel pressured into going with

24    the rest of the jurors in what their position was.

25               THE COURT:  So you might feel pressure from the

1    other jurors?

2              PROSPECTIVE JUROR NO. 134:  Yes.  That's the only

3    thing that would bother me.

4              That's it.

5              THE COURT:  Thank you very much.

6              Now, when you got the jury summons, we estimated

7    nine months, but I can assure you we won't be in trial every

8    day for nine months.  There may in fact be continuances that

9    would be unexplained to you.  They may be for a week or a

10   month.  I just don't know yet.  That will be my

11   responsibility.

12             In cases where the government is seeking the death

13   penalty against a defendant, the law provides for a

14   two-stage trial in front of the same jury.  I am going to

15   ask you some questions about the second stage of such a

16   trial.  We oftentimes refer to as the penalty phase.  By

17   asking these questions, I don't want you to assume or even

18   know if we will get to the second phase of a trial.  In case

19   we did, it's important that I ask you the questions now.

20             In the first trial, the jury's job is the same as

21   it would be in any other criminal case, to decide if the

22   accused is guilty or not guilty of the crime charged.  If,

23   and only if, the jury returns a verdict of guilty against

24   defendant Mr. Mills or defendant Mr. Bingham as to the

25   counts alleged against them which potentially carry a

1    sentence of death, the same jury will have the task of

2    considering the penalty at this penalty phase trial, this

3    second trial.   In that case, the jury may hear additional

4    and evidence and arguments and will be asked to weigh

5    various aggravating and mitigating factors that I will

6    explain to you at that time if, and only if, we get to that

7    second penalty phase trial.

8            Based upon these considerations, the jury by

9    unanimous vote shall recommend whether the defendant should

10   be sentenced to death or to life imprisonment without the

11   possibility of release.

12           Now, I have four questions I want to ask you, and

13   then I want to turn back to the questionnaire for just a

14   moment.

15           Would you automatically find for death without

16   fairly weighing the aggravating and mitigating factors in a

17   penalty trial if we got there?

18           PROSPECTIVE JUROR NO. 134:   No.

19           THE COURT:   Is there a substantial likelihood that

20   you would find for death without fairly weighing the

21   aggravating and mitigating factors if we got to this second

22   penalty phase trial?

23           PROSPECTIVE JUROR NO. 134:   I'm sorry.

24           THE COURT:   Is there a substantial likelihood that

25   you would find for death without fairly weighing the

1  aggravating and mitigating factors?

2          PROSPECTIVE JUROR NO. 134:  No.

3          THE COURT:  Let me turn to the opposite

4  perspective.

5          Would you automatically never find for death

6  without fairly weighing the aggravating and mitigating

7  factors in a second trial?

8          PROSPECTIVE JUROR NO. 134:  If I had sit in as a

9  juror, no.

10         THE COURT:  Is there a substantial likelihood that

11 you would never find for death without fairly weighing the

12 aggravating and mitigating factors in a second trial?

13         PROSPECTIVE JUROR NO. 134:  No.

14         THE COURT:  Now, I want you to turn back to your

15 questionnaire for just a moment.  In Question No. 61, you

16 said, "I believe that everyone has what is coming to them

17 when they pass away" -- in other words, when they die --

18 "and our God decides what their punishment should be."

19         Do you have a strong religious conviction or moral

20 conviction?

21         PROSPECTIVE JUROR NO. 134:  It's not a strong --

22 it's more moral than --

23         THE COURT:  More moral?

24         PROSPECTIVE JUROR NO. 134:  Yes.

25         THE COURT:  "66.  Are your views expressed above,

1  as set forth in Questions 62 through 65, based on religios

2  considerations?"

3         You marked "Yes."  That's what I wanted to talk to

4  you about.

5         Could you explain that to me just a little bit

6  further?

7         PROSPECTIVE JUROR NO. 134:  Everybody is -- you

8  know, it's based on the Bible, should not take a life.  I

9  think if I were to sit here send someone -- that one

10  question comes to that where if I believe -- No. 75, where

11  if I was pressured into making a decision and the decision

12  is the death penalty, and I believe that they shouldn't be

13  sentenced to the death penalty, I think -- I would have a

14  problem with that.  It's more moral than religion.

15         THE COURT:  You have used the example if 11 jurors

16  were voting for death, and you were voting not for death,

17  and you feel that you might be swayed by the majority and

18  have a difficult time with that pressure.

19         PROSPECTIVE JUROR NO. 134:  Yes.

20         THE COURT:  It would be the opposite way if the 11

21  jurors were voting for life without possibility of release

22  and you were voting for death.

23         Would you have a viewpoint -- you know, feeling

24  pressure in moving to their side, or would you feel stronger

25  about maintaining your position for death?

1          PROSPECTIVE JUROR NO. 134:  I think I would feel

2     the pressure.

3          THE COURT:  Coequally on either side?

4          PROSPECTIVE JUROR NO. 134:  Yes.

5          THE COURT:  That's interesting.

6          Could you turn to 62, 63, and 64?  These are

7     difficult questions.  Some of them are hard.  I want to go

8     to 64 for just a moment.

9          "64.  Are your views concerning the death penalty

10    such that, if you were to reach a penalty phase in this

11    case, you would have substantial difficulty in voting for

12    death as the appropriate penalty?"

13          You have marked "Yes."

14          Is that your answer, and if so, could you talk to

15    me about that?  You have indicated so far in the four

16    questions I have asked you that it depends on mitigating and

17    aggravating factors.

18          PROSPECTIVE JUROR NO. 134:  Yes, and that went

19    along with the original -- what I put for 61.  If I had to

20    sit in as a juror, of course, based on the evidence, I

21    wouldn't have difficulty, but --

22          THE COURT:  Let me excuse you for just a moment.

23    Let me talk to counsel.  I may have a few questions for you

24    in just a moment.  If you will go with Lisa for just a

25    second.  Just leave your questionnaire there, and we will

114

1  come right back to you.

2          (Prospective Juror No. 134 exits courtroom.)

3          THE COURT:  Now, I am no longer a litigator, but I

4  couldn't figure out if I sat on either one of the sides of

5  this courtroom right now whether she is pro life or pro

6  death to begin with.  Of course, that's not the standard,

7  but I think you are probably each going to have a difficulty

8  time figuring out where she stands because her answers are

9  much different, and one of the telling answers to me is No.

10  75.

11          I am concerned about her holding up under pressure

12  of course and bending to the majority will.  If you want to

13  spend a lot of time with her, I would be glad to, but I am

14  not going to excuse her for cause yet.  I just don't quite

15  know where to go with the questions because she is answering

16  the questions appropriately, although the answers on the

17  sheet are not as appropriate.

18          If you have a follow-up question, I would like you

19  to write it down for me again, and I'll attach it to the

20  back of the questionnaire.

21          MR. WHITE:  We have none, Your Honor.

22          MR. STEWARD:  We have none, Your Honor.

23          THE COURT:  Mr. Emmick?

24          MR. EMMICK:  Mine would only have one word.  I

25  could write that word down.

115

1   THE COURT:  Tell me the word is.

2   MR. EMMICK:  I was going to suggest the word "why"

3   for 64?  The reason is I don't know that we actually got an

4   explanation for No. 64.

5   THE COURT:  You didn't.

6   MR. EMMICK:  Here is our concern.  I think

7   everybody is rightly concerned about whether she will bow to

8   pressure, and that's a legitimate concern.

9   THE COURT:  That's a question for general voir

10  dire.

11  MR. EMMICK:  I agree with that, but I am unable to

12  square her "Yes" answer with 64 with the answers to 66 and

13  61 that she modified a bit here.  Perhaps if we just started

14  with why she answered that, we would have a little more

15  information.  I don't know how to evaluate it at all.

16  THE COURT:  I will be courteous to you as I was

17  with Mr. White.  I will ask the question why, but that's

18  probably where it will end.  I'm really prepared to finding

19  depending upon her answer that she is going to be coming

20  back.

21  Would you ask her to rejoin us, please.

22  (Prospective Juror No. 134 enters courtroom.)

23  THE COURT:  I just have one question that probably

24  has one word to it.  If you would turn to Question 64 again,

25  you have answered that question differently today in court.

116

1    You basically said that you were willing to -- well, let me

2    strike that.  It says:

3              "64.  Are your views concerning the death penalty

4    such that, if you were to reach a penalty phase in this

5    case, you would have substantial difficulty in voting for

6    death as the appropriate penalty?"

7              You said "Yes."

8              Why?

9              PROSPECTIVE JUROR NO. 134:  Well, I answered that,

10   "Yes" -- it would be hard for me because of what it says in

11   61.  I don't believe it's up to us if someone should die or

12   not, but if I had to sit in as a juror, based on all the

13   evidence -- of course, it would be based on all the

14   evidence.

15             THE COURT:  You would render your verdict as such?

16             PROSPECTIVE JUROR NO. 134:  Yes.

17             THE COURT:  I am going to ask you to come back and

18   join us on Wednesday, February 22, at 8:30 in the morning.

19             Lisa is going to give you a slip, and you give her

20   your questionnaire.  I know you are supposed to call the

21   jury commissioner and the jury commissioner is going to call

22   you on February 21.  I don't care what the mechanical voice

23   says.  We are starting at February 22 at 8:30 in the

24   morning.  We will probably place a follow-up phone call, but

25   no matter what, we are starting February 22.  I just don't

117

1   trust the mechanical apparatus.

2           What is going to happen is the sides are initially

3   coming together and trying to find a group of jurors that

4   think will be fair and impartial.  You are going to join

5   that body.  From that group, they will select a jury of 12

6   people and 8 to 12 alternates, so we will know on the 22nd

7   or 23rd -- I think it's only going to take about two days.

8   It could take Friday, but we will know in two or three days

9   who that jury is.  Then if you are selected, you will know.

10  If you are not selected, you will know also.  Thank you very

11  much.

12           (Prospective Juror No. 134 exits courtroom.)

13           THE COURT:  Now, this is more in line this morning

14  with my experience.  By the way, just because we have a

15  certain count of jurors, don't count on these jurors

16  returning.  Let's say we basically end up with 140.  I

17  promise you 15 or 20 are going to develop employment

18  problems.

19           So today we looked at 14 jurors.  Tomorrow morning

20  we have 15.  Tomorrow afternoon we have 15.  Of those, we

21  have Juror No. 23, Juror 25, Juror 26, Juror 28, Juror 30,

22  Juror 31, Juror 33, Juror 34, and 134.

23           MR. WHITE:  I think 23 was excused.

24           MS. FLYNN:  That's what I have as well.

25           THE COURT:  23 was excused.

1          MR. WHITE:  And 34.

2          MS. FLYNN:  Yes.

3          THE COURT:  23 was excused.  24 was excused.  We

4   have 25.  26 was returning.  27 was excused.  28 is

5   returning.  29 is excused.  30 is returning.  31 is

6   returning.  32 is excused.  33 is returning.  34 is

7   returning -- 34 is not.

8          THE COURT:  Was that the prison guard?

9          MR. STEWARD:  Yes.

10          THE COURT:  134 is returning.

11          MR. WHITE:  And 47.  It should be eight.

12          THE COURT:  And 47.  Thank you very much.

13          How many jurors is that?

14          MR. WHITE:  Eight returning.

15          THE COURT:  Out of 14.

16          MR. WHITE:  Fifteen.

17          THE COURT:  Eight out of 15.  It's hard to judge,

18   but how many did we have yesterday?  I think we had 14

19   jurors yesterday.  We have eight today in this morning

20   session for a total of 22 jurors who potentially can sit out

21   of how many total jurors have we examined?

22          MR. WHITE:  We did 15 today.

23          MS. FLYNN:  We did 20 yesterday.

24          MR. EMMICK:  We got to 21, and one was missing.

25          THE COURT:  Out of 35 jurors, we are getting 22

119

1    approximately.

2            MR. WHITE:   70 percent.

3            THE COURT:   A safe number is going to be -- it's

4    varies all over the place.   My experience has been about

5    55 percent to 75 percent.   They running in that range

6    usually.   I have had some exceptions to that.   Let's just

7    figure two-thirds.   Of 214 jurors, I guarantee five or ten

8    of those are going to call and say they just can't make it

9    in this period of time.   We are down to 205 that probably

10   will show up at the most, and we will drop at least

11   one-third.   We will in my opinion to probably about 130 to

12   140 if we are lucking.

13           Of the 130 to 140, you will still lose more

14   jurors -- even though we think we have a jury pool,

15   something happens when they go back to their employer and

16   the reality hits that they are really joining the pool.   A

17   couple of them going back right now and finally checking,

18   and their boss is telling them you're not sitting, so I

19   always figure we are going to drop some more.   What we have

20   to do is figure out along the way are we cutting it to

21   close?   Do I need to send out more jury summons?

22           Let's go through it again.   We have got 12 in the

23   boxes and potentially 12 alternates.   There could be eight

24   alternates.   Right now I'm planning on 12.   24, 30

25   preemptories per side.   Add 60 more.   That's 84.   Now, we

120

1   also gave preemptories, though, to each side for the
2   alternates.
3           MR. WHITE:  I think we said 12 apiece.
4           THE COURT:  So add 24 more.
5           MR. WHITE:  That's 108.
6           THE COURT:  Does that appear to be kind of a magic
7   number that we have to have to realistically give you all of
8   the preemptories if you decided to use every preemptory?
9           MR. WHITE:  Yes.
10          MR. EMMICK:  That's assuming none for cause during
11  the voir dire portion.
12          THE COURT:  That's assuming none for cause, and
13  that's assuming that everybody shows up.  I mean, we really
14  need a pool of at least 130 to give you a comfortable level.
15          Do I need to send out more subpoenas?  If I do, I
16  want to do it now.  I don't think, frankly, you are going to
17  use all 30, but I can't take that chance.
18          Do you want to wait until the end of the day to
19  see how we do this afternoon?  Think about it.  Let's see
20  how we do in the afternoon session.  Some days we will have
21  a great run like yesterday.  Other days none of them will
22  show up.  By that I mean, they would be disqualified
23  obviously.
24          Okay, let's reconvene at 1:15.
25          (Proceedings concluded.)

1    -oOo-

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

122

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Sharon Seffens    2/8/06

SHARON SEFFENS, U.S. COURT REPORTER