ORIGINAL

1

58

FILED
CLERK, U.S. DISTRICT COURT

AUG – 8 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1

2          UNITED STATES DISTRICT COURT

3          CENTRAL DISTRICT OF CALIFORNIA

4               SOUTHERN DIVISION

5                  - - -

6     UNITED STATES OF AMERICA,
                Plaintiff,
7          vs.
                              CR-02-938(C)
8     BARRY BYRON MILLS;           DAY 3, VOL. 1
      TYLER DAVIS BINGHAM;         HOVEY VOIR DIRE
9     CHRISTOPHER OVERTON
      GIBSON; EDGAR WESLEY
10    HEVLE,

11              Defendants.

12    ---------------------------

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              Santa Ana, California

17              February 9, 2006

18

19

20          SHARON A. SEFFENS, RPR
            United States Courthouse
21          411 West 4th Street, Suite 1-1053
            Santa Ana, CA  92701
22          (714) 543-0870

23

24

25

DOCKETED ON CM

5

040

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    DEBRA W. YANG
      United States Attorney
 4    STEVEN D. CLYMER
      Special Assistant United States Attorney
 5    Chief, Criminal Division
      STEPHEN WOLFE
 6    MICHAEL EMMICK
      TERRI FLYNN
 7    Assistant United States Attorneys
      1400 United States Courthouse
 8    312 North Spring Street
      Los Angeles, CA  90012
 9    (213) 894-0511

10    For Defendant BARRY BYRON MILLS:

11    H. DEAN STEWARD
      LAW OFFICES OF H. DEAN STEWARD
12    107 Avenida Miramar, Suite C
      San Clemente, CA
13    (949) 481-4900

14    MARK F. FLEMING
      LAW OFFICES OF MARK F. FLEMING
15    433 "G" Street, Suite 202
      San Diego, CA  92101
16    (619) 652-9970

17    For Defendant TYLER DAVIS BINGHAM:

18    MICHAEL  V. WHITE
      LAW OFFICES OF MICHAEL V. WHITE
19    1717 Fourth Street, Third Floor
      Santa Monica, CA  90401
20    (310) 576-6242

21    WILLIAM S. HARRIS
      STEWART & HARRIS
22    1499 Huntington Drive, Suite 403
      South Pasadena, CA  91030
23    (626) 441-9300

24

25
```

4

1    SANTA ANA, CALIFORNIA; THURSDAY, FEBRUARY 9, 2006; 9:15 A.M.

2            THE COURT:  We are on the record.  Mr. Mills and

3    Mr. Bingham are present.  Mr. White and Mr. Harris are

4    present.  Mr. Fleming and Mr. Steward are present.  Mr.

5    Emmick and Ms. Flynn are present.

6            Good morning.

7            Could we ask Juror No. 48 to join us, please.

8            THE COURT:  Did you pick up that material, Mr.

9    Fleming?

10           MR. FLEMING:  It's being delivered to us this

11   morning.

12           (Prospective Juror No. 48 enters courtroom.)

13           THE COURT:  Sir, if you would like to have a seat

14   with me this morning.  Would you have a seat in this chair

15   right here for just a second.

16           After you are comfortably seated, let me start by

17   saying to you that we sent you a jury summons as we did so

18   many jurors, and in that jury summons, we estimated that the

19   trial could take nine months.  I want to assure that the

20   trial will not take nine months of actual jury time, but it

21   could take place over a prolonged period of time that might

22   encompass nine months.  There are going to be numerous

23   breaks.

24           There are even to be what I call mental health

25   breaks so that counsel can catch up, you know, marshal their

1   resources so that we are in session, and both sides have a

2   chance to present the case from 8:30 in the morning to 4:30

3   or 5:00 each day.  Those breaks may come with no

4   explanation.  In fact, they will.  We will just go on a

5   break.  There are going to be numerous inconveniences for

6   you in terms of some vacations that you might be planning,

7   that you would have to take a different week, and I want you

8   to know that.

9           Now, I probably provided too much time this

10  morning.  I was back reading some other documents that I

11  needed to finish.  We gave you back your jury questionnaire

12  and asked if you would fill in any changes or modifications

13  in red ink just so I can keep track of what those are.

14          Did you make any modifications or changes?

15          PROSPECTIVE JUROR NO. 48:  No, just to a spelling

16  word.

17          THE COURT:  Do you care about the spelling,

18  Counsel?

19          Let me begin with a little background.  In cases

20  where the government is seeking the death penalty against a

21  defendant, the law provides for a two-stage trial in front

22  of the same jury.  The second stage of that trial process or

23  the second trial is oftentimes referred to as a penalty

24  phase trial, so you will hear us use the word second stage

25  or second trial or penalty phase trial.

1    I am going to ask you some questions about that
2  penalty phase trial, but by asking those questions, I am
3  really concerned the jurors would believe that I believe
4  that we are going to get there.  I just don't know if we
5  will ever get that far, but if we do -- I am hearing the
6  case for the first time just as you are.  I don't know what
7  the jury is going to do.  If we do, I need to talk to you
8  about your thoughts and feelings concerning the death
9  penalty.

10    In the first trial, the jury's job is the same as
11  it would be in any other criminal case, to decide if the
12  accused is guilty or not guilty.  If, and only if, the jury
13  returns a verdict of guilty against either defendant Mr.
14  Mills, who is the gentleman who just nodded his head, or
15  Mr. Bingham, the gentleman who just nodded his head, as to
16  the counts alleged against them which potentially carry a
17  sentence of death, then you the same jury would be asked to
18  consider the penalty in a penalty phase trial.  In that
19  penalty phase trial, you may hear additional evidence and
20  arguments by the counsel, and you will be asked to weigh
21  various aggravating factors and mitigating factors.  I will
22  explain to you what those aggravating and mitigating factors
23  are and instruct you if we get to that second phase but not
24  now.

25    Based upon these considerations, the jury in that

1  penalty phase trial by unanimous verdict or vote shall

2  recommend whether the defendant shall be sentenced to death

3  or to life imprisonment without possibility of release.

4          In any case where the charge carries a possible

5  penalty of death, the law requires that the jurors answer

6  questions regarding their thoughts, feelings and opinions

7  about the possible penalties, which is why we have intruded

8  into this very personal and private area of your life.

9          I have four questions for you this morning and

10  maybe a few follow-ups.

11          Would you automatically find for death without

12  fairly weighing the aggravating and mitigating factors in

13  the penalty phase?

14          PROSPECTIVE JUROR NO. 48:  No.

15          THE COURT:  Is there a substantial likelihood -- I

16  changed that standard from automatic to substantial

17  likelihood -- is there a substantial likelihood that you

18  would find for death without fairly weighing the aggravating

19  and mitigating factors in the penalty phase?

20          PROSPECTIVE JUROR NO. 48:  No.

21          THE COURT:  Now I am going to turn the coin all

22  the way over to the other side.

23          Would you automatically never find for death

24  without fairly weighing the aggravating and mitigating

25  factors?

1        PROSPECTIVE JUROR NO. 48:   No.

2        THE COURT:   Is there a substantial likelihood that

3   you would never find for death without fairly weighing the

4   aggravating and mitigating factors?

5        PROSPECTIVE JUROR NO. 48:   No.

6        THE COURT:   Let me turn to one question I think

7   that I hadn't gotten a checkmark on.   I understand that the

8   questionnaire is a little convoluted.   I have already had

9   that explained to me by a couple of jurors, and they're

10   right, but it really has the benefit also of making you

11   really think about the answers.   These are worded in such a

12   way that it does slow you down.

13        On Question No. 65, I didn't see a checkmark on

14   that.

15        PROSPECTIVE JUROR NO. 48:   I forgot to answer

16   that.   That's the one I did.   I'm sorry.   I didn't mark it

17   the first time, so I did mark that --

18        THE COURT:   Counsel, he has marked that "No" in

19   red.

20        Now, you stated you believe that the death penalty

21   is warranted for crimes of a heinous nature.   I expect I am

22   going to get a good number of people who are what I call

23   more inclined for the death penalty and a good number of

24   people who are more inclined against the death penalty.

25   That isn't going to be the issue.

1    The issue is if we get to the penalty phase could

2 you look at these aggravating and mitigating factors and put

3 any of your -- it's what I used to call beer talk, but it's

4 not -- any of your opinions aside and fairly weigh these?

5 Are you going to do that?

6    PROSPECTIVE JUROR NO. 48:   Absolutely.

7    THE COURT:   Let me check the second page.

8    I don't see any issue concerning 73, Counsel.   I'm

9 satisfied.

10    Let me turn back to the government.

11    MS. FLYNN:   Nothing, Your Honor.

12    THE COURT:   Mr. Emmick?

13    MR. EMMICK:   Nothing.

14    THE COURT:   Mr. White?

15    MR. WHITE:   No questions.

16    THE COURT:   Mr. Steward?

17    MR. STEWARD:   No questions.

18    THE COURT:   Thank you very much.   We are going ask

19 you to return on February 22, which is a Wednesday, at 8:30

20 in the morning.   Let me explain what is happening so there

21 is no mystery.   If you would give Lisa your questionnaire on

22 your way out.   She is going to give you a slip of paper

23 reminding you of February 22 at 8:30.

24    Now, you are going to call a mechanical voice, the

25 jury commissioner, on February 21, or they're supposed to

1   call you.  I don't trust the mechanical voice.  We are

2   starting February 22 at 8:30.  I don't care what the voice

3   says, so follow their directions, but please be here at 8:30

4   that day.

5           PROSPECTIVE JUROR NO. 48:  Absolutely.

6           THE COURT:  Thank you very much.

7           (Prospective Juror No. 48 exits courtroom.)

8           THE CLERK:  Judge, I am going to skip 49 and 50

9   because they just arrived.

10          THE COURT:  They haven't filled out the

11  questionnaire.  We will come back to them.

12          51 then.

13          I have got about another 500 pages to read.  I was

14  in a very interesting spot.  I apologize for taking a half

15  hour today, but it's hard not to read this in a block of

16  time.  I'm reading every word.  It's going to take you eight

17  hours at the most, at the very most.  Most of it you are

18  going to recognize.

19          MR. STEWARD:  Some of it we actually gave to them.

20  A couple of the transcripts they got from me.

21          MR. EMMICK:  We're giving it back to you.

22          (Prospective Juror No. 51 enters courtroom.)

23          THE COURT:  How are you today?  Good morning.

24  Would you be kind enough to have a seat right in this chair

25  here.  I think we're going to refer to you always as Juror

No. 51.

Let me start, first of all, by thanking you for filling out the questionnaire.

Second, we gave you an opportunity -- probably too much time -- but I wanted everybody to have enough time to go back over their questionnaire.  If you had any changes, we wanted you to make those in red ink.

Did you make any changes or modifications?

PROSPECTIVE JUROR NO. 51:  No.

THE COURT:  Third, you got a jury summons that said we needed you for nine months.  I have hopefully overestimated.  I wanted to be cautious.  I didn't want the public to feel that we had misled them.  You are not going to be in session for nine months.  It may encompass a long period of time, but it could be significantly shorter also. There are going to be numerous breaks.

I will never explain why those breaks are occurring.  It may require you to change a vacation, but you are going to have numerous breaks where you go back to work or to whatever you are doing, and I will try to give you notification of those in advance.  Some of those will just have to be breaks where counsel can catch up, marshal their resources, and start again so that when you come in you are working from 8:30 to 4:30 each day.  You are not in for one hour, and then you go home.

1          First of all, let me begin by telling you that in
2     cases where the government is seeking the death penalty
3     against a defendant, the law provides for a two-stage trial
4     in front of the same jury.  I will call it a first trial and
5     a second trial.  That second trial is sometimes referred to
6     as a penalty phase trial.  I am going to ask you some
7     questions about a penalty phase trial in just a moment and
8     explain a little bit more about it, but by talking to you
9     about this second or penalty phase trial, I don't want you
10    to assume that we are necessarily going to get there.  I am
11    a little concerned about that, but if we did, it's important
12    that a judge ask you these questions about your thoughts and
13    feelings concerning the death penalty at the very beginning
14    of the case.
15          In the first trial, the jury's job is the same as
16    it would be in any other criminal case, to decide if the
17    accused is guilty or not guilty.  If, and only if, the jury
18    returns a verdict of guilty against either defendant Mr.
19    Mills, the gentleman who just nodded to you, and/or
20    defendant Mr. Bingham, the gentleman who just nodded to you,
21    then the same jury will have the task of considering the
22    penalty in a penalty phase trial.  In that case, the jury
23    may hear additional evidence and arguments, and you will be
24    asked to weigh various aggravating factors and mitigating
25    factors, and I will explain those to you, as well as

1    instruct you if we ever get to that penalty phase trial but

2    not now.

3              Based upon these considerations, the jury in a

4    penalty phase trial by unanimous vote shall recommend

5    whether the defendant should be sentenced to death or to

6    life imprisonment without the possibility of release.

7              In any case in which the charge carries a possible

8    penalty of death, the law requires that the jurors answer

9    questions regarding their thoughts, feelings and opinions

10   about the possible penalties.  That's why we have intruded

11   into this very personal aspect of your life which would

12   otherwise be completely private.

13             I just have four questions initially for you.

14             Would you automatically find for death without

15   fairly weighing the aggravating and mitigating factors in a

16   penalty phase trial?

17             PROSPECTIVE JUROR NO. 51:  No.

18             THE COURT:  I am going to change that a little, a

19   different standard.

20             Is there a substantial likelihood that you would

21   find for death without fairly weighing the aggravating and

22   mitigating factors in a penalty phase trial?

23             PROSPECTIVE JUROR NO. 51:  No.

24             THE COURT:  Let me flip the coin for a moment.

25   There are two completely different questions.

1            Would you automatically never find for death

2    without fairly weighing the aggravating and mitigating

3    factors in a penalty phase trial?

4            PROSPECTIVE JUROR NO. 51:  No.

5            THE COURT:  I will change the standard a little

6    again.

7            Is there a substantial likelihood that you would

8    never find for death without fairly weighing the aggravating

9    and mitigating factors in a penalty phase trial?  Let me say

10   that again.  Is there a substantial likelihood -- I changed

11   from automatic to -- I'm using the words "substantial

12   likelihood."  Is there a substantial likelihood that you

13   would never find for death without fairly weighing the

14   aggravating and mitigating factors?

15           PROSPECTIVE JUROR NO. 51:  No.

16           THE COURT:  I think in going through your

17   questionnaire that I didn't have any other questions.

18           I don't have any further questions.

19           Mr. Emmick.

20           MR. EMMICK:  Nothing.

21           THE COURT:  MS. Flynn?

22           MS. FLYNN:  Nothing, Your Honor.

23           THE COURT:  Mr. White?

24           MR. WHITE:  Nothing.

25           THE COURT:  Mr. Steward?

```
 1          MR. STEWARD:  Nothing.
 2          THE COURT:  We am going to ask you to return to us
 3   on February 22 at 8:30 in the morning.  I know you are
 4   supposed to call the jury commissioner on February 21, and I
 5   want you to, and you're going to get a mechanical voice.  I
 6   don't trust the mechanical voice.  We are starting on
 7   February 22 at 8:30.  We are going to bring a whole group of
 8   you back.  At that time, we are going to go through the
 9   process of deciding who the 12 jurors are and the 12
10   alternates or maybe eight alternates.  In doing so, I think
11   we will know by Friday of that week -- in fact, I know we
12   will know by Friday of that week and probably Thursday,
13   within two days -- who our jury is.
14          Thank you very much.  If you will return the
15   questionnaire to Lisa, she will give you a slip to remind
16   you.
17          (Prospective Juror No. 51 exits courtroom.)
18          THE COURT:  Lisa, I think the next juror will be
19   No. 52.
20          THE CLERK:  Correct.
21          THE COURT:  Counsel, just to catch up a little
22   this morning, I'm going to go quickly.  Then if we see
23   something, I will ask you to point out the question.  That
24   way I can get back on track quickly.
25          Counsel, I might inquire about No. 14.  He is an
```

1    electrical contractor.  You may have a situation where he

2    hasn't spoken to the employer yet.  We want to make sure the

3    jurors can sit with us for this period of time.

4                 MS. FLYNN:  Your Honor, he may be self-employed.

5                 THE COURT:  Let's talk to him about that, if we

6    have a financial hardship to begin with.

7                 (Prospective Juror No. 52 enters courtroom.)

8                 THE COURT:  Sir, how are you today?  Come and join

9    me for a moment.  If you would be kind enough to have a seat

10   in the chair opposite me for just a moment.  We are going to

11   refer you to as Juror No. 52.

12                First, I want to thank you for filling out the

13   questionnaire.  It's a difficult questionnaire.  I wanted to

14   give you time this morning when you got here at 8:00 -- we

15   gave every one of you in the back a red pen.

16                Have you made any modifications or changes to the

17   questionnaire?

18                PROSPECTIVE JUROR NO. 52:  No.

19                THE COURT:  The second thing is when we sent out

20   that jury summons I wrote a letter explaining that this

21   could be a nine-month case.  I hope that I have been overly

22   cautious in that regard.  I want to tell you that you are

23   not going to be in trial for nine months, but it could

24   encompass a lengthy period of time.  We just don't know yet.

25                We are going to have numerous continuances during

1    the case.   Some of those I'm just going to call mental

2    health week continuances where the attorneys just have to

3    catch up.   Their day is just going to begin when you go home

4    at 5:00.   If they're getting anymore than five or six hours

5    of sleep a night, I'm not doing my job.

6              It's going to be pretty strenuous on them bringing

7    witnesses and trying to bring facts together and present

8    evidence on both sides, and this is a tremendous logistical

9    undertaking, so you will see these funny continuances for a

10   week or so, and I won't give you an explanation, although I

11   will try to be courteous.   You may have to change vacations

12   and other things, but we'll try to be courteous and let you

13   know.

14             I want to start by giving you a little background

15   about why we are speaking to you separately.   We are talking

16   to you about the death penalty today without the other

17   jurors present.   Later on, we will have jury selection

18   starting on February 22.

19             When the government is seeking the death penalty

20   against a defendant, the law provides for a two-stage trial.

21   The second stage of that trial in front of the same jury is

22   oftentimes called a penalty phase trial, so you will hear us

23   use words "second stage," "second trial," or "penalty phase

24   trial".   I am going to talk to you about the penalty phase

25   in just a moment, but by asking these questions, I don't

1    want you to assume that necessarily we are going to get to

2    this penalty phase trial.  I just don't know yet.  I'm going

3    to hear it for the first time just like you are.

4           In the first trial, the jury's job is the same as

5    it would be in any other criminal case, to decide if the

6    accused is guilty or not guilty.  If, and only if, the jury

7    returns a verdict of guilty against defendant Mr. Mills, the

8    gentleman nodding to you right now, or Mr. Bingham, the

9    gentleman who is nodding to you right now, as to the counts

10   alleged against them which potentially carry a sentence of

11   death, then the same jury will be asked and have the task of

12   considering the penalty in a penalty phase trial, this

13   second trial.  In that case, the jury may hear additional

14   evidence and arguments, and you will be asked to weigh

15   various aggravating and mitigating factors, and I will

16   explain what those are to you and instruct you on the law if

17   we get to a penalty phase in this case but not now.

18          Based upon these considerations, the jury by

19   unanimous vote in this penalty phase trial will recommend

20   whether the defendant should be sentenced to death or to

21   life imprisonment without the possibility of release.

22          Now, in any case in which the charge carries a

23   possible penalty of death, the law requires that jurors

24   answer questions regarding their thoughts, feelings and

25   opinions about the death penalty.  Otherwise, this is a

1    completely private matter from my perspective, and we would

2    never inquire into these opinions.

3                I have four questions I would like to start with

4    today.

5                Would you ultimately find for death without fairly

6    weighing the aggravating and mitigating factors in a penalty

7    phase trial?

8                PROSPECTIVE JUROR NO. 52:  No.

9                THE COURT:  I am going to change that standard.

10               Is there a substantial likelihood that you would

11   find for death without fairly weighing the aggravating and

12   mitigating factors in a penalty phase trial?

13               PROSPECTIVE JUROR NO. 52:  No.

14               THE COURT:  Now I am going to turn the coin all

15   the way over for a moment.

16               Would you automatically never find for death

17   without fairly weighing the aggravating and mitigating

18   factors in a penalty phase trial?

19               PROSPECTIVE JUROR NO. 52:  No.

20               THE COURT:  Is there a substantial likelihood like

21   that you would never find for death without fairly weighing

22   the aggravating and mitigating factors in a penalty phase

23   trial?

24               PROSPECTIVE JUROR NO. 52:  No.

25               THE COURT:  I don't think I have any other

1    questions but just a concern.

2              Are you self-employed?

3              PROSPECTIVE JUROR NO. 52:  Yes.

4              THE COURT:  Let me talk to you about that.  We are

5    not trying to create a hardship.  There have been some

6    fabulous jurors who have come down who I'd like to be a sign

7    on, and that would say, "I'm a conscientious juror."

8              Can you sit with us for some period over this nine

9    months?

10             PROSPECTIVE JUROR NO. 52:  Yes.

11             THE COURT:  I don't have any further questions.

12             I will turn to Mr. White.

13             MR. WHITE:  No questions.

14             THE COURT:  Mr. Steward?

15             MR. STEWARD:  No, Your Honor.

16             THE COURT:  Mr. Emmick?

17             MR. EMMICK:  No questions.

18             THE COURT:  Ms. Flynn?

19             MS. FLYNN:  Nothing, Your Honor.

20             THE COURT:  Sir, I am going to ask you to come

21   back on February 22.  It's a Wednesday.  Lisa is going to

22   give you a slip of paper with that date.  Now, I know you

23   are supposed to call the jury commissioner on February 21,

24   and the mechanical voice is going to give you instructions.

25   I don't trust that mechanical voice.  I don't care what that

1    mechanical voice says.  On February 22 at 8:30, we are

2    starting.

3            Now, on that day, there is going to be a group of

4    you who come back that both sides are accepting initially,

5    and you will undergo general questioning at that time, and

6    we will know probably by Thursday who the jury is.  Thank

7    you very much.  Return the questionnaire to Lisa, and she

8    will give you a slip.

9            (Prospective Juror No. 52 exits courtroom.)

10            THE COURT:  Counsel, on 53, there is an extensive

11    portion that wasn't filled in.  Let's take the time now

12    instead of when we reassemble the entire jury to walk

13    through some of these things.

14            MR. STEWARD:  59 is a language problem, and there

15    are also serious health concerns.

16            THE COURT:  Do you want me to start with that?

17            MR. STEWARD:  I do.

18            MR. EMMICK:  Yes.

19            THE COURT:  All right.

20            (Prospective Juror No. 53 enters courtroom.)

21            THE COURT:  Good morning.  How are you today?

22    Would you be kind enough to have a seat.  You are Juror No.

23    53.

24            PROSPECTIVE JUROR NO. 53:  Yes.

25            THE COURT:  In Question 59, you said that you do

22

1   not understand English well.

2           PROSPECTIVE JUROR NO. 53:  Yes.

3           THE COURT:  And you have diabetes and heart

4   disease.

5           Could you tell me a little bit about your health

6   and English-speaking ability?  Let's start with your health,

7   your diabetes and heart.

8           PROSPECTIVE JUROR NO. 53:  I have diabetes ten

9   years ago.

10          THE COURT:  Do you control that with shots or

11  diet?

12          PROSPECTIVE JUROR NO. 53:  Just a pill.

13          THE COURT:  Well, that's good.  My father had that

14  for a while, and you will have probably have it a long, long

15  time before you ever have to have shots.

16          How are you feeling?

17          PROSPECTIVE JUROR NO. 53:  Okay.

18          THE COURT:  What about your heart?  You said you

19  have heart disease.

20          PROSPECTIVE JUROR NO. 53:  I have heart disease in

21  my chest.

22          THE COURT:  Tell me more about that.

23          PROSPECTIVE JUROR NO. 53:  Sometimes I feel very

24  just heavy here (indicating).  Sometimes I cannot breathe.

25  When I walk to my doctor in the treatment, I can't breathe.

23

1    THE COURT:  Okay.

2         We sent you a jury summons, and I actually wrote a

3    letter and tried to explain to the perspective jurors that

4    the case could take place over a nine-month period of time.

5    I hopefully we have overestimated that time period, but the

6    case may take place over a nine-month period of time,

7    although there may be a week or extended continuances during

8    that period of time, and I won't give you an explanation.

9    It will just be because I am trying to make sure that the

10   attorneys get caught up, that they are focused, that they

11   are getting their witnesses in here, and that when we are in

12   session we have a full day.

13        Are you going to be able to keep our schedule over

14   this nine months in light of your health?  Is your health

15   good enough?

16        PROSPECTIVE JUROR NO. 53:  I can't, and I have

17   problem with my back.  I need to take a pill every two

18   hours.

19        THE COURT:  Every two hours.

20        PROSPECTIVE JUROR NO. 53:  And I need to take a

21   snack.

22        THE COURT:  Tell me about your nap.

23        PROSPECTIVE JUROR NO. 53:  No, no, snack.

24        THE COURT:  Oh, a snack.

25        If you are selected to be a juror, I can promise

1    you that you can take the pill here in court.  I promise you

2    that you can bring food in, so I don't want to exclude you

3    for that, but I don't want to force you into jury service

4    either.  If your health isn't good, then I'm concerned.

5              PROSPECTIVE JUROR NO. 53:  I have to take the

6    pills three times a day, morning --

7              THE COURT:  Let me not continue any further.

8              Counsel, for the moment, you know -- it depends

9    upon a stipulation.  From my perspective, without a

10   stipulation, I want to continue on, but if you are

11   stipulating, then I don't want to take any more of the

12   lady's time.

13             MR. STEWARD:  We will stipulate.

14             MR. WHITE:  We would stipulate.

15             MR. EMMICK:  We would stipulate.

16             THE COURT:  All counsel are stipulating to excuse

17   for health reasons.

18             MR. EMMICK:  Yes.

19             THE COURT:  We are going to thank you very much.

20   All counsel are stipulating.  I want to thank you very much

21   for being such a good citizen and coming down and being

22   willing to participate in this process.  If you would give

23   Lisa the questionnaire, you are free to go.

24             (Prospective Juror No. 53 excused.)

25             THE COURT:  Once again, remember, Counsel, that

1   without the stipulation -- and I think that was wise on

2   everyone's part -- if there is a hearing problem, we will

3   put the juror closer.  If there is a sight problem -- we are

4   not going to excuse for any infirmity as long as we believe

5   the person is capable of sitting.  We will make that

6   accommodation.

7              No. 54.

8              (Prospective Juror No. 54 enters courtroom.)

9              THE COURT:  How are you today?  Why don't you come

10  over and have a seat opposite me for just a moment.

11             First, I want to thank you for filling out the

12  jury questionnaire and taking the time to do so.  It's very

13  complete.

14             Have you made any changes or modifications?  We

15  gave each of the jurors a red pen, so if there were any

16  modifications, we would know what those were.  Did you make

17  any modifications?

18             PROSPECTIVE JUROR NO. 54:  Just a few.

19             THE COURT:  Which question?

20             PROSPECTIVE JUROR NO. 54:  Question No. 40, 42 --

21             THE COURT:  Let's start with Question No. 40.

22             What modification or change did you make?

23             PROSPECTIVE JUROR NO. 54:  It's actually the same

24  answer as for 42.  My daughter witnessed a gang-related

25  shooting near her high school about six years ago.

26

1          THE COURT:  Okay, thank you.

2          Any other changes?

3          PROSPECTIVE JUROR NO. 54:  Just a real minor one

4   under 51(c).  It asks what websites I visit.  I go to like

5   catalog websites.

6          THE COURT:  Thank you.

7          PROSPECTIVE JUROR NO. 54:  That was it.

8          THE COURT:  Thank you very much.

9          When we sent out the jury summons to prospective

10  jurors, I wanted to write a letter to each of you when you

11  received that summons, and in that letter, I explained that

12  the case could take nine months.  I want to assure you that

13  you won't be in trial every day during those nine months.

14  Hopefully, I have overestimated the time.  I didn't want

15  jurors to be misled.  By the same token that the case can

16  take a substantial period of time, there may be numerous

17  continuances.

18          I won't give you an explanation for that, although

19  I will try to give you warning about when that week may

20  come, but I want you to be in consistent session, and I want

21  those days filled.  When you are in session, those shouldn't

22  be one-hour sessions.  They should be from 8:30 to 5:00.  I

23  can promise you that the attorneys aren't going to be

24  sleeping more than four, five, or six hours a night.  If

25  they are, I'm not doing my job.  They will be under

1    tremendous strain once this trial starts.

2            I want to start this morning by saying to you that

3    in cases where the government is seeking the death penalty

4    against a defendant the law provides for a two-stage trial

5    in front of the same jury.  Oftentimes, we refer to that

6    second stage or that second trial as a penalty phase trial.

7    You will hear us use those words.

8            I am going to ask you some questions about your

9    thoughts, feelings and opinions concerning the death penalty

10   and this second stage trial, but by asking those questions,

11   I don't want you to necessarily assume that we are ever

12   going to get to that second stage or penalty phase trial,

13   but if we do, I'm required by law to ask you questions now.

14           In the first trial, the jury's job is the same as

15   it would be in any other criminal case, to decide if the

16   accused is guilty or not guilty.  If, and only if, the jury

17   returns a verdict of guilty against either Mr. Mills -- Mr.

18   Mills is the gentleman right here -- or Mr. Bingham, the

19   gentleman right here who is going to nod, the same jury will

20   have the task of considering the penalty at this penalty

21   phase trial.  In that case, that jury may hear additional

22   evidence and arguments and will be asked to weigh various

23   aggravating factors and mitigating factors, and I will

24   explain what those are and instruct you fully on the law if

25   we get to the penalty phase trial but not now.

1          Based upon these considerations, the jury in a

2    penalty phase trial by unanimous verdict shall recommend

3    whether the defendant should be sentenced to death or to

4    life imprisonment without the possibility of release.   In

5    any case in which the charge carries a possible penalty of

6    death, the law requires that jurors answer questions

7    regarding their thoughts, feelings and opinions about the

8    possible penalties.  That's why we have inquired into what I

9    think is an absolute and private matter in your life, so I

10   apologize for that, but it's necessary.

11         I am going to start with just four questions for

12   you.

13         Would you automatically find for death without

14   fairly weighing the aggravating and mitigating factors in a

15   penalty phase trial?

16         PROSPECTIVE JUROR NO. 54:  No.

17         THE COURT:  I am going to change that standard.

18         Is there a substantial likelihood that you would

19   find for death without fairly weighing the aggravating and

20   mitigating factors in a penalty phase trial?  I just changed

21   it from automatic to substantial likelihood.

22         PROSPECTIVE JUROR NO. 54:  No.

23         THE COURT:  Let me say it to you again just to be

24   sure.

25         Is there a substantial likelihood that you would

1  find for death without fairly weighing the aggravating and

2  mitigating factors in a penalty phase trial?

3  　　　　　PROSPECTIVE JUROR NO. 54:  No.

4  　　　　　THE COURT:  Now I am going to turn the coin

5  completely to the other side.

6  　　　　　Would you automatically never find for death

7  without fairly weighing the aggravating and mitigating

8  factors in a penalty phase trial?

9  　　　　　PROSPECTIVE JUROR NO. 54:  Automatically, no.

10  　　　　　THE COURT:  Is there a substantial likelihood that

11  you would never find for death without fairly weighing the

12  aggravating and mitigating factors in a penalty phase trial?

13  　　　　　PROSPECTIVE JUROR NO. 54:  There is a possibility.

14  　　　　　THE COURT:  Is that because you are uncomfortable

15  with the death penalty in some way?

16  　　　　　PROSPECTIVE JUROR NO. 54:  Yes.

17  　　　　　THE COURT:  Tell me a little bit more about that

18  for a moment.

19  　　　　　PROSPECTIVE JUROR NO. 54:  My main quandry is I

20  don't think the death penalty is evenly applied.  I think

21  some people who are guilty of very heinous crimes are not

22  given the death penalty, and other people who have committed

23  equal or lesser crimes are given the death penalty.  That's

24  one of my main concerns.

25  　　　　　Another concern is especially now with DNA

1   evidence coming out that the wrong persons are sometimes

2   executed.  It's a mistake that can't be --

3          THE COURT:  It's what I call a proportionality

4   concern.  Some people are executed, and some aren't.

5      When you balance that, you have some concern or at

6   least frustration about how that is carried out, whether

7   it's implemented fairly or not?

8          PROSPECTIVE JUROR NO. 54:  Yes.  I am also not

9   totally comfort with the notion that we have the right to

10  kill people under any circumstances.

11         THE COURT:  Would that affect you so that you

12  would have a substantial likelihood of not fairly weighing

13  these aggravating and mitigating factors?

14         PROSPECTIVE JUROR NO. 54:  I have given that a lot

15  of thought in the last couple of weeks since I had to answer

16  this.  I cannot honestly say that it would not affect my

17  ruling.  I think it would be something on my mind, and I

18  think it would affect the way that I would vote on the

19  penalty phase.

20         THE COURT:  I saw in your questionnaire -- were

21  you interested in applying for law enforcement, or have you

22  already applied?

23         PROSPECTIVE JUROR NO. 54:  No, my son.  My son is

24  very involved with law enforcement.

25         THE COURT:  I misread that.

1    Counsel, let me turn to I think the government

2  first.

3    Mr. Emmick.

4    MR. EMMICK:  Nothing, Your Honor.

5    THE COURT:  Mr. Steward.

6    MR. STEWARD:  Just a couple, Your Honor.

7    The difficulty that you are having -- I think the

8  judge gave you different standards, automatically,

9  substantial difficulty.

10    In your mind, are you at the substantial

11  difficulty standard, or are you of a mind that you could

12  look at these factors before you make a judgment?

13    PROSPECTIVE JUROR NO. 54:  You know, it's really

14  hard for me to really put myself in that position because I

15  have always thought about this on a very theoretical sort of

16  a basis, but if I was in the room having to make that

17  decision, I'm not sure.  I mean, on the one hand, I don't

18  think that the jury room is the place to change policy, and

19  I believe that my job as a juror would be to follow the law,

20  but I can't honestly say that my feelings about the death

21  penalty would not affect my judgment.

22    THE COURT:  Mr. White.

23    MR. WHITE:  So on one level, you feel as though

24  there are cases where the death penalty is appropriate?

25    PROSPECTIVE JUROR NO. 54:  You know, on an

32

1    emotional level, yes.  On a very rational level, I'm not

2    sure.

3            MR. WHITE:  So even if you sat on a jury where you

4    thought emotionally the case deserved the death penalty, you

5    are not sure that you could find for death even under that

6    circumstance?

7            PROSPECTIVE JUROR NO. 54:  I'm not sure.

8            THE COURT:  I'm going to ask you to go back to the

9    jury room for just a moment.  Let me have a discussion with

10   counsel as we are with each of the jurors for just a moment

11   outside your presence, and we will bring you right back in.

12   Just leave your questionnaire here.  Thank you for sharing

13   your thoughts with us.  We will be right with you.

14           (Prospective Juror No. 54 exits courtroom.)

15           THE COURT:  Let me hear from each of you.

16           Is there a motion by the government?

17           MS. FLYNN:  Yes.  We would move to excuse her for

18   cause.

19           THE COURT:  Mr. White?

20           MR. WHITE:  Submitted.

21           MR. STEWARD:  I'm uncomfortable.  Had she answered

22   my question about substantial difficulty and said, yes, I

23   have substantial difficulty, I wouldn't be bothered, but

24   that's not what she said.

25           THE COURT:  She is a problem for me also.  She can

1  carry out the death penalty.  She has a proportionality

2  concern.  She has a DNA concern, and this isn't going to be

3  a DNA case.  If it's there's a conviction here, it's going

4  to involve multiple murders, and she answered that question

5  from your perspective correctly.

6          By the same token, under the nicety of our

7  standards -- substantial likelihood, substantial difficulty,

8  substantial impairment -- we have agreed we could use

9  different -- she is a very difficult call.  I want to delay

10 her for a little while.  I want to bring her back.  I think

11 she is a close call for the Court in terms of including her

12 in this 150-person jury pool.

13         Let's ask her if she would remain for just a

14 moment, but we are going to want to have further discussion

15 with her.  Just ask her to bear with us today.

16         I think upon reflection also she will come out

17 even more strongly one way or the other.  That's usually my

18 experience in death cases over the years.  They will get

19 back to the jury room, and it will solidify it.  No, I can't

20 or a different change, and then I've got a better record, a

21 better ruling.

22         No. 55.

23         MR. STEWARD:  No. 3 is an interesting response.

24         THE COURT:  I read this the other night also.

25         No. 3, "Background:  Police officer."  Remember no

1    profession disqualifies.

2            MS. FLYNN:  What number are we on?

3            THE COURT:  55.

4            THE CLERK:  55 is not coming in today.  They are

5    coming in on February 17.

6            THE COURT:  Oh, we switched 55 around?

7            THE CLERK:  Yes.

8            THE COURT:  Keep 49 and 50 there.  They were a

9    little late today.

10           How about No. 56?

11           (Prospective Juror No. 56 enters courtroom.)

12           THE COURT:  Hello.  How are you?

13           PROSPECTIVE JUROR NO. 56:  Hello.

14           THE COURT:  Would you be kind enough to have a

15   seat in this chair just across the table from me.

16           Let me begin by first thanking you for filling out

17   a rather convoluted complex jury questionnaire.  It's pretty

18   complete.  We also gave a red pen to each of the jurors to

19   ask if there were any modifications or changes and if there

20   were if you would note those in red ink.

21           Did you make any changes?

22           PROSPECTIVE JUROR NO. 56:  Yes.

23           THE COURT:  Would you be kind enough to go through

24   those changes with me and just tell me the question number

25   for a moment?

1          PROSPECTIVE JUROR NO. 56:   70.

2          THE COURT:   Thank you.

3          "70.  Do you feel that the death penalty is used

4    too often?  too seldom?  randomly?"

5          PROSPECTIVE JUROR NO. 56:   I answered "No."  After

6    reading the question again this morning, I modified it

7    because of the words in the question having to do with "too

8    often."  I said I feel that the death penalty needs to be

9    used more often to deter respective crimes.

10          THE COURT:   Thank you.

11          Any other changes?

12          PROSPECTIVE JUROR NO. 56:   73.  After reading the

13    question again, I changed from ""Yes" to "No."

14          THE COURT:   "73.  Do you believe anyone who has

15    committed multiple murders should automatically, without

16    consideration of any other circumstances, be sentenced to

17    death?"

18          You have changed from "Yes" to "No"?

19          PROSPECTIVE JUROR NO. 56:   Correct.

20          THE COURT:   Anything else?

21          PROSPECTIVE JUROR NO. 56:   That was it.

22          THE COURT:   Thank you for spending the time with

23    it.

24          Now, when you received this jury summons, I wrote

25    a letter trying to inform all of you that the case could

1    take place over a period of time, as long as nine months.  I

2    can assure you this is not going to be a nine-month trial,

3    but the case can take a significant period of time.  What I

4    wanted to do was be certain that I wasn't misleading any

5    member of the public.

6            There are going to be numerous breaks in the case.

7    Counsel have to catch up.  I need to make sure the jury

8    stays focused.  When you are in session, we should be in

9    session from 8:30 to 5:00.  You shouldn't be waiting.  I can

10   tell you there will be tremendous pressure on counsel.  For

11   instance, we will be in session this Saturday.  They have

12   been in session on numerous Saturdays.  Their nights are

13   getting longer.  If they are getting any more than four or

14   five hours of sleep, something is wrong.  I need to be

15   careful about that.  You'll have notification, and I will

16   try to be courteous and say this is what is happening as

17   best I can.

18           I want to start by telling you that in cases where

19   the government is seeking the death penalty against a

20   defendant the law provides for a two-stage trial in front of

21   the same jury.  The second stage trial is sometimes called a

22   second trial, but in my profession, you oftentimes hear it

23   referred to as a penalty phase trial.  In asking you

24   questions about this second or penalty phase trial, I don't

25   want you to necessarily assume that we are going to in fact

1    get to a penalty phase trial, but we may.  I just don't know

2    yet.  I am going to hear the evidence for the first time

3    just as you are.

4         In the first trial, the jury's job is the same as

5    it would be in any other criminal case, to determine the

6    guilt or the innocence of the defendant or defendants.  If,

7    and only if, the jury returns a verdict of guilty against

8    either the defendant Mr. Mills, who is nodding his head, or

9    Mr. Bingham, who is nodding his head, as to the counts

10   alleged against them which potentially carries a sentence of

11   death, the same jury will have the task of considering the

12   penalty at a penalty phase trial.  In that case, in this

13   penalty phase trial, the jury may hear additional evidence

14   and arguments by the attorneys, and you will be asked to

15   weigh various aggravating factors and mitigating factors

16   that I will instruct you on if we get to that penalty phase

17   trial but not now.

18        Based upon these considerations, the jury in the

19   penalty phase trial by unanimous vote shall recommend

20   whether the defendant should be sentenced to death or to

21   life imprisonment without the possibility of release.

22        Now, in any case in which the charge carries a

23   possible penalty of death, the law requires that jurors

24   answer questions regarding their thoughts, feelings and

25   opinions about the possible penalties.  That's why I am

38

1    intruding into what I consider an absolutely private area.

2    The law requires me to in this case.  Otherwise, this is no

3    one's concern except yours.

4            I just have four initial questions to ask you, and

5    I think you have answered them in the jury questionnaire,

6    but I will ask them in a little different way.

7            Would you automatically -- automatically -- find

8    for death without fairly weighing the aggravating and

9    mitigating factors in a penalty phase trial?

10           PROSPECTIVE JUROR NO. 56:  No.

11           THE COURT:  I'm going to change the standard a

12   little bit.

13           Is there a substantial likelihood that you would

14   find for death without fairly weighing the aggravating and

15   mitigating factors in a penalty phase trial?

16           PROSPECTIVE JUROR NO. 56:  Repeat the first part

17   of the question.

18           THE COURT:  I moved from the word "automatic" to

19   "substantial likelihood."

20           Is there a substantial likelihood that you would

21   find for death without weighing the aggravating and

22   mitigating factors in a penalty phase trial?

23           PROSPECTIVE JUROR NO. 56:  No.

24           THE COURT:  Now I am going to turn the coin all

25   the way over for a moment.

1          Would you automatically never find -- and I will

2     say automatic again -- never find for death without fairly

3     weighing the aggravating and mitigating factors at a penalty

4     phase trial?

5          PROSPECTIVE JUROR NO. 56:  No.

6          THE COURT:  Is there a substantial likelihood that

7     you would never find for death without fairly weighing the

8     aggravating and mitigating factors in a penalty phase trial?

9          PROSPECTIVE JUROR NO. 56:  No.

10          THE COURT:  Now let me check two more changes in

11    your questionnaire for just a moment.

12          On Question No. 59, you say you are going in for

13    lasics.

14          Would that interfere with your service?

15          PROSPECTIVE JUROR NO. 56:  Actually, tomorrow I am

16    supposed to be going in to have contacts put in to see if I

17    can adapt to what they call monovision.

18          THE COURT:  If it works, let me know.

19          PROSPECTIVE JUROR NO. 56:  And then scheduling the

20    lasics after that as soon as possible.

21          THE COURT:  We will work with you in that regard

22    or try to.  I will give you a schedule in just a moment if

23    we have you coming back.

24          Mr. Steward.

25          MR. STEWARD:  No questions.

1          THE COURT:  Mr. White.

2          MR. WHITE:  Your Honor, I would have a question

3   about No. 61.

4          THE COURT:  No. 61.  I will ask that.  Just a

5   moment.

6          (Pause in proceedings.)

7          THE COURT:  You stated, "Those who are convicted

8   of willfully taking a life should be executed."

9          In other words, I'm going to get people in here

10  who are more inclined to favor the death penalty and people

11  who are less inclined to favor the death penalty.  Everybody

12  has got an opinion about the death penalty.

13         Let me go back to the standard.  I think the

14  standard is whether people can -- regardless of which side

15  they come out on if they can more fairly get into this

16  second penalty phase and weigh these aggravating and

17  mitigating factors, but I think counsel would like to ask me

18  a little bit of follow up just concerning any other thoughts

19  and feelings that you have concerning Question No. 61, or

20  does this adequately express your opinion?

21         PROSPECTIVE JUROR NO. 56:  It asks my general

22  feelings.  Generally I feel that those convicted of

23  willfully taking a life should be executed.  Of course,

24  there again there is always what you call the mitigating

25  circumstances.

```
1              THE COURT:  And you would weigh those?

2              PROSPECTIVE JUROR NO. 56:  Sure.

3              THE COURT:  Then I don't have anything else.

4         Mr. White.

5              MR. WHITE:  Can I ask a question?

6              THE COURT:  No.  You will have time to ask your

7    questions later on.

8              THE COURT:  Mr. Steward?

9              MR. STEWARD:  No.

10             THE COURT:  Mr. Emmick?

11             MR. EMMICK:  No.

12             THE COURT:  Sir, we are going to invite you back

13   on February 22 at 8:30 in the morning.  Counsel are

14   accepting a group of jurors in this regard.  The pool that's

15   formed on that day will act as the pool for the jury

16   selection in the case.  We believe that we are going to have

17   a jury pretty quick Wednesday and Thursday, but we have set

18   aside Friday just in case, and you will know if you are one

19   of the 12 jurors or 8 to 12 alternates at that time.

20             There is an instruction from our jury commissioner

21   who is a wonderful person about calling in I think on

22   February 21.  You are supposed to call a number, and they

23   tell you what to do.  I want you to follow all those

24   instructions, but it's a mechanical voice.  Anytime you get

25   that Press 1, Press 2, I'm concerned.  We are starting on
```

1    February 22 at 8:30 in the morning.  I don't care what that

2    voice tells you.  Lisa will give you notification of that.

3              Thank you, sir.  It's been a pleasure meeting you.

4              PROSPECTIVE JUROR NO. 56:  You, too.

5              (Prospective Juror No. 56 exits courtroom.)

6              THE COURT:  Now let me talk a little bit more

7    about this on the record.

8              Certainly, Mr. White, you can ask more questions

9    in general voir dire.  Remember you may have decided just as

10   the government has decided with other persons that this

11   person just gives you intuititvely an unhealthy feeling on

12   behalf of your client.  You don't want them or maybe you do,

13   but for each side, I am not going to let you get too far

14   into the general discussion as long as I am getting

15   relatively candid answers.

16             He told you what he feels.  If you don't want him,

17   I'll give you a further a preempt.  You can kick him off.

18   Just watch out because I have had the experience -- if you

19   have an intuition, kick him off on either side.  I have had

20   the experience when I wasn't doing this individually with 10

21   to 100 where someone stood up, for instance, in Superior

22   Court, and a juror said in response to a question said,

23   quote, "My sister was raped and murdered, and I'll kill

24   every son-of-a-bitch accused of this crime."  Now, I'll

25   leave that to your wisdom.

```
 1              MR. WHITE:  That's why I wouldn't ask that
 2    question.
 3              THE COURT:  That's what makes you such an
 4    excellent attorney.
 5              The second thing is there is a "Newsweek" article
 6    that came out.  Let me talk to you about that for a moment
 7    on both sides.
 8              Mike, could I get a copy of that "Newsweek"
 9    article on the monitor.
10              I took "Newsweek" for years, but I ran out of
11    money.  I'm going to read to you a little bit and ask you
12    how want me to handle this and see if we can agree.
13              Gentlemen, one of the requirements of the law is
14    that the jury doesn't know that you are shackled.  That's
15    why I have ordered for the next nine months that nobody rise
16    when I come into court.  Everybody is to remain seated.
17              Mr. Mills, and, Mr. Bingham, you don't have a
18    choice.  You are shackled, and the jury can't see that.
19              Well, let's go down and read together -- drop down
20    a couple paragraphs.  I read this again this morning.  Let's
21    go own down to the shackling.  Just slide it down the page.
22    It's down aways.  Go further down.
23              "Prosecutors acknowledge that they are taking a
24    risk by bringing so many of the men into a courtroom
25    together, but they say they have no choice.  'There really
```

1   was an idea that there should be a body blow against the

2   gang' says a government employee close to the case who

3   requested anonymity because the judge asked all participants

4   not to speak to the press."

5           You know once again you can speak to the press

6   anytime.  I'm not putting a gag order on you.  You can hold

7   press conferences in front of the courthouse.  I will just

8   have you in session six days a week, ten hours a day, to

9   protect my jury.  I don't want to start over, but you have

10  no gags.

11          "The defendants will be tried in small groups in

12  the Santa Ana, California, Federal Courthouse in a tiered

13  courtroom built especially for high-threat cases."

14          Gentlemen, the courtroom wasn't built for you.  I

15  had built it out for a Mexican Mafia case.

16          "The marshals won't discuss security details, but

17  attorneys confirm that the defendants' shackles will be

18  bolted to the floor, their restraints hidden from the jury

19  by panels.  Prosecutors will call several Aryan Brotherhood

20  members turned informants now hidden away in the prison

21  system under protective custody," blah, blah, blah.

22          In most death cases I have presided over, the

23  shackling aspects in the courtroom become somewhat a focus

24  somewhere along the way.  I think we are really lucky this

25  has come out now in terms of shackling.  Of course, if the

1    defendants were shackled in the jury's view, it portrays you

2    to the jury unfairly in terms of the danger aspect.  By the

3    same token, I have made my record why you are shackled.  I

4    won't go through that again.

5          How are we going to handle that?  How are we going

6    to handle that any jury with any common sense, quite

7    frankly, within a week will figure out that you gentlemen

8    are in custody?  They are going to know that.

9          Now, my guess is that you don't really care that

10   the jury knows that you are in custody.  The first tactical

11   decision between all of us in the real world -- not in the

12   appellate world or Supreme Court's world, which is much

13   larger than I am -- do we just want to come out with the

14   fact that Mr. Mills and Mr. Bingham -- that you gentlemen

15   are in custody?  There is no surprise about that, but we

16   always leave out the shackling.

17         No. 2, do we want to start notifying the jurors

18   about different aspects?  Should we say to them, by the way,

19   there is an article in "Newsweek"?  We are going to

20   appreciate that you not read this?  I promise as soon as you

21   say that everybody will go buy "Newsweek," or if there's an

22   article in the "Register" or the "Times," they can't resist.

23   They will go and buy it, or we can pretend that they can't

24   read.

25         I want you to think about that.  How are we going

1   to handle that?  Do you have any suggestion?  This case can

2   really heat up in terms of interest very, very quickly far

3   beyond the name Aryan Brotherhood, which, of course, already

4   a national publication has attracted a very significant

5   article.  What happens after opening statement?  You know,

6   you are dealing with 30-plus murders or attempted murders.

7   This case could end up being very dull, but I don't think

8   so.

9           Mr. Fleming, how do we want to deal with this?

10          MR. FLEMING:  With this particular article?

11          THE COURT:  And the press in general.  First of

12   all, there is no gag order.  I will never do that.  What I

13   will do -- it's not a punishment -- I will protect my jury

14   pool by speeding up the time frame becaue the more I spread

15   that out the more chances I take in terms of problems.  If

16   you think it's advantageous to both sides, I don't care.

17   Both sides seem to be talking.  One just wants to remain

18   anonymous.  I don't think there has been any harm so far.

19   In fact, I'm somewhat appreciative it's already happened so

20   we can deal with the issue now and think it through.

21          How do we want to handle this?

22          MR. STEWARD:  In terms of the shackling, I suggest

23   that we just ignore that.

24          MR. FLEMING:  I agree with that.

25          THE COURT:  No instruction to the jury?  Avoid

```
 1    "Newsweek" --
 2              MR. FLEMING:  I think we ought to ignore that
 3    issue, not comment on it, but, of course, at some point make
 4    the general inquiry whether anybody has read this article.
 5              THE COURT:  I think what I have done in the past
 6    is jokingly -- I will tell the jury that I never mean for my
 7    sense of humor to mislead people.  It's just after dealing
 8    with so many cases -- not like this but similar to this over
 9    the years -- it's just a way that I can go on and try to
10    make it a little bit more livable situation during the nine
11    months.
12              I agree with you, and I will constantly remind
13    them if anybody read anything about the case we will have to
14    start all over again.  I will also instruct them
15    appropriately.  Otherwise, we have got to sequester for nine
16    months, and instead of the 8,600 jury summons we sent out --
17    in the Mexican Mafia case, we had to send out 18,000, and
18    that was a nonsequestered situation.  We would have to run
19    20,000 to 40,000 jury summons if I sequestered the jury, and
20    then you are going to get a very stilted jury.
21              Mr. White.
22              MR. WHITE:  I think at this point --
23              THE COURT:  Ignore it?
24              MR. WHITE:  Yes.
25              MR. HARRIS:  Yes.
```

```
 1              THE COURT:  Mr. Emmick?

 2              MR. EMMICK:  We agree, and, frankly, we do this

 3     more for the defense's input.  We, of course, respond to

 4     whatever their thoughts are.  It's more a question of how

 5     they want to handle it because it's their clients' interests

 6     at stake.

 7              THE COURT:  Ms. Flynn?

 8              MS. FLYNN:  I agree.

 9              THE COURT:  Now, a couple of things that we did,

10     during the Mexican Mafia trial during that year and a half,

11     we started off and we didn't have the end partitions built

12     out.  When I had this courtoom constructed, the complex

13     courtroom, we had to put curtains up because this was open,

14     so anybody could look down, Mr. Mills, and, Mr. Bingham, and

15     see if you were shackled.  We put curtains up immediately.

16              When I had this built, I had it built as one

17     structure in a sense, so it looks like it is supposed to be

18     built this way.  That's why I had numerous photographs taken

19     for any appellate review of what the courtroom looked like.

20              Thank you very much.

21              Let's call Juror No. 57.

22              My other concern is what we are going to do if we

23     get into a discussion concerning organized crime.

24              (Prospective Juror No. 57 enters courtroom.)

25              THE COURT:  How are you today?
```

1          PROSPECTIVE JUROR NO. 57:  Good.

2          THE COURT:  Would you be kind enough to take a

3  seat in this chair just across the table from me.

4          You are Juror No. 57.

5          PROSPECTIVE JUROR NO. 57:  Yes.

6          THE COURT:  First of all, I want to thank you for

7  filling out the questionnaire and taking the time to do so.

8          PROSPECTIVE JUROR NO. 57:  You're welcome.

9          THE COURT:  Very complex questionnaire.  Some of

10  the questions are convoluted and poorly word, but it is

11  designed to make you really slow down and think about the

12  answers.

13          Have you made any changes or modifications?

14          PROSPECTIVE JUROR NO. 57:  Yes.

15          THE COURT:  Would you tell us the question?

16          PROSPECTIVE JUROR NO. 57:  Question 14.

17          THE COURT:  What have you changed?

18          PROSPECTIVE JUROR NO. 57:  I have a new job.  I am

19  now employed as a legal assistant.

20          THE COURT:  That's okay.  You don't have to

21  scrinch up your face.  I don't want to know who you are

22  working for.

23          Is the attorney that you are working for -- does

24  he or she practice criminal law?

25          PROSPECTIVE JUROR NO. 57:  No.

```
 1              THE COURT:  What else?

 2              PROSPECTIVE JUROR NO. 57:  23.

 3              THE COURT:  Thank you.

 4              PROSPECTIVE JUROR NO. 57:  I have a friend that is

 5     employed with Homeland Security.

 6              THE COURT:  Thank you very much.

 7              PROSPECTIVE JUROR NO. 57:  I added a sentence to

 8     61.

 9              THE COURT:  Okay, let me read 61 for just a

10     moment.

11              "61.  What is your general feeling regarding the

12     death penalty?"

13              "It's here to stay.  It's a tough punishment.  I

14     try not to get too involved.  Each case is individual.

15     Recently Stanley Tookie -- some felt he was rehabilitated.

16     Others didn't.  I didn't feel partial either way.  As long

17     as it doesn't directly affect me, I'm fine I think.

18              "Does the government spend a lot to have the death

19     penalty around?  Then it might bother me, but then what?

20     Nothing can be done, so I go on."

21              What did you add?

22              PROSPECTIVE JUROR NO. 57:  "Sometimes I wonder if

23     it's too harsh a punishment.  What if innocent people are

24     being put to death?"

25              THE COURT:  Thank you.
```

1    Any other changes?

2    PROSPECTIVE JUROR NO. 57: 67.

3    THE COURT: "67. Are your views expressed above

4 as set forth in Questions 62 through 65 based on other

5 reasons such as social and political considerations?"

6    You answered "Probably. It's not religion,

7 social, political, what would it be? It has to be one of

8 those three, but I am not sure which - personally." I put

9 an "X" in "No."

10    PROSPECTIVE JUROR NO. 57:

11    THE COURT: Thank you.

12    PROSPECTIVE JUROR NO. 57: I put "The law is what

13 we will follow and the evidence. It would not be social or

14 political."

15    THE COURT: Thank you.

16    PROSPECTIVE JUROR NO. 57: 70.

17    THE COURT: "70. Do you feel that the death

18 penalty is used too often? too seldom? randomly?"

19    "With so many on Death Row, how many actually get

20 put to death? I haven't studied it enough to make a

21 decision."

22    PROSPECTIVE JUROR NO. 57: "You don't hear about

23 it often enough in the news to believe it's used too often."

24    THE COURT: Thank you.

25    PROSPECTIVE JUROR NO. 57: 71.

1    THE COURT:   "71.   There has been a great deal of
2    publicity recently in the newspapers regarding the death
3    penalty.   Please describe what, if anything, you have read?"
4    "Stanley Tookie Williams and that other older guy
5    who is confined to a wheelchair," and then you put down
6    "Scott Peterson."
7    PROSPECTIVE JUROR NO. 57:   "Scott Peterson, too,
8    although I don't believe his trial is finished."
9    THE COURT:   Thank you.
10   PROSPECTIVE JUROR NO. 57:   73.
11   THE COURT:   "73.   Do you believe anyone who has
12   committed multiple murders should automatically, without
13   consideration of any other circumstances, be sentenced to
14   death?"
15   You checked "No," and you said, "I need more
16   discussion.   This answer is subject to change."
17   PROSPECTIVE JUROR NO. 57:   I added, "There are
18   other factors to consider such as mental capability,
19   upbringing, their family history.   It's important to
20   consider as much as possible."
21   THE COURT:   Thank you.
22   I want to thank you for your time and attention
23   you spent with this.
24   Any others up to the conclusion?
25   PROSPECTIVE JUROR NO. 57:   I kind of X'd out my

1  comments on the explanation sheet.  I thought maybe they

2  weren't pertinent.

3            THE COURT:  "No matter how far we have come from

4  the days before the civil war racism still exists, and

5  that's too bad.  As my dad has always said, at least you can

6  pass for white."  You crossed that out.

7            I noticed you put down half Chinese and half

8  Caucasian ethnicity.

9            PROSPECTIVE JUROR NO. 57:  Yes.

10           THE COURT:  When we sent out a jury summons to

11  you, I wrote a letter explaining that the case may take as

12  long as nine months.  First of all, I can assure you that we

13  will not be in session every day for nine months.  I tried

14  to overestimate the time so I was never misleading the

15  general public when we tried to send out a notice to the

16  jurors.

17           I want to tell you that there are going to be

18  numerous breaks.  A trial like this will go in starts and

19  stops, but the important thing is that I manage it so when

20  you are in session you are truly working from 8:30 to 5:00

21  or 4:30.  I will try to be courteous and try to extend some

22  notice to you, but sometimes you just won't get an

23  explanation.

24           I want to start with a little description.  In a

25  case where the government is seeking the death penalty

54

1    against a defendant, the law provides for a two-stage trial

2    or two trials in front of the same jury.  Oftentimes, in my

3    profession, you will hear me refer to that as a penalty

4    phase trial.  I am going to ask you some questions about the

5    second or penalty phrase trial, but by asking you these

6    questions, I don't want you to necessarily assume that we

7    are going to get to that situation, but if we do, the law

8    requires me to ask questions now about your thoughts and

9    feelings about the death penalty.

10           In the first trial, the jury's job is the same as

11   it would be in any criminal case, to decide if the accused

12   is guilty or not guilty.  If, and only if, the jury returns

13   a verdict of guilty against either the defendant Mr. Mills,

14   the gentleman who is nodding his head right now, and/or

15   Mr. Bingham, the gentleman who is nodding his head, as to

16   the counts alleged against them which potentially carry a

17   sentence of death.  Then the same jury will have the task in

18   the second or penalty phase trial of recommending a penalty.

19   In that case, the jury may hear additional evidence and

20   arguments, and you will be asked to weigh various

21   aggravating factors and mitigating factors.  I will explain

22   to you what those factors are if we get to a second or

23   penalty phase trial but not now.

24           Based upon these considerations, the jury by

25   unanimous vote shall recommend whether the defendant should

1   be sentenced to death or to life without possibility of

2   release.   In any case in which the charge carries a possible

3   penalty of death, the law requires jurors to answer

4   questions about their thoughts, feelings and opinions about

5   the possible penalties, which is why we have intruded into

6   what I consider a very personal part of your life.

7                I have just four questions for you.

8                Would you automatically find for death without

9   fairly weighing the aggravating and mitigating factors if we

10  get to a penalty phase?

11               PROSPECTIVE JUROR NO. 57:  No.

12               THE COURT:  I am going to change the standard.

13               Is there a substantial likelihood that you would

14  find for death without fairly weighing the aggravating and

15  mitigating factors if we get to a penalty phase trial?

16               PROSPECTIVE JUROR NO. 57:  No.

17               THE COURT:  Now I am going to turn the coin all

18  the way over to the reverse side for a moment.

19               Would you automatically never find for death --

20  would you automatically never find for death -- without

21  fairly weighing the aggravating and mitigating factors if we

22  get to a penalty phase trial?

23               PROSPECTIVE JUROR NO. 57:  No.

24               THE COURT:  Is there a substantial likelihood that

25  you would never find for death without fairly weighing the

56

1    aggravating and mitigating factors if we get to a penalty

2    phase trial?

3                PROSPECTIVE JUROR NO. 57:  No.

4                THE COURT:  I don't believe I have any further

5    questions.

6                Mr. Steward.

7                MR. STEWARD:  No questions.

8                THE COURT:  Mr. White?

9                MR. WHITE:  No, Your Honor.

10               THE COURT:  Mr. Emmick?

11               MR. EMMICK:  The only possibility would be No. 64.

12               THE COURT:  Let me look for just a moment.

13               You stated, "It may be difficult once it's real."

14               Can you sita?  In other words, are you willing to

15   go through the process?  64 you checked "No," which is

16   consistent with what you have answered in court, but then

17   you added, "It may be difficult once it's real."  I assume

18   what you meant by that is if I'm really in that seat.

19               Are you willing to undertake the task if you are

20   selected by both sides?

21               PROSPECTIVE JUROR NO. 57:  Yes.

22               THE COURT:  It will be difficult whatever you

23   decide in the first trial and/or if we get to a second

24   trial.  Jury service is hard.

25               PROSPECTIVE JUROR NO. 57:  That's what I meant.

1          THE COURT:  Counsel?

2          MR. EMMICK:  Nothing further.

3          THE COURT:  We are going to ask you to return to

4   us on February 22 at 8:30 in the morning.  Lisa is going to

5   give you a sheet of paper with the date on it.  I know the

6   jury commissioner is going to call you, or you are supposed

7   to call the jury commissioner on February 21, and you will

8   get a mechanical voice that will give you directions.  I

9   just don't trust the mechanical voice.  We are starting

10  February 22 at 8:30 in the morning.  I don't care what

11  anybody says.  Follow the information.  The information will

12  be accurate.  I just don't want to take any chances.

13          If you would give your questionnaire to Lisa, and

14  it's been a pleasure meeting you.

15          PROSPECTIVE JUROR NO. 57:  Thank you.

16          THE COURT:  58.

17          (Prospective Juror No. 58 enters courtroom.)

18          THE COURT:  Hello.  It's nice meeting you.  You

19  are Juror No. 58.  If you would have a seat across the table

20  from me.

21          First, I want to thank you for filling out the

22  questionnaire.

23          Second, we have tried to provide enough time so if

24  you wanted to modify or change any of the prior answers you

25  could do that in red ink, and we would know what the changes

1    are.

2              Have you modified any of the answers?

3              PROSPECTIVE JUROR NO. 58:  Yes.  On No. 6, after

4    the "City of Palm Springs," I noticed all you could read was

5    "19-".  I put "1968" on that one.

6              On No. 14, I am retired, but I went ahead and

7    dropped down to 14(d) and added that I was previously in

8    city government as a parks and recreation administrator is

9    what I did for my career.

10             On 44, I had marked "Yes" when it should have been

11   "No."

12             THE COURT:  Thank you very much.

13             When we sent out the jury questionnaire to you and

14   the other -- the jury summons to you and the other

15   prospective jurors, I wrote a letter that the case could

16   take as long as nine months.  I tried to overestimate the

17   time so that I didn't feel that the American public was

18   being misled in any way in terms of coming in for jury

19   service.  I can assure you the case is not going to take

20   nine months, although it could encompass a broad expanse of

21   time.  The case will probably start and stop to let counsel

22   catch up, let them marshal their resources, get their

23   witnesses in.  If the attorneys are getting any more than

24   four to six hours of sleep, I'm not doing my job.  They will

25   be exhausted.  This trial will be somewhat strenuous.

1    I am going to start with just a few background

2 areas for you that you may already understand.  If not, bear

3 with me.  In a case where the government is seeking the

4 death penalty against a defendant, the law provides for a

5 two-stage trial, and this second trial is oftentimes

6 referred to as a penalty phase trial.  I'm going to talk to

7 you a little bit about this penalty phase trial in just a

8 moment, but by talking to you, I don't want you to

9 necessarily assume that we will get to that second or

10 penalty phase trial, but if we did, I need to ask you

11 questions now.

12    In the first trial, the jury's job is the same as

13 it would be in any other criminal case, to determine if the

14 accused is guilty or not guilty.  If, and only if, the jury

15 returns a verdict of guilty against either the defendant Mr.

16 Mills, who is the gentleman who has just nodded his head, or

17 Mr. Bingham, the gentleman who just nodded his head, the

18 same jury will have the task in the penalty phase trial --

19 this second trial -- of considering the penalty.  In that

20 case, the jury may hear additional evidence and arguments,

21 and you will be asked to weigh various aggravating factors

22 and mitigating factors.  I will explain to you what those

23 are as well as fully instruct you on the law if we get to a

24 penalty phase trial but not now.

25    Based upon these considerations, the jury by

1  unanimous vote shall recommend whether the defendant should

2  be sentenced to death or to life imprisonment without the

3  possibility of release.

4         In any case in which the charge carries a possible

5  penalty of death the law requires that jurors answer

6  questions regarding their thoughts, feelings, and opinions

7  about the possible penalty, which is why I have intruded

8  into a very personal part of your life which is, quite

9  frankly, no one's concern or business except in this

10  particular case.

11         I just have four questions.

12         Would you automatically find for death without

13  fairly weighing these aggravating and mitigating factors if

14  we get to a penalty phase trial?

15         PROSPECTIVE JUROR NO. 58:  No.

16         THE COURT:  I am going to change the standard.

17         Is there a substantial likelihood that you would

18  find for death without fairly weighing the aggravating and

19  mitigating factors if we got to a penalty phase trial.

20         PROSPECTIVE JUROR NO. 58:  No.

21         THE COURT:  Now I am going to turn the coin

22  180 degrees over.

23         Would you automatically never find for death

24  without fairly weighing the aggravating and mitigating

25  factors if we got to a penalty phase trial?

1          PROSPECTIVE JUROR NO. 58:  No.

2          THE COURT:  Finally, is there a substantial

3    likelihood that you would never find for death without

4    fairly weighing the aggravating and mitigating factors if we

5    got to penalty phase trial?

6          PROSPECTIVE JUROR NO. 58:  No.

7          THE COURT:  I don't think I have any further

8    questions.  Let me just check.

9          (Pause in proceedings.)

10         THE COURT:  Mr. Steward?

11         MR. STEWARD:  None.

12         THE COURT:  Mr. White?

13         MR. WHITE:  No.

14         THE COURT:  Mr. Emmick?

15         MR. EMMICK:  None, Your Honor.

16         THE COURT:  Ms. Flynn?

17         MS. FLYNN:  Nothing, Your Honor.

18         THE COURT:  Thank you, sir.  In just a moment, you

19   are going to give that questionnaire to Lisa on the way into

20   the jury room, and she is going to give you a slip of paper

21   back.  On that slip of paper, it's going to ask you to

22   return on February 22, a Wednesday, at 8:30 in the morning.

23   Now, I know the jury commissioner has told you to call or

24   they are going to call you on the 21st.  You are going to

25   get a mechanical voice.  No matter what the mechanical voice

1   says, we are starting Wednesday, February 22, at 8:30.  I

2   don't trust Press 1, Press 2.  We are starting at 8:30.

3            Now, from that jury pool that has been invited to

4   come back, so there is no mystery to you we are going to

5   select 12 jurors and 8 to 12 alternates.  Sometimes things

6   happen.  People can have health problems, a tragedy, just

7   personal things in the family, and I need to make sure we

8   have enough alternates so we can finish this case.  We have

9   set aside Wednesday, Thursday, and Friday.  I think we will

10  have a jury by Thursday in this matter, and you will know

11  whether you are sitting as a juror or alternate very

12  quickly.

13            Thank you very much.  Thank you for your courtesy.

14            (Prospective Juror No. 58 exits courtroom.)

15            THE COURT:  Juror No. 59.

16            (Prospective Juror No. 59 enters courtroom.)

17            THE COURT:  Hello.  How are you today?

18            PROSPECTIVE JUROR NO. 59:  Good.

19            THE COURT:  Would you be kind enough to have a

20  seat across the table from me in this chair.

21            Let me begin by thanking you for filling out the

22  questionnaire and paying such time and attention to it.  We

23  provided each juror with a red pen in case you wanted to

24  make any changes or modifications.

25            PROSPECTIVE JUROR NO. 59:  I don't believe I made

1    any modifications at all -- no.

2              THE COURT:   Now, when we sent out the jury summons

3    to you, I wrote a letter saying that the case may take as

4    long as nine months.   I can assure you that you will not be

5    in trial every day for nine months, but the case can

6    encompass a lengthy period of time.   We may have numerous

7    continuances unexplained to you by me.   When you are down

8    here, I want us working.   I want you not to come down for an

9    hour.   We are going to be in session from 8:30 to 5:00.

10   Otherwise, I want you back at work or whatever you are

11   doing.

12             I am going to start with just some general

13   background.   You may have already known this from the

14   questionnaire but bear with me.

15             In a case where the government is seeking the

16   death penalty against a defendant, the law provides for a

17   two-stage trial or two trials in front of the same jury.   We

18   oftentimes refer to this second trial as a penalty phase

19   trial, so you will hear second trial, second stage trial,

20   penalty trial.   It's all this second trial.   By asking you

21   these questions about your thoughts and feelings concerning

22   the death penalty and this second stage trial, I don't want

23   you to necessarily assume that we will get to this second

24   stage trial, but if we do, then it's important that I ask

25   these questions now.

1          In the first trial, the jury's job is the same as

2    it would be in any other criminal case, to decide if the

3    accused is guilty or not guilty.  If, and only if, the jury

4    returns a verdict of guilty against either the defendant Mr.

5    Mills, who is the gentleman who just nodded to you, and/or

6    Mr. Bingham, the gentleman who just nodded to you, as to the

7    counts alleged against them which potentially carry a

8    sentence of death, the same jury in this penalty phase, this

9    second trial, will be asked to consider the penalty.  In

10   that case, the jury may hear additional evidence and

11   arguments by counsel, and you will be asked to weigh various

12   aggravating and mitigating factors that I will explain to

13   you and instruct you on the law about if we get to the

14   penalty phase trial but not now.

15          Based upon these considerations, the same jury in

16   this second or penalty phase trial by unanimous vote shall

17   recommend whether the defendant should be sentenced to death

18   or life imprisonment without the possibility of release.

19          Now, in any case where the charge carries this

20   possible penalty of death, the law requires that the judge

21   ask jurors questions about their thoughts, feelings and

22   opinions concerning these possible penalties.  Otherwise,

23   this is a strictly private matter.  We would have no

24   business ever inquiring into this.

25          I just have four questions I believe, sir.

1    Would you automatically find for death without

2    fairly weighing the aggravating and mitigating factors if we

3    got to a second trial or penalty phase trial?

4         PROSPECTIVE JUROR NO. 59:  Of course not.

5         THE COURT:  Is there a substantial likelihood that

6    you would find for death without fairly weighing the

7    aggravating and mitigating factors if we got to the penalty

8    phase?

9         PROSPECTIVE JUROR NO. 59:  No.

10        THE COURT:  Now I am going to turn the coin all

11   the way over to the opposite side.

12        Would you automatically never find for death

13   without fairly weighing the aggravating and mitigating

14   factors?

15        PROSPECTIVE JUROR NO. 59:  No.

16        THE COURT:  Is there a substantial likelihood that

17   you would never find for death without fairly weighing the

18   aggravating and mitigating factors?

19        PROSPECTIVE JUROR NO. 59:  No, of course not.

20        THE COURT:  Counsel, let me just check the

21   questionnaire for one moment again.  I don't think I have

22   any further questions other than thanking you further.

23        MR. EMMICK:  If I might offer --

24        THE COURT:  Just one moment.

25        (Pause in proceedings.)

1       THE COURT:  Counsel, what follow-up area?

2       MR. EMMICK:  No. 59.

3       THE COURT:  Lower back problems.  You can stand up

4   anytime you want to.  I am trying to protect myself with the

5   years, so you will see me stand up sometimes in the

6   afternoon.

7       Would that preclude you from jury service?

8       PROSPECTIVE JUROR NO. 59:  It shouldn't.  I have

9   two disks in my back that -- sometimes I can't always feel

10  my right leg, and sometimes I would need to stand.

11      THE COURT:  If you are selected, will carry you in

12  on a stretcher if you want.  I'm just kidding you.

13      PROSPECTIVE JUROR NO. 59:  There is one situation

14  I would like to bring up.  Between the time I received the

15  paperwork -- was it in October or November they sent it out?

16      THE COURT:  Yes.

17      PROSPECTIVE JUROR NO. 59:  -- and the time I

18  received my summons -- I'm going to be out the country in

19  June.

20      THE COURT:  What dates?

21      PROSPECTIVE JUROR NO. 59:  I believe we leave the

22  24th of June and come back just before the 4th of July.

23      THE COURT:  Let's go through the process for a

24  moment.  There is a certain amount of bargaining that can go

25  on.  Literally -- I don't know -- we may get to the point

1   where we need to take three weeks off during that period of

2   time, so I don't want to preclude you because I think I am

3   going to hear different time frames from all sorts of

4   jurors.

5            Can I ask you where you are going?

6            PROSPECTIVE JUROR NO. 59:  Jamaica.  It's a

7   vacation that my wife and I have saved for for a couple of

8   years.

9            THE COURT:  You go home and tell your wife so

10  there is no problem that she should count on going to

11  Jamaica even if you're a juror.  We're going to have to work

12  that out with a lot of you.  Obviously I can't do the

13  ridiculous.  We may get to a point in the general pool where

14  I just ask both counsel privately can we afford three weeks

15  off?  I'm going to have all sorts of problems with different

16  vacations, et cetera.

17           Some of those I'm going to be asking people to

18  cancel or change, and if they can't, maybe they just can't

19  sit.  There are going to be so many things coming up in the

20  trial, and I just can't predict when we will take those

21  recesses.  We could be done with the first phase and never

22  go onto the second phase by that time.  We could be done

23  with the first phase and going onto the second phase and

24  need a month or two between the two.

25           PROSPECTIVE JUROR NO. 59:  I thought it was fair

1    to bring it up.  I didn't want to create a complication for

2    either one of us.

3              THE COURT:  Perfect.  Couldn't be better.

4              Counsel, you are all aware of that.  You can make

5    a note of it.

6              Lisa is going to give you a return slip.  It's

7    going to tell to report back on February 22 which is a

8    Wednesday at 8:30.  You are going to join a group of jurors

9    who both sides are inviting back.  In that situation, we are

10   going to select from this group 12 jurors and eight

11   alternates or maybe 12 alternates.  I'm not sure yet.

12             I really believe that because of the way we are

13   going about it that we are actually going to get a jury in

14   two days, not weeks and weeks as it would normally take.  We

15   are having a chance to talk to each of you individually, and

16   we are able to ask questions about the death penalty.  We

17   are getting a lot more candid answers, and the other jurors

18   aren't playing off each other thinking there is a right

19   answer.

20             Thank you very much.  It's been a pleasure.  If

21   you would give that questionnaire to Lisa.  It's awfully

22   nice meeting you.

23             (Prospective Juror No. 59 exits courtroom.)

24             THE COURT:  Before we call in Juror No. 60, I want

25   you to be aware as I know you are of Question No. 59:  "It's

1    a long time, is so long for me."  On paper, all of the other

2    answers seem appropriate.  There is one other notation --

3             Well, let's bring the juror in, and then I will

4    ask those questions.

5             Do you see anything else, Mr. White?

6             MR. WHITE:  Only that there were a lot of none

7    answers.

8             THE COURT:  Mr. Steward?

9             MR. STEWARD:  I saw the same thing.

10            THE COURT:  Mr. Emmick?

11            MR. EMMICK:  There were some language concerns.

12            THE COURT:  Let's get the person talking and see

13   if there is any difficulty in understanding the process.

14            Juror No. 60, please.

15            (Prospective Juror No. 60 enters courtroom.)

16            THE COURT:  How are you today?  If you would come

17   over and join me, please.  It's nice meeting you.  If you

18   would be kind enough to have a seat in the chair across the

19   table from me.

20            First of all, I want to thank you for filling out

21   the questionnaire.  I can assure you I also wrote a letter

22   to the prospective jurors when they were summoned and said

23   that the case may take nine months.  You won't be in session

24   every day for nine months.  I wanted to estimate the longest

25   possible period of time so I wasn't misleading any juror.

1          Today we gave you a red pen and asked if you had

2   any changes or any modifications to your questionnaire.  Do

3   you?

4          PROSPECTIVE JUROR NO. 60:  Yes, I think I did.

5          THE COURT:  Could you tell us the number of the

6   question so all of us can turn to that?

7          PROSPECTIVE JUROR NO. 60:  69.

8          THE COURT:  Thank you.

9          "69.  Will you have any difficulty in not

10  discussing the case with anyone until it is submitted to you

11  for your decision and then discussing the case only with the

12  other jurors in the room?"

13          You said, "No."

14          Are you changing your answer?

15          PROSPECTIVE JUROR NO. 60:  Yes.

16          THE COURT:  Tell me what your change is.

17          PROSPECTIVE JUROR NO. 60:  I changed it to "Yes."

18          THE COURT:  You would have difficulty --

19          PROSPECTIVE JUROR NO. 60:  No, I don't have

20  difficulty.

21          THE COURT:  You don't have difficulty?  You could

22  keep that case to yourself?

23          PROSPECTIVE JUROR NO. 60:  You are right.

24          THE COURT:  Okay, I think she has actually

25  answered correctly from my conservation with her.

1          Let's start with some background for just a
2    moment.
3          In cases where the government is seeking the death
4    penalty against a defendant, the law provides for two trials
5    in front of the same jury.  This second trial we oftentimes
6    called a penalty phase trial.  I am going to ask you some
7    questions about the penalty phase, but I don't want you to
8    necessarily assume that we are going to get to the second or
9    penalty phase trial, but I need to ask you questions in case
10   we do.
11         In the first trial, the jury's job is the same as
12   it would be in any other criminal case, to decide if the
13   accused person is guilty or not guilty.  If, and only if,
14   the jury returns a verdict of guilty against either the
15   defendant Mr. Mills, who is this gentleman who just nodded
16   his head, and/or Mr. Bingham, this gentleman who just nodded
17   his head, as to the counts alleged against them which
18   potentially carry a sentence of death, the same jury will be
19   asked in a penalty phase trial to consider the penalty.  In
20   that case, the jury may hear additional evidence and
21   arguments, and you will be asked to weigh various
22   aggravating factors and mitigating factors.  I will explain
23   to you what those aggravating and mitigating factors are
24   that you are to consider if we get to the second or penalty
25   phase trial but not now.

1           Based upon these considerations, the jury by
2   unanimous vote in this penalty phase trial shall recommend
3   whether the defendant should be sentenced to death or to
4   life imprisonment without the possibility of release.
5           In any case in which the charge carries the
6   possible penalty of death, the law requires the Court to ask
7   and jurors questions regarding their thoughts, feelings and
8   opinions about the death penalty.  That's why we have
9   intruded into what I consider a very private area of your
10  lives.
11          I have initially just four questions.
12          Would you automatically find for death without
13  fairly weighing the aggravating and mitigating factors in a
14  penalty phase trial?
15          PROSPECTIVE JUROR NO. 60:  I don't think so.
16          THE COURT:  Is there a substantial likelihood -- I
17  am going to change that a little bit -- is there a
18  substantial likelihood that you would find for death without
19  fairly weighing the aggravating and mitigating factors if we
20  got to a penalty phase trial?
21          PROSPECTIVE JUROR NO. 60:  I really do have a
22  little bit of a problem -- everything in this life outside
23  is different than the Court's legal determination, so I
24  wonder if I might misunderstand something, and I might not
25  think really clearly, and it would maybe cause problems.

```
 1              THE COURT:  Well, let me ask you are you an
 2   American citizen?
 3              PROSPECTIVE JUROR NO. 60:  Yes.
 4              THE COURT:  How long -- were you born here, or did
 5   you migrate here?
 6              PROSPECTIVE JUROR NO. 60:  I was born in
 7   South Korea.
 8              THE COURT:  Where?
 9              PROSPECTIVE JUROR NO. 60:  Yechen (phonetic)
10              THE COURT:  I know where Inchon is and Seoul.
11              PROSPECTIVE JUROR NO. 60:  It's a little distance.
12              THE COURT:  How old were you when you migrated or
13   immigrated to the United States?
14              PROSPECTIVE JUROR NO. 60:  22, so I have been here
15   almost 30 years.
16              THE COURT:  Did you come with your parents?
17              PROSPECTIVE JUROR NO. 60:  No.  I came here with
18   marriage.
19              THE COURT:  This has nothing to do with the case,
20   but it's just kind of interesting.
21              PROSPECTIVE JUROR NO. 60:  Yes, I thought about
22   this case because it's a long range of service, several
23   months, but I have never served -- I have called in for a
24   lot of jury service, but I have never been selected, not
25   even a small case.  This would be a long trial, and, also,
```

```
 1    if we find a guilty verdict, it might go to the death
 2    penalty, so I thought maybe -- you know, I don't really have
 3    experience.  If I had experience, then, yes, I will try, but
 4    I don't have law experience at all.  Also, my English might
 5    be a little bit of a problem.
 6              THE COURT:  I may be wrong, but I think you will
 7    be able to master the English that's spoken here, but I
 8    don't know, and I will leave that to both counsel, but you
 9    have been very helpful just by talking to me.  I have a
10    better idea of your concerns now.
11              Let me go back to these questions.  You have
12    already answered these questions in the questionnaire, and I
13    want to follow up for just a moment.  I am asking them in a
14    little different way.
15              Is there a substantial likelihood that you would
16    find for death without fairly weighing the aggravating and
17    mitigating factors in a penalty phase trial?
18              PROSPECTIVE JUROR NO. 60:  No.
19              THE COURT:  Now I'm going to ask you exactly the
20    opposite question for a moment.
21              PROSPECTIVE JUROR NO. 60:  Okay.
22              THE COURT:  Would you automatically never find for
23    death without fairly weighing the aggravating and mitigating
24    factors at a penalty phase trial?
25              PROSPECTIVE JUROR NO. 60:  No.
```

```
1              THE COURT:  Is there a substantial likelihood that
2    you would never find for death without fairly weighing the
3    aggravating and mitigating factors at a penalty phase trial?
4              PROSPECTIVE JUROR NO. 60:  No.
5              THE COURT:  I don't think that I have any further
6    questions.  Just a moment.  Let me check for just one
7    moment.
8              (Pause in proceedings.)
9              THE COURT:  No, I don't.
10             Mr. Steward?
11             MR. STEWARD:  I was just wondering if 59 -- we
12   kind of talked about that.
13             THE COURT:  No, I think she has given us an
14   explanation about that.
15             Mr. White?
16             MR. WHITE:  I have nothing.
17             THE COURT:  Mr. Emmick?
18             MR. EMMICK:  Nothing.
19             THE COURT:  Ms. Flynn?
20             MS. FLYNN:  Nothing.
21             THE COURT:  I am going to ask you to return on
22   Wednesday, February 22, at 8:30.  Lisa is going to give you
23   a card with the date on it.  Let me tell you what is going
24   to happen that day so there is no mystery to it.  We are
25   bringing back a group of people, and from this group of
```

1  people, we are going to attempt to get a jury.  I think

2  there is going to be 130 people who are coming back to us.

3  In two days or maybe three -- but I think in two days -- we

4  will have a jury.  We are going to have 12 jurors and 8 to

5  12 alternates.  You are going to know if both sides are

6  asking you to be a juror or not very quickly.

7           They are aware of your concerns.  They are aware

8  of any potential language difficulty you feel you may have,

9  but I am not going to you exclude you at this time.  We will

10 have you join that group.  You seem to have a very good

11 understanding so far.  You have answered the questionnaire

12 very candidly, and it's been very helpful.  If you could

13 give your questionnaire to Lisa on the way out.

14           By the way, I know you are supposed to call on

15 February 21 a voice mail.  No matter what that voice mail

16 says, we need you here on February 22.  I don't trust the

17 mechanical voices.  We are starting February 22 at 8:30.

18           PROSPECTIVE JUROR NO. 60:  Thank you.

19           (Prospective Juror No. 60 exits courtroom.)

20           THE COURT:  Now, with that juror, if you are

21 troubled by the language barrier, you can also stipulate

22 later on, but based on the questionnaire and based upon her

23 answers, and based upon what I think the level of -- I don't

24 think we are going to be dealing with large words.  Your

25 concern may be in her ability to comprehend the jury

1   instructions, but by the same token, there are 12 jurors, so

2   I am very reluctant to disqualify somebody who has been an

3   American citizen and here 30 years, employed, et cetera.

4   It's just not appropriate at this stage.

5          Why don't we take about a 10 to 15-minute break.

6   We will be in recess for that period of time.

7          (Recess.)

8          THE COURT:  We are back in session.

9          Counsel, this would be Juror No. 61.  I will point

10  out to you that I am not going to question him at the

11  present time -- on Question No. 55, he works for CRC.

12  What's CRC?

13         MR. WHITE:  California Rehabilitation Center.

14         THE COURT:  Let's ask him about that right now.  I

15  am afraid if we get that in front of a general jury pool and

16  he comes out with something like, well, yeah, I work there,

17  and by the way, I know all about the AB, then I'm stuck in

18  front of a general jury pool with a problem.  He has also

19  worked on "America's Most Wanted."  As far as a disqualifer

20  for what I look for on paper, though, he wouldn't be one I

21  would set aside.  That changes sometimes very rapidly with

22  questioning.

23         No. 61.

24         (Prospective Juror No. 61 enters courtroom.)

25         THE COURT:  Hello.  How are you today?  It's nice

78

1    to meet you.  If you would be kind enough to have a seat

2    across the table from me in this chair.

3              You are Juror No. 61.

4              PROSPECTIVE JUROR NO. 61:  Correct.

5              THE COURT:  First of all, I want to thank you for

6    taking the time to fill out the questionnaire.  We have

7    asked all the jurors to use a red pen and try to give

8    everyone time in case there are any modifications or

9    changes.

10             Do you have any of those?

11             PROSPECTIVE JUROR NO. 61:  I just explained a

12   couple of additions.

13             THE COURT:  Why don't you tell me the question

14   number.

15

16             PROSPECTIVE JUROR NO. 61:  On Question No. 10, I

17   just explained that my wife works in the computer industry,

18   and my son is a full-time student.

19             Question 11, I just wrote two students and one

20   unknown.  I put there my 20-year-old son is a full-time

21   student.  My oldest son I am not in contact with.

22             THE COURT:  The next question?

23             PROSPECTIVE JUROR NO. 61:  On 12, I put two times.

24   Where it say "Do you attend religious service?" I forgot to

25   put the times.

1          On 13, I put down I was in the service for 52
2    days.
3          On 14, I also work at Children's Hospital of
4    Orange County in the emergency room on Sundays.  I have
5    worked as a truckdriver in my past and in sales management.
6          15, the paralegal program.I went through was an
7    ABA-approved program.
8          23, I specified -- I put down my brother was a
9    sheriff.  He is retired and has been retired for like 20
10   years.
11          THE COURT:  Your stepfather worked at CIM?  I
12   don't want to know what institution.
13          PROSPECTIVE JUROR NO. 61:  Yes, and he is retired
14   from State Forestry.
15          THE COURT:  Thank you.
16          PROSPECTIVE JUROR NO. 61:  Question 48, I forgot
17   to put down which stations I watch.  I probably listen to
18   CBS or NBC.
19          THE COURT:  Is your father still working?
20          PROSPECTIVE JUROR NO. 61:  My stepfather.  I think
21   on an on-call basis.
22          THE COURT:  Question 51(b), listing information,
23   resources.
24          I believe that's it.
25          THE COURT:  Thank you very much.

1          THE COURT:  You also stated that you work for CRC.

2          PROSPECTIVE JUROR NO. 61:  I was a liason, which

3   meant that I really didn't work for anybody.  That was just

4   the facility that --

5          THE COURT:  On "America's Most Wanted" --

6          PROSPECTIVE JUROR NO. 61:  Which question was

7   that?

8          THE COURT:  55.  It was an only a name

9   association?

10          PROSPECTIVE JUROR NO. 61:  Yes.  It's certainly

11   not one of the my favorite programs, but I have turned it

12   on, and I have seen shows.

13          THE COURT:  Oh, I see.  You didn't work for them.

14          PROSPECTIVE JUROR NO. 61:  No.  It says have you

15   read, seen, or heard --

16          THE COURT:  Thank you.

17          When I sent out the jury summons, I included a

18   personal letter to each of you indicating that the case

19   might take as long as nine months, but I tried to

20   overestimate.  I didn't want anybody to be misled.  The case

21   is not going -- you are not going to be in session for nine

22   months.  The case is going to stop and start at different

23   times.  I may even have what I call a mental health week

24   just to give the jury and the attorneys some time to catch

25   up.  I will try to negotiate with all of jurors and all

1    counsel.

2           The process requires a little bit of background.

3    In cases where the government is seeking the death penalty

4    against a defendant, the law provides for a two-stage or two

5    trials in front of the same jury.  I am going to ask you

6    some questions about this second trial in front of the same

7    jury, which we oftentimes refer to as a penalty phase trial,

8    but in asking you these questions, I don't want you to

9    assume that we will necessarily reach that trial, but if we

10   did, it's important to ask you questions now.

11          In the first trial, the jury's job is the same as

12   it would be in any other criminal case, to decide if the

13   accused is guilty or not guilty.  If, and only if, the jury

14   returns a verdict of guilty against either the defendant Mr.

15   Mills, the gentleman over here who just nodded, and/or

16   Mr. Bingham, the gentleman who just nodded over here, then

17   the same jury will have the task of considering the penalty

18   at a penalty phase trial.  In that case, the jury can hear

19   additional evidence and arguments by counsel for both sides,

20   and you are going to be call upon to look at aggravating

21   factors and mitigating factors.  I won't explain those to

22   you now, but if we get to the penalty phase, I will fully

23   instruct you on the law and how you are to deal with these

24   different factors, the aggravating and the mitigating.

25          Based upon the considerations by the jury in this

1    penalty phase trial, by unanimous vote the jury shall

2    recommend whether the defendant should be sentenced to death

3    or to life imprisonment without the possible of release.

4           In any case in which the charge carries a possible

5    penalty of death, the law requires that jurors answer

6    questions regarding their thoughts, feelings and opinions

7    about the possible penalties.  That's why we have intruded

8    into what I consider an absolutely private area.

9           I just have four questions of you I believe.

10          Would you automatically find for death without

11   fairly weighing the aggravating and mitigating factors at a

12   penalty phase trial?

13          PROSPECTIVE JUROR NO. 61:  No.

14          THE COURT:  Let me change that a little bit.

15          Is there a substantial likelihood that you would

16   find for death without fairly weighing the aggravating and

17   mitigating factors at a penalty phase trial?

18          PROSPECTIVE JUROR NO. 61:  No.

19          THE COURT:  Now, I am going to turn the coin all

20   the way over to the other side.

21          Would you automatically never find for death

22   without fairly weighing the aggravating and mitigating

23   factors?

24          PROSPECTIVE JUROR NO. 61:  No.

25          THE COURT:  Is there a substantial likelihood that

1    you would never find for death without fairly weighing the

2    aggravating and mitigating factors?

3              PROSPECTIVE JUROR NO. 61:  No.

4              THE COURT:  I don't think I have any further

5    questions.

6              Mr. Emmick?

7              MR. EMMICK:  Nothing.

8              THE COURT:  Ms. Flynn?

9              MS. FLYNN:  Nothing.

10             THE COURT:  Mr. Steward?

11             MR. STEWARD:  No, Your Honor.

12             THE COURT:  Mr. White?

13             MR. WHITE:  No, Your Honor.

14             THE COURT:  I will ask you to return February 22

15   at 8:30.  Lisa is going to give you a slip of paper.  You

16   are joining a pool of jurors that each side is inviting

17   back.  At that time, we will actually select I believe in

18   two days, although we set aside three days for jury

19   selection -- I think we will select the jury in two days and

20   the 8 to 12 alternates.  You will know in that three-day

21   period of time if you are sitting.

22             I know the jury commissioner instructed you to

23   call in.  I want to follow all those directions.  I don't

24   care what that voice says.  I don't trust mechanical voices

25   on the phone.  February 22 at 8:30 we are starting, so we

```
 1    will have you come back at that time.

 2              PROSPECTIVE JUROR NO. 61:  Thank you, Your Honor.

 3              (Prospective Juror No. 61 exits courtroom.)

 4              THE COURT:  Juror No. 62.

 5              (Prospective Juror No. 62 enters courtroom.)

 6              THE COURT:  Hello.  How are you today?

 7              PROSPECTIVE JUROR NO. 62:  I am fine.  Thank you.

 8              THE COURT:  If you would have a seat in this chair

 9    just across the table from me.  Thank you.

10              You are Juror No. 62.  First of all, let me thank

11    you for filling out the jury questionnaire.  You have

12    probably been provided with more than enough time now.

13              If have you made any modifications or changes in

14    red ink, could you tell you us what those are?

15              PROSPECTIVE JUROR NO. 62:  On Question 23, I added

16    that two friends are in a prison Outreach Program.

17              Back on 19, I added the words "or property."

18              On 26, I realized I had not given a time involved,

19    and I added about ten years ago.

20              31, another organization, Community Bible Study,

21    and I am a substitute core leader.

22              33, I changed the "No" to "Yes."  My cousin was

23    shot 20 to 25 years ago.

24              THE COURT:  That would be on 34?

25              PROSPECTIVE JUROR NO. 62:  33, and he has
```

1   completely recovered.

2              THE COURT:  About 20 years ago?

3              PROSPECTIVE JUROR NO. 62:  20 to 25.

4         On 44, I added "West Side Story."

5         On 48, I added Channel 5, KTLA.

6         On 50, I spelled Mozart correctly.

7         51(c), I added "Toys-R-Us or Nordstrom."  I am

8    sure that's what you all wanted to know.

9              On 54 and 55, I added, "Just what the judge told

10   us."  I think that's it.

11             THE COURT:  Thank you very much.

12             Now, when we sent out the jury questionnaire to

13   you -- when we sent out the jury summons to you, I was

14   hopefully careful and estimated that the case could take up

15   to nine months, but I am hopeful that I have overestimated

16   the time.  I can assure you that you are not going to be in

17   trial those entire nine months.  We are going to start and

18   stop.  Counsel need to catch up.  Witnesses are coming from

19   a lot of different places for the parties on both sides.

20   Everybody is going to be inconvenienced.  It's not going to

21   be nine months, but it can encompass that long of a time.

22             I want to start by saying to you in cases where

23   the government is seeking the death penalty against a

24   defendant, the law provides for two trials in front of the

25   same jury.  I am going to ask you some questions about the

1    second trial and talk to you a little bit about it.  We

2    sometimes refer to that as a penalty phase trial, so you

3    will hear us say second stage trial, second trial, or

4    penalty phase trial.  It's all the same thing.  I don't want

5    you to necessarily assume from my questions that we are

6    going to get to this penalty phase trial, this second trial,

7    but if we do, it's important that I ask you questions now.

8           Now, in the first trial, the jury's job is the

9    same as it would be in any other criminal case.  That's to

10   decide if the accused is guilty or not guilty of the

11   offense.  If, and only if, the jury returns a verdict of

12   guilty against either the defendant Mr. Mills, who is the

13   gentleman who just nodded to you, and/or Mr. Bingham, the

14   gentleman who just nodded to you, then the same jury will

15   have the task of considering a penalty at a penalty phase

16   trial.

17          In that case, the jury may hear additional

18   evidence and arguments, and you will be asked to weigh

19   various aggravating factors and mitigating factors.  I won't

20   explain to you what those are right now, only if we get to

21   that second trial, and then I will thoroughly instruct you

22   on the law and thoroughly explain how you are to deal with

23   these factors, mitigation and aggravation.  Now, if we get

24   do that point in the second trial the penalty phase trial,

25   then the jury by unanimous vote shall recommend whether the

1  defendant should be sentenced to death or to life

2  imprisonment without possibly of release.

3          In any case in which the charge carries a possible

4  penalty of death, the law requires that jurors answer

5  questions regarding their thoughts, feelings, and opinions

6  about the possible penalties.  That's why we are intruding

7  into an area that normally is an absolute private matter.

8          I just have four questions for you today.  Then I

9  will check with counsel in just a moment.

10          Would you automatically find for death without

11  fairly weighing the aggravating and mitigating factors if we

12  got to a penalty phase trial?

13          PROSPECTIVE JUROR NO. 62:  No.

14          THE COURT:  Let me change that a little bit.

15          Is there substantial likelihood that you would

16  find for death without fairly weighing the aggravating and

17  mitigating factors if we got to a penalty phase trial?

18          PROSPECTIVE JUROR NO. 62:  No.

19          THE COURT:  Now I am going to turn the coin clear

20  over on the other side.

21          Would you automatically never find for death

22  without fairly weighing the aggravating and the mitigating

23  factors in a penalty phase?

24          PROSPECTIVE JUROR NO. 62:  No.

25          THE COURT:  Is there a substantial likelihood that

1   you would never find for death without fairly weighing the

2   aggravating and mitigating factors in a penalty phase?

3            PROSPECTIVE JUROR NO. 62:  No.

4            THE COURT:  I don't have any other questions.

5   Mr. Emmick, or, Ms. Flynn?

6            MS. FLYNN:  Nothing.

7            THE COURT:  Mr. Steward?

8            MR. STEWARD:  No, Your Honor.

9            THE COURT:  Mr. White?

10           MR. WHITE:  No, Your Honor.

11           THE COURT:  We are going to ask you to come back

12   on February 22 at 8:30.  Lisa will give you a slip of paper,

13   and you will hand her the questionnaire.

14           Before you leave, let me explain to you what is

15   happening.  Counsel for both parties are inviting back a

16   general pool of jurors from the group we meet.  From that

17   pool of jurors, they will select 12 jurors and 8 to 12

18   alternates to sit on this case.  I really believe because of

19   the process we are going through that we will probably get

20   the jury in two days, Wednesday and Thursday, but we have

21   reserved Friday just in case, so, therefore, within three

22   days, you will know if you are a juror or not.

23           PROSPECTIVE JUROR NO. 62:  Fine.

24           THE COURT:  Thank you very much.  I know the jury

25   commissioner has told to you call in on the 21st.  I don't

1    care what the mechanical voice says.  I know they will get

2    it right, but we are starting February 22 at 8:30.

3                   (Prospective Juror No. 62 exits courtroom.)

4                   THE COURT:  No. 10 is hilarous.

5                   "10.  What are the occupations of the persons you

6    live with, and how are they related to you?"

7                   "My wife is living with you, and she is a

8    secretary."

9                   Of course, we have got 62, 63, and 65.  I need to

10   make certain that those are the correct answers.  On this

11   occasion, I think they would cause concern to both parties

12   because I don't know --

13                  MR. STEWARD:  68 and 69 as well.

14                  THE COURT:  Yes.

15                  MR. EMMICK:  On the language issue, perhaps 75 and

16   76.

17                  THE COURT:  What we may have is a language issue

18   here.  Well, we be able to determine very quickly --

19                  Can we have No. 63, please.

20                  (Prospective Juror No. 63 enters courtroom.)

21                  THE COURT:  Hello.  How are you today?

22                  PROSPECTIVE JUROR NO. 63:  Good.

23                  THE COURT:  Would you be kind enough to have a

24   seat, please.

25                  I want to thank you for filling out the

1    questionnaire.

2              PROSPECTIVE JUROR NO. 63:   Thank you.

3              THE COURT:   We provided you with a red pen.

4              If you made any changes or modifications, could

5    you tell us what question number and what the change is?

6              PROSPECTIVE JUROR NO. 63:   On No. 6, I changed the

7    date, 1990 to 2002.

8              No. 64.

9              THE COURT:   "64.   Are your views concerning the

10   death penalty such that, if you were to reach a penalty

11   phase in this case, you would have substantial difficulty in

12   voting for death as the appropriate penalty?"

13             PROSPECTIVE JUROR NO. 63:   I said "Yes" to that.

14             No. 75.

15             THE COURT:   "75.   Is there anything that you would

16   like to bring to the Court's attention that might in any way

17   affect your ability to be a fair and impartial juror in this

18   case?"

19             PROSPECTIVE JUROR NO. 63:   I meant 65.   I'm sorry.

20             THE COURT:   "65.   Are your views concerning the

21   death penalty such that, if you were to reach a penalty

22   phase in this case, you would have substantial difficulty in

23   voting for life imprisonment as the appropriate penalty?"

24             PROSPECTIVE JUROR NO. 63:   I said, "No."

25             No. 73.

1        THE COURT:  "73.  Do you believe anyone who has

2   committed multiple murders should automatically, without

3   consideration of any other circumstances, be sentenced to

4   death?"

5        PROSPECTIVE JUROR NO. 63:  I said, "Yes."

6        THE COURT:  So you changed that.

7        PROSPECTIVE JUROR NO.63:  74(c).

8        THE COURT:  "74(c).  Do you feel you will have any

9   difficulty following the Court's instructions?"

10       You changed that.

11       Are those all the changes?

12       PROSPECTIVE JUROR NO. 63:  Yes.

13       THE COURT:  Thank you very much.

14       When we sent out the jury summons to you, we

15   estimated that the case might take nine months.  I can

16   assure you we won't be in trial every day of those nine

17   months, but the case can take place over a long period of

18   time, although there will be starts and stops at different

19   times, and we will take a recess.

20       I want to go through some background information

21   about the process.

22       In cases where the government is seeking the death

23   penalty against a defendant, the law provides for two trials

24   in front of the same jury.  I am going to ask you some

25   questions about this second trial in front of the jury that

1   we sometimes call a penalty phase trial.  By asking these

2   questions, I don't want you to necessarily assume that we

3   will get to the second or penalty phase trial, but I need to

4   ask you questions now in case we do.

5          In the first trial, the jury's job is the same as

6   it would be in any other criminal case, to decide if the

7   accused is guilty or not guilty.  If, and only if, the jury

8   returns a verdict of guilty against either the defendant Mr.

9   Mills, who is the gentleman right here, and/or the gentleman

10  right here, Mr. Bingham, who just nodded to you, the same

11  jury if they reach the counts alleged against either of

12  these defendants which potentially carry a sentence of death

13  will be asked to consider the penalty.  In that case, in the

14  second or penalty phase trial, the jury may hear additional

15  evidence and arguments, and that jury will be asked to weigh

16  various aggravating factors and mitigating factors.  I will

17  explain those to you and instruct you fully on the law if we

18  get to a second penalty phase trial but not now.

19         Based upon these considerations, the jury by

20  unanimous vote shall recommend whether the defendant should

21  be sentenced to death or to life imprisonment without

22  possibility of release.  In any case in which the charges

23  carry a possible penalty of death, the law requires that

24  jurors answer questions regarding their thoughts, feelings

25  and opinions about the possible penalties, which is why we

1    are talking to you now.

2              I have four questions for you initially.

3              Would you automatically find for death without

4    fairly weighing the aggravating and mitigating factors at a

5    penalty phase trial?

6              PROSPECTIVE JUROR NO. 63:  Do I have to say yes or

7    no to the question?

8              THE COURT:  It's a question, yes.

9              Do you want me to read that to you again?

10             PROSPECTIVE JUROR NO. 63:  Yes.

11             THE COURT:  Would you automatically find for death

12   without fairly weighing the aggravating and mitigating

13   factors at a penalty phase trial?

14             PROSPECTIVE JUROR NO. 63:  No.

15             THE COURT:  Is there a substantial likelihood that

16   you would find for death without fairly weighing the

17   aggravating and mitigating factors at a penalty phase trial?

18             PROSPECTIVE JUROR NO. 63:  Yes.

19             THE COURT:  Now I am going to the other side of

20   the coin.

21             Would you automatically never find for death

22   without fairly weighing the aggravating and mitigating

23   factors at a penalty phase trial?

24             PROSPECTIVE JUROR NO. 63:  No.

25             THE COURT:  I will change that a little bit.

1          Is there a substantial likelihood that you would

2     never find for death without fairly weighing the aggravating

3     and mitigating factors at a penalty phase trial?

4          PROSPECTIVE JUROR NO. 63:   No.

5          THE COURT:   Now, you said there was a substantial

6     likelihood that you would find for death without fairly

7     weighing the aggravating and mitigating factors.

8          Could you explain that to me just a little bit

9     more fully what your thoughts are about that?   Is there

10    anything else you wanted to say?

11         PROSPECTIVE JUROR NO. 63:   I don't have anything

12    to say.

13         THE COURT:   Let me talk to the attorneys for just

14    a minute.   Would you go back into the room with Lisa for

15    just a minute.   Just leave your questionnaire here for a

16    second.

17         (Prospective Juror No. 63 exits courtroom.)

18         THE COURT:   I am going to throw open the questions

19    because I'm confused by the answers in relation to the

20    questionnaire.   I can't quite discern where he is at.   I

21    don't know if it's a language issue.   I don't feel very

22    comfortable -- I felt very comfortable with the former

23    person who expressed some trepidation about their English

24    and their ability to communicate, and their answers seemed

25    to be consistent one way or the other.

1      Here I am getting a tremendous amount of

2  inconsistency, which causes me to think that you are really

3  placing the fate on both sides to a flip of the coin.

4  Therefore, I don't think that this juror is comprehending,

5  but I am not going to intrude.  I leave that to your wisdom

6  and what you want to do.

7           MR. EMMICK:  We will stipulate.

8           THE COURT:  Mr. White, will you?

9           MR. WHITE:  We will stipulate.

10           THE COURT:  Mr. Steward, will you?

11           MR. STEWARD:  Yes.

12           THE COURT:  Everybody feel comfortable with that?

13  Mr. Bingham?

14           DEFENDANT BINGHAM:  Yes.

15           THE COURT:  Mr. Mills?

16           DEFENDANT MILLS:  Yes.

17           THE COURT:  Lisa, would you bring Juror No. 63

18  back?

19           (Prospective Juror No. 63 enters courtroom.)

20           THE COURT:  Sir, we want to thank you very much.

21  We have all agreed to thank and excuse you.  I appreciate

22  your attendance today.  Thank you very much.

23           (Prospective Juror No. 63 excused.)

24           THE COURT:  Juror No. 64.

25           MS. FLYNN:  We were scheduled only to go through

1   Juror No. 63 this morning.

2          THE COURT:   Okay.   We have 49 and 50 who are left

3   and 55 and 54.

4          Lisa, our records show we have 49, 50, 55, and 54.

5          THE CLERK:   55 is coming in another day, but we do

6   have 49 and 50, and you wanted to see 54 one more time.

7          THE COURT:   Let's take Juror No. 49.   There is a

8   potential hardship on Question No. 14.   He is a day trader

9   by profession.

10          (Prospective Juror No. 49 enters courtroom.)

11          THE COURT:   How are you today, sir?   If you would

12   come and join me, I would appreciate it and if you would be

13   kind enough to have a seat.

14          First, thank you for filling out the

15   questionnaire.   We tried to provide each juror with a red

16   pen.

17          If you have made any modifications or changes,

18   could you tell us what number that is?

19          PROSPECTIVE JUROR NO. 49:   I didn't make any

20   modifications.

21          THE COURT:   When we sent out the questionnaire to

22   all the jurors, I wanted to be very cautious and not mislead

23   anybody.   I hope I overestimated the trial when I put down

24   nine months.   I can assure you we won't be in trial every

25   day for nine months.   There will be starts and stops to this

1   trial and even continuances for no other reason except where

2   I need to call a week for what I call a mental health week.

3   I won't give an explanation, but I will try to be courteous

4   and tell people in advance what those will be.

5           I want to go through a little bit of background

6   with you.

7           In cases where the government is seeking the death

8   penalty, the law provides for two trials in front of the

9   same jury.  We oftentimes refer to this second trial as a

10  penalty phase trial, so you will hear words overlap like

11  second tier trial, second trial, penalty phase trial.  It's

12  all the same thing.  By asking questions today of you about

13  this penalty phase trial, I don't want you to assume

14  necessarily that we will get there, but if we do, then I am

15  required by law to ask questions at the beginning.

16          In the first trial, the jury's job is the same as

17  it would be in any other criminal case, to decide if the

18  accused is guilty or not guilty.  If, and only if, the jury

19  returns a verdict of guilty against either the defendant

20  Mills -- Mr. Mills is here nodding -- and/or the defendant

21  Mr. Bingham, who is here nodding, as to the counts alleged

22  against them which potentially carry a sentence of death,

23  the same jury will have the task of considering what the

24  penalty should be at this penalty phase trial.  In that

25  case, in this penalty phase or second trial, the jury may

1    hear additional evidence and arguments by the attorneys, and

2    you may have various aggravating and mitigating factors to

3    weigh.   I will explain to you what those are if we get to

4    that penalty phase trial and fully instruct you on the law

5    and how to deal with that.

6           Based upon these considerations by the jury in

7    this second trial, by unanimous vote, the jury shall

8    recommend whether the defendant should be sentenced to death

9    or to life imprisonment without the possibility of release.

10          Now, in any case in which the charge carries a

11   possible penalty of death, the law requires that the Court

12   ask and the jury answer questions regarding their thoughts,

13   feelings and opinions about the possible penalty.

14   Otherwise, this is no one's concern.   This is a private

15   matter, and we shouldn't be delving into it, but understand

16   these circumstances, we are required to.

17          I think I have very few questions to begin with.

18          Would you automatically find for death without

19   fairly weighing the aggravating and mitigating factors if we

20   got to a penalty phase trial?

21          PROSPECTIVE JUROR NO. 49:   It just depends on the

22   facts.   I don't know.   I can't answer that.

23          THE COURT:   Okay.   I have got three more questions

24   to go.

25          Is there a substantial likelihood that you would

1     find for death -- a substantial likelihood that you would

2     find for death -- without fairly weighing the aggravating

3     and mitigating factors if we got to a penalty phase trial?

4                    PROSPECTIVE JUROR NO. 49:  Can you repeat that

5     again?

6                    THE COURT:  Is there a substantial likelihood that

7     you would find for death without fairly weighing the

8     mitigating and aggravating factors in a penalty phase trial?

9                    PROSPECTIVE JUROR NO. 49:  I don't know.  I am

10    not -- based on what I put on my paperwork -- I mean, why

11    waste people's tax money housing somebody that has committed

12    murder or a serious crime.  It seems like a waste of my

13    money and everybody else's.

14                   THE COURT:  Let me ask the opposite question for a

15    moment, the other side of the coin.

16                   Would you automatically never find for death

17    without fairly weighing the aggravating and mitigating

18    factors at a penalty phase trial?  Would you automatically

19    never find for death without weighing the aggravating and

20    mitigating factors at a penalty phase trial?

21                   PROSPECTIVE JUROR NO. 49:  The facts would have to

22    be there to go to that level.

23                   THE COURT:  Is there a substantial likelihood that

24    you would never for death without fairly weighing the

25    aggravating and mitigating factors?

100

1    PROSPECTIVE JUROR NO. 49:  I'm not understanding.

2    THE COURT:  Tell me a little about your thoughts

3  and feelings concerning the death penalty.  I think you

4  started to.  Talk to me about what your thoughts are.

5    PROSPECTIVE JUROR NO. 49:  What do you want to

6  know?  You have sped up a little bit.  I have worked in

7  construction for 16 years and banging --

8    THE COURT:  You said, "Everyone on Death Row

9  should be put to death.  Quit wasting mine and everyone

10  else's tax money."

11    Can you tell me a little more about your thoughts

12  and feelings concerning that?

13    PROSPECTIVE JUROR NO. 49:  All these people on

14  Death Row are sitting there wasting our tax money.  I

15  haven't been working for a year and a half, but when I was

16  working, I worked hard for the money.  If these people are

17  wasting my tax money sitting there, get rid of them.  It's a

18  waste of my time and money to me.

19    THE COURT:  Let me ask you to go back in the jury

20  room for a moment.  I want to have a conversation with both

21  sides, and then we will be back to you in just a moment.

22  Why don't you take that with you, and I will see you in just

23  a few moments.  Thanks a lot.

24    (Prospective Juror No. 49 leaves courtroom.)

25    THE COURT:  Is there a motion?

*SHARON SEFFENS, U.S. COURT REPORTER*

101

1          MR. WHITE:  Yes, Your Honor.

2          MR. STEWARD:  Yes.

3          THE COURT:  Any objection by the government?

4          MS. FLYNN:  No.

5          THE COURT:  Submitted.

6          MR. EMMICK:  Yes.

7          THE COURT:  We are going to excuse the juror.  He

8    is obviously not qualified to sit on this matter.  We will

9    excuse him for bias.

10          Would you ask the gentleman to come back in.

11   Lisa, collect his sheet also.

12          (Prospective Juror No. 49 enters courtroom.)

13          THE COURT:  Thank you very much.  We are going to

14   thank and excuse you at this time.

15          (Prospective Juror No. 49 excused.)

16          THE COURT:  Juror No. 50, please.

17          (Prospective Juror No. 50 enters courtroom.)

18          THE COURT:  If you would come in sir.  How are you

19   today?  It's nice meeting you.  Would you be kind enough to

20   have a seat in this chair.  After you are seated, let me

21   talk to you a little bit.

22          First of all, I want to thank you for filling out

23   the jury questionnaire.

24          If you made any modifications or changes in red

25   ink, just tell me the question and then tell us the change.

102

1           PROSPECTIVE JUROR NO. 50:  On 51, just the

2    question on what I use it for, the Internet.  I just added

3    "Banking" on there.

4           On the back, I just wrote if I could request to be

5    excused because it would be a financial burden for me.

6           THE COURT:  You are employed right now as a

7    customer service agent.

8           PROSPECTIVE JUROR NO. 50:  Yes.  I just started.

9           THE COURT:  And a financial burden --

10          PROSPECTIVE JUROR NO. 50:  Well, I got laid off

11   last year, and I'm beginning to recover.  After sending in

12   the questionnaire, I found out they don't pay.

13          THE COURT:  So there has been a change in your

14   circumstances.

15          PROSPECTIVE JUROR NO. 50:  Yes.

16          THE COURT:  Counsel, do you want me to inquire any

17   further?

18          MS. FLYNN:  No.

19          MR. STEWARD:  No.

20          MR. WHITE:  No.

21          THE COURT:  Will counsel excuse this gentleman?

22          MR. STEWARD:  Yes.

23          MR. WHITE:  Yes.

24          MR. EMMICK:  Yes.

25          MS. FLYNN:  Yes.

103

1          THE COURT:  Sir, we are going to thank and excuse

2     you for a financial hardship.  That's by stipulation.

3          (Prospective Juror No. 50 excused.)

4          THE COURT:  Now, counsel with the last juror of

5     this morning's session, let's have a discussion outside --

6          Lisa, don't bring this juror in for just a moment.

7          Let's just take a moment to refresh our

8     recollection because this is going to be a very difficult

9     call.  This juror states, "Emotionally there are people who

10    deserve to die for what they have done, but I have a lot of

11    reservations because the death penalty is not evenly or

12    fairly applied because mistakes are made regarding the guilt

13    of some people."

14         So on one hand when I read the questionnaire, she

15    is not opposed to it.  On the other hand, there is a

16    reluctance on Question 64 in terms of voting for death.  I

17    gave her time to reflect.  I think all of this is going to

18    become much more clearer, but I may have to excuse her one

19    more time and have a discussion out of the presence of her

20    for a moment with each of you.  So let's go slowly, and

21    bring her back in and see where it takes us.  I don't think

22    I am going to read this preamble to her again.  I don't

23    think I have to.

24         I think also we need to give her the chance to

25    speak.  Then if you have questions on either side, if you

104

1    want to ask those questions again, I will bear with you, and

2    we will ask those.

3                   (Prospective Juror No. 54 enters courtroom.)

4                   THE COURT:  Hello.  Come and join us again.

5                   First of all, all of us want to apologize to you

6    for sending you back and keeping you this long, but we do

7    really want to talk to you.

8                   Instead of us talking to you, tell us anything you

9    would like to about your thoughts and feelings.  I think

10   that might be more beneficial than some of the legal

11   standards that we are operating -- some of them are

12   confining.

13                  On one hand, you have expressed just to refresh

14   our recollection a concern about proportionality.  If it was

15   carried out, it might not be carried out fairly.  You have

16   considered a word about DNA evidence and some of the

17   concerns in terms of executions that might take place,

18   especially in light of some of the notority around DNA,

19   finding various people who were falsely accused.

20                  Is there anything that you can tell us in regard

21   to that?

22                  PROSPECTIVE JUROR NO. 54:  It's really difficult

23   for me to answer these questions because I do feel a little

24   bit ambivalent about these issues.  Also, because as I said,

25   I have only thought about theoretically.  If I were in a

1    position of having to make those decisions in a very real

2    situation, I'm not totally sure how I would react to be very

3    honest.

4               THE COURT:  And you probably can't determine that

5    right now because there is no evidence in front you.

6               PROSPECTIVE JUROR NO. 54:  Right.

7               THE COURT:  Well, I don't care which side I start

8    with.  I don't care who wants to ask questions.  I will give

9    two rounds to the parties and maybe even additional if you

10   would like to.

11              Do you want to start, Mr. White, or, Mr. Steward?

12              MR. WHITE:  I will give it a go.

13              THE COURT:  Okay.

14              MR. WHITE:  Good morning again.  Again, to

15   reiterate, we very much appreciate your attempting to come

16   to grips with us.  I guess -- again, it sounds like that you

17   do believe at least emotionally that there are some

18   circumstances -- if you were convinced beyond a reasonable

19   doubt that the person was guilty so that there was no

20   question about DNA issues that would come up in the future,

21   and if you were not bothered in a particular case about the

22   proportionality issues, the color of one's skin, you believe

23   emotionally there would be a case that does warrant the

24   death penalty; is that right?

25              PROSPECTIVE JUROR NO. 54:  Yes, I think so.

106

1      MR. WHITE:  Now, your concern is -- the difficulty

2   in that circumstance where you feel the case warranted the

3   death penalty -- your concern is the difficulty you might

4   have in actually voting for death?

5      PROSPECTIVE JUROR NO. 54:  Yes.

6      MR. WHITE:  I think the law doesn't -- these are

7   not easy decisions for anybody.  Do you understand that?

8      PROSPECTIVE JUROR NO. 54:  Yes.

9      MR. WHITE:  So there is definitely no requirement

10   that it be easy for a juror to make this very momentous

11   decision.  Do you understand that?

12      PROSPECTIVE JUROR NO. 54:  Yes.

13      THE COURT:  I note from your history that you are

14   someone who takes your responsibility as a citizen very

15   seriously.

16      PROSPECTIVE JUROR NO. 54:  Yes, that's true.

17      MR. WHITE:  So, again, I think the question is

18   knowing that it's not an easy decision or should not be an

19   easy decision for anybody, do you think you can sit on this

20   case if you get to the point where you think in this case

21   after having found someone guilty that the death penalty is

22   warranted that you can make that tough decision?

23      PROSPECTIVE JUROR NO. 54:  I think I could say

24   that if I was completely convinced that the person was

25   guilty, and if the law says that the penalty was the death

107

1   penalty, then I would follow the law.

2          MR. WHITE:  Now, the law is never going to tell

3   you that you have to decide that the appropriate punishment

4   is death.

5          So the question is after following the

6   instructions that the Court has given you, if after weighing

7   the factors in mitigation, or good things, or the factors in

8   aggravation, the bad things, applied to one or more of the

9   people that are on trial -- if after making that decision

10   you think that the death penalty is the appropriate

11   punishment, can you make that difficult decision if you

12   decide it's the right decision?

13          PROSPECTIVE JUROR NO. 54:  You know, if it's a

14   matter of a choice, I would probably tend toward choosing

15   live imprisonment over capital punishment.

16          MR. WHITE:  But what I am asking you is this.

17   It's not an issue about tending to.  It's an issue about

18   being on a case where you feel as though the death penalty

19   is warranted.

20          If you feel as though the death penalty is

21   warranted, could you make that difficult decision and vote

22   for the death penalty?

23          THE COURT:  Based upon the aggravating and

24   mitigating factors.

25          MR. WHITE:  Yes.

108

 1          THE COURT:  So it's clear, you are going to have

 2    some standards to look at.  It's not just going to be an

 3    emotional how I feel about it.  I am going to instruct you

 4    fully in that area.  I going to instruct you on what the

 5    aggravating and mitigating factors are that you can look at.

 6    You are going to be called upon to balance and to look at

 7    these different factors in different ways, so you are not

 8    left out there as you are now.  You are going to have some

 9    guidelines, but it won't answer the ultimate question.

10    Maybe we should go a little bit further and say both sides

11    obviously want to make sure they have a person who can

12    fairly weigh those aggravating and mitigating factors.

13          Do you want to reask the question?

14          MR. WHITE:  Do you understand my question --

15          PROSPECTIVE JUROR NO. 54:  Yes.  I think I could

16    vote for the death penalty, yes.

17          MR. WHITE:  I have nothing further.

18          THE COURT:  Mr. Emmick, or, Ms. Flynn?

19          MR. EMMICK:  I guess the place I want to start is

20    the place you started when you thought first about whether

21    emotionally you thought the death penalty might be

22    appropriate, but rationally you had a little bit of a

23    different view.

24          Do you understand that it's not simply an

25    emotional decision, but it's also a rational decision?

1      PROSPECTIVE JUROR NO. 54:  Right.

2      THE COURT:  With the same guidelines we have

3  talked about, these mitigating and aggravating factors?  I

4  will fully instruct you what you can examine in that penalty

5  phase.

6      PROSPECTIVE JUROR NO. 54:  Yes.

7      MR. EMMICK:  I thought I heard you say that you

8  thought emotionally you could come to a conclusion that the

9  death penalty would be appropriate.  You used the word

10  "emotionally."

11      So I wanted to ask you if you have that same

12  attitude about it with the word "rationally."  Do you

13  understand what I am saying?

14      PROSPECTIVE JUROR NO. 54:  No.

15      MR. EMMICK:  Here is what I mean.  You feel like

16  from an emotional point of view you could come to a

17  conclusion that the death penalty is warranted.  I am asking

18  the other side of that.

19      Could you come to that conclusion rationally

20  having in mind that you listed some reasons why rationally

21  you had some concerns about the application of the death

22  penalty?

23      PROSPECTIVE JUROR NO. 54:  Well, as the judge laid

24  it out to me, if I were in a situation where I had no doubt

25  of the person's guilt and I understood the law clearly, then

110

1   I think I could rationally make that decision, yes.

2          MR. EMMICK:  When you said you would tend toward

3   life without the possibility of release, in a way, we are

4   trying to get clear on how forceful that tendency is in a

5   manner of speaking.

6          I am going to ask the question this way.  In a

7   real-life situation when you are in the jury room and you

8   are thinking about this, would all of these views that you

9   have -- let's call them concerns -- about the death

10  penalty -- would they in combination substantially impair

11  the performance of your duties as a juror to fairly weigh

12  all the factors and to decide the facts as you see them?

13         PROSPECTIVE JUROR NO. 54:  No, I don't think so.

14         MR. EMMICK:  Nothing further.

15         THE COURT:  I am going to invite you back on

16  February 22 at 8:30 in the morning.  You are going to join a

17  jury pool at that time.  From that jury pool, we believe

18  because we have been able to talk each of you thoughtfully

19  one by one that we are actually going to get that jury

20  within probably two days, Wednesday and Thursday, and we

21  will know who those 12 jurors are and 8 to 12 alternates

22  very quickly.  Lisa is going to give you a slip of paper

23  reminding you of February 22.

24         Now, I think you are supposed to call the jury

25  commissioner on February 21.  We want you to follow their

1    instructions, but I don't care what the mechanical voice

2    says.  Sometimes the mechanical voice gets confused.  We are

3    starting no matter what on February 22 at 8:30 in the

4    morning.  I think within two days you will know if you are

5    sitting on the jury, and counsel on both sides have a good

6    indication from your thoughtful answers today.

7            Thank you very much.  It's been a pleasure.  Give

8    your questionnaire to Lisa, and we will see you on the 22nd.

9    Thank you.

10           (Prospective Juror No. exits courtroom.)..

11           THE COURT:  With this last juror, I didn't want to

12   excuse her back to the jury room and bring her back.

13           If there is a motion by the government, let me

14   entertain that now.  I can always phone her, but is there a

15   motion?

16           MR. EMMICK:  No.  We withdraw.

17           THE COURT:  And obviously the defense --

18           MR. STEWARD:  We would oppose it.

19           THE COURT:  Would oppose it but there is no

20   motion.

21           THE COURT:  Once again, you have 30 preemptories.

22   We are going to get down to a jury pool -- we will negotiate

23   at the end of next week.  If you think you need more, we

24   will talk about it then.

25           MR. EMMICK:  Clearly, this woman is being very

112

1    straight with us.

2           THE COURT:  She really is.  She is one of those

3    who could surprise both of you on each side.  She is really

4    going to think this through, which is absolutely what we

5    want.  I am convinced that although she answered the

6    question that could lead to disqualification, after talking

7    with her, my own finding is that she would be very fair and

8    impartial in that regard and that the answers qualify her as

9    a juror.

10           Have a nice recess.  We will see you at 1:15.

11           (Lunch recess.)

12                              -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

113

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

SHARON SEFFENS, U.S. COURT REPORTER

7/17/07