1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

            Plaintiff,

    vs.

BARRY BYRON MILLS;                CR-02-938(C)
TYLER DAVIS BINGHAM;              DAY 27, VOL. V
CHRISTOPHER OVERTON
GIBSON; EDGAR WESLEY
HEVLE,
            Defendants.

----------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 12, 2006

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    DEBRA W. YANG
      United States Attorney
 4    STEVEN D. CLYMER
      Special Assistant United States Attorney
 5    Chief, Criminal Division
      MICHAEL EMMICK
 6    TERRI FLYNN
      JOEY BLANCH
 7    Assistant United States Attorneys
      1400 United States Courthouse
 8    312 North Spring Street
      Los Angeles, CA  90012
 9    (213) 894-0511

10    For Defendant BARRY BYRON MILLS:

11    H. DEAN STEWARD
      LAW OFFICES OF H. DEAN STEWARD
12    107 Avenida Miramar, Suite C
      San Clemente, CA
13    (949) 481-4900

14    MARK F. FLEMING
      LAW OFFICES OF MARK F. FLEMING
15    433 "G" Street, Suite 202
      San Diego, CA  92101
16    (619) 652-9970

17    For Defendant TYLER DAVIS BINGHAM:

18    MICHAEL  V. WHITE
      LAW OFFICES OF MICHAEL V. WHITE
19    1717 Fourth Street, Third Floor
      Santa Monica, CA  90401
20    (310) 576-6242

21    WILLIAM S. HARRIS
      STEWART & HARRIS
22    1499 Huntington Drive, Suite 403
      South Pasadena, CA  91030
23    (626) 441-9300

24

25
```

```
 1   For Defendant CHRISTOPHER OVERTON GIBSON:

 2   KENNETH A. REED
     LAW OFFICES OF KENNETH A. REED
 3   404 West 4th Street, Suite C
     Santa Ana, CA  92701
 4   (714) 953-7400

 5   For Defendant EDGAR WESLEY HEVLE:

 6   BERNARD J. ROSEN
     LAW OFFICES OF BERNARD J. ROSEN
 7   1717 Fourth Street, Suite 300
     Santa Monica, CA  90401
 8   (310) 451-4577

 9   DONALD J. CALABRIA
     LAW OFFICES OF DONALD J. CALABRIA
10   16133 Ventura Boulevard, Suite 600
     Encino, CA  91436
11   (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                               INDEX

2                                                        PAGE

3   PLAINTIFF'S
    WITNESS:                DIRECT      CROSS    REDIRECT    RECROSS
4

5   JOHN MCGINLEY
       (Continued)            5
6
    PLAINTIFF'S
7   EXHIBITS:                         MARKED            RECEIVED

8   (None)

9   DEFENSE
    WITNESSES:              DIRECT    CROSS    REDIRECT    RECROSS
10
    (None)
11

12  DEFENSE
    EXHIBITS:                    MARKED            RECEIVED
13
    (None)
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    SANTA ANA, CALIFORNIA; FRIDAY, MAY 12, 2006; 3:00 P.M.
2                (Jury present.)
3      JOHN MCGINLEY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
4                DIRECT EXAMINATION (Continued)
5    BY MS. FLYNN:
6    Q    When you say "cover text," that's what this is, the
7    book list?
8    A    Yes.
9    Q    Could that be anything that you would write on the
10   document?
11   A    Anything.
12   Q    Do you use the process that you described of assigning
13   each letter of the code in either "A" Alphabet or "B"
14   Alphabet?
15   A    Yes.
16   Q    It's my understanding then you said you group them in
17   5s.
18   A    Yes.
19   Q    And does that spell out the code?
20   A    In some cases, it comes out directly.  In some cases,
21   you will put it through a second key.
22   Q    If another AB member got this reading list, how would
23   they know what code to use to break it?
24   A    May I come back to this page?
25   Q    Yes.  Please flip back to 250.
```

6

1    A    We had advised everybody that if there was no

2    indication of which key to use that Q would be the key.   In

3    other instances, the very first group of five on the page

4    would be the key to use.

5    Q    Now, Q would be the key.   Explain that.

6    A    Okay, after this or before this, depending on how you

7    went about encoding it, you have two lines of letters kind

8    of like one of those little cereal box -- secret agent rings

9    when you were kids.   It's got two alphabets that you line

10   up.   You can put the R before the A or the M beneath the A,

11   whichever, so the A and the Q lines up together, would be

12   the Q key.

13   Q    And that was pretty much the default key for the Aryan

14   Brotherhood?

15   A    It was just a second -- yeah, the Q.

16   Q    I think you said if that key didn't work then to

17   attempt to use the first five letters as starting the key?

18   A    Yes.   If the first five letters didn't indicate a

19   specific key, then Q was the key to use.

20   Q    And how would the first five letters indicate a

21   specific key to use?

22   A    Well, I might put ABBAB, which would mean to use the B

23   for the second round of decoding.

24   Q    And when you say ABBAB, you are referring to the B on

25   this code key here?

1    A    Yes.

2    Q    Now, I realize that was just a brief overview of the

3    15th Century cipher system you used, but using that cipher

4    system that you described, did you code up this reading list

5    to be a membership list?

6    A    Yes.

7    Q    When did you do that?

8    A    In 1996.

9    Q    Why did you do that?

10   A    Somebody was looking for somebody's birthday, and it

11   came out that Chris Gibson had a list of every AB member in

12   his cell with all their birthdays and numbers, and it was

13   obviously an AB list also.  Mills didn't want those things

14   floating around in everybody's property where the

15   authorities could just go in your cell and find it and know

16   what it is probably, so they asked me to code the membership

17   list up.  There was an obvious need to have it with

18   everybody's numbers, so that's how it came about.

19   Q    When you say everybody's numbers, what numbers did you

20   put?

21   A    Prison registration numbers.

22   Q    Is that what Exhibit 250 is?

23   A    Yes.

24   Q    If we use your cipher system and decode it, do we get a

25   membership list?

1    A    Yes.

2    Q    Let me turn to the second page of Exhibit 250-A.  At

3    the top, it appears that there is a whole punch over what

4    appears to be a 1 with a question marked next to it, and

5    then it goes down to 2, and it appears that it's decoded.

6         Referring back to 250-A where it says the 2, does that

7    correspond to the 2 on Exhibit 250 where it says

8    "Bickermann, E. from Ezra" --

9    A    This is covered up right here, so I can't tell you, but

10   if that's what you have --

11             MS. FLYNN:  May I approach the witness?

12             THE COURT:  You may.

13             MS. FLYNN:  We can just flip the exhibit tag up so

14   you can see.

15             THE WITNESS:  Yes.

16   BY MS. FLYNN:

17   Q    On your decipher decoded page, does that correspond to

18   where it says 2 here?

19   A    Yes.

20   Q    Who is the Bickermann book?  Who is that member?

21   A    Al Benton.

22   Q    Is that what's indicated --

23             MS. FLYNN:  I realize this is very bad for anybody

24   to see on the overhead.  I'll zoom it.  Al Benton.

25   BY MS. FLYNN:

1   Q    So if you use your cipher system on No. 2 there, that's

2   member Al Benton?

3   A    His name and his registration number.

4   Q    Moving down to No. 3, who does that translate into?

5   A    T. Bingham with a registration number.

6   Q    Is T. Bingham Tyler Davis Bingham?

7   A    Yes.

8   Q    No. 4, who is that?

9        THE COURT:  You're referring to 250, Bullard

10  Roger?

11       MS. FLYNN:  Yes.

12  BY MS. FLYNN:

13  Q    On Exhibit 250, the Bullard, Roger, book, who does that

14  translate into?

15  A    W. Bridgewater.

16  Q    Also an Aryan Brotherhood member?

17  A    Yes.

18  Q    If we go through this entire document, is it a list of

19  all Aryan Brotherhood members?

20  A    Yes.

21  Q    Let me just skip down to No. 10 on the bottom of page

22  one of Exhibit 250.  It appears to be the Gaster, Theodore,

23  book.

24       Looking at the bottom of Exhibit 250-A where it

25  looks like it's been hole punched over but 9 is right above

1   it, who does this one translate into?

2   A    C. Gibson with a registration number.

3   Q    Is that defendant Gibson?

4   A    Yes.

5   Q    Turning the page, to -- on Exhibit 250, Book 12, Hadas,

6   Moses, then looking at Exhibit 250-A, No. 12, who does that

7   translate into?

8   A    E. Hevle with a registration number.

9            THE COURT:  Counsel, just to be clear, it's

10  "Hadas, Moses, the third and fourth books of the Macabees"

11  -- do you want the entire phrase?

12           MS. FLYNN:  Yes.

13  BY MS. FLYNN:

14  Q    When I say "Hadas, Moses," for the other ones, I am

15  referring to the entire two or three lines.

16           Does that represent the decoded name?

17  A    Yes.

18  Q    It's not just the short name one that I used to refer

19  your attention to?

20  A    No.  It's the entire entry under that number.

21  Q    Skipping down to page three of Exhibit 250, there are

22  three lines that begin with "Milik, Joseph."  Do you see

23  that?

24  A    Item 22?

25  Q    Yes.

1  A    Yes.

2  Q    Now, looking at Exhibit 250-A, who does that translate

3  into?

4  A    J. McGinley with a registration number.

5  Q    Who is that?

6  A    That would be me.

7  Q    Now, actually to go back, directing your attention to

8  No. 20 on page two where there are about three lines

9  indicating a book that starts with "Mead" -- I can't really

10 read that.

11 A    "George Robert."

12 Q    And then comparing it to No. 20 on 250-A, there is a

13 name there, but there is a question mark by it?

14 A    Yes.

15 Q    It says, "Barry Mills?"  Can you explain that to me?

16 A    I didn't have his registration number for some reason.

17 Q    So 20 translates into Barry Mills but with no

18 registration number?

19 A    Yes.

20          THE COURT:  Counsel, would this be convenient

21 then --

22          MS. FLYNN:  Yes, Your Honor.

23          THE COURT:  Especially if we are going to go on

24 with some of the testimony in this area, I think I am going

25 to send you home right now and bring you back on Tuesday and

1    make sure you're fresh.

2            Counsel is it acceptable that we send the jury

3    home at this time?

4            MR. FLEMING:  Yes.

5            THE COURT:  I think that it's a good breaking

6    point, and that way counsel can pick up after three days

7    recess right in this area again.

8            You are admonished not to discuss this matter

9    amongst yourselves nor to form or express any opinion

10   concerning this case.  We will see you Tuesday at 8:30.

11   Have a good weekend.

12            (Jury not present.)

13            THE COURT:  Mr. McGinley is present.  The jury is

14   not.

15            Mr. McGinley, I am curious about a number of

16   things.

17            How do you get registration code numbers?  For

18   instance, take the first one "Bensly, Robert," which

19   coincides with what name?

20            THE WITNESS:  I believe that was Al Benton.

21            THE COURT:  Does it have the registration number?

22            THE WITNESS:  Yes.

23            THE COURT:  I think I understand -- well, I think

24   I understand how the names are finally derived.

25            How about the registration numbers?  How do you

1  translate those into numbers instead of letters?

2          THE WITNESS:  Well, you can see that there were

3  enough combinations left over to use for other purposes, so

4  we used them for the numerals 0 through 9.

5          THE COURT:  So, in other words, once I get a name,

6  I then notice that everything else that follows isn't going

7  to be a letter?  I switch to a number?

8          THE WITNESS:  Yeah.  There was something in here I

9  think -- here it is right here, BAAAB --

10         THE COURT:  Counsel, put up No. 250 for a moment.

11         THE WITNESS:  Actually, it's not 250 that would

12  explain it.

13         THE COURT:  It's the code?

14         THE WITNESS:  Yes.

15         THE COURT:  Counsel, you can come up and literally

16  look over the gentleman's shoulder.  I think this is going

17  to be complicated enough on cross-examination let alone on

18  direct.

19         Now, we are going to slow down for a moment.  I

20  want to see it.  They can gather around you.

21         Ms. Flynn, apparently you are an expert now in

22  this also.  You put the code up for a moment, 250-A.

23         Now, I know it has been a long time since you have

24  looked at this, but we have got lots of time.  You have lots

25  of time left.

1        You are doing 20 or 30 years?

2        THE WITNESS:  Twenty years.

3        THE COURT:  You have lots of time.  I have all

4   weekend.  This isn't going to come in until I understand it.

5   I think I get it, but let me make sure all of us do.

6        Why don't we slow down for just a moment and

7   take 250 -- just keep your code there.  Put it right beside

8   it.  Flip that little yellow tag up.  Let's just start with

9   the first name who is going to come out to --

10       MS. FLYNN:  Let's not do No. 1.  It's not on the

11  actually deciphered one.  No. 2 is Al Benton.

12       THE COURT:  Well, I don't want to take Al Benton.

13       MS. FLYNN:  No. 3 would be T.D. Bingham.

14       THE COURT:  Excellent.

15       THE COURT:  Walk us through -- let's get a copy up

16  here.  I want him to circle some of the letters.  I don't

17  care if you make a mistake right now.  We have got all

18  weekend.

19       MS. FLYNN:  Exhibit 250-A you want a copy of or

20  250?

21       THE COURT:  I just want a copy so he can work off

22  of 250.  We might as well understand it now thoroughly

23  because if we get to cross-examination and we start making

24  mistakes -- let's take the time to go over it right now.  It

25  makes sense to me because I have been trying to study it in

1    the evening hours.  It's interesting.

2            Are you going to bring in a cipher code expert

3    also?

4            MS. FLYNN:  Yes.

5            THE COURT:  The defense is going to have to know

6    how to cross-examine.  You apparently understand it.  I

7    think I understand it finally.  I have been looking at it in

8    the evening, and it's been mindboggling.

9            Let's take No. 3.  This document you can mark on

10   if you would like.  Go through -- I'm not going to worry if

11   you miss a couple of letters.  We will go back and clean it

12   up, but I want everybody to understand by circling -- start

13   off and decode this for us and just talk as you go.

14           THE WITNESS:  You said entry No. 3.  The photocopy

15   is hard to read.  I'm not sure what those last -- if that's

16   1BLAU or BALI.  I'm not sure.  I think it's BLA--

17           MR. HARRIS:  It's BLAU you.

18           THE WITNESS:  So we take five letters over.  Now,

19   I can remember this much, that this J would come from the A

20   Alphabet.  This U was from the A Alphabet.  This A was from

21   the A Alphabet I believe, and this L was from the B

22   Alphabet, and this B was from the A Alphabet, so you have

23   ABAAA, so when we look for ABAAAA on this pad.  Let's see if

24   anybody sees it.

25           MS. FLYNN:    I can see it.

1          THE WITNESS:  There it is there.  ABAAA translates

2     to a "T."

3          THE COURT:  Show me again.

4          THE WITNESS:  We have a B.  It's style is from the

5     A Alphabet.  The letter L is a style from the B Alphabet, so

6     we have an AB.  This A is A Alphabet.  The U is an A

7     Alphabet, and this J is from the A Alphabet.

8          THE COURT:  Regardless of the word BLAU to begin

9     with, you have really gone five numbers over?  You disregard

10    the comma, and now you have got a five-letter -- which

11    translates right up there on line three to the key.

12         THE WITNESS:  Right.

13         THE COURT:  Take the next one for me.

14         Do you count five letters again?

15         THE WITNESS:  Everything is five letters because

16    these are all five letters right here.

17         THE COURT:  Now count five letters.

18         THE WITNESS:  You have got O from the A Alphabet,

19    S from the B Alphabet.

20         THE COURT:  How do you know the S -- is that

21    because of the cursive again?

22         THE WITNESS:  This little tail on the top right

23    here I remember is from the B Alphabet as opposed to we

24    could find another S that's an A to compare it to.

25         THE COURT:  Another S doesn't have that tail on

1    it?

2             THE WITNESS:  An S from the A Alphabet won't have

3    that tail, right.  This S at the end of the first line on

4    entry No. 4 is different from this S.  This S doesn't have

5    the tail sticking up.

6             THE COURT:  So what you have pointed out is this S

7    has this little tail on it, and that way you know it's the B

8    Alphabet as opposed to that S without the tail on it that's

9    not coded up.  You know that's the B Alphabet.

10            THE WITNESS:  Correct.

11            THE COURT:  Keep going.  Take five letters over.

12            THE WITNESS:  The E I know is from the B Alphabet.

13   The P is from the A Alphabet, and this H -- I have to look

14   for another H to be sure.  I think that's from the A

15   Alphabet.

16            THE WITNESS:  They both have the tail stick --

17   this cross sticks out to the side, so I think that might be

18   from the B Alphabet.

19            THE COURT:  Let's test that out again.

20            THE WITNESS:  ABBAB.  ABBAB is a B, which would be

21   the first letter of the last name Bingham, which is in this

22   entry.

23            THE COURT:  Excellent.

24            Everybody understand that?

25            MR. CALABRIA:  Yes.

1        THE COURT:  Do you understand for

2  cross-examination purposes?

3        MR. CALABRIA:  Yes.

4        THE COURT:  Mr. White?

5        MR. WHITE:  Yes.

6        THE COURT:  Mr. Harris?

7        MR. HARRIS:  Yes.

8        THE COURT:  Mr. Fleming?

9        MR. FLEMING:  Yes.

10        THE COURT:  Mr. Reed?

11        MR. REED:  I'll deal with it.

12        THE COURT:  Now, in other words, if we gave you

13  enough time, you could literally go through and decode this,

14  and it would match right up with 251 in theory wouldn't it?

15        THE WITNESS:  Yes.

16        THE COURT:  What I am suggesting, Counsel, is that

17  what both sides do is take him through -- like No. 3, for

18  instance, T. Bingham, or Mills or something on Tuesday --

19  take him through one complete decoding of just one name.

20  You don't have to do that for all of them.  Otherwise, it's

21  going to be mass confusion on direct and cross, and then we

22  can fight about why the AB would go about that, who would

23  know about that.

24        MS. FLYNN:  Would counsel object if I made copies

25  of the actual cipher which I moved into evidence to pass out

1  to the jury to follow along?

2          THE COURT:  No, they won't object because I'm

3  going to allow them to have it.  That just makes a lot of

4  sense.  This is the kind of evidence the jury needs to make

5  it understandable.  They are not going to sit there and not

6  understand this, so you are going to have leeway to pass out

7  the cipher, and you can walk through it.  You can even talk

8  to the gentleman over the weekend if you want to.  I'm not

9  precluding you.  In fact, I am encouraging that.

10          I want to make certain, though, that outside the

11  presence of the jury that if you have any questions

12  concerning this cipher -- I know that there is an expert

13  coming in from whom, the FBI?

14          MS. FLYNN:  Yes.

15          THE COURT:  If you have any questions, if you want

16  to ask Mr. McGinley now about this cipher, I want to afford

17  you that opportunity out of the presence of the jury so

18  everybody is really professionally prepared in front of the

19  jury for this.

20          Mr. White?

21          MR. WHITE:  No.  I'll ask questions on cross.

22          THE COURT:  Are you satisfied?

23          MR. WHITE:  Yes.

24          THE COURT:  Mr. Fleming, or, Mr. Steward?

25          MR. FLEMING:  No.  I am prepared.

1            THE COURT:  Mr. Calabria?

2            MR. CALABRIA:  I am prepared.

3            THE COURT:  Mr. Reed?

4            MR. REED:  I will do it in front of the jury.

5            THE COURT:  I wish we had multiple elmos in a

6    sense during this last presentation, but you can certainly

7    pass out the cipher code, and if you need to, you can even

8    bring in a display and put it in the middle of the court,

9    whatever you want to do in that regard, or you can do

10   nothing further at this point.

11           I want to thank you, Mr. McGinley, for staying

12   afterwards.  You have been very helpful to the Court and

13   have been very helpful to counsel for both sides.

14           You said this comes from the 15th or 16th Century

15   code?

16           THE WITNESS:  15th Century.

17           THE COURT:  How did you pick this up out of

18   Shakespeare?

19           THE WITNESS:  Just in reading.

20           THE COURT:  Have you had an interest in this since

21   you were young?

22           THE WITNESS:  Yes.

23           THE COURT:  You mentioned rings and --

24           THE WITNESS:  It was just first thing that came to

25   mind as an example.

1          THE COURT:  Counsel for the government may come

2     and visit you this weekend.  I'm not sure.  They may not.

3     Otherwise, we will see you Tuesday at 8:30, and I think it's

4     logical to bring you back when the jury is fresh.

5          Thank you, Mr. McGinley.  We will see you on

6     Tuesday.

7          I am trying not to keep you Saturday.  You know I

8     want you to stay fresh and focused.  I think we have three

9     areas that I need to cover because the government is

10    potentially resting not next week but the week after.  I

11    have Mr. Beckwith here tomorrow, and I have got

12    Mr. Pennington apparently on the phone.

13         I have Mr. Smith who has flown in and who is here

14    now.  Has he brought any additional materials?

15         MS. FLYNN:  He has not, but we have some

16    materials.

17         THE COURT:  It's not that I am dissatisfied.  I am

18    not yet accepting the fact that the Aryan Brotherhood tape

19    involving the black/white confrontation on January 2, 1997,

20    does not exist.

21         Would Mr. Smith have been privy to this, Mr.

22    Steward?  Mr. Fleming?

23         MR. STEWARD:  I don't know, Your Honor.

24         THE COURT:  Was Mr. Smith at Marion?

25         MR. FLEMING:  He was at ADX.

1          THE COURT:  So he wouldn't have had access at

2    least in January at Marion in theory.

3          We have gotten Mr. Beckwith's representation, but

4    up to this point, I have never gotten an affidavit have I to

5    the effect that this doesn't exist?

6          MS. FLYNN:  No, Your Honor.  I don't think he has

7    done one.

8          THE COURT:  Now, this may have been destroyed.  It

9    may not be available, but I just have a hard time believing

10   that a black/white confrontation on the yard that leads to a

11   war eventually is destroyed.  I want affidavits.  I want

12   something on the record from somebody who is responsible,

13   and Pennington is as high as I have gone in the BOP so far.

14   That is going to encourage the BOP to undertake one more

15   search.

16         Mr. Fleming, Mr. White, and Mr. Steward, you have

17   consistently asked for that.  I'm thinking it needs the

18   Court's help and the Court's muscle.  I'm not kidding about

19   it.  If it exists, it better not turn up later on, so we

20   will think about that for a while.  Mr. Smith might be of

21   help.

22         Calling Mr. Smith to the stand isn't going to

23   leave anyplace concerning that tape is it?

24         MR. STEWARD:  It doesn't sound like it.

25         THE COURT:  Second, there is a motion that the

1  government filed to have a WITSEC inspector testify under a

2  pseudo name.  They filed it yesterday with the Court.

3          Mr. White, you look perplexed or tired.  Did you

4  receive that?

5          THE COURT:  Mr. White, did you receive this?

6          MR. WHITE:  Mr. Harris did.

7          THE COURT:  Mr. Harris, do you have it?

8          MR. HARRIS:  Yes.

9          THE COURT:  Mr. Fleming, Mr. Steward, do you have

10 it?

11         MR. STEWARD:  We have it.

12         THE COURT:  Have you read it?

13         MR. STEWARD:  Yes.

14         THE COURT:  Mr. Calabria?

15         MR. CALABRIA:  Yes.

16         THE COURT:  Mr. Rosen?

17         MR. ROSEN:  Yes.

18         THE COURT:  Mr. Reed?

19         MR. REED:  Yes.

20         THE COURT:  Is there opposition to this?

21 Apparently WITSEC and the government is asking the Court to

22 balance the interests in the inspector using their true

23 name.  Obviously, if the true name is divulged and someone

24 could locate where that investigator is, that would tell

25 anybody looking for a WITSEC witness the location of that

```
 1    WITSEC witness because WITSEC employees and inspectors are
 2    probably in close location, plus there is some difficulty
 3    concerning harm to the WITSEC program that the Attorney
 4    General's Office believes might be forthcoming.  Obviously
 5    you want to keep from the government's perspective those
 6    agents secret just like you would in foreign intelligence
 7    work, but if there is a disagreement over this, then I want
 8    to start resolving that between counsel.
 9              MR. STEWARD:  We don't disagree.  The only thing
10    that we would ask is that the jury not be told this person
11    is testifying under a pseudo name because there is danger or
12    anything like that.
13              THE COURT:  I agree.  I think it brings the
14    heightened drama, if you will, that the AB is so dangerous
15    that it would be an assumption that this inspector has to go
16    undercover when that's not true at all.  It's a policy to
17    protect the WITSEC people involved in the program.
18              Well, let's see if that's an agreement with
19    everyone.
20              Mr. Fleming, Mr. Steward, is that acceptable?
21              MR. FLEMING:  Yes.
22              THE COURT:  Mr. steward?
23              MR. STEWARD:  Yes.
24              THE COURT:  Mr. White?
25              MR. WHITE:  Yes.
```

1          THE COURT:  Mr. Harris?

2          MR. HARRIS:  Yes.

3          THE COURT:  Mr. Rosen?

4          MR. ROSEN:  Yes.

5          THE COURT:  Mr. Calabria?

6          MR. CALABRIA:  Yes.

7          THE COURT:  Mr. Reed?

8          MR. REED:  Yes.

9          THE COURT:  Is that acceptable to the government?

10         MS. FLYNN:  Yes.

11         THE COURT:  That means that when this person

12  testifies they are using a pseudo name that the jury doesn't

13  know by stipulation of all counsel.  That resolves one issue

14  this evening that I thought was going to take quite awhile.

15         Second, would you pull the transcript from

16  yesterday, Mr. Fleming, or, Mr. White.  I want to see the

17  portion concerning the Cupples testimony and how this was

18  phrased, and I would like to get the official transcript.

19  Each of you have have a daily.  It would be on recross

20  examination.

21         Ms. Flynn, I didn't intend to cut you off at a

22  certain point.  This is complicated.  If you want to come to

23  that, I think it would just be wise if we took the recess

24  because another half-hour break took the jury to 4:00 or

25  4:15.  If you are going to stay with this code for a while,

1 then it's a good place to come back and remind them after

2 the recess where you are at.

3   MS. FLYNN:  Thank you.

4   THE COURT:  How are you doing with your case?  I

5 don't mean evidencewise, but are you on schedule not to

6 conclude this week but the following week whether it's

7 Tuesday, Wednesday, or Thursday?

8   MS. FLYNN:  Yes.

9   THE COURT:  So whether it's Tuesday, Wednesday, or

10 Thursday, it's not going to be this coming week but the

11 following week, the week of the 23rd sometime?

12   MS. FLYNN:  Yes, and we have no idea whether it

13 will be Tuesday, Wednesday, or Thursday yet.

14   THE COURT:  I understand.

15   Once again, would you have mind if I had a meeting

16 with defense counsel in-camera because I want them prepared

17 and ready to go?  If you rest like at 12:00 noon, I will

18 take the afternoon for Rule 29s, but the next day I expect

19 the defense to start their case, and they have got WITSEC

20 problems.  I will start getting those names also for you as

21 a courtesy so you will be prepared for cross-examination.

22   MS. FLYNN:  Actually, Mr. Steward and the defense

23 have been very courteous in sending us a letter with 14

24 names already.

25   THE COURT:  Is that the basic order that you are

1    going to call them in?

2            MR. STEWARD:  Yes.  That's the first two weeks of

3    our case.

4            THE COURT:  Thank you.

5            Do you have a copy of that transcript?

6            MR. WHITE:  I think it's in Volume II, and we

7    don't have Volume II.  I have I and III, and it's not in

8    either of those volumes.

9            THE COURT:  We will get Volume II and take a look

10   at it in just a moment.

11           The discussion concerning Mr. Mills' peacefulness

12   and the quality of peacefulness was elicited by you, Mr.

13   Fleming, on another occasion, and whether it takes five

14   minutes or five hours, we're going to find that.  This is

15   either the second or third time that there has been a

16   question asked by you concerning the peacefulness of Mr.

17   Mills, so start digging because I am going to find that

18   other one, you know, today, tomorrow, whenever.  Let's get

19   busy and find that if we can or if you can recall whose

20   testimony it was that you elicited that in or the government

21   can recall whose testimony that was.  I made a big mark by

22   it at the time.

23           MR. FLEMING:  Kevin Roach.

24           THE COURT:  I believe there was a third occasion,

25   but I do recall explicitly a second time it was mentioned.

1          I am looking at the following testimony --
2    hopefully you can help me -- in either cross or recross in
3    minimally Roach's testimony where you elicited, Mr. Fleming,
4    testimony that Mr. Mills acted as a peacemaker that staff
5    went to on occasion and also that Mr. Mills acted -- I'm not
6    certain of this -- a peacemaker with other groups.  You need
7    to find that for me.

8          MR. FLEMING:  That's what I'm looking for.

9          THE COURT:  All right.  I have in my notes also
10   Mills had been used in the past to make truces.  I want to
11   make sure the government has this also.  It's on page 72,
12   April 18, Day 16, Volume II.

13         MS. FLYNN:  I don't have that, but I can look on
14   somebody's.

15         THE COURT:  That does not appear initially to be
16   reputation evidence.  That appears to be something
17   specifically that Mr. Mills was asked to do.

18         THE COURT:  For the record, the question was on
19   page 72, line 10:

20         "Q.  And tell Officer Beneviz (phonetic) that we
21   would try to quell the racial tension, right?

22         "A.  Yes, sir.

23         "Q.  Well, we will stop right there for a moment.
24   Mr. Mills has been used in the past to do just that hasn't
25   he?"

1              "A.  Possibly, yes.

2              "Q.  I mean, you have heard that happening,

3       right?

4              "A.  Yes.

5              "Q.  Where Mr. Mills acted as a for lack of

6       better word 'peacemaker,' right?

7              "A.  Yes."

8              This is tentative subject to argument by both of

9       you.  Reading Carpenter's cross-examination, let me start

10      earlier in the transcript than I probably need to.  I am

11      reading from page 64.  I am going to start at line 20:

12             "Q.  Of course no one actually saw Mr. Mills

13      cutting a groove into this little fixture, right?

14             "A.  No.

15             "Q.  I believe you know Mr. Mills not well but you

16      have had some interaction with him in the years prior to you

17      discovering this groove?

18             "A.  Very little.

19             "Q.  Well, your understanding was -- at least what

20      you knew of him -- that this would be out of character for

21      him to have cut a groove in his cell; isn't that right?

22             "A.  Yes, it would have been out of character

23      because as long as I have been at ADX I have never seen

24      anything like this happen in his cell or him involved in

25      anything like this.

1          "Q.  In your experience, he has been quite

2    respectful towards staff?

3          "A.  Right."

4          Is this Carpenter's report?  I can't read the

5    handwriting.

6          MS. FLYNN:  What date?

7          THE COURT:  March 19, 1997.

8          MS. FLYNN:  It went to Todd Carpenter.  That's his

9    signature above two investigative agents.

10         THE COURT:  It says "Reply to the attention of,"

11   and it's Anderson's report?

12         MS. FLYNN:  Yes.  He is the one that wrote the

13   report.

14         THE COURT:  Okay.

15         "On March 14, 1997, I was in E unit talking with a

16   staff member when inmate Barry Mills called me over to the

17   rec cage.  Mills then stated that he was informed that he

18   would not be going through the program here at ADX.  He

19   alleged that the warden had stated to him that he was a gang

20   leader and that he would be locked down along with several

21   people already in the stepdown program.

22         "He then made the statement that we had been

23   ignoring a lot of shit since this place opened on the

24   grounds that we could program out of here and that you are

25   taking away any chance to program and expect us to go lay

1    down in a corner.  That ain't going to happen.  A half like

2    you that's not going anywhere should take an interest and

3    tell the higher-ups that we need a program because you are

4    the ones that has to work here."

5            Dropping down to the sentence beginning with

6    "That, "That if they were going to pull a lot of people out

7    of the stepdown unit and put them in the same spot that he

8    is in that they should offer a program along the lines of K

9    Unit if they couldn't leave."

10           He then made several statements to the effect of,

11   "Misery loves company.  If I'm miserable and my associates

12   are miserable, then we'll all be miserable together."  He

13   also made the statement that "This should be something the

14   union is interested in."

15           Tentatively subject to your arguments, I view this

16   as the character trait of respectfulness towards staff

17   elicited on page 65, lines 8 through 10.  I am very

18   convinced of this because the prior question and answer have

19   led to the interaction having been very little between this

20   staff member and Mr. Carpenter, the staff member and Mr.

21   Mills.

22           Reading from page 64, line 23:

23           "Q.  And I believe you know Mr. Mills not well,

24   but you had some interaction with him in the years prior to

25   the discovery of this groove?

1          "A.  Very little."

2          Also, there is an argument concerning the

3     character trait of peacefulness.  Two things are happening

4     here in the Court's opinion.  First, Mr. Mills is quite

5     probably going to turn staff into the vehicle for convincing

6     the hierarchy of BOP that this is the wrong decision in

7     reducing the stepdown program.

8          Second, the statement that "If I'm miserable and

9     my associates are miserable, then we'll all be miserable

10    together" coupled with the statement that this should be of

11    interest to your union is not respectful towards staff, but

12    that doesn't open the door to all character evidence

13    concerning peacefulness or all character evidence concerning

14    staff, so I want an explicit representation if you are going

15    to rebut this raised in the cross-examination by Mr. Fleming

16    who that is going to be with.

17         Now, also impliedly -- my ruling is not based upon

18    on it -- impliedly, there have been other characterizations

19    concerning peacefulness, although I do agree with Mr.

20    Fleming that the earlier comment in the cross-examination of

21    Mr. Roach at page 72, line 10:

22         "Q.  And tell Officer Benetiz that he could try to

23    qwell the racial tension, right?

24         "A.  Yes, sir.

25         "Q.  Well, we'll stop right there for a moment.

1   Mr. Mills has been used in the past to do just that hasn't

2   he?"

3            Mr. Fleming is going to argue in a moment that

4   that's a specific act.  I agree that that's subject to

5   interpretation, but from the government's perspective, you

6   could just as ably argue that this is the character trait

7   for peacefulness in qwelling disturbances.

8            "Q.  I mean you have heard of that happening,

9   right?

10           "A.  Yes.

11           "Q.  Where Mr. Mills acted as for lack of a better

12   word 'peacemaker,' right?

13            "A.  Yes."

14            I think the Cupples cross-examination quite

15   frankly resolves this issue, but I want to hear from the

16   government first.  I want to see how expansive you think you

17   are going to be on this.

18            MS. FLYNN:  At this point, I don't think we would

19   go to all character traits of peacefulness, just exactly

20   what you are saying there.  We don't have the transcripts

21   here, but we are finding some other instances.  We think

22   there is some cross-examination of Bentley that may open the

23   door for us if we wanted to go that route.

24            THE COURT:  I think there is, too, and I just --

25   why don't you find that for me.

1    MS. FLYNN:  Unfortunately, we don't have the

2  transcript.  What I can represent to you on what we have

3  here -- I can try and find it -- it's Mark Fleming's recross

4  of Gene Bentley.

5    THE COURT:  First of all, maybe we should do this

6  tomorrow.  I need to find this tonight also, but tell me

7  what you have concerning Bentley, and I will start dragging

8  that out of my transcripts this evening also.

9    MS. FLYNN:  What we have here -- can I have one

10  moment?

11    THE COURT:  Certainly.

12    MS. FLYNN:  Your Honor, at this point, the only

13  individuals we would have to rebut this are the two memos

14  that the Court has, the March 18 and the March 19, 1997,

15  memos.

16    THE COURT:  Counsel, if you could, if you come up

17  and look at these transcripts.  Come down here and look at

18  April 26, 2006, and I want you to look at the recross.  It

19  will be in the very last portion.  It's going to be -- I

20  simply wrote in -- this was my vernacular -- Barry is a nice

21  guy.  Now, that's not exactly what he said.  BOP

22  administration went to both sides, but Barry was not trying

23  to bring the war down.  BOP utilized Barry to keep peace on

24  occasion at both Marion and ADX.  I want to see that

25  transcript.

1          I don't believe that Bentley's cross-examination

2     is reputation evidence.   It's Carpenter's.

3          MS. FLYNN:   Your Honor, the government -- at this

4     time, I have not talked to these two individuals.   All I

5     have are the two memorandums.   All I would be seeking to do

6     is exactly what the Court has ruled.   At this point, I can

7     represent to the Court the witnesses might be Mr. Jones and

8     Mr. Anderson, and I would notify the Court beforehand.

9          THE COURT:   That would be my limitation I would

10    place on you also.   I don't think it's opened the door so

11    wide for the general character trait of peacefulness that

12    you are allowed to rebut at this time, but I do think that

13    the door has been significantly opened in terms of the

14    respectfulness of staff.   You are entitled to present those

15    two sections, and I was reading from Anderson's report.   I

16    have underlined those.   I will show those to Mr. Fleming and

17    and to Mr. Steward and Ms. Flynn.

18          Now, let me hear from you, Mr. Fleming, so we have

19    a record on behalf of your client.

20          MR. FLEMING:   We have no objection at all to those

21    two individuals being called to testify to that narrow area.

22          THE COURT:   You know you have my representation

23    that you can put that in the entire context of what Mr.

24    Mills was saying, but it's fair to the government also.

25    They can argue that if this is a character trait, which the

```
1    Court believes was elicited for respectfulness of staff,
2    they are able to rebut.
3            MR. FLEMING:  We are fine with that.
4            THE COURT:  That resolves the second issue this
5    evening.  Let me give these transcripts back.
6            Now, lastly, I know Mr. Smith was flown in
7    probably sometime today, and there were specific areas that
8    all of the parties were interested in.
9            First, was there a letter that responded to
10   Cupples?  This would be Mr. Smith's letter to Valerie.  This
11   is in response to the Ronnie Yandell letter.  We don't know
12   that yet I assume.
13           MS. BLANCH:  We believe we have it.  We have given
14   a packet of information that we received from ADX to Mr.
15   Smith.  He is reviewing it right now.
16           THE COURT:  There is a letter from Cupples to
17   Mr. Jessner after March of 2003 we believe.
18           MS. BLANCH:  We have gone through all of our
19   Cupples files.  We don't have a letter like that.  I have
20   spoken to Mr. Jessner.  He says he does not recall that
21   letter and that if did exist it would be in the files that
22   we have already looked through.
23           THE COURT:  Three, is there a response letter from
24   Mr. Jessner to Mr. Cupples?
25           MS. BLANCH:  Same answer, Your Honor.  Also, in
```

1   addition to going through the Scott Cupples files that we

2   have printed out, I have also looked through all our

3   computer records and as well as Mr. Jessner's records in

4   this case and have found no letter like that, and I have

5   spoken to Mr. Jessner, and he says he does not recall that

6   sort of a letter, and if it did exist, it would be in the

7   places that I looked.

8           THE COURT:  Fourth, the reports of cutting in the

9   rec cages and/or photos in the time period of 2000 to early

10  2003.

11          MS. BLANCH:  We have the photographs, Your Honor.

12          THE COURT:  Has the defense seen them yet?

13          MS. BLANCH:  Not yet.

14          THE COURT:  Is there also a report?

15          MS. BLANCH:  We haven't seen any reports, Your

16  Honor.  Mr. Shoff -- I'm being corrected, Your Honor.

17  Apparently, there is a file on it, and there may be some

18  reports in there.  We just haven't finished going through

19  them.

20          THE COURT:  It's downstairs someplace.

21          MS. BLANCH:  Yes.

22          THE COURT:  The letter to Mr. Smith to Cupples the

23  first week of -- I'm sorry.  It's mentioned on the first

24  lines of Exhibit 1056.

25          MR. WHITE:  Yes.

1          MS. BLANCH:  Your Honor, we believe we have that

2     letter.  Again, it's with the packet.  Les Smith is going

3     through to make sure it's the right letter.

4          THE COURT:  Sixth, the Cupples handwritten

5     debrief.  Mr. Cupples I believe testified there might not

6     have been enough space in the paragraph provided, so he may

7     have handwritten a paragraph or pages.  He wasn't certain,

8     and we are going to see about the debrief.  That's why I

9     brought Mr. Smith out.

10          He is going through that now?

11          MS. BLANCH:  Yes.

12          THE COURT:  Have you found anything in that

13     regard?

14          MS. BLANCH:  Yes.

15          THE COURT:  Excellent.

16          Seven, Cupples sends out second letter to Yandell

17     to --

18          MS. BLANCH:  I believe we have that.

19          THE COURT:  Now, what time do you want to

20     reconvene tomorrow?  I want to give you enough time to get

21     that done and give that to the defense so they can read it.

22          MS. FLYNN:  We think we need only about a

23     half-hour to put it all together.

24          THE COURT:  Let's choose 8:00 in the morning

25     tomorrow.

1                MS. FLYNN:  That's fine.

2                MR. FLEMING:  That's fine.

3           *(At 4:30 p.m., proceedings were adjourned.)*

4                            -oOo-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-oOo-

CERTIFICATE

        I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.


Date:  May 12, 2006


                    Sharon Seffens 5/12/06

                    SHARON SEFFENS, U.S. COURT REPORTER