1

FILED
CLERK, U.S. DISTRICT COURT

AUG - 8 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

BARRY BYRON MILLS;
TYLER DAVIS BINGHAM;
CHRISTOPHER OVERTON
GIBSON; EDGAR WESLEY
HEVLE,
           Defendants.

CR-02-938(C)
DAY 28, VOL. III

----------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 16, 2006

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

DOCKETED ON CM

5

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   DEBRA W. YANG
     United States Attorney
 4   STEVEN D. CLYMER
     Special Assistant United States Attorney
 5   Chief, Criminal Division
     MICHAEL EMMICK
 6   TERRI FLYNN
     JOEY BLANCH
 7   Assistant United States Attorneys
     1400 United States Courthouse
 8   312 North Spring Street
     Los Angeles, CA  90012
 9   (213) 894-0511

10   For Defendant BARRY BYRON MILLS:

11   H. DEAN STEWARD
     LAW OFFICES OF H. DEAN STEWARD
12   107 Avenida Miramar, Suite C
     San Clemente, CA
13   (949) 481-4900

14   MARK F. FLEMING
     LAW OFFICES OF MARK F. FLEMING
15   433 "G" Street, Suite 202
     San Diego, CA  92101
16   (619) 652-9970

17   For Defendant TYLER DAVIS BINGHAM:

18   MICHAEL  V. WHITE
     LAW OFFICES OF MICHAEL V. WHITE
19   1717 Fourth Street, Third Floor
     Santa Monica, CA  90401
20   (310) 576-6242

21   WILLIAM S. HARRIS
     STEWART & HARRIS
22   1499 Huntington Drive, Suite 403
     South Pasadena, CA  91030
23   (626) 441-9300

24

25
```

```
 1   For Defendant CHRISTOPHER OVERTON GIBSON:

 2   KENNETH A. REED
     LAW OFFICES OF KENNETH A. REED
 3   404 West 4th Street, Suite C
     Santa Ana, CA  92701
 4   (714) 953-7400

 5   For Defendant EDGAR WESLEY HEVLE:

 6   BERNARD J. ROSEN
     LAW OFFICES OF BERNARD J. ROSEN
 7   1717 Fourth Street, Suite 300
     Santa Monica, CA  90401
 8   (310) 451-4577

 9   DONALD J. CALABRIA
     LAW OFFICES OF DONALD J. CALABRIA
10   16133 Ventura Boulevard, Suite 600
     Encino, CA  91436
11   (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                              INDEX

 2                                                      PAGE

 3   PLAINTIFF'S
     WITNESS:           DIRECT     CROSS    REDIRECT    RECROSS
 4

 5   JOHN MCGINLEY
          (Continued)              5(Wh)
 6                                85(Fl)

 7

 8   PLAINTIFF'S
     EXHIBITS:                     MARKED            RECEIVED

 9   Exhibit 1059                   117

10   DEFENSE
     WITNESSES:         DIRECT     CROSS    REDIRECT    RECROSS
11
      (None)
12

13   DEFENSE
     EXHIBITS:                     MARKED            RECEIVED
14
      (None)
15

16

17

18

19

20

21

22

23

24

25
```

```
 1    SANTA ANA, CALIFORNIA; TUESDAY, MAY 16, 2006; 1:00 P.M.

 2              (Jury not present.)

 3              THE COURT:  We are back in session.  All counsel

 4    are present.  The defendants are present.  The government is

 5    present.

 6              Lisa, would you kind enough to summon the jury,

 7    please.

 8              (Jury present.)

 9              THE COURT:  The jurors and alternate jurors are

10    present.  We are once again in session.  Counsel are

11    present.  The defendants are present, and the government is

12    present.

13              This is Mr. White on continued cross-examination.

14                    CROSS-EXAMINATION (Continued)

15    BY MR. WHITE:

16    Q    Mr. McGinley, just to recap, your first adult

17    conviction was 1975 for an armed aggravated robbery in

18    Colorado?

19    A    Yes, sir.

20    Q    I think your testimony is that you had actually not

21    reached the age of 18 at that time, correct?

22    A    Correct.

23    Q    But you chose to use an assumed name with an assumed

24    birthdate so that you would be treated as an adult rather

25    than a juvenile; is that correct?
```

```
1    A    Yes.

2    Q    And that has something to do with your prior juvenile

3    problems, and you thought it would be better for you to be

4    convicted as an adult; is that correct?

5    A    Yes.

6    Q    Now, you said you were released from the Colorado

7    prison in 1997?

8    A    Yes.

9    Q    How long were you out of prison before you were

10   arrested for murder and assault with a deadly weapon?

11   A    Approximately six months.

12   Q    And that arrest came in California, correct?

13   A    Yes.

14   Q    As a result of that arrest, you were convicted of

15   second degree murder?

16   A    Yes.

17   Q    And assault with a deadly weapon; is that correct?

18   A    Yes.

19   Q    You may have mentioned that your sentence on second

20   degree murder was seven years.  Is that right?

21   A    Yes.

22   Q    At the time, to your knowledge, was that the maximum

23   sentence on a second degree murder in the state of

24   California?

25   A    It was.
```

```
 1   Q    And that was in the year 1978?

 2   A    Yes.

 3   Q    When were you released from prison on that case?

 4   A    1985.

 5   Q    And how long were you out of prison on that case before

 6   you were rearrested?

 7   A    About three weeks I think.

 8   Q    When you were rearrested in three weeks, what was the

 9   new crime?

10   A    Robbery.

11   Q    Again, was it an armed robbery?

12   A    No.

13   Q    Did you use any kind of weapon?

14   A    My hands.

15   Q    And were you convicted of that robbery?

16   A    Yes.

17   Q    Did you go to a California state prison on that

18   robbery?

19   A    Yes.

20   Q    When were you released on that robbery?

21   A    1989.

22   Q    How long were you out of prison in 1989 before you were

23   arrested again?

24   A    Approximately six months.

25   Q    At that point, you were arrested in the state of
```

1    Oregon; is that correct?

2    A     No, sir, California.

3    Q     For a crime that you had committed in Oregon; is that

4    correct?

5    A     Yes.

6    Q     And the crime that you were arrested for was for an

7    armed robbery?

8    A     Yes.

9    Q     They brought you up to Oregon; is that correct?

10   A     Yes.

11   Q     Now, how long had you been in Oregon between your

12   release in '89 and your rearrest in '89?

13   A     Just a matter of a few weeks.  I don't remember

14   exactly.

15   Q     When you went back up to Oregon, they filed robbery

16   charges against you?

17   A     They had already been filed against me.  I was being

18   held in California on a detainer.

19   Q     And at that point up in Oregon --

20         MS. FLYNN:  I am going to object to this line of

21   questioning.  He wasn't convicted of the robbery.

22         THE COURT:  Do the two of you want to discuss this

23   for a moment?

24         MR. WHITE:  I can move on.  That's all right.

25   BY MR. WHITE:

1   Q   At that point, the federal government stepped in; is

2   that correct?

3   A   Yes.

4   Q   And the federal government charged you with being

5   a felon in possession of a weapon; is that correct?

6   A   Yes.

7   Q   And that weapon was the weapon you used in the robbery;

8   is that correct?

9   A   The robbery was never adjudicated.

10  Q   Was that weapon --

11  A   I was simply being charged with ex-felon in possession

12  of a weapon, no other charges.

13  Q   Was that weapon the weapon you used in the robbery?

14  A   I take the Fifth Amendment.

15  Q   You've got immunity, Mr. McGinley.

16  A   I was accused of using that weapon in a robbery, the

17  charges of which were dismissed in a state court.  The

18  federal government was not charging me with a robbery.

19  Q   Well, No. 1, the state court dismissed charges because

20  the federal government jumped ]in and filed the felon in

21  possession of a gun, correct?

22  A   No, sir.

23        MS. FLYNN:  I am going to object to this line of

24  questioning.  It violates the stipulation that we were only

25  going to ask about felony convictions.

10

1          MR. WHITE:   I'll withdraw that last question.

2     BY MR. WHITE:

3     Q     You were convicted in federal court of a felon in

4     possession of a gun?

5     A     Yes.

6     Q     And you were sentenced in federal court for that; is

7     that correct?

8     A     Yes.

9     Q     And you were sentenced to 235 months; is that right?

10    A     Yes.

11    Q     A little less than 20 years; is that right?

12    A     Twenty years exactly I think.

13    Q     Are you better with letters than you are with numbers?

14    A     Obviously not.

15    Q     That conviction was in what year?

16    A     1992.

17    Q     And that's the sentence that you are still serving?

18    A     Correct.

19    Q     And you mentioned during your direct examination that

20    you are still fighting that sentence.  You are still arguing

21    to the courts that that sentence was incorrect; is that

22    right?

23    A     Yes.

24    Q     And you have been appealing that sentence since what

25    year?

1   A     Since 1992.

2   Q     So you have been appealing that sentence for 14 years?

3   A     Yes.

4   Q     How many appellate courts have told you or ruled that

5   the sentence was an appropriate sentence?

6   A     The Ninth Circuit Court of Appeals and the United

7   States Supreme Court have ruled a number of times that

8   several of the sentences I was given were incorrect.  This

9   is about the fifth or sixth resentencing that I am serving

10  right now, so the sentence wasn't correct.  The first one,

11  the second one, the third one, the fourth one, and the fifth

12  one were all incorrect, and whatever number we are at right

13  now I am still arguing is incorrect.

14  Q     As it stands right now, how many years are you serving?

15  A     Twenty years.

16  Q     When you were sentenced in 1992, how many years did you

17  get sentenced to?

18  A     Thirty years.

19  Q     So initially you got 30 years?

20  A     Yes.

21  Q     And how quickly did that change?  How quickly was that

22  30 reduced to 20?

23  A     That 30 was vacated in about two days.  They gave me 30

24  again.  That went to the Supreme Court.  That was remanded

25  and vacated.  They gave me 30 again.  That was vacated and

1    remanded.  They gave me 20.  That was vacated and remanded.

2    That happened two or three more times I think.

3    Q    Well, you were given 20 beginning in 1994, correct?

4              MS. FLYNN:  Objection to this line of questioning.

5    I think it's irrelevant.

6              THE COURT:  Overruled.

7    BY MR. WHITE:

8    Q    You were given 20 years beginning in 1994 weren't you?

9    A    I don't have the record in front of me, but if that's

10   what you have, I won't argue.

11   Q    Do you think if you would take a look at the record, it

12   might refresh your recollection as to the date?

13   A    Yeah.

14   Q    Do you recall being sentenced by Judge Hogan in Eugene,

15   Oregon?

16   A    Yes.

17   Q    And that's when you got 20 years?

18   A    Yes.

19             MR. WHITE:  May I approach?

20             THE COURT:  Is this a sentence or resentence?

21             MR. WHITE:  This is probably a resentence.

22   BY MR. WHITE:

23   Q    Looking at that date, Mr. McGinley, does that refresh

24   your memory with regard to when you were sentenced in

25   Eugene, Oregon, to 20 years?

1    A    Yes, sir.

2    Q    What was the date?

3    A    August 8, 1994.

4    Q    Since August 8, 1994, you have been attempting to get

5    that 20-year sentence reduced, correct?

6    A    I have had that sentence vacated, and I have been

7    resentenced since then, but it's all been to 20 years.

8    Q    So you are still serving a 20-year sentence?

9    A    Yes.

10    Q    Is it your testimony still that you hope to have that

11    sentence reduced by an appellate court?

12    A    Yes.

13    Q    Do you have any action pending at this moment?

14    A    As soon as I get back to where I am being housed, I

15    have a writ of mandamus that I intend to submit to the U.S.

16    Supreme Court.

17    Q    And the basic issue with regard to that 20-year

18    sentence has to do with that robbery we talked about,

19    correct?

20    A    No, sir.

21    Q    So, Mr. McGinley, over the period of time since 1975,

22    that being the last 20 years approximately, you have been

23    out of custody less than a year; is that correct?

24    A    A year something, yeah.

25    Q    Now, you told us that when you served time in the

1    California state prison, you became friendly with members of

2    the Aryan Brotherhood, right?

3    A    Yes.

4    Q    And during some period while in the California state

5    prison system, you were offered a membership in the Aryan

6    Brotherhood; is that right?

7    A    Yes.

8    Q    And you decided that -- I think what you said was you

9    didn't want to guard domino tables and hold up a wall.  Is

10   that it?

11   A    Yes, sir.

12   Q    You didn't feel as though the Aryan Brotherhood was --

13   strike that.  What do you mean by that?  When you say that

14   you didn't join the Aryan Brotherhood because you didn't

15   want to do that, what do you mean by that?

16   A    It seemed like a waste of talent and potential.  A lot

17   of guys that I was around at the time who were Aryan

18   Brotherhood members were serving lengthy sentences and

19   weren't ever getting out probably, so they didn't have

20   ambitions beyond the penitentiary.  I had a date to get out

21   of prison, and I wasn't interested in getting a life

22   sentence because of things going on in prison that didn't

23   amount to anything.

24   Q    So you had ambitions beyond prison, correct?

25   A    Yes.

1   Q    And your ambitions were criminal ambitions?

2   A    Yes.

3   Q    When you say it was "a waste of talent," in your mind,

4   it was a waste of criminal talent?

5   A    Yes.

6   Q    So way back in the '70s when you are in the California

7   state prison, you were already dreaming of ways to utilize

8   criminal talent outside of prison, correct?

9   A    In the context of my association with the Aryan

10  Brotherhood, it seemed obvious, yes.

11  Q    You just told us that you had ambitions -- you had a

12  date?  You were going to get out of prison?

13  A    Yes.

14  Q    You had ambitions once you got out of prison?

15  A    For myself, yes.

16  Q    And those ambitions were criminal ambitions?

17  A    Yes.

18  Q    So basically the Aryan Brotherhood in the California

19  state system was not enough of a criminal organization for

20  you, correct?

21  A    Yes.

22  Q    Is it fair to say that you are a guy who has lots of

23  ideas bouncing around in your head?

24  A    Yeah.

25  Q    And I assume that you were an idea guy back in the '70s

```
 1    when you were in the California state prison system,
 2    correct?
 3    A     Yes.
 4    Q     So you saw these members of the Aryan Brotherhood, and
 5    you imagined what they could be in terms of a real criminal
 6    organization?
 7    A     Yes.
 8    Q     Now, you were released from the California state prison
 9    the first time in '85; is that right?
10    A     Yes.
11    Q     By the way, just to set a time frame on this, you first
12    meet members of the Aryan Brotherhood in the state prison
13    system back in the '70s?
14    A     Yes.
15    Q     Then you are released in '85.
16          You immediately go back to prison, correct?
17    A     Yes.
18    Q     Again you are around members of the Aryan Brotherhood?
19    A     Yes.
20    Q     And that's in the California state system?
21    A     Yes.
22    Q     Are you again asked to become a member?
23    A     Yes.
24    Q     And, again, you feel the same way?
25    A     Yes.
```

17

1   Q    They are not enough of a criminal organization for you?

2   A    Yes.

3   Q    You see these guys, and you see them as a bunch of guys

4   who basically are individuals who do what they want to do,

5   correct?

6   A    Not necessarily.

7   Q    Well, they are not people who are easily governed are

8   they?

9   A    Among themselves and by themselves, they are easily

10  governed.

11  Q    So you get out of prison in this time, '89, and you are

12  arrested within a few months, and this time you go to

13  federal prison; is that correct?

14  A    Yes.

15  Q    That's in -- when did you first go to federal prison?

16  A    Early 1992.

17  Q    Because you are in custody in Oregon fighting your case

18  from '89 to '92, correct?

19  A    '90 to '92, yeah.

20  Q    It took awhile for you to be arrested?

21  A    It took awhile for them to transfer me up to Oregon.

22  Q    You were arrested in California?

23  A    Yes.

24  Q    On an Oregon warrant?

25  A    Yes.

1    Q    It took awhile for the state of Oregon to bring you up

2    to Oregon from California?

3    A    Yes.

4    Q    You get into federal prison, and where was the first

5    facility that you went to for any period of time?

6    A    U.S. Penitentiary, Marion, Illinois.

7    Q    At Marion in 1992, there were a number of members of

8    the Aryan Brotherhood there; is that correct?

9    A    Yes.

10   Q    How long did you stay at Marion?

11   A    Until early 1995.

12   Q    During that period of time, you saw guys like T.D.

13   Bingham; is that right?

14   A    I never met T.D. at Marion, no.

15   Q    Do you know if he was there?

16   A    Yes.

17   Q    But you never met him?

18   A    No.

19   Q    Marion at that time was the most restrictive facility

20   in the federal system?

21   A    Yes.

22   Q    So there could be somebody who is on another unit that

23   you may never meet?

24   A    Correct.

25   Q    It was not easy to meet people unless you were celled

1   within close proximity of them?

2   A    Correct.

3   Q    Did you meet Barry Mills there?

4   A    No.

5   Q    You met Kevin Roach there?

6   A    Yes.

7   Q    And you met other Aryan Brotherhood members; is that

8   correct?

9   A    Yes.

10   Q    Now, at Marion, you watched members of the Aryan

11   Brotherhood and the way they operated; is that right?

12   A    Yes.

13   Q    You still felt that they were not much of a criminal

14   organization; is that correct?

15   A    As far as I could see.

16   Q    Were you asked to become a member while at Marion?

17   A    Yes.

18   Q    Beginning when?

19   A    In 1993.

20   Q    And you said no?

21   A    Yes.

22   Q    Because, again, you didn't want to guard domino tables

23   or hold up walls?

24   A    Correct.

25   Q    In Marion at the time, you didn't see much economic

```
 1   benefit from being a member of the Aryan Brotherhood did
 2   you?
 3   A    There's not a lot of activity in Marion at all.
 4   Q    Because it was so restrictive?
 5   A    Yes.
 6   Q    At the ADX the same is true?  Because it's so
 7   restrictive, there is not a lot of activity?
 8   A    There are no gambling tables.  There's no
 9   drug-trafficking to speak of.  No.
10   Q    Drugs and gambling are usually the biggest moneymakers
11   in prison?
12   A    And loan sharking.
13   Q    Those things didn't exist at Marion or the ADX?
14   A    There were drugs for personal use.  Nobody was selling
15   them that I know of.  I didn't see any gambling rackets
16   going on at Marion or ADX or loan sharking.
17   Q    So in '93 you were asked to join, and for the same
18   reason you declined in the '70s and '80s in California, you
19   declined at Marion in '93?
20   A    Yes.
21   Q    Were you housed in a place that was close to Kevin
22   Roach?
23   A    When I first got to Marion in 1992, he was in I Unit.
24   When you first come to Marion, that's where you stay until
25   you are classified to whichever unit they send you to.
```

1   That's when I first met Kevin.

2   Q    During your period at Marion you and he became good

3   friends?

4   A    No, sir.  I saw him in I Unit when I first got there,

5   and I didn't meet him again until we got to ADX.

6   Q    You left Marion to go to ADX in 1995?

7   A    Yes.

8   Q    When you got to ADX, were you thrown into a place that

9   was close to Kevin Roach?

10   A    We were neighbors.

11   Q    Neighbors meaning?

12   A    One cell next to the other.

13   Q    And the ADX again -- strike that.

14        The ADX once it was built became the most

15   restrictive prison in the federal system?

16   A    Yes.

17   Q    It became even more restrictive than Marion; is that

18   right?

19   A    Yes.

20   Q    The one place where you could talk to somebody was if

21   your cells were right next to each other?

22   A    Or on the yard.

23   Q    At any rate, you had ample opportunity to speak to

24   Kevin Roach?

25   A    Yes.

1    Q    And Kevin Roach was a talker?

2    A    He is sociable, and he's personable, but he's not a

3    talker in the sense if you're suggesting that he talked

4    about the AB's business to anybody outside the AB.

5    Q    I am not suggesting anything.

6    A    Okay.  I just wanted to be clear.

7    Q    You and Kevin Roach at that point became good friends?

8    A    Yes.

9    Q    And Kevin Roach tried to talk you into joining the

10   Aryan Brotherhood?

11   A    Yes.

12   Q    Kevin Roach talked to you about his ideas for the Aryan

13   Brotherhood; is that correct?

14   A    Later on.

15   Q    Well, how did Kevin Roach talk you into joining the

16   Aryan Brotherhood -- strike that.  Kevin Roach was

17   successful?  He talked you into it?

18   A    He helped.

19   Q    How did Kevin Roach help talk you into joining the

20   Aryan Brotherhood?

21   A    The first time that he started divulging information to

22   me the new direction the Aryan Brotherhood was trying to go

23   into was in the presence of Barry Mills when we all got over

24   to J Unit in 1996.

25   Q    Before that, Mr. Roach would not talk about Aryan

1    Brotherhood business?

2    A     No.  He just asked me to keep my mind open to the

3    possibility of joining.

4    Q     By the way, just to leave this topic for a moment, you

5    told us that you spoke to Agent Halualani in October of the

6    year 2000, correct?

7    A     Yes.

8    Q     Was that the first time that you spoke to somebody from

9    the government about cooperating with the government?

10   A     No.

11   Q     When was the first time you spoke to the government

12   about becoming a cooperator?

13   A     It was shortly before that.  I was in the hole.  I had

14   dropped out of the Aryan Brotherhood.  I knew that I was

15   going to be stuck in the ADX if I couldn't get somebody to

16   raise their hand and say, yeah, we know he is not in the AB

17   anymore.  Let's program him to enjoy life and send him

18   someplace else, so I asked for the lieutenant.  I spoke with

19   Lieutenant Manley, and he went and talked to the SIS, Danny

20   Shoff.  They came and asked me a few questions and asked me

21   if I would be willing to talk to the ATF.

22   Q     So that's how it came about?

23   A     That's how it came about.

24   Q     That was how long before you spoke to Halualani in

25   October?

1  A     Not very long.  I can't recall exactly.

2  Q     So you contacted them?  They didn't contact you?

3  A     That's right.

4  Q     Let's go back to 1996.

5          At some point in 1996, you decide to become a

6  member of the Aryan Brotherhood, correct?

7  A     Yes.

8  Q     And this is because you believe that there will be a

9  change in the organization, correct?

10  A     Yes.

11  Q     All those things -- or at least some of those things

12  that you had thought about going way back to the '70s you

13  believed that the Aryan Brotherhood -- the federal branch of

14  the Aryan Brotherhood was about to embark down that road,

15  correct?

16  A     Yes.

17  Q     When was it that you agreed to become a member, if you

18  know?

19  A     It was in 1996.  I can't tell you exactly.

20  Q     Now, I think you have told us that at the time you

21  agreed to become a member you already held a position in the

22  Aryan Brotherhood; is that correct?

23  A     Yes.

24  Q     What was the position that you held?

25  A     Director of intelligence.

1   Q    So you were the director of intelligence before you

2   even agreed to become a member of the Aryan Brotherhood?

3   A    No, sir.  I was given the job after I agreed to become

4   a member but before I was actually inducted.

5   Q    So you said, yes, you would become a member?

6   A    Yes.

7   Q    Then there was some period before you're inducted; is

8   that right?

9   A    Yes.

10   Q    As soon as you told them that would become about a

11   member, you were made head of of intelligence?

12   A    Yes.

13   Q    So that would have been sometime in 1996?

14   A    Yes.

15   Q    What were your duties as head of intelligence?

16   A    Generally speaking, to protect and advance the

17   interests of the Aryan Brotherhood as they were put forth by

18   the Commission.

19   Q    I think you told us that right off the bat one of your

20   responsibilities was communication.

21   A    Yes.

22   Q    Communication included these various methods of inmates

23   communicating with other inmates?

24   A    Yes.

25   Q    And this code that you have talked about, that's one of

1  those methods?

2  A     Yes.

3  Q     Various other codes were also used to communicate; is

4  that correct?

5  A     Yes.

6  Q     So your job beginning sometime in '96 included being

7  the head of communications, correct?

8  A     Yes.

9  Q     Then you became a member officially in February '97?

10  A     Yes.

11  Q     And a few months later you became a counselor; is that

12  correct?

13  A     Yes.

14  Q     You were a counselor in charge of intelligence and

15  security; is that right?

16  A     Yes.

17  Q     So security was added to your position at that point?

18  A     Prior to that.

19  Q     Did you say "Prior to that"?

20  A     Prior to that.

21  Q     You became the head of security and intelligence before

22  you became a member in February '97?

23  A     Yes.

24  Q     So when we talk about security, how did that expand

25  your duties or responsibilities?

1    A    It was going to include things like weapons, devising

2    plans to carry off moves.  At some point when we got to the

3    main line, it would be protection details for commissioners,

4    for example, providing security for narcotics trafficking,

5    for any of the rackets.

6    Q    Now, of course, as far as security for narcotics, there

7    was no narcotics trafficking at ADX, correct?

8    A    That's true.

9    Q    As far as protection details, when you say that, you

10   are talking about inmates who are detailed to protect the

11   leaders of the Aryan Brotherhood?

12   A    Yes.

13   Q    Of course that's not something that could be done at

14   the ADX, correct?

15   A    Correct.

16   Q    As far as -- did you say something about the rackets?

17   A    Gambling, drugs.  Whatever interests that the Aryan

18   Brotherhood had security would have a responsibility to

19   provide protection.

20   Q    Again, there were no rackets at the ADX?

21   A    No.

22   Q    Under your position as head of intelligence and

23   security, was there -- did you also have responsibility if

24   there was a war?

25   A    Yes.

Q    As head of security and intelligence, you had
responsibility when it came to either prosecuting a war or
weighing in on whether there should be a war; is that right?

A    Anybody on the council would necessarily have some say
in what is going to happen, but ultimately it's the
Commission's decision.

Q    But being the councilor in charge of security and
intelligence, I would think that you had a little bit more
weight in that regard than other counselors, correct?

A    You would think.

Q    Now, in terms of the position of the Aryan Brotherhood
at that point -- we're talking about 1997 -- you are hoping
having just joined that things are going to change; is that
correct?

A    Yes.

Q    One of the things that was clear to you was that the
Aryan Brotherhood needed new blood, correct?

A    Yes.

Q    I think you had a list of members that you coded into a
book list, right?

A    Yes.

Q    Do you know how many members were on that list?

A    I seem to recall it was 30-some odd members.

Q    In your mind, the Aryan Brotherhood needed a lot more
members, correct?

```
 1   A    Yes.
 2   Q    It was because of that that you went at some point to
 3   Barry Mills and suggested that the Aryan Brotherhood expand
 4   by embracing skinheads, correct?
 5   A    It wasn't my idea to try to open the books up to any
 6   particular group.  I think the first I did referenced the
 7   Dirty White Boys as grounds for recruitment, and I expanded
 8   on that with the skinheads, yes.
 9   Q    I think you testified that you had a discussion with
10   Mr. Mills and Mr. Roach about widening the network; is that
11   correct?
12   A    Sounds correct.
13   Q    What you meant by widening the network was to bring in
14   new members?
15   A    Yes.
16   Q    And you testified that the most obvious choice I assume
17   in your mind were skinhead groups; is that correct?
18   A    Yes.
19   Q    Then you testified that you discussed this with Mr.
20   Mills briefly; is that right?
21   A    Yes.
22   Q    And you don't recall what Mr. Mills' reaction was to
23   that discussion.  That was your testimony.  Do you remember
24   that?
25   A    Yes.
```

1   Q    You do in fact recall Mr. Mills' reaction to that don't

2   you?

3   A    No.

4   Q    Don't you recall that Mr. Mills was angry about that

5   suggestion?

6   A    No.

7            MS. FLYNN:  Objection, asked and answered

8   argumentative.

9            THE COURT:  Overruled.

10  BY MR. WHITE:

11  Q    Mr. McGinley, did you share the ideology of the

12  skinhead groups?

13  A    No, sir.

14  Q    Mr. McGinley, you are a racist aren't you?

15  A    No, sir.

16           MS. FLYNN:  Objection, argumentative.

17           THE COURT:  Overruled.

18  BY MR. WHITE:

19  Q    Mr. McGinley, I want to go back to your 1978 conviction

20  for second degree murder and assault with a deadly weapon.

21  Do you have that in mind?

22  A    Yes.

23  Q    You shot a biracial couple --

24           MS. FLYNN:  Objection.  This is getting into the

25  underlying facts.

```
 1              THE COURT:  Overruled.
 2    BY MR. WHITE:
 3    Q     You shot a biracial couple, did you not?
 4    A     Yes.
 5    Q     One of the people was black; is that correct?
 6    A     Yes.
 7    Q     And one was white; is that correct?
 8    A     Yes.
 9    Q     And that's the case where you were convicted of second
10    degree murder?
11    A     Yes.
12    Q     And convicted of assault with a deadly weapon; is that
13    correct?
14    A     Yes.
15    Q     You shot those people because they were a biracial
16    couple; is that correct?
17    A     No, sir.
18    Q     Why did you shoot them?
19    A     I will give you the fact that that probably influenced
20    my decision, but it's been a long time.  In any case, that
21    was never established in court or anywhere else.
22    Q     That's not my question.
23          My question was why did you shoot them, and you
24    just said that influenced your decision.  How did the fact
25    that they were a biracial couple influence your decision?
```

```
1   A    Because at that time in my life, it was something that
2   I disagreed with.
3   Q    So you were a racist then in 1978, correct?
4   A    Hadn't thought about it like that, but I guess I was.
5   Q    Were you a racist in 1997?
6   A    No.
7   Q    You no longer had problems with black people at that
8   point?
9   A    I had problems with everybody.
10  Q    Mr. McGinley --
11  A    I didn't have problems with anybody because of the
12  color of their skin.
13  Q    Mr. McGinley, you worked with several skinhead groups
14  in Oregon didn't you?
15  A    No, sir.
16  Q    Did you run a small paramilitary camp where you were
17  training skinheads in Oregon?
18  A    I was associated with a group of people towards
19  criminal enterprising.
20  Q    Skinheads?
21  A    Yes.
22  Q    In Oregon?
23  A    Yes.
24  Q    A paramilitary camp?
25  A    Yes.
```

1    Q    And you were training them in the use of weapons?

2    A    Yes.

3    Q    And military tactics; is that right?

4    A    Yes.

5    Q    And gorilla warfare?

6    A    That might be stretching things.

7    Q    Were you a racist then, Mr. McGinley?

8    A    No, sir.  They were convenient.

9    Q    They were what?

10   A    Convenient.

11   Q    What do you mean "They were convenient"?

12   A    I wanted people that I could take on a criminal

13   enterprise with me, and they were convenient.

14   Q    What year was it that you were training skinheads in a

15   paramilitary camp?  What year was that?

16   A    1989.

17   Q    So that was the brief period -- one of the brief

18   periods where you were out of prison?

19   A    Yes.

20   Q    This was after having been paroled on one robbery and

21   before being arrested on another robbery; is that correct?

22   A    Yes.

23   Q    In fact, your conviction in '92 I think was out of

24   Oregon, right?

25   A    Yes.

34

```
1    Q    I think you testified a little while ago that you were
2    only up in Oregon for a few weeks.  That's not right is it?
3    A    It's right.
4    Q    So it was during this few weeks that you connected up
5    with this skinhead group and taught at this paramilitary
6    camp?
7    A    I stayed in Oregon for a few weeks and then moved up to
8    Washington for a little while.
9    Q    Where was this paramilitary camp?
10   A    Washington.
11   Q    But you were not a racist at that point?
12   A    No.
13   Q    They just happened to be prime candidates for criminal
14   enterprises that you had in mind, correct?
15   A    Exactly.
16   Q    What were you going to do with these people?
17   A    What we were going to do in the AB.
18   Q    I am asking you what your idea was in 1989 at this
19   paramilitary camp in Washington with these skinheads.
20        What were you going to do with these people?
21   A    Commit robbery, sell drugs, criminal enterprising.
22   Q    All the things that the AB was unable to do?
23   A    Yes.
24   Q    Then you also had involvement with a skinhead group in
25   Los Angeles; is that correct?
```

1    A    Yes.

2    Q    Called the L.A. Death Squad?

3    A    I don't think I have ever met anybody from the L.A.

4    Death Squad, but I have met people from a number of

5    different organizations in Los Angeles.

6    Q    Skinhead organizations?

7    A    Yes.

8    Q    Racist organizations?

9    A    Yes.

10   Q    By the way, while you said you were not a racist in

11   1989, surely you would admit that those skinheads that you

12   were training to become a part of your organization were in

13   fact racist, correct?

14   A    Yes, they were.

15   Q    Now, you have also testified that you wrote a letter to

16   Tom Metzger; is that right?

17   A    Yes.

18   Q    This is in 1997, correct?

19   A    I don't remember the date, but it sounds right.

20   Q    It sounds about right?

21   A    Yes.

22   Q    So we have got you shooting a biracial couple in '78.

23   We have got you training skinheads at a paramilitary camp in

24   '89, and now in '97, you are writing to Tom Metzger; is that

25   right?

1    A    Yes.

2    Q    But in '97, you're not a racist?

3    A    No, sir.

4    Q    Now, you had experience or contact with Tom Metzger

5    before you wrote him in '97?

6    A    Yes.

7    Q    You had met Metzger in Oregon?

8    A    I have never met Tom Metzger in person.

9    Q    But you corresponded with him?

10   A    Yes.

11   Q    When did you correspond with him?

12   A    Starting in the early '80s probably from Folsom prison.

13   Q    Again, Mr. Metzger, among other things, was the grand

14   dragon of the Klu Klux Klan?

15   A    I heard.

16   Q    Clearly a racist?

17   A    Yes.

18   Q    And you make reference in your letter to Mr. Metzger

19   about something that happened in Portland; is that right?

20   A    I don't recall.  I would have to see the letter to

21   remember anything that was in it.

22        MR. WHITE:  Your Honor, may I can approach to show

23   the witness something to see if it refreshes his

24   recollection?

25        THE COURT:  You may.

BY MR. WHITE:

Q    Mr. McGinley, if you would take a look at the yellow portion at the bottom and the top and see if that refreshes your memory.

A    Yes, sir.

Q    Does that refresh your memory as to what you wrote Mr. Metzger?

A    Yes, sir.

Q    Now, this was October '97; is that right?

A    Yes.

Q    In October of 1997 -- by the way, when you wrote this letter to Metzger, in part you were asking him for a list of skinhead crews; is that correct?

A    Yes.

Q    In other words, you are asking him for a list of skinheads; is that right?

A    Yes.

Q    And I assume the purpose was to try to enlist the help of these skinheads.

A    To establish some association and go from there.

Q    And your concern was prosecuting a war against blacks; is that right?

A    No, sir.

Q    In October of 1997, you were in the hole; is that correct?

1    A    Yes.

2    Q    And above you or below you -- I don't remember -- was

3    Kevin Roach; is that correct?

4    A    You would have to look at a SENTRY log.  I don't

5    remember.

6    Q    Do you remember being in the hole in October of '97 and

7    having numerous conversations with Kevin Roach?

8    A    Yes.

9    Q    Through the toilet?  The pipes?

10   A    Pipes, the vent, the rec cages, law libraries.

11   Q    You and he talked a lot during that period?

12   A    Yes.

13   Q    And one of the things that you and he talked about was

14   trying to put the word out that there was to be or there was

15   a race war going on, correct?

16   A    Not in relation to this, no.

17   Q    Did Mr. Roach tell you that he wrote a number of

18   letters trying to enlist support for the race war?

19   A    No.

20   Q    What was the purpose of this letter that you wrote

21   Metzger?

22   A    I had been putting that off for a long time.  We

23   discussed it in 1996.  I had been putting it off.  I had

24   time on my hands.  We were in the hole, so that's when I

25   wrote it.

1   Q    Why do you want a list of skinhead crews?

2   A    To draw who we can from their ranks and to use whatever

3  -- to use their organizations as they were in any way we

4  could.

5   Q    Despite the fact that Mr. Mills has said he doesn't

6  want these kind of people in the Aryan Brotherhood?

7   A    Mr. Mills didn't tell me that, no.

8   Q    Mr. McGinley, at some point -- strike that.

9         You have told us that at every opportunity you

10  would complain to people about the way the Aryan Brotherhood

11  was being run; is that correct?

12   A    No, sir.

13   Q    Well, you have told us that you expressed

14  dissatisfaction often about the Aryan Brotherhood, correct?

15   A    No, sir, not exactly.  I said towards the end right

16  before I dropped out I talked with the people about my

17  dissatisfaction, raised the points.  It wasn't as though

18  from the very beginning I was criticizing things.

19   Q    Did this dissatisfaction rise to the level where you

20  tried to recruit Scott Cupples to murder T.D. Bingham and

21  Barry Mills?

22   A    I don't recall ever speaking with Scott Cupples about

23  murdering anyone.

24   Q    Do you recall sending Mr. Cupples a couple of notes?

25   A    Vaguely.

1    Q    Do you vaguely recall that those notes were about Barry

2    Mills and T.D. Bingham?

3    A    I don't think they were, no.

4    Q    Do you remember the phrase that "You had to destroy an

5    old house in order to erect a new one"?

6    A    Along those lines, yes.

7    Q    What you were saying was in your mind you had to get

8    rid of T.D. Bingham and Barry Mills?

9    A    We had come to that understanding far before then.

10   Q    When you say "We," you are talking about you and Kevin

11   Roach?

12   A    Correct.

13   Q    You and Roach had decided long before then that in

14   order for the Aryan Brotherhood to become the organization

15   that you wanted it to become you needed to get rid of Mills

16   and Bingham?

17   A    Yes.

18   Q    At one point, you tried to enlist Scott Cupples to help

19   in that regard; is that correct?

20   A    I don't recall trying to enlist or bring him into my

21   confidence in this matter.

22   Q    When you say you don't recall, are you saying that it

23   may have happened, and you just don't remember?

24   A    I don't think it happened.  That's what I am saying.

25   Q    Assume that Mr. Cupples sat in the seat you are sitting

1    in right now some weeks ago and testified that you sent him

2    notes asking him to participate in murdering Mills and

3    Bingham.  Assume he testified to that.  Is he wrong about

4    that?

5    A    To the best of my recollection, I would have to

6    contradict that testimony.

7    Q    When you say to the best of your recollection, are you

8    saying that it might have happened, and you may have

9    forgotten?

10   A    No.  I am saying I absolutely do not remember bringing

11   him into our confidence.

12   Q    Who did you talk to about getting rid of Mr. Mills and

13   Mr. Bingham?

14   A    Mr. Roach and I were the only ones that discussed it

15   with each other.  Because of the sensitivity of it and the

16   danger of it, I hadn't talked to anyone else about it, and I

17   don't know that he had either, but we knew that we wanted to

18   bring one more person on board.  We hadn't done it yet.

19   Q    So it was you and Roach that talked about in essence a

20   coup?

21   A    Yes.

22   Q    One of the ways to get rid of Mr. Mills and Mr. Bingham

23   would have been to kill them; is that correct?

24   A    Yes.

25   Q    And you and Roach talked about that; is that right?

1    A    Yes.

2    Q    Now, you said that you felt you needed a third person

3    before you could pull it off; is that right?

4    A    Yes.

5    Q    Did you approach anybody else about killing Mr. Mills

6    and Mr. Bingham?

7    A    No.

8    Q    You couldn't find the third person, at least not to

9    your satisfaction?

10   A    Correct.

11   Q    Now, you and Mr. Roach were idea guys.

12        What kind of ideas did you have as far as killing

13   Mr. Bingham and Mr. Mills?  How were you going to do it?

14   A    I would have to say that we didn't have the plan

15   flushed out in that much detail.

16   Q    Just give us the generalities.

17   A    By the time it would have come to that point right

18   there, you would have to consider where everybody was, who

19   was in what positions, what kind of sympathy we may have

20   garnered towards our cause that we may have been able to use

21   or misuse as the case may be.

22   Q    So to go back to your letter to Metzger trying to

23   recruit skinheads, you wrote that letter to Metzger with the

24   hope that you and Roach would be able to kill Mills and

25   Bingham and take over the AB, and these skinheads would

1  become part of the AB?

2  A    No, sir.  That letter had nothing to do with what we

3  are talking about here.

4  Q    At some point, Mr. McGinley, did word get to

5  Mr. Bingham or Mr. Mills that you were plotting a coup?

6  A    I doubt it.

7  Q    So Mr. Bingham never talked to you about that?

8  A    No.

9  Q    By the way, you told us that you left the Aryan

10  Brotherhood because you got tired of it; is that correct?

11  A    Partly, sir.

12  Q    Weren't you concerned that in fact the word had gotten

13  out that you were plotting to kill Mr. Bingham and Mr.

14  Mills?

15  A    No.

16  Q    Again, assuming that Scott Cupples testified that

17  Mr. Bingham had a conversation with you about your plan to

18  kill them, he would be wrong?

19  A    Yes.  Let me -- if I may, Mr. Bingham and I did have a

20  conversation which may have bordered on that possibility,

21  but it had nothing to do with what Mr. Roach and I were

22  planning to do.  It had to do with the fact that I was

23  dropping out of the tip, and we knew where we stood with

24  each other.  He knew that he was going to have to kill me if

25  he could.  Likewise, I wasn't going to make it easy.

1   Q    So your memory of that conversation was not that it was

2   about the fact that Mr. Bingham had found out that you were

3   plotting to kill him, but your memory of it is that it was

4   because Mr. Bingham found out you were dropping out?

5   A    That is the fact of the matter.  I told Mr. Bingham I

6   was dropping out.

7   Q    By the way, how long was it between when you told

8   Mr. Bingham that you were dropping out and you went into

9   protective custody?  How long was that period of time?

10  A    It must have been at least a year, maybe closer to two.

11  Q    And there were periods of time when you were on the

12  yard with members of the Aryan Brotherhood; is that correct?

13  A    Yes.

14  Q    Wasn't it a rule that if you drop out of the Aryan

15  Brotherhood that you are going to be hit at the first

16  opportunity?

17  A    Yes.

18  Q    It didn't happen with you, though.

19  A    No, it didn't.

20  Q    Because you are big strong tough guy?

21  A    I can't explain it.  Ask the people that were supposed

22  to do it.  I told them I was done.  I told them it's their

23  yard.  They know what they have to do, and I know what I'm

24  going to do.  If they want me to come out to the yard, I

25  will come out to the yard depending on what frame of mind

45

1    I'm in.

2          They asked me to come, so I went out.  I thought

3    they were going to try to make a move, and they didn't.

4    They tried to talk me down and talk me out of it.  I

5    explained to them that it's over with John.  There's no

6    talking about anything, and don't call me out again unless

7    they make me do something.  They called me out again.  I

8    came out again.  They still didn't do anything.  They still

9    wanted to talk about it.

10          Glen Filkins told me that he didn't want to get

11   involved in it.  He had received a message from Barry saying

12   to hit me, so they weren't going to be able to just leave it

13   between myself and them.

14   Q    We have had witness after witness sit where you are

15   sitting and claim that if somebody drops out of the Aryan

16   Brotherhood they're going to be killed at the first

17   opportunity.

18   A    I will testify to the same thing.  That's a fact.

19   Q    It didn't happen to you.

20   A    No.

21   Q    Now, you told us that one of the reasons you dropped

22   out is because in your mind they again demonstrated -- they

23   being the Aryan Brotherhood -- how stupid they were,

24   correct?

25   A    You can take the beast out of the jungle, but you can't

46

1    take the jungle out of the beast.  They just want to revert

2    back to pointless violence.

3    Q    You say they want to revert back to pointless violence,

4    correct?

5    A    Yes.

6    Q    Yet you told us that two of the things that you were

7    upset about was that after this war supposedly started that

8    T.D. Bingham and Barry Mills each had a knife, correct?

9    A    Right.

10   Q    And you specifically pointed to the fact that after

11   this supposed war started Barry Mills got into a fistfight

12   in the yard, right?

13   A    Yes.

14   Q    I assume it was with a black person.

15   A    It was with a group of blacks, yes.

16   Q    A group of blacks.

17        And you were upset because Barry Mills didn't pull

18   out his knife and try to kill somebody?

19   A    Yes.

20   Q    And then a second incident that you pointed to which

21   you were upset about was that T.D. Bingham got into a fight

22   on the yard; is that correct?

23   A    Yes.

24   Q    With a black guy?

25   A    Yes.

1  Q     And you are upset because T.D. Bingham didn't pull out

2  a knife and try to kill that black guy?

3  A     Yes.

4  Q     Does that have anything to do with the fact,

5  Mr. McGinley, that you were and are and always will be a

6  racist?

7  A     No, sir.  It had to do with the fact that the war had

8  started, and we can't call the dogs back now, so we have got

9  to step to it as hard as we can.

10 Q     You wanted a war desperately didn't you?

11 A     Not at all.  In fact, I was the person that tried to

12 convince T.D. that the message did not say that we had to go

13 to war.  It was because of me that the two letters of

14 confirmation went out.

15 Q     Let's talk about the two letters of confirmation.

16        First of all, the message that came out of the

17 hole, you said you don't exactly remember what that message

18 was, correct?

19 A     I do recall now.  I have looked at it.

20 Q     You have looked at what, the message that came out of

21 the hole?

22 A     Excuse me.  I thought you were referring to something

23 else.  No, I don't recall the verbatim content.

24 Q     This is the message that Chris Risk brought out of the

25 hole from Barry Mills, correct?

1    A    Yes.

2    Q    You looked at that message; is that right?

3    A    Yes.

4    Q    You looked at the message, and you did not believe that

5    the message said we're going to war?

6    A    Correct.

7    Q    What you saw in the message -- and correct me if I am

8    wrong -- was that the D.C. Blacks at Marion had put a hit

9    out on Dave and Mac; is that correct?

10   A    Yes.

11   Q    And the second piece of the message was to let

12   Lewisburg know; is that correct?

13   A    I don't recall.

14   Q    You don't recall whether that was a piece of the

15   message?

16   A    I don't recall if Lewisburg was specifically mentioned

17   in the message.

18   Q    But what you do recall is that there was nothing in the

19   message which said, we, the AB at ADX, are going to war,

20   correct?

21   A    My reading of it, that's not what it said.   T.D.

22   Bingham's reading of it, that's what it said.

23   Q    I am asking you what you remember was on the message.

24   A    That wasn't the way I took it, no.

25   Q    Now, you claim that when that message was read there

1    was you and Mr. Bentley and Mr. Matthews and Mr. Bingham in

2    K Unit; is that right?

3    A    Yes.

4    Q    And you were all in the common area of K Unit?

5    A    Yes.

6    Q    Sitting at tables?

7    A    Yes.

8    Q    And that's right out there in the middle?

9    A    Yes.

10   Q    Guards can see it?

11   A    Yes.

12   Q    I mean, there's supervision even in K Unit?

13   A    They can see four people sitting at a table down the

14   tier.

15   Q    It's your claim that Mr. Bingham said that he thought

16   it meant go to war?

17   A    Yes.

18   Q    So you read something, and you tell us that it didn't

19   mean war, but you say Mr. Bingham read the same thing, and

20   his interpretation was that it was war?

21   A    Yes.

22   Q    After that was read, what happened?

23   A    He asked Norman Matthews and Gene Bentley what they

24   took from the message, and they agreed with him.  At that

25   point, I asked him if we could send letters asking for

50

1    confirmation to Mr. Mills.  He agreed, and that's when we

2    coded up these letters that went out.  He gave instructions

3    to get in touch with Mr. Roach and let him know and to

4    sharpen the knives up that we had on hand and get ready to

5    kill Hollywood Smith.

6    Q    You said that there were letters that were coded up; is

7    that right?

8    A    Yes.

9    Q    Explain -- strike that.  I think you said that there

10   was one letter that was supposed to you claim go to Mr.

11   Mills, right?

12   A    Yes.

13   Q    And the purpose you say of that letter was to confirm

14   that in fact it was Mr. Mills' desire to go to war?

15   A    Yes.

16   Q    Is it your testimony that Mr. Bingham then dictated

17   that letter to you?

18   A    Yes.

19   Q    As you sat there in the day room of the K Unit?

20   A    Yes.

21   Q    And he sat there?

22   A    Yes.

23   Q    And he spoke the words to you; is that right?

24   A    The message under the cover text asking for

25   confirmation was my choice of words.  The words in the cover

1    text were his words.

2    Q    The cover text is what appears in the letter?  It

3    starts with "Bubba"?

4    A    Yes.

5    Q    It's your testimony that Mr. Bingham dictated this

6    cover text?

7    A    Yes.

8    Q    And that as he is dictating you're encoding it?

9    A    Yes.

10   Q    Is that right?

11   A    Yes.

12   Q    How long did it take to -- how long did this process

13   take?

14   A    I couldn't tell you.

15   Q    Did it take five minutes, ten minutes, half an hour?

16   A    Half-hour, maybe an hour.  I couldn't tell you.

17   Q    And you say Mr. Bentley was there while this happened?

18   A    Yes.

19   Q    Now, what about this letter to Iriece Simpson?  When

20   was that coded up?

21   A    At the same time.

22   Q    Did it have exactly the same language?

23   A    There was no code hidden in the cover text.  It was

24   simply an enciphered message asking for confirmation.  It

25   was generally the same.

1   Q    That was done at the same time?

2   A    It was the same evening.  I went into my cell and did

3   that one by myself.

4   Q    So when it comes to the Iriece Simpson letter, that you

5    took into your cell and did by yourself?

6   A    Yes.

7   Q    That one wasn't dictated by Mr. Bingham?

8   A    No, but I told him that I was going to send it, and he

9   agreed.

10  Q    And you say that this letter which I think is Exhibit

11  -- I think it may be 158.  Do you have it up there?

12  A    The one starting "Bubba"?

13  Q    Yes, but do you have the actual letter?

14  A    No.

15  Q    It should be up there, 158.

16         THE COURT:  Why don't you come up, Counsel, and

17  help.

18         THE WITNESS:  Here's 158.  Excuse me.

19  BY MR. WHITE:

20  Q    Now, as far as 158 which starts "Bubba" -- by the way,

21  with regard to this code, you have testified that you cannot

22  use the normal cipher code on this letter; is that correct?

23  A    I don't follow you.  It's the same system.

24  Q    But it takes a second step?

25  A    Yes.

1   Q    I think you termed it a second permeatation, right?

2   A    Yes.

3   Q    By the way, when you were sitting and working on this

4   letter, did you have the cipher code?

5   A    I was doing a lot of this at the time, so it was in my

6   head.  I was able to spin it out.

7   Q    So you didn't need to refer to notes or anything to

8   determine --

9   A    I think I probably did write done some ABABs just to

10  make sure I got it right.

11  Q    What do you mean you wrote down some ABABs?

12  A    I believe I took the cipher key and wrote the message

13  that I wanted to asking for confirmation and had it sitting

14  there in its form as a bunch of As and Bs to refer to so

15  that when I write "Bubba," just a line or two, I knew which

16  letter to use from the A or the B Alphabet.

17  Q    So now you are saying that you did have the code in

18  front of you?

19  A    Yes.

20  Q    Because a moment ago you said you didn't.  You said you

21  were working at it a lot at that point, and you had it in

22  your head.

23  A    The As and the Bs styling I have got in my head.  I was

24  able to run that without having to look -- to refer to

25  anything.

54

1   Q   The As and the Bs styling --

2   A   The As and the Bs styling is the As and the Bs styling.

3   The As and the Bs groupings are the cipher pad.  They are

4   two different things.

5   Q   The As and the Bs styling simply means if it's cursive

6   it's A, and if it's noncursive it's B, right?

7   A   Correct.

8   Q   That's a pretty easy thing to have in your head.

9   That's not what I was asking you.  You know what I was

10   asking you.

11        Did you have the cipher code in front of you as

12   you were doing this letter?

13   A   I had a piece of paper that had a lot of As and Bs on

14   it.

15   Q   What did you mean when you said, no, I didn't?  I was

16   doing a lot of it at the time, and I had it in my head.

17   A   I didn't need to have the cipher key sitting in front

18   of me, and I didn't have to have the copy of the A and the B

19   styling sitting in front of me.  All I had was the groupings

20   that pertained to the message.

21   Q   It's becoming vague, and it's my fault.

22        You just held up 158-A; is that correct?

23   A   250-A.

24   Q   250-A, correct?

25   A   Yes.

1    Q    Up at the top of the first page of 250-A is something

2    called the code key, correct?

3    A    Yes.

4              THE COURT:  Do you want to use the elmo?

5              MR. WHITE:  Yes.  That's the code key.

6    BY MR. WHITE:

7    Q    Now, are you saying that you had this in your head?

8    A    No, sir.  I am saying I did not have this in front of

9    me when I wrote this letter.

10   Q    Fine.

11             So when you wrote the Bubba letter as we will call

12   it, 158, you wrote it as Mr. Bingham --

13             THE COURT:  Why don't you put that up also.

14   BY MR. WHITE:

15   Q    Just to understand the process, your testimony is that

16   Mr. Bingham was dictating to you, correct?

17   A    Yes.

18   Q    In other words, he said "Bubba" -- he told you what the

19   date was, or you dated it yourself?

20   A    I don't recall.

21   Q    "Just a line or two to let you know all is well."

22             As he is telling you that, he is dictating it to

23   you, and you are writing it down?

24   A    Yes.

25   Q    And you are able to do it without having a code key in

1    front of you?

2    A    Yes.

3    Q    Just to remind everybody, what you have got to do as he

4    is dictating is you have to make sure that you get each of

5    these five groupings of letters correct; is that right?

6    A    Yes.

7    Q    When I say correct, I mean you have to make sure that

8    you write it in either the cursive or the noncursive?

9    A    Yes.

10   Q    And you are able to do that as Mr. Bingham is dictating

11   it to you?

12   A    Yes.

13   Q    And that took you how long?

14   A    I can't recall, but you are leaving something out.

15   Q    What's that?

16   A    I didn't have the cipher key in my head.  Before we sat

17   down to do this letter that he dictated to me, I knew that

18   the message asking for confirmation was going to go in it,

19   so I already put the groups of As and Bs together pertaining

20   to that message, so I had a paper with As and Bs that I

21   brought to the table with us, so as he dictated to me, I was

22   able to look at these As and Bs as we went along.

23              Do you get it?

24   Q    I understand what you are saying.

25              How was it that you knew what the message was

57

1    going to be?

2    A     Because I encoded it before we sat down to write the

3    letter.

4    Q     By the way, Mr. McGinley, you have told us that you sat

5    down, and Mr. Bingham dictated this letter to you

6    immediately after Mr. Risk came out with the message; is

7    that correct?

8    A     The same evening, yes.

9    Q     The same evening?

10   A     I believe it was the same evening.

11   Q     Assume for a moment that the testimony has been that

12   Mr. Risk came out of the hole with the message on August 14,

13   1997.

14   A     Well, then I would stand corrected.

15   Q     Can you explain to us why this document is dated

16   August 17, 1997?

17   A     Three days later is immediate in prison terms I guess.

18   It was the first order of business.

19   Q     The first order of business?

20   A     It was the first order of business.

21   Q     And you have a clear recollection because this was a

22   big deal, correct, Mr. McGinley?

23   A     My recollection fails me a little bit, but to me, it

24   was immediately after we got the message.

25   Q     When there was this discussion about the message that

1  came out of the hole and somebody believed that it was a war

2  call, that left an impression on your mind, correct?

3  A    Yes.

4  Q    I think you told us that you were particularly

5  concerned because this is under your list of

6  responsibilities as head of security and intelligence,

7  correct?

8  A    I'm concerned because it's going to destroy a lot of

9  work we have been doing towards more productive things.

10  Q    So it stands to reason if you are telling the truth

11  that this letter would have been written the same day that

12  Mr. Risk brought the message out of the hole, correct?

13         MS. FLYNN:  Objection to if you are telling the

14  truth.  Argumentative.

15         THE COURT:  Sustained.

16  BY MR. WHITE:

17  Q    It stands to reason given those facts that this letter

18  would have been written the same day, correct?

19  A    Not necessarily.

20  Q    What about, Mr. McGinley, if you had written this

21  letter, 158, in the privacy of your cell, and you didn't get

22  around to it until three days later, August 17?  Would that

23  also be consistent with Mr. Risk bringing the message out on

24  August 14, and you putting the date of August 17 on the

25  letter?

1  A    No, sir.

2  Q    Mr. McGinley, you are telling us that you encouraged

3  Mr. Bingham to send out Exhibit 158 in an attempt to confirm

4  that what Mr. Mills wanted was war?  Is that your testimony?

5  A    Yes.

6  Q    Let's assume for a moment that Mr. Bentley has

7  testified that Mr. Mills prepared -- Mr. Bingham prepared a

8  hit or miss letter that was to go to Lewisburg ordering that

9  Lewisburg attack D.C. Blacks on the same day the message

10 came out from the hole.  Do you understand that?

11 A    I don't see the question, but I understand what you are

12 saying.

13 Q    The question is why would Mr. Bingham send an order to

14 Lewisburg to go to war before he received this confirmation

15 about what Mr. Mills' true desire was?  Do you understand

16 that question?

17 A    Yes.  Perhaps because I was the only one concerned in

18 getting confirmation.  In his mind, it said we're going to

19 war already, so --

20 Q    As head of intelligence and security, were you aware of

21 this supposed hit or miss letter?

22 A    No.

23 Q    By the way, in your mind, the message that came out of

24 the hole was as you say -- what did you say?  It was

25 neutral?

A     No, it wasn't neutral, but it wasn't an explicit

instruction or notification that we were going to war, that

we were at war.

Q     You don't remember whether it said anything about

letting Lewisburg know?

A     I don't recall.

Q     You don't recall one way or another?

A     I don't recall Lewisburg being mentioned.

Q     Now, if -- by the way, as head of intelligence and

security, were you familiar with Lewisburg?

Q     Were you familiar with Lewisburg?

A     I am aware there is a U.S. Penitentiary at Lewisburg,

yes.

Q     Were you aware that there is a large population of

black inmates at Lewisburg?

A     Yes.

Q     Were you aware that there is a large population of D.C.

Blacks at Lewisburg?

A     Yes.

Q     Were you aware that in August 1997 there were very few

Aryan Brotherhood members at Lewisburg?

A     Yes.

Q     Now, you have also told us that there was a discussion

about there being an attempt to have simultaneous attacks

throughout the prison system; is that right?

1   A    Yes.

2   Q    How is that going to take place, Mr. McGinley?   How is

3   there going to be simultaneous attacks throughout the prison

4   system?

5   A    It would simply be a matter of contacting everybody at

6   every prison where we had somebody, letting everybody know

7   what's going on and then deciding on a time and a date.

8   Q    So it would be -- let's say you chose January 1, 1998.

9        It would consist of choosing a date; is that

10  right?

11  A    Yes.

12  Q    And then letting every institution where there were AB

13  members know that the date that this is going to happen is

14  January 1, 1998?

15  A    Yes.

16  Q    At such and such a time?

17  A    Yes.

18  Q    Because it was important to do it simultaneously,

19  because as soon as there would be an attack at one

20  institution, everybody else would be locked down?

21  A    Yes.

22  Q    How is that going to work?

23  A    As you just explained it.

24  Q    Well, let's take ADX, for example.

25       ADX is a pretty restrictive place isn't it?

1    A     Yes.

2    Q     How could you choose a date and time and have any idea

3    that the opportunity was going to be there to kill somebody?

4    A     You have to just sit down and collate all the

5    information, find out what timeframe exists when the most

6    people will be in an area at the same time to make a move.

7    Q     How were you going to coordinate that with Marion?

8    Marion is pretty restrictive, too, isn't it?

9    A     Yes.

10   Q     How were you going to coordinate with Marion?

11   A     It's not going to go off without a hitch.  I mean,

12   there are going to be some places -- we weren't able to get

13   to some places at ADX and some places in Marion.

14   Q     How were you going to be able to coordinate that with

15   Lewisburg?

16   A     Lewisburg, Lompoc -- the penitentiaries that are open

17   are open all day and night long as far as I know.  We have

18   got an all day schedule that we can look at right there.

19   Q     The communications system as far as going from one

20   prison to another prison is pretty difficult isn't it?

21   A     No.

22   Q     Easy?

23   A     Yes.

24            MR. WHITE:  Your Honor, would this be a good time?

25            THE COURT:  This would be a good time.

1          You are admonished not to discuss this matter

2     amongst yourselves nor to form or express any opinion

3     concerning this case.

4          We will come and get you in a half-hour.  Have a

5     nice recess.

6          (Jury not present.)

7          THE COURT:  The jury is no longer present.

8          Anything before the recess?

9          Mr. McGinley, if you would return in a half-hour.

10    Thank you, sir.

11         (Recess.)

12         THE COURT:  We are back on the record.  Counsel

13    are present.  The defendants are present.  The government is

14    present.

15         Lisa, if you would be kind enough to summon the

16    jury.

17         THE COURT:  We are back in session.  The jury and

18    the and alternates are present.  All counsel and the

19    defendants are still present.  The government is present.

20         This is Mr. White's continued cross-examination on

21    behalf of Mr. Bingham.

22    BY MR. WHITE:

23    Q    Mr. McGinley, before we go back to what we were talking

24    about, when does your current sentence end?

25    A    I don't know the date exactly.  I don't even know the

1    year.   Sometime before 2002.

2    Q     Sometime before 2002?

3    A     Before 2002, yes.

4    Q     Now, you told us that you do understand what a Rule 35

5    is.

6    A     Yes.

7    Q     Just a shorthand version, it's a reduction in your

8    sentence, correct?

9    A     Yes.

10   Q     And you have told us that you are still pursuing legal

11   avenues to get your sentence reduced.

12   A     Yes.

13   Q     Something apart from governmental help in a Rule 35?

14   A     Yes.

15   Q     Is your testimony that if the government comes forward

16   with a motion for a Rule 35 which would shorten your

17   sentence that that's not something you would accept?

18   A     Not at this point, no.

19   Q     At what point would you accept a reduction in your

20   sentence pursuant to a Rule 35 by the government?

21   A     A writ of mandamus is my last avenue to the courts.   If

22   that fails, then I would be open to it.

23   Q     Are you in custody on anything else other than the

24   sentence you are currently serving?

25   A     Nothing else.

1   Q   I want to go back to Exhibit 158, the letter that

2   starts out "Bubba" and is dated August 17, 1997.

3         By the way, were you aware that Mr. Bingham was

4   often referred to as Bubba?

5   A   No.

6   Q   Now, is it your testimony that as you sat there with

7   Mr. Bingham and Mr. Bentley and Mr. Matthews that there was

8   some discussion about a simultaneous attack?

9   A   That conversation took place between Mr. Bingham and

10   myself exclusively.

11   Q   So Mr. Bentley and Mr. Matthews didn't hear that?

12   A   I don't remember them being there, no.

13   Q   Is it your testimony that this discussion was the same

14   day that the message came out of the hole?

15   A   It could have been the same day.  It was more than one

16   day.  It was -- we were in a planning phase of what to do,

17   so we had the conversation on more than one occasion.

18   Q   And it's your testimony that Mr. Bingham expressed to

19   you his desire that there be simultaneous attacks throughout

20   the entire prison system?

21   A   Yes.

22   Q   Now, would you agree with me that a desire to have

23   simultaneous attacks throughout the prison system would be

24   inconsistent with Mr. Bingham allegedly sending a message to

25   Lewisburg ordering a war at that point?

1    A    I didn't know that he had sent such a message.  It

2    would be inconsistent with that intention unless they jumped

3    the gun.  I don't know the situation.  I don't know the

4    circumstances.

5    Q    Now, to go back to this letter for a moment, in this

6    letter -- again, that's Exhibit 158, and you can see that

7    part of it is highlighted in yellow.  Do you see "a

8    strapping 8-pound, 7-ounce, baby boy"?

9    A    Yes.

10   Q    It's your testimony that it was Mr. Bingham that

11   dictated that to you, correct?

12   A    Yes.

13   Q    And it's your testimony that you did not know what

14   "baby boy" meant?

15   A    At that time, correct.

16   Q    Is that your testimony?

17   A    Yes.

18   Q    This is August of 1997, correct?

19   A    Yes.

20   Q    Is "baby boy" regarded as a code?

21   A    Yes.

22   Q    And you are the man who was the head of communications

23   since sometime in 1996; is that right?

24   A    Yes.

25   Q    So codes are under your job title, correct?

1   A     Yes.

2   Q     You are the code man?

3   A     Yes.

4   Q     You came up with a 15th Century or 16th Century

5   biliteral cipher code; is that right?

6   A     Yes.

7   Q     And you are telling us that you didn't know what the

8   significance "baby boy" had in this letter?

9   A     That's what I am telling you.

10  Q     Now, in August '97 -- by that point, you as

11  intelligence chief were aware that there were racial

12  tensions at ADX, correct?

13  A     At Marion mostly, yes.

14  Q     Were you aware in August of '97 that there had been

15  racial tensions at the ADX throughout the summer?

16  A     Yes.

17  Q     Were you aware that there had been racial tensions at

18  Marion in 1997?

19  A     Yes.

20  Q     You were aware of Joe Tokash being assaulted; is that

21  correct?

22  A     Yes.

23  Q     And you knew that there was some issue about how these

24  racial tensions were going to go; is that correct?

25  A     Yes.

1   Q    Didn't you know that there had been a prearranged code

2   whereby if the words "baby boy" were used it would mean it

3   was a go, and if the words "baby girl" were used it would

4   mean it was not a go?

5   A    I wasn't aware of that until later.

6   Q    You were not aware of that until later?

7   A    Right.

8   Q    Wouldn't you think as head of security and

9   intelligence -- and you were those two things in the middle

10  of the summer of '97, correct.

11  A    Yes.

12  Q    Wouldn't you think that you would be aware of simple

13  codes like that?

14  A    No, sir, because everybody has things that they

15  prearrange between themselves, and this was one of those

16  things.

17  Q    Now, do you remember testifying in Benton, Illinois, on

18  December 4, 2003?

19  A    Yes.

20  Q    You remember that don't you?

21  A    Yes.

22  Q    Do you remember being asked questions about the meaning

23  of "baby boy" and "baby girl"?

24  A    Yes.

25  Q    Do you remember the following --

1          MR. WHITE:   I would refer counsel to page 155.

2    BY MR. WHITE:

3    Q     Do you remember the following, Mr. McGinley, and these

4    are questions about this letter, Exhibit 158:

5          "Q.   What phrases do you know about that were put

6    in there specifically to be another message?

7          "A.   Um, okay.  Well, let's see.  Okay, 'a

8    strapping' -- right here, these two lines right here, 'a

9    strapping 8-pound, 7-ounce, baby boy.'.

10         "Q.   What could that possibly be?

11         "A.   That means the killing is on.  Green light is

12   on, baby boy, the prearranged phrase with respect to the war

13   with the D.C.s.  At one point, we were trying to squash this

14   war with the D.C. Blacks, and it was hard to tell which way

15   we were go to go, so the prearranged code was 'baby girl'

16   means, no, that it's off.  Everything is all right.  'Baby

17   boy' means it's on.  Let's go.  This right here, reference

18   to the 'baby boy,' it means the war is on.  It's an

19   affirmation to go.

20         "Q.   So you are sending it to Mr. Mills from T.D.

21   Bingham that the war is on?

22         "A.   And that this is the message we got.

23         "Q.   Okay.

24         "A.   And this is redundant right here, but the

25   reference to 'a strapping 8-pound, 7-ounce,' then 'baby

1    boy' -- A being the singular, take it as the number 1, and

2    then the 8 and the 7 -- 187 are the Penal Code numbers for

3    murder in California, and it's a common phrase that's used."

4              Did you testify to that on December 4, 2003, in

5    Benton, Illinois?

6    A    I seem to recall that I did, yes.

7    Q    You are telling us, Mr. McGinley, that this letter,

8    Exhibit 158, was supposed to be a letter sent with the

9    purpose being that it reached Mr. Mills to confirm the

10   message that Chris Risk sent out; is that correct?

11   A    Yes.

12   Q    In fact, the biliteral cipher code that you have done

13   here translated says, "Confirm message from Chris Risk war

14   with D.C"?

15   A    From Chris with D.C., yes.

16   Q    Is that it?

17   A    Yes.

18   Q    So this is supposed to get to Mr. Mills in an effort to

19   have Mr. Mills get back to Mr. Bingham to confirm that that

20   in fact was the message that came out of the hole?

21   A    Yes.

22   Q    How long was this process going to take do you think?

23   A    It depended on how long it took to get to him and how

24   long it takes to get back.  Within a month.

25   Q    First of all, the letter is going to go to Joanne

71

1   Guthrie; is that right?

2   A   Yes.

3   Q   Mr. Byron Guthrie, 8000 Crest Avenue, Oakland,

4   California?

5   A   Yes.

6   Q   That's the address of Joanne Guthrie?

7   A   I believe so.

8   Q   So it would get to her, and then how would she know

9   what to do with it?

10  A   Again, this is probably one of those prearranged things

11  that she would know to send it back to Barry Mills.

12  Q   When this letter goes out of the ADX, before it gets

13  out, it's looked at by Bureau of Prisons personnel?

14  A   Yes.

15  Q   They are going to look at this thing?

16  A   Yes.

17  Q   If they see anything strange about it, then they are

18  not going to let it out, correct?

19  A   Correct.

20  Q   Let's assume it gets out.  It gets to Joanne Guthrie.

21  That's the purpose, right?

22  A   Yes.

23  Q   Now, does she know the code?

24  A   No.

25  Q   So she is not going to know what the letter means,

1   correct?

2   A    Correct.

3   Q    So she is going to turn around and send it back into

4   the ADX, correct?

5   A    Yes.

6   Q    This time for Barry Mills; is that right?

7   A    Yes.

8   Q    Do you think anybody might take a look at this letter

9   and say, boy, does this look familiar?

10  A    How so?

11  Q    Well, were you aware that the SIS monitors all inmate

12  mail from particular groups?

13  A    The SIS would have never cracked this code without

14  help.

15  Q    Do you think maybe an SIS member would have taken a

16  look at this letter and said this looks familiar?  Do you

17  think it's possible that somebody from SIS -- stike that.

18       Do you know that it's the same person from SIS

19  that reviews all Aryan Brotherhood mail?

20  A    My understanding of it is that they have a number of

21  SIS technicians working in what they call their shop, and

22  different technicians are assigned different caseloads, so

23  there is a chance that when it came back in it might have

24  gone through a different technician or maybe the same

25  technician.  There's a chance.  It's a gamble.

73

```
 1   Q      There is a chance it would get back to Mr. Mills?

 2   A      Yes.

 3   Q      So it goes to Joanne Guthrie who sends it back to Mr.

 4   Mills.  Maybe it gets to him, or maybe it doesn't, correct?

 5   A      Yes.

 6   Q      Then once Mr. Mills gets it, he has got to decode it?

 7   A      Yes.

 8   Q      Now, you told us that there is a standard cipher code,

 9   correct?

10   A      Yes.

11   Q      But that this particular letter required another step,

12   another permeatation?

13   A      Yes.

14   Q      So you needed something beyond the standard cipher code

15   in order to decode the letter, correct?

16   A      Yes.

17   Q      Where in this letter is Mr. Mills going to know what

18   that last permeatation is?

19   A      Because we had discussed the entire system, including

20   the second permeatation, so if it came out with jibberish,

21   he would know that he needs to put it through one more step.

22   Q      How is he going to know what step it was?

23   A      Because we covered all this in 1996 with each other.

24   Q      What was the last step?

25   A      To line the two alphabets up offset so that the
```

```
 1   jibberish letters would come down to the bottom line, and it
 2   would make sense.
 3   Q    Offset by what?
 4   A    In this case offset by a "U" it appears to be.
 5   Q    Where does it say that?
 6   A    Exhibit 158-A, page three, marked as page 15 on the
 7   bottom.
 8   Q    By the way, Exhibit 158-A, is that something that you
 9   prepared?
10   A    I don't recall.
11   Q    But that's still --
12   A    I didn't type this, me.
13   Q    That still doesn't answer the question.
14           How does Mr. Mills know that it's offset by that?
15   A    We had discussed this before.
16   Q    And the discussion was what?
17   A    How to use this entire cipher system, including the
18   second permeatation.
19   Q    Now, do you know -- let me ask you another question.
20   This signature down at the bottom, is that "MC"?
21   A    "ME."
22   Q    It's your testimony that Mr. Bingham told you to write
23   "ME"?
24   A    Everything in this cover text was taken down by me
25   verbatim from Mr. Bingham.
```

```
 1    Q    Do you know what a loopback letter is?

 2    A    This "o," for example, in "love"?

 3    Q    Pardon?

 4    A    No.  Please tell me.

 5    Q    You don't know what a loopback letter is?

 6    A    Well, yeah, yeah, okay, I understand what you are

 7    saying.

 8    Q    You know what a loopback letter is, correct?

 9    A    Yes, I understand.

10    Q    A loopback letter --

11              THE COURT:  Are you showing 158, the first page?

12              MR. WHITE:  Yes.

13    BY MR. WHITE:

14    Q    Do you know who Danine Adams is?

15    A    Yes.

16    Q    Danine Adams worked for SIS when you were at ADX,

17    correct?

18    A    Yes.

19    Q    Assume Danine Adams testified as an expert in this case

20    on Aryan Brotherhood matters, and assume that Danine Adams

21    testified that this was a loopback letter, okay?

22    A    Okay.

23    Q    So if this were a loopback letter, it would mean that

24    in fact the letter was written not by T.D. Bingham but by

25    somebody else; is that correct?
```

76

1    A      Yeah.

2    Q      And that in fact the purpose -- strike that.

3           In a loopback letter, no stamp is put on the

4    envelope; is that correct?

5    A      Correct.

6    Q      Do you see the envelope here?

7    A      Yes.

8    Q      Or you see a copy of the envelope?

9    A      I have a copy of it.

10   Q      Do you see a stamp on there?

11   A      No, I don't.

12   Q      The fact that there is no stamp on there, is that

13   consistent with it being a loopback letter?

14   A      Yes.

15   Q      The fact that T.D. Bingham's name is up here as

16   apparently the sender, if this is a loopback letter, in

17   fact, this letter is intended to go to T.D. Bingham; is that

18   correct?

19   A      This envelope would go back to T.D. Bingham with

20   whatever contents were in it.  The letter that we're

21   referring to would not have been in such a letter because I

22   wrote that letter.  I know.

23   Q      Well, let's assume that the testimony of a number of

24   government officials is that the letter that says "Bubba"

25   and is dated August 17 -- the copy of the actual letter was

1   in an envelope that you are looking at right here.   The

2   testimony is that the letter was in this envelope.   Do you

3   understand that?

4   A     I understand.

5   Q     You're saying that couldn't have happened?

6   A     I am saying that Barry Mills did not write this letter

7   that we are talking about.

8   Q     Of course he didn't right the letter did he?   He was in

9   the hole wasn't he?

10  A     Yes.

11  Q     Barry Mills was in the hole wasn't he?

12  A     Yes.

13  Q     You wrote the letter didn't you?

14  A     Yes.

15  Q     You were in your cell when you wrote the letter weren't

16  you?

17  A     No.   I was sitting at a table in K Unit with

18  Mr. Bingham.

19  Q     Why is there no stamp on this letter if the intention

20  is for it to go to Mr. Mills?

21  A     I can't explain that to you.   You would have to ask

22  Mr. Bingham.   As soon as I wrote the letter and addressed

23  the envelope, I gave both to him.

24  Q     Let's again talk about the loopback letter, Danine

25  Adams' opinion that this is a loopback letter.

78

1    A    All right.

2    Q    If she's right, the intent was that this letter end up

3    with Mr. Bingham; is that correct?

4    A    You are confusing things in a way that's hard for me to

5    follow, but, yeah, assuming.

6    Q    Assume that Exhibit 158, this Bubba letter that you

7    wrote -- assume that that letter was in an envelope that

8    looked just like this.

9    A    Yes.

10   Q    If Danine Adams is correct, whoever wrote this letter

11   wanted it to go to T.D. Bingham?

12   A    Yes.

13   Q    And we do know that you did write the letter?

14   A    Correct.

15   Q    Now, do you see the date there of August 26, 1997?

16   A    Yes.

17   Q    Do you know the significance of that stamp?

18   A    It says that it was received in the SIS Office on that

19   date.

20   Q    On August 26, 1997?

21   A    Yes.

22   Q    Now, can you explain to us why if this letter was

23   written on August 17 why it wasn't received by the SIS/SIA

24   Office until August 26?

25   A    I can't explain that.

1   Q     The normal procedure -- and correct me if I am wrong --

2   is when somebody wantS to mail a letter they put it out on

3   the bars; is that correct?

4   A     Yes.

5   Q     And somebody comes along and collects it; is that

6   right?

7   A     Yes.

8   Q     Is it a Bureau of Prisons employee that does that?

9   A     A correctional officer.

10  Q     And a correctional officer would take the mail, in this

11  case a letter that has something to do with a member of the

12  Aryan Brotherhood, down to the SIS/SIA Office for

13  examination?

14  A     Correct?

15  A     Yes.

16  Q     So there is no way that a letter written on August 17

17  and mailed on August 17 or put out on the bars to be

18  mailed -- there is no way it's going to take nine days for

19  that letter to travel down to the SIS or SIA Office is

20  there?

21  A     No.

22  Q     Would there have been a reason, Mr. McGinley, why you

23  would have kept this letter in your cell until August 25 or

24  August 26 and then put it out for supposed mailing?

25  A     No.

80

1   Q    Mr. McGinley, you said that you didn't want to go to

2   war; is that correct?

3   A    That's right.

4   Q    Because you didn't believe it was economically -- an

5   economically sound decision for the Aryan Brotherhood; is

6   that correct?

7   A    No, sir, that's not what I said.  What I said was that

8   we had put in a lot of work towards building it into

9   something else, into making a transition, and that this war

10  was going to destroy everything that we were working on.

11  Q    Except that, Mr. McGinley, at the time this started

12  there were 30-some members of the Aryan Brotherhood?

13  A    Yes.

14  Q    There was no way in the world that 30-some members of

15  the Aryan Brotherhood were going to be able to fulfill your

16  fantasies of what this organization should become was there?

17  A    Not true.

18  Q    Didn't you think at the time, Mr. McGinley, that a war

19  might be the kind of thing that would in fact swell the

20  ranks of the Aryan Brotherhood?

21  A    It would.  As it turns out, it probably will, but

22  that's not an argument to go to war and destroy a lot of

23  hard work.

24  Q    You will concede that a war would be something that

25  would increase the number of Aryan Brotherhood members,

1    correct?

2    A     You could take an advantage out of it, yeah.

3    Q     In fact, one of the things you did was under the guise

4    of being in a war is you reached out to Tom Metzger in an

5    attempt to get lists of skinheads to bring them on board?

6    A     No, sir.  We had those intentions before the war.

7    Q     Are you saying that Barry Mills intended to bring

8    skinheads into the Aryan Brotherhood?

9    A     Yes, sir.

10   Q     Would you be surprised to hear that Gene Bentley said

11   you got into trouble because you brought up to Barry Mills

12   bringing skinhead groups into the Aryan Brotherhood?  Would

13   that surprise you?

14   A     Yeah.  Nobody said anything to me about it.

15   Q     Do you think that Mr. Mills shared your racist

16   attitudes?

17   A     My ideas didn't come from a racist attitude.  I don't

18   know what he believes.

19   Q     Another thing about this letter -- your testimony is

20   that this letter is meant to be -- strike that.

21         Your testimony is that this letter is meant to go

22   to Barry Mills, correct?

23   A     Yes.

24   Q     It's meant to attempt to confirm with Mr. Mills that it

25   was his desire to go to war; is that right?

1    A    Yes.

2    Q    Now, you have told us that the front of the letter

3    talking about giving birth to a baby boy -- first of all,

4    giving birth to a baby boy means the war is on, correct?

5    A    Yes.

6    Q    Does it mean the war is on with a question mark, or

7    does it mean the war is on with a period or an exclamation

8    point?

9    A    With a period.  It's a definitive statement.

10   Q    So it's not a request for some kind of confirmation?

11   A    No.

12   Q    When "a strapping 8-pound, 7-ounce, baby boy" is

13   mentioned, the '8-pound, 7-ounce' means 187, correct?

14   A    Yes.

15   Q    That's murder in the state of California?

16   A    Yes.

17   Q    That's what you were convicted of back in 1978?

18   A    Yes.

19   Q    And you say that the cover of this letter clearly means

20   war with the D.C.s is on.  Kill D.C. Blacks?

21   A    Yes.

22   Q    No question mark in any of those statements?

23   A    Correct.

24   Q    So how, sir, does the cover of this letter -- how is

25   that a request to confirm whether or not there is a war?

1    A    The cover of the letter doesn't ask for confirmation.

2    Q    No.   The cover letter clearly says there is a war,

3    right?

4    A    Yes.

5    Q    When you wrote this letter, you knew what "baby boy"

6    meant didn't you?

7    A    No, sir.

8    Q    You knew what "a strapping 8-pound, 7-ounce, baby boy"

9    meant didn't you?

10    A    No.

11    Q    Mr. McGinley, were you upset at the fact that

12    Mr. Bingham did not believe that this was a war call?

13    A    I wasn't upset about it, no.

14    Q    We were talking about Lewisburg before, and you knew

15    that the overwhelming numbers at Lewisburg were black

16    inmates, correct?

17    A    Yes.

18    Q    Many of them were D.C. Blacks?

19    A    Yes.

20    Q    And there were only a couple of Aryan Brotherhood

21    members there?

22    A    Yes.

23    Q    So if there was racial tension at Lewisburg, it was a

24    very dangerous place for Aryan Brotherhood members; is that

25    correct?

1   A     Potentially.

2   Q     Well, was it or wasn't it?  If there was racial tension

3   at Lewisburg, was that a dangerous place for Aryan

4   Brotherhood members?

5   A     Potentially.  If you look at the Aryan Brotherhood

6   history, you will see that they have always been outnumbered

7   anywhere that they have been, and it's never made a

8   difference in the outcome of things.  They usually carry the

9   day.

10  Q     If you, Mr. McGinley, believed that members of the

11  Aryan Brotherhood were in danger at Lewisburg, would you as

12  chief of intelligence and security attempt to get word to

13  them to warn them that they were in danger?

14  A     No, sir.  That wouldn't be my job.

15  Q     Whose job would that be?

16  A     That would be one of the commissioners to decide for me

17  to do that or not.

18  Q     It would be Mr. Bingham's job if he believed that Aryan

19  Brotherhood members at Lewisburg were in danger -- it would

20  be his job to be sure that they got word that they were in

21  danger, correct?

22  A     If.

23          MR. WHITE:  I have nothing further.

24          THE COURT:  This will be cross-examination by Mr.

25  Fleming on behalf of Mr. Mills.

CROSS-EXAMINATION

BY MR. FLEMING:

Q    Mr. McGinley, do you still have Exhibit 158 in front of you, the Bubba letter?

A    Yes, sir.

Q    I want to ask you a couple of follow-up questions about that.

You are aware that there are SIS technicians at the ADX who read outgoing mail by AB members?

A    Yes.

Q    And you are aware that each and every piece of mail that's sent out of the ADX by an AB member is at least reviewed by a technician?

A    Yes.

Q    If there is anything suspicious about that piece of mail, it's copied and placed in a file?

A    Yes.

Q    The same thing with incoming mail, you are aware that an SIS technician reviews incoming mail to known or suspected AB members at the ADX?

A    Yes.

Q    You are also aware that these technicians are trained in that job?

A    Yes.

Q    And as part of the chief of intelligence for the Aryan

86

1   Brotherhood, I take it you make it a point to know what goes

2   on in terms of the security within the ADX BOP staff, right?

3   A    We make an effort.

4   Q    Now, would you be surprised to learn that Danine Adams

5   not only reviews the mail of Mr. Mills, for example, but

6   that she recognizes the handwriting of Mr. Mills?

7   A    No.

8   Q    The same applies to Mr. Bingham.

9        Would it surprise you that Ms. Adams is an expert

10  in recognizing the handwriting of a number of Aryan

11  Brotherhood members?

12  A    It wouldn't surprise me, no.

13  Q    Are you also aware that technicians such as Danine

14  Adams also know who writes to Mr. Mills, for example?

15  A    It wouldn't surprise me.

16  Q    Now, looking at this exhibit, 158, first of all, as I

17  understand what you have testified to, this letter was

18  intended to leave the ADX, and it was intended to be mailed

19  to Joanne Guthrie; is that right?

20  A    Yes.

21  Q    First of all, obviously your handwriting and the

22  handwriting in this letter -- and Mr. Mills are different,

23  right?

24  A    Yes.

25  Q    And noticeably different?

1   A    Yes, except for the fact that we had agreed on a

2   particular handwriting for this system, so it didn't matter

3   who was writing it.   It would be in the same style.   The

4   style is familiar to Mr. Mills' handwriting because he

5   insisted that we use the style that was closer to his

6   natural handwriting.

7   Q    You made an effort in writing this letter to make it

8   appear to be similar to that of Mr. Mills in order to fool

9   somebody who might be reading it?

10  A    No, sir.   Let me back up.   When we put this -- when we

11  sat down and discussed this cipher system and which style

12  the A alphabet is going to be and which style the B alphabet

13  is going to be, it was myself, Mr. Mills, and Mr. Roach

14  sitting at a table discussing this.   I already had some

15  alphabets ready that were a lot more subtle than this, that

16  would not have been as obviously different from one another,

17  and he insisted that we use this style right here that he

18  actually gave us because it was closer to how he naturally

19  writes.

20  Q    This is a discussion that you and Mr. Mills had?

21  A    Yes.

22  Q    What I am hearing is that this was an effort to make

23  the letter -- the handwriting in the letter appear similar

24  to that of Mr. Mills; is that right?

25  A    Yes.

1   Q     Mr. Mills wasn't supposed to be the author of this

2   letter was he?

3   A     Mr. Mills was not the author of this letter.

4   Q     It was supposed to be T.D. Bingham?  That was the ruse

5   that you were trying to run past the ADX, right?

6   A     Yes.

7   Q     So Mr. Mills' handwriting had nothing at all to do with

8   the handwriting we see in this letter?

9   A     Except for the fact that Mr. Mills' handwriting is

10  similar to the style we adopted to be the style used for

11  this incription system, there is no relation.

12  Q     The bottom line is, Mr. McGinley, you know full well

13  that this letter had absolutely no chance of getting out of

14  the ADX; isn't that true?

15  A     No.  I was aware of the possibility that it might not.

16  That's why we wrote a second letter of confirmation and sent

17  it to Iriece Simpson.  Hopefully one of them would get

18  through.

19  Q     Do you know if that letter was copied by the

20  technicians at the ADX?

21  A     I don't know.

22  Q     No one has ever brought that to your attention?

23  A     No.

24  Q     After the time that you debriefed?

25  A     No.  I never debriefed, but, no.

1    Q    Was this Bubba letter ever shown to you by anyone from

2    the government prior to your testimony?

3    A    Yes.

4    Q    Who showed this letter to you?

5    A    I was asked about what I had done during this same time

6    frame regarding these same instances in Los Angeles by the

7    ATF and by the FBI in Illinois.

8    Q    The ATF, is that ATF Agent Halualani?

9    A    Right.

10   Q    When did you meet with Mr. Halualani?

11   A    I believe it was in -- late 2000 I think was the date,

12   2000 or 2001.

13   Q    I think you said earlier that you had a discussion with

14   him in October of 2000.

15   A    Yes.

16   Q    You testified before the grand jury in October of 2000,

17   right?

18   A    Yes.

19   Q    And that was on this case?

20   A    Yes.

21   Q    The date that you met with Mr. Halualani -- at least

22   one of the dates was approximately a day or two days before

23   you testified in front of the grand jury?

24   A    Yes.

25   Q    Now, that's not the first time you met Mr. Halualani is

1    it?

2    A    It's been a long time, but I think he may have come to

3    ADX once for an interview.

4    Q    When you first made this decision that you were going

5    to drop out of the Aryan Brotherhood -- I think you told us

6    it was in -- was it in 1998?

7    A    Yes.

8    Q    Initially, you didn't let the administration at the ADX

9    know that you were planning on dropping out; is that right?

10   A    Right.

11   Q    You spent almost a year or approximately a year having

12   dropped out of the Aryan Brotherhood but remaining in the

13   same living conditions that you had prior to dropping out?

14   A    Yes.

15   Q    As you have told us, no harm came to you?

16   A    Right.

17   Q    No one attacked you?

18   A    No.

19   Q    No one threatened you?

20   A    No.

21   Q    Were you surprised by that?

22   A    No.

23   Q    In fact, there were some people who contacted you to

24   try to see if you truly wanted to leave the Aryan

25   Brotherhood?

1   A    The two times that I went out to the yard individuals

2   tried to talk me out of it, but it was too late.  It was

3   done.  Part of what they were doing was just violins and

4   spaghetti.

5   Q    You just said "violins and spaghetti"?

6   A    They were trying to lullaby me, put me to sleep,

7   perhaps for a better opportunity.  They knew that if they

8   moved on me -- at that point, I hadn't talked to anybody.  I

9   think they knew I hadn't talked to anybody, so if they moved

10  on me, they were going to have to kill me because there was

11  a good chance that if they didn't now I probably would start

12  cooperating with the government.

13  Q    You made a decision to cooperate even though no one

14  ever made any attempt to harm you; isn't that right?

15  A    Yes.

16  Q    And this took place in '99; is that right?

17  A    Yes.

18  Q    And that initially began with your dropout letter that

19  we have seen, the short letter?

20  A    Yes.

21  Q    In which you renounced any affiliation with the Aryan

22  Brotherhood?

23  A    Yes.

24  Q    At that time, were you moved to a different housing

25  unit once you filed that letter with the Bureau of Prisons?

1    A    No.

2    Q    Did anything change in your situation in terms of your

3    confinement at that point in time?

4    A    No.

5    Q    Did anyone come to talk to you about this letter that

6    you provided to them?

7    A    No.

8    Q    When was the first time someone from the SIS or the SIA

9    spoke to you about your defection from the Aryan

10   Brotherhood?

11   A    It seemed like it might have been at least a year.   I

12   don't recall exactly.   It was immediately prior to the first

13   time I spoke with Mr. Halualani.

14   Q    You requested to speak with the ATF; is that right?

15   A    No.   They asked me if I would be willing to speak with

16   the ATF.

17   Q    Who asked you that?

18   A    I believe it was Mr. Shoff.

19   Q    Danny Shoff?

20   A    Yes.

21   Q    And the reason he suggested that you speak to the ATF

22   is because he spent some time talking to you about what

23   information you might have to provide to the ATF, right?

24   A    Very brief.

25   Q    Mr. McGinley, there was a time when you were removed

```
 1    from your cell and taken to a location where you and

 2    Mr. Shoff sat down and spoke about a few things?

 3    A    Yes.

 4    Q    Do you recall approximately when that took place?

 5    A    No.

 6    Q    For the benefit of the jury, who is Danny Shoff?

 7    A    He was in charge of the SIS Office.

 8    Q    Now, at this point in time, your friend Kevin Roach had

 9    already dropped out?

10    A    Yes.

11    Q    And you heard that Kevin Roach was cooperating in this

12    case, right?

13    A    No.

14    Q    You hadn't heard that?

15    A    No.

16    Q    Had you heard that Kevin Roach was moved to a unit

17    referred to as H Unit within the ADX?

18    A    I didn't know that at the time, no.

19    Q    You had no idea about that?

20    A    No, sir.  I didn't know that there was -- I had no

21    inkling of a prosecution under way at all until Shoff told

22    me that the ATF would want to talk to me.

23    Q    Let's get back to this meeting you had with Mr. Shoff.

24             He was the first person within the SIA or SIS to

25    actually sit down and talk to you about the possibility of
```

1    your cooperating in this case; isn't that right?

2    A     Yes.

3    Q     And you told him that you are willing to cooperate?

4    A     I told him that I would talk to the ATF.

5    Q     Mr. Shoff had some questions for you before he put you

6    in touch with ATF Agent Halualani, right?

7    A     He may have.  I don't remember.

8    Q     You have no recollection at all of this conversation

9    that we are talking about?  Is that your testimony?

10   A     I remember being in an office talking to him.  I don't

11   remember the content of the conversation.  I think he wanted

12   to know whether I was sincere, whether I was willing to talk

13   to the ATF.  He might have asked me why I was doing it, but

14   as I recall, he pretty much -- the conversation stayed away

15   from whatever it was the government was going to want to

16   talk to me about.

17   Q     He provided you with a list of questions as part of

18   the initiation of the debriefing process?

19   A     I was never debriefed, no.

20   Q     Did he provide with you a packet for you to fill out

21   having to do with your association with the Aryan

22   Brotherhood?

23   A     No.

24   Q     Never happened?

25   A     No.

1  Q    Did Mr. Shoff ask you about your membership in the
2  Aryan Brotherhood?
3  A    He may have.
4  Q    You have no recollection of it one way or the other?
5  A    No, I really don't.
6  Q    Who else was present in this initial meeting you had
7  with Mr. Shoff?
8  A    Lieutenant Manley I think was there.
9  Q    Was it just the three of you, or was anyone else
10 present?
11 A    Just the three of us.
12 Q    Did either of the two individuals who were interviewing
13 you take notes during the interview?
14 A    I don't recall.
15 Q    Do you recall discussing in any detail your knowledge
16 of the innerworkings of the Aryan Brotherhood with Mr. Shoff
17 at that time?
18 A    It's been a long time, and I don't recall the things --
19 there are a couple of things that are reemerging.  I do
20 remember he seemed most interested for himself in whatever
21 useful information he could get at the moment as to where
22 weapons might be and what was going on at the time.  I was
23 gone from the tip too long at that point to know anything.
24 Q    Did he ask you any questions about Lewisburg?
25 A    He may have.

1   Q      You think he did?

2   A      He may have.   I don't know.

3   Q      You don't remember?

4   A      I don't remember.

5   Q      Were you a drug user during your time in prison?

6   A      No, sir.

7   Q      Have you ever been a drug user?

8   A      I have experimented.

9   Q      Do you have any difficulty with your memory as far as

10  you know?

11  A      Just time.

12  Q      When Kevin Roach dropped out of the Aryan Brotherhood,

13  is it fair to say that that was a blow to you personally?

14  A      No, sir.

15  Q      You couldn't care one way or the other?

16  A      I was -- I wouldn't say that I was indifferent to it,

17  but it wasn't a blow.  He's not the first person that ever

18  defected.   There are people that left the Aryan Brotherhood

19  that I liked a lot more than I liked him.   It's just a fact

20  of life.   It's something that happens.

21  Q      Let's back up a little bit to something you testified

22  to on direct.

23         You prepared a mission statement at some point in

24  time prior to becoming a member of the Aryan Brotherhood; is

25  that right?

```
 1    A     Yes.

 2    Q     And what year was that mission statement prepared?

 3    A     1996.

 4    Q     And that was done at the ADX I take it.  You had been

 5    there for about a year?

 6    A     Yes.

 7    Q     Kevin Roach was a neighbor of yours at that time?

 8    A     No.  We were housed in the same unit.

 9    Q     You had contact with Kevin Roach during the preparation

10    of this mission statement?

11    A     Yes.

12    Q     Kevin Roach had some input into what went into your

13    mission statement; is that right?

14    A     Yes.

15    Q     A lot of the ideas that you have discussed such as the

16    expansion of the Aryan Brotherhood onto the streets, for

17    example, were ideas that you and Kevin Roach discussed in

18    detail back in the years 1995 and 1996; isn't that right?

19    A     No, sir.

20    Q     You and Kevin Roach -- did you discuss these at all?

21    A     Beginning in 1996.

22    Q     Beginning in '96?

23    A     Yes.

24    Q     And you had frequent conversations with Kevin Roach

25    from 1996 until let's use Lewisburg as an ending point to
```

1    that point in time about changes that both of you would like

2    to see made within the Aryan Brotherhood structure?

3    A    Yes.

4    Q    You have already told us that as time went on during

5    the course of that year or so you became frustrated with the

6    leadership, right?

7    A    Towards the end, immediately prior to my departure from

8    the Aryan Brotherhood, my dissatisfaction had risen to an

9    overt level.  Up to that point right there, I thought the

10   things that were wrong could have been worked out.  It

11   wasn't a frustration.

12   Q    One of the things that you thought was wrong with the

13   Aryan Brotherhood was the fact that -- I think you told us

14   essentially they were a bunch of guys who were guarding

15   domino tables and holding up a wall, right?

16   A    Yes.

17   Q    That's not something you were interested in doing?

18   A    No.

19   Q    You had bigger plans for yourself?

20   A    I had bigger plans for myself.

21   Q    You are a big thinker in terms of where you would like

22   to see yourself go?

23   A    I had ambitions.

24   Q    You had ambitions, and they weren't being fulfilled by

25   the Aryan Brotherhood structure once you got into the

99

```
 1   Brotherhood; is that right?
 2   A    No, they weren't.
 3   Q    Prior to cooperating, you were kept at the ADX
 4   post-Lewisburg in a restrictive environment; isn't that
 5   right?
 6   A    Yes.
 7   Q    Give us a sense of how restrictive your environment was
 8   at that time?
 9   A    After Lewisburg?
10   Q    Yes.
11        You are in a cell for 23 hours a day?
12   A    Yes.
13   Q    It's a small cell?
14   A    Yes.
15   Q    In that cell is a poured cement slab for a bed?
16   A    Yes.
17   Q    And a poured cement slab for a desk?
18   A    Yes.
19   Q    And there is a little cement stool that you can sit on?
20   A    Yes.
21   Q    And you have your own little shower in there?
22   A    Yes.
23   Q    It's nearly soundproof, not completely soundproof but
24   nearly soundproof?
25   A    Not nearly.
```

100

1  Q     You can hear things within the cell?

2  A     Yeah.

3  Q     You are by yourself almost the entire day; is that

4  right?

5  A     Yes.

6  Q     You are alone with your thoughts for the most part?

7  A     You have got communication going on all day with

8  whoever is around you.

9  Q     But essentially you are isolated physically?

10  A     Physically you are isolated.

11  Q     Now, that's not how you envision spending your life; is

12  that right?

13  A     I understood that I was going to be in that situation

14  until I paroled.

15  Q     Well, you are no longer in that situation now are you?

16  A     Yes.

17  Q     You are in the same situation you were in then?

18  A     I'm in a situation deeper than that.

19  Q     Let's talk about this biliteral code.

20        It was within the ADX where you devised the

21  biliteral decipher system?

22  A     Where I discovered it and introduced it to the Aryan

23  Brotherhood, yes.

24  Q     That took place in your cell; is that right?

25  A     Yes.

1    Q     Sitting in your cell thinking up how you might be able

2    to utilize this particular code as the intelligence officer

3    with the Aryan Brotherhood, correct?

4    A     Could you ask that again?

5    Q     You are sitting in your cell.  You come across this

6    biliteral cipher code that I think you told us originated

7    from Sir Francis Bacon, right?

8    A     Okay.

9    Q     You find this, and you think of how you might be able

10   to use this within the Aryan Brotherhood as a means of

11   communication?

12   A     Yes.

13   Q     And you study it; is that right?

14   A     Yes.

15   Q     You learn the code?

16   A     Yes.

17   Q     And you become an expert in the code?

18   A     Yes.

19   Q     And now you want others to get up to speed as well; is

20   that right?

21   A     Yes.

22   Q     You told us that you had conversations with various

23   people about the code system?

24   A     Yes.

25   Q     And you said you briefly reviewed it with Mr. Bingham,

1   right?

2   A    Yes.

3   Q    You spent a little time talking about it also with Mr.

4   Mills?

5   A    Yes.

6   Q    The truth is no one really understood the code but you,

7   right?

8   A    No.

9   Q    You think they understood the code?

10  A    We sat down at the table, Mr. Mills and I, and we

11  discussed it.  It was more than just a short conversation.

12  We went over and over it, and he said that he understood it.

13  Q    Mr. Mills has never sent you a letter that was coded up

14  has he?

15  A    No, I never got one.

16  Q    You never received a coded up letter from Mr. Mills?

17  A    No.

18  Q    In order to decipher the code, the person on the

19  receiving end would have to have the key to the code, right?

20  A    Yes, they would have to know which type of code you are

21  using, right.  There is only one kind of code, the biliteral

22  cipher.

23  Q    So they would need what's introduced as Government's

24  Exhibit 158-A, for example, as a key code?

25  A    Yes.

1  Q    Now, to your knowledge, has any member of the Aryan

2  Brotherhood ever had such a code found in their cell with

3  the exception of you?

4  A    Not to my knowledge.

5  Q    And there are routine cell searches at the ADX?

6  A    Yes.

7  Q    And of course you would want that known, that

8  information to trickle down to you as chief of security,

9  right?

10 A    If it were comprised, yeah.

11 Q    As far as you know, not a single member of the Aryan

12 Brotherhood had ever been discovered with a key code that is

13 necessary to decode any messages you might be sending,

14 correct?

15 A    I had marked a book for Mr. Mills using little dashes.

16 I marked on the edge of that book short lines indicating an

17 A and long lines indicating a B, so he would have that to

18 fall back on as a reference in case his memory failed him.

19 I did the same thing with "The Complete Works of

20 Shakespeare" for Mr. Bingham, so they had a copy of the

21 cipher key.

22 Q    Do you remember my question?

23       MS. FLYNN:  Objection.  He answered it.

24 BY MR. FLEMING:

25 Q    Let me ask the question again.

1              My question is nobody as far as you know -- no

2    code -- no key code was ever found in any Aryan Brotherhood

3    member's cell at the ADX?

4    A    Not as far as I know.

5    Q    Now, you showed us I believe it was on Friday

6    Government's Exhibit 450, which is your address book.  Do

7    you see that?  Do you have that in front of you?

8    A    I don't have it here, but I think I can remember.

9    Q    You remember looking at your address book, right?

10   A    Yes.

11             THE COURT:  Counsel, do you want to come up and

12   give him that address book?

13             MR. FLEMING:  I will, Your Honor.  I am just

14   looking for one more document.

15   BY MR. FLEMING:

16   Q    I would like you to try to find if you can Exhibit

17   250-A, which is the coded up membership of the Aryan

18   Brotherhood.

19             THE COURT:  450 will be the address book.

20             MR. FLEMING:  Yes, 450 is the address book.

21   BY MR. FLEMING:

22   Q    250-A is the coded up membership list that you have

23   discussed on your direct examination.

24             Do you have both of those documents now?

25   A    250 is the membership list, yes.

1          THE COURT:  Why don't you come up and check and

2     just make sure.

3          THE WITNESS:  This is 250.  This is 250-A.

4          MR. FLEMING:  This is just a typed version.  250-A

5     is what I am referring to.

6     BY MR. FLEMING:

7     Q    I think you testified that you took it upon yourself to

8     code up all of the known members of the Aryan Brotherhood;

9     is that right?

10    A    No, sir.  I was instructed to.

11    Q    By whom?

12    A    By Barry Mills.

13    Q    So your testimony is Barry Mills told you to go ahead

14    and code everybody's name and register number and keep it in

15    your cell?

16    A    To use this code that we discussed to code this

17    information up, yes.

18    Q    The reason that you gave us was because it's not a good

19    idea to have that kind of information in your cell, in your

20    property, where the Bureau of Prisons can find it?

21    A    Yes.

22    Q    I notice that you -- on Exhibit 250-A with regard to

23    T.D. Bingham, you wrote out his entire last name, "T." and

24    then "Bingham," right?

25    A    Yes.

1  Q    Now, is it fair to say that everyone in the Aryan

2  Brotherhood knows T.D. Bingham as T.D., right?

3  A    Yes.

4  Q    But you decided to go ahead and write out the entire

5  name; is that right?

6  A    Yes.

7  Q    And you did that for almost all of the other members?

8  A    Yes.

9  Q    In fact, you included yourself in the list?

10  A    Yes.

11  Q    Is there some reason why you had to include yourself in

12  the list of known members?

13  A    Just to be exhaustive about it I guess.

14  Q    You had a lot of time to spend on a list like this,

15  right?

16  A    Yes.

17  Q    You weren't in a hurry, right?

18  A    Right.

19  Q    Now, have you looked at your address book?

20  A    I don't have it.

21  Q    I am going to bring it up to you in a second.

22        MR. FLEMING:  This is 450.

23  BY MR. FLEMING:

24  Q    I am going to ask you a question first, and then if you

25  need this I will give it to you.

1              Did you keep this address book in your personal

2    property?

3    A    Yes.

4    Q    Do you have a list of names of Aryan Brotherhood

5    members in your address book?

6    A    Yes.

7    Q    Do you have next to some of the names the registration

8    numbers written out?

9    A    No.

10   Q    You don't?

11   A    No.  I have birthdays.

12           MR. FLEMING:  May I approach?

13           THE COURT:  Yes.

14           MR. FLEMING:  450, page two.

15   BY MR. FLEMING:

16   Q    I am showing you this document.  This is the address

17   book, correct?

18   A    Yes.

19   Q    What does it say next to K. Roach?  Is there a number

20   there?

21   A    Yes.

22   Q    Read the number out.

23   A    40855-066.

24   Q    Now, is that his birthday?

25   A    No.  That's his registration number.

1  Q    Would you agree that there are some registration

2  numbers printed in your address book?

3  A    Two registration numbers, yes.

4  Q    Not coded up, right?

5  A    Right.

6  Q    As head of security of the Aryan Brotherhood, would it

7  surprise you to learn that other members' books contained

8  complete names and registration numbers without any type of

9  coding?

10 A    No, it wouldn't surprise me.  It was -- this list was

11 for the purpose of eliminating that.

12 Q    I'm sorry?

13 A    This list was encoded for the purpose of eliminating.

14 Q    Did you distribute this list to other people?

15 A    I think I -- I gave Kevin a copy.  I'm pretty sure I

16 gave Mr. Roach a copy, and I might have given Mr. Mills a

17 copy.  I remember I think two copies going out.

18 Q    You think you gave Mr. Mills a copy?

19 A    I think so.

20 Q    Are you sure about that?

21 A    I wouldn't swear to it.

22 Q    Well, you're under oath.

23 A    So I'm not sure.

24         THE COURT:  Then I will move to strike.

25         THE WITNESS:  Okay.

```
 1              THE COURT:  I'm not certain --
 2              MS. FLYNN:  Objection.  He answered the question.
 3              MR. FLEMING:  I will withdraw the question.  I
 4   have a cold, so I am doing the best I can.
 5   BY MR. FLEMING:
 6   Q    Let's switch gears a little bit.
 7              You told us during your period of dissatisfaction
 8   that you had with Mr. Mills and Mr. Bingham that there was a
 9   general understanding that it was an onsite war with D.C.
10   Blacks; is that right?
11   A    Yes.
12   Q    Let's talk about what you did during your association
13   with the Aryan Brotherhood in terms of what assaults you
14   participated in.
15              Now, you have been an associate of the Aryan
16   Brotherhood for how long?
17   A    Over 20 years, 20 to 25 years.
18   Q    Now, you haven't killed anyone on behalf of the Aryan
19   Brotherhood yourself have you?
20   A    No.
21   Q    Both before and after you became a member?
22   A    No.
23   Q    Now, you have killed people in the past?  We have heard
24   that.
25   A    Yes.
```

1   Q    That had nothing to do with your association with the

2   Aryan Brotherhood?

3   A    Yes.

4   Q    Now, after this declaration of war that you have told

5   us about, did you personally participate in any assaults

6   against any D.C. Black members?

7   A    No.

8   Q    How about D.C. Black associates?

9   A    No.

10  Q    You said that you learned that Mr. Mills got into a

11  fight on the yard with some black inmates?

12  A    Yes.

13  Q    And were they to your knowledge either D.C. Blacks or

14  associates of?

15  A    I don't recall at this time who all was out there.  I

16  know that there were I think a couple of members from the

17  Blood gang and someone from the Gangster Disciples.  It's

18  been a long time.

19  Q    But, regardless, you do remember being upset with Mr.

20  Mills for not having stabbed whoever it was he was fighting

21  with?

22  A    Yes.

23  Q    And this had to do with your understanding of the war

24  that was going on; is that right?

25  A    My disappointment with him or dissatisfaction with

1    being upset with him?

2    Q    Yes.

3    A    It had to do with the fact that he was in a prime

4    position to set a good example, that he needed to set an

5    example for everybody that he was expecting to go out and

6    get a life sentence or go to Death Row for.

7    Q    So his actions in terms of his reluctance to go beyond

8    a fistfight on the yard would be inconsistent with your

9    understanding of what an Aryan Brotherwood member was

10   supposed to do on the yard during this conflict?

11   A    It was inconsistent with what we were explicitly

12   supposed to do.

13   Q    In your logic, in your way of thinking, the fact that

14   Mr. Mills did not attack another inmate with a knife sets a

15   poor example?

16   A    Yes.

17   Q    That's what you believed at the time?

18   A    Yes.

19   Q    And you still believe that now?

20   A    Yes.

21   Q    And the same applies to Mr. Bingham?

22   A    Yes.

23   Q    He also had some reluctance in stabbing or killing

24   another inmate?

25   A    Apparently.

1   Q    You have the same opinion of Mr. Bingham, that he sets

2   a poor example of what you believe the Aryan Brotherhood was

3   all about at that time; isn't that right?

4   A    No.  They are contradicting their own orders.  They are

5   the ones that told us to make sure that we killed whoever we

6   get on, and then they go out there and half step.

7   Q    Let's talk about your understanding of Mr. Mills in

8   terms of his views on race.  You know Mr. Mills.  You spent

9   time talking to him in the past?

10  A    Yes.

11  Q    Barry Mills is not a racist; isn't that right?

12  A    I don't know that.

13  Q    You don't know that?

14  A    I don't know that.

15  Q    Well, you have never heard him espouse a racist

16  philosophy?

17  A    No.

18  Q    Or idealogy?

19  A    No.

20  Q    He has never exhibited himself as somebody who hates

21  another person simply because of the color or their skin?

22  A    No.

23  Q    Now, you, though, at least at one point in your past,

24  have held such views?

25  A    Yes.

113

```
 1   Q    You told us that you shot and killed a person because

 2   that person was dating someone from another race?

 3   A    Yes.

 4   Q    So you clearly held those views at one time?

 5   A    Yes.

 6   Q    And you told this jury that at some point in time your

 7   feelings or your views changed?

 8   A    Yes.

 9   Q    Can you pinpoint for us when your views changed?

10   A    Probably sometime in the mid to late '80s.

11   Q    Now, you told us in the late '80s you were involved

12   with a paramilitary organization made up of skinheads,

13   right?

14   A    Yes.

15   Q    But at the time that you were involved with that

16   organization, you did not share the views held by those

17   other people; is that right?

18   A    Correct.

19   Q    I take it, though, you had to pretend to have shared

20   those views in order to be found credible, right?

21   A    No, sir.

22   Q    So you made it clear to the skinheads that you were

23   training with up in the hills of Oregon or Washington that

24   you didn't share their believes; is that right?

25   A    That's exactly the case.  I spent a number of years
```

114

1    communicating with Mr. Metzger from Folsom for the purpose

2    of having some contacts when I got out of prison.  When I

3    got out of prison, I was invited to come to a number of

4    different meetings, and I would select one or two people

5    from these meetings that I had thought had a little bit of

6    sense.  I would talk to them and tell them to take all the

7    insignia off and get rid of their boots and grow their hair

8    and learn how to do something for themselves.

9    Q    What was it they were doing up there when they were

10   training in Washington?  What were you doing?

11   A    Training, tactics mostly.

12   Q    Describe what the tactics were.

13   A    We had army manuals, police manuals, videos, different

14   things, weapons.  We would run through drills.

15   Q    These were hard-core racists, right?

16   A    They were.

17   Q    These were people who were very much committed to their

18   idealogy?

19   A    I don't know how committed you can be at the age of 19

20   or 20.  I mean, they were impressionable.  I was pulling

21   them away from that right there.

22   Q    When you wrote to Tom Metzger, what year was that?

23   A    I believe it was 1997.

24   Q    In your letter, are you at least trying to give the

25   impression to Mr. Metzger that you share in his racist

1   idealogy?

2   A    Yes.

3   Q    So with Tom Metzger, you agree that you were at least

4   pretending to be a racist, right?

5   A    Yes.

6   Q    But deep down inside yourself you weren't a racist at

7   the time?  Is that your testimony?

8   A    That's my testimony.

9   Q    When you discussed with Mr. Mills the possibility of

10  bringing skinheads into the Aryan Brotherhood, you claim not

11  to remember what Mr. Mills said back to you?

12  A    I don't recall a negative response.  I don't remember

13  specifically, but I am certain there was no negative

14  response.

15  Q    When you wrote to Tom Metzger in 1997, you didn't tell

16  Mr. Mills that you were going to write to Mr. Metzger to

17  recruit skinheads?

18  A    No.

19  Q    That was something you did entirely on your own?

20  A    With the head councilor's knowledge, yes.

21  Q    Give us his name again.

22  A    Kevin Roach.

23  Q    Kevin Roach knew about your plans?

24  A    Yes.

25  Q    But no one else?

```
 1   A    As far as I know, no.

 2   Q    The fact of the matter is when you approached Mr. Mills

 3   with your plan to recruit skinheads into the Aryan

 4   Brotherhood, he told you that under no circumstances we

 5   would agree to such a thing; isn't that right?

 6   A    No.

 7   Q    He told you that he didn't want those kinds of people

 8   in the Aryan Brotherhood; isn't that right?

 9   A    No.

10   Q    Did you seek help from the government in regard to your

11   sentence that you are currently serving?

12   A    No.

13   Q    Never?

14   A    No.

15   Q    Never asked them for any assistance?

16   A    No.

17   Q    How about Mr. Jessner?  Have you ever asked Mr. Jessner

18   for any assistance --

19   A    No.

20   Q    -- to look into what is going on?

21   A    I explained to him that I had a sentence that I thought

22   was illegal or incorrect, and if I could get any help in

23   bringing attention to it and correcting it, I would welcome

24   that.

25   Q    Well, in all the time you have been in prison -- prior
```

1    to this interaction with Mr. Jessner, have you ever gone to

2    a prosecutor and asked that prosecutor to perhaps look into

3    some legal issue that you have to see if they could help you

4    out?

5    A    No.

6    Q    That's the first time?

7    A    Yes.

8    Q    And the reason you thought Mr. Jessner might be

9    receptive to your questions is because you are cooperating

10   in this case?

11   A    Yes.

12   Q    And you were hopeful that your cooperation in this case

13   might encourage Mr. Jessner to intercede on your behalf?

14   A    I had hoped.

15   Q    And you still have that hope don't you?

16   A    No.

17   Q    You write a letter on January 1, 2001, to Mr. Jessner

18   and someone named Wendy?

19   A    I don't recall.

20        MR. FLEMING:  May I approach, Your Honor?

21        THE COURT:  You may.

22        MR. FLEMING:  I am going to mark this as next in

23   order as Defense Exhibit 1059.

24        THE COURT:  1059.  Thank you.

25        (Exhibit 1059 marked.)

1      MR. FLEMING:  For the benefit of counsel, I will

2   be at page 106508.

3      MS. FLYNN:  May I see it, Your Honor?

4      THE COURT:  Yes.

5   BY MR. FLEMING:

6   Q    I have just handed you what has been marked for

7   identification as Defense 1059.  Just take a look at it for

8   a moment.

9      First, do you recognize the handwriting?

10  A    Yes.

11  Q    That's your handwriting, right?

12  A    Yes.

13  Q    It's addressed "Dear Wendy"?

14  A    Yes.

15  Q    The date is January 1, 2001?

16  A    Yes.

17  Q    Who is Wendy?

18  A    I think she was in an investigator with the U.S.

19  Attorney's Office.

20  Q    An investigator?

21  A    I think.  I'm not sure.

22  Q    You are on a first name basis with her?

23  A    A lot of people don't want you to know their last name,

24  so a lot of people get on their first name basis with you.

25  Q    You know Mr. Jessner right?

1    A    Yes.

2    Q    You call him "dragon" in the letter?

3    A    If you say I do.  I have spoken to him as Greg, yes.

4    Q    So you are on a first name basis with Mr. Jessner; is

5    that right?

6    A    Yes.

7    Q    He calls you John, and you call him Greg?

8    A    Yes.

9    Q    In this letter, the first part of the letter lays out

10   your difficulties, your legal issues, right?

11   A    Yes.

12   Q    That goes on for about four-and-a-half pages up to page

13   five of seven?

14   A    Yes.

15   Q    Essentially what you are doing is you are laying out

16   your arguments that you have made in your various appeals,

17   right?

18   A    Yes.

19   Q    The same arguments that were rejected, by the way, by

20   every court that has looked at them?

21   A    No, sir.

22   Q    Have you been successful in your appeal?

23   A    A number of times, yes.

24   Q    What was your original sentence?

25   A    Thirty years.

1   Q    Now you are doing a 20-year sentence?

2   A    Yes.

3   Q    How long have you been on this 20-year sentence?

4   A    I think the last time I was sentenced was in 1996.

5   Q    So from 1996 until today, you are still doing the same

6   20-year sentence?

7   A    Yes.

8   Q    Whatever court looked at this issue from 1996 to today

9   disagreed with your efforts to cut your sentence down?

10  A    No court ever ruled on these issues.

11  Q    What is the status of your appeal right now?

12  A    I'm dead.

13  Q    You're dead?

14  A    I'm dead.

15  Q    In this letter in 2001, on page five, do you beg Greg

16  Jessner to help you in this letter?

17  A    Do you want to direct me to a particular paragraph?

18  Q    Let me read you a paragraph.

19        Do you write on page five of your letter, "Wendy,

20  Greg, from a prosecutor's point of view, one could dance

21  around these issues until they become moot.  So far, that's

22  been the case.  From a defense attorney's perspective, one

23  could make a compelling case.  Obviously there are grounds

24  and supporting authorities that I am overlooking altogether.

25  These are my claims in general terms, and I beg your good

1   faith and diligence in making the most of them on my

2   behalf."  Did you write that?

3   A    Yes.

4   Q    What you are asking Greg Jessner to do is pick up your

5   case and champion it up to the appropriate courts, right?

6   A    I don't know what he can do procedurally.  I don't know

7   what the rules are -- yes.  In effect, I am asking for his

8   help, yes.

9   Q    At this point in time, you have been cooperating with

10  the government for a number of years; isn't that right?

11  A    No.  This was 2001.  I think the first time we talked

12  was only a few months before this.

13  Q    So this is during the course of your cooperation?

14  A    Yes.

15  Q    And you testified before the grand jury in October of

16  2000?

17  A    That sounds good.

18  Q    Now, you also went to Mr. Jessner on a few other issues

19  didn't you?

20  A    You would have to refresh my memory.

21  Q    How about your placement?  At some point in time, did

22  you make a request to be transferred to a state institution?

23  A    Yes.

24  Q    And you asked Mr. Jessner to see if he could help you

25  with that?

122

1   A    Yes.

2   Q    And, in fact, he did didn't he?

3   A    No, sir.

4   Q    Well, didn't he -- did he write a letter to Warden Hood

5   on your behalf?

6   A    I have never seen such a letter, and no one has told me

7   about such a letter.

8   Q    You have never seen such a letter written by

9   Mr. Jessner on your behalf?

10  A    No.

11  Q    Did you ask Mr. Jessner to write such a letter on your

12  behalf so you could be transferred to another facility?

13  A    No.  I don't know what the procedures are, what he

14  would have to go through, who he would have to contact.  I

15  asked for his help in being transferred to a state prison or

16  to a main line someplace in the feds.

17  Q    So you asked Mr. Jessner to help you in that regard?

18  A    Yes.

19  Q    The reason why you were in a position to do that was

20  based on your cooperation with the government?

21  A    I felt so, yes.

22  Q    If you weren't cooperating in this case, it would be

23  pointless to go to Mr. Jessner and ask for any assistance

24  for anything at all, right?

25  A    I wouldn't know Mr. Jessner.

1    Q    Well, did you also ask for the assistance of

2    Mr. Jessner in changing your name back from John McGinley to

3    your given name?

4    A    It rings a bell.  I think I may have, yes.

5    Q    Do you know if Mr. Jessner did anything like that on

6    your behalf?

7    A    He didn't do anything as far as I know.

8    Q    He hasn't done anything?

9    A    In that regard as far as I know, no.

10   Q    Have you ever spoken to Mr. Jessner about your case,

11   about the sentence that you received?

12   A    Yes.

13   Q    Tell us about that conversation.

14   A    That conversation is what led to this letter right

15   here.  He didn't understand the issues that I was trying to

16   explain to him, so he told me to lay it out the best I could

17   and to send it to Wendy, and they would look at it.

18   Q    So when you first approached him with your problem,

19   Mr. Jessner did not give you any type of a resounding, no, I

20   can't help you, right?

21   A    No.  He neither committed himself nor dismissed it.

22   Q    After that conversation with Mr. Jessner, there was at

23   least in your mind the possibility that there was something

24   Mr. Jessner might be able to do for you?

25   A    Yes.

1    Q    Which is, of course, why you wrote the letter?

2    A    Yes.

3    Q    Let's go back to Lewisburg for a moment.

4         Right after the Lewisburg murders, you were placed

5 in the hole; is that right?

6    A    Yes.

7    Q    And there were a number of other AB members in the hole

8 at that time?

9    A    Yes.

10    Q    Now, did you send messages out to anyone else to let

11 them know what happened at Lewisburg while you were in the

12 hole?

13    A    No.

14    Q    Was there any discussion between yourself and anyone

15 else in the hole at that time about what happened at

16 Lewisburg?

17    A    Yes.

18    Q    You and who?

19    A    Everybody was talking to everybody, me and Roach, me

20 and Gibson, me and Steve Scott.

21    Q    What did you and Roach discuss about Lewisburg when you

22 were in the hole?

23    A    He knew more than I did about exactly what happened

24 there.

25    Q    So he gave you some details about what happened at

1   Lewisburg that you were unaware of?

2   A    Yes.

3   Q    Did he tell you how he knew more than you about what

4   happened at Lewisburg?

5   A    No.

6   Q    Can you recall any of the details that Mr. Roach gave

7   you about what had happened at Lewisburg while the two of

8   you were in the hole?

9   A    I don't recall exactly.

10   Q    Now, would you be surprised to learn that -- you know

11   Mr. Roach testified before you already in this trial?

12   A    I do now.

13   Q    If Mr. Roach testified to the following -- tell us

14   whether this would be true or not true.  If Mr. Roach took

15   the stand and testified before this jury and said that he

16   didn't know anything about Lewisburg until he got to the

17   hole, and he learned about the murders from you because you

18   sent down a coded message in a newspaper and let him know

19   why you guys were locked up, does that sound like what

20   happened?

21   A    No.

22   Q    If Mr. Roach had testified to this jury to those facts,

23   would he have been lying?

24   A    I don't recall it that way.  I would have to say so.

25   Q    You would have to say Mr. Roach lied about your coding

126

1    up a message and sending it to him in the hole?

2    A    Yes.

3    Q    You have spent some time with Gene Bentley since you

4    decided to cooperate with the government?

5    A    Yes.

6    Q    When was that?

7    A    In 1997.

8    Q    You and Mr. Bentley spent some time together in 1997

9    when both of you --

10   Q    Did you say '97?

11   A    Yes.

12   Q    Wasn't that prior to you deciding to cooperate?

13   A    Yes.

14   Q    I am talking about after.

15   A    No.

16   Q    You were never housed with Mr. Bentley anytime after

17   you decided to cooperate?

18   A    No.

19   Q    What about Mr. Roach?

20   A    At one point, we were housed in the same unit but not

21   where we had daily communications.

22   Q    Where was that?

23   A    The hole.

24   Q    Where?

25   A    In the hole, Z Unit.

1    Q    At ADX?

2    A    Yes.

3    Q    What year?

4    A    2001 or 2002.  I don't recall exactly.

5    Q    Sometime after or before you testified to the grand

6    jury?

7    A    I think it may be after.

8    Q    But you are not sure?

9    A    No.

10   Q    Let's talk about this party list.

11             MR. FLEMING:  This is Government's Exhibit 173.

12   It's been moved into evidence.

13   BY MR. FLEMING:

14   Q    Do you recall what I am talking about?

15   A    Yes.

16   Q    How did you get a look at this party list?  Who showed

17   it to you?

18   A    I think the first time I saw it Agent Halualani showed

19   it to me I think.

20   Q    When was that?

21   A    The end of 2000 or the beginning of 2001.  It was our

22   first interview I believe.

23   Q    It was actually before you testified in front of the

24   grand jury?

25   A    Yes.

1    Q    And Agent Halualani showed you a number of documents

2    before you testified?

3    A    Yes.

4    Q    Among the documents that he showed you was what we

5    referred to as this party list?

6    A    Yes.

7    Q    What else were you shown by Agent Halualani before you

8    testified in front of the grand jury?

9    A    The membership list, the Guthrie letter.  That's all I

10    can recall right now.

11    Q    Now, getting back to the party list, your understanding

12    of this list is that the people whose name appears on this

13    list are all in the hat, right?

14    A    Yes.

15    Q    And "in the hat" -- at least your understanding of the

16    term means you are targeted to be killed?

17    A    Yes.

18    Q    There is no way out of the hat once you are in the hat?

19    A    Correct.

20    Q    Among the 20 names or so on the party list are you

21    aware of a single person on this list who has been killed,

22    just one name?

23    A    I don't recall.  There was a killing in Marion.  I

24    don't remember if his name is on that list or not.

25    Q    So you have no knowledge as to whether anybody on this

1  list has actually ever been killed by the Aryan Brotherhood;

2  is that right?

3  A    Right.

4  Q    This list dates back how long?

5  A    Late '97, early '98.

6  Q    As far as you know, no one has been killed whose name

7  appears on that list?

8  A    As far as I know.

9  Q    Prior to you becoming a full-blown member of the Aryan

10  Brotherhood, you spent time discussing according to your own

11  testimony Aryan Brotherhood business with Kevin Roach?

12  A    Yes.

13  Q    And according to your testimony, you also spoke to

14  Barry Mills about Aryan Brotherhood business?

15  A    Yes.

16  Q    And at some point, you told us that you took over the

17  position that had been occupied by Chris Gibson; is that

18  right?

19  A    Yes.

20  Q    And that was the position of head of security?

21  A    Yes.

22  Q    The reason you gave us for why Chris Gibson lost that

23  position was because he was discussing AB business with Clay

24  Barnett, a non-AB inmate?

25  A    Yes.

1    Q    So according to your testimony, Chris Gibson is kicked

2    out of that position for discussing AB business with non-AB

3    members?

4    A    Yes.

5    Q    And you are put into the position having done exactly

6    the same thing; is that right?

7    A    With whom?

8    Q    With Mr. Mills and Mr. Roach.

9    A    No.  Chris Gibson was talking about the AB's business

10   outside the AB circle.  I wasn't talking about AB business

11   without anybody outside the circle.

12   Q    Clay Barnett isn't outside the AB circle is he?

13   A    Yes.

14   Q    Weren't you an AB associate prior to joining the AB?

15   A    Yes.

16   Q    You were both associates?

17   A    Yes.

18   Q    And your testimony is that you are then given this

19   position as head of security immediately upon becoming a

20   member; is that right?

21   A    Before then even.

22   Q    Even before you became a member?

23   A    Yes.

24   Q    The book list -- this is Exhibit 449.  Let's talk about

25   the book list.

1          You told us that this list was compiled by

2     yourself and Kevin Roach and Barry Mills; is that right?

3     A    It's a partial list that was compiled by us, yes.

4     Q    Exhibit 449 is a one-page list of books?

5     A    Yes.

6     Q    And the purpose again is for what?  What's the reason

7     for this list?

8     A    To get people interested in things that would lead to a

9     more intelligent lifestyle.

10    Q    What do you mean by more intelligent lifestyle?  You

11    are laughing.

12    A    I am graveling for words here.  It's hard to put into

13    words.

14    Q    In general, the purpose of the list was -- I think you

15    told us it was to promote unity among AB members, right?

16    A    Yes, and cohesiveness.

17    Q    Do you remember which book you added to the list?

18    A    No, I don't.

19    Q    Among the books that are listed is "Leaves of Grass" by

20    Walt Whitman?

21    A    Yes.

22    Q    Have you read "Leaves of Grass" by Walt Whitman?

23    A    Yes.

24    Q    There is nothing in there about warfare?

25    A    No.

132

```
 1   Q    Or becoming a better soldier?

 2   A    No, there isn't.

 3   Q    It's a book of poems?

 4   A    Yes.

 5   Q    How about "The Complete Works of Oscar Wilde"?  Who

 6   brought that in?

 7   A    I don't recall.

 8   Q    These books are a list of books that people recommend

 9   for reading, right, for pleasure?

10   A    Yes.

11   Q    "Leaves of Grass" by Walt Whitman doesn't further the

12   AB agenda as you have laid it out?

13   A    You have to approach people with what they are

14   interested in or get them interested in something so their

15   minds will start working on something else besides the next

16   shot of dope, so if poetry or literature were areas that

17   might spark an interest with them, that would be a place to

18   start.  The list itself was a very eclectic selection.

19   Q    One of the reasons why you dropped out of the AB is

20   because you grew up; is that right?

21   A    Yes.

22   Q    How old were you when you group up?

23   A    How old?  There was no particular point in time.  It's

24   a process.  It just comes around and kicks you in the head.

25   Q    How old are you now?
```

1    A    Forty-nine.

2    Q    So you were about 40 years old when you group up and

3    left the AB?

4    A    Sounds about right.

5    Q    You have admitted to us on the stand that you had

6    planned to kill Barry Mills?

7    A    Yes.

8    Q    And you intended to carry out that plan didn't you?

9    A    Yes.

10   Q    You also intended to kill T.D. Bingham?

11   A    Yes.

12   Q    For whatever reason, it didn't work out for you did it?

13   A    No.

14   Q    Now, you were fully prepared to kill both Mr. Bingham

15   and Mr. Mills, right?

16   A    Yes.

17   Q    But instead you came in here and testified against

18   them?

19   A    Yes.

20   Q    Is the jury supposed to accept your testimony as

21   truthful?

22        MS. FLYNN:  Objection, argumentative.

23        THE COURT:  Sustained.

24        MR. FLEMING:  I have nothing further.

25        THE COURT:  First of all, how are you?  Time to

134

1   go?

2          I see unanimous nodding of the head by the jury.

3   Why don't we recess.

4          Mr. Reed, is tomorrow morning acceptable?

5          MR. REED:  That's fine.

6          THE COURT:  You are admonished not to discuss this

7   case nor to form or express any opinion regarding the case.

8   Please don't discuss this matter and have a nice evening.

9          (Jury not present.)

10          THE COURT:  Mr. McGinley, thank you.  We will see

11   you tomorrow morning at 8:30.

12          Mr. McGinley is no longer present.

13          Pursuant to our discussion and the request

14   concerning further discovery, I have typed out a tentative

15   order trying to memorialize the discussion on Saturday.  I

16   didn't have a clerk present at that time.

17          I am wondering if you want to informally look at

18   that this evening, Mr. Fleming, and, Ms. Blanch, and make

19   sure that's your memory also of what was requested and what

20   I had memorialized on the record without looking back.  I

21   will give this to Lisa.  You can look at it informally.

22   Just tell me tomorrow morning.

23          Second, whether you found what you were looking

24   for at ADX or not, Mr. Fleming, I'm fairly well-satisfied

25   that ADX has -- you have exhausted the options back at ADX.

135

1    I repeat for my record at least in your future request that

2    you are free to go to ADX anytime you would like, so if

3    there is something that comes up that you think is a stone

4    left unturned back on a plane.

5              I'm not being facetious about this.  Because I am

6    becoming satisfied with ADX, that doesn't mean I'm satisfied

7    yet with Marion.  I'm not trying to force you on the plane,

8    but I am going to constantly remind you if you want to go

9    back to Marion, you can fly back, and Ms. Blanch would be

10   more than happy to meet you there.

11             MR. FLEMING:  Right at this point, we don't need

12   to go to Marion.

13             THE COURT:  You let me know when you do.

14             Mr. Reed, Mr. Calabria, Mr. Rosen, Mr. White, the

15   same offer.  You relied this time on Mr. Fleming.

16             Anything further, Ms. Blanch?

17             MS. BLANCH:  No.

18             THE COURT:  Ms. Flynn?

19             MS. FLYNN:  No.

20             THE COURT:  Mr. Emmick, anything further?

21             MR. EMMICK:  There is one thing that relates to --

22   that I think will happen after the testimony of Michael

23   Olson.

24             May I approach the Court?

25             THE COURT:  Yes.  Thank you.

1          MR. EMMICK:  What I have for the Court is a

2    package of really three things.  One is a redacted version

3    of the conviction of Mr. Gibson for the Monster Barnett

4    stabbing.  Second is an unredacted version of that same

5    certified copy, and last is a proposed limiting instruction

6    and description of the item itself.

7          When I provided them to Mr. Reed, he said he had

8    some issues about some of the things.  He said why don't we

9    try to resolve it now.  If we can, I am happy to.

10          THE COURT:  At least you placed me on notice.

11          Just so I know our time frame after Mr. McGinley

12    has finished testifying, who is the next witness?

13          MR. EMMICK:  We would go with Michael Olson.  He

14    is the last of the witnesses to the Monster Barnett

15    stabbing, so in terms of timing, that would be an

16    appropriate time for us to introduce the conviction.  It

17    doesn't have to be at that time, but I think it makes sense

18    to do it then.

19          THE COURT:  Mr. Reed, do you want the evening to

20    think about this?

21          MR. REED:  I have no problem with this.  I

22    misunderstood when he came over to give it to me.

23          THE COURT:  Which version?

24          MR. REED:  I don't think the terms and conditions

25    of probation are relevant.  The first two pages and then the

```
 1   final page which is a stipulation would appear to be fine
 2   with me.
 3              THE COURT:  Is that acceptable to the government?
 4              MR. EMMICK:  It is.
 5              THE COURT:  The first two pages which are redacted
 6   will be viewed by the jury and received into evidence.  The
 7   Unredacted portion will not be.
 8              MR. EMMICK:  Correct.
 9              THE COURT:  And there is a limiting instruction at
10   the end.
11              MR. EMMICK:  That's the reason I think the other
12   three counsel ought to be looking at it because it's a
13   limiting instruction that will pertain to them.
14              THE COURT:  Anything further?
15              MR. EMMICK:  Nothing further.
16              THE COURT:  Mr. Steward?
17              MR. STEWARD:  No, Your Honor.
18              THE COURT:  Mr. White?  Mr. Harris?
19              MR. WHITE:  There is one matter with regard to
20   Exhibit 158-A, but I think that Ms. Flynn and I can work it
21   out and then come to the Court with it tomorrow.
22              THE COURT:  But that will not hold up the
23   proceeding tomorrow?
24              MR. WHITE:  Correct.
25              MS. FLYNN:  It's simply proposed redactions.
```

138

1          THE COURT:  That's fine.  I don't want to hold up

2     the jury.

3          THE COURT:  Mr. Rosen?

4          MR. ROSEN:  Nothing.

5          THE COURT:  Mr. Calabria?

6          MR. CALABRIA:  Nothing.

7          THE COURT:  Mr. Reed?

8          MR. REED:  Nothing.

9          THE COURT:  Ms. Flynn?

10         MS. FLYNN:  The WITSEC representative that will be

11    testifying tomorrow, he will be called as Jeff Thomas.

12         THE COURT:  His pseudo name will be Jeff Thomas.

13         Just as a preview, how long do you think you will

14    have with Mr. McGinley, Mr. Reed?

15         MR. REED:  It depends on Mr. McGinley, Your Honor.

16    It could be a half-hour.  It could be half a day.

17         THE COURT:  That was helpful.  Thank you.  I am

18    just kidding you.

19         After that, we can all expect Michael Olson or

20    Jeff Thomas in some order, whatever you decide this evening.

21         Will that take us through the entire day tomorrow?

22         MS. FLYNN:  No.

23         THE COURT:  Who else do we have?

24         MS. BLANCH:  Dewey Lee.

25         THE COURT:  We know with Dewey Lee we are not

1    going to finish.  That should take us through the day.

2              MS. FLYNN:  Most likely.

3              THE COURT:  Counsel, is that enough for this

4    evening?

5              MR. STEWARD:  Yes.

6              THE COURT:  Have a nice evening.  Go get some

7    sleep.  We will see you tomorrow at 8:30.

8         *(At 4:30 p.m., proceedings were adjourned.)*

9                              -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

140

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 16, 2006


SHARON SEFFENS, U.S. COURT REPORTER