ORIGINAL

1

1

2          UNITED STATES DISTRICT COURT

3        CENTRAL DISTRICT OF CALIFORNIA

4              SOUTHERN DIVISION

5                  - - -

6   THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

7      UNITED STATES OF AMERICA,

8                  Plaintiff,
        vs.
9                              CR-02-938(C)
     BARRY BYRON MILLS;        (Status Conference)
10    TYLER DAVIS BINGHAM;      (Vol. VI)
     CHRISTOPHER OVERTON
11    GIBSON; EDGAR WESLEY
     HEVLE,
12                  Defendants.

13   ---------------------------

14

15

16      REPORTER'S TRANSCRIPT OF PROCEEDINGS

17          Santa Ana, California

18            June 29, 2006

19

20

21        SHARON A. SEFFENS, RPR
         United States Courthouse
22        411 West 4th Street, Suite 1053
         Santa Ana, CA 92701
23        (714) 543-0870

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   DEBRA W. YANG
     United States Attorney
 4   STEVEN D. CLYMER
     Special Assistant United States Attorney
 5   Chief, Criminal Division
     MICHAEL EMMICK
 6   TERRI FLYNN
     JOEY BLANCH
 7   STEPHEN WOLFE
     Assistant United States Attorneys
 8   1400 United States Courthouse
     312 North Spring Street
 9   Los Angeles, CA  90012
     (213) 894-0511
10

11   For Defendant BARRY BYRON MILLS:

12   H. DEAN STEWARD
     LAW OFFICES OF H. DEAN STEWARD
13   107 Avenida Miramar, Suite C
     San Clemente, CA
14   (949) 481-4900

15   MARK F. FLEMING
     LAW OFFICES OF MARK F. FLEMING
16   433 "G" Street, Suite 202
     San Diego, CA  92101
17   (619) 652-9970

18   For Defendant TYLER DAVIS BINGHAM:

19   MICHAEL  V. WHITE
     LAW OFFICES OF MICHAEL V. WHITE
20   1717 Fourth Street, Third Floor
     Santa Monica, CA  90401
21   (310) 576-6242

22   WILLIAM S. HARRIS
     STEWART & HARRIS
23   1499 Huntington Drive, Suite 403
     South Pasadena, CA  91030
24   (626) 441-9300

25
```

1   For Defendant CHRISTOPHER OVERTON GIBSON:

2   KENNETH A. REED
    LAW OFFICES OF KENNETH A. REED
3   404 West 4th Street, Suite C
    Santa Ana, CA  92701
4   (714) 953-7400

5   For Defendant EDGAR WESLEY HEVLE:

6   BERNARD J. ROSEN
    LAW OFFICES OF BERNARD J. ROSEN
7   1717 Fourth Street, Suite 300
    Santa Monica, CA  90401
8   (310) 451-4577

9   DONALD J. CALABRIA
    LAW OFFICES OF DONALD J. CALABRIA
10  16133 Ventura Boulevard, Suite 600
    Encino, CA  91436
11  (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                              INDEX

 2                                                    PAGE

 3    STATUS CONFERENCE (Cont'd)                       5

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; THURSDAY, JUNE 29, 2006; 5:30 P.M.

2         (Jury not present.)

3         THE COURT:  As an aside, Mr. Mills, I'm not

4    looking ahead, but I need to look ahead.  This is not

5    dispositive if we get to a penalty phase.  In a penalty

6    phase, the argument may become proportionality.  Certainly,

7    for instance, Mr. Benton -- certainly the evidence that

8    Mr. Benton committed the Lewisburg murders and got nine or

9    ten years comes into evidence in a proportionality argument.

10        You can renew your motion concerning whether --

11    and give the government a chance to respond -- and I have

12    made no predetermination on this -- whether that also

13    applies to the ultimate sentence that Mr. Gibson received to

14    the Nevergall assault, which I think was six months.  That's

15    something I will struggle with in terms of proportionality.

16        I will hand this down in written form, so in

17    essence, you have this.  You have the fact he pled guilty.

18    What you don't have is the factual basis.

19        Do you all understand that ruling?

20        MR. STEWARD:  I will hand it down in written form

21    in a few moments.  You will have that before you leave.

22        If there is nothing further, what I propose to do

23    is have you gentlemen taken back because we are not going to

24    go on the record again but have at least one counsel from

25    each of the sides remain, and if they want to bring a copy

```
 1   down to you, I will leave that to your choice and theirs.

 2   They can come down and visit you over the break.

 3          Then I won't reconvene until July 6, but if you

 4   want to stay until we get these copies of the instructions,

 5   then you are more than welcome to.  My guess is it will be

 6   another hour.

 7          MS. BLANCH:  I have made all the changes, so maybe

 8   it will be less.

 9          THE COURT:  In a half-hour to 45 minutes, we are

10   going to have a handout of the jury instructions.

11          MR. CALABRIA:  Your Honor, we have jury

12   instructions.

13          What are we getting now?

14          THE COURT:  You are going to get a cleaned up

15   copy, and you are going to stay until you get them.

16          MR. CALABRIA:  Fine.

17          THE COURT:  That way there is no red marks.  That

18   way you can go through that.  I am going to throw away my

19   other copies frankly.  They are getting in the way now, and

20   that forces us to read them all again.  The nice thing about

21   the proceedings is it forces us all to go through them at

22   one time.  If there are changes, they will be minor changes.

23          What is your thought, Mr. Mills?  What would you

24   like to do?

25          DEFENDANT MILLS:  I want to go.
```

7

```
 1              THE COURT:  Mr. Bingham?

 2              DEFENDANT BINGHAM:  Go eat.

 3              THE COURT:  Mr. Hevle?

 4              DEFENDANT HEVLE:  Go.

 5              THE COURT:  Mr. Gibson?

 6              DEFENDANT GIBSON:  I'm ready.

 7              THE COURT:  Gentlemen, have a nice week.

 8         If you need to reconvene on July 5, let me know.

 9    Otherwise, I won't see you until July 6.

10         (At 5:45 p.m., proceedings were adjourned.)

11                        -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              -oOo-

2

3                          CERTIFICATE

4

5        I hereby certify that pursuant to Section 753,

6   Title 28, United States Code, the foregoing is a true and

7   correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12  Date:  June 29, 2006

13
                          Sharon Seffens      6/29/06
14                        _____
                          SHARON SEFFENS, U.S. COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25
```

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                    Plaintiff,

            vs.

                                    CR-02-938(C)
BARRY BYRON MILLS;                  DAY 24, VOL. IV
TYLER DAVIS BINGHAM;
CHRISTOPHER OVERTON
GIBSON; EDGAR WESLEY
HEVLE,
                    Defendants.

--------------------------




REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 9, 2006




SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

2

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   DEBRA W. YANG
     United States Attorney
 4   STEVEN D. CLYMER
     Special Assistant United States Attorney
 5   Chief, Criminal Division
     MICHAEL EMMICK
 6   TERRI FLYNN
     JOEY BLANCH
 7   Assistant United States Attorneys
     1400 United States Courthouse
 8   312 North Spring Street
     Los Angeles, CA  90012
 9   (213) 894-0511

10   For Defendant BARRY BYRON MILLS:

11   H. DEAN STEWARD
     LAW OFFICES OF H. DEAN STEWARD
12   107 Avenida Miramar, Suite C
     San Clemente, CA
13   (949) 481-4900

14   MARK F. FLEMING
     LAW OFFICES OF MARK F. FLEMING
15   433 "G" Street, Suite 202
     San Diego, CA  92101
16   (619) 652-9970

17   For Defendant TYLER DAVIS BINGHAM:

18   MICHAEL  V. WHITE
     LAW OFFICES OF MICHAEL V. WHITE
19   1717 Fourth Street, Third Floor
     Santa Monica, CA  90401
20   (310) 576-6242

21   WILLIAM S. HARRIS
     STEWART & HARRIS
22   1499 Huntington Drive, Suite 403
     South Pasadena, CA  91030
23   (626) 441-9300

24

25
```

```
 1    For Defendant CHRISTOPHER OVERTON GIBSON:

 2    KENNETH A. REED
      LAW OFFICES OF KENNETH A. REED
 3    404 West 4th Street, Suite C
      Santa Ana, CA  92701
 4    (714) 953-7400

 5    For Defendant EDGAR WESLEY HEVLE:

 6    BERNARD J. ROSEN
      LAW OFFICES OF BERNARD J. ROSEN
 7    1717 Fourth Street, Suite 300
      Santa Monica, CA  90401
 8    (310) 451-4577

 9    DONALD J. CALABRIA
      LAW OFFICES OF DONALD J. CALABRIA
10    16133 Ventura Boulevard, Suite 600
      Encino, CA  91436
11    (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                          INDEX

2                                                    PAGE

3    PLAINTIFF'S
     WITNESS:           DIRECT      CROSS    REDIRECT    RECROSS
4

5    JEFFREY WILLIAMS       5
     MARK BEZY              8
6    FREEMAN BARGER        13
     JEFFREY BARNETT       17
7    MICHAEL MANBY         44

8
     PLAINTIFF'S
9    EXHIBITS:                    MARKED          RECEIVED

10   (None)

11   DEFENSE
     WITNESSES:         DIRECT    CROSS    REDIRECT    RECROSS
12
     (None)
13

14   DEFENSE
     EXHIBITS:               MARKED          RECEIVED
15
     (None)
16

17

18

19

20

21

22

23

24

25

1    SANTA ANA, CALIFORNIA; TUESDAY, MAY 9, 2006; 3:00 P.M.

2              (Jury present.)

3              THE COURT:  The jury is back and the alternates.

4    The defendants, counsel, and the government are present.

5              Counsel, would you like to call your next witness

6    on behalf of the government.

7              MS. BLANCH:  The government calls Jeffrey

8    Williams.

9              THE COURT:  Mr. Williams, if you would step

10   forward between the double doors.

11             Would you raise your right hand, and Lisa is going

12   to administer the oath to you.

13        JEFFREY WILLIAMS, PLAINTIFF'S WITNESS, SWORN

14             THE COURT:  Mr. Williams, if you would please be

15   seated here in the witness box.

16             After you are seated, would you state your full

17   name for the jury and spell your last name, please.

18             THE WITNESS:  Jeffrey Newell Williams,

19   W-i-l-l-i-a-m-s.

20             THE COURT:  This will be Ms. Blanch on behalf of

21   the government on direct examination of Mr. Williams.

22                       DIRECT EXAMINATION

23   BY MS. BLANCH:

24   Q    Mr. Williams, are you employed by the Bureau of

25   Prisons?

6

1   A     Yes, ma'am.

2   Q     And in what capacity are you employed?

3   A     Correctional officer.

4   Q     How long have you been employed by the BOP?

5   A     Seventeen years.

6   Q     Were you employed by the BOP on September 30, 1993?

7   A     Yes, ma'am.

8   Q     And were you working on that day?

9   A     Yes, ma'am.

10  Q     In what capacity?

11        THE COURT:  Would you move just a little closer to

12  that microphone so we can hear you.

13        THE COURT:  I was working as the 6 Tower officer.

14  BY MS. BLANCH:

15  Q     You were working as the 6 Tower officer?

16  A     Yes.

17  Q     Was that at USP Marion?

18  A     Yes, ma'am.

19  Q     What's involved with being the 6 Tower officer?

20  A     I was in charge of watching recreation on the north and

21  south yards just outside the east quarter door.

22  Q     You're stationed literally up on a tower?

23  A     Yes, ma'am.

24  Q     Did anything happen on the yard on September 30, 1993,

25  that you saw?

1    A     We had a fight on the south yard.

2    Q     Did you see the fight start?

3    A     I saw one inmate knock another inmate to the ground at

4    which time he placed him in what appeared to be a choke hold

5    from where I was, and I saw a third inmate jump on top of

6    the two that were already on the ground and began

7    striking -- I couldn't tell who from my position -- began

8    striking someone while they were on the ground.

9    Q     Could you tell who the inmates were?

10   A     No, ma'am, at that time, I could not.

11   Q     Could you tell whether or not any of the inmates were

12   armed?

13   A     No, ma'am, I could not.

14              MS. BLANCH:  I have no further questions.

15              THE COURT:  Cross-examination, Mr. Steward, on

16   behalf of Mr. Mills?

17              MR. STEWARD:  None.

18              THE COURT:  Mr. Harris, or, Mr. White, on behalf

19   of Mr. Bingham?

20              MR. WHITE:  No.

21              THE COURT:  Mr. Calabria or Mr. Rosen on behalf of

22   Mr. Hevle?

23              MR. CALABRIA:  No, Your Honor.

24              THE COURT:  Mr. Reed, on behalf of Mr. Gibson?

25              MR. REED:  No.

1          THE COURT:  Sir, we are going to place you on

2    call.  I doubt that you are going to return to these

3    proceedings, but we are doing that with every single

4    witness.  If you're needed, you are going to have an

5    abundant amount of time, so if you're going on vacation, if

6    you have anything planned, keep your normal schedule.  If we

7    need you, we will call you back.

8          Counsel, your next witness.

9          MS. BLANCH:  The government calls Mark Bezy.

10          THE COURT:  Thank you.

11          Sir, if you would be kind enough to step between

12    the double doors and after you have done so if you would

13    raise your right hand.  Lisa is going to administer the oath

14    to you.

15               MARK BEZY, PLAINTIFF'S WITNESS, SWORN

16          THE COURT:  If you would come across the center of

17    the courtroom and be seated to my right in the witness box.

18          Would you state your full name for the jury and

19    spell your last name.

20          THE WITNESS:  Mark Bezy, B-e-z-y.

21          THE COURT:  This will be Ms. Blanch on direct

22    examination on behalf of the government.

23                    DIRECT EXAMINATION

24    BY MS. BLANCH:

25    Q    Mr. Bezy, are you employed by the Bureau of Prisons?

9

| | | |
|---|---|---|

1   A    Yes.

2   Q    How long have you employed by the Bureau of Prisons?

3   A    Twenty-eight years.

4   Q    What's your current position with the BOP?

5   A    I am the warden of the Federal Correctional Complex in

6   Terre Haute, Indiana.

7   Q    What was your position on September 30, 1993?

8   A    I was a captain at USP Marion.

9   Q    And were you employed on September 30, 1993?

10  A    Yes.

11  Q    What were your duties at that time?

12  A    As a captain, I oversaw the Correctional Services

13  Department which is approximately 220 staff, ensured

14  security for the institution.

15  Q    Did you respond to an alarm on that day?

16  A    Yes.

17  Q    Where were you when the alarm sounded?

18  A    I believe I was in my office.

19  Q    What did you do?

20  A    I grabbed a baton as I left the Lieutenant's Office and

21  ran out to the yard where the call for assistance was?

22  Q    When you got there, what did you do?

23  A    Staff said that I believe in the south yard there were

24  two inmates fighting with one inmate.

25  Q    Did you see that?

10

| | | |
|---|---|---|
| 1 | A | I saw two inmates on the ground, yes. |
| 2 | Q | Who were those inmates? |
| 3 | A | It was inmate King and Inman I believe. |
| 4 | Q | Would that be Curt King? |
| 5 | A | Yes. |
| 6 | Q | And Jimmy Lee Inman? |
| 7 | A | Yes. |
| 8 | Q | What were their positions on the ground? |
| 9 | A | I think King was on top of the other inmate. |
| 10 | Q | Could you tell whether either of them were armed? |
| 11 | A | Not from a distance, but as you got close -- as we got |

12  close to them, you could see that King was in possession of

13  a knife.

14  Q    What did you do?

15  A    I told him to drop the knife.  When he didn't, I hit

16  him with the baton in the hand.

17  Q    How did you physically approach them?

18  A    Actually from the side.  I put my knee in the back of

19  King, tried to get him off.  He wouldn't move.  You could

20  see that he had a knife.  At that point, I ordered him to

21  drop the knife.  He didn't, so I hit him with the baton.

22  Q    Did he eventually drop the knife while you were hitting

23  him?

24  A    It was difficult because it was strapped to his wrist,

25  but he did let go of it.

1   Q    The knife was strapped to his wrist?

2   A    Right.

3   Q    Could you see whether or not he had stabbed inmate

4   Inman?

5   A    I believe he had.

6   Q    Then what did you do?

7   A    Got the inmate to the hospital and then took control of

8   the two inmates that were the assaulters.

9   Q    When you say you got the inmate to the hospital, would

10  that be Jimmy Lee Inman?

11  A    Yes.

12  Q    You said there were two other inmates who had been

13  assaulting.  Who were they?

14  A    Maynard was one, and then King was the other one.

15  Staff had already pulled Maynard off.

16  Q    Would that be Roger Maynard?

17  A    Yes.

18  Q    Then what did you do?

19  A    Actually cuffed everybody up that was on the rec yard

20  and put them back in their cells with the exception of the

21  two inmates that did the assaulting.  We had them medically

22  assessed and moved them to the Special Housing Unit.

23          MS. BLANCH:  No further questions.

24          THE COURT:  Any cross-examination, Mr. Steward,

25  or, Mr. Fleming, on behalf of Mr. Mills?

1              MR. STEWARD:  None.

2              THE COURT:  Mr. White, Mr. Harris, on behalf of

3    Mr. Bingham?

4              MR. WHITE:  No questions.

5              THE COURT:  Mr. Rosen, or, Mr. Calabria, on behalf

6    of Mr. Hevle?

7              MR. CALABRIA:  No questions.

8              THE COURT:  Mr. Reed, on behalf of Mr. Gibson?

9              MR. REED:  No questions.

10             THE COURT:  I am placing everyone on call in this

11   case so that there are no further subpoenas that have to go

12   out across the United States.  I doubt you are going to be

13   returning, so, therefore, keep your normal schedule.  If you

14   have vacations or conferences or whatever, this trial will

15   not interfere with those.  If by any stretch of the

16   imagination you are needed back here, you will have two

17   weeks to a month notice.

18             Counsel, if you would call your next witness on

19   behalf of the government.

20             MS. BLANCH:  The government calls Freeman Barger.

21             THE COURT:  Thank you.

22             Sir, would you come forward and raise your right

23   hand.  The clerk will administer the oath to you.

24             FREEMAN BARGER, PLAINTIFF'S WITNESS, SWORN

25             THE COURT:  If you would come forward right across

1    the center of the courtroom and please be seated to my right

2    here in the witness box.

3              Would you be kind enough to state your full name

4    for the jury and spell your last name.

5              THE WITNESS:  Freeman Barger, B-a-r-g-er.

6              THE COURT:  Thank you very much.

7              This will be direct examination by Ms. Blanch on

8    behalf of the government.

9    BY MS. BLANCH:

10   Q    Mr. Barger, did you used to be employed by the Bureau

11   of Prisons?

12   A    Yes.

13   Q    Where are you employed currently?

14   A    Vienna Correctional Center (phonetic), Vienna,

15   Illinois.

16   Q    In what capacity?

17   A    Director of Nurses.

18   Q    Are you in fact an RN?

19   A    Yes, ma'am.

20   Q    I mean by that a registered nurse.

21   A    Yes, ma'am.

22   Q    How long were you employed by the Bureau of Prisons

23   before you retired?

24   A    Twenty years.

25   Q    And in what capacity did you first become employed by

14

1    the Bureau of Prisons?

2    A    Registered nurse.

3    Q    Were you employed by the BOP on September 30, 1993?

4    A    Yes.

5    Q    And in what capacity were you employed on that date?

6    A    Physician's assistant.

7    Q    Do you recall an incident on September 30, 1993?

8    A    No.

9    Q    Would it refresh your recollection to look at your

10   report from that date?

11   A    Yes, ma'am, it would help.

12          MS. BLANCH:  I am going to show him, Counsel, what

13   has been given in discovery as Bates Nos. 4402 and 4403.

14          THE COURT:  Counsel, why don't you give him a

15   minute to read that.

16          MS. BLANCH:  I believe he has read it already

17   today.

18          THE COURT:  Okay.

19   BY MS. BLANCH:

20   Q    Mr. Barger, were you employed at USP Marion as a

21   physician's assistant on September 30, 1993?

22   A    Yes, ma'am.

23   Q    Did you conduct a medical review of an inmate named

24   Curt King on that date?

25   A    According to this, I did, yes.

1  Q     When you conduct medical assessments on inmates, is it

2  your pattern and practice to fill out a Bureau of Prisons

3  Medical Assessment Form?

4  A     Yes, ma'am.

5  Q     Do you also fill out a chronological record of medical

6  care?

7  A     Yes, ma'am.

8  Q     If inmate Curt King had been injured on that date,

9  would that be -- would you have put that in your notes?

10 A     Yes, ma'am.

11 Q     As a matter of practice and policy?

12 A     Yes.

13 Q     According to your notes, was Curt King injured on

14 September 30, 1993?

15 A     No, ma'am.  He sustained no injuries.

16 Q     Did you note that he had no abrasions?

17 A     Yes, ma'am.

18 Q     And no contusions?

19 A     Yes, ma'am.

20 Q     And no bleeding?

21 A     Yes, ma'am.

22 Q     And did you mark that he needed no medical attention

23 whatsoever?

24 A     Yes, ma'am.

25         MS. BLANCH:  Thank you.  I have no further

*SHARON SEFFENS, U.S. COURT REPORTER*

```
1   questions.
2             THE COURT:  Cross-examination, Mr. Steward, or,
3   Mr. Fleming, on behalf Mr. Mills?
4             MR. STEWARD:  No, Your Honor.
5             THE COURT:  Mr. White, or, Mr. Harris, on behalf
6   of Mr. Bingham?
7             MR. WHITE:  No, thank you.
8             THE COURT:  Mr. Calabria, or, Mr. Rosen, on behalf
9   of Mr. Hevle?
10            MR. CALABRIA:  No, Your Honor.
11            THE COURT:  Mr. Reed, on behalf of Mr. Gibson?
12            MR. REED:  No questions.
13            THE COURT:  Sir, we are placing every witness on
14  call in this case.  I can't imagine you are returning to
15  court, but I don't want further subpoenas to have to go back
16  across the country.  If by any stretch of the imagination
17  you are needed back in court, you will have at least two
18  weeks and probably a month notice.  I doubt that you're
19  returning, so go about your vacation schedule, your
20  employment, whatever you have.  If we need you, we will find
21  you.
22            Now, Counsel, I am going to ask the jury if you
23  will be kind enough to step out for a moment.  You are
24  admonished not to discuss this matter amongst yourselves nor
25  to form or express an opinion.
```

1          This is not a break -- well, it's a break, but a

2    small break, no more than about three to five minutes

3    probably.

4               (Recess.)

5               (Jury present.)

6          THE COURT:  We will go back on the record.  The

7    jury and the alternates are present, the defendants,

8    counsel, and the government.

9          The government may call its next witness.

10         MR. EMMICK:  Jeffrey Lee Barnett.

11         THE COURT:  Would you raise your right hand.  Lisa

12   will administer an oath to you.

13         JEFFREY LEE BARNETT, PLAINTIFF'S WITNESS, SWORN

14         THE COURT:  Would you state your full name for the

15   record and spell your last name.

16         THE WITNESS:  Jeffrey Lee Barnett, B-a-r-n-e-t-t.

17         THE COURT:  Counsel, this would be direct

18   examination by Mr. Emmick on behalf of the government of

19   Mr. Barnett.

20         MR. EMMICK:  Thank you, Your Honor.

21                    DIRECT EXAMINATION

22   BY MR. EMMICK:

23   Q    Mr. Barnett, do you have a nickname?

24   A    Yes.

25   Q    What is that nickname?

18

| | | |
|---|---|---|
| 1 | A | Monster. |
| 2 | Q | How did you get that nickname? |
| 3 | A | I used to be a lot bigger than I am now. |
| 4 | Q | How much bigger? |
| 5 | A | 45, 50 pounds. |
| 6 | Q | In 1990, were you a federal inmate at the United States |

7   Penitentiary in Lompoc, California ?

| | | |
|---|---|---|
| 8 | A | Yes. |
| 9 | Q | Were you the victim of a stabbing on March 13, 1990? |
| 10 | A | It was in 1990. |
| 11 | Q | How many people were involved in that stabbing? |
| 12 | A | Two. |
| 13 | Q | Who were those two people? |
| 14 | A | Hicklin and Gibson. |
| 15 | Q | Do you know their first names? |
| 16 | A | Chris Gibson.  I'm not sure about Hicklin. |
| 17 | Q | Does Steve Hicklin ring a bell? |
| 18 | A | That sounds about right. |
| 19 | Q | Do you recall Chris Gibson well enough to be able to |

20   pick him out in court?

| | | |
|---|---|---|
| 21 | A | I know Chris Gibson. |
| 22 | Q | Would you pick him out in court for us? |
| 23 | A | He is over there with glasses, the top left. |
| 24 | | THE COURT:  Would that be sufficient, Mr. Reed? |
| 25 | | MR. REED:  Yes. |

```
 1              THE COURT:  The record will indicate that
 2   Mr. Barnett has identified Mr. Gibson.
 3              (Defendant Gibson identified.)
 4   BY MS. BLANCH:
 5   Q    We will return to the details of that stabbing in a
 6   moment.  Let me ask you a few questions about your
 7   background.
 8              After high school, did you go into the military?
 9   A    Yes.
10   Q    What branches and what years?
11   A    Marine Corps 1969 to '71.
12   Q    What were you doing there in the Marine Corps?
13   A    I was an air wing.
14   Q    What is the air wing?
15   A    Helicopters.
16   Q    After the Marines did you return to civilian life?
17   A    Yes.
18   Q    When you were in civilian life, did you have some
19   convictions for felonies?
20   A    Yes.
21   Q    Would you walk us through the felony convictions that
22   you have?
23   A    After I was back out of the service about six months, I
24   picked up a robbery.
25   Q    That would have been in about --
```

1   A    It was '72.  I did about three years on that.  Then

2   after that, I picked up an "N" number.

3   Q    What does that mean?

4   A    That's a narcotics number out of California.  It's a

5   civil commitment where they give an addict seven years.

6   They postpone their prison sentence while their going to a

7   treatment program.

8   Q    I assume from that you were an addict at the time.

9   A    Yes, I was.

10  Q    What were you addicted to?

11  A    Heroin.

12  Q    After you served some time in connection with the "N"

13  number, did you suffer any felony convictions?

14  A    I had a burglary during that time, probably around '76

15  or so.

16  Q    Now, the convictions that you have talked about so far,

17  those are California state convictions?

18  A    Yes.

19  Q    At some point did you have a federal conviction as

20  well?

21  A    In 1981.

22  Q    What was that a conviction for?

23  A    A whole lot of bank robberies.

24  Q    Was that just a federal conviction, or was it a state

25  conviction as well?

1   A     State and federal because part of the banks were

2   savings and loans and banks.  If they weren't insured, they

3   were savings and loans, and the state took those, and the

4   feds took the other ones.

5   Q     What was your sentence on those 1981 robberies?

6   A     Fourteen years for the state and 25 years for the feds.

7   They ran consecutive.

8   Q     Let me turn to the California state convictions that

9   you mentioned.

10          Initially, I assume that you were then put into

11  the California state prison system; is that right?

12  A     Yes.

13  Q     What prisons did you -- were you housed at?  If you

14  could walk us through what state prisons and approximately

15  what years.

16  A     I started at Palm Hall.

17  Q     Where is Palm Hall?

18  A     Chino.

19  Q     What years were you at Palm Hall if you remember?

20  A     '81 to 82.  From there, I went to court for the federal

21  beef.  Then I came back to Palm Hall again.  Then from

22  there, I went to Folsom in '82.  After Folsom, I went to

23  San Quentin.  After San Quentin, I went to Soledad.  Then I

24  went into custody for the feds.

25  Q     When did you go into custody for the feds?

1  A    1989.

2  Q    While you were in state custody, did you come to be

3  familiar with a group known as the Aryan Brotherhood?

4  A    Yes.

5  Q    Would you tell us how you came to be familiar with the

6  group?

7  A    Well, if you're doing time -- everybody knows who the

8  Aryan Brotherhood is, but I happened to be doing -- when I

9  was over in Palm Hall, I met them, and when I was in L.A.

10 County Jail in back in the '70s, I was in high power with a

11 lot of them.

12         THE COURT:  The jury is not going to know what

13 high power is.

14 BY MR. EMMICK:

15 Q    What is high power?

16 A    In county jail, there is a regular unit.  Then for

17 people that are considered a risk or danger or something

18 like that, they have the next level, and it's called high

19 power.  You don't associate with anybody except -- you are

20 all by yourself and all that stuff.

21 Q    It's a higher level of security?

22 A    A lot higher.

23 Q    Would you tell us what kind of interaction you had with

24 members and associates of the Aryan Brotherhood at Palm

25 Hall?

1    A    We talked, walked the yard, played dominos, small talk.

2    I had pretty good conversations with a few of them.

3    Q    Do you remember the names of any of the members of the

4    Aryan Brotherhood you knew there at Palm Hall?

5    A    Blue, Clifford.

6    Q    You said Blue.

7         Do you remember Blue's full name?

8    A    Wendall Norris.

9    Q    Who else of the Aryan Brotherhood members did you know?

10   A    Clifford Smith.

11   Q    Did he have a nickname?

12   A    Smitty.

13   Q    Who else?

14   A    John Stinson, Ricky T., Ricky Terflinger.   There were

15   17 of them there.

16   Q    There at Palm Hall?

17   A    Yes.

18   Q    Through speaking with them, did you come to be familiar

19   with the Aryan Brotherhood policies and the Aryan

20   Brotherhood culture?

21   A    As much as you can.   Unless you are one of them, they

22   are not going to tell you much.

23   Q    Did there come a time when you were interested in

24   becoming a member of the Aryan Brotherhood?

25   A    Yeah, I thought about it.

24

1    Q    Why were you interested in becoming a member of the
2    Aryan Brotherhood?
3    A    Everybody wants to be in the AB.
4    Q    Why is that?
5    A    Because if you are going to do time, that's the elite.
6    As far as white people are concerned, that's who you want to
7    be with whether you're just a little convict or all the way
8    up.
9    Q    From your point of view, what did the AB offer?
10   A    Fellowship, strength, unity, a lot of pride.  That's
11   plenty.
12   Q    The AB was involved in violence at those institutions;
13   is that right?
14   A    Everybody is.
15   Q    Did the AB play any role in the approval of violence by
16   white inmates against one another?
17   A    I wasn't there to say yes, but that's -- I can't really
18   comment on that.  I wasn't there.
19   Q    You mentioned that you were interested in becoming a
20   member of the Aryan Brotherhood.
21        Did you have discussions with members of the Aryan
22   Brotherhood on that topic?
23   A    I talked to Blue, and I talked to Clifford.
24   Q    What did they say about that?
25   A    Blue told me that it was a bad idea because me being a

1  drug addict brought too much baggage, and he told me it

2  wasn't what it was supposed to be.

3  Q    What do you mean by that?

4  A    He was saying like when he -- I guess when he got into

5  it it was supposed to be one way, and it changed.  Then it

6  was another way.  He just told me it wasn't what it was

7  supposed to be.

8  Q    Did that have some influence on your decision whether

9  to join the Aryan Brotherhood?

10  A    Not as much as you would think because you always still

11  think maybe if they ask me to do something I will do it.

12  Q    While you were at Palm Hall, did you use drugs?

13  A    Yes.

14  Q    How did you get the drugs?

15  A    My old lady brought them to me.

16  Q    Have you ever heard the expression kicking down drugs?

17  A    Yes, sir.

18  Q    What does kicking down drugs mean?

19  A    That means when you bring in some drugs you take care

20  of certain people.  That means like they have got that

21  coming off the top.

22  Q    Who are the certain people you are referring to?

23  A    Anybody that you look up to or have a friendship with

24  or you deem they deserve that.

25  Q    Would that include in your case members of the Aryan

1   Brotherhood?

2   A    Yes, sir.

3   Q    Did you kick down drugs to members of the Aryan

4   Brotherhood?

5   A    One.

6   Q    Who?

7   A    Clifford.

8   Q    That's Clifford Smith?

9   A    Clifford Smith.

10  Q    After Palm Hall, you went to Folsom you said?

11  A    Yes, sir.

12  Q    Was there an AB presence there?

13  A    Yes, sir.

14  Q    Can you tell us what AB members or associates were

15  there?

16  A    There was -- they have got two different holes there.

17  There was a lot.   There was a lot of them there, Junior --

18  Q    Do you know Junior's name?

19  A    Junior Schneider, Ronnie Slocum.   I mean, there is a

20  lot.   If they weren't in San Quentin, they were in Folsom.

21  Q    Did there come a time when the Aryan Brotherhood asked

22  you whether your wife would bring Aryan Brotherhood drugs

23  into Folsom?

24  A    Yes.

25  Q    Who was it that talked to you about that?

1    A     Junior.

2    Q     Where were you when you talked with Junior on that

3    subject?

4    A     I was in the visiting room.

5    Q     Tell us how that conversation proceeded.

6    A     What it was was Junior --

7              MR. STEWARD:  Objection, foundation as to time on

8    that.

9              THE WITNESS:  It would be --

10             THE COURT:  You said he was at Folsom in 1982.

11             Do you want to see if that can be narrowed into

12   some --

13   BY MR. EMMICK:

14   Q     Do you remember what year it was that you had this

15   discussion with Junior Schneider as best you can recall?

16   A     '83, but I have no clue what month.

17   Q     You were mentioning this discussion that you had with

18   Junior Schneider about bringing Aryan Brotherhood drugs in

19   through your wife.  Tell us how that conversation went.

20   A     At the time, Junior was behind the glass, which means

21   he didn't have any contact visits, and I did, so his wife

22   went to mine and asked her to bring their drugs in for them.

23   Q     It should be obvious, but could you explain what a

24   contact visit is?

25   A     Instead of -- a contact visit is when you are sitting

1    across from your visitor at a table, and a noncontact

2    visitor is behind glass.  If you have lost your visits for

3    some reason, you are behind the glass.  If not, you have

4    regular visits.

5    Q    How else did the conversation proceed?

6    A    Well, he came to me and asked me -- well, actually my

7    wife came to me and told me that the wife had approached her

8    and asked for her to bring in the drugs.  Well, she didn't

9    do it.  She came and told me.  I went to Junior probably

10   within minutes of that or an hour of that the same day of

11   the visit, and I told him that she wasn't going to do that.

12   Q    Why was that?

13   A    She would take care of me, but she wouldn't run drugs

14   for them.  I figured I was already taking care of them,

15   so --

16   Q    Where were you when this conversation took place?

17   A    In the visiting room.

18   Q    Now, what was his reaction when you said to Schneider

19   that you weren't going to do that?

20   A    It's hard to remember, but I would just have to guess.

21   It wasn't good.

22        MR. STEWARD:  Objection, speculation.

23   BY MR. EMMICK:

24   Q    Don't guess.  If you remember, tell us.  If you

25   don't --

1    A     I really don't.

2             THE COURT:  Sustained.

3    BY MR. EMMICK:

4    Q     At the time were you in the hole?

5    A     Yes.

6    Q     Again, it should be obvious, but tell us what the hole

7    is.

8    A     It's a unit they put you into if there is some type of

9    investigation going on.  It's a higher security unit.  You

10   are away from the main population, but you still go to the

11   visiting room and stuff and get your visits and all that.

12   Q     You were in the hole, but you were nevertheless allowed

13   contacts?

14   A     Yes, because I was pending investigation.

15   Q     At some point, were you let out of the hole?

16   A     Yes.

17   Q     What happened the day you were let out of the hole?

18   A     I was stabbed about 45 minutes after I got out of the

19   hole.

20   Q     Would you tell us about that stabbing?

21   A     I was sitting in front of the commissary on a trash

22   can.  They have these 350-gallon drums that they use for

23   chairs.  I was sitting on a trash can in front of the

24   commissary, and the whole prison was out there.  They were

25   released.  About 1,400 people were on the yard.  As I am

1    sitting there, I was kind of looking off to the side, and

2    somebody slid through and stabbed me in the chest.

3    Q    Who is the somebody who slid through?

4    A    Somebody named Daryl.

5    Q    Does the name Daryl Warner ring a bell?

6    A    Yes, I would say so.

7    Q    Now, did you know Daryl from earlier?

8    A    I knew Daryl from CRC.

9    Q    Did you have any beef with Daryl?

10   A    Not a bit.

11   Q    Any problems at all with Daryl?

12   A    I do now, but I didn't then, no.

13   Q    Now, was Daryl a member or associate of the AB?

14        MR. STEWARD:  Objection, foundation.

15        THE COURT:  Well, subject to a motion to strike

16   you can answer that question.

17        THE WITNESS:  I don't think so.

18   BY MR. EMMICK:

19   Q    After the stabbing occurred -- let me strike that.

20        At the time the stabbing occurred, was anything

21   said to you by Daryl?

22   A    No.  He stabbed me once, pulled the knife out, tried to

23   stab me again.  I blocked that one, and then he ran off.

24   Q    What happened after that?  You got a stab wound in the

25   chest.  How bad was the wound?

1  A    It was bad.  It split my sternum.  The knife was

2  14 inches, so you figure -- pretty much it was bone

3  pressure.

4  Q    Where did you go in order to be treated?

5         THE COURT:  The jury is not going to know what

6  bone pressure is.

7         THE WITNESS:  It's a knife that will go through

8  bone.  It's a serious knife.

9  BY MR. EMMICK:

10  Q    What happened after that?  You had to have some sort of

11  treatment I assume.

12  A    Oh, yeah.  I went to the Trauma Unit at UC Davis.

13  Q    While you were at the Trauma Unit -- at some point, did

14  you have a discussion with Blue about the stabbing?

15  A    Yeah.  After I came back from the hospital, one of the

16  guards brought him in to see me at the hospital.  He told me

17  point blank, "It wasn't any of us.  It was a drug debt.  You

18  owed money."

19  Q    Did you at the time?

20  A    Not a bit.

21  Q    Did you owe a drug debt to anybody?

22  A    No, I didn't owe anything.  I had my own drugs.  I

23  didn't need it.

24  Q    At some point, did you tell your wife about the

25  stabbing?

1   A     She knew about it.  It was in the -- it was on TV and

2   stuff for that area.

3   Q     After she knew about the stabbing or after the stabbing

4   itself, did you see her anymore?

5   A     She came up one time when I was in the hospital.  That

6   was it for about four-and-a-half years.  Then she saw me

7   again.  She stopped by and saw me then.

8   Q     Did you regard the stabbing by Daryl Warner as an AB

9   hit?

10  A     Yes.

11  Q     Why?

12  A     Just the circumstances that came down, the way the drug

13  thing was.  It's like -- they know about everything.  I

14  mean, nobody is going to do anything without them knowing.

15  Q     At some point, did you express to the AB or to the tier

16  generally your views about the AB?

17  A     When I came back, I got a job as a tier tender in one

18  building, and I was pretty vocal about it.

19  Q     How do you mean?

20  A     Well, I cut off all my hair and kind of went into a nut

21  mode.  I got a job as a tier tender with a broom in case I

22  could catch up with somebody.

23  Q     At some point, did you transfer to San Quentin?

24  A     Yes.  They transferred me I think within four to five

25  months.

1   Q    Were you asked by the guards why the stabbing occurred?

2   A    I don't remember that.

3   Q    Did you ever tell the guards what happened?

4        MR. REED:  Objection, hearsay, Your Honor, what he

5   told the guards.

6        THE COURT:  Sustained.

7   BY MR. EMMICK:

8   Q    Did you tell the guards anything about what happened?

9   A    Not a bit.

10  Q    Why not?

11  A    I didn't think they needed to know.  I thought I could

12  handle it myself.

13  Q    At some point, you came into federal custody; is that

14  right?

15  A    In 1989.

16  Q    Why?  What was the sentence you were serving?

17  A    Twenty-five years.

18  Q    Where were you in federal custody?

19  A    Lompoc.

20  Q    Do you remember about what month you came in?

21  A    I believe it was the end of October, November.

22  Q    When you were at Lompoc, did you know Chris Gibson?

23  A    Yes.

24  Q    How did you come to know him?

25  A    He's my homeboy.

34

1    Q    Meaning what?

2    A    From the same area, South Bay, L.A.

3    Q    Were you friendly with Chris Gibson?

4    A    Yes.

5    Q    Did you have any beef with Chris Gibson?

6    A    I didn't think so.

7    Q    Did you know Chris Gibson at Folsom?

8    A    I didn't.  I don't remember Chris at Folsom.

9    Q    At some point, did he tell you whether he had been at

10   Folsom?

11   A    I don't remember that.

12   Q    Did you know Steve Hicklin at Lompoc?

13   A    Yeah.

14   Q    Tell us how you knew Steve Hicklin.

15   A    He is the guy that stabbed me in the back.

16   Q    Before he stabbed you in the back.

17   A    Just in passing.  It wasn't like I was drinking coffee

18   with him or anything.  I would say hello to him.

19   Q    Did you understand that they were members or associates

20   of the AB when you --

21             MR. REED:  Objection, compound as phrased.

22             THE COURT:  Why don't you just take one at a time.

23   Sustained.

24   BY MR. EMMICK:

25   Q    Did you understand whether Chris Gibson was AB at the

1   time you got to Lompoc?

2   A    No.

3   Q    Did you understand whether Hicklin was at the time you

4   got to Lompoc?

5   A    I had no idea either way.

6   Q    At some point did you have discussions with Steve

7   Hicklin about Ronnie Slocum?

8   A    I don't remember that conversation, but I did talk to

9   Ronnie.

10   Q    Was Ronnie there when you first got there?

11   A    No, he wasn't.

12   Q    So Ronnie transfers in?

13   A    He came in on a violation.

14   Q    What did you and Ronnie Slocum talk about?

15   A    We went out to the yard and had a walk around the track

16   out on the yard.  We went for a walk on the track, and we

17   discussed what happened at Folsom.

18   Q    Tell us in a little more detail how the conversation

19   was arranged and then what the two of you talked about.

20   A    Somebody had to arrange it.  I don't remember who

21   actually did.  It was real cordial as far as Ronnie wants to

22   go out and talk to you.  I said no problem, so I met him out

23   on the track.  We walked around and discussed things by

24   ourselves.

25   Q    Tell us what was discussed.  What was said?

1   A    Ronnie told me that the hit that came down at Folsom

2   was a mistake.  Daryl acted on his own and that Daryl had

3   ended up locking up, going to CMC because of the move,

4   something like that, because of the stabbing he did on me.

5   Q    Did you believe it when Ronnie said that?

6   A    I didn't believe that.

7   Q    Why not?

8   A    It was too convenient.  It was like -- I mean, the guy

9   is just not going to do that on his own.  As far as making

10  mistakes, I haven't heard that many mistakes ever being made

11  as far as any stabbings.

12  Q    Prior to that time had you heard that you were in the

13  hat?

14  A    That's pretty easy to tell.

15          MR. REED:  Nonresponsive.

16          THE WITNESS:  Yes, I knew I was in the hat.

17  BY MR. EMMICK:

18  Q    How did you know you were in the hat?

19  A    I had gotten stabbed already.  I had been hearing it

20  for five years, the whole time I was in Soledad.

21  Q    Have you ever heard the phrase "being rocked to sleep"?

22  A    Yes, sir.

23  Q    What does that mean?

24  A    I believe it means when somebody tells you something to

25  get your confidence or make you feel better about a subject

37

1    or a position.

2    Q    After Ronnie Slocum arrived, did Gibson or Hicklin

3    spend time with him?

4    A    I didn't notice that.

5    Q    Let me direct your attention to March 13, 1990, the day

6    you were stabbed.  Tell us how the day started.

7    A    I believe 7:30 was work call.  I had a dentist

8    appointment, and the dentist cancelled or something.  I went

9    to the dentist, and nobody was there, so I was about ten

10   minutes late to go to work, but I was on my way to work at

11   probably -- at the end of work call.

12   Q    Where did you walk to?

13   A    There is a corridor that goes from the main building

14   past the laundry out to the maintenance in that area, and I

15   was in that area right there, the corridor.

16   Q    Can you describe what this corridor looks like and how

17   many people are around during 7:30 in the morning, say?

18   A    I would say half the prison, probably 700 people, go

19   through that corridor in the morning going to work, and the

20   corridor is probably 15 to 20 feet wide, probably a football

21   field long, something like that.

22   Q    How well lit is it?

23   A    It's dark.  They probably have got a light every

24   30 feet or so.

25   Q    You mentioned earlier that you weren't having any beefs

1    with Mr. Gibson.

2            Were you having any beefs with Mr. Hicklin at all?

3    A    I didn't think so, no.

4    Q    As you were walking down the work corridor, did you see

5    Mr. Gibson?

6    A    Yes, I saw Chris.

7    Q    Tell us what happened.

8    A    He was ahead of me facing me.  He started walking

9    towards me doing the homeboy thing.  "How are you doing?

10   How's your old lady?" that type of thing.

11   Q    When he asked you "How's your old lady?" did you

12   associate that at all with what happened at Folsom?

13   A    No.

14   Q    What happened after he was social with you?

15   A    He grabbed me by my jacket.  I was wearing a jacket for

16   work.  He grabbed me by my jacket, and somebody jumped on my

17   back and started stabbing me.

18   Q    He grabbed you where on your jacket?

19   A    I'm not sure.  I just know he grabbed the front of my

20   jacket.

21   Q    When you said someone stabbed you, tell us what you

22   felt or saw.

23   A    Well, when somebody stabs you, it's like getting

24   punched as hard as possible with a fist.  It feels like you

25   are getting punched.

39

1   Q    Did you know you were getting stabbed?

2   A    No, except about the second time, I couldn't breathe.

3  I knew I was in trouble.

4   Q    What were you doing at the time?

5   A    Fighting.

6   Q    Fighting who?

7   A    Chris.

8   Q    What was Chris doing?

9   A    For some reason, he was holding onto me.

10   Q    At the time, could you see who was stabbing you in the

11  back?

12   A    Not until the end.

13   Q    How long did the struggle occur?

14   A    It seemed like forever, but it probably 20 seconds, 30

15  seconds.  It seemed like a long time, but it was probably

16  less than a minute.

17   Q    And you are struggling primarily with Gibson?

18   A    I'm struggling -- honestly, I was just trying to stay

19  alive.

20   Q    At some point, did you turn and see Steve Hicklin?

21   A    Yes.

22   Q    Tell us what happened in that regard.

23   A    I guess they were done or whatever.  They stopped.

24  Everything stopped.  I don't know why they stopped, but they

25  stopped stabbing me.  I turned around, and Hicklin was

1   crouched down with a knife in his hands.

2   Q    Tell us what the knife looked like.

3   A    A knife.  Honestly, it was big enough for me to see the

4   knife.  From there, I can't tell you.

5   Q    A metal knife?

6   A    I don't remember.

7   Q    Did you see whether Mr. Gibson had a knife?

8   A    No, I didn't see a knife.

9   Q    What was Mr. Hicklin doing?  You said he was crouched

10  down.

11  A    He was crouched down.  It was wierd.  He was like on

12  one knee.  He looked like he was the one that got stabbed,

13  but he was down on one knee with the knife in his hands.

14  Q    Then what happened?

15  A    I think they thought maybe I was done, and that's why

16  they stopped.  I got out of there.  I went back up the

17  corridor as fast as I could.

18  Q    What were the injuries that you had, the stab wounds?

19  A    Three in the back, two in the front.

20  Q    The two in the front -- Mr. Hicklin was at your back.

21  A    I still have no clue how that happened.  I didn't see

22  Chris with a knife.  I was cut in the front from the right

23  side up here at the top, and my back was tore up.  Hicklin

24  stabbed me on the top right side, had hit my lung on the

25  left side, and they just missed my spine down the middle.

1   Q    How serious were the injuries?

2   A    Pretty serious.

3   Q    Where were you treated?

4   A    Back to the Trauma Unit.  This was at Lompoc, and I was

5   in whatever the Trauma Unit is for the city.

6   Q    And then?

7   A    Okay, I was there for I think ten days.  Then I came

8   back to Lompoc Hospital.  Then my lungs went down again.

9   They deflated, and I had to go back out to surgery again.

10  Q    You mentioned earlier when you were stabbed by Daryl

11  Warner you didn't say to the guards what had happened in

12  connection with the stabbing.

13           Did you say to the guards or the FBI what happened

14  this time?

15  A    Oh, yeah.

16  Q    Tell us about that.

17  A    I am in the hospital about two or three days.  I am not

18  sure exactly, two or three days, and an SIS investigator or

19  somebody came and talked to me.  At that time, I was angry

20  enough to cooperate.

21  Q    So why were you willing to cooperate this time when you

22  didn't cooperate when Daryl --

23  A    Because the guy stabbed me in the back.  If the guy

24  didn't stab me in the back, I probably never would have

25  testified.

```
1    Q    Did you have a second interview with the FBI?

2    A    I probably had -- I honestly don't know how many

3    interviews I had.  They interviewed the heck out of me.

4    Q    Did you testify at the '92 trial of Gibson and Hicklin?

5    A    Yes.

6    Q    Did the government promise you anything in connection

7    with your testimony at that time?

8    A    At some time, they promised me to write a letter to the

9    Board.

10   Q    The Board being the Parole Board?

11   A    The Parole Board.  I'm still waiting for something to

12   happen on that.

13   Q    At some point were you paroled?

14   A    I was paroled in 1997.

15   Q    And after you were paroled, did you have some parole

16   violations?

17   A    I am on a parole violation right now.

18   Q    So you are back in custody now?

19   A    Yes.

20   Q    The parole violation was connected to narcotics?

21   A    Yes, sir.

22   Q    When you first learned that you were going to be asked

23   to testify in this case, what was your reaction?

24   A    I really didn't want to do it.

25   Q    Why is that?
```

```
1   A    I figured I have done it one time.  That's enough, but
2   the more you think about it, the more you go, you know what,
3   he shouldn't have stabbed me in the back.
4   Q    You are in on a parole violation now.
5             When are you going to be released from this parole
6   violation?
7   A    Two months.
8             MR. EMMICK:  No further questions.
9             THE COURT:  Mr. Fleming, or, Mr. Steward, do you
10  have any questions on cross-examination on behalf of Mr.
11  Mills?
12            MR. STEWARD:  No questions.
13            THE COURT:  Mr. White, or, Mr. Harris?
14            MR. WHITE:  No questions.
15            THE COURT:  Mr. Rosen, or, Mr. Calabria, on behalf
16  of Mr. Hevle?
17            MR. CALABRIA:  No questions.
18            THE COURT:  Mr. Reed, on behalf of Mr. Gibson?
19            MR. CALABRIA:  No questions.
20            THE COURT:  I'm going to excuse you for just a
21  moment.  You are admonished not to discuss this matter
22  amongst yourselves nor to form or express a opinion.
23            I am going to place you on call, Mr. Barnett.  I
24  doubt you will be returning to court but just in case.
25            (Jury not present.)
```

1          THE COURT:  We will go back on the record in just

2     a moment.  We will take a brief recess.  Mr. Hevle needs to

3     use the restroom.  We will reconvene in five or ten minutes.

4          (Recess.)

5          (Jury present.)

6          THE COURT:  The jury is present, the alternates,

7     all counsel, the defendants, and the government.

8          Mr. Emmick, on behalf of the government, your next

9     witness, please.

10          MR. EMMICK:  The government calls Michael Manby.

11          THE COURT:  Thank you very much.

12          Sir, if you would come forward, please, between

13     the double doors and if you would be kind enough to raise

14     your right hand.  Lisa is the clerk, and she will

15     administrator the oath to you.

16       MICHAEL WILLIAM MANBY, PLAINTIFF'S WITNESS, SWORN

17          THE COURT:  Thank you.  If you would take the

18     stand, please.

19          THE COURT:  Would you state your full name for the

20     jury, please, and spell your last name.

21          THE WITNESS:  Michael William Manby, M-a-n-b-y.

22          THE COURT:  Thank you.

23          This will be Mr. Emmick on direct examination for

24     the government.

25          MR. EMMICK:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. EMMICK:

Q    Mr. Manby, are you an inmate now?

A    No, I'm not.

Q    Were you previously an inmate at the United States Penitentiary at Lompoc?

A    Yes.

Q    Were you at Lompoc in August 1989 when Arva Lee, Baby Ray, was murdered?

A    Yes.

Q    Did you testify at the 1994 trial of Glen Filkins for the murder of Arva Lee Ray?

A    I did.

Q    Were you at Lompoc in March 1990, the day when Jeffrey Monster Barnett was stabbed?

A    Yes.

Q    Did you testify at the 1992 trial of Chris Gibson and Steve Hicklin for the attempted murder of Jeffrey Barnett?

A    Yes.

Q    Before we get into the details of what you know about those two crimes, let me ask you some questions about your experience in the prison system.

         You were in prison, and would you walk us through your felony convictions if you would, please?

A    Are you talking about the federal prison?

1    Q     Let's start with the state.

2    A     '70 to '71, robbery, Soledad.   '76 to 77, grand theft,

3    Sierra.

4    Q     What does Sierra mean?

5    A     It's training for going to camp, fire camp.   I went

6    through the training.   I went to Crestline to a fire camp.

7    From there, I walked off.   Then in '78, I picked up a bank

8    robbery.   I went to Terminal Island and resided there for

9    court.   Then I went to McNeal Island for a 15-year sentence.

10   Q     Where is McNeal Island?

11   A     In Washington state.

12   Q     You said you had a sentence of 15 years.   Is that what

13   you said?

14   A     Fifteen years, correct.   From the closing down of

15   McNeal Island, the majority of us went to Lompoc.

16   Q     When did you go to Lompoc?

17   A     Approximately '79 or '80.

18   Q     How long were you at Lompoc from '79?

19   A     Until '85.

20   Q     What happened in '85?

21   A     I paroled.

22   Q     What happened in '86?

23   A     In '86, I was violated, a parole violation, and was

24   sent back to Lompoc until '91.

25   Q     So you were then in Lompoc from '86 to '91 as well?

47

1    A    Yes.

2    Q    In '91, you were released?

3    A    I was released from Lompoc around February or March,

4    and in May of '91, I picked up another bank robbery.

5    Q    Were you convicted of that bank robbery?

6    A    Yes.

7    Q    Did you receive a sentence in connection with that?

8    A    Yes.

9    Q    What was the length of that sentence initially?

10   A    Seventeen years.

11   Q    Was it later reduced because of cooperation with the

12   government?

13   A    Yes.

14   Q    What was it reduced to?

15   A    Eight or nine years with a Rule 35 I believe it was.

16   Q    As a result of that reduction, when were you released?

17   A    1999, December 2.

18   Q    Let's go back and talk about your time in the

19   California state system.

20        While you were at I think it was Soledad you said --

21   A    Yes.

22   Q    -- did you come to know an organization called the

23   Aryan Brotherhood?

24   A    Yes.

25   Q    Was there an AB presence at Soledad?

48

```
1    A    There was an AB presence on my ride to and in Soledad.
2    Q    Tell us what AB members were at Soledad.
3    A    Alan, Woods, Dogtail, Bobby.  I can't remember his last
4    name.  There was a faction that was growing.
5    Q    You mentioned that you met someone on the bus who was
6    AB.
7    A    Yes.  His name is Blue.
8    Q    Did you spend time interacting with AB members and
9    associates while you were there at Soledad?
10   A    Yes.
11   Q    How much interaction did you have with them?
12   A    Every day.
13   Q    Would you describe what kind of things you did?
14   A    Rec, horsehoes, recreation yard, iron pile, theater,
15   chow hall.
16   Q    Could you tell us what the Aryan Brotherhood was at the
17   time?
18   A    A white faction, just a white -- Aryan Brotherhood,
19   just like I said, Aryan for white, and it's a brotherhood.
20   Q    Were you ever an Aryan Brotherwood member yourself?
21   A    No.
22   Q    Did you want to be an Aryan Brotherwood member?
23   A    No.
24   Q    Why not?
25   A    I'm just an independent.  I do my own time, try to.
```

1    Q    Why did you want to hang out with them if you didn't

2    want to join them?

3    A    I felt familiar with them.

4    Q    What do you mean?

5    A    I just felt like they were my people.  At that time, I

6    wasn't going to hang around the BTF or whatever.  I am going

7    to hang around with a white faction.

8    Q    So you were friendly with the AB members and

9    associates?

10   A    Yes, very.

11   Q    They accepted you?

12   A    Yes.

13   Q    Would you regard yourself as an AB associate?

14   A    An AB associate?

15   Q    Yes.

16   A    An acquaintance?

17   Q    Yes.

18   A    Yes.

19   Q    You mentioned that at some point you went to McNeal

20   Island up in Washington state; is that right?

21   A    Yes.

22   Q    Was there an AB presence there?

23   A    Yes.

24   Q    Did you interact with the AB members there at McNeal

25   Island?

1    A    Yes.

2    Q    Who was up at McNeal Island if you remember?

3    A    Mr. Mills at that time, Sugar Bear.

4    Q    Who was Sugar Bear?

5    A    I can't remember his real name.  I just knew him by

6    Sugar Bear.  A Von -- I can't remember his last name either.

7    I mean, this was probably, what, 16 years ago.

8    Q    What year was it?

9    A    I'm sorry.  It was longer than that.  It was 26 years

10   ago I believe.

11   Q    What year was it that you were at McNeal Island?

12   A    '79, '80, prior to Lompoc.

13   Q    Who else in the AB was there if you remember?  You

14   mentioned Mr. Mills.

15   A    Mr. Mills, Sugar Bear.  I'm reaching hard, too.  I just

16   can't put them all together right now.

17   Q    As you did in Soledad, did you tend to hang out with

18   the AB?

19   A    Correct, whites and ABs, white regulars.  White

20   regulars are the guys that the ABs accept to converse with.

21   I should reflect that.

22   Q    At some point, did you transfer from McNeal Island to

23   Lompoc?

24   A    Yes.

25   Q    What year was that?

1    A    I want to say '80.

2    Q    Was there an AB presence at Lompoc in 1980?

3    A    It was growing.  Yes.

4    Q    What AB members do you remember being at Lompoc in

5    1980?

6    A    Cowboy.  I can't remember his real name.  I had his

7    name this morning.  I know Ronnie had driven up.

8    Q    Ronnie had driven up?  What do you mean by that?

9    A    Slo.  He had arrived there and then got transferred

10   out.

11   Q    When you say "Slo," is that Ronnie Slocum?

12   A    Ronnie Slocum.  I am trying to think of the gentleman

13   that died at Lewisburg.  I just can't grab their names right

14   now.

15   Q    Would you describe for us your interaction with the

16   Aryan Brotherhood at Lompoc during that first period of time

17   you were there?

18   A    Again, when you don't have too many ABs on the line --

19   you might have two or three -- they do need the help of the

20   regulars that they hang around with to keep them strong.

21   Q    Now, when you say "the regulars," do you mean what we

22   have here come to refer to as AB associates?

23   A    I guess you would say associates or acquaintances.

24   Q    People who associate with the members?

25   A    Right.

52

1    Q    Do you remember an AB member by the name of Charlie Dog

2    Kell (phonetic)?

3    A    Yes.

4    Q    Was he there as well?

5    A    No.

6    Q    He was not there at this time.

7         Was he at some point at Lompoc?

8    A    Not that I recall.

9    Q    But he was an AB member that you knew of?

10   A    Correct.

11   Q    From the time that you spent in the federal system with

12   AB members there, could you tell us how you would compare

13   that with the ABs that you saw in the state system?

14   A    A lot of your ABs from the state were coming to the

15   federal system, so really there wasn't much difference, but

16   I would say that the ones in the state were more of a cowboy

17   caliber.

18   Q    And did you come to be familiar with AB policies?

19   A    Yes.

20   Q    Would you tell us about the AB policies that you are

21   familiar with?

22   A    For one thing, homosexuality on an ongoing basis is a

23   no, no.  It's not to be tolerated.

24   Q    Were there any policies about drugs?

25   A    Drugs, all members get their proper issue.

1   Q    What happens if members don't share?

2   A    There is a lot of talk, and if the individual does not

3   succumb to what they are talking about, then he is in very

4   big trouble.

5   Q    What happens if an AB member has what you might call a

6   long-term homosexual relationship?

7   A    You could possibly be put in the hat.

8   Q    What does it mean to be put in the hat?

9   A    That your life will be taken.   A contract is out on

10  you.

11  Q    What kinds of things do what you referred to as regs or

12  associates -- what kinds of things would they do for the AB?

13  A    It's the same thing with drugs, give them their issue,

14  and in return, the Brand, AB, would kick them down when they

15  hit.

16  Q    What do you mean "kick them down"?

17  A    Kick them down some drugs or whatever, do favors for

18  them.

19  Q    What kinds of favors?

20  A    Just the drug thing and -- maybe help their wife on the

21  street.   I'm not sure.

22  Q    Let me direct your attention then to the events

23  surrounding the murder of Arva Lee Ray.

24       You were in Lompoc in August of '89 when Arva Lee

25  Ray was murdered?

```
1    A     Yes.

2    Q     What unit were you in if you remember?

3    A     I was in E Unit.

4    Q     Is that part of the open population, part of the main

5    line?

6    A     Yes.

7    Q     In 1989, what AB members were there at Lompoc?

8    A     Eddie Hevle, Steve Hicklin.  There was one or two on

9    their way, but on the line, I believe it was Eddie Hevle and

10   -- oh, Phil Myers.

11   Q     What about Chris Anderson?

12   A     And Chris Anderson.

13   Q     Did you know someone named Filkins?

14   A     Glen Filkins, correct.

15   Q     Can you tell us how you came to know Glen Filkins?

16   A     From working in the dish room with him.

17   Q     Focusing on this 1989 period and the AB members and

18   associates, how much interaction did you have with those AB

19   members and associates during that time period?

20   A     On the yard --

21             MR. CALABRIA:  Objection, vague as to the period

22   of time.  He is asking a very vague question.

23             THE COURT:  I thought this was in 1989.

24             Do you want it narrowed down more?

25             MR. CALABRIA:  Of course.
```

55

```
 1    BY MR. EMMICK:
 2    Q    As best you can, identify what time period you are
 3    talking about.  I am asking you what the nature of your
 4    interaction was with these members of the AB.
 5              THE COURT:  For 1989?
 6              MR. EMMICK:  1989.
 7              THE COURT:  Overruled.
 8              If we get into the specific act, Counsel, I'll
 9    sustain the objection.
10    BY MR. EMMICK:
11    Q    Do you understand the question?
12    A    Yes, my interaction.
13    Q    What did you do with the various AB members?
14    A    We bullshitted a lot, talked and walked, worked out at
15    the same time period.
16    Q    You worked with them in the dish room area?
17    A    In the dish room area.  I was even a cook and supplied
18    them with extra food.
19              MR. CALABRIA:  Objection.  That's leading.
20              THE COURT:  Overruled.
21    BY MR. EMMICK:
22    Q    Who did you work with in the dish room area?
23    A    Speedy West, Glen Filkins, Baby Ray.  I believe Eddie
24    worked there before he went to industry.  I can't quite
25    remember, but I do recall something on that.
```

56

| | | |
|---|---|---|
| 1 | Q | When you say Eddie, you mean Eddie Hevle? |
| 2 | A | Right. |
| 3 | Q | Let's focus on some individuals. |
| 4 | | You knew Arva Lee Ray? |
| 5 | A | Yes. |
| 6 | Q | How did you know Arva Lee Ray? |
| 7 | A | I first met him in '79 or '80 at Lompoc. |
| 8 | Q | Was he a member of the AB? |
| 9 | A | Not at that time, no. |
| 10 | Q | Was he a member when you were with him at Lompoc? |
| 11 | A | Yes. |
| 12 | Q | Did you know Thomas Buzz Miller? |
| 13 | A | Yes. |
| 14 | Q | Was he a member of the AB? |
| 15 | A | No. |
| 16 | Q | Was he what you might call a regular or an associate? |
| 17 | A | Yes. |
| 18 | Q | How did you know Thomas Buzz Miller? |
| 19 | A | He was a famous tatoo artist at Lompoc. |
| 20 | Q | He was there in 1989? |
| 21 | A | Yes. |
| 22 | Q | Before the murder of Arva Lee Ray on August 9, 1989, |
| 23 | | did you have discussions with AB members or associates about |
| 24 | | Ray and the problems they were having with him? |
| 25 | A | Yes. |

57

```
 1    Q     First, let's bracket the time period when these
 2    conversations took place, and then we will walk through
 3    them.
 4              What time period in general did these
 5    conversations take place?
 6    A     What time period are you asking --
 7    Q     How long a period before the actual murder took place?
 8    A     I would say anywhere from -- up to five days, two to
 9    five days.
10    Q     What kind of concerns were expressed about Ray?
11    A     His not giving the right percent on the drugs and his
12    homosexual activities with a homosexual.
13    Q     Who was it that was expressing these concerns about
14    Ray?
15    A     Phil Myers and Eddie Hevle.
16    Q     Did they express those concerns more than once?
17    A     A couple of times to my knowledge that I can recall.
18    Q     When you said they were having concerns about Ray and
19    drugs, what was the nature of the concerns?  What were they
20    saying about Arva Lee Ray and drugs?
21    A     That he had better get his shit together, or he would
22    be in big trouble.
23    Q     Who was saying that?
24    A     Myers and Hevle.
25    Q     Where did that conversation take place?
```

58

1   A     Outside on the yard.

2   Q     It was you, Myers, Hevle, and who else?

3   A     That's about all I can recall.

4   Q     Did they say anything about what might happen?

5   A     That he might be in the hat.

6   Q     Now, you were having those discussions with Myers and

7   with Eddie Hevle.

8         Did you have any discussions like that with

9   Filkins?

10  A     None.

11  Q     Did you have any discussions like that with Buzz

12  Miller?

13  A     No, not at that time.

14  Q     Now, at some point, you learned that Arva Lee Ray had

15  been killed?

16  A     Yes.

17  Q     Sometime after he was killed, did you have further

18  discussions with Eddie Hevle and Myers, something about a

19  necktie?

20  A     Yes.

21        Can I explain?

22  Q     Yes.  That would be my next question.

23        Tell us what the conversations were.

24  A     Apparently when they came out of the hole after

25  investigations, I was told that they have a necktie man, and

1    the necktie man can make a necktie big enough for me.

2    Q    Let's back off a little bit.

3         Who was in this conversation?

4    A    Hevle and Myers.

5    Q    And you?

6    A    And me.

7    Q    Where did it take place?

8    A    On the yard.

9    Q    How long after Arva Lee Ray was murdered did this take

10   place?

11   A    Probably a month or five or six weeks, whatever it

12   could have been for them to be exonerated.

13   Q    The three of you were having a discussion.  Tell us

14   what that discussion involved.  What was said?

15   A    That they have a necktie man and that the necktie man

16   can make a necktie big enough for me.

17   Q    Did they say anything about Baby Ray?

18   A    At that point?

19   Q    Yes.

20   A    I don't recall.

21   Q    Were there other discussions of that sort that happened

22   with Mr. Hevle and Mr. Myers?

23   A    At that time, I don't recall.

24   Q    How about at any other time?

25   A    Not that I can think of.

```
 1    Q     After the murder of Ray, was there any discussion with
 2    AB members or associates about who had ordered the murder of
 3    Arva Lee Ray?
 4    A     Yes.
 5    Q     Tell us again -- we'll set the time, who was there, and
 6    then we will get to the discussion.
 7               What was the time period?  When was this?
 8    A     In August -- July/August '90.
 9    Q     Who was that with?
10    A     Glen Filkins.
11    Q     How did you come to be with Glen Filkins?
12    A     I got in trouble, went to the hole, and Filkins pulled
13    me into his cell to reside with him for the next 25 to 30
14    days.
15    Q     When you use the phrase "pulled me into his cell," what
16    does that mean?
17    A     I was celling with him.
18    Q     So the two of you were in the same cell together in the
19    hole?
20    A     Correct.
21    Q     How long were you in the hole with Filkins?
22    A     Mid July to mid August, late August.
23    Q     Now, at that time, were Gibson and Hicklin also in the
24    hole?
25    A     Yes.
```

1    Q    Were they in a different cell?

2    A    Yes.

3    Q    Did you have opportunities to talk with them as well?

4    A    Yes.

5    Q    Why don't we just focus on Filkins for the time being,

6    and then we will circle back to Gibson and Hicklin in a

7    moment.

8         With respect to Mr. Filkins, did he say anything

9    about the Baby Ray murder?

10   A    Yes.

11   Q    Can you tell us how many times approximately he spoke

12   about the Baby Ray murder?

13   A    Four to six times.

14   Q    Did these discussions take place in the cell, or were

15   they on the rec yard?

16   A    Both.

17   Q    Focusing just on what Mr. Filkins said, tell us what he

18   said about the Baby Ray murder.

19   A    He said it's something that had to be done, that Baby

20   Ray's name was in the hat, and he was instructed to take up

21   the contract.

22   Q    Did he say who he was instructed by?

23   A    Mr. Myers.

24   Q    Did he say whether anybody else was involved in these

25   instructions?

62

1    A    Eddie Hevle.

2    Q    Did he say -- give us more detail about that.  What did

3    he say about Hevle, and what did he say about Myers, and

4    what they were instructing?

5    A    That the boy had done bad.  He's no good.  He is a

6    fuckin' punk.  His time is up.  That's not the exact words,

7    but --

8    Q    Did Mr. Filkins say why he had killed Baby Ray?

9    A    To make his bones.

10   Q    What does it to make your bones?

11   A    To make your bones is to be accepted by the Brand, ABs.

12   Your name is put out for a vote.

13   Q    Did he say anything about anyone else becoming involved

14   in the murder of Baby Ray?

15   A    Yes.

16   Q    What did he say?

17   A    He said Buzz Miller was his point.

18   Q    What does it mean to be point?

19   A    Point to where you are on lookout for guards so they

20   don't walk up on you.

21   Q    Did he say anything about the experience of killing

22   Baby Ray?

23   A    It felt good, the power, the strength, the

24   strangulation of somebody.  It's like you absorb it.  You

25   absorb their life.

63

| | | |
|---|---|---|
| 1 | Q | Did he say anything about whether he liked Baby Ray? |
| 2 | A | He liked Baby Ray a lot -- |
| 3 | Q | If he liked Baby Ray, why did he kill him? |
| 4 | A | -- prior to all the bullshit. |
| 5 | Q | If he liked Baby Ray, why did he kill him? |
| 6 | A | Because he wanted to be AB. |
| 7 | Q | Now, you mentioned that you were in the hole with |
| 8 | | Filkins in July and August. |
| 9 | | Did anything happen on the anniversary of the |
| 10 | | murder of Baby Ray? |
| 11 | A | Yes.  We celebrated. |
| 12 | Q | What do you mean? |
| 13 | A | We drank wine and smoked marijuana. |
| 14 | Q | Anything else that you can recall that Filkins said |
| 15 | | about the murder of Baby Ray? |
| 16 | A | Right at this time, no. |
| 17 | Q | Now, you have already indicated that you were going to |
| 18 | | rec with Gibson and Hicklin.  Before we turn to any |
| 19 | | discussions with them, let's go back in time and talk about |
| 20 | | the attempted murder of Jeffrey Lee Barnett. |
| 21 | | Do you know a man named Monster Barnett? |
| 22 | A | Yes. |
| 23 | Q | How did you know Monster Barnett? |
| 24 | A | From the main line talking to him. |
| 25 | Q | And you knew Hicklin? |

*SHARON SEFFENS, U.S. COURT REPORTER*

64

```
 1    A    I knew Hicklin.
 2    Q    Did you know him well?
 3    A    I knew him pretty well.
 4    Q    Friendly?
 5    A    Friendly.
 6    Q    What about Mr. Gibson?
 7    A    I knew Mr. Gibson but wasn't quite as friendly.
 8    Q    You mentioned earlier that you knew someone named Chris
 9  Anderson.
10    A    Yes.
11    Q    Let's start with your discussions -- any discussions
12  you might have had with Chris Anderson about Monster
13  Barnett.
14         Did you have discussions with Chris Anderson about
15  Monster Barnett?
16    A    Yes.
17    Q    When and where?
18    A    Every day, in the hallway, on the yard.
19         THE COURT:  I think we need further foundation,
20  don't we, concerning Mr. Anderson?  I don't know that there
21  is any testimony or foundation yet as to who he was.
22         MR. EMMICK:  We will lay more.
23  BY MR. EMMICK:
24    Q    Chris Anderson, was he a member of the AB?
25    A    Yes.
```

65

```
 1   Q    Had he been a member of the AB from the time that you

 2   got there at Lompoc?

 3   A    Yes.

 4   Q    What was the nature of your relationship with

 5   Mr. Anderson?

 6   A    Pretty tight.

 7   Q    Now, you were about to mention some discussions you had

 8   with Chris Anderson about Monster Barnett.

 9   A    That Ronnie was driving up, coming to the main line,

10   and that Barnett had to be taken out prior to Ronnie's

11   arrival, Ronnie Slocum.

12   Q    Now, did you also have discussions with Hicklin on the

13   subject?

14   A    Yes.

15   Q    Tell us what discussions you had with Hicklin about the

16   subject of Barnett having to be taken out or Slocum coming

17   to prison.

18   A    Monster's name is in the hat and that it was up to him,

19   Steve Hicklin, to get rid of Monster, get him off the line

20   prior to Ronnie's arrival.

21   Q    How many discussions did you have with Hicklin about

22   that?

23   A    It was like a worry-wart for him, try to figure out how

24   to do it, when to do it, because Monster was a pretty big

25   boy, and it was going to take more than one person.
```

66

1    Q    Now, let's go back to Anderson for just a moment.

2    You had discussions with Anderson about that subject.

3             Did he say whether he was asked to do the hit?

4    A    No, he was not.

5    Q    Was there a discussion with Mr. Anderson about poison?

6    A    Yes.

7    Q    Tell us what the discussion with Mr. Anderson about

8    poison in the context of Monster Barnett was.

9    A    Anderson, not himself, would do it with a guy named

10   Shorty Ruff out of the C Unit who resided there with

11   Monster, and it had to do with Stricknine (phonetic) or rat

12   poisoning.

13   Q    Was Mr. Ruff an AB member?

14   A    No.

15            MR. REED:  Objection, hearsay.

16            THE COURT:  Because Shorty Ruff hasn't been

17   established foundationally as an associate or member?

18            MR. REED:  Yes.

19            THE COURT:  Sustained.

20   BY MR. EMMICK:

21   Q    All of these discussions that you are describing, these

22   are discussions with Chris Anderson?

23   A    Correct.

24   Q    Chris Anderson is a member of the AB?

25   A    Correct.

```
 1              MR. REED:  It's still hearsay.

 2              THE COURT:  Overruled.

 3   BY MR. EMMICK:

 4   Q    You were starting to talk about --

 5              THE COURT:  Let me be absolutely certain about

 6   that ruling.

 7              You're talking about your conversation with

 8   Anderson, and he is mentioning Shorty Ruff during the

 9   conversation?

10              THE WITNESS:  Correct.

11              THE COURT:  Overruled.

12   BY MR. EMMICK:

13   Q    You started to talk about Stricknine and Shorty Ruff.

14              What was the role of Shorty Ruff as Chris Anderson

15   described it?

16   A    To put the poison in the coffee.

17   Q    How was the poison to be brought into the prison?

18   A    Through the hobby shop or a visit and then brought into

19   the hobby shop.

20   Q    How was the poison going to be brought into the hobby

21   shop and by who according to Chris Anderson?

22   A    Shorty Ruff.

23   Q    What did Chris Anderson tell you about what had

24   happened with this plan?

25   A    The plan had failed.  The poison apparently was put in
```

68

```
 1   the coffee, and I seen the individual, Monster, the next
 2   day --
 3   Q    The question is what did Chris Anderson tell you?
 4   A    That Shorty Ruff had put the poison in the coffee.
 5   Q    Let's talk again about Mr. Hicklin's discussions with
 6   you about Monster Barnett.  Now, you said that there were a
 7   lot of discussions.
 8        What was the time period during which these
 9   discussions took place?
10   A    8 to 11 weeks prior to his stabbing.
11   Q    Now, you mentioned that Hicklin said that Monster was
12   in the hat.
13        Did he say anything about why Monster was in the
14   hat?
15   A    Something that happened in the state system.
16   Q    Now, you mentioned that he talked about Slocum's
17   impending arrival.  How did that tie in?
18   A    He had gotten word that Slo, Ronnie Slocum, wanted him
19   off the line prior to his arrival.
20   Q    Why would that be such a big deal?
21   A    That way he wouldn't be under investigation.
22   Q    Who is the "he"?
23   A    Ronnie Slocum.
24   Q    Did you have discussions with Mr. Hicklin about how
25   Monster might be killed?
```

1   A     Yes.

2   Q     Again, tell us approximately when and where these

3   discussions took place, and if there was more than one, tell

4   us that as well.

5   A     Mostly on the yard, maybe even at the table in the chow

6   hall if we ate together or in the hallway, but I believe it

7   was mostly in the yard after we worked out and stuff.

8   Q     Were these discussions just between you and Hicklin, or

9   were others involved?

10  A     Sometimes Chris Gibson would be there.

11  Q     What was discussed about how Monster Barnett might be

12  killed?

13  A     One was the poisoning which didn't work.  Others were

14  that it would take more than one, blind spots.

15  Q     It would take more than one what?

16  A     Person to take him out.

17  Q     Why would that be?

18  A     Because he is a very big boy.

19  Q     When you said it would take more than one, was there

20  any discussion about who would play what role?

21  A     I even offered my assistance jokingly.

22  Q     What would be done if there were two people involved?

23  A     One from the back, one from the front.

24  Q     You just mentioned that you jokingly said that you

25  offered your assistance.

1    A    Yes.

2    Q    Why was it a joke?

3    A    I was hoping it was a joke.

4    Q    What was Hicklin's reaction?

5    A    No.  You're going home pretty soon.

6    Q    What did he mean by that?

7    A    That I was going home pretty soon, so he didn't want me

8    involved.

9    Q    When were you about to be paroled?

10   A    In about 11 to 12 months, maybe 14 to 15 months, right

11   around there.

12   Q    Did he say who he was going to do with it with?

13   A    Chris Gibson.  He said, no, me and Chris will handle

14   it.

15   Q    Did he talk with you at all about places that the

16   killing might take place?

17   A    Yes, the blind spot coming out of the J and K Units

18   down at the end of the hall.  You can turn into the hallway

19   and go towards the laundry.  There is a blind spot right

20   there before the metal detectors.

21   Q    Blind shot in what respect?

22   A    Blind spot where the officers can't see you right away,

23   and at work hall, you have hundreds of inmates going to

24   work.

25   Q    Why does that make a good place to do a stabbing?

```
 1   A      You might get away with it.

 2   Q      At some point, did Ronnie Slocum arrive?

 3   A      Yes, he did.

 4   Q      How long before the actual attempted murder of Monster

 5   Barnett did Ron Slocum arrive as best you can recall?

 6   A      Two to five weeks.

 7   Q      Now, did you have discussions with him about Monster

 8   Barnett?

 9   A      He was a little upset, yes.

10   Q      Tell us where these discussions took place and who else

11   was there.

12   A      Again, yard, hobby shop.

13   Q      More than one discussion it sounds like.

14   A      A couple.

15   Q      What did he say about Monster Barnett?

16   A      He said the guy should have been taken care of before

17   he got there, that he was very disappointed.

18   Q      Should have been taken care of?

19   A      Should have been taken out.

20   Q      Should have been taken out where?  At Lompoc you mean?

21   A      Yes.

22   Q      He said he was disappointed.

23          What do you mean he was disappointed?

24   A      He was a little upset that the guy was still on the

25   line when he got there.
```

72

1   Q    Did he say anything about any prior stabbings in the

2   state system of Monster?

3   A    Yeah.  He mentioned that he had been hit in Folsom or

4   San Quentin.  I'm not sure which one.

5   Q    What did he say about that?

6   A    He didn't really say too much.  I didn't ask.

7   Q    Let's just take a step back.

8        Why wouldn't you ask?

9   A    Because it was none of my business.

10  Q    Did Ronnie Slocum indicate why he was unhappy that

11  Monster hadn't already been taken out?

12  A    Because it jeopardized his Disneyland time on the main

13  line.

14  Q    What do you mean by Disneyland time?

15  A    Drugs and being able to walk the yard, smell the fresh

16  air, stuff like that.

17  Q    Why would that jeopardize his Disneyland time?

18  A    Because of his affiliation or his AB.

19  Q    Spell that out.  Why would his being a member of the AB

20  jeopardize his time on the yard?

21  A    Because if it's an AB hit, they generally pull all the

22  ABs in or whatever for investigation.

23  Q    Now, as time went along, did you continue to have

24  discussions with Mr. Hicklin and Mr. Gibson about Monster?

25  A    Yes.

73

```
 1    Q    Tell us what the two of them were saying about Monster
 2    as time was going along.
 3    A    Prior to the hit?
 4    Q    Yes.
 5    A    That it had to be done.
 6    Q    At some point, did you decide to warn someone about the
 7    hit?
 8    A    Yes, a young kid named Delbert.
 9    Q    And why would you warn Delbert about it?
10    A    Because Delbert was hanging around with him too much.
11    Q    Hanging around with who?
12    A    Monster.
13    Q    Why would that be a problem?
14    A    I didn't want him to get hurt.
15    Q    Did the AB or any members of the AB find out you had
16    warned Delbert?
17    A    Somebody chastised me, but I can't recall who it was at
18    this time.
19    Q    Let's turn our attention to March 13, 1990, the actual
20    day that Barnett was stabbed.
21         Do you have that day in mind?
22    A    Yes.
23    Q    Were you with Ronnie Slocum that day?
24    A    Yes.
25    Q    What time of day was it?
```

74

```
1    A    Between 7:30 and 8:00 in the morning.

2    Q    Where were you?

3    A    I was on the yard at the iron pile.

4    Q    Tell us what Ronnie said and did at that time.

5    A    Ronnie came out all aglow.

6    Q    "All aglow," what does that mean?

7    A    He was high.  We were on the iron pile out there for

8    like 10 or 15 minutes max, and then all of a sudden the

9    duces went off, and Ronnie started doing the monster mash,

10   which is a dance.

11   Q    Did you recognize it to be the monster mash, or did he

12   say something about it?

13   A    He was singing the song the monster mash.

14   Q    What he was saying at the time?

15   A    "My boys finally took care of business.  I hope they

16   killed that fucker."

17   Q    Did he say anything about an alibi?

18   A    Yes.  The lieutenant had called him, and he looked back

19   at me and said, "Don't forget you're my alibi.  I was here

20   all the time."

21   Q    Did he say anything about why Monster Barnett was hit?

22   A    Because of something that happened in the state system.

23   Q    Did he say what it was that had happened in the state

24   system?

25   A    I didn't ask.
```

1    Q    But did he say?

2    A    I don't recall.

3    Q    You mentioned that in July of 1990 you were put into

4    the hole.  You were put into segregation.

5    A    Yes.

6    Q    You were celling with Filkins, and Gibson and Hicklin

7    were in another cell?

8    A    Correct.

9    Q    How were you able to spend any time with Gibson and

10   Hicklin?

11   A    We had rec one hour a day Monday through Friday.  They

12   put us on the same rec yard at the same time, me, Filkins,

13   Gibson, and Hicklin.

14   Q    So for an hour a day, the four of you were together?

15   A    Correct.

16   Q    While you were at rec with Gibson and Hicklin, did you

17   ever talk about the Monster Barnett killing?

18   A    Yes.

19   Q    Tell us how often.

20   A    Me directly not all the time but some of the time.

21   Q    Was it frequent?

22   A    It was frequent.  It was a brag.

23   Q    Tell us what they said and try as best you can to

24   differentiate between Gibson on the one hand and Hicklin on

25   the other hand.

1    A    Hicklin was glad there was a lot of blood.  Gibson, I

2    thought for sure we killed him.  "I would do anything for

3    the brothers.  I would kill anybody for the brothers,"

4    Gibson's statement.

5    Q    When he said "the brothers," what did you understand

6    that to mean?

7    A    The AB.

8    Q    Did they say anything about Monster himself?

9    A    That he is a tough MF.

10            MR. EMMICK:  Your Honor, this would be a

11   convenient place to stop.

12            THE COURT:  You are admonished not to discuss this

13   matter amongst yourselves nor to form or express any opinion

14   concerning the case.  We will see you at 8:30 in the

15   morning.

16            (Jury not present.)

17            THE COURT:  Mr. Manby, we are going to have you

18   return tomorrow at 8:30.  Thank you very much.  You may step

19   down.  See you tomorrow morning.

20            I have a stipulation concerning Ismal Benitez

21   Mendez.

22            When will that be read into the record?

23            MR. HARRIS:  I understand those series of

24   witnesses are coming up later this week, Wednesday or

25   Thursday, so that would be the appropriate time.

1           THE COURT:  Everyone has looked at the

2    stipulation?  Mr. Steward?

3           MR. STEWARD:  Yes.

4           MR. CALABRIA:  We all signed it, Your Honor.

5           THE COURT:  What else this evening, Counsel?  Any

6    problems on the horizon?

7           MR. CALABRIA:  I want it on the record the issue

8    with regard to the grand jury transcript.

9           THE COURT:  Why don't each of you state the issue

10   concerning the grand jury transcript.

11          MR. CALABRIA:  Basically, in the discovery, we

12   have read that Mr. Manby references testifying in front of a

13   grand jury.  Mr. Manby was also interviewed by an

14   investigator, and in that interview, he also mentions having

15   testified in front of the grand jury, so I have been talking

16   with the U.S. Attorney, and they have made an effort to

17   locate it.  It's my understanding they have been unable to

18   locate that grand jury testimony.

19          THE COURT:  Let's be more specific.  First, Mrs.

20   Manby was a witness in the murder of Arva Lee Ray on

21   August 9, 1989.  That's not what we are referring to.  He

22   was a witness in the attempted murder of Monster Barnett on

23   March 13, 1990.  That's not the grand jury transcript each

24   of you are referring to.

25          You're referring to a grand jury transcript in

1    this proceeding?

2          MR. CALABRIA:  Actually, we don't know which one

3    it is.

4          MR. EMMICK:  It can't be this one because it's

5    prior in time.  It's from the transcripts of the trials that

6    we know he gave some testimony in front of the grand jury.

7          THE COURT:  Which trial?  He testified twice.

8          MR. CALABRIA:  Therein lies the problem.

9          THE COURT:  I know that, so until we define the

10   problem, I don't like this record.  Here is the little I

11   know.  On August 9, '89, on direct examination, he stated

12   that he testified in the trial of Arva Lee Ray.  He

13   testified that on March 13, 1990, he testified in the

14   attempted murder of Jeffrey Barnett.

15         Did he testify in a grand jury proceeding

16   involving the Indictment of Mr. Mills, Bingham, et al.?

17         MR. EMMICK:  No.

18         THE COURT:  That resolves that.  That's not the

19   grand jury transcript we are after.

20         Then which of these two grand jury transcripts are

21   we missing, or are we missing both grand jury transcripts?

22         MR. CALABRIA:  The way I read it is his statement

23   to an investigator was that he later testified for the grand

24   jury as well as in trial, and he mentions regarding the Arva

25   Lee Ray and Jeffrey Barnett incidents.  He mentions both of

1    them, and I am reading from investigator notes of an

2    interview of him in February.

3              THE COURT:  Was this one of your investigators?

4              MR. CALABRIA:  It was actually not my investigator

5    but one of the defense counsel investigators.

6              THE COURT:  Can we get that investigator in and

7    find out what he or she met by those notes?  When they get

8    jumbled together, I am not going out on a wild goose chase.

9              MR. REED:  I had her stay out of the courtroom

10   because he was going to be on the witness stand.  I sent her

11   home.

12             THE COURT:  Never mind.

13             THE COURT:  At least we can find out which grand

14   jury transcript is missing or if both grand jury transcripts

15   are missing.

16             MR. EMMICK:  There is even a third possibility.

17   He also was willing to provide testimony in a Sacramento

18   case, and that involved a codefendant, Chris Anderson, who

19   is the AB member from Lompoc, so it's unclear which grand

20   jury testimony is being referred to at these various times,

21   but this is what we have done.  We have done an exhaustive

22   search of the grand jury testimony in connection with the

23   Barnett case and in connection with the Arva Lee Ray case,

24   and we have come up with no grand jury testimony by the

25   witness at all.

```
 1              THE COURT:  Do we even know if he was called in
 2     each of those grand jury proceedings?
 3              MR. CALABRIA:  We don't.
 4              THE COURT:  Is the gentleman still around?  I saw
 5     him go out.  I think he is surrounded by ATF agents.  Let's
 6     find out right now.
 7              MR. EMMICK:  He recalls at least testifying in the
 8     Sacramento case, and that's the Chris Anderson case.
 9              THE COURT:  We know he testified at a trial.
10              Do you have the trial testimony of Mr. Manby
11     involving Arva Lee Ray?
12              MR. CALABRIA:  Yes.  That is the Filkins trial.  I
13     have it completely.
14              THE COURT:  Do you have the trial testimony of Mr.
15     Manby in the attempted murder of Monster Barnett?
16              MR. CALABRIA:  Yes.
17              THE COURT:  So what you are missing is the grand
18     jury transcript -- or testimony if he was called in the
19     grand jury, and I'm assuming he was.
20              MR. CALABRIA:  He said he was, but he could have
21     been confused.
22              THE COURT:  Let's take two seconds so we are not
23     guessing, and I have got a clear record, and we know where
24     to search.
25              Have you discussed any further this brilliant
```

1    proposal of mine to cut out one week instead of two weeks,

2    how beneficial that would be to everybody?

3              Hearing a resounding nothing, I know it's not

4    convenient.  I'm concerned.  So far we have had two breaks

5    in the government's case of one week.  Therefore, the

6    government's case is relatively fresh in the minds of the

7    jurors.  I said to the government let's get started, and we

8    will try it sequentially, plus we have had a very

9    professional job by WITSEC.  It's been really hard in terms

10   of their transportation.  Those breaks were really

11   appropriate.  They have been doing an excellent job.

12             When we get to the defense case -- and you are

13   going to be in that defense case when you get up to June.

14   My guess is you're going to be either two or three weeks.

15   That's my guess.  I think this case is going -- well, I

16   don't want to guess.  If you go two weeks and you're right

17   in the middle of H Unit, that's hard for the jury to get

18   back to.

19             Now, I know it's inconvenient, but if you have

20   planned vacations, hey, I will bow to those, but if it's

21   simply another client, that I think we could fit into one

22   week.

23             Let me turn to you, Mr. Steward.

24             MR. STEWARD:  Certainly from the Mills team, it's

25   inconvenient, but we will do whatever the Court wants.

```
 1              THE COURT:  Let me ask the jury.  They may quash
 2    that right away.  We promised them two weeks.  It's really
 3    unfair to impose on them now especially if they have had
 4    made vacation plans.
 5              Mr. White?  Mr. Harris?
 6              MR. WHITE:  We would echo Mr. Steward's remarks.
 7    It's inconvenient, but we will do what the Court decides.
 8              THE COURT:  I am thinking of fairness.  I want
 9    this equal on both sides.  I know it's inconvenient.
10              MR. CALABRIA:  Because the Court had given us
11    those two weeks, I have just a couple of Fridays where I
12    have set matters.  For one of them, my son can certainly
13    appear, so there is no problem.  The other I have a little
14    bit of a problem.
15              THE COURT:  On Friday, the 16th, if we can get
16    three days in, I can recess and give you back Friday.
17              MR. CALABRIA:  The Friday that I have a problem
18    with is the following Friday, the 23rd.
19              THE COURT:  We will recess then.
20              MR. CALABRIA:  Then I have no problem.
21              THE COURT:  No matter what, we know that from the
22    19th to the 23rd we are not in session.
23              MR. CALABRIA:  I have no problem if I am available
24    the 23rd, and my son can appear for me on the 16th.
25              THE COURT:  I will probably just send you on your
```

1    way after the morning session, but if we can get a couple of

2    days in --

3              Mr. Reed?

4              MR. REED:  I am with everybody else.

5              THE COURT:  Let me turn to the government.  You

6    are going to be done with your case, so you will be in the

7    middle of cross-examination.

8              MS. FLYNN:  That's fine.

9              THE COURT:  I am going to inquire of the jury.  I

10   think the jury will immediately put a stop to this effort on

11   my part.  I think that they are going to turn around and say

12   you promised us two weeks.  We made plans in that week.  If

13   any one of the jurors says that, it's not fair on my part to

14   go back, but that will also let them know how hard working

15   you are and that you are willing to give up that wee, so I

16   want a big smile on everybody's face when I say that to the

17   jury and with enthusiasm.

18             Is Mr. Manby out there?

19             MR. EMMICK:  He is.

20             THE COURT:  Mr. Manby, if you would come and join

21   me for a minute and come back up on the witness stand.  I

22   want to ask you a couple of questions to help me find out

23   what other discovery both the government and the defense

24   might need, and I appreciate your courtesy, sir.

25             The defense and the government both have,

1  Mr. Manby, the trial transcripts of your testimony involving

2  the murder of Arva Lee Ray, and they have your trial

3  testimony involving the attempted murder of Jeffrey Barnett.

4          Do you remember if you were called -- do you know

5  what a grand jury proceeding is?

6          MR. MANBY:  Yes.

7          THE COURT:  Do you remember if you were called at

8  a grand jury proceeding involving the murder of Arva Lee

9  Ray?

10         MR. MANBY:  I recall a grand jury investigation,

11 but I can't recall the material right at this time.

12         THE COURT:  Do you recall if you were placed in

13 front of a grand jury prior to the trial and if you

14 testified to the grand jury?

15         MR. MANBY:  Yes, Your Honor.

16         THE COURT:  Did you do so?

17         MR. MANBY:  Yes.

18         THE COURT:  How about the attempted murder of

19 Monster Barnett?  Did you go through a grand jury proceeding

20 as well as the actual trial testimony?

21         MR. MANBY:  I went to one grand jury

22 investigation.

23         THE COURT:  So between these two, you appeared in

24 one grand jury?

25         MR. MANBY:  Prior to the two.

1          THE COURT:  Let me say that again because I'm

2     confused.  I just want to take the murder of Arva Lee Ray

3     allegedly involving Mr. Filkins.  I just want to focus on

4     that murder.

5          Did you go to a grand jury proceeding as well as

6     the trial?

7          MR. MANBY:  I went to a grand jury, but I can't

8     recall what the grand jury was for.

9          THE COURT:  So you don't know if it was for the

10    Arva Lee Ray murder or the attempted murder of Jeffrey

11    Barnett?

12         MR. MANBY:  Correct.

13         THE COURT:  And you know that you went to one, not

14    two, grand jury proceedings?

15         MR. MANBY:  Correct.

16         THE COURT:  I think that solves our problem, and I

17    want to thank you.

18         Mr. Emmick.

19         MR. EMMICK:  If I might ask, where did you appear

20    before the grand jury?

21         THE COURT:  What city?

22         MR. MANBY:  I believe it was Sacramento.

23         MR. EMMICK:  And not any grand jury here in

24    Los Angeles?

25         MR. MANBY:  Correct.

1          THE COURT:  Was the Indictment up in Sacramento?

2          MR. EMMICK:  No.  Both the Arva Lee Ray and

3     Barnett cases were indicted out of Los Angeles.  The

4     Sacramento case I believe is the Chris Anderson case.

5          THE COURT:  Is it possible also you went in front

6     of a grand jury with Chris Anderson's case?

7          MR. MANBY:  It could have been.

8          THE COURT:  So we have three possibilites, but you

9     know you only appeared in front of one grand jury with these

10    three cases?

11         MR. MANBY:  Yes.

12         THE COURT:  And you believe that that was up in

13    Sacramento?

14         MR. MANBY:  Yes.

15         THE COURT:  I think that answers it.

16         Mr. Calabria, do you have any questions?

17         MR. CALABRIA:  No.  I'm satisifed.

18         THE COURT:  We know what we are looking for now.

19         MR. CALABRIA:  Yes.

20         THE COURT:  Does anybody have any questions

21    concerning this discovery of Mr. Manby?  Everyone is

22    satisfied this evening?

23         Thank you, Mr. Manby, for your courtesy.  We will

24    see you tomorrow morning at 8:30.

25         Do you have anything further of Mr. Manby?

87

1          MR. CALABRIA:  No.

2          THE COURT:  Mr. Calabria, are you satisfied?  It

3    sounds like it's Chris Anderson's grand jury testimony.  He

4    testified from my record it appears in front of one grand

5    jury, and it comes out of Sacramento.

6          MR. CALABRIA:  It makes sense to me it was that

7    case.  Actually he was arrested on that robbery in '91.

8          Mr. Rosen.

9          MR. ROSEN:  When we recessed a week ago Friday,

10   the Court was going to review an ATF report of an interview

11   of Phil Myers to determine if there was any Brady material.

12         THE COURT:  I did not see any.  I am going to look

13   at it again, but I will give you an indication now that I

14   didn't see anything that appeared to be Brady material, but

15   let me look at it again.

16         MR. ROSEN:  May I make two inquiries of the Court?

17         THE COURT:  No.  I am going to look at it again.

18   You may make your inquiries tomorrow.

19         Mr. Reed, anything further?

20         MR. REED:  No.

21         THE COURT:  Mr. Harris?

22         MR. HARRIS:  Nothing further.

23         THE COURT:  Mr. White?

24         MR. WHITE:  No, Your Honor.

25         THE COURT:  Mr. Fleming?

88

1         MR. FLEMING:  Just the witnesses for tomorrow, the

2     order.

3         THE COURT:  Let's go over that for a moment.

4         After Mr. Manby, who would the government call

5     tomorrow?

6         MR. EMMICK:  John Hobson Malone.

7         THE COURT:  John Malone.

8         After Mr. Malone?

9         MS. FLYNN:  Jimmy Lee Inman.

10        THE COURT:  Inman.

11        MS. FLYNN:  Mark Littlefield.

12        THE COURT:  Tell me about Mark Littlefield.

13        MS. BLANCH:  He is a detective with the

14    Los Angeles County Sheriff's Department.

15        THE COURT:  Thank you.

16        That would probably take the day do you think, or

17    who else do you have planned?

18        MS. FLYNN:  Frank Ruopoli.  Then we have one BOP

19    witness we might want to try and squeeze in, Todd Carpenter.

20    He testified already.  He will be coming back just to

21    identify some photos.

22        THE COURT:  Is that satisfactory, Mr. Fleming?

23        MR. FLEMING:  That's all.

24        THE COURT:  Mr. Steward?

25        MR. STEWARD:  I'm fine.

89

```
 1              THE COURT:  Ms. Blanch?

 2              MS. BLANCH:  Nothing, Your Honor.

 3              THE COURT:  Ms. Flynn?

 4              MS. FLYNN:  I have an issue that we talked about

 5    earlier about a BOP witness regarding the transfer from

 6    Marion to the ADX.

 7              THE COURT:  Let's raise that immediately, transfer

 8    from ADX.  I have received some films in-camera to view.  I

 9    am going to start viewing those films as early as this

10    evening, but they appear to be about eight hours.

11              MS. FLYNN:  That's kind of a guesstimate.  I

12    watched most of them and fast-forwarded.  The issue is the

13    videotapes do not show the inside of the bus.  The

14    videotapes are also of only two transfers, and there were I

15    believe three that were done.

16              THE COURT:  Let's go over that for the record.

17              There was testimony, Mr. Reed, that you may be

18    interested in, and that testimony was that when the transfer

19    took place from Marion to ADX that there were 120 marshals

20    or some large number.  There were a rather small group of

21    prisoners, 20 or so, that the bus took them from Marion to

22    the airport.  They were flown to ADX and then massive

23    security into ADX, and part of that testimony was that --

24    one of the witnesses testified that there were guards

25    literally every five feet in the center of the bus.
```

90

1      Do you recall who testified to that?

2           MR. REED:  Roach.

3           THE COURT:  And you were potentially interested in

4    that testimony to find out how great that security was and

5    whether the message could have realistically had any

6    opportunity of being passed.

7           MR. REED:  Yes.

8           THE COURT:  Let's go that far this evening.  I

9    think that defines the problem.

10          Can we get started with -- who is your BOP person?

11          MS. FLYNN:  Mr. Bezy who already testified.  We

12   are going to send him back.  He has plane reservations to

13   leave.

14          THE COURT:  Bezy is from Terre Haute?

15          MS. FLYNN:  Yes.

16          THE COURT:  And he is the warden there now?

17          MS. FLYNN:  Yes.

18          THE COURT:  Death Row is still at Terre Haute?

19          MS. BLANCH:  Yes.

20          THE COURT:  So he is in charge of Death Row back

21   there.  All right.

22          When do you think that Mr. Bezy would be called

23   again in your case?  In other words, how much time do I

24   have?

25          MS. FLYNN:  We don't intend to call him.  We think

1   the video will resolve it.

2          THE COURT:  How much time do I have to look at

3   these tapes?

4          MR. REED:  Over a month.

5          THE COURT:  That resolves it then.  I will look at

6   these tapes this weekend then.

7          A couple of more things.  I am not trying to shove

8   you into a Saturday session, but I don't know how else to

9   keep the jury going, so I am looking for some suggestions

10   from you.  I want that jury in session from 8:30 to 4:30 or

11   5:00 every day.  We are moving ahead nicely.  We are months

12   ahead of schedule probably from what we anticipated, and my

13   appreciation to both sides for doing such hard work.

14          I want this discovery if Mr. Les Smith has this

15   discovery on the table so we can all see what that is prior

16   to the time of Les Smith being called because I don't want

17   the government caught in a box with a surprise, and I don't

18   want the defense caught in a box with a surprise, and it

19   makes cross-examination doubly difficult if any of you

20   make a mistake, and then you have to try to undue that

21   mistake.  That's why Mr. Reed wisely decided to call back

22   Mr. Cupples because they were getting along so well today.

23          The other thing is I don't want the BOP to ever

24   get the idea that we are playing with this discovery.  No

25   lieutenant, no SIA officer, no whatever they are is going to

1   make any independent decision except to run in here with the

2   evidence that we're asking for.

3          I'm a little afraid of just putting somebody on

4   the stand, and then at 5:00, we just kind of melt and fit

5   in.  I just think it deserves the dignity of getting that

6   person out here and spending some time with them and finding

7   out what they have got.  Certainly Les Smith is an important

8   witness.

9          Now, if you come up with any better solution, I am

10   glad not to take your weekends from you, but as far as I am

11   concerned, I have the marshals, the courthouse.  I will even

12   have air-conditioning this Saturday.  You ran a couple of

13   Saturdays when we ran out of air-conditioning.  I think I

14   would like to get Mr. Smith out here so we can all

15   anticipate what his testimony is.  Let's find out.

16          There are a lot of important documents I think

17   that have been divulged, but I just don't know yet because

18   of the scope of this case who has what or if they don't have

19   the pages where they went.  I don't want the case to get

20   rolling so fast that there is a mistake made by either side.

21   That's why the Saturday session.  Now, this will be the

22   third or fourth Saturday session or so.  I'm not trying to

23   get use to them.  If you have another suggestion, tell me

24   what it is.

25          MR. FLEMING:  I can't think of any.

93

```
1              THE COURT:   Let's get in session on Saturday.
2              MR. WHITE:   I would hope we could receive the
3    documents before Saturday.
4              THE COURT:   If we do, we will cancel the Saturday
5    session.  My guess is what you are going to get is maybe
6    some documents or the location of where some document might
7    be, but remember this.  Nobody has the sense of urgency that
8    the government and the defense and the Court have because we
9    are involved in the trial.  ADX has a lot of problems going
10   on, and so do other institutions.  This needs to get on the
11   front burner.  I can't think of any other way except get
12   down to the hard work and spend time with it.
13             If we get the documents, I will cancel it,
14   Mr. White.  I know Ms. Flynn is working hard on that.  She
15   is trying to get everything possible.
16             Mr. Calabria, do you have any suggestion?
17             MR. CALABRIA:   No further suggestion.
18             THE COURT:   If we get the documents, I will cancel
19   Saturday's session.
20             Mr. Reed, is that American sign language?
21             MR. REED:   If I can talk to Ms. Flynn for a
22   minute.
23             (Counsel conferring.)
24             THE COURT:   If we are going to have a session, I
25   don't want to be waiting for phone calls.  I want
```

94

1    Mr. Beckwith down here because he has been helpful to both

2    sides.   I want Mr. Pennington someplace by phone up in

3    Northern California.   If you think there are FBI documents,

4    I will bring them back in here, but obviously the case is

5    going so smoothly because you are willing to be in session

6    from 8:30 to 5:00 without this silly sidebar conferences.

7    Because of your hard work, we don't have take any time with

8    this jury sitting out in the hallway.   It's been a very

9    professional presentation by the government and equally

10   professional by the defense.

11           MR. REED:   I would ask the Court to hold off on

12   this Saturday from what I am hearing from the government and

13   give us another week and give them more time.   It appears it

14   may not be Les Smith.   If he comes in on Saturday and says

15   he doesn't have it, it appears that that doesn't end the

16   inquiry.   With only three days for the government to work --

17           THE COURT:   Let's list everything that we need for

18   a moment -- bear with me.   I want you to state everything

19   that you are asking for in discovery from today's testimony.

20   Very slowly write that down.

21           First, 1057, is the letter that Smith urged

22   Cupples to send to Valerie.

23           What you are looking for is if there was a

24   response from Ronnie Yandell?

25           MR. FLEMING:   Yes.

1          THE COURT:  Is there a letter that responded to

2   Cupples and Smith's letter to Valerie?  That means a

3   response from Ronnie Yandell or just to be certain any other

4   persons so that it's the broadest possible discovery.

5          Second, Mr. Jessner's letter or response to

6   Cupples' request.

7          MR. FLEMING:  The letter that was sent from

8   Mr. Cupples to Mr. Jessner.

9          THE COURT:  The letter from Cupples to

10  Mr. Jessner.

11         The approximate time frame would be what?

12         MS. FLYNN:  Sometime after March 2003.

13         MR. FLEMING:  Right.

14         THE COURT:  So after March 2003, and if there is a

15  letter from Mr. Jessner to Mr. Cupples.

16         No. 3, Mr. Cupples testified that while he was at

17  ADX that he was going to go from rec cage to rec cage

18  killing black prisoners, other prisoners, and he testified

19  that he had climbed 30 feet to the top of the rec cage,

20  swung from a bar with a knife, and cut out the asbestos

21  believing that he could go over the edge of the rec cage

22  into the next rec cage.

23         He doesn't know which rec cage that was, but he

24  testified the first hole he cut was big enough for him to

25  get his body through, and he realized at that time that

96

1  there was a solid wall that went above the drywall or

2  asbestos ceiling, and he testified that he could have just

3  punched his fist through in retrospect, but he didn't know

4  that at the time.  He also testified that there were two

5  other rec cages that he also cut through the ceiling of, but

6  in those two instances, it sounded to me as if the holes

7  were much smaller.  He used them as a stash for weapons.

8          You wanted, Mr. Reed, reports from each of those

9  incidents because he testified that the warden had come

10 down, and the warden didn't know who had done this, but

11 photographs were taken by SIS, and he claimed time and time

12 again that there were reports made about these cuts.

13         Is that also what we are after?

14         MR. FLEMING:  We are not interested in that.

15 That's Mr. Reed.  I prefer not to go down that road.

16         THE COURT:  Why?  Because it might corroborate

17 him?

18         MR. FLEMING:  Yes.  I think there's going to be

19 reports that he climbed up 30 feet and - That's not our

20 request.

21         THE COURT:  We are going to get them. So we want

22 the reports of cutting incidents in the rec cages and

23 photos.

24         The time period that Mr. Cupples testified that he

25 was going to commit these murders and climb over the walls

97

1    was approximately when?

2              MR. REED:  2000, 2001.

3              THE COURT:  Let's say 2000 through 2001.  I can

4    almost guarantee that they are there unless he is completely

5    noncredible.  You might extend it if you don't find it to

6    early 2002.  I think Mr. Beckwith can get on that

7    immediately.  That's something we can resolve pretty

8    quickly.

9              MS. FLYNN:  On all of these, an e-mail was sent to

10   everybody, so they are starting to look.

11             THE COURT:  Great.

12             Finally, in looking at my notes quickly, there may

13   be something else, Counsel, but those are the four things

14   that I have.

15             MR. HARRIS:  There is one other.  There is a

16   letter from Smith to Cupples referenced in the first line of

17   1056.

18             THE COURT:  "I was relieved to get your letter

19   today because I would prefer to deal with you personally."

20             Now maybe we can accomplish that.

21             MR. STEWARD:  Apparently the Court already has the

22   handwritten debrief.  The other item was the second letter

23   Cupples sent out to Yandell through, quote, "a new address."

24             THE COURT:  There are two letters?

25             MR. STEWARD:  Yes.  He sent out two letters.  The

98

1    Court just read one -- I'm sorry.

2            THE COURT:  That's the letter I am referring to.

3    Let me retrace my notes for a moment.  I have first a letter

4    that responds to Cupples' letter to Valerie.

5            MR. FLEMING:  From Yandell.

6            THE COURT:  I made it even broader just in case

7    Yandell is using somebody else as an intermediary, so we all

8    recognize that as the reponse by Yandell, but it should be

9    broader than that in case Yandell is sending it back to

10   Valerie or somebody else.

11           The second is a letter from Cupples to Mr. Jessner

12   sometime after March 2003 we believe if there is such a

13   letter, and that should be easy for the U.S. Attorney to

14   check their file.

15           Third is a response letter from Jessner to Cupples

16   if there is such a letter.  It's easy for the United States

17   Attorney to check their file.

18           Four is the report of the cutting incidents in the

19   three rec yards, which include reports and/or photos

20   sometime between 2000 and 2002.

21           Five is a letter from Smith to Mr. Cupples that

22   you reference in Exhibit No. 1056 in the first line.

23           What are we missing?

24           MR. STEWARD:  We are missing Cupples' handwritten

25   debrief.

99

          1          THE COURT:  You are absolutely right, Cupples'

          2   handwritten debrief.  Let me remember from memory.  That was

          3   Question No. 24.

          4          MR. REED:  Well, actually, there were a number of

          5   questions.

          6          THE COURT:  We started on Question No. 24, and his

          7   testimony was that in the debrief there might not have been

          8   enough room.  Therefore, he can't specifically recall but he

          9   may have handwritten out a whole paragraph or paragraphs or

         10   page or pages -- no one knows yet -- a handwritten debrief,

         11   and that was potentially last seen with Mr. Smith.

         12          Now, I want to assume for a moment --

         13          MR. REED:  If there was a report drafted with

         14   regard to what happened in those three rec yards -- the

         15   report wherein Mr. Cupples admitted he did that prior to

         16   testifying on the witness stand today -- since he told us

         17   he's the one he did it -- I'm sure he has told the BOP

         18   everything he has done because part of the debrief is to do

         19   that -- whatever reports --

         20          THE COURT:  Mr. Cupples is going to be back.  That

         21   question wasn't specifically asked of him.  If there is a

         22   report, obviously we are going to get that for you, but

         23   that's why it's important to either get Smith on the stand

         24   or to find out where this initial debrief went.  Maybe he

         25   said nothing about it.

1          Now, I don't know of any other debrief because he

2     said that they disappeared for about four years or some long

3     period of time -- two years -- that they disappeared for

4     some long period of time, and he didn't see anybody again.

5     My impression was that that wasn't until recently, like

6     2003, so it either has to be 2003 or afterwards if he is

7     correct, and there is no debrief that I know to look from

8     hypothetically 2000 to 2003.  I don't know where to find

9     that right now?

10          MR. REED:  I understand what the Court is saying.

11    He doesn't die until 2003, so it wouldn't be anything prior

12    to that.  The questions in the debrief if you look through

13    them and the ones that he left blank would include any and

14    all crimes that he was involved in.

15          THE COURT:  We're going to go as far as finding

16    the debrief if we can first.

17          MR. REED:  I think it will resolve the problem.

18          THE COURT:  I do, too.  I[m not going to go down

19    that road because I don't know what to ask for and what to

20    ask the government to get, so let's get the debrief first.

21          Now, if all of these were answered, do you want

22    Mr. Smith out here?  I don't want any surprises.

23          MR. REED:  He is coming out anyway.

24          THE COURT:  The question is do you want him out

25    Saturday?  I am saying this to you as loudly as I can.  What

1    I'm not going to do is we are not recessing and going into

2    some sidebar when we could be working on Saturdays and/or

3    Sundays if we need to and have this jury sit out in the

4    hallway.  About that time, I'm not going to be pleased, so

5    if you want information, I'm at your disposal, but don't

6    approach me on a sidebar when I am making that offer to you.

7    Don't slow down this jury.  Do you want him?

8              MR. STEWARD:  Yes.

9              THE COURT:  I want him here Saturday morning.

10   It's really simple.  That way nothing is slowed down.  Mr.

11   Smith is on the stand.  If you want to call him on Tuesday,

12   you can take him out of order, so we will be in session on

13   Saturday.

14              Let me tell the marshals that.

15              Now, anything else this evening?

16              Okay, have a nice evening.

17              MR. STEWARD:  We missed one last document.

18   Cupples sent out two letters.  The first one goes to

19   Valerie.  He said he sent a second one as well.  It was

20   going to Yandell to a new address.  That's the last letter

21   that we didn't address and do need.  That's all I have.

22              THE COURT:  To save everybody time, on Saturday, I

23   am sitting here until I get satisfactory answers.  That's

24   why I we need Beckwith.  We need Pennington who can get

25   things done at least by phone.  If it has anything to do

1    with the FBI, you can have the SAC agent stand by.  She

2    doesn't have to be down here.  We are absolutely sitting

3    here until I have some satisfactory answers.  The check is

4    not going to be in the mail on this one.

5                   MR. FLEMING:  One other item we want to address on

6    Saturday is we would like to make that Mr. Smith brings with

7    him any notes or reports of his contacts with Mr. Cupples

8    or --

9                   THE COURT:  I can almost guarantee you Mr. Smith

10   is going to be wise enough to do that, or he is going to be

11   flying back and forth.  That gets expensive and --

12                  MS. BLANCH:  Can I make one thing clear for the

13   record?  Mr. Smith is no longer at ADX.  He has actually

14   been assigned by the BOP to a task force --

15                  THE COURT:  That's not good enough.  I don't know

16   where to start on this trial unless I start with Smith, so I

17   am not waiting for some bureaucrat in Washington, D.C., to

18   suddenly find these documents, many of which through no

19   fault of yours should have been found a long time ago.  I am

20   not going to have you placed at a disadvantage or surprised,

21   and I am not going to have the defense at a disadvantage or

22   surprise, so the more things that Smith can tell us, then we

23   can get on that Saturday night or Sunday or Monday,

24   whatever.  That's the only reason I am doing this?

25                  MS. BLANCH:  I am not disputing that.  I think he

103

1    will be here.  I am just giving you fair warning he may only

2    tell you that he doesn't have the documents any longer.  We

3    will have to look at ADX.

4            THE COURT:  He is going to have to tell me where

5    they are at.  If he's got a debrief, he's going to have to

6    say I think I remember some pages, or I didn't get any

7    pages, so get him on the plane.

8            Now, I don't think we need Mr. Jessner.  I think

9    you can accomplish that with Mr. Jessner by simple inquiry.

10   You can brief me tomorrow or on Thursday.  I just want to

11   get this process going.  Smith seems to be the key.

12           Is 8:00 okay with you, or do you want 9:00?  I get

13   here at 6:30 or 6:15.  I don't think you want that time.

14           MR. FLEMING:  8:00

15           THE COURT:  Okay, we are going to start at 8:00

16   Saturday.  Have a good evening.  Go get refreshed.  We see

17   you tomorrow morning.

18           *(At 5:30 p.m., proceedings were adjourned.)*

19                           -oOo-

20

21

22

23

24

25

104

1                              -oOo-

2

3                          CERTIFICATE

4

5          I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  May 10, 2006

13                      Sharon A. Seffens    5/10/06    5/10/06

14   _____
     SHARON A. SEFFENS, U.S. COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25