ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

AUG - 8 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

         Plaintiff,

  vs.

BARRY BYRON MILLS;          CR-02-938(C)
TYLER DAVIS BINGHAM;      DAY 64, VOL. II
CHRISTOPHER OVERTON
GIBSON; EDGAR WESLEY
HEVLE,
         Defendants.

---------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

August 30, 2006

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

DOCKETED ON CM

5

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    DEBRA W. YANG
      United States Attorney
 4    STEVEN D. CLYMER
      Special Assistant United States Attorney
 5    Chief, Criminal Division
      MICHAEL EMMICK
 6    STEPHEN WOLFE
      TERRI FLYNN
 7    JOEY BLANCH
      Assistant United States Attorneys
 8    1400 United States Courthouse
      312 North Spring Street
 9    Los Angeles, CA  90012
      (213) 894-0511

10

11    For Defendant BARRY BYRON MILLS:

12    H. DEAN STEWARD
      LAW OFFICES OF H. DEAN STEWARD
13    107 Avenida Miramar, Suite C
      San Clemente, CA
14    (949) 481-4900

15    MARK F. FLEMING
      LAW OFFICES OF MARK F. FLEMING
16    433 "G" Street, Suite 202
      San Diego, CA  92101
17    (619) 652-9970

18    For Defendant TYLER DAVIS BINGHAM:

19    MICHAEL  V. WHITE
      LAW OFFICES OF MICHAEL V. WHITE
20    1717 Fourth Street, Third Floor
      Santa Monica, CA  90401
21    (310) 576-6242

22    WILLIAM S. HARRIS
      STEWART & HARRIS
23    1499 Huntington Drive, Suite 403
      South Pasadena, CA  91030
24    (626) 441-9300

25
```

```
 1    For Defendant CHRISTOPHER OVERTON GIBSON:

 2    KENNETH A. REED
      LAW OFFICES OF KENNETH A. REED
 3    404 West 4th Street, Suite C
      Santa Ana, CA  92701
 4    (714) 953-7400

 5    For Defendant EDGAR WESLEY HEVLE:

 6    BERNARD J. ROSEN
      LAW OFFICES OF BERNARD J. ROSEN
 7    1717 Fourth Street, Suite 300
      Santa Monica, CA  90401
 8    (310) 451-4577

 9    DONALD J. CALABRIA
      LAW OFFICES OF DONALD J. CALABRIA
10    16133 Ventura Boulevard, Suite 600
      Encino, CA  91436
11    (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

| PLAINTIFF'S WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (None) | | | | |

| PLAINTIFF'S EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| Exhibit 592 | | 95 |
| Exhibit 593 | | 95 |

| DEFENSE WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DANIEL MACALLAIR | | | | |
| (Continued) | 4 | 13 | 19 | |
| DON INGWERSON | 25 | | | |
| CARMEN INGWERSON | 32 | | | |
| GARY GONI | 36 | | | |
| BRIAN MILLER | 42 | | | |
| TYLER BINGHAM | 46 | | | |
| PENNY ALLAMPRESE | 69 | | | |

| DEFENSE EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| Exhibits 1605 and 1606 | | 5 |
| Exhibits 1601 to 1604 | | 24 |
| Exhibits 1607 to 1611 | 52 | 54 |
| Exhibits 1612 to 1613 | 56 | 56 |
| Exhibits 1614 to 1616 | 57 | 57 |
| Exhibits 1617 to 1618 | 58 | 58 |
| Exhibit 1619 | 58 | 59 |
| Exhibits 1620 to 1621 | 59 | 59 |
| Exhibit 1622 | 59 | 60 |
| Exhibit 1623 | 60 | 61 |
| Exhibits 1624 to 1626 | 61 | 61 |
| Exhibits 1627 to 1629 | 62 | 62 |
| Exhibit 1630 | 62 | 63 |
| Exhibits 1631 to 1633 | 63 | 63 |
| Exhibits 1634 to 1636 | 64 | 64 |
| Exhibit 1637 | 64 | 65 |
| Exhibits 1638 to 1639 | 65 | 65 |
| Exhibit 1640 | 65 | 66 |
| Exhibits 1641 to 1642 | 66 | 66 |
| Exhibit 1643 | 66 | 67 |
| Exhibits 1644 to 1646 | 67 | 67 |
| Exhibit 1647 | 67 | 68 |
| Exhibits 1648 to 1649 | 68 | 68 |

4

1    SANTA ANA, CALIFORNIA; WEDNESDAY, AUGUST 30, 2006; 1:30 P.M.

2              (Jury not present.)

3              THE COURT:  Would you summon the jury, please.

4              (Jury present.)

5              THE COURT:  We are back in session.  Counsel are

6    present.  The defendants are present.  The government is

7    present.

8              Mr. White, you may continue.

9              MR. WHITE:  Your Honor, I have a photograph that

10   has been marked Exhibit 1605 and one that's been marked

11   1606.

12             MR. WHITE:  Your Honor, may I approach the

13   witness, please?

14             THE COURT:  Yes.

15      DANIEL MACALLAIR, DEFENSE WITNESS, PREVIOUSLY SWORN

16   BY MR. WHITE:

17   Q    Would you take a look at Exhibit 1605, please?

18   A    Yes.

19   Q    Did you cause 1605 to be -- well, strike that.  Do you

20   know what 1605 depicts, what that photograph depicts?

21   A    It's a picture of a living unit at Paso Robles, a CYA

22   facility.

23   Q    Can you hold it up for the jury?

24             THE COURT:  Do you want that received?

25             MS. FLYNN:  No objection.

1    THE COURT:  What about 1606?  Is that acceptable?

2    MS. FLYNN:  Yes.

3    THE COURT:  All right, 1605 and 1606 will be

4  received.

5    (Exhibits 1605 and 1606 received.)

6  BY MR. WHITE:

7  Q    Now, Mr. Macallair, that living unit depicted in 1605,

8  would that have been the kind of unit that a 14 or a

9  15-year-old entering Paso Robles in 1962 would have lived

10  in?

11  A    Yes.  This is a standard dormitory style living unit at

12  Paso Robles.  This is a standard youth authority dormitory

13  style.  It differs with each institution.  This particular

14  institution was built in the mid '50s, so this is how it

15  would have looked and how it did look.  This is designed to

16  hold anywhere from 50 to 60 youths at any given time.

17  Q    Could you look at 1606 and tell us what this is?

18  A    In every Youth Authority institution, there are

19  isolation rooms generally for disciplinary purposes or in

20  some instances for youth who are acting out, perhaps are

21  mentally ill and cannot be maintained in the general

22  population, so they will be placed into an isolation room.

23  These are typically locked cells, and they would be in there

24  for generally 23 hours a day with one hour of exercise time,

25  but this is a standard unit in their Cambria Unit which is

1    the Disciplinary Unit at Paso Robles.

2    Q    When we finished just before lunch, you were discussing

3    what it was like in the California Youth Authority, and you

4    were describing basically the code of the California Youth

5    Authority.

6    A    The institutions had -- it's an unwritten code.  It's

7    basically again what we see in prison movies, the unwritten

8    code that really dictates how people act, how people behave

9    themselves, how people relate to one another.

10    Q    Now, we have heard a lot of testimony from adult --

11    from people who were in the California state prison system

12    and the federal prison system.  They described a convict

13    code.

14         Are you familiar with the convict code in adult

15    incarceration situations?

16    A    Yes, I am.

17    Q    Is the code that you described to us that was in

18    existence in the California Youth Authority in the 1960s --

19    is it the same code that exists in federal prison and state

20    prison?

21    A    Yes.  It's defined -- I mean, the code that was present

22    in the Youth Authority was documented by the Youth

23    Authority's own research staff back in the 1960s.

24    Essentially it was you stick with your own race.  If you are

25    challenged, you respond to challenges.  You don't snitch.

1    You don't report any rule breaking by other wards or

2    inmates.  That's pretty much the four or five main points.

3    Q    So would it be fair to say that for juveniles, for

4    children, in the youth authority, they had to learn the same

5    conduct in order to survive in the Youth Authority that

6    adults then needed to learn to survive in adult prisons?

7    A    It's an informal code.  It's unwritten code that

8    everyone comes to understand, and it essentially dictates

9    behavior and the nature of relationships in correctional

10   facilities.

11   Q    Are you familiar with the term "prisonization"?

12   A    It was a term -- "prisonization" was a term coined by

13   criminalist Ron Clemmer back in the early '50's.

14   Essentially it describes the process people go through, the

15   changes that people go through, the longer they are

16   incarcerated and subject to that, essentially subject to the

17   code and certain behaviors that evolve over time, and it

18   becomes more acute the longer someone is incarcerated or

19   imprisoned.

20   Q    Is that phenomenon true within the California Youth

21   Authority?

22   A    The Youth Authority without using that specific term

23   conducted a study that took place at Preston School of

24   Industry in 1964 where they were looking at essentially the

25   subculture that existed within that particular institution.

1    As part of that literature review, they talk about

2    prisonization, and they related it back to the findings in

3    their own study, the fact that there is a subculture.  There

4    was a subculture within that institution.  It was very

5    discernible.  It was acknowledged by both staff and by

6    wards.  Wards were expected to conform to code.  As part of

7    that study, they talk about how it was a process that

8    occurred over time, and the longer people were there the

9    more absorbed or entrenched in that code they became.

10   Q    When you talk about subculture, what do you mean?

11   A    It's a way of acting, a way of behaving.  We are all

12   part of the mainstream culture.  There are cultures that --

13   a subculture develops in isolated situations such as in

14   correctional institutions where people are separated from

15   the mainstream culture and very often act in opposition to

16   the mainstream culture.  For example, the prison code would

17   be an example of something that fosters a subculture.  It

18   tells how people are supposed to behave, how people are

19   supposed to act and to relate to one another.

20   Q    You talk about when a juvenile is challenged they

21   really had to respond by fighting; is that right?

22   A    As I stated in my testimony this morning, it's all

23   about respect.  It's consistent with anyone who has ever

24   been in the Youth Authority, certainly anyone I have ever

25   interviewed.  It's recognized by staff.  The Youth Authority

1    is a violent environment, so in order to survive that, you

2    have to be willing to demonstrate that you are capable of

3    fighting and capable and willing to defend yourself.

4    Q    What happens in the Youth Authority when two juveniles

5    fight?  How does the staff react to that?

6    A    Well, it depends.  In some instances, staff would allow

7    wards to fight.  Generally, if it was between -- if two

8    wards were of the same race, they tended to be more willing

9    to allow the wards to fight it out.  If it was a fight

10   between different races, then they were more likely to

11   intervene because that could escalate into a large school

12   riot which did occasionally occur.

13          The other ways to fight would be what they would

14   call a Level B infraction, the more serious infraction, that

15   could result in you being placed in an isolation cell for a

16   period of time.  It could also result in what they call time

17   adds where you have time added to your sentence by the

18   Parole Board for the infraction or a combination of the two.

19   Q    Mr. Macallair, there is evidence that Barry Mills was

20   in the California Youth Authority from 1964 to 1967.

21          Were the conditions in the California Youth

22   Authority from '64 to '67 the very same conditions you have

23   testified to that existed while Mr. Bingham was in the

24   California Youth Authority from '62 to '65?

25   A    Yes.  The conditions in the California Youth Authority

1    have remained virtually unchanged for the last 30 to 40

2    years.  You will find the same documented problems in the

3    1960s as you found in the 1970s, 1980s, and 1990s.

4    Q    Did they have in the California Youth Authority

5    individual counseling, for example?  If there was a child

6    who needed counseling -- and it's hard to imagine that -- I

7    would imagine that just about every one did.  Was there

8    individual counseling available to children in the

9    California Youth Authority?

10   A    It's important to make a distinction between counseling

11   and I guess therapy, therapy being carried out by a licensed

12   mental health professional with a treatment plan with

13   specific goals that you are attempting to achieve over a

14   period of time.  For wards in the general population, there

15   was no one-to-one therapy.  There was no therapy for a ward

16   in the general population.

17          What the Youth Authority often refers to is

18   counseling.  It's kind of the ad hoc casual interactions

19   that might occur between staff and wards on a daily basis,

20   and it can be anywhere from -- generally a conversation over

21   how your day is going.  Those are positive things, and those

22   are things that are certainly important in relationship

23   developing between wards and staff, but it wasn't therapy.

24          At the time -- in the 1960s, the Youth Authority

25   institution struggled with chronic understaffing.  You had

1  an increasing population, and at the same time, you had a

2  legislature that was unwilling to allocate additional

3  resources, so it would not be unusual during the day have

4  two staff for every 60 wards, and at night, you would have

5  one staff for every 60 awards.

6         In a typical dormitory -- you can't see it in

7  here -- you would have a guard station -- it's actually on

8  this end -- you can't see it in this picture -- which is a

9  locked self-enclosed station.  At night, the guard would

10 remain in that station, just one guard, and would not come

11 out regardless of what happened.  Whatever happened on this

12 dormitory, the guard would not come out from that station.

13        If a fight or a riot broke out -- there is a tear

14 gas slot in each of the stations.  A tear gas bomb might be

15 thrown in, and then a task force would be summoned, and they

16 would come in and qwell the disturbance, but the guard would

17 never come out.  In those instances, you had one staff

18 person for every 60 wards.  It was a chronic understaffing,

19 and it was a constant source of concern expressed by the

20 Youth Authority leadership at the time.

21 Q   Are you familiar with situations in the 1960s in the

22 California Youth Authority where as a result of some

23 violation that a youth committed they were taken to a room

24 without any light, without any air, and they were stripped

25 naked and beaten?  Is that something that you are familiar

1   with?

2   A    You have various versions over the years.  The

3   isolation cells in some instances in some institutions

4   were -- I have heard this from wards.  It's not documented

5   in the Youth Authority's own research -- dark cells where

6   you would have -- Mr. Bingham recounted this -- where you

7   would have in the isolation units, the disciplinary units --

8   the windows would be covered, so the cells -- a dark cell

9   essentially is -- it's pitch black 24 hours a day.

10              You have other accounts of the disciplinary units

11   where the plumbing wasn't working, feces on the walls, the

12   smelling of urine, garbage never being cleaned out.  You

13   would have various accounts over time.  In fact, it's been

14   consistent over the last 30 years, wards being chained to --

15   shackled to piping.

16              These were part of the informal rules or

17   procedures for enforcement.  It's not part of official CYA

18   policy, but it did occur.

19   Q    It included beatings at times?

20   A    Yes.

21   Q    The last question I have for you is I think you told us

22   that you testified in front of the legislature in 1988.

23   A    Yes.

24   Q    Did you testify about the California Youth Authority?

25   A    Yes.  I happen to have a copy of it here.

1   Q     Did you testify about the same things that you have

2   testify to today in court?

3   A     Yes.  The situation back then was the same situation as

4   today.  Many of the same complaints that we heard in 1988

5   are the same complaints being heard today, and they are

6   currently the subject of a lawsuit and a consent decree

7   where the state was acknowledged that the problems did

8   exist.  It's the current situation today but also the same

9   problems that were documented 30 years ago.

10  Q     And the same problems that were documented in the 1960s

11  when T.D. Bingham and Barry Mills were in the Youth

12  Authority?

13  A     Consistently.  There are studies from the 1960s, 1970s,

14  1980s, and into the 1990s right up until now.

15          MR. WHITE:  Thank you.

16          THE COURT:  Cross-examination by Ms. Flynn on

17  behalf of the government.

18          MS. FLYNN:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20  BY MS. FLYNN:

21  Q     Good after, Mr. Macallair.

22  A     Good afternoon.

23  Q     I want to go back to -- Mr. White was asking you some

24  questions about how someone gets to the California Youth

25  Authority.

1      Typically it's not a -- a first-time offender

2  isn't sentenced to the California Youth Authority, correct?

3  A    Typically, no.

4  Q    Unless it's some very serious crime?

5  A    Again, that depended on the -- in the 1960s -- actually

6  up until very recently, it often depended on the county.

7  Counties had different commitment practices, so it would not

8  be unusual, for example, to have a first-time offender, a

9  car thief, sentenced from Kern County or Fresno County where

10  they might not be sent from Los Angeles County or San

11  Francisco County or one of the more urban counties, so there

12  was a wide disparity between counties, and it was an issue

13  with Youth Authority officials in the 1960s.

14  Q    More often than not they had prior contact with law

15  enforcement of some sort the offenders that went to the

16  Youth Authority?

17  A    I think that's fair, yes.

18  Q    You have interviewed Mr. Bingham?

19  A    Yes.

20  Q    When did that interview take place?

21  A    Two weeks ago.

22  Q    About how long did you spend with him?

23  A    About five hours.

24  Q    Did you learn during that interview that he had had

25  prior contact with law enforcement before he was first sent

15

1    to the California Youth Authority?

2    A     Oh, yes.  He was quite clear about that.

3    Q     At age 14 when he was committed and then at age 15 sent

4    to Paso Robles, that wasn't his first contact with law

5    enforcement, correct?

6    A     Correct.  I believe he had a prior burglary.

7    Q     When he was age 12?

8    A     Yes.

9    Q     Were you aware that he had an arrest for petty theft at

10   age nine?

11   A     Yes.

12   Q     He had a delinquency history going back at least a few

13   years before he was put in the Youth Authority?

14   A     Yes.

15   Q     Now, I want to talk to you about the goal of the

16   California Youth Authority.

17          Is it fair to say that the goal is not to cure

18   criminal behavior but to increase a ward's chance for

19   success on the outside?

20   A     The Youth Authority statute is to substitute

21   retributive punishment with training and treatment and

22   rehabilitation and -- I forget the rest of it.  Essentially

23   it's a rehabilitative mandate.

24   Q     Would it be fair to say that it's to give a ward some

25   tools to use on the outside when they get out there?

1    A    That was the expressed purpose, yes.

2    Q    But it's not specifically to cure what could be bad

3    criminal behavior?

4    A    Well, it was to provide rehabilitative services in

5    order to increase the person's potential for success once

6    they leave the institution.

7    Q    That success depended a lot on the person when they

8    left, correct?

9    A    Correct.

10   Q    And it depended on how motivated that youth or ward was

11   when they left the authority?

12   A    Yes.

13   Q    Some individuals were more motivated and took

14   responsibility for their actions rather than others?

15   A    Yes.

16   Q    Have you done studies on the percentages of California

17   Youth Authority wards that have gone on to commit murder?

18   A    No.

19   Q    You don't know what the percentage is of people that

20   were in the California Youth Authority that later went on to

21   become murders?

22   A    Nobody knows that.  The Youth Authority doesn't know

23   that.

24   Q    So they don't know how many then went on to become

25   multiple murders?

17

```
1    A    All we know are the general recidivism rates.
2    Q    Do you know how many went on to become leaders of a
3    nationwide prison gang?
4    A    No.
5    Q    Now, you also talked a little bit about the California
6    Youth Authority and that it broke down along racial lines;
7    is that correct?
8    A    Yes.
9    Q    Is it fair to say that a person when coming out of the
10   California Youth Authority might have developed some racist
11   tendencies?
12   A    Coming out of the Youth Authority?
13   Q    Yes.
14   A    Yes.  I mean there is -- basically they would either go
15   in with them and have it reinforced, or they would learn it
16   once they were in.
17   Q    So that was something that might have been taught to
18   them during their time in the Youth Authority informally of
19   course?
20   A    It was part of the daily experience.
21   Q    Now, you are here testifying because Mr. Bingham's team
22   is paying you; is that correct?
23   A    Yes.
24   Q    So you are a hired expert?
25   A    Yes.
```

18

1   Q    You testified several times as an expert witness; is

2   that correct?

3   A    Yes.

4   Q    You also have been given a copy of your resume.  It

5   looks like you have some extensive lecturing and training

6   that you do throughout the country.

7   A    Yes.

8   Q    I also noticed that in 2004 you were a trainer at an

9   annual capital case defense seminar.

10  A    Yes.

11  Q    Was that in helping defense attorneys learn mitigation

12  evidence to present in a capital phase?

13  A    Yes.  I was asked to give -- essentially give a

14  presentation on conditions in youth correctional facilities.

15  Q    And I think you lectured on a similar thing in about

16  2004, '99, and 98 to California attorneys in the Public

17  Defenders Association.

18  A    Yes.  I get requested frequently.

19  Q    So that is something you frequently do?

20  A    Occasionally.

21  Q    And you also lecture on juvenile issues exclusively as

22  well?

23  A    Yes.

24  Q    I know you said you interviewed Mr. Bingham.

25       Did you ever interview Mr. Mills?

1   A    No.

2   Q    When you interviewed Mr. Bingham, did he relate to you

3   his experiences in the California Youth Authority?

4   A    Yes.

5   Q    And then you never interviewed Mr. Mills?

6   A    No.

7           MS. FLYNN:  I have nothing further, Your Honor.

8           THE COURT:  Mr. White, do you have any redirect?

9           MR. WHITE:  Yes.

10          THE COURT:  This is Mr. White on redirect

11  examination.

12                  REDIRECT EXAMINATION

13  BY MR. WHITE:

14  Q    Mr. Macallair, you have testified that you lectured at

15  some death penalty seminars; is that right?

16  A    Yes.

17  Q    Regarding conditions within the Youth Authority over

18  the last 40 years?

19  A    Yes.

20  Q    That's what you have testified about today?

21  A    Yes.

22  Q    When you testified in front of the legislature in 1988,

23  you also testified about conditions within the Youth

24  Authority over the last 40 years; is that correct?

25  A    Yes.

1  Q    Did your testimony in front of the legislature in 1988

2  have anything to do with the death penalty?

3  A    No.

4  Q    Now, do you also contract with District Attorney's

5  Offices in various locations?

6  A    Yes.

7  Q    Where is it that you have a contract with the District

8  Attorney's Office?

9  A    I should say we have had -- we have contracted with the

10  San Francisco District Attorney's Office on at least two

11  occasions over the last ten years.  We were contracted --

12  actually they contracted with us to support our Intensive

13  Case Management Program for chronic delinquents in the city

14  of San Francisco, and we were also contracted do a project.

15           One of their model programs right now is a reentry

16  program for people with histories of substance abuse -- or

17  actually drug sales and abuse and to help develop a reentry

18  program for the City of San Francisco, which is currently --

19  the contract ended a couple of years ago.  It's now

20  currently -- we were contracted help implement it.  It's now

21  fully operative and considered one of the City's models.

22  Q    You were asked a question about Mr. Bingham's juvenile

23  history.  He was arrested for a petty theft at the age of

24  nine.  He had a petition sustained for burglary at the age

25  of 12 and a petition sustained for grand theft auto at the

1  age of 14.

2         Based upon your experience, would you consider that

3  a rather low level of criminal history for one being sent to

4  the California Youth Authority?

5  A    The California Youth Authority was originally intended

6  to be a place of -- a place of last resort generally

7  reserved for very chronic offenders or those with histories

8  of violence and aggression.  As I said, there were wide

9  county disparities.  In this instance, somebody being sent

10  to the Youth Authority for car theft -- this is a case that

11  probably would have caused some concern among many officials

12  in the Youth Authority at the time, and it is also what gave

13  rise to a couple of their experimental programs of the

14  1960s, specifically the Community Treatment Program in 1964

15  and the Probation Subsidy Program in 1967.

16         Both were designed to expand the range of

17  community-based services to prevent or reduce the number of

18  kids committed to the Youth Authority and also expand the

19  capacity of local Probation Departments to provide a wider

20  range of interventions so institutionalization would not be

21  a first resort.

22  Q    So the Youth Authority's own view, it was not set up

23  for an individual with Mr. Bingham's record, correct?

24  A    The biggest problem that was confronting Youth

25  Authority officials at the time -- again, this is

1    well-documented -- is that they possessed limited resources.

2    It's mandate was to provide rehabilitation.  I say that

3    unequivocally.  That was their mandate, but the necessary

4    resources to do that in an institutional setting were not

5    being made available by the legislature.  The Youth

6    Authority officials at the time lamented the fact that they

7    were forced to rely on these large dormitory style living

8    units which they all acknowledged to be ineffective and in

9    many ways promoted the violence in the institutions, but the

10   legislature and the Department of Finance insisted on it

11   because if for nothing else it was cost effective.

12   Q    It was brought out that the mandate of the Youth

13   Authority was rehabilitation, correct?

14   A    Yes.

15   Q    Were they able to deliver on that mandate in the '60s?

16   A    They weren't able to deliver it on in the '60s, '70s,

17   '80s, '90s, or up until now.  That's why we are currently

18   under a consent decree.

19   Q    Finally, you were asked -- you mentioned rates of

20   recidivism.

21          Does the Youth Authority or anybody keep

22   statistics on the rate of recidivism?

23   A    Yes.

24   Q    What is the rate of recidivism for children who were in

25   the Youth Authority?

```
 1    A     It depends on how you measure it.  The traditional

 2    measurement used by the Youth Authority if you were to call

 3    and ask them what your recidivism rate is -- what they will

 4    tell you and what they would have told you back in the '60s

 5    is between 46 and 49 percent.  It was 47 percent then.  I

 6    think it's about 46 today.

 7            That is based on the number of wards who are

 8    returned from parole, who violate some form of their parole.

 9    Why that doesn't tell the whole picture is because the

10    majority of roles who are paroled from the Youth Authority

11    are over 18, so if they come out and commit a new offense,

12    it may result in a new conviction.  That's a conviction in

13    adult court.

14            The Youth Authority has conducted studies over

15    time, and they did so in the 1970s and 1980s and most

16    recently.  If you track the wards after they leave for a

17    period of three years, then the recidivism rates, the

18    rearrest rates -- the number of wards rearrested will rise

19    between anywhere from 76 percent, 80 percent in some of the

20    studies in the 1980s, to 90 percent in the 1990s.

21            MR. WHITE:  Thank you.  I have nothing further.

22            THE COURT:  Any recross?

23            MS. FLYNN:  No, Your Honor.

24            THE COURT:  May the witness be excused?

25            MS. FLYNN:  Yes, Your Honor.
```

```
 1              MR. WHITE:  Yes, Your Honor.
 2              THE COURT:  Thank you very much.  You are excused.
 3              MR. WHITE:  Your Honor, before I forget, we would
 4    offer at this point into evidence Exhibit 1600 through 1606.
 5              THE COURT:  One is 1605 had been received.  1606
 6    received.
 7              Any objection to 1604?
 8              MS. FLYNN:  No, Your Honor.
 9              THE COURT:  1604 is received.
10              (Exhibit 1604 received.)
11              THE COURT:  1603, Social Security records, any
12    objection, counsel?
13              MS. FLYNN:  No, Your Honor.
14              THE COURT:  1603 is received.
15              (Exhibit 1603 received.)
16              THE COURT:  1602, register of Mr. Bingham with the
17    Youth Authority, any objection?
18              MS. FLYNN:  No.
19              THE COURT:  1602 is recived.
20              (Exhibit 1602 received.)
21              THE COURT:  And 1601 is received.
22              (Exhibit 1601 received.)
23              THE COURT:  Mr. White.
24              MR. WHITE:  We would call as our next witness Don
25    Ingwersen.
```

```
 1            THE COURT:  If you would step between the double
 2   doors, please.  Would you raise your right hand.  Christy,
 3   the clerk, will administer the oath to you.
 4            DON INGWERSEN, DEFENSE WITNESS, SWORN
 5            THE COURT:  Would you please be seated here in the
 6   witness box.
 7            Would you be kind enough to state your name for
 8   the jurors.
 9            THE WITNESS:  Don Ingwersen, I-n-g-w-e-r-s-e-n.
10                    DIRECT EXAMINATION
11   BY MR. WHITE:
12   Q    Good afternoon, Mr. Ingwersen.
13   A    Good afternoon.
14   Q    What is your connection with this case?
15   A    I was appointed as the investigator for Mr. Bingham.
16   Q    Approximately how many years ago was that?
17   A    It was in January of 2003.
18   Q    So you have been the investigator on this case on
19   behalf of Mr. Bingham since January 2003?
20   A    Yes, sir.
21   Q    As such, do you work with myself and Bill Harris?
22   A    Yes.
23   Q    Now, first of all, I would like to ask you what is your
24   occupation?
25   A    I am an investigator licensed by the State of
```

1    California.

2    Q    Can you give us some of your experience with regard to

3    law enforcement?  Have you ever been in law enforcement?

4    A    Yes, sir.  I was a deputy sheriff, Los Angeles County,

5    for 18 years.  I then transferred to the Los Angeles County

6    Public Defender's Office and served there for 15 years as a

7    felony investigator.

8    Q    How long have you been a private investigator?

9    A    I retired from county service in 1983 and immediately

10   became a private investigator.

11   Q    If I might ask how old are you?

12   A    I am 80.

13   Q    Now, how long have you and I worked together?

14   A    At least 25 years.

15   Q    We have worked on a lot of cases together?

16   A    Yes, sir.

17   Q    You have told us about -- well, first of all, let me

18   ask you this.

19            In connection with your investigation on this

20   case, have you had occasion to interview Gayle Miller?

21   A    Yes, I have.

22   Q    Can you tell us where that interview took place?

23   A    In Okmulgee, Oklahoma.

24   Q    When did the interview take place?

25   A    January 30 of this year -- I'm sorry, July 30.

1    Q    Did you prepare a report in connection with that

2    interview?

3    A    Yes, I did.

4    Q    Do you have that report with you?

5    A    Yes.

6    Q    Do you think you might need it at times to refresh your

7    recollection?

8    A    Probably so.

9    Q    Now, before interviewing Gayle Miller, did you

10   receive --

11          MR. WHITE:   Your Honor, can I approach?

12   BY MR. WHITE:

13   Q    I would like to show you Exhibit 1604.   Would you take

14   a look at that?

15   A    Yes, sir.

16   Q    Do you recognize that?

17   A    Yes.

18   Q    What is that?

19   A    It's a letter that's prepared by Gayle Miller at my

20   request.

21   Q    Did she send that letter to you?

22   A    Yes.

23   Q    And you received that letter?

24   A    Yes.

25   Q    And you gave me that letter?

1    A    Right.

2    Q    Now, when you spoke to Gayle Miller in Okmulgee,

3    Oklahoma, did you ask her about the contents of the letter?

4    A    We discussed the letter, yes.

5    Q    Did she confirm that she had sent that letter to you?

6    A    Yes.

7    Q    Now, can you tell us about your interview with Gayle

8    Miller?  Can you tell us -- you can go through your report

9    if you like.  Tell us the sum and substance of the interview

10   with her, please.

11   A    Well, the main thing I recall is that she was very

12   outgoing and forthcoming.  She was a very willing witness to

13   interview.

14   Q    Do you know when Mr. Bingham and Gayle Miller divorced,

15   approximately when that was?

16   A    I don't know the time of the divorce, no, sir.

17   Q    Did Ms. Miller -- again, she confirmed everything that

18   she had written in the letter?

19   A    Yes.

20   Q    Now, while back in Okmulgee, did you also have an

21   occasion to interview Nolan Posey?

22   A    Who is Nolan Posey?

23   A    Gayle's brother.

24   Q    Is Nolan Posey the uncle of Gary Goni, Brian Miller,

25   and Tyler Bingham?

1    A    Yes.

2    Q    What did Nolan Posey tell you about Mr. Bingham?

3    A    He indicated that he never had any harsh words.  He was

4    always attentive when they would go on a family outing.  He

5    was very good to the children and to Gayle.

6    Q    That T.D. was good to the children and to Gayle?

7    A    Yes.

8    Q    Now, Mr. Ingwersen, aside -- strike that.  Do you feel

9    like you have a relationship with T.D.?

10   A    Yes, sir, I do.

11   Q    Beyond the professional relationship of a private

12   investigator and client?

13   A    Yes, sir, I do.

14   Q    How would you describe your relationship at this point

15   with T.D. Bingham?

16   A    I consider him a friend.

17   Q    Did you know T.D. Bingham before January 2003 when you

18   became an investigator on this case?

19   A    No, sir, I did not.

20   Q    This friendship has built up over the last three years

21   or so?

22   A    Frequently preparing for the case at least about I

23   would say once a week, and I had phone conversations with

24   him in between, so it's been a continual thing for the last

25   three-and-a-half years.

30

Q     These interviews and phone conversations, did they go beyond a discussion of the case?

A     Yes, they did.

Q     This friendship that built up was not as a result of talking about the case I take it.

A     After several interviews, I could see that if he said something I would believe it, and I think vice versa.   He also trusted me.

Q     Mr. Ingwersen, your wife's name is Carmen?

A     Yes, sir.

Q     Within the last couple of years, did Carmen become sick?

A     Yes.

Q     Do you know when that was?

A     May 2004.

Q     By that time, you had known Mr. Bingham for almost a year and a half?

A     Correct.

Q     Did she have surgery in May 2004?

A     Yes.

Q     What kind of surgery?

A     She had quadruple bypass, and then it was complimented by a massive hemorrhage two days later.

Q     How long have you been married to Carmen?

A     35 years.

1    Q    For how long was Carmen sick after her surgery and the

2    massive hemorrhage?

3    A    It was ongoing until the first of this year.  She was

4    in four different hospitals, five different operations.

5    Q    Over 18 months?

6    A    Yes.

7    Q    Needless to say, that was a very difficult time for

8    you.

9    A    It certainly was.

10   Q    Were there times you felt like she wasn't going to make

11   it?

12   A    I was told by the doctors that she probably would not

13   make it.  Certainly there were times.

14   Q    Would T.D. Bingham talk to you about that?

15   A    Yes.

16   Q    Will you tell the jury how T.D. Bingham reacted?

17   A    Well, every time I saw him after Carmen got sick the

18   conversation would go directly to her.  He has made a

19   statement more than once that he was praying for her.

20   Q    Would Mr. Bingham write letters to Carmen?

21   A    Letters and cards of encouragement, yes.

22   Q    Would he speak to her on the phone if she was able to

23   speak on the phone?

24   A    They spoke quite a lot, yes.

25   Q    Was Mr. Bingham helpful to you in weathering those

1    trying times?

2    A     Yes, he was.

3              MR. WHITE:   Thank you, Your Honor.   I have nothing

4    further.

5              THE COURT:   Cross-examination?

6              MR. FLEMING:   No cross examination.

7              THE COURT:   Thank you, Mr. Ingwersen.   You may

8    step down.

9              MR. WHITE:   Your Honor, we would call Carmen

10   Ingwersen.

11             THE COURT:   Mrs. Ingwersen, if you would step

12   between the double doors, please.

13             Would you please raise your right hand.   Lisa is

14   going to administer the oath to you.

15             CARMEN INGWERSEN, DEFENSE WITNESS, SWORN

16             THE COURT:   Would you be seated here just to my

17   right.

18             Would state your name for the jury and please

19   spell your last name.

20             THE WITNESS:   Carmen Ingwersen, I-n-g-w-e-r-s-o-n.

21             THE COURT:   Mr. White.

22                       DIRECT EXAMINATION

23   BY MR. WHITE:

24   Q    Mrs. Ingwersen, your husband is Don?

25   A    My husband is Don.

33

```
 1    Q     And you have been married for at least 35 years?

 2    A     Well, he is wrong.  It's 34.

 3    Q     During all that period of time, Don has been an

 4    investigator; is that correct?

 5    A     That's right.

 6    Q     Have you ever had occasion to testify before?

 7    A     No, I haven't.

 8    Q     This is your first time?

 9    A     Yes, it is.

10    Q     Have you come to know T.D. Bingham?

11    A     Yes, I have.

12    Q     You have never met him have you?

13    A     I have never met him personally.  Our transactions have

14    been over the phone and in letter writing.

15    Q     How do you regard Mr. Bingham?  Do you regard him as a

16    friend?

17    A     I regard him as a very good friend, yes.

18    Q     Don told us about your surgery in May of 2004 I

19    believe.

20    A     2004, yes.

21    Q     And then there were complications after your surgery?

22    A     Yes, for a year and a half after my surgery.

23    Q     You were in a number of hospitals?

24    A     Yes.  I had four operations in the year and a half.

25    Q     There were times that things looked pretty grim?
```

1   A     Yes, they did.

2   Q     Did you have communication with T.D. Bingham during

3   that period of your illness?

4   A     Yes.  When I was home from the hospital in between my

5   hospital visits, I would talk to T.D. on the phone, and when

6   I was in the hospital, he wrote me some letters all the time

7   telling me that he was praying for my recovery, which meant

8   a lot to me.  He said, "I haven't prayed in a long time,

9   Carmen, but I am praying for you for your recovery."  It was

10  very touching.

11              MR. WHITE:  Thank you.  I have nothing further.

12              THE COURT:  Ms. Flynn.

13              MS. FLYNN:  No questions on cross-examination.

14              THE COURT:  May the witness be excused?

15              MS. FLYNN:  Yes.

16              MR. WHITE:  Yes.

17              THE COURT:  Thank you very much.  You may step

18  down.

19              MR. WHITE:  The defense would call -- we have a

20  stipulation.

21              THE COURT:  There is a stipulation?

22              MR. HARRIS:  Yes, Your Honor.  A few preliminary

23  matters.  I don't know if we offered 1600.  If we didn't, we

24  would offer it at this time, the report.

25              THE COURT:  Any objection?

1          MS. FLYNN:  No, Your Honor.

2          THE COURT:  1600 is received.

3          (Exhibit 1600 received.)

4          MR. HARRIS:  We have two stipulations, Your Honor.

5   The first stipulation is as follows:

6          "T.D. Bingham has a projected release date of

7   January 10, 2010."

8          THE COURT:  That stipulated to by the government?

9          MS. FLYNN:  Yes.

10          MR. HARRIS:  The second stipulation is as follows:

11          "T.D. Bingham has a discipline-free record in

12   prison since 1999."

13          THE COURT:  Is that stipulated to by the

14   government?

15          MS. FLYNN:  Yes.

16          THE COURT:  Those stipulations are binding upon

17   us.

18          Counsel, your next witness, please.

19          MR. HARRIS:  On behalf of Mr. Bingham, the defense

20   would call Gary Goni.

21          THE COURT:  If you would be kind enough to step

22   between the double doors.

23          Now, sir, would you stop and please raise your

24   right hand.  Lisa will administer an oath to you.

25          GARY FRANCIS GONI, DEFENSE WITNESS, SWORN

36

| | | |
|---|---|---|
| 1 | | THE COURT:  Sir, would you state your full name |
| 2 | | for the jury and spell your last name. |
| 3 | | THE WITNESS:  Gary Francis Goni, G-o-n-i. |
| 4 | | THE COURT:  This is direct examination by Mr. |
| 5 | | Harris of Mr. Goni. |
| 6 | | DIRECT EXAMINATION |
| 7 | | BY MR. HARRIS: |
| 8 | Q | Mr. Goan I hold are you? |
| 9 | A | Twenty-six. |
| 10 | Q | What is your date of birth? |
| 11 | A | 11/28/79. |
| 12 | Q | How do you make your living? |
| 13 | A | I am a commercial painter, foreman. |
| 14 | Q | What's the name of the company? |
| 15 | A | Ball-Turner Painting (phonetic) |
| 16 | Q | Where do you live? |
| 17 | A | Tulsa, Oklahoma. |
| 18 | Q | Do you have a roommate? |
| 19 | A | Yes, tyler. |
| 20 | Q | What is Tyler's last name? |
| 21 | A | Bingham. |
| 22 | Q | What is your relationship to Tyler Bingham? |
| 23 | A | I am his older brother. |
| 24 | Q | You know Mr. Bingham, T.D. Bingham, do you not? |
| 25 | A | He's my dad. |

37

```
 1    Q     Do you have another brother?

 2    A     Yes, Brian Miller.

 3    Q     Where does he live?

 4    A     Okmulgee, Oklahoma.

 5    Q     Who is Gayle Miller?

 6    A     That's my mother.

 7    Q     Where does she live?

 8    A     Okmulgee, Oklahoma.

 9    Q     Taking you back to the period 1981 to 1985, you were

10    between one and five years old at that time approximately?

11    A     Yes.

12    Q     Where were you living at that time?

13    A     Texas.

14    Q     Who were you living with?  Who was your family back

15    then?

16    A     My dad and my mother, Gayle and T.D.

17    Q     When was Tyler born?

18    A     '81, something like that.

19    Q     '81 or '82?

20    A     '81 or '82.

21    Q     Do you have some memories of those years, 1981 to 1985?

22    A     Yes, sir.

23    Q     You were living in Texas then?

24    A     Yes, sir.

25    Q     Could you describe for the jury what kind of father
```

1    T.D. Bingham was to you first of all generally?

2    A    He was a wonderful dad.   Even today he is still a

3    wonderful dad.

4    Q    Could you share with the jury some of your

5    recollections about Mr. Bingham back during those years 1981

6    to 1985?

7    A    All kinds of stuff.   I remember everything from sitting

8    down at the dinner table with him to going places like water

9    parks, all kinds of stuff.

10   Q    Did he spend a lot of time with you?

11   A    When he wasn't working, yes.

12   Q    What kind of work did he do?

13   A    He was in the oil field.

14   Q    Did he provide for the family?

15   A    Yes, sir.

16   Q    Did you always have enough food to eat and a roof over

17   your head?

18   A    Yes, sir.

19   Q    Did you ever go out to the oil fields with him?

20   A    Yeah.   There was quite a -- a couple -- a few occasions

21   I remember.   We would drive the truck.   He had an old work

22   truck.   We would drive the work truck out there, and he

23   would let us crawl around on the oil rig, and we would stay

24   in the dog house and eat lunch with him, all kinds of good

25   stuff.

1  Q    So he would just take you there, and you would hang out

2  with him?

3  A    Yeah, on his lighter days of duty.

4  Q    Do you remember any other recollections from those

5  years about your dad that you could tell the jury about?

6  A    All kinds of stuff, just basic kids stuff.  He taught

7  us how to ride a bike and bought us dogs.  We had our own

8  heavy punching bag out back on the porch that he had us

9  boxing on when we were little.  Marvelous Marvin Haggard and

10 Sugar Ray Leonard was the two boxers I remember back then.

11 Q    You were telling me yesterday something about the lunch

12 box.

13 A    He would calls keep something, crackers or candy, in

14 his lunch that he packed that morning to bring home to me

15 and my brothers.  It was like a gift or a big surprise or

16 something that we got to eat when we got home, a little gift

17 for his boys.

18 Q    Did he have a truck?

19 A    Yeah, an Apache, red and white.

20 Q    Do you remember anything about him letting you drive

21 the truck or sit on his lap?

22 A    Sat on his lap and steered.  There were some occasions

23 we would sneak those in going down the road.

24 Q    You were telling me something about fire flies last

25 night.  What was that?

```
 1    A     In Texas, we used to catch fire flies in a glass
 2    container and take them home and watch them light up in the
 3    jar and release them in the house, all kinds of stuff like
 4    that.
 5    Q     He would show you how to do that?
 6    A     Yeah.
 7    Q     Now, Mr. Bingham went away from the family in 1985, did
 8    he not?
 9    A     Yes.
10    Q     That's when he was arrested?
11    A     Yes.
12    Q     He never came back to you as your father living in the
13    same house with you; is that right?
14    A     Yes, sir.
15    Q     After 1985, did you continue to have some contact with
16    Mr. Bingham?
17    A     Yes.  He wrote letters quite often, birthdays and just
18    out of the blue, to check on us and see how we were doing,
19    remind us that school is important.  We heard from him quite
20    often in letters.  When phone calls was available, he would
21    call us.
22    Q     Would you write back to him?
23    A     Yes, sir.
24    Q     That sort of back and forth correspondence, about how
25    long did that go on?
```

```
 1    A      It went on until probably my adolescence.   Then I
 2    started drifting my own way doing my own thing.
 3    Q      Did you ever have face-to-face visits with him after he
 4    left the house?
 5    A      Once when I was little.   I forget for sure how old I
 6    was.   I went with his mother to the penitentiary and saw him
 7    face to face.
 8    Q      Who else was with you on that trip?
 9    A      My brothers, Brian and Tyler.
10    Q      As you sit here today, can you tell the jury how you
11    feel about your dad?
12    A      I love him.   I love him to death.
13    Q      Is it important to you to have a continuing
14    relationship with your dad in the years to come?
15    A      Yes, sir.
16    Q      Why is that?
17    A      Because I love him.   It's my dad.
18            MR. HARRIS:   Thank you.   No further questions.
19            THE COURT:   Cross-examination by the government?
20            MS. BLANCH:   No questions.
21            THE COURT:   May the witness be excused, Mr.
22    Harris?
23            MR. HARRIS:   Yes.
24            THE COURT:   Ms. Flynn?
25            MS. FLYNN:   Yes, Your Honor.
```

1          THE COURT:  Thank you, sir.  You are excused from

2    these proceedings.

3          MR. HARRIS:  The defense would next call Brian

4    Miller, Your Honor.

5               BRIAN MILLER, DEFENSE WITNESS, SWORN

6          THE COURT:  Would you please be seated in the

7    witness box just to my right.

8          Would you state your full name for the jury,

9    please.

10         THE WITNESS:  Brian Miller, M-i-l-l-e-r.

11         THE COURT:  Thank you.

12               DIRECT EXAMINATION

13   BY MR. HARRIS:

14   Q    Good afternoon, Mr. Miller.

15   A    How are you doing?

16   Q    How old are you?

17   A    Twenty-six years old.

18   Q    You have a twin brother?

19   A    Yes, Gary Goni.

20   Q    Do you have another brother?

21   A    Yes.

22   Q    Who is that?

23   A    Tyler Bingham.

24   Q    Are you employed?

25   A    Yes.

43

1    Q    How do you make your living?

2    A    I make my living as a field machinist.  I travel the

3    world, and I work on engines that are compressed to natural

4    gas from the Gulf coast up into Canada.

5    Q    What is the name of the company you work for?

6    A    Arrow Industries.

7    Q    Where do you live?

8    A    I live in Okmulgee, Oklahoma.

9    Q    Can you spell it?

10   A    O-k-m-u-l-g-e-e.

11   Q    What is your relationship to Mr. Bingham?

12   A    I am T.D.'s son, middle son.

13   Q    Taking you back to the years 1981 to 1985, you were a

14   young boy then?

15   A    Very young.

16   Q    One to five approximately?

17   A    Yes.

18   Q    Where were you living back during those years?

19   A    Really couldn't tell you.  Texas I think.

20   Q    Do you have recollections -- who was the family unit

21   back then?  Who was all in the family?

22   A    That would be my mother, Gayle, my two other brothers,

23   myself, and T.D.

24   Q    Now, do you have some recollections of Mr. Bingham

25   during those years?

1    A    We are speaking of Sr.?

2    Q    Sr.

3    A    Absolutely, a loving, honest, caring father,

4    hard-working individual, very well-rounded I would say.

5    Directly, as far as the work ethic was concerned, he was a

6    very positive figure in that manner.

7    Q    Did he always provide for the family?

8    A    Absolutely as best he could, yes.

9    Q    Did you know what kind of work he was involved in?

10   A    The oil field.

11   Q    How do you know that?

12   A    I know that just because I have been there, seen it.

13   He took us and involved our lives in his work life.  He

14   didn't have the best time in the world to spend with his

15   kids, and when he did, he took us to the place of work where

16   he worked sometimes just to spend that little extra time

17   with us.

18   Q    Did he have a truck?

19   A    Yeah, a '58 Chevy Apache, GMC '58 Apache with a white

20   top, red body, slick, step-side.

21   Q    Would you see him work on that truck?

22   A    Oh, yeah.  He worked on it, let us drive it.  When my

23   brother Gary and I -- when we was about five years old, he

24   would take us and stick us on his lap.  I remember there was

25   a set of railroad tracks right before you would come into

1    our driveway.  He would let us drive from the railroad

2    tracks on in.  Of course we would steer.  We wasn't able to

3    quite reach the pedals.  He would stick us on his lap and

4    let us drive into the driveway.  It was a pretty unique

5    experience for our first time driving.

6    Q     Do you remember anything about boxing gloves?

7    A     Yeah.  We used to put on the boxing gloves, my twin and

8    I.  We would spar a bit.  He would take us out to the garage

9    and let us hit around on the speed bag and the punching bag

10   and lifted weights with him.  He showed us how to be

11   physical young men, you know.

12   Q     How did you learn how to swim?

13   A     He took us out several times, him and my mother, for

14   family events, barbecues and what not.  We would go out, and

15   he would get us in the water.  He would lay us across his

16   arms and let us kick and paddle, you know, pretty much how

17   to swim.  I ain't forgot today.

18   Q     Are there any other vivid memories that you have about

19   your father in those years that you can tell the jury?

20   A     Yes, sir.  There is only one that really sticks with

21   me.  This man loved his baby boy Tyler.  He would hold my

22   brother and caress my brother, and the reason why I know

23   this for a fact and still today is because I was jealous

24   then that we wasn't babies, and he wasn't doing us the same

25   way.  He would hold my little brother and cradle my brother.

46

```
 1   There is no way that that love -- it's undeniable love that
 2   you would see.  The man still has it with him today.
 3              MR. HARRIS:  Thank you, Mr. Miller.  No further
 4   questions.
 5              THE COURT:  Any questions?
 6              THE COURT:  Any questions on cross-examination?
 7              MS. BLANCH:  No questions.
 8              THE COURT:  May Mr. Miller be excused?
 9              MR. HARRIS:  Yes.
10              MS. FLYNN:  Yes.
11              THE COURT:  Mr. Miller, thank you very much.  You
12   are excused from these proceedings.
13              Counsel, you may call your next witness.
14              MR. WHITE:  We will call Tyler Bingham.
15              TYLER DUSTIN BINGHAM, DEFENSE WITNESS, SWORN
16              THE COURT:  Would you state your full name for the
17   jury and spell your last name.
18              THE WITNESS:  Tyler Dustin Bingham, B-i-n-g-h-a-m.
19              THE COURT:  Thank you very much.
20              THE COURT:  Direct examination by Mr. White of Mr.
21   Bingham.
22                        DIRECT EXAMINATION
23   BY MR. WHITE:
24   Q    Mr. Bingham, is that your father sitting over there?
25   A    Yes, sir.
```

| | | |
|---|---|---|
| 1 | Q | How old are you? |
| 2 | A | Twenty-three. |
| 3 | Q | What is your date of birth? |
| 4 | A | 7/12/83. |
| 5 | Q | Where do you live right now? |
| 6 | A | Tulsa, Oklahoma. |
| 7 | Q | Who do you live with? |
| 8 | A | My brother Gary. |
| 9 | Q | Are you employed right now? |
| 10 | A | Yes, sir. |
| 11 | Q | Where do you work? |
| 12 | A | For American Residential. |
| 13 | Q | What do you for American Residential? |
| 14 | A | I am a maintenance technician. |
| 15 | Q | What does a maintenance technician do? |
| 16 | A | Keep up apartments, makes sure the air-conditioning is |
| 17 | | running, the electrical, everything works. |
| 18 | Q | How long have you worked for them? |
| 19 | A | I just transferred from another property about a month |
| 20 | | ago. |
| 21 | Q | And what was that other property you worked for? |
| 22 | A | Riverside Park. |
| 23 | Q | How long did you work for them? |
| 24 | A | About two years. |
| 25 | Q | Now, when you went to work for them two years ago, were |

```
 1    you in college at the time?
 2    A    Yes, sir.
 3    Q    Let's talk about your college a little bit.
 4              What college did you go to?
 5    A    Northeastern State.
 6    Q    What state is that in?
 7    A    Oklahoma.
 8    Q    For how many years did you go to Northeastern State?
 9    A    A year.
10    Q    Where did you go after that?
11    A    Oklahoma State.
12    Q    How long did you go to school there approximately?
13    A    I am not sure, Mr. White.
14    Q    How many years of college do you have now?
15    A    Two-and-a-half.
16    Q    So you have a year and a half to go before you get your
17    degree?
18    A    Yes, sir.
19    Q    Why did you stop college?
20    A    I just needed to take a break.
21    Q    Do you intend to go back?
22    A    Yes, sir.
23    Q    When you were in high school, did you play sports?
24    A    Yes, sir.
25    Q    What sports did you play?
```

```
1    A     Wrestling, football, track.

2    Q     By the way, we didn't ask your brothers, but did your

3    brother Brian play sports?

4    A     Yes.

5    Q     What sports did he play?

6    A     Wrestling, football, baseball.

7    Q     How about your brother Gary?

8    A     The same.

9    Q     Did you guys all go to the same high school?

10   A     Yes, sir.

11   Q     At different times?

12   A     Yes, sir.

13   Q     When you went to college, did you wrestle in college?

14   A     Yes.

15   Q     For how long?

16   A     Until I hurt my knee.  A year.

17   Q     Did that knee cause you to have to stop wrestling?

18   A     Yes.

19   Q     At some point after graduating from high school or

20   maybe while you were in high school, did you receive a

21   letter from Stanford University?

22   A     Yes, sir.

23   Q     Do you remember when that was?

24   A     No, I don't.

25   Q     Were you in high school or had you finished?
```

```
 1   A     I think I was in high school.

 2   Q     What was the nature of the letter?

 3   A     Asking me to apply with them and come out and check out

 4   the school.

 5   Q     Were you able to do that?

 6   A     No, sir.

 7   Q     Did you feel like that was a pretty big honor to get a

 8   letter from Stanford?

 9   A     Yes.

10   Q     Did you have good grades in high school, Tyler?

11   A     Yes, sir.

12   Q     Now, you were born in 1983; is that right?

13   A     Yes, sir.

14   Q     Do you have any memories of your dad back in -- before

15   he went back to jail?

16   A     No, sir.

17   Q     You have seen a number of pictures of your dad holding

18   you.

19   A     Yes, sir.

20   Q     And other pictures of you and your dad together?

21   A     Yes, sir.

22   Q     You don't have any memories of those times do you?

23   A     No, sir.

24   Q     What's the first memory you have about your dad?   Do

25   you remember getting letters from him and talking to him on
```

51

1   the telephone?

2   A    Yes, sir.

3   Q    Brian talked about visiting your dad out here when he

4   was in prison.  Do you remember that?

5   A    No, sir.  I was too young.

6   Q    So your first memories are the telephone and letters?

7   A    Yes, sir.

8   Q    When is the first time you remember visiting your

9   father?

10  A    I think it was two years ago when he was in West

11  Valley.

12  Q    West Valley?

13  A    Yes, sir.

14  Q    Your dad was awaiting trial in this case?

15  A    Yes, sir.

16  Q    And you were how old?

17  A    Twenty-one.

18  Q    And you had no memories of having ever seen him before?

19  A    No, sir.

20  Q    What was it like to see your father?

21  A    Words can't express how it felt.

22  Q    How much time were you able to spend with him?

23  A    A few hours.

24  Q    Were you able to see him more than one day?

25  A    Yes, sir.

1    Q    Your dad is a pretty prolific letter writer; is that

2    right?

3    A    Yes, sir.

4    Q    Likes to lecture you at times through the mail?

5    A    Yes, sir.

6    Q    Or on the telephone?

7    A    Yes.

8         MR. WHITE:  Your Honor, I have five letters --

9    actually they are individually marked, so I would ask that

10   the first letter which is postmarked April 25, 2003, be

11   marked Exhibit 1607 and the second letter postmarked

12   August 14, 2004, be marked 1608, and the third letter

13   postmarked August 26, 2004, be marked 1609, and the fourth

14   letter which has no postmark on the envelope but which is

15   dated August 25, 2004, be marked 1610, and the fifth letter

16   without a postmark but dated October 15, 2004, be marked

17   1611.

18        THE COURT:  All right.

19        (Exhibits 1607 through 1611 marked.)

20        MR. WHITE:  May I approach the witness?

21        THE COURT:  You may.

22   BY MR. WHITE:

23   Q    Mr. Bingham, would you look at Exhibit 1607?  Is that a

24   letter that you received from your dad?

25   A    Yes, sir.

1    Q    Did you send this letter to me pursuant to my request?

2    A    Yes, sir.

3    Q    I would like you to read this letter to the jury.

4    A    "Son, you have no idea how proud I am of you, how proud

5    your grandfater and grandmother would be, and there is a

6    heaven.  Surely they are smiling down upon you.  I am

7    incapable of expressing the enormity of love and pride in my

8    heart-filled single thought of you.

9           "Dawn came to see me yesterday and told me you

10   have been invited to an interview at Stanford.  He mentioned

11   wrestling would transfer from Northeastern and involves a

12   double scholarship.  Son, I want so much for you to rise

13   above and overcome disadvantages my neglect as a father

14   forced upon you."

15          I can't read this.

16   Q    Okay.

17          Could you look at Exhibit 1608.  I am just going

18   to ask you to identify each of the letters.

19          MR. WHITE:  We would propose a stipulation that

20   1607, 1608, 1609, 1610, and 1611 were all letters sent by

21   Mr. T.D. Bingham to his son Tyler.

22          THE COURT:  Have you talked to the government?

23          MR. WHITE:  Yes.

24          THE COURT:  Is that acceptable to all the parties?

25          MS. FLYNN:  Yes.

54

1          MR. WHITE:  And we would request admission.

2          THE COURT:  Any objection?

3          MS. FLYNN:  No.

4          THE COURT: 1607, 1608, 1609, 1610, and 1611 are

5    received into evidence.

6          (Exhibits 1607 through 1611 received.)

7    BY MR. WHITE:

8    Q    I am not going to ask you to read anymore.  I just want

9    to ask you a couple more questions.

10          Were you hoping that your father would be found

11   not guilty and one day in the year 2010 be able to come out

12   of jail and be with you?

13   A    Yes, sir.

14   Q    Even though that has not happened, is it important to

15   you that he still be able to send you letters and talk to

16   you on the telephone?

17   A    Yes, sir.

18          MR. WHITE:  I have nothing further.

19          THE COURT:  Cross-examination by the government?

20          MS. FLYNN:  No, Your Honor.

21          THE COURT:  May Mr. Bingham be excused?

22          MR. WHITE:  Yes.

23          MS. FLYNN:  Yes.

24          THE COURT:  Thank you very much.  You are excused

25   from these proceedings.

1          Counsel, would you like to call your last witness

2    or take a recess?

3                MR. WHITE:  We would like to take a recess.

4                THE COURT:  Let's take a normal half hour then.

5          Ladies and gentlemen, you are admonished not to

6    discuss this matter or to form or express any opinion

7    concerning this case.

8                (Jury not present.)

9                THE COURT:  Anything further before we recess?

10         Why don't we recess until 3:30.  It's an easy time

11   to remember.

12               (Recess.)

13               (Jury not present.)

14               THE COURT:  We are back on the record.  All

15   counsel are present.  The defendants are present.  The

16   government is present.

17         Would you be kind enough to summon the jury,

18   please.

19               (Jury present.)

20               THE COURT:  The jury is present.  The alternates

21   are present.

22         One of you told Lisa the first day you had a

23   childcare issue.  Just remind me, but give me a time

24   Wednesday at the end of the day so you can get the kids to

25   school or whatever.  We will start at that time, whether

1   it's 9:00 or whatever.

2           We are back in session.  The jury is present.  All

3   counsel are present.  The defendants, defense counsel, and

4   the government are present.

5           Mr. White.

6           MR. WHITE:  Your Honor, we have some items to be

7   marked as exhibits.  We would ask that Exhibit 1612 be

8   marked.  It is an inmate education transcript for Mr.

9   Bingham.  I believe there is a stipulation to its admission.

10          MS. FLYNN:  That's correct.

11          (Exhibit 1612 marked.)

12          THE COURT:  Received.

13          (Exhibit 1612 received.)

14          MR. WHITE:  1613 would be a guided individual

15  study regarding a geography class that Mr. Bingham took in

16  prison.  We would ask that be marked 1613, and I believe

17  there would be a stipulation to its admission.

18          (Exhibit 1613 marked.)

19          MS. FLYNN:  Any objection?

20          MS. FLYNN:  No, Your Honor.

21          THE COURT:  1613 is received.

22          (Exhibit 1613 received.)

23          MR. WHITE:  We would ask that a guided individual

24  study again for Mr. Bingham with a date of 7/31/86 be marked

25  1614.

57

1               (Exhibit 1614 marked.)

2               THE COURT:  And the individual study is what?

3               MR. WHITE:  It looks like another geography class.

4       It looks like the same course but different dates actually.

5               THE COURT:  Any objection, Counsel?

6               MS. FLYNN:  No, Your Honor.

7               THE COURT:  1614 is received into evidence.

8               (Exhibit 1614 received.)

9               MR. WHITE:  1615 is a certificate of reward for

10      Tyler Bingham with regards to an astronomy class in 1997.

11              (Exhibit 1615 marked.)

12              THE COURT:  Any objection to its receipt?

13              MS. FLYNN:  No.

14              THE COURT:  1615 is received into evidence.

15              (Exhibit 1615 received.)

16              MR. WHITE:  We would ask that a Certificate of

17      Award for Mr. Bingham for Class of America by Design for the

18      year 1996 be marked 1616.

19              (Exhibit 1616 marked.)

20              THE COURT:  Any objection, Counsel, to its

21      receipt?

22              MS. FLYNN:  No, Your Honor.

23              THE COURT:  1616 is received into evidence.

24              (Exhibit 1616 received.)

25              MR. WHITE:  We would ask that a Certificate of

58

1   Achievement for Tyler Bingham for the year 2000 indicating

2   he has completed Reading Enhancement II, Adult Continuing

3   Education Class, be marked 1617.

4               (Exhibit 1617 marked.)

5               THE COURT:  Any objection to its receipt into

6   evidence?

7               MS. FLYNN:  No, Your Honor.

8               THE COURT:  1617 is received into evidence.

9               (Exhibit 1617 received.)

10              MS. FLYNN:  We could ask that a Certificate of

11  Award dated 1997 for a class in the Great Depression for

12  Tyler Bingham be marked Exhibit 1618.

13              (Exhibit 1618 marked.)

14              THE COURT:  Any objection to its receipt into

15  evidence?

16              MS. FLYNN:  No, Your Honor.

17              THE COURT:  It's received.

18              (Exhibit 1618 received.)

19              MR. WHITE:  We would ask that a Certificate of

20  Achievement for King Arthur and Chivalry from the year 2001

21  be marked 1619.

22              (Exhibit 1619 marked.)

23              THE COURT:  Any objection to 1619 being received

24  into evidence?

25              MS. FLYNN:  No, Your Honor.

59

1          THE COURT:  1619 is received into evidence.

2          (Exhibit 1619 received.)

3          MR. WHITE:  We would request that a Certificate of

4   Achievement for Tyler Bingham for the year 2002 for the

5   class of the American President be marked 1620.

6          (Exhibit 1620 marked.)

7          THE COURT:  Any objection to its receipt into

8   evidence?

9          MS. FLYNN:  No, Your Honor.

10         THE COURT:  1620 is received into evidence.

11         (Exhibit 1620 received.)

12         MR. WHITE:  We would request a Certificate of

13  Training dated May 18, 1990, for Mr. Bingham be marked

14  Exhibit 1621.

15         (Exhibit 1621 marked.)

16         THE COURT:  Any objection to its receipt into

17  evidence?

18         MS. FLYNN:  No, Your Honor.

19         THE COURT:  1621 is received.

20         (Exhibit 1621 received.)

21         MR. WHITE:  We would request that a Certificate of

22  Achievement for the year 2002 for a class in world

23  philosophy be marked 1622.

24         (Exhibit 1622 marked.)

25         THE COURT:  Any objection to its receipt into

```
 1    evidence, Counsel?

 2              MS. FLYNN:  No, Your Honor.

 3              THE COURT:  Received into evidence.

 4              (Exhibit 1622 received.)

 5              MR. WHITE:  Your Honor, we also have a number of

 6    photographs that we would request be marked for

 7    identification.

 8              Would the Court like a brief description for each

 9    photograph?

10              THE COURT:  Whatever.  If you want to describe

11    those and attach a number, it might be easier for the jury.

12              MR. WHITE:  We would request a photograph of Mr.

13    Bingham and his mother and his older brother Sam and Mr.

14    Bingham when he was approximately five or six years old --

15    we would ask it be marked 1622-A.

16              THE COURT:  1622 is the Certificate of

17    Achievement.

18              MR. WHITE:  Can we mark it -- I will put it aside

19    for a moment and mark it at the end of the photographs.

20              We have a photograph of what appears to be a

21    kindergarten class.  We would ask that be marked 1623.

22              (Exhibit 1623 marked.)

23              THE COURT:  Any objection to its receipt into

24    evidence?

25              MS. FLYNN:  No.
```

```
 1                  THE COURT:  1623 is received.

 2                  (Exhibit 1623 received.)

 3                  MR. WHITE:  A photograph of Mr. Bingham at the age

 4    of about ten years old we would ask be marked 1624.

 5                  (Exhibit 1624 marked.)

 6                  THE COURT:  Any objection to its receipt?

 7                  MS. FLYNN:  No.

 8                  THE COURT:  Received into evidence.

 9                  (Exhibit 1624 received.)

10                  MR. WHITE:  A photograph of Penny Johnson and her

11    two brothers we would be marked 1625.

12                  (Exhibit 1625 marked.)

13                  THE COURT:  Any objection?

14                  MS. FLYNN:  No objection.

15                  THE COURT:  Received into evidence.

16                  (Exhibit 1625 received.)

17                  MR. WHITE:  A photograph of Mr. Bingham when he

18    was approximately 13 years old we would asked be marked

19    1626.

20                  (Exhibit 1626 marked.)

21                  THE COURT:  Any objection?

22                  MS. FLYNN:  No objection.

23                  THE COURT:  Received into evidence.

24                  (Exhibit 1626 received.)

25                  MR. WHITE:  A photograph of Mr. Bingham when he
```

1    was approximately 15 years old we would ask be marked 1627.

2                (Exhibit 1627 marked.)

3                THE COURT:  Any objection?

4                MS. FLYNN:  No objection.

5                THE COURT:  Received into evidence.

6                (Exhibit 1627 received.)

7                MR. WHITE:  A photograph of Mr. Bingham and his

8    wife, Gayle, and their sons Gary and Brian with Santa Claus

9    we would ask be marked 1628.

10               (Exhibit 1628 marked.)

11               THE COURT:  Any objection?

12               MS. FLYNN:  No objection.

13               THE COURT:  Received into evidence.

14               (Exhibit 1628 received.)

15               MR. WHITE:  A photograph of Mr. Bingham with his

16   boys Gary and Brian we would ask be marked 1629.

17               (Exhibit 1629 marked.)

18               THE COURT:  Any objection?

19               MS. FLYNN:  No.

20               THE COURT:  Received.

21               (Exhibit 1629 received.)

22               MR. WHITE:  A photograph of Mr. Bingham's father

23   and mother we would ask be marked 1630.

24               (Exhibit 1630 marked.)

25               THE COURT:  Any objection to its receipt?

63

1              MS. FLYNN:  No.

2              THE COURT:  Received.

3              (Exhibit 1630 received.)

4              MR. WHITE:  A photograph of Penny Johnson we would

5      ask be marked 1631.

6              (Exhibit 1631 marked.)

7              MS. FLYNN:  No objection.

8              THE COURT:  Received.

9              (Exhibit 1631 received.)

10             MR. WHITE:  A photograph of Tyler Bingham with his

11     sons Gary and Brian and Tyler Bingham's father holding

12     Tyler, Jr., we would ask that it be marked 1632.

13             (Exhibit 1632 marked.)

14             MS. FLYNN:  No objection.

15             THE COURT:  Received.

16             (Exhibit 1632 received.)

17             MR. WHITE:  A photograph of Mr. Tyler Bingham with

18     his son Tyler and son Brian we would ask be marked 1633.

19             (Exhibit 1633 marked.)

20             THE COURT:  Any objection to its receipt?

21             MS. FLYNN:  No.

22             THE COURT:  Received into evidence.

23             (Exhibit 1633 received.)

24             MR. WHITE:  A photograph of Mr. Bingham with his

25     son Tyler and sons Gary and Brian we would ask be marked

1   1634.

2            (Exhibit 1634 marked.)

3            THE COURT:   Any objection?

4            MS. FLYNN:   No objection.

5            THE COURT:   Received.

6            (Exhibit 1634 received.)

7            MR. WHITE:   A photograph of Mr. Bingham with his

8   sons Brian, Tyler, and Gary, and one of the boys is holding

9   an American flag we would ask be marked 1635.

10            (Exhibit 1635 marked.)

11            THE COURT:   Any objection?

12            MS. FLYNN:   No objection.

13            THE COURT:   Received.

14            (Exhibit 1635 received.)

15            MR. WHITE:   A photograph of Mr. Bingham and his

16   son Tyler sitting on Mr. Bingham's truck we would ask be

17   marked 1636.

18            (Exhibit 1636 marked.)

19            THE COURT:   Any objection?

20            MS. FLYNN:   No objection.

21            THE COURT:   Received.

22            (Exhibit 1636 received.)

23            MR. WHITE:   A photograph of Mr. Bingham and his

24   three boys we would ask be marked 1637.

25            (Exhibit 1637 marked.)

1        THE COURT:  Any objection?

2        MS. FLYNN:  No objection.

3        THE COURT:  Received.

4        (Exhibit 1637 received.)

5        MR. WHITE:  A photograph of Mr. Bingham and his

6    son Gary lifting weights we would ask be marked 1638.

7        (Exhibit 1638 marked.)

8        Any objection?

9        MS. FLYNN:  No objection.

10        THE COURT:  Received.

11        (Exhibit 1638 received.)

12        MR. WHITE:  A photograph -- I will go back to the

13    photograph of Mr. Bingham and his mother and his brother Sam

14    when Mr. Bingham was about five or six years ago and ask

15    that it be marked 1639.

16        (Exhibit 1639 marked.)

17        THE COURT:  This is the first photograph you

18    started with.  You just remarked that?

19        MR. WHITE:  Yes.

20        THE COURT:  Any objection to its receipt?

21        MS. FLYNN:  No objection.

22        THE COURT:  Received.

23        (Exhibit 1639 received.)

24        MR. WHITE:  A photograph of Mr. Bingham and his

25    three boys we would ask be marked 1640.

```
 1                    (Exhibit 1640 marked.)

 2              THE COURT:  Any objection?

 3              MS. FLYNN:  No objection.

 4              THE COURT:  Received.

 5                    (Exhibit 1640 received.)

 6              MR. WHITE:  A photograph of Mr. Bingham and Tyler

 7   and Gary we would ask be marked 1641.

 8                    (Exhibit 1641 marked.)

 9              THE COURT:  Any objection to its receipt?

10              MS. FLYNN:  No.

11              THE COURT:  Received.

12                    (Exhibit 1641 received.)

13              MR. WHITE:  A photograph of Mr. Bingham holding

14   Tyler as a baby we would ask be marked 1642.

15                    (Exhibit 1642 marked.)

16              THE COURT:  Any objection?

17              MS. FLYNN:  No objection.

18              THE COURT:  Received.

19                    (Exhibit 1642 received.)

20              MR. WHITE:  A photograph of Mr. Bingham again

21   holding Tyler as a baby we would ask be marked 1643.

22                    (Exhibit 1643 marked.)

23              THE COURT:  Any objection?

24              MS. FLYNN:  No objection.

25              THE COURT:  Received.
```

1          (Exhibit 1643 received.)

2          MR. WHITE:   A photograph of Mr. Bingham with his

3  boys Brian and Gary we would ask be marked 1644.

4          (Exhibit 1644 marked.)

5          THE COURT:   Any objection?

6          MS. FLYNN:   No objection.

7          THE COURT:   Received.

8          (Exhibit 1644 received.)

9          MR. WHITE:   A photograph of Mr. Bingham and his

10  three boys and his dog we would ask be marked 1645.

11          (Exhibit 1645 marked.)

12          THE COURT:   Any objection?

13          MS. FLYNN:   No objection.

14          THE COURT:   Received.

15          (Exhibit 1645 received.)

16          MR. WHITE:   A photograph of Mr. Bingham with his

17  three boys we would ask be marked 1646.

18          (Exhibit 1646 marked.)

19          THE COURT:   Any objection?

20          MS. FLYNN:   No objection.

21          THE COURT:   Received into evidence.

22          (Exhibit 1646 received.)

23          MR. WHITE:   A picture of Mr. Bingham's three boys

24  we would ask be marked 1647.

25          (Exhibit 1647 marked.)

| | |
|---|---|
| 1 | THE COURT:  Any objection? |
| 2 | MS. FLYNN:  No objection. |
| 3 | THE COURT:  Received. |
| 4 | (Exhibit 1647 received.) |
| 5 | MR. WHITE:  A photograph of Mr. Bingham and his |
| 6 | three boys we would ask be marked 1648. |
| 7 | (Exhibit 1648 marked.) |
| 8 | THE COURT:  Any objection? |
| 9 | MS. FLYNN:  No objection. |
| 10 | THE COURT:  Received. |
| 11 | (Exhibit 1648 received.) |
| 12 | MR. WHITE:  A photograph of Mr. Bingham with his |
| 13 | son Tyler we would ask it be marked 1649. |
| 14 | (Exhibit 1649 marked.) |
| 15 | THE COURT:  Any objection? |
| 16 | MS. FLYNN:  No objection. |
| 17 | THE COURT:  Received. |
| 18 | (Exhibit 1649 received.) |
| 19 | MR. WHITE:  We would call as the next witness, |
| 20 | Penny Allamprese. |
| 21 | PENNY ALLAMPRESSE, DEFENSE WITNESS, SWORN |
| 22 | THE COURT:  If you would come up and approach the |
| 23 | witness box and please be seated to my right. |
| 24 | After you have been seated, would you state your |
| 25 | full name and spell your last name. |

```
 1              THE WITNESS:  Penny Allamprese,
 2    A-l-l-a-m-p-r-e-s-e.
 3              THE COURT:  Counsel, this is direct examination by
 4    Mr. White.
 5                     DIRECT EXAMINATION
 6    BY MR. WHITE:
 7    Q    Good afternoon, Ms. Allamprese.
 8    A    Hi.
 9    Q    Do you know Tyler Bingham?
10    A    Yes, I do.
11    Q    For how long have you known him?
12    A    Since September of 1961.
13    Q    How old were you when you first met T.D. Bingham?
14    A    I was 12.
15    Q    And how old was he?
16    A    Fourteen.
17    Q    Before we go there, I want to ask you are you currently
18    working?
19    A    Yes.
20    Q    What do you do for a living?
21    A    I am a realtor.
22    Q    Do you have any children?
23    A    I have three birth daughters and three heart sons.
24    Q    How old are your birth daughters?
25    A    40, 35, and 33.
```

70

1    Q    You said three heart sons.

2    A    Yep, right over there.

3    Q    H-e-a-r-t?

4    A    Yes, heart, heart, heart.

5    Q    You are talking about --

6    A    Tyler, Gary, and Brian.

7    Q    Now, let's go back to when you met T.D. Bingham.

8         Do you remember the year that was?

9    A    It was 1961, September.

10   Q    Where did you first meet him?

11   A    I had my school books clutched to my chest in the

12   school yard shivering, and he came walking through the

13   entrance to the school with a girl on each side, auburn

14   head, beautiful smile.  We laid eyes on each other, and I

15   knew at that moment that I would be with him throughout

16   life.

17   Q    At the time, what grade were you in do you recall?

18   A    I had just started seventh grade.

19   Q    Do you remember what grade he was in?

20   A    Ninth I think.

21   Q    Was it one of those schools where -- you didn't start

22   high school at one of those districts until tenth grade?

23   A    Right, and if any of you saw "Blackboard Jungle," it

24   was that kind of junior high.  That's why I was shivering

25   like this.

Q     Did you and T.D. become boyfriend/girlfriend at that point?

A     Yes, we did.

Q     Now, you were at home.

      Did you have brothers or sisters?

A     I had two brothers.

Q     Were your mom and dad at home?

A     My mother.

Q     Did you get to know T.D. Bingham's family?

A     Oh, yes, very well.

Q     Now, what do you remember about those early times with T.D. Bingham?  What kind of person was he as a 14-year-old or a 13-year-old?

A     He always had a lot of vitality and a lot of energy, very positive, and he told stories to me all the time.  I would like to hear his stories.  He would make me laugh with his jokes.  He was very attentive.  My brothers didn't have a father figure.  My little brother Joseph would jump on up on his lap.  He would sit with him on his lap and tell him stories and talk to him and teach my older brother some things.  He spent a lot of time with them.

      He is very warm, very caring to me.  He was always -- I didn't have a lot of encouragement at that time.  My grandmother was the one who had done that years earlier, and he came along and told me I could do anything and be

1  anybody.  I already was.  He was just everything to me.  He

2  still is.

3  Q    Did -- was there a time when you and T.D. decided to

4  runaway?

5  A    Yes.  I think that was probably my idea.  My mother

6  hated him on sight.  Honestly, that's the only person I have

7  ever known who did hate him or dislike him.  She just hated

8  him.  She would bar me from seeing him and then let me see

9  him and then bar me from seeing him and then beat me for

10 seeing him.  I couldn't live without him.

11 Q    What happened?

12 A    Well, he stole a car and met me at midnight.  I packed

13 my purse with two pairs of underwear, a toothbrush, and some

14 silver dollars, and we were going to Texas to get married.

15 We got as far as Barstow.  It really never occurred to me to

16 be worried that a 14-year-old was driving me across country.

17          On the way -- he had driven all night, and we

18 stopped -- this is the kind of person he is.  We stopped.

19 It was out in the middle of nowhere, and there were patches

20 of snow on the ground.  It was early in the morning.  He

21 said let's go wash our face.  I said, no, thank you.  He got

22 out of the car and ran over, and he was throwing snow on his

23 face, and I am thinking he is really whacky.  He came back

24 to the car and told me I had really missed something.

25 Q    Did you get out of the car?

```
 1    A    Hell no.  Excuse me.

 2    Q    What happened after that?

 3    A    We got to Barstow -- we were really smart -- we got to

 4    Barstow and parked on the hill of a firing range.  There

 5    were no trees, no brush, no cover, and woke up to a

 6    sheriff's car pulling up.  We tried to convince him we were

 7    from Barstow and where our addresses were and that we were

 8    like 20.  They took us away, and I didn't see him again.

 9    Q    Was that the -- you were both arrested?

10    A    Yes.

11    Q    Was that the arrest that caused T.D. to be sent to the

12    California Youth Authority?

13    A    Yes.

14    Q    While in the Youth Authority, did you correspond with

15    him?

16    A    Yes.  We wrote to each other.

17    Q    What happened when he eventually got out of the Youth

18    Authority?  Did you guys get back together again?

19    A    Yeah.  I was at the bus station with his mom and dad

20    when he came home.

21    Q    During those years, your teenage years, do you

22    recall -- you were on and off with him -- you were with T.D.

23    when he was not in custody?

24    A    Yes.

25    Q    Now, at some point, did you get married?
```

```
 1   A    I did.  My mother forced me to marry my next-door
 2   neighbor whom I had gotten pregnant by.  He said he was 19.
 3   He was in fact closer to 30 and had other children that I
 4   didn't know about, and right before I learned I was
 5   pregnant, he beat me up, so I didn't want to see him anymore
 6   naturally.
 7        When my mom found out I was pregnant, it was
 8   either get a portion or marry him, so I married him with the
 9   stipulation that I would never ever live with him.  She took
10   us to Reno, and they went out and gambled, and then they
11   came back, and he wanted me to go to my room, and my mom
12   said I probably should because I was his wife.  I didn't.
13   It was annulled, and that's my oldest baby.
14   Q    Your oldest baby is named what?
15   A    Paula.
16   Q    When was Paula born?
17   A    June 20, 1966.
18   Q    Did there come a time when Paula became sick?
19   A    She got an ear infection that poisoned her system, and
20   it was the same year that there was an outbreak of spinal
21   meningitis at some base in California.  She had minute
22   amounts of it.  It had just started in her system.  They
23   told me she wouldn't live, and if she did live, she would be
24   blind, deaf, retarded, or all of the above.  She was on the
25   critical list for about a week, and during that time, I of
```

1    course camped at the hospital.  Then she was taken from

2    critical, so I went back to school.  I was financing my last

3    six months of high school.

4    Q    Do you remember something that happened at the hospital

5    involving T.D?

6    A    Yes.  I came after school and the nurse at the

7    reception area -- I stopped to see how she was, and she told

8    me that your husband -- now nice your husband is visiting,

9    and that terrified me, so I went back running to the room,

10   and it was T standing there holding her, and he had a blue

11   bear.  The nose would wiggle this, and it played "Raindrops

12   Keep Falling on My Head," and he was talking to her as I

13   came in and holding her.  I kind of imagine he was telling

14   her stories like he tells me.

15   Q    What happened after that between you and T.D. do you

16   recall?

17   A    We were still seeing each other, and I think we were

18   out and he dropped me off to go into a club, and right after

19   that he got picked up.

20   Q    Went back to jail?

21   A    Yep.

22   Q    Do you remember a time when he called you on the

23   telephone around sometime maybe in '68?  You told me about

24   this the other day.  Can you relate that to the jury?

25   A    He had called my mother at work and gotten my phone

76

1    number, and she was willing to give it to him because I was

2    engaged, and she wanted him to hear that from me.  He called

3    me, and I said I need to break the engagement and go to him,

4    and he wouldn't let me because he was on heroin, and he was

5    strung out.  I had never seen him do a drug.  I've never

6    been around it, and he wouldn't let me come to him, and he

7    just wanted me to be happy.

8    Q    Did you marry the gentleman you were engaged to?

9    A    I did.

10   Q    When was the next time that you remember hearing from

11   or seeing T.D?

12   A    I have thought about him every day of my life, and I

13   know he has me.  I just started getting this real anxious

14   feeling, and I didn't know how to get ahold of him.  I used

15   to go through phone books trying to find his parents or

16   somebody even when I was married.  Finally I found him, and

17   he had just landed in Lompoc, so I was with him for a time,

18   and he told me at the time that it was going to be really

19   hard, and I am kind of want it now kind of gal.  It did get

20   too hard, and I walked away from him.  I remember that phone

21   call.

22   Q    Now, when you say that he was at Lompoc, you mean he

23   was in prison at that time?

24   A    Yes.

25   Q    When you say you were with him, you meant you had

1  renewed your --

2  A    Visited, written, telephone calls, yes.

3  Q    When you were back with him during that period of time,

4  did he tell you about the fact that he was out of prison

5  from 1981 to 1985?

6  A    Yes.

7  Q    Had you known that?

8  A    No.

9  Q    What did he say about that?

10  A    Well, he thought I was happily married, so he made no

11  attempt to find me.  He did find someone, and they got

12  married, and they had the babies.  He did very, very well.

13  He was so proud of that family and his sons and of what he

14  had accomplished.  I thought that he had three birth sons up

15  until just a very short while ago.  There was never a

16  distinction at all.

17  Q    You mean that you thought that Gary and Brian and Tyler

18  were all his birth sons?

19  A    Yes.  I had met with them and been with them when they

20  were children, little boys, right after he went to Lompoc.

21  There was never a distinction made.  I just later on was

22  trying to do the math in my head how did that happen.  I

23  thought they were all his birth children.  There is no

24  distinction made today.

25  Q    You said that it became too hard, and, again, you

1    discontinued your relationship with T.D.

2    A    Yes.

3    Q    About when was that?

4    A    '86 I think, maybe '87.  I am not sure.

5    Q    For how long did you stop your relationship with him --

6    or when did you renew it I guess is the question?

7    A    I think it was 2003 or 2002.  I got a letter.  My

8    daughter handed me the envelope, my youngest daughter, my

9    middle daughter.  I saw the handwriting we and, whoa, that

10   was it.  It was back.

11   Q    Were you married at the time?

12   A    No, I wasn't married.  It was kind -- I was just kind

13   of coming out of a really difficult time.

14   Q    How would you describe your relationship with him

15   today?

16   A    Such as they are, it's fabulous.  It really is.  Every

17   once in a while a person needs to be reminded that they are

18   special and that they can do anything and be anything, and

19   he is always there for me.  He has never walked away from

20   me.

21   Q    I would like to show you some photographs and have you

22   identify the pictures.

23         MR. WHITE:  The photographs that I have marked I

24   have on a slide show, so I am going to go through the slide

25   show hopefully.

1    THE COURT:  It may be cumbersome for you to call

2    out the number.  If you know the number, you can.  This is

3    1634, for instance.

4    MR. WHITE:  I would appreciate that.

5    THE COURT:  These are all the same photographs you

6    have already introduced?

7    MR. WHITE:  Yes.

8    THE COURT:  Ms. Flynn, any objection?

9    MS. FLYNN:  No.

10    THE COURT:  That will save the numbers being

11    called out.

12    BY MR. WHITE:

13    Q    Can you identify the people in this picture?

14    A    The tall man is Mr. Bingham, T.D.'s father.  Then there

15    is Sam, his older brother, and that's T and Grace, his

16    mother.

17    Q    Can you identify this photograph?

18    A    That's his little kindergarten picture.

19    Q    Do you know where he is at?

20    A    Yeah.  He is the little cutie smiling over there.

21    Q    Is this him?

22    A    Yes.

23    That's my favorite.  That's T.D. Bingham.  That's

24    my favorite photograph.  He was ten years old, and that's

25    really -- that's T.

Q     You mean it captures him?

A     It does, his smile and little eyes.  It's my favorite photo.

Q     Who is this a photo of?

A     The little guy in front is Troy, my brother.  In the middle is Joseph, my little brother, and the one in back is me.

Q     How old were you there?

A     I was 12.  It was like a month before I met T.  I think that's about a year before he and I met.  He was about 12 or 13 there.

Q     That's T.D?

A     Oh, yes, that is.

Q     Who is that?

A     That was T in the Youth Authority.  He's so sad there.

Q     Who is that?

A     That's me.  Don't laugh.  That's terrible.  I think it says:  "To my Duke, T.D., from your Duchess, Penny."  That's our song, "Duke of Earl," romantic, huh.

Q     Who is in this picture?

A     T.D. is in the cowboy hat, and I think that is Santa Claus in the middle, little Brian, Gary, and Gayle, his wife.

Q     Who is in this picture?

A     I believe that's Brian and Gary and Mr. T in the

```
 1   middle.
 2          That one is Brian and Gary with their dad.
 3   Q    Who is riding his shoulders there?  That's Brian?
 4   A    I believe so.
 5   Q    Who is in this picture?
 6   A    That's T.D. with Tyler.
 7   Q    Now, was there a problem when Tyler was born?
 8   A    He was born with a cord around his neck and was very
 9   gravely ill.  I believe he was helicoptered to Dallas, and
10   he worked all day long in the oil fields and at night every
11   night.  For the two weeks that baby was so ill, he would go
12   and see him every night, every night.  The kids are his
13   heart.
14   Q    Can you make out that picture?
15   A    That is Mr. Bingham, Sr., baby Tyler, Brian, and Gary.
16          That's Grace and Mr. Bingham.
17          T and Tyler.
18          T and Tyler.
19   Q    That's Brian in the background?
20   A    I think so, but that's kind of hard for me to see.
21   Q    That's Tyler on T.D.'s lap?
22   A    Yes.  Still had some hair there.
23          That's T and his boys.  Tyler is on his lap.
24          T.D., Tyler, Brian, and Gary.
25          T.D. and his boys.
```

82

1                    T.D. and the boys.

2                    That's T.D., his truck, his boys, and the dog.

3                    Tyler and dad.

4                    T.D., Brian, Gary, and Tyler.

5                    T.D. and one of the twins.  I can't tell from

6     here which.

7                    T.D. and the babies.

8                    T.D. and the boys.

9                    T.D. and the boys.

10                   The babies.

11    Q    Can you read the front of that?

12    A    Tyler, Brian, and Gary, my sons.

13    Q    Has T.D. sent you a lot of his poetry over the years?

14    A    Yes.

15    Q    Would it be fair to say hundreds of poems?

16    A    That would be fair.

17    Q    He is a prolific writer?

18    A    He is.

19                   MR. WHITE:  Your Honor, we have six poems we would

20    like marked collectively Exhibit 1650.  We are going to ask

21    Ms. Allamprese to read them.  We have made a copy for each

22    juror if they could be distributed.

23                   THE COURT:  Would you give those to Lisa for just

24    a minute.

25                   THE COURT:  Do you have copies?

83

1          MS. FLYNN:  Yes, Your Honor.

2          MR. WHITE:  Your Honor, we also have another group

3    of poems that we do not propose to read.  We would like them

4    marked 1651 collectively, and I have provided the government

5    with a copy of them.

6          THE COURT:  Thank you.

7          MR. WHITE:  We would move for the admission of

8    1650 and 1651.

9          THE COURT:  Any objection, Counsel?

10          MS. FLYNN:  No, Your Honor.

11          THE COURT:  1650 and 1651 are received.

12          (Exhibits 1650 and 1651 received.)

13   BY MR. WHITE:

14   Q    Ms. Allamprese, could you please read for us the poem

15   "Prayer from the Wall"?

16   A    Yes.

17          "Prayer from the Wall.

18          "Only sometimes does time fly,

19          "Often it slows to a crawl.

20          "And many men deny

21          "Remembrance made by prison walls.

22          "But when at times I see his face

23          "Tear-streaked by grief I caused,

24          "My loving son these sorrows trace

25          "To when I broke the law.

1    "His rueful cry still haunting now,

2    "Though it's been eight long years.

3    "And this memory sleep disallows,

4    "When his trembling voice I hear.

5    "His pleadings echo in my soul.

6    "His heart my greed betrayed

7    "A trust to guard, safe and hold,

8    "From his cradle to my grave.

9    "This prayer in desparate heart I've kept,

10   "To release his fate forlorn

11   "Rivers of tears my soul's wept.

12   "For this child to me born.

13   "My state is just, his is not.

14   "Yet he's suffered most

15   "For crimes my hand wrought,

16   "He's forced to be the host.

17   "It is unfair for a child to bear

18   "Sin for which I am condemned

19   "When his soul is pure as prayer.

20   "From lips of holy men.

21   "Release him of his wretched state,

22   "While he's still a child

23   "Let not his be my fate,

24   "Let his angry heart beat mild.

25   "Gather him to loving breast,

1         "Embrace him in your fold.

2         "Let his heart know your joy's caress,

3         "Before it grows too cold.

4         "Bless his heart, his spirit soul,

5         "Bless his life to be.

6         "And from child to man grow old,

7         "Where no bars the eye can see.

8         "T.D."

9    Q    Could you please read the next poem "They Built For Me

10   a Cage."

11   A    "They Built For Me a Cage.

12         "I am a man, a human being,

13         "Yet they built for me a cage,

14         "As if I were a beast in rage,

15         "A rabid animal, a thing

16         "Of kindness undeserving,

17         "These things my heart weighs

18         "They built for me a cage.

19         "At eleven, they placed me in a cell,

20         "I knew despair face wet with tears,

21         "Pain met loneliness, heart met fear,

22         "Children should not know such hell,

23         "Places where such things dwell,

24         "Cells, tears, pain or fear,

25         "Or dark shadows lurking near.

86

1  "At fourteen, a reform school hole,

2  "A strip cell, a dark abyss,

3  "Beaten by keepers with hard fists,

4  "Naked alone, body and soul.

5  "In darkness few roses grow,

6  "Nor perfumed gardens that bring bliss,

7  "Living there are demons that hiss.

8  "Even in old age, these memories loom,

9  "Isolation cells, concrete steads,

10  "And young heart that knew dread,

11  "A heart that should have breathed perfumes.

12  "Of seasons under stars, the moon,

13  "Created verse to be read.

14  "Long after spirit from shell has fled.

15  "I am a man, a human being,

16  "Yet they built for me a cage."

17  Q    Could you read "Box, Lock, Bars, and Rock," please?

18  A    Okay.

19  "A box, a lock, steel bars and rock,

20  "Chains shackles and ill fame,

21  "The hour glass dropped but clock don't stop,

22  "Nor the sun setting on life plane.

23  "Pace and pace can't abate these thoughts,

24  "Drug-addicted robber caught.

25  "My sons' tears or my mother's grief,

87

1          "No penitence can be prayed,

2          "No rest for the wicked, no soul's relief,

3          "In this hell my conscience stays.

4          "A lock, a box, steel bars, and rock,

5          "The hour glass broke, but memory won't stop."

6     Q    Could you read "Nursery Rhymes and Life," please?

7     A    Okay.

8          "From babe in crib to child on a swing,

9          "First punch of a school yard fight,

10         "Fists of stone and hurtful names that bring

11         "Fright like goblins in the night.

12         "A pauper's child in clothes worn and torn,

13         "Hand me down shoes that did not fit,

14         "Blood and gravel on my face shame and scorn,

15         "Heavy in heart those things sit.

16         "Hey diddle, diddle, a cat with a fiddle

17         "And junk yard dogs that bite,

18         "Up the river, caught in the middle,

19         "Hard knocks has been my life.

20         "Life of crime, many sorrows and regrets,

21         "One day young, the next you're old,

22         "35 years in a cage, the mirror reflects

23         "A road-mapped face mother would not know.

24         "I been to places where demons howl,

25         "Places of vice and sin,

88

1     "Shot heroin raw in the devil's bowels,

2     "Escaped once, but got hooked again.

3     "I observe the world through a dead man's eyes,

4     "Days and nights surrender all too soon,

5     "In the reaper's shadow, no hope resides,

6     "Nor views of stars or moon.

7     "Though sometimes when I sleep at night,

8     "I hear my mother calling me,

9     "She is an angel among stars in flight,

10    "Somewhere on the edge of eternity.

11    "Angel's wings are the most perfect things,

12    "A serpent's instinct is to bite,

13    "Scorpions sting and choir boys sing,

14    "I am a child again lost in night.

15    "Nursery rhymes, childhood songs and tunes

16    "Sorrow, regret, flesh, blood and bone,

17    "Mother will be calling me home soon,

18    "And I will not be so cold or alone.

19    "How I wish I were that boy again,

20    "That school boy in clothes tattered, worn,

21    "In a world without hurt or sin,

22    "Before heart knew blood and scorn.

23    "Angel's wings are the most perfect things,

24    "A serpent's instinct is to bite,

25    "Scorpions sting and choir boys sing,

89

1           "I'm a child again lost in night."

2    Q    Could you please read "My Darling Sends Me Flowers"?

3    A    Okay.

4           "My Darling sends me flowers.

5           "They arrive in envelopes by mail,

6           "Beauties grown under sun's wonderous shower

7           "And watered daily by her garden pail.

8           "Roses, violets, tulips and daffodils,

9           "Black-eyed Susans, Blue Bells and ferns,

10          "Replanted daisies, wild from the fields,

11          "Each tendered lovingly in its turn.

12          "My Darling, she sends me flowers,

13          "Photographs to adorn my cell's dull wall,

14          "Flowers to improve seasons that are dour,

15          "Because she knows I have no view at all.

16          "My darling she sends me flowers."

17   Q    Are you his darling?

18   A    Yes.

19   Q    Do you send him pictures of flowers?

20   A    Yes, flowers, the house, if I change a rug in a room.

21   Q    Finally, could you read "The Bride Beyond Walls"?

22   A    "From this tomb, this cell I glimpse beyond the gloom

23   past tall towers over the walled barbed wire fence where

24   many towers track the hours and with laws and guns would

25   deny my spirit freedom to this right.  To vistas of

1   mountains, rivers, glens, shedding shackles of pain, still

2   gliding upon the wind free of suffering chain.  Awareness my

3   vessel I ride possessed bars with sadness far behind the

4   reach, sweetness of dreams both high crest past hurtful

5   memories, crimes, deceits of my mother's prayed tears, my

6   ill fame that to her door brought much shame.  I flew past

7   clouds.  I fly high gathering stars as I travel by, but on

8   the horizon not very far, the sun will rise on my caged

9   bars, and reality cold is the bite of the night, sweet

10   dreams receding with the light, and I begin another day of

11   years on this tier with my convict peers."

12         MR. WHITE:  Thank you.  I have no further

13   questions.

14         THE COURT:  Cross-examination.

15         MS. FLYNN:  No, Your Honor.

16         THE COURT:  May the witness be excused, Your

17   Honor?

18         MS. FLYNN:  Yes, Your Honor.

19         MR. WHITE:  Yes, Your Honor.

20         THE COURT:  Thank you very much.  You are excused

21   from these proceedings.

22         MR. WHITE:  On behalf of Mr. Bingham, the defense

23   rests.

24         THE COURT:  I want speak to counsel for just a

25   moment outside of your presence.  I want to see if there is

1  any rebuttal or surrebuttal.  This may conclude the

2  evidence, or there may be a short presentation by one or

3  both parties.  I don't think it will be very longer.

4          You are admonished not to discuss this matter

5  amongst yourselves nor to form express any opinion.  I will

6  come back and get you very shortly.

7          (Jury not present.)

8          THE COURT:  The jury is no longer present.  The

9  alternate are no longer present.

10          I have excused them because I don't know if the

11  government had rebuttal or what that was if they did, and I

12  didn't know if the defense had surrebuttal, so let me turn

13  to the government for a moment and get your thoughts.

14          MR. WOLFE:  We have two documents that we would

15  offer in rebuttal to the Mills case.

16          THE COURT:  Could I hear and see what those

17  documents are?

18          MR. WOLFE:  One is his waiver of parole in 1987,

19  and the other is a certificate of the nonexistence of

20  records in the Parole Commission.  It shows that he has

21  never applied for parole, and he was never given a hearing.

22          THE COURT:  Counsel, do you have copies of these?

23          MR. STEWARD:  Yes.

24          THE COURT:  Any objection?

25          MR. STEWARD:  No.

1          THE COURT:  You are going to be allowed to present

2     these.  This is entirely appropriate rebuttal.

3          Will that conclude the rebuttal position of your

4     case?

5          MR. WOLFE:  Yes.

6          THE COURT:  Turning back to Mr. Mills, since there

7     is no rebuttal concerning Mr. Bingham, I assume that rests

8     your case with finality.  Is that correct?

9          MR. WHITE:  Yes.

10         MR. HARRIS:  Yes.

11         THE COURT:  Mr. Steward, Mr. Fleming, are you

12    going to have surrebuttal?

13         MR. STEWARD:  No, Your Honor.

14         THE COURT:  Will that conclude the evidence?  What

15    I don't want are any surprises.  In other words, if there is

16    any possibility that there is going to be additional

17    evidence, then I want the jury back tomorrow even if I bring

18    them back at 1:30.  I am not looking for surprises nor the

19    advantage to one side or the other next week.  Now,

20    sometimes things come up, and the Court is stuck with the

21    record, so I have to do those things, but I am trying to

22    make certain that next week is reserved for both sides, and

23    there is no last moment evidence.

24         Is there anything on behalf of the government that

25    you can contemplate at the present time?

1      MR. WOLFE:  I can't imagine anything?

2      THE COURT:  Ms. Flynn?

3      MS. FLYNN:  No.

4      THE COURT:  Ms. Blanch?

5      MS. BLANCH:  No.

6      THE COURT:  Mr. Emmick?

7      MR. EMMICK:  No.

8      THE COURT:  Is there anything in the works, Mr.

9  Steward, or, Mr. Fleming, that I should know about even

10 privately or even in-camera?

11     MR. STEWARD:  No, Your Honor.

12     THE COURT:  Mr. White, or, Mr. Harris, any

13 surprises?  Anything that you are anticipating for next

14 week, or are we truly going into argument next week?

15     MR. HARRIS:  Nothing further, Your Honor.

16     THE COURT:  After this rebuttal, then it's safe to

17 excuse the jury until Wednesday at 8:30 in the morning.  You

18 know that a note was sent out to Christy or Lisa because

19 apparently school starts on Thursday, so we will probably

20 start at 9:00 on Thursday.

21     THE CLERK:  They want to start at 11:00 on

22 Thursday.

23     THE COURT:  We will probably start at 11:00 on

24 Thursday.  We have asked them to sit nine months.  We can do

25 that for them on Thursday.

94

1          You probably haven't completely prepared your

2   arguments, but who is going to open for the government?

3          MS. FLYNN:  I am.

4          THE COURT:  We can take this up after the jury

5   leaves but any idea how long?

6          MS. FLYNN:  Probably an hour and a half.

7          THE COURT:  On behalf of Mr. Mills?

8          MR. STEWARD:  Three hours.

9          THE COURT:  On behalf of Mr. Bingham?

10          MR. WHITE:  I hope an hour.

11          THE COURT:  Who is going to close for the

12   government?

13          MR. WOLFE:  I will.

14          THE COURT:  It's probably difficult to tell.  You

15   don't know what is going to be said.  It's possible that we

16   may resolve it that day.  If not, then -- I just think we

17   are going to have to give the jury that 11:00 start time on

18   Thursday.  I don't think we can ask them to come in at 9:00

19   when they are making the request.

20          All right, would you summon the jury again?

21          THE COURT:  Counsel, I may bring the jury back

22   tomorrow just to be certain.  I want to have a little time

23   this evening with you to go over a few things.  I can't get

24   them back, so I may just bring them back tomorrow briefly.

25          (Jury present.)

1          THE COURT:  We are back in session.  All counsel
2    are present.  The defendants are present.
3          Counsel for the government has a short rebuttal,
4    and we will proceed with that this evening.
5          This is Mr. Wolfe, and this would be rebuttal.
6          MR. WOLFE:  Your Honor, the government offers
7    Exhibits 592 and 593 in evidence.
8          THE COURT:  You can describe those also if you
9    would like to.
10         Any objection to 592 and 593?
11         MR. STEWARD:  No.
12         THE COURT:  592 and 593 are received.
13         (Exhibits 592 and 593 received.)
14         MR. WOLFE:  Your Honor, Exhibit 593 is Notice of
15   Parole Application Representative and Disclosure Request
16   dated April 13, 1987, for defendant Mills.  The form is not
17   filled out in Section I or in Section II.  In Section III
18   entitled "Waiver of Parole Hearing," there are the initials
19   B.M. opposite letter A:  "I wish to waive parole
20   consideration at this time."
21         Exhibit 592 is entitled "United States Department
22   of Justice, United States Parole Commission.
23         "I, Mary Jo Williams, certify as follows:
24         "I am a case analyst with the United States Parole
25   Commission, 5550 Friendship Boulevard, Chevy Chase, Maryland

1    20815.   In performing my responsibility as a case analyst, I

2    search for and review parole records on parole eligible

3    federal prisoners.   These records are maintained in the

4    Commission's Record Center in the Chevy Chase office.

5            "On August 22, 2006, I conducted a diligent

6    search of the Commission's records.   As a result of that

7    search, I found no evidence that the Parole Commission had

8    received a parole application from Barry Byron Mills,

9    Register No. 14559-116, with regard to sentences for bank

10   robbery, conspiracy to murder, or murder in the

11   first-degree, or that the Commission had conducted a parole

12   hearing for Mills on these sentences.

13           "In witness whereof, I have signed and caused the

14   seal of the United States Parole Commission to be affixed

15   under date noted below.

16           "Mary Jo Williams, Case Analyst, U.S. Parole

17   Commission, dated August 22, 2006."

18           THE COURT:   Each of those documents have been

19   received into evidence.

20           Is there anything further concerning rebuttal?

21           MR. WOLFE:   No, Your Honor.   The government rests

22   in its rebuttal.

23           THE COURT:   Fine.

24           Let me turn and make sure my record is complete

25   and provide the last opportunity to the defense if there is

1    any surrebuttal.

2              Mr. Fleming, Mr. Steward, on behalf of Mr. Mills?

3              MR. FLEMING:  No, Your Honor.

4              MR. STEWARD:  No, Your Honor.

5              THE COURT:  Mr. White, Mr. Harris, on behalf of

6    Mr. Bingham?

7              MR. HARRIS:  No, Your Honor.

8              THE COURT:  I don't want any surprises.  I am

9    trying to make certain that next week when we come back that

10   there is no last moment evidence.  I don't want either side

11   to have that last word right before the argument.  Now,

12   those can be things that occur over the recess that even

13   counsel for either party aren't aware of, and of course the

14   Court would be in the position of probably granting a

15   request to reopen, but my intention all the way along is to

16   occupy this week with all the evidence.  I think I explained

17   that to you before.  I would like us back in session next

18   Wednesday at 8:30 for argument and instructions.  We think

19   we can probably complete that in a day.

20             I know that one of you made a request for 11:00

21   Thursday.  That's what we are going to do.  I think it's a

22   back-to-school day for the first time.  I don't know which

23   he juror it is.  It doesn't matter.  Asking you to sit to

24   seven to nine months, that's the minimum the Court can do.

25   So you are coming back Wednesday.

1          Now, tomorrow may be an absolute complete waste of

2     your time, but I would like -- I have been keeping counsel

3     some rather extraordinary hours on occasion.   I think I just

4     need some time with counsel to make sure that we are truly

5     ready to go.   I am thinking about bringing tomorrow with my

6     apologies to you because I may simply have you sit back

7     there anywhere from half and hour to two or three hours and

8     send you back on your way.

9          I am thinking I would like the morning session

10    with counsel just to make certain that everything is in

11    order, and I am wondering instead of bringing the jury in

12    the morning if I can bring them in at 1:30.   Then if we

13    resolve all of our discussions, we can send them right home.

14         Would that be acceptable just to double-check?

15         MR. STEWARD:   That's fine.

16         THE COURT:   I am afraid if I excuse them now and

17    something comes up during the evenings hours between 5:00

18    and 9:00 tonight, I can't get them back.

19         Is that acceptable, Ms. Flynn, and, Mr. Wolfe?

20         MS. FLYNN:   Yes.

21         THE COURT:   I can't have a long enough

22    conversation without keeping you to tonight.   I can bring

23    you in at 9:00 tomorrow morning, but I don't want to.   I

24    want the morning session with counsel.   I think I would like

25    to send them home this evening at a decent hour, have them

1    get some rest, and come back with a fresh mind tomorrow.

2         So I could be sending you home by literally 1:30

3    or 2:00 tomorrow, but I am going to ask you to come back in

4    at 1:30.  If there is anything additional that comes up,

5    that evidence will be presented to you tomorrow, but in good

6    faith, all parties have rested at this point.

7         I don't think I have anything further for you this

8    evening.  You will not be in session on Friday, and you will

9    not be in session on Tuesday, but you will be on session on

10   Wednesday at 8:30.

11        First of all, let me compliment all of you.  You

12   were right on time.

13        I don't know how to how to deal with this except

14   directly.  Of course, at this point, your mind is starting

15   to think what I am going to do with this case?  That's

16   natural, so let me just take that head on.  You haven't

17   heard the instructions from the Court yet, though, and you

18   haven't heard argument from counsel, so you can't do that.

19   You just have to put this case away after I send you home

20   tomorrow for about five or six days until we are back in

21   session Wednesday.  That's hard to do because of course when

22   you hear the case is concluded, well, it hasn't.

23        What I am trying to provide to counsel is the

24   weekend for the government and the defense to put all this

25   together and to give you a concise argument on their

1  position.  I think in the long-run, that's fair rather than

2  starting tomorrow with the arguments, and all of a sudden,

3  you get arguments and instructions.  If we don't quite

4  finish, I don't have the safety valve of Friday.  Everything

5  gets split again.  I don't think that's wise to save a day.

6           Secondly, I really do need to talk to counsel

7  outside your presence for a couple of hours.

8           Please don't talk to anybody about the case.  I

9  can't tell you how many cases start over again because at

10  this delicate phase you sit alone and isolated in the sense

11  you can talk and visit with each other, but you can't talk

12  about the case.  You can talk about anything else, so it's a

13  pretty lonely position.  No judge ever talks to you this

14  read.  We read you instructions.  We send you home, and you

15  take good care of yourselves.

16           You are admonished not to discuss this matter

17  amongst yourselves nor form or express any opinion, and

18  that's supposed to handle all the problems in the world for

19  you.

20           By now, there may be more than one who has figured

21  out what you are sitting on.  You have to keep them at bay,

22  and you have to do everything you can just to set this aside

23  until we get back into argument and instructions next week.

24           Counsel are estimating -- it's going to be about

25  five or maybe six hours of argument.  We may have to split

101

1   that.  We may be coming back Thursday to finish the

2   instructions.

3           Counsel, I want you to talk about whether you want

4   me to instruct first or have you argue first.  I think my

5   recommendation is going to have you argue first so the jury

6   is fresh, but we will talk about this evening.

7           Now, do any of you have any questions of me in

8   terms of the timing?  Be back tomorrow at 1:30?  If it's a

9   waste of your time, I am going to apologize to you, but if I

10  am making any mistakes, I need to find out tonight from the

11  government or the defense, and I can't get you back.   I

12  can't call you at home and have you come back again.

13          All of you okay?

14          Then you are admonished not to discuss this matter

15  amongst yourselves nor to form or express any opinion

16  concerning the case.

17          You are ordered back at 1:30 tomorrow.   Please

18  drive safely.

19          (Jury not present.)

20          THE COURT:  All right, first, it provides the

21  government an opportunity to go over all your notes, have a

22  private discussion.  You are not in the heat of passion or a

23  rust to conclude your case.  Make certain, and I will ask

24  you again tomorrow probably on the record.  You have the

25  evening to think about that.

1        Mr. Mills, Mr. Steward, Mr. Fleming, I will ask

2   you same question tomorrow probably in the jury's presence.

3   Go back over all your notes.  Talk to your client this

4   evening so that you are not in the rush of the moment.  See

5   if there is anything further.  It also establishes a good

6   record for me.

7        Mr. White, Mr. Harris, Mr. Bingham, have a private

8   discussion this evening or tomorrow.

9        I will have you gentlemen brought down in the

10  morning.  You will probably sit until 1:30, but I want you

11  for available for counsel.  If there is anything further, I

12  want to know about it tomorrow.  Otherwise, I will go right

13  back on the record about 1:30 or 2:00 after our morning

14  discussion and just make sure that there is no surrebuttal,

15  that there is nothing that any party has missed.

16       Now, I want to hear your argument, Mr. Harris,

17  this evening concerning the reasonable doubt request you

18  have in five different parts of the instructions.  I am

19  prepared to hand down a ruling, but I would like to wait

20  until tomorrow.  I want to hear your argument because

21  initially my thoughts may be very tentative in that regard,

22  and I don't think I have really heard yet a response to the

23  government's brief.

24       MR. HARRIS:  Yes, Your Honor.

25       In the instructions, may I point out the insertion

103

1    of the "reasonable doubt" just so we are clear on that?

2                THE COURT:  Well, first of all, do one of you have

3    the latest rendition of the instructions?

4                MR. HARRIS:  Yes, Your Honor.

5                THE COURT:  Could I have a copy?

6                MR. WHITE:  I may have a copy in my briefcase.

7                THE COURT:  Better yet, I will get it from the

8    government.  You have to make copies anyway.  Why don't you

9    just make your record at the present time.

10               Would you bring me two extra copies.  I would

11   appreciate it.

12               MR. HARRIS:  On behalf of the defense, what we are

13   asking for is insertion of the words "beyond a reasonable

14   doubt" in several point of the instructions.  The first

15   point is on page 3, line 21, after the words "unanimously

16   find," so line 21 should read, "If you unanimously find

17   beyond a reasonable doubt that the aggravating factors," and

18   so forth, page 3, line 21.

19               Next would be page 11, line 21.  After the words

20   "unanimously persuaded," we would ask for the insertion of

21   the words "beyond a reasonable doubt," so it would say

22   "unanimously persuaded beyond a reasonable doubt that the

23   aggravating factors" --

24               The next point would be on page 14, line 26.

25   After the words "unanimously decide" insertion of the words

104

 1    "beyond a reasonable doubt," so it would read "unanimously

 2    decide beyond a reasonable doubt whether the aggravating

 3    factors," et cetera.

 4           Next, page 20, line 8, after the words

 5    "unanimously agree" insertion of "beyond a reasonable

 6    doubt," so "The jurors must unanimously agree beyond a

 7    reasonable doubt that" --

 8           Finally, page 45, at two points.  First, line 16,

 9    after the words "unanimously persuaded," we would ask for

10    insertion of "beyond a reasonable doubt," and on line 20,

11    likewise, after "unanimously persuaded" insert "beyond a

12    reasonable doubt."

13           THE COURT:  I received a brief from the government

14    objecting to this.

15           What's your response?

16           MR. HARRIS:  The response is as follows.  Mr.

17    Emmick has attached as Exhibit 3 to his brief the

18    instruction from the Modern Federal Jury Instructions

19    that -- specifically, Instruction 9A-19, in which Judge Sand

20    and others, the authors of this treatise, interpret the

21    Federal Death Penalty Act to contain a requirement that

22    beyond a reasonable doubt be included in the weighing to

23    this extent, that -- our position is that the jury must find

24    beyond a reasonable doubt that the aggravating factors

25    sufficiently outweigh the mitigating factors to justify a

105

1    position of a sentence of death.

2          Mr. Emmick has cited -- the cases he has cited,

3    the relevant ones, seem to be United States versus Hammer in

4    which that dealt with the Federal Death Penalty Act in which

5    this position that I am advocating appears to have been

6    rejected, and there is also in his final footnote the

7    United States versus Sampson case of Massassuchetts in which

8    this was given.

9          I believe it's called for under the statute, and I

10   can state how I come to that conclusion.  I think the key is

11   at 18 USC Section 3591(a).  I believe that everybody would

12   agree that the finding that the defendant must be 18 years

13   old is required to be found by the jury unanimously and

14   beyond a reasonable doubt.  I don't think we are going to

15   have any dispute on that point.  That's what the

16   instructions say, these several points, so the finding of 18

17   years old requires beyond a reasonable doubt.

18         The language that I would invite the Court's

19   attention to is at the end of the 3591(a).  It talks

20   about -- the language is, "It is determined that imposition

21   of a sentence of death is justified, except that no person

22   may be sentenced to death who was less than 18 years of age

23   at the time of the offense."

24         The structure of the statute at that point

25   indicates that the exception to the determination must be

1    found beyond a reasonable doubt.  I think it's a fair
2    reading of the statute that since the exception to the
3    determination must be beyond a reasonable doubt, namely, 18
4    years old, the determination itself is intended to be beyond
5    a reasonable doubt.

6           I think it would be an odd reading of the statute
7    where the exception to the determination is by one standard
8    and the encompassing determination itself is by another
9    standard.  I think if you look throughout the statute it
10   indicates that the key -- at least looking at 3591, you have
11   got the so-called threshold eligibility factors required to
12   be found beyond a reasonable doubt.  That's at the start.
13   At the end, you have got the 18 years of age exception must
14   be found beyond a reasonable doubt.  I think that that
15   determination in the middle -- sandwiched in the middle of
16   this is part of the same sentence that likewise must be
17   found beyond a reasonable doubt.

18          So my argument to the Court is looking at the
19   words "It is determined," which is talking about the
20   determination in question, under 3591, I believe that
21   determination must be found beyond a reasonable doubt.  That
22   was the conclusion of Judge Sand in his treatise, and I
23   believe that's a just and fair and correct reading of the
24   statute.

25          THE COURT:  Mr. White, is there anything you have

```
 1   to add?
 2              MR. WHITE:  No.
 3              THE COURT:  Mr. Fleming?  Mr. Steward?
 4              MR. FLEMING:  We join the argument.
 5              THE COURT:  Mr. Emmick.
 6              MR. EMMICK:  We tried to set forth our position in
 7   the papers.  If I might just hit the high points, let me
 8   first commend Mr. Harris for his creative argument, but the
 9   relevant statute is 3593, and that's the statute that has
10   the language in it that does not have the "beyond a
11   reasonable doubt" language.  Rather, the language that is
12   operative is the "sufficiently outweigh" language without
13   "beyond a reasonable doubt."
14          The current jury instruction is the jury
15   instruction that matches this language.  It matches the
16   language from the Eight Circuit and from the Tenth Circuit
17   and from the Martinez case.  It is also consistent with the
18   interpretation that since the "beyond a reasonable doubt"
19   language is not found here but is found elsewhere in 3593,
20   the traditional interpretation principle would suggest that
21   Congress intentionally did not have the beyond a reasonable
22   doubt standard to be used with respect to the task of the
23   balancing aspects of the case.  That is consistent with the
24   case law that we have cited from the Ninth Circuit and from
25   several other cases -- several other Circuits including
```

1    District Court cases.

2         We acknowledge that the Sand instruction does

3    contain the "beyond a reasonable doubt" language, but there

4    is no citation of authority to that.  We don't know where it

5    comes from, and, frankly, we think it's just a mistake of

6    law.  We did identify the one case in a footnote where it

7    looks like "beyond a reasonable doubt" was part of a jury

8    instruction, but in that case -- and it's a case that's

9    never been followed by the way.  In that case, the

10   government simply went along with the "beyond a reasonable

11   doubt" instruction, and it looks like it was part of

12   horse-trading, if you will, because the defense was asking

13   that there be an even stronger jury instruction, that is,

14   that there be certainty.

15        So we look at this and there is virtually nothing

16   to support the insertion of "beyond a reasonable doubt."  We

17   think it's not only unnecessary and that absolutely the case

18   law is clear on that, but it's a wrong statement of the law.

19   We should just stick with what the law is and what the

20   statute requires.

21        THE COURT:  I am going to go back and look at

22   Hammer and Sampson again.  I want to reread it again this

23   evening.  Tentatively, I agree with the government.  I think

24   3593 is controlling in this regard.  Congress certainly

25   knows the standard, and if they intended "beyond a

1   reasonable doubt" instead of "sufficiently outweigh,"

2   Congress would have inserted "beyond a reasonable doubt,"

3   but I want to be cautious in that regard.  I want the

4   evening to look at it.

5          I also want to provide each of you an opportunity

6   to go back over all your notes, all your evidence.  Let's

7   just make certain tomorrow.  I am going to put the jury back

8   in the box tomorrow and ask you the same question one more

9   time and, that is, if are resting on behalf of the

10  government, if you are resting on behalf of the defense.

11         Mr. Mills, have a thorough and thoughtful

12  discussion with both of your attorneys this evening or

13  tomorrow.

14         Mr. Bingham, have a thorough and thoughtful

15  discussion with your attorneys.

16         Gentlemen, I will bring you down tomorrow morning

17  probably at the same time, but I am not going to require

18  counsel to be here until 10:00.  That way you can go back

19  and strategize for both sides.

20         I would like to get two copies of instructions

21  before I leave, so if you go back to your office -- I have

22  so many copies up here.  I don't want to make a mistake.  I

23  have Martinez.  I have got the case from Judge -- I have got

24  so many renditions of each -- I should have thrown them away

25  as we went, and I didn't.  I am just terrified I am going to

1   pick up the wrong one.

2          Mr. Harris, if you would remain and, Mr. Fleming,

3   and, Mr. Emmick.  I am simply going to sit here, and you are

4   going to go back to your office, xerox off, and give me two

5   copies.  I will excuse everyone else this evening.

6          What else do we have to do because tomorrow we are

7   going to read through the instructions one last time.  If I

8   hold to my tentative ruling, these instructions are

9   complete.

10          MR. EMMICK:  Let me give you a minor heads-up on

11   one very small possible addition.  I have mentioned this to

12   Mr. Harris.  I think we may have reason to add a little

13   phrase -- here is what has happened.  The preliminary

14   instructions and I think the instructions we have now say

15   there is no parole in the federal system.  That's an

16   accurate statement as of 1987.  We have the oddity in this

17   case that both Mr. Mills and Mr. Bingham have some parole

18   eligibility because they have convictions from before 1987,

19   so it might be a little confusing to the jury to hear that

20   there is no parole but to hear about parole possibilities

21   for these two defendants.  There may be a chance to just put

22   in the phrase, "Since 1987, there has been no parole in the

23   federal system.

24          MR. STEWARD:  We would endorse that.  It is

25   confusing.  I hadn't even thought about it.  I think that a

1    great idea.

2              MR. FLEMING:  He is suggesting a slight change in

3    the language.  It's the concept I think we are in agreement

4    on, and we will work that out.

5              THE COURT:  Mr. White, and, Mr. Harris, anything

6    else this evening?

7              MR. WHITE:  No, Your Honor.

8              MR. HARRIS:  No.

9              THE COURT:  What else are we forgetting in terms

10   of the instructions because I really want to let you go on

11   Friday if we can?  We sit here until we have a complete

12   package, and if we can get that done, then there is no

13   reason for you to come in on Friday.  If not, we go right

14   through them.  Anything else?

15             MR. HARRIS:  No.

16             THE COURT:  All right, I will see all of you at

17   10:00 tomorrow, but Mr. Fleming, Mr. Harris, Mr. Emmick, I

18   am sitting here waiting for my copy.  Have a nice evening.

19             (Proceedings were adjourned.)

20                            -oOo-

21

22

23

24

25

112

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  August 31, 2006

Sharon A. Seffens    8/31/06

SHARON A. SEFFENS, U.S. COURT REPORTER