ORIGINAL

1

2          UNITED STATES DISTRICT COURT

3          CENTRAL DISTRICT OF CALIFORNIA

4               SOUTHERN DIVISION

5                    - - -

6    UNITED STATES OF AMERICA, )
                    Plaintiff,    )
7         vs.                     )
                                  )  CR-02-938(C)
8    BARRY BYRON MILLS;           )  DAY 2, VOL. IV
     TYLER DAVIS BINGHAM;         )
9    CHRISTOPHER OVERTON          )
     GIBSON; EDGAR WESLEY         )
10   HEVLE,                       )
               Defendants.        )
11   --------------------------)

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            Santa Ana, California

16             March 14, 2006

17

18

19         SHARON A. SEFFENS, RPR
           United States Courthouse
20         411 West 4th Street, Suite 1-1053
           Santa Ana, CA  92701
21         (714) 543-0870

22

23                    2 0

24

25

SHARON SEFFENS, U.S. COURT REPORTER

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    DEBRA W. YANG
      United States Attorney
 4    STEVEN D. CLYMER
      Special Assistant United States Attorney
 5    Chief, Criminal Division
      STEPHEN WOLFE
 6    MICHAEL EMMICK
      TERRI FLYNN
 7    JOEY BLANCHE
      Assistant United States Attorneys
 8    1400 United States Courthouse
      312 North Spring Street
 9    Los Angeles, CA  90012
      (213) 894-0511

10

11    For Defendant BARRY BYRON MILLS:

12    H. DEAN STEWARD
      LAW OFFICES OF H. DEAN STEWARD
13    107 Avenida Miramar, Suite C
      San Clemente, CA
14    (949) 481-4900

15    MARK F. FLEMING
      LAW OFFICES OF MARK F. FLEMING
16    433 "G" Street, Suite 202
      San Diego, CA  92101
17    (619) 652-9970

18    For Defendant TYLER DAVIS BINGHAM:

19    MICHAEL  V. WHITE
      LAW OFFICES OF MICHAEL V. WHITE
20    1717 Fourth Street, Third Floor
      Santa Monica, CA  90401
21    (310) 576-6242

22    WILLIAM S. HARRIS
      STEWART & HARRIS
23    1499 Huntington Drive, Suite 403
      South Pasadena, CA  91030
24    (626) 441-9300

25
```

1    For Defendant CHRISTOPHER OVERTON GIBSON:

2    KENNETH A. REED
     LAW OFFICES OF KENNETH A. REED
3    404 West 4th Street, Suite C
     Santa Ana, CA  92701
4    (714) 953-7400

5    For Defendant EDGAR WESLEY HEVLE:

6    BERNARD J. ROSEN
     LAW OFFICES OF BERNARD J. ROSEN
7    1717 Fourth Street, Suite 300
     Santa Monica, CA  90401
8    (310) 451-4577

9    DONALD J. CALABRIA
     LAW OFFICES OF DONALD J. CALABRIA
10   16133 Ventura Boulevard, Suite 600
     Encino, CA  91436
11   (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                                I-N-D-E-X

2                                                        PAGE

3     OPENING STATEMENT BY MR. WHITE                      5

4     OPENING STATEMENT BY MR. ROSEN                     20

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SANTA ANA, CALIFORNIA; TUESDAY, MARCH 14, 2006; 3:30 P.M.
 2            (Jury not present.)
 3            THE COURT:  During the next break before we leave
 4   this evening I want to discuss this letter to the employers
 5   that we had made out.  I want to go over that one more time
 6   because we want to be courteous and thank employers for
 7   donating their employees for jury service.  I don't want to
 8   let that go unnoticed.  Therefore, we have this letter from
 9   the Court to each of the employers.  I want to make sure it
10   meets with your consent before we mass distribute it to the
11   jurors.
12            (Jury present.)
13            THE COURT:  The jury is present, the alternates,
14   all counsel, the defendants, and the government.
15            This will be Mr. White's opening statement on
16   behalf of Mr. Bingham.
17            MR. WHITE:  Thank you, Your Honor.
18            Good afternoon, ladies and gentlemen.  My name
19   again is Michael White and myself and Bill Harris represent
20   T.D. Bingham.  I'm going to called him T.D. Bingham because
21   that's his name.  I am not going to be as long as Mr. Emmick
22   or Mr. Steward.  I wouldn't do that to you.  I hope you
23   understand that my comparative brevity in no way indicates
24   that I feel any less strong about the innocence of T.D.
25   Bingham.  We feel there will be a very strong defense case
```

1    presented on behalf of Mr. Bingham.

2            I notice that a number of you have taken notes

3    today.  I hate to be -- sound like a recorded message, but,

4    again, what we are telling you now is what we expect the

5    evidence to be, and you will at some later point, maybe

6    three months, maybe four months, maybe five months down the

7    line when you get this case to deliberate and decide guilt

8    or innocence -- I suggest you look back in your book because

9    you have taken notes during opening statements and see how

10   much of what the government has said they are going to prove

11   has in fact been proven because I suggest to you that much

12   of what they said earlier today will not be proven during

13   this trial.

14           I'm going to start -- you have heard about the

15   historical information about the Aryan Brotherhood.  Again,

16   it happened in the '60s in.California at a time when black

17   power was very prevalent.  There were Hispanic gangs.  There

18   were black gangs, and this group of white guys got together

19   for self-protection.  In fact, initially their name was the

20   Bluebirds, and I guess they felt that that really didn't

21   send the kind of message they wanted sent, so they changed

22   it to the Diamond Tooth Gang, which also didn't send the

23   proper message, and some people settled upon the Aryan

24   Brotherhood, which in retrospect is a terrible name, but

25   those were days when political correctness was not something

1    they were thinking about.  They were thinking about

2    survival.

3              I will tell you right now that what you are going

4    to find is that the Aryan Brotherhood is not like the KKK.

5    It's not like the Aryan Nation.  They're not a bunch of

6    skinheads.  That's not what they were about or are about.

7    You will see black inmates testify during this trial for the

8    defense.  You will find out they were friends of T.D.

9    Bingham.  You will see Hispanic inmates.  You will hear an

10   accusation from one government's witnesses that one of the

11   complaints about T.D. Bingham was he was too close to

12   Hispanic inmates.  So despite the name Aryan Brotherhood,

13   these are not racists, nor are they anti-semantic like the

14   Aryan in the Nazis.  In fact, there are Jews who are members

15   of the Aryan Brotherhood.  In fact, T.D. Bingham is Jewish.

16             The prosecution tells you that this was a

17   conspiracy to commit crimes and to control the prisons.  In

18   fact, what this was were guys who got together to survive

19   prison.  Everybody has talked about the dangers in prison.

20   I am not going to go back into it.  However, if you don't

21   have people backing you up, if you don't stand up for

22   yourself, you get your property taken.  You get physically

23   assaulted.  You get sexually assaulted.

24             One of the men that was killed in Lewisburg, Abdul

25   Salaam, not only was he in prison for a number of rapes but

1    he was a sexual predator within the prison system.  So it is

2    dangerous, and you must be with others.  You must be with

3    others for protection purposes.

4              Again, you will hear about that from inmates of

5    all colors, from people all colors.  We know that in the

6    news over the last couple of months there has been a lot of

7    racial tensions in the Los Angeles County jail system.  We

8    know about that.  Every day for a couple of weeks there was

9    something about it.

10             Racial violence in the jails is impossible to

11   prevent.  They will divide on racial lines.  There is a code

12   of race.  You are required to defend your race.  Those are

13   words by the L.A. County Sheriff, Lee Baca.  That's just the

14   reality.  It was the reality in the '60s, '70s, '80s, '90s,

15   and today.  It's unfortunate.  It's sad, but those are the

16   realities.

17             Now, the prosecution is going to try to convince

18   you that every criminal act committed by an Aryan

19   Brotherwood member or an associate or a wanabee is

20   sanctioned by the Aryan Brotherhood leadership and is

21   therefore the responsibility of Mr. Mills and Mr. Bingham.

22             Ladies and gentlemen, this is simply not so.  This

23   is a myth.  The men who -- some of the men who are members

24   of the Aryan Brotherhood were murderers.  Keven Roach, the

25   star witness for the government in this case, long before he

1    joined the Aryan Brotherhood was a murderer.  He was

2    convicted of two separate murders, one in prison, long

3    before he had anything to do with the Aryan Brotherhood.

4             Al Benton, another star witness for the

5    prosecution, the man who is going to claim that what he

6    received at Lewisburg was an order to go to war with the

7    D.C. Blacks -- he's going to claim that.  That's going to be

8    a lie.  Al Benton was an Italian Mafia torpedo before he

9    ever joined the Aryan Brotherhood.  Who knows how many

10   people he killed.  Then once he got sent to prison before he

11   joined the Aryan Brotherhood, he murdered the guy who had

12   testified against them in court long before he had any

13   association with the Aryan Brotherhood.

14            The point is that there are people in the Aryan

15   Brotherhood -- lock, every one of them is there because they

16   committed a crime.  These people cannot be controlled.  They

17   don't abide by the rules.  If they want to do something, if

18   they want to assault someone, if they feel that they have

19   been disrespected and they think that stabbing somebody is

20   appropriate, they don't need word from 2,000 miles away.

21   They go ahead and act.

22            The government tells you -- gives you all these

23   rules that they claim are written or unwritten in an Aryan

24   Brotherwood charter.  I just want to talk about a few of

25   those rules.

1       They talk about blood in and blood out.  That's

2    very dramatic.  That was the first thing up on the board,

3    blood in and blood out, very, very dramatic.  Of course, as

4    Mr. Emmick talks, he eventually concedes that that really

5    isn't the way it is.  Maybe it was back in the '60s, but it

6    wasn't that way in the '80s or '90s or even the '70s.

7            Then the oath is mentioned.  Of course, Mr. Emmick

8    then mentions that sometimes the oath is given and sometimes

9    it's not given.

10           Then he talks about the rule of lifetime

11   allegiance.  If you're a member of the Aryan Brotherhood and

12   you get out of prison, then your responsibility at the

13   penalty of death is to do work for the Aryan Brotherhood on

14   the outside in society, commit criminal acts.

15           Well, Mr. Emmick mentioned that T.D. Bingham in

16   1981 was released from prison.  He was released

17   from California State prison.  In 1981, T.D. Bingham got

18   married to a woman who had two 15-month old boys.  T.D.

19   Bingham and his wife and his new kids went to Texas where

20   T.D. Bingham worked in the Texas oil fields until the oil

21   crisis came about, and he lost his job, and he robbed a

22   bank, and he went back to prison in 1985.  He was out for

23   over four years.

24           There will be no evidence of T.D. Bingham putting

25   in work for the Aryan Brotherhood during that period of

1    time, none.  There won't be any evidence of it because he

2    didn't do it.  This is just another supposed rule that you

3    will find out people like Kevin Roach and others have made

4    up.

5         We hear about the rule that if a nonmember kills a

6    member that's a violation, and somebody has got to pay for

7    that.  We hear that the McKinney murder -- Mr. McKinney was

8    murdered by a guy named Kennedy who wasn't a member, and the

9    claim is that Kennedy got in trouble because he a nonmember

10   killed a member, but in a breath before that we hear about

11   the Arva Lee Ray murder.  Arva Lee Ray was killed by a man

12   named Glenn Filkins.

13        Well, the evidence will be that Glenn Filkins was

14   not a member at the time he killed Arva Lee Ray who was a

15   member.  Was Glenn Filkins in trouble because of it?  No.

16   He became a member after that.  Another fictional

17   mythological rule that simply -- that's what it is,

18   fictional, mythological.

19        Many of these myths are going to be testified to

20   by Kevin Lee Roach, and it's interesting because Kevin Lee

21   Roach rolled over in May and June of 1998.  Now, you heard

22   Mr. Emmick say that the investigation of the Aryan

23   Brotherhood of the RICO charges started in 1997 but began in

24   earnest in 1998.  It began in earnest in 1998 because of

25   Kevin Roach.  Kevin Roach sold the Bureau of Prisons a bill

1    of goods.

2          You heard Mr. Emmick talk about how people usually

3    request to cooperate with the government.  They want to

4    cooperate for various reasons.  Well, you will see Kevin

5    Roach's copout letter.  That copout letter is the letter

6    which makes the prison officials know that you want to

7    cooperate.  Well, Kevin Roach's copout letter was really a

8    demand letter.  If you want me, this is what you need to do.

9    I can deliver the Aryan Brotherhood to you, but here is what

10   you have got to do.

11         Among those things, you have got to put me in my

12   own special unit all by myself.  This guy was in his own

13   unit at the ADX in Florence, Colorado, for a year all by

14   himself.  Much of the evidence in this case starts with him,

15   and whether or not the government proves their case in large

16   part depends on whether you believe Kevin Roach, whether you

17   think he is an honest credible witness.

18         Now, during the government's opening statement

19   oftentimes Mr. Emmick referred to the evidence.  I actually

20   have a difference of opinion with Mr. Steward.  He said 90

21   percent of the evidence consisted of snitch or rat

22   testimony.  I would say it's closer to 95 to 96 percent.

23   That's what this case is based on, snitches and rats.  The

24   government calls them cooperators.  We call them informants,

25   snitches, and rats.  You will decide which they are.  If

1   they're lying, their snitches and rats.

2           The evidence will show how snitches or rats lie

3   under oath.  You will learn how they gather information

4   about things and events they know nothing about, how they

5   are adept at weaving pieces of the truth into lies in order

6   to try to convince jurors and law enforcement that in fact

7   they are telling the truth.  You will learn at how adept

8   they are at working the criminal justice system to their

9   advantage.  You will learn that they are people without

10  morals.

11          As Mr. Steward mentioned, you are going to find

12  out about all the benefits they received for testifying.

13  Alan Benton, one of the star witnesses for the government,

14  brutally, brutally killed Abdul Salaam.  He had a 13-inch

15  shank and with someone else stabbed this man 35 times.  Alan

16  Benton as a result of his cooperation pled guilty to an

17  assault, assault, and got eight years or nine years or

18  something like that when in fact he could be looking at the

19  death penalty for what he did.

20          I'm not going to go through the various informants

21  and what they receive.  Tomorrow you are going to see a guy

22  -- well, maybe tomorrow or maybe Thursday you will see a guy

23  named Glenn Speedy West.  He is going to be the second

24  witness for the prosecution.  Mr. West who is named in our

25  Indictment, who is looking at murder charges for Arva Lee

1   Ray, was allowed to plead guilty to something that happened

2   on Christmas Day 1980.

3        The reason he was allowed to do that -- and I

4   don't want to get too technical, but the bottom line is he

5   was allowed to do that so that he could serve no more time

6   in custody if he got up on that witness stand and cooperate.

7   Part of that deal was if he gets up there and cooperates,

8   then this Indictment as to him will be dismissed.

9        Now, yes, these people all have convictions,

10  felony convictions, other convictions than murder.  I don't

11  think anybody should be become immuned to those felony

12  convictions.  Those are things you should consider in

13  deciding whether people are telling the truth.  All felony

14  convictions are things that bear on truthfulness, and you

15  are going to be instructed about that.

16        Ladies and gentlemen, I didn't count.  Dean

17  Steward said 42 informants, 42 snitches.  Sheer numbers of

18  lying witnesses do not make up for a lack of the truth, so I

19  ask you not to get overwhelmed by the numbers and look at

20  each one of these witnesses individually.

21        When Mr. Emmick suggests that in analyzing a

22  witness's credibility you see if their testimony is

23  supported or corroborated by another witness's testimony,

24  well, if you have got two liars corroborating each other,

25  you've got nothing.  You still have lies, and you are going

1   to find out how that works in this system, how adept the

2   informants are at doing things like that.

3           I'm just going to correct a thing or two before I

4   move onto the Lewisburg thing.  I'm sure this was an

5   innocent mistake on Mr. Emmick's part, but Mr. Bingham is

6   charged with the attempted murder of Benitez Mendez, not the

7   murder of.  You guys have had so many charges and acts

8   thrown at you that there is no way you can keep anything

9   straight at this point, and I appreciate that, but I did

10  want to correct that.

11          I also want to point out that in one of

12  Mr. Emmick's charts he mentions Mr. Bingham's name with a

13  conspiracy regarding Frank Rupoli.  Well, there is no -- if

14  somebody remembers this, you need to be in the "Guinness

15  Book of Records," but when the judge read to you the

16  Indictment weeks ago or maybe it was months ago, you didn't

17  hear Mr. Bingham charged with the Ruopoli conspiracy because

18  he is not.

19          I guess that leads me to ask you not to get bogged

20  down by the sheer number of charges.  Again, the sheer

21  volume of the charges does not make up for the lack of

22  evidence in any one charge, so I ask you to take each one

23  individually.

24          Now I want to move to the Lewisburg case.

25  Mr. Bingham, Mr. Mills, Mr. Gibson, and Mr. Hevle are all

1    charged with the murders at Lewisburg, and the prosecution

2    claims that an order to go to war with the D.C. Blacks came

3    out of the hole from Mr. Mills and went to Mr. Bingham who

4    was in the another part of prison.  Mr. Bingham then passed

5    that order to go to war to Ron Slocum who is not in prison,

6    and Mr. Slocum passed that order to go to war to Alan Benton

7    who is in federal prison at Lewisburg.  That's the

8    prosecution's theory of the case.

9            In fact, the evidence will be that what went from

10   T.D. Bingham to Ron Slocum to Al Benton was a warning to the

11   inmates at Lewisburg that the D.C. Blacks were on the

12   warpath.  You heard from Mr. Steward about some of the

13   things that were happening at Marion prison.  Al Benton was

14   warned be careful.  He was warned because as Mr. Steward

15   explained to you at Lewisburg black inmates -- D.C. Black

16   inmates overwhelmingly outnumbered white inmates,

17   overwhelming outnumbered Aryan Brotherhood inmates.  I think

18   there were two or three members of the Aryan Brotherhood at

19   Lewisburg, so they were being warned.

20           For reasons that will become clear during the

21   trial, Al Benton took that warning and told these other guys

22   that participated in this that it was a call to war, and

23   hours later Al Benton and these other guys attacked the

24   black guys.  During the trial you will understand why Benton

25   did this, why he believed it would be in his own best

1   self-interest to kill Abdul Salaam and then immediately

2   become a cooperator with the government.  Only in the crazy

3   world of a maximum federal prison with a psychopathic killer

4   like Al Benton would someone brutally murder a person by

5   stabbing them with a 13-inch blade 35 times and then offer

6   to cooperate with the government because in their mind this

7   was to their best self-interest.

8           You are going to hear some evidence.  You are

9   going to see some actual physical evidence.  You are going

10  to hear a telephone call from Benton to Slocum the morning

11  of the killing, and you are going to hear a discussion about

12  something that Benton got from T.D.  You are not going to

13  hear a discussion about receiving a war call because it

14  wasn't a war call.

15          What's interesting about that is that Benton calls

16  Slocum in the morning.  Benton is on the telephone.  Benton

17  is going to testify that he was shocked that he received

18  this war call.  Well, if fact he would have received a war

19  call, of course he would have been shocked.  It would have

20  been suicidal.  It would have been a suicide mission, but he

21  is going to testify he was shocked, and he is going to

22  testify he called Ron Slocum.  He is on phone with Ron

23  Slocum, and you will hear this.  He says, "Hello," and then

24  almost immediatly says to Slocum, "I'll call you back in ten

25  minutes" and hangs up.

1    You're going to find out that the reason Benton

2 hung up is because there was a man walking by with $50 worth

3 of stamps, which is what Benton needed in order to get his

4 next heroin fix, so here is Al Benton who is so shocked

5 about this alleged call to war, but he's not so shocked that

6 he can't take a few minutes to get the currency so that he

7 can score his next fix of heroin.

8    You are going to see some -- you are actually

9 going to see a couple of pieces of evidence, and I want to

10 show them to you.  Now, ladies and gentlemen, that is a

11 letter sent to Barry Mills from Ron Slocum, and he says in

12 that letter, "I heard from Bubba.  It looks like drama

13 worldwide."  Ron Slocum is telling Barry Mills that he heard

14 from T.D. Bingham.  He heard from T.D. that there was danger

15 at Lewisburg and that he should pass onto Lewisburg a

16 warning.

17    You are also going to see a letter from Ron Slocum

18 to T.D. Bingham.  He says, "I got your letter and got word

19 to that guy.  Oh, well, shit happens."  That is Ron Slocum

20 telling T.D. Bingham that he got T.D.'s letter telling him

21 to pass a warning onto Al Benton at Lewisburg.  Slocum is

22 telling T.D. Bingham that he passed a warning onto Benton.

23    I want to show you the top of this letter.  As you

24 can see -- maybe you can't read it.  It says, "Hey, hulk, I

25 did read your stuff.  I could not do the work.  I apologize.

1    Give me some air, homeboy."  The evidence will be that that

2    top of the letter also was sent to T.D. Bingham.  It was

3    written by a man named Danny Redhog Martin.

4         Danny Redhog Martin at the time was no longer in

5    state prison.  Danny Redhog Martin was a friend of T.D.

6    Bingham.  Danny Redhog Martin had met T.D. Bingham in

7    prison.  He had gotten out of prison.  He had become a

8    successful writer.  He had written a couple of books.  The

9    evidence will be that T.D. Bingham's passion in the mid '90s

10   up through 2,000 was to become a writer and that T.D.

11   Bingham sent Danny Redhog Martin short stories, chapters of

12   books, and Martin was trying to help him.  That's what

13   Martin was referring to.

14        Why that is relevant, ladies and gentlemen, is

15   because Kevin Roach, the star witness for the government,

16   will testify that T.D. Bingham was obsessed with being a

17   writer to the point where in Roach's estimation T.D. Bingham

18   was not taking care of Aryan Brotherhood business.  Roach

19   will testify that there were counselors who were upset with

20   Bingham because of that and would simply go around him or

21   ignore him.  The point being that in August of 1997 when the

22   government claims T.D. Bingham is ordering a race war in

23   Lewisburg, he wasn't doing that.  He was a man who was

24   obsessed with becoming a writer.  His focus was on writing,

25   not on ordering race wars, not on sending friends or

1    associates on a suicide mission.

2            Ladies and gentlemen, you have heard differences

3    of opinion on what the evidence will show and whether or not

4    it will prove guilt or innocence.  You know our opinion.

5    You know the government's opinion.  Ultimately, my opinion

6    means nothing.  Ultimately, it is you, ladies and gentlemen,

7    after listening to all the evidence in this case deciding

8    based on the evidence and the law just and fair verdicts.

9    I'm sure you will do that, and I believe you will find

10   Mr. Bingham not guilty of all charges.

11           Thank you very much.

12           THE COURT:  Mr. White, thank you.

13           Counsel on behalf of Mr. Hevle, Mr. Calabria, or,

14   Mr. Rosen, would you like to make an opening statement at

15   this time, or would like to reserve that statement until the

16   beginning of the defense case?

17           MR. ROSEN:  Your Honor, we would like to make an

18   opening statement.

19           THE COURT:  Will you be making that statement,

20   Mr. Rosen?

21           MR. ROSEN:  Yes, Your Honor.

22           THE COURT:  This will be Mr. Rosen then at the

23   lectern on behalf of Mr. Hevle.

24           MR. ROSEN:  Ladies and gentlemen, the hour is

25   late.  I am well-aware of fact that you are fatigued

1    physically and mentally, but Mr. Hevle, the client that
2    Mr. Calabria and I represent, has the right to have his
3    counsel present to you an opening statement letting you know
4    what we are going to prove and what the government hasn't
5    told you about, and this is the time that has been allotted
6    for it.   I will try to be brief, and I am almost certain I
7    am not going to repeat anything that Mr. Steward or
8    Mr. White have already said.
9              Mr. Emmick entitled his presentation this morning
10   the Aryan Brotherhood blood in/blood out.   On more than one
11   occasion as he was working with his power point
12   presentation, I kept thinking to myself the computer
13   equivalent garbage in/garbage out because I'm going to tell
14   you right now how that presentation stretched the facts to
15   try to include Mr. Hevle, how that presentation twisted the
16   facts to try to include Mr. Hevle, and most importantly of
17   all what was left out that the government knows is factual
18   to give a distorted picture of Mr. Hevle.
19             I'm not going to go in chronological order.   I'm
20   going to go in an order that I think may be in terms of the
21   importance of the accusations against Mr. Hevle, those being
22   the murders at Lewisburg in August of 1997, Counts 6 and 7.
23   Those murders occurred on August 28 1997, in the prison at
24   Lewisburg in eastern Pennsylvania at which time Mr. Hevle
25   was locked up some thousand or more miles to the west in ADX

1   Florence, Colorado.

2           If you remember the chart that you were shown,

3   sort of a triangle of events, the presentation included Mr.

4   Hevle as having done something at Lewisburg, but not in

5   August of 1997.  Mr. Hevle wasn't at Lewisburg in August

6   '97.  The presentation was something about a message.  I'm

7   going to go back to that message in a few moments.

8           We're going to prove some very important dates,

9   one of the which has already been mentioned, November 5,

10  1996.  Remember the picture that Mr. Steward showed up here

11  of Joe Tokash.  In 1996, I think he was 50 years old, and he

12  was hit by that radio in the pillowcase by Buch Johnson who

13  was 25 or 26, half his age.

14          A check-in move -- Mr. Steward and Mr. White I

15  think have told you something about what a check-in move is.

16  You have already learned I think about the rules and the

17  code of prison life.  One black inmate on November 5 strikes

18  a white inmate.  That isn't going to be the end of it.  It

19  may not be tomorrow or a week after.  It may be a couple of

20  months later.  In fact, it was the December 18, 1996.  Mr.

21  Steward forgot this incident.  It is mentioned briefly in

22  the Indictment.

23          On December 18, 1996, a white inmate by the name

24  of Michael Wagner attempted to assault Mr. Johnson in

25  retaliation for the attack against Mr. Tokash, but they were

1   out on a yard that was very icy.  Marion is in southern

2   Illinois, and the wintertime can be treacherous.  Because it

3   was very icy, Mr. Wagner couldn't get his feet planted

4   underneath him, and what was an attempt to assault turned

5   out to be not much damage at all, but we have a black inmate

6   striking a white inmate in November and one white inmate

7   striking one black inmate in December.  It might not be what

8   we would expect on the streets, but we are talking about the

9   code of prison.

10           Does that end it?  No.  Mr. Johnson was infuriated

11  that a white inmate would attempt to come at him for his

12  assault on Mr. Tokash.  He therefore got a whole gang of

13  black inmates together and said the next time we get out on

14  the yard we're really going to show those white guys what

15  it's all about.  Well, again there is bad weather.  In fact,

16  Marion was fogged in for four days and four nights.  As you

17  might expect, when it's foggy and you can't see, prison

18  officials don't want the inmates out on the yard, so they

19  are locked in.

20           The first clear day was on January 2, 1997, a date

21  that as far as Mr. Hevle is concerned is what this trial is

22  all about, but a date that does not appear in the 100-page

23  Indictment that will be on trial here.  On January 2,

24  Mr. Tokash still in his '50s and some other white inmates go

25  out on the yard thinking it's their exercise time.  They

24

1   didn't know and they didn't expect that about ten black

2   inmates were going to be coming at them with knives.

3         There were some injuries.  As you have been told,

4   the knives were primarily plastic, not the best weapons in

5   the world.  No deaths on January 2, but we're not talking

6   about one inmate against one inmate anymore.  We are talking

7   about an assault by ten armed inmates by surprise, a rather

8   significant escalation.  Eventually that day the staff get

9   everything under control.  As you have already heard, "Get

10  down."  Eventually everyone was down, and now the staff can

11  come in and take control of the yard.

12        What happens?  Well, first, let's get them off the

13  yard into security cells, and then we will try to figure out

14  what has happened, so everyone was locked in what has been

15  termed the SHU, Special Housing Unit.  The initials SHU IS

16  one of the terms you have now learned.  We call it the SHU.

17  It's not like being in the car.  It's not like being in the

18  hat.  You're in the SHU.

19        On January 2, the white inmates in the SHU are

20  already planning their revenge, and you are going to hear at

21  least one of those white inmates tell you about that.  He

22  said as soon as we were locked up we are starting a list of

23  who was out there attacking us because those are the guys we

24  are going to get first, and let's start making weapons.

25  This is very, very important because our Indictment doesn't

1    say anything about that.

2           Our Indictment says that in January of 1997 Edgar

3    Hevle sent a message to make McElhiney and Sahakian saying

4    that there had been racial problems at Lewisburg and that

5    white inmates at Marion should begin making knives in order

6    to commit acts of violence against black inmates.  Then the

7    very next overt act says in January '97 McElhiney and

8    Sahakian ordered white inmates at Marion to murder black

9    inmates.

10          Reading that it sounds like Mr. Hevle started it

11   all.  No, it started on November 5 when Mr. Johnson decided

12   his check-in move was going to be against Mr. Tokash, and it

13   escalated when the black inmates attached the white inmates

14   on the yard.  It had nothing to do with Mr. Hevle in

15   Lewisburg.  He didn't even know about it.  In fact, the

16   Bureau of Prisons own investigation concluded that that

17   attack on January 2 was racially motivated and initiated by

18   black inmates.

19          The United States government indicted some of the

20   people that were involved in that and some of the events

21   that occurred afterwards and also alleged that what happened

22   at Marion was caused by the white inmates there as a war of

23   retaliation and revenge against the black inmates involved

24   in the fight of January 2 at Marion.

25          Where does Mr. Hevle's message come into this?  Mr.

1    Van Meter whose name you have heard and you have been told
2    is going to be called as a government witness as to some
3    other things -- now, either the government or I at some
4    point in this trial are going to ask him about what happened
5    to him on January 2.  Amongst the injuries he received was a
6    broken jaw.  On January 2 as he was being taken to health
7    services he was heard to be saying, "They slipped up on us
8    this time.  The next time it will be different.  They have
9    started something they won't like.  They had better watch
10   out for Round 2."  That's Mr. Van Meter in Marion on
11   January 2 through his broken jaw.

12          On January 6, four days later, the investigator at
13   the prison -- one of the investigators at the prison was
14   told, was given a warning, everybody in the SHU is talking
15   about the war is on.

16          On January 22, a note was given to that
17   investigator.  The note said -- and it was given to him by a
18   white inmate -- "All seven of us have been given
19   instructions to hit the first black guy we come in contact
20   with when we go back to general population."

21          As you now realize, being in the hat doesn't mean
22   you are in a hat.  Being in the car doesn't mean you are in
23   a car.  Doing a hit doesn't mean you are talking about
24   slapping somebody on the wrist.  A hit in convict code means
25   you are going to try to kill someone.  So on January 22, one

1  of the investigators is told by a white inmate in the SHU
2  seven of us have already been told to kill the first black
3  inmate we find once we are out in general population.
4         The name Dewey Lee was mentioned as a witness to
5  be called by the government.  Dewey Lee arrived at Marion on
6  September 26, 1996, so he was there when Mr. Johnson pulled
7  his check-in move on Mr. Tokash.
8         Remember you were told I think a couple of times
9  that sometimes inmates get moved from one prison to another
10 because they are called as witnesses to testify on
11 somebody's behalf somewhere else.  Mr. Lee left Marion on
12 December 5, 1996, and one of the nice things about the BOP
13 administration now that we have computers is we not only can
14 tell you the day someone is moved from one prison to another
15 or one unit to another, but we can tell you the hour and the
16 minute of the day.
17        On December 5, Mr. Lee left Marion to be
18 transferred to Lewisburg.  Why?  Because he had been
19 subpoenaed or writed to be taken to Lewisburg and housed in
20 Lewisburg because he was going to be called as a witness in
21 a trial that was being conducted and the closest court and
22 the closest prison was Lewisburg, Williamsport, Pennsyvania,
23 so he was going to be housed there while he was needed to
24 testify in Williamsport.
25        So he left Marion on December 5 which is before

1    Mr. Wagner tried hitting Mr. Johnson, so he didn't know
2    anything about that.  He arrived in Lewisburg on
3    December 17.  He left Lewisburg January 21.  When he left
4    Lewisburg, he probably didn't know that there had been the
5    attack on Mr. Johnson on December 18 at Marion, and he
6    probably didn't know about the attack by the black inmates
7    on the whites on January 2 because it does take time to move
8    from prison to prison.
9            At some point in time, as we have been told, he
10   decided he was going to cooperate, so he debriefed.  Now,
11   when you debrief, it's not simply, okay, tell us what you
12   want to tell us.  These are very detailed interviews
13   sometimes lasting several days frequently involving officers
14   from several prisons, several departments.  You're not
15   simply asked about what do you want to tell us?  Questions
16   are asked.  Do you know this guy?  What do you know about
17   him?  Do you remember this crime?  What do you know about
18   that?  There's a lot of stuff that goes on.
19           During the course of one of these debriefings,
20   Mr. Lee says to a Mr. Ford of the FBI when I left Lewisburg
21   I was told by someone that I knew as Snail to deliver a
22   message to the guys at Marion.  Mr. Ford said what was the
23   message?  The AB were to be on guard because of a murder at
24   USP Lewisburg.  So the first interpretation of this message
25   is the AB are supposed to be on guard.

1          Over the course of several interviews and a couple

2      of different opportunities to testify, that message changed

3      a little bit and grew a little bit.  Well, the message was

4      tell the brothers to be ready.  You know, maybe make knives.

5      The allegation of course was make knives to attack black

6      inmates.  Even Mr. Lee never went that far.

7          Now, Mr. Emmick did tell you something very

8      important.  A lot of these cooperators have already

9      testified.  They have already been under oath.  They have

10     been in front of juries.  They have been examined on direct

11     examination by government prosecutors.  They have been

12     cross-examined time and again by defense attorneys.

13         Let me give you two examples of Mr. Lee's answers

14     on cross-examination about this message.  At one of these

15     hearings when he first gave his testimony on direct, he was

16     asked on cross-examination by a defense attorney:

17         "Q.  Snail gave you a message, am I correct?

18         "A.  Yes, he does.

19         "Q.  And Snail gives you a message as to what has

20     been going on at Lewisburg, right?

21         "A.  Yes, sir.

22         "Q.  And what it is that ought to be done at

23     Marion?

24         "A.  He doesn't say what should be done at Marion.

25     He just said get ready."

1          I'm going to come back to this in just a moment.

2   Remember a moment ago I was trying to tell you about the

3   dates that I was going to prove up.  Mr. Lee didn't get back

4   to Marion until January 23 at 4:30 in the afternoon.

5          On January 6, the Marion investigator had been

6   told by one of the inmates in the SHU everybody in here is

7   talking about the war is on.

8          On January 22, the day before Dewey Lee gets back

9   to Marion, the SIS investigator is handed a note, "All seven

10  of us have been told to try to kill black inmates when we

11  get out in the general population."

12         There may have been a message, but it was entirely

13  coincidental and entirely about a series of events that were

14  going on at Lewisburg having nothing to do with Marion

15  except that everyone is fearful it might spread to Marion.

16  When Mr. Emmick said he was going to talk about the

17  pre-Lewisburg event, I thought he was going to include this

18  in.

19         On November 7, 1996, two days after Buch Johnson

20  did his check-in move on Joe Tokash in Marion, two white

21  inmates at Lewisburg in Pennsylvania killed a white inmate.

22  Two white inmates killed a white inmate.  What's that got to

23  do with this case?  It's about the war on black inmates

24  supposedly.

25         Well, the white inmate had been a skinhead.

1   Sometimes when we see or read things in the media things are
2   either shortened, or we don't have a 20-second sound bite,
3   so we can't give you the full history or whatever.   Everyone
4   who will testify in this case, be it Mr. Benton or Mr. Roach
5   or the BOP staff, will tell you the AB is not the AB Nation,
6   is not the KKK, is not the skinheads.   Bloods are not
7   Crypts, although they both may be black.   Skinheads and
8   Aryan brothers may be white, but they have different
9   agendas.
10         Mr. Roach and Mr. Benton will both tell you we
11   were about business.   We weren't about hate.   But the
12   skinheads are different.   The skinheads are about hate.   The
13   inmate that was killed in Lewisburg on November 7, 1996, was
14   an ex-skinhead who had embarrassed and had disgraced his
15   former skinhead brothers.
16         How had he done so?   He had a religious
17   experience.   He converted to Islam, and when you are an
18   inmate at the United States Penitentiary in Lewisburg,
19   Pennsylvania, if you practice Islam, you are socializing and
20   commingling with black inmates, and his two skinhead former
21   brothers would not accept that, so two white inmates killed
22   a white inmate because they thought that white inmate had
23   disgraced them and embarrassed them.   Lewisburg was closed
24   down for three days and reopened on November 10, 1996.
25         On November 10, 1996, there was another murder at

1    USP Lewisburg.  Five black inmates surrounded the cell of

2    another inmate, Perry York.  Three of those inmates stayed

3    out in the hall.  Two of those inmates went in Mr. York's

4    cell and while he was screaming and begging for his life

5    stabbed him and stabbed him and stabbed him, and when they

6    finished, those two black inmates walked out of his cell,

7    and two of the three that were outside went in and stabbed

8    him and stabbed him and stabbed him, and when those two

9    inmates finished, the fifth one went in.

10          What was Mr. York's crime?  Was he an Aryan

11   Brotherhood brother?  No.  Was he an AB associate?  No.  How

12   about a skinhead associate?  Not that anybody knows.  He was

13   white, and the black Islamic inmates at Lewisburg were going

14   to get their message sent loud and clear, so five inmates

15   went after a target to send a message.  By the way,

16   according to the BOP, inmate York functioned at a lower IQ

17   level and was not a large man.

18          Lewisburg was in a panic.  The staff will probably

19   tell you everyone was so unsure of what was going to happen

20   next they were glad when their tour of duty was up each day

21   knowing that they had made it through the day safely, the

22   staff, so were the inmates.  Yes, inmates' phone calls and

23   mail were being monitored, and everyone was concerned about

24   letting other people know about what happened and be on

25   guard in case it spread.

1          The last question that Mr. Lee was asked when he

2     testified about it on cross-examination was:

3          "Q.  They said basically pass it back to the

4     individuals or the people at Marion that there might be --

5     there might be an attack by the DCB's prisonwide?

6          "A.  Snail, Edward Hevle, told me to tell Mac and

7     Dave there might be some more racial violence."

8          Well, there already had been on January 2.  It had

9     nothing to do with the events that took place in Lewisburg.

10    The prison officials concluded that Mr. York was the victim

11    of a savage assault.  I think Mr. Benton's description would

12    be a little more accurate.  He was butchered.

13         Mr. Hevle in that atmosphere when he realized that

14    Mr. Lee was going to be sent back to Marion told Mr. Lee we

15    have had problems here.  When you get back there, let

16    everybody know there.  Be on guard.  Be prepared.

17         The other major crime that Mr. Hevle is accused of

18    is the participation in the murder of Alva Lee Ray, Baby

19    Ray, Count 9.  Baby Ray was a jerk.  He was real arrogant.

20    He probably weighed 145 to 150 pounds.  He talked like a

21    gorilla, though, real obnoxious, just a horrible guy to be

22    around 24 hours a day.  That was Buzz Miller's description

23    of him when asked to testify before the grand jury that

24    brought this Indictment.

25         A lot of people did not like Mr. Ray, and, yes,

```
1   Mr. Hevle was at Lompoc at the time, but there were two shot
2   callers at Lompoc at the time.  The shot caller at Lompoc in
3   1989 was Glenn Speedy West.  He's going to be the second
4   government witness in this case.
5           Not only are the informants hoping to get things
6   by their testimony, whether it's Rule 35s or whatever else
7   they can obtain, but sometimes there are other ways of
8   protecting them.  By my count, Mr. West has been interviewed
9   on ten different occasions during 2003 and 2004 by Agent
10  Halualani, the case agent that Mr. Emmick described this
11  morning.  Three straight days in May of 2004 -- May 19, May
12  20, May 21 -- three straight and I'm assuming solid days of
13  interviewing asking him about just about every allegation in
14  our Indictment.
15          As I stand here right now, I only know two things
16  about Mr. West.  He never mentioned Mr. Hevle's name.  He
17  was never asked anything about Baby Ray, and yet when Phil
18  Myers was interviewed by the same agent even before then,
19  Mr. Myers who was No. 2 at Lompoc at the time said Glenn
20  West told me he wanted Arva Ray murdered for engaging in
21  homosexual activity.
22          Sometimes stories just grow if I hadn't been
23  around so long, and we get different versions of them.
24  Mr. Emmick tries combining two -- this incident about
25  Mr. Ray had spit at Mr. Hevle and threw papers at him.
```

1    Originally those were two separate stories.  Now they seem

2    to be combined as one. I don't think the government has a

3    witness who is going to come in and say they ever saw that,

4    but it's part of the folklore of what has been going on.

5         Mr. Ray was murdered not for any justification.

6    He was cheating on the dope.  He was obnoxious.  He was

7    disrespecting people, and he was openly cavorting with a

8    homesexual in prison.  What you do in the shadows is one

9    thing, but you can't do it openly because that disrespects

10   us all.  Those were the reasons that Mr. Ray was ordered

11   killed, and that decision was made by Mr. West and

12   Mr. Myers.

13         Lastly, Mr. Hevle is accused in Count 2 of

14   conspiring with all of these people in the conspiracy to

15   commit RICO charge.  If you can try to picture in your mind

16   what a conspiracy is, people working together, passing

17   information up or down or around, whatever -- remember what

18   I told you a debriefing is.  You are not simply given the

19   opportunity to say what you want to say, but other prison

20   officials are brought in, other law enforcement people

21   perhaps, and you are drilled.  Tell us about this.  Tell us

22   about that.  Tell us about this guy.  Tell us about that

23   crime.  Mr. Benton, tell us about Mr. Hevle.  He is nothing.

24   He used to be, but he can't get along with people, which

25   kept him out of the loop on a lot of things, kept him out of

1   the loop on a lot of things.

2           Ladies and gentlemen, when we do finally get to

3   argue this case, Mr. Calabria and I will be asking you to

4   find Mr. Hevle not guilty of the murders at Lewisburg,

5   Counts 6 and 7, because we will show that he had nothing to

6   do with them.  We will be asking you to find Mr. Hevle not

7   guilty of Count 4 of the murder of Mr. Ruffo because we

8   think the evidence will convince you that he nothing to do

9   with them, and we will be asking you to find him not guilty

10  of Count 2, the conspiracy count, because you, too, are

11  going to find that he was out of the loop, and you can't be

12  out of the loop and be a conspirator.

13          Thank you, ladies and gentlemen, for your time.

14          THE COURT:  Mr. Reed, on behalf of Mr. Gibson,

15  would you like to make an opening statement, or would you

16  like to reserve your opening statement until the beginning

17  of the defense case?  If you would like to make an opening

18  statement, I'm not going to put you at any disadvantage.

19  I'll take a brief recess so you can prepare, or would you

20  like to reserve?

21          MR. REED:  My intent is to reserve.

22          THE COURT:  It's entirely appropriate and proper.

23          Counsel, I assume you have completed all of your

24  opening statements this afternoon.

25          Let me talk to you for just a minute, and we can

1    plan out -- you're kind of this court family -- how we are
2    going to operate and see if this meets with your approval.
3    First, I hope you already realize how difficult the
4    scheduling will be for all parties.  Obviously we have got
5    people coming from all the over the country.  We have got
6    people coming from different penal institutions.  We have
7    got cooperators, Wit Sec people.  That's obvious to you by
8    now.

9              When I was selecting you and talking to, sometimes
10   in what we call that death qualification phase -- not
11   assuming that we ever get to that, but in talking to you
12   individually, I somewhat forewarned you that the breaks
13   would become obvious to you sometimes during the trial.
14   Sometimes there are going be strange pieces of time that you
15   are not in session but counsel and the Court will be in
16   Section I assure you on almost every Saturday from this
17   point forward, and we have been in session on almost every
18   Saturday except I think last Saturday for a long period of
19   time.  That's with my appreciation of both counsel for the
20   government and the defense and the defendants and all
21   concerned being willing to do that.

22             That's to make that the presentation by both sides
23   is concise, appropriate, and that we are not taking your
24   time by arguing matters outside of your presence for half an
25   hour or an hour while you are sitting in the jury room.

1    Now, as soon as I say that -- I promise you that will occur

2    more than once, so we will try.

3         No. 2, I want you to understand that I care deeply

4    that both sides have an excellent presentation to you, and

5    they are going to be very, very tired.  Their day is going

6    to begin literally when you go home.  I doubt they will go

7    home before 8:00 or 9:00 any evening this week unless they

8    are reaching stipulations, and we will see later this

9    evening.

10        Once again, I need to be careful about their

11   presentation, and I want you to understand I will constantly

12   check in with them.  You know, how are you holding up?  Have

13   you maintained your focus?  Sometimes we are going to need

14   to take a recess.  How are you holding up on occasion?  Do

15   we need to take a longer recess?

16        You can see I would like to get started at 8:30,

17   take a half-hour recess, get back to it, try to get three

18   hours in the morning, come back, and if I can bargain with

19   you, I'll try to constantly move you towards 8:00 instead of

20   8:30, but I don't want to start there.  It's 8:30 right now.

21        Now, can all of you be here at 8:30?

22        (Jurors nodding affirmatively.)

23        THE COURT:  Excellent.

24        So you will see me checking with them just to make

25   certain that they are holding up.  It's a strain on both

1    sides in terms of the presentation of this volume evidence.

2    It's just horrific.  It's very difficult for both sides.

3            Typically, I'm going to ask you to stay until

4    about 5:00.  There will afternoons when we literally recess

5    about 4:00 or 4:30, and that's just because in my judgment

6    calling a witness for a half-hour doesn't make sense.  We

7    should hear witnesses if possible in a block of time, but

8    there will be evenings -- I'll be courteous and ask you can

9    you stay until 5:45 or 6:00 on a particular evening?  So if

10   we can finish that witness in a block of time, let's do so,

11   but I will always check with you, so if you have childcare

12   problems or something else, you will let that be known to

13   me.  There are 22 of you, and I think we are going to have a

14   lot of demands between all of us.

15           There is a letter that has been prepared for your

16   employers for a long period of time.  I have that in my

17   possession.  I want to go over that one more time with

18   counsel this evening before we release that to you.  I'm

19   probably with the consent of both counsel this evening going

20   to simply put that in envelopes with, you know, official

21   federal court stationery, et cetera, signed by me, and you

22   can pick that up and take that to your employer at your

23   convenience.  I'm not addressing your employers by name.  He

24   or she or whoever the person is -- it will simply start

25   "Dear Sir" or "Dear Madam."  I don't mean to be standoffish

1  about that.  I just choose and all counsel have stipulated
2  from both side no addresses of employers.
3          Concerning what you may read, I am not worried
4  about your ethics.  I have constantly said to you in those
5  eight days we spent together that in this day of mass
6  communication it would be silly to sequester you.  I think
7  we all argee.  In fact, I don't think any of you could sit
8  for nine months.  I have asked you to turn off the sources
9  of media attention.  Actually it's healthy that if there is
10 going to be any media attention it occurs early on, we
11 talked to some of you about that.
12          Obviously there will be some media attention, so
13 let's talk about that.  I am not worried about you.
14          By the way, has anybody talked to anybody, so I
15 can start the case all over again?
16          I'm worried about those who love you.  When you go
17 home tonight, there aren't any cases in the United States
18 that have a nine-month estimate right now, so if there is
19 somebody who loves you who is reading something in the last
20 couple weeks or will in the future, they will very quickly
21 put together regardless of what you have said that you are
22 sitting on this particular case.  Because they love you,
23 they can't help but try to talk to you.  That's why they
24 love you.  You have got to turn off that conversation, and
25 you are the only ones who can.

1          What you can do is say you have got a
2    fire-breathing judge who is stomping his foot and saying
3    that there is not to be any communication, and that won't
4    work.   Then you can kid them a little bit, but tell them to
5    call (714) 338-4545, and I'll talk to them.   That usually
6    stops them, although I have gotten a couple of calls before.
7          I'm joking with you about that.   I'm trying to
8    make that as humorous as possible, but I'm really saying to
9    you with a smile on my face that if you reach out and you
10   get out input, if that turns out to be detrimental or you
11   are receiving information outside these proceedings of
12   witnesses who are called that we see and hear here in court,
13   I have no choice but minimally to excuse you, and if you
14   talk to another juror about that, I excuse that juror, and
15   on it goes, and sometimes we end up in that horrendous
16   position where we start over.   I want to avoid that.
17         Now, tomorrow when you come in, I'm going to
18   listen to any problems at the end of the day.   Let's send
19   you home today back to your family and loved ones.
20         Counsel, I want you to remain for a few moments.
21   We have a lot of work to do this evening.
22         I can't think of anything else to address the jury
23   on today.
24         Mr. Wolfe, Mr. Emmick, or Ms. Flynn, do you?
25         MS. FLYNN:   No, Your Honor.

1          THE COURT:  Mr. Fleming, and, Mr. Steward,
2     anything for the jury?
3          MR. FLEMING:  No, Your Honor.
4          THE COURT:  Mr. White?  Mr. Harris?
5          MR. WHITE:  No, Your Honor.
6          THE COURT:  Mr. Rosen?  Mr. Calabria?
7          MR. ROSEN:  No, Your Honor.
8          THE COURT:  Mr. Reed?
9          MR. REED:  No, Your Honor.
10         THE COURT:  Okay.
11         You're admonished not to discuss this matter
12    amongst yourselves or form or express any opinion concerning
13    the case.
14         I will ask you to be here at 8:15 just for the
15    logistics, not 8:30.  I'm going to ask you to go back down
16    to the jury room that you checked in today, and Christy or
17    Lisa will come and get you along with a court security
18    officer.  They will bring you up because I plan to start
19    promptly every day up at 8:30 unless I can move you earlier,
20    but right now let's not be ambitious.  Let's start at 8:30.
21    Please drive safely.  I will see you tomorrow.
22         (Jury not present.)
23         THE COURT:  The jurors are no longer present or
24    the alternates.
25         To free up all the resources, I am going to only

1   require one counsel to remain, except Mr. Reed there's one
2   of you, this evening, so if the other counsel wants to go
3   about your preparation for tomorrow, you can.  I'm only
4   requiring one government counsel to remain, so if you want
5   to go about your preparation -- I know the strain that's
6   upon you.
7           I want to know the following.  The last time we
8   were going through the discovery process with these
9   thousands of papers -- again, Beckwith was here from the
10  Bureau of Prisons who has the Court's highest regard --
11  there was a January 2, 1997, video allegedly taken at one
12  time concerning the black/white confrontation.  This was
13  what you referred to as the second Tokash assault.
14          I had ordered Mr. Beckwith to check with the
15  Bureau of Prisons, and I wasn't going to accept the fact
16  that that tape had been destroyed unless the warden
17  eventually personally attests to that under penalty of
18  perjury.  I'm not going to be in the position of finding
19  additional evidence, because if the government is successful
20  in obtaining the death penalty, there aren't going to be
21  thousands of documents that just show up inadvertently.
22          What is the status because I have a hard time
23  believing that that tape doesn't exist because those tapes
24  are used for training tapes usually?  Confrontations on the
25  yard are usually preserved, so help me.  Who is here from

1    the Bureau of Prisons, or do I need Mr. Beckwith?

2         MR. WOLFE:  Perhaps the fact that nothing has been

3    brought to the Court is my fault.  I understood Your Honor

4    early in the hearing to have said that you would accept the

5    warden's attestation by a certain date.  I later understood

6    Your Honor to say that Your Honor would not accept an

7    attestation, that Your Honor believed it had to exist and

8    that it had to be found.

9         THE COURT:  Let's take either one of those.

10        Has it been found?

11        MR. WOLFE:  It has not been found.

12        THE COURT:  Then the warden -- a personal

13   attestation under penalty of perjury that a thorough search

14   has been made that there is no tape, and then I know exactly

15   who to look for for responsibility.  Remember I don't want a

16   record sergeant because that record sergeant will always

17   says, golly gosh, Judge, I didn't know.  I am a record

18   sergeant, so I'm not responsible.  I want somebody who I can

19   look directly ask and find him in contempt.

20        MR. WOLFE:  I understand.  If Your Honor will give

21   me a date --

22        THE COURT:  Why don't you get back to me with

23   information by Thursday at 5:00 and send Mr. Beckwith back

24   to that task.

25        Now, do you have a copy of that tape?

1          MR. STEWARD:  No.

2          THE COURT:  All right.

3          Who are the witnesses for tomorrow?

4          MS. FLYNN:  Clifford Smith, and then if we finish

5     with him, Glenn West.

6          THE COURT:  Is Clifford Smith going to set out the

7     history of the AB?

8          MS. FLYNN:  Yes, Your Honor.

9          THE COURT:  What objections can I expect

10    concerning Clifford Smith?  In other words, am I going to

11    find myself in the position that Cliff Smith became a member

12    or an associate of the AB, for instance, in 1981

13    hypothetically but he is attesting to the Bluebird and

14    Diamond Tooth gang back in the '60s, and there is a

15    foundational objection because he's not that old like maybe

16    George Harp or others?  What am I going to expect because

17    all the evidentiary problems are worked out this evening?

18         MR. FLEMING:  There may well be a foundational

19    objection.  We haven't received a summary of his testimony,

20    so I don't exactly what he is going to testify to.

21         THE COURT:  They are not required to.

22         When did Smith join the AB?

23         MS. FLYNN:  He joined the AB in 1978.

24         THE COURT:  So he's pretty old.

25         What rank does he attain?

1          MS. FLYNN:  Councilor.  He was there for the

2    meeting when they decided the commission and council for the

3    state AB.

4          THE COURT:  What institutions -- is he in ADX?

5          MS. FLYNN:  No.  He is only a California AB

6    member.

7          THE COURT:  Pelican Bay?

8          MS. FLYNN:  I don't actually think he is ever in

9    Pelican Bay.  He was mostly at Chino, Folsom, San Quentin.

10          THE COURT:  Is he the one who has the stick of

11    dynamite up his rectum?

12          MS. FLYNN:  I don't believe so.  I don't recall

13    reading that for him, but --

14          THE COURT:  You might ask him before he gets on

15    the stand because one of them has.  The other one has the

16    blasting cap up his rectum.

17          What problems do you anticipate that you are going

18    to run into from the defense side?  What objections might be

19    lodged, so we can just hash them out this evening?

20          MS. FLYNN:  I will say he is going to be asked

21    about what he was told as he was becoming a member of the AB

22    about how the AB was started.

23          THE COURT:  Let's say from '78 on those objections

24    might not be sustained, but prior to 1978 -- let's assume

25    for a moment that he's not a member of the AB, and he is

1    told by somebody about the San Quentin formation of the

2    Bluebirds and then onto the Diamond Tooth gang.

3              Are these originally Hells Angels?

4              MS. FLYNN:  No, I don't think so.

5              THE COURT:  Now, where does he get this

6    information, so the defense knows whether they are going to

7    object or not?

8              MS. FLYNN:  Once he is in the AB, various times he

9    has talked to different people about it, including a guy

10   named Shorty.  He names T.D. Bingham.

11             THE COURT:  He talked to T.D. Bingham?

12             MS. FLYNN:  And Griffin.

13             THE COURT:  And Griffin is part of the next group.

14             MS. FLYNN:  Yes.

15             THE COURT:  Now, where does he talk to T.D.

16   Bingham?

17             MS. FLYNN:  Your Honor, he can't pinpoint exact

18   time periods.  He just knows that he talked to T.D. Bingham

19   when he was in the AB.  He talked to Blinky when he was in

20   the AB.  He talked to Shorty.  During these conversations

21   they talked about the history.  He's not going to be able to

22   pinpoint precisely who and when told him that it was the

23   Bluebirds and Diamond Tooth.

24             THE COURT:  You can probably expect a foundational

25   objection unless Shorty is more clearly delineated or at

1   least the location and time period for Shorty.  I'm not sure
2   who Shorty is.  A conversation with T.D. Bingham may be
3   entirely appropriate.  It's just that you have got to
4   separate out what T.D. Bingham is actually saying if he
5   recalls and not mush that together.  Otherwise, I can
6   guarantee you an objection, and that is lack of foundation,
7   Judge.  Which conversation is taking place by whom and what
8   general period of time anyway and where?

9           MS. FLYNN:  I will tell you that there were
10  conversations that occurred after he joined in '78, '79,
11  before he dropped out in about '84.  They were conversations
12  as part of him being an AB member and him learning about the
13  organization, how things started, and why it started and its
14  what purpose was.  I would say it's a co-conspirator
15  statement that other AB members -- Shorty -- I don't know
16  his real name, but Mr. Smith said he is an AB member.

17          THE COURT:  I'm not concerned about that.  I'm
18  simply concerned about the foundation for a moment about
19  where that takes place.  The defense needs to know because
20  on cross-examination they have the right to try to disprove
21  that there could be possible contact between the two.  So
22  let's say that you generally say that T.D. Bingham had a
23  conversation with Mr. Smith, and you find out that Mr. Smith
24  is an AB in California -- let's say in Chino -- and Bingham
25  is not there at the same time.  That's where the objection

1   is going to come in.

2           MS. FLYNN:  I agree, but I would argue it's still

3   admissible.  That would be something the defense could cross

4   and say you don't even know -- you can't pinpoint -- how do

5   we know this even happened?

6           THE COURT:  So we are all alerted to that.  I will

7   reserve the ruling until tomorrow, but I know that that

8   problem area is going to occur.

9           What other problems could occur concerning Mr.

10  Smith?

11          MR. REED:  Anything he talks about 1984 when he

12  left.

13          MS. FLYNN:  He is not going to be asked about

14  anything after that.

15          MR. REED:  In his grand jury testimony when he is

16  asked questions, he says I assume, which to most defense

17  attorneys is an objectionable statement.  I guess it depends

18  on how the question is asked by the government, but --

19          MS. FLYNN:  I think those were in response to do

20  you know how Tommy Lamb died?  He heard about that I think

21  after he had dropped out, so he will not be asked.

22          THE COURT:  Any other problems concerning Mr.

23  Smith?

24          MS. FLYNN:  I don't want to definitely say no and

25  then there would be a problem.  I don't anticipate other

1   problems.

2          THE COURT:  What evidentiary items are you going

3   to show him?

4          MS. FLYNN:  We have exhibit books in my office.

5   They have not been distributed to counsel yet.  I will be

6   showing him what I call the Tommy Lamb kite.  I will be

7   showing him some photos of the California members of the AB

8   including Griffin, Terflinger, Stinson, and Slocum.  I will

9   be showing him a transcript of Richard Andresean's

10  cooperation in a robbery and homicide out of Westminster.  I

11  will be showing him a map of the.California Prison system.

12         THE COURT:  You will have him identify, Pelican

13  Bay, Folsum --

14         MS. FLYNN:  Where he has been housed, yes.  I will

15  be showing him the AB reading list found in Mills' property

16  but not offering it into evidence tomorrow.

17         THE COURT:  Did he have a discussion with T.D.

18  Bingham or anyone else who is a defendant in this trial

19  about that reading list?

20         MS. FLYNN:  I can't say specifically.  I was more

21  asking him along the lines of in the Aryan Brotherhood was

22  this the reading list?

23         THE COURT:  And that's the reading list I have

24  seen before?

25         MS. FLYNN:  Yes.  Your Honor, I don't believe he

1 has seen that exact reading list because that was found in

2 Mills's property in 1999.

3          THE COURT:  Mr. Fleming.

4          MR. FLEMING:  Your Honor, there is one problem or

5 evidentiary issue.  In reading through Clifford Smith's

6 discovery, in each of his debriefings, Clifford Smith talks

7 about the meeting where there were these major changes

8 within the.California AB.  Each time the Steven Barnes

9 situation is brought up.

10          I guess what I am asking for is the government to

11 just caution this witness in particular that that area, the

12 Barnes murder, is not something that should be discussed

13 because in his prior transcripts that comes out in almost

14 every line.

15          THE COURT:  The government is not pursuing the

16 Barnes murder with this group anyway.

17          MR. FLEMING:  That's right.

18          MS. FLYNN:  He has been instructed that he is not

19 to mention the Barnes murder absent questioning on it or in

20 that area.

21          THE COURT:  Is Mr. Smith in custody?

22          MS. FLYNN:  Yes.

23          THE COURT:  Is he a protection of some type?

24          MS. FLYNN:  Yes.  Well, he is housed in protection

25 but not Wit Sec.

1           MR. FLEMING:  The other issue may be with the

2     Andreasen murder.  In our proffer motion, we brought this

3     up, that we don't have the statements from Clifford Smith

4     about the Andreasen murder.  I think what he is probably

5     going to testify about was the initial attack by the state

6     AB guys.  If that's it --.

7           THE COURT:  At the conclusion of his direct

8     regardless of where we are at, I will come back -- as I have

9     said before, there is no way Brady will ever be completely

10    complied with.  I will come back and see what surprises you

11    think have occurred, and if you need to bring this witness

12    back, we will do so.

13          I think that we should set a policy from this

14    point forward that all witnesses are placed on call for all

15    sides, so we don't have to go through the subpoena process

16    again.  That way if you need somebody back we still have

17    jurisdiction over that person, and I am not causing the FBI

18    or your office to go out and find that person, and that

19    works for both sides coequally.

20          MS. FLYNN:  On Mr. Smith, I just wanted to remind

21    the marshals if they can make sure that Mr. Smith has his

22    glasses, or he can't see anything.  I contacted the

23    Santa Ana jail, and he should, but there was a problem

24    earlier.

25          THE COURT:  He will have his glasses.

```
 1              Is he going to be dressed in civilian clothing or
 2    jail house --
 3              MS. FLYNN:  Inmate clothing.
 4              THE COURT:  Does he need to be shackled down?
 5              MS. FLYNN:  That, Your Honor, is not my call.  I
 6    am going to leave that to the marshals.
 7              THE COURT:  I need to set a record.  I have set a
 8    record in terms of shackling for the defendants.  I need to
 9    set a record in terms of shackling if I am going to do there
10    for a witness.
11              MS. FLYNN:  May I have a moment?
12              THE COURT:  Yes.
13              MS. FLYNN:  Your Honor, the government takes no
14    position on that.  We leave that to the marshals.
15              THE COURT:  I am wondering if I could have the
16    consent of the defendants in this matter.  I don't know that
17    I even need that, but I just prefer to have Mr. Smith
18    shackled down.  If he is in the Wit Sec program or whatever
19    or even if he is a cooperator -- I want to stop any nonsense
20    before it ever begins.
21              In the Mexican Mafia trial, I literally needed to
22    have a line of marshals between the Mexico Mafia and the
23    cooperators.  I can't tell you -- and you already know --
24    any of the shenanigans that went on there I assume aren't
25    going to happen here.  It would be devastating for you,
```

54

```
 1   gentlemen, in front of the jury, so I expect that not to
 2   occur.
 3           I think under the circumstances of the Marshal's
 4   resources I should make a record as to each one of these
 5   people, frankly, as I have with each of your clients and set
 6   out an adequate record from my standpoint concerning your
 7   past history which has called for shackling, but I don't
 8   have Mr. Smith at hand.  I don't have his rap sheet in my
 9   hand, so, therefore, if I have a stipulation, I can do this.
10           Mr. Steward, is that acceptable?
11           MR. STEWARD:  Yes.
12           THE COURT:  Mr. White?
13           MR. WHITE:  Yes.
14           THE COURT:  Mr. Rosen?
15           MR. ROSEN:  Yes.
16           THE COURT:  Mr. Reed?
17           MR. REED:  Yes.
18           THE COURT:  Is that acceptable to the government?
19           MR. WOLFE:  I am a little reluctant to have the
20   secure circumstances for government witnesses placed in the
21   purview of the defense.
22           THE COURT:  They are not.  I am just asking.  I am
23   can do anything I want as long as I have a stipulation.  I
24   don't have to worry about the Circuit.  If I don't, then I
25   will make the independent call.
```

```
 1             MR. WOLFE:  I am not concern about whether they
 2    will provide adequate security.  I think the Marshal's
 3    Service can do that.  I am concerned that they will ask for
 4    excessive security because it's unpleasant.  I am concerned
 5    that the defendants are inclined to ask for excessive
 6    security because it's unpleasant to be shackled.
 7             THE COURT:  It's not going to be excessive.  It
 8    will be the same as the defendants have, no worse.  There is
 9    one little bar down there, and it just stops all the
10    problems between the cooperators and the defendants.
11             MR. WOLFE:  Very well.
12             THE COURT:  After court you can look -- come up
13    and look.  Have the marshal show you.  Just describe to him
14    what you are going to do.  It's exactly the same as the
15    defendants have, no worse, no better.
16             Mr. Wolfe, is that acceptable?
17             MR. WOLFE:  Yes.
18             THE COURT:  All right, the rule is then you don't
19    start off then on cross-examination and ask, well, aren't
20    you shackled to the floor?  I mean, if I am not going to
21    allow the government to call that to the jury's attention,
22    obviously, that's not going to be asked.
23             Is that fair enough?
24             MR. STEWARD:  Yes, Your Honor.
25             MR. WHITE:  Your Honor, there is one other matter
```

1    as to Mr. Smith.

2              THE COURT:  Mr. White.

3              MR. WHITE:  I think in excess of 2,000 pages were

4    put into discovery yesterday.  Now, in reading the index,

5    there are notations of Jencks, Giglio, or whatever it is.

6    We would just like to know if there is something in there

7    that is relevant to Smith or West because we haven't had a

8    chance to --

9              MS. FLYNN:  I don't think so.  I think the last

10   page that is relevant to Smith is at 106618.  That's the

11   grand jury testimony.  I think you already have that.

12             MR. WHITE:  Yes, we have that.

13             MR. WHITE:  Then West is the next witness.

14             MS. FLYNN:  He ends at 106623.

15             THE COURT:  Finally, if you were to reestimate now

16   that we have gone through our opening statements -- it

17   sounds to me roughly speaking that your defenses remain

18   consistent from the time that we started through the

19   discovery and really bore down on this, and the government's

20   position hasn't substantially changed.  What do you think we

21   are still looking at?  About a four to six-month trial?  If

22   this was over in Superior Court across the street and they

23   had one murder, you would be covering six to eight weeks

24   minimum.  Here you have got about 30, so when you think

25   about it, six months is not an excessive period of time.

1   Still around six months?

2           If we get to the death penalty phase -- if the

3   government obtains the verdicts, then we will talk about

4   what kind of break we need, whether it's two weeks or three

5   weeks, because everybody readjusts in a death case.  I won't

6   discuss that now.  That would then move that into that

7   nine-month estimate I assume.

8           Who is the next witness if we get there?  Glenn

9   West?

10          MS. FLYNN:  Yes.

11          THE COURT:  Tell me again about Mr. West.

12          MS. FLYNN:  Mr. West is out of custody.  He was an

13  AB member.  He was put up for membership in '79, became a

14  member in '81, was released from prison July 24, 2000, still

15  is an AB member.  He was arrested on October 17, 2002, in

16  connection with this case.

17          THE COURT:  Who took the plea on Glenn West?

18          MS. FLYNN:  I don't have his plea agreement before

19  me.

20          THE COURT:  The Northern District of California

21  apparently took that plea.

22          Is that possible?

23          MR. WOLFE:  I don't believe that's true.

24          THE COURT:  Would this be Judge King?

25          MS. FLYNN:  We think so, yes.

1    THE COURT:  The reason I am asking that is

2    obviously I had the first 13 defendants who are nondeath

3    eligible.  You need to remind me of any of the people that

4    pled in my court are then testifying back in this Court.  I

5    don't think it's appropriate that this Court is mentioned --

6    in other words, it should be generic, that a Court will

7    consider it.  I don't think this Court should be drawn in as

8    the Court who would consider any reduction, but we don't

9    have that problem with Mr. West because this was Judge King

10   who took the plea apparently?

11       THE CLERK:  Christy thinks you took the plea.

12       THE COURT:  Is Christy back there?

13       THE CLERK:  She is checking right now.

14       THE COURT:  I had the original 13 defendants which

15   was supposed to be a six-month trial, and then 12 pled, and

16   one killed himself.

17       MS. FLYNN:  His plea was taken August 20, 2003.

18       THE CLERK:  Judge Carter took it for Judge King on

19   August 20, 2003.

20       THE COURT:  I took it for Judge King.  That means

21   that I don't think it's appropriate as this Court is

22   mentioned as eventual considerer, but it's appropriate to

23   mention that a Court will consider generically.  I hope I

24   have the agreement of everyone concerning that.

25       MS. FLYNN:  Yes.

*SHARON SEFFENS, U.S. COURT REPORTER*

1          THE COURT:  What evidentiary problems are going to

2     occur tomorrow concerning Mr. Smith?  Is he going to lay out

3     the history of the AB?

4          MS. FLYNN:  Mr. West?

5          THE COURT:  Yes.

6          MS. FLYNN:  He is going to talk about what he

7     learned during his time in the AB and during his

8     probationary period.  I don't believe he is going to be

9     asked how the AB was formed and how it started.

10         THE COURT:  For instance, passing kites?

11         MS. FLYNN:  Yes, how he communicated.

12         THE COURT:  600-year-old code?

13         MS. FLYNN:  Yes.

14         THE COURT:  Can he describe that code?

15         MS. FLYNN:  I don't believe so.

16         THE COURT:  Who is going to describe that code

17    eventually?

18         MS. FLYNN:  McGinley.

19         THE COURT:  It's a pretty interesting code.

20         So it's more about how things occur within the

21    organization?  It's not as historical --

22         MS. FLYNN:  Actually, he does know that it started

23    with the Diamond Tooth gang and the Bluebird gang.

24         THE COURT:  That's the one thing I am concerned

25    about.  It's how you lay the foundation without just rushing

1   through that.

2           Where does he get this information?

3           MS. FLYNN:  We are not going to have his objection

4   to his testimony it started with the Bluebirds and Diamond

5   Tooth.

6           THE COURT:  Because it's really not a defense?

7           If that's the case, Mr. Fleming, then you're

8   really not objecting I would assume to the prior witness --

9   and that's Mr. Smith -- going back about the Bluebird

10  gang --

11          MR. FLEMING:  That's fine.

12          THE COURT:  Then it doesn't sound like we have any

13  issues tomorrow.

14          Is there any reason for me to keep you?  Mr.

15  Fleming?

16          MR. FLEMING:  No, Your Honor.

17          THE COURT:  Are you satisfied for tomorrow?

18          MR. FLEMING:  I am.

19          THE COURT:  Mr. Steward.

20          MR. STEWARD:  A couple of quick things, first,

21  with Mr. West, this is a real unusual situation in his plea

22  bargain.  He is be allowed to plead to a Superseding

23  Information which alleges conspiracy to try and kill someone

24  at Marion in 1980.  I assume the government is going to

25  dismiss everything else.  He is named with all of our folks,

1   so --

2          THE COURT:  Originally, he was named.

3          MR. STEWARD:  Correct.

4          My intention is to do it the way I do with any

5   drug snitch, which is take them over count by count what

6   they are charged with and what the maximum could have been.

7          THE COURT:  The government is not going to object

8   to that.

9          MS. FLYNN:  He is only charged in Count 9.

10          MR. STEWARD:  I will have to look at it again.

11          THE COURT:  Assume it's Count 9, though.  They are

12   not going to object to that.

13          MR. STEWARD:  I had two other little things not

14   related to witnesses.  One is we are going to ask the Court

15   to invoke witness exclusion.  The one exception we would ask

16   for for the Mills team is our investigator, Mr. Rearick.  I

17   don't know that he is going to testify in the guilt phase.

18   He probably won't unless it's impeachment, but if we get to

19   the penalty phase, he is clearly going to testify.  We

20   really need him to be present when a number of the witnesses

21   testify.

22          THE COURT:  Why?  You are getting a daily

23   transcript.

24          MR. STEWARD:  Only because he knows things that no

25   one else knows.  I am not asking in terms of the CJA and the

1    rest of that.  He is not going to be here all the time.

2            THE COURT:  You mean if something comes up and you

3    need to talk to him during the recess?

4            MR. STEWARD:  Yes.  I don't want to violate the

5    witness exclusion rule is what I'm saying.

6            THE COURT:  Tell me first where is he going to

7    testify?  If we get to the penalty phase, that's not like

8    any phase that most of you have been through.  There the

9    rules of evidence -- they don't fall by the wayside, but

10   they are significantly different.

11           I am not too concerned about Mr. Rearick being

12   present and then testifying in the penalty phase.  I am

13   concerned about him being present if he takes the stand in

14   the guilt phase.  I don't know why I would create that

15   exception.  I am not inclined to do that.  By the same

16   token, if you tell me he is not going to testify in the

17   guilt phase, he is more than welcome to be present.

18           MR. STEWARD:  If I were to have a mental list of

19   defense witnesses right now, he would not be on it.  What I

20   am saying is he knows the snitches better than the

21   government and anybody in this case, and I really need him

22   understand certain circumstances.  I am asking that he be

23   like a case agent for the government.  He is not going to

24   sit here day after day, but there are some critical

25   witnesses that he knows.

1    THE COURT:  If I did that, the difficulty is if he

2  takes the stand potentially his credibility is harmed

3  because the government is going to be allowed to ask of all

4  the witness didn't Judge Carter sign an order allowing you

5  to be present?  Yes.  Therefore, haven't you heard all the

6  testimony?  Yes, I have.  So you destroy his credibility by

7  doing that.

8    MR. STEWARD:  Fine.  I understand.  I accept that

9  for the guilt phase.

10    How about the penalty phase?

11    THE COURT:  You can have him for the penalty

12  phase.  If we get to the death phase, the rules are very

13  relaxed.

14    MR. STEWARD:  So he can be here during the guilt

15  phase and still testify at the penalty phase?

16    THE COURT:  Yes, absolutely.  If we get to the

17  death phase, if the government is seeking your client's

18  life, which they are, you will have the ability to have

19  Mr. Rearick testify at that phase.  Remember I will allow

20  the government to ask if the testimony is substantive

21  weren't you present during the entire guilt phase?  Yes, I

22  was.

23    MR. STEWARD:  Fair enough.

24    The other thing is we are getting daily

25  transcripts, and there was a big problem in the Moussaoui

64

1  case.  I would sure hate to have problem in this case.  On

2  the defense side, we are not going to share any transcripts

3  at any time with any witness.  I kind of want assurances

4  from the government that they aren't going to do it either.

5  This crew wouldn't do it, but we have got the FBI, the ATF,

6  the Bureau of Prisons.  All of them are actively here, and

7  what's happen in Moussaoui.

8          THE COURT:  A TSA attorney apparently shared Judge

9  Brinkema's order, and there was -- I don't know what she has

10 done today.  I know that each of us have been following

11 parallel tracks, and even our jury selection process has

12 been parallel.  I haven't talked to her.  She hasn't reached

13 out to me.  We are just proceeding on parallel tracks.  I

14 don't know what she is going to do.  It's going to be very

15 interesting.

16          Mr. Wolfe, I don't think I even have to say that

17 to you.  You have been exemplary.

18          MR. WOLFE:  The witness exclusion rule is what it

19 is.  Everybody is obliged to adhere it.  I don't feel that I

20 am in a position to speak for the ethics of other persons in

21 the government.  I have no reason nor do I know of any

22 reason Mr. Steward --

23          THE COURT:  I think he is just bringing up.  Your

24 ethics have been exemplary, and this is a fabulous trial

25 team on behalf of the government.

1          MR. STEWARD:  That's all I had, Your Honor.

2          THE COURT:  Mr. White?

3          MR. WHITE:  Nothing, Your Honor.

4          THE COURT:  Mr. Harris.

5          MR. HARRIS:  If we could inquire about whether

6    Mr. West has been sentenced yet by Judge King.  The docket

7    is kind of ambiguous on that point.

8          MS. FLYNN:  He has not.

9          MR. HARRIS:  Thank you.

10         THE COURT:  Mr. Rosen?

11         MR. ROSEN:  Yes, I anticipate either possibly late

12   tomorrow or more likely sometime on Wednesday our right to

13   Jencks statements when we have some concrete -- that is,

14   when the direct examination of Mr. West finishes.  As I

15   indicated in my opening statement, we have yet to receive

16   anything pertaining to a west Interview where he has either

17   mentioned the Baby Ray killing, or he has mentioned our

18   client.

19         If either of those events happen in direct --

20         THE COURT:  If those happen in direct, obviously

21   you will call that to my attention.  Obviously, you are not

22   going to begin your cross-examination.

23         Do you know of any Jencks material in that regard?

24         MR. WOLFE:  No.

25         THE COURT:  At this point, the government doesn't

1  know of anything.

2          MR. ROSEN:  All right.

3          THE COURT:  Mr. Calabria?

4          MR. CALABRIA:  Nothing further.

5          THE COURT:  Mr. Reed?

6          MR. REED:  Nothing.

7          THE COURT:  Mr. Wolfe, anything further?

8          MR. WOLFE:  No, Your Honor.

9          THE COURT:  Mr. Wolfe, could you put this on the

10  elmo?

11          I want to show you this letter, and I want to go

12  over it one more time to make certain that it still meets

13  with your consent.

14          Mr. Wolfe, would you be kind enough to read that

15  into the record one more time?

16          Counsel, you can follow along.  Once again, I

17  think it's a courteous thing that we should undertake.  You

18  both stipulated that we reach out to the employers and thank

19  them for this absolutely phenomenal self-sacrifice on behalf

20  of their employees being willing to serve -- or allowing

21  them to serve.

22          Mr. Wolfe, why don't you read this and make

23  certain that this letter still has everyone's consent.

24          MR. WOLFE:  "Dear Sir or Madam:

25          "Your employee has been selected to serve as a

1    juror in the case of United States versus Mills pending

2    before this Court.   The service of your employee in this

3    regard is invaluable to the administration of justice and to

4    our democracy.

5               "As employer of the juror, you have kindly agreed

6    to compensate the juror during the term of jury service.

7    The Court thanks you for this financial sacrifice and for

8    the sacrifice of the loss of your employee's services to the

9    company or organization during this trial.   Your citizenship

10   in this regard is commendable.

11              "I regret that I cannot address this to you or the

12   juror personally as we are maintaining the confidentiality

13   of the jurors' identities in this case.

14              "Very truly yours, the Court."

15              THE COURT:   Mr. Fleming, does that meet with your

16   approval?

17              MR. FLEMING:   Yes.

18              THE COURT:   Mr. Steward?

19              MR. STEWARD:   Yes.

20              THE COURT:   Mr. White?

21              MR. WHITE:   Yes.

22              THE COURT:   Mr. Harris?

23              MR. HARRIS:   Yes.

24              THE COURT:   Mr. Rosen?

25              MR. ROSEN:   Yes.

```
1              THE COURT:  Mr. Calabria?

2              MR. CALABRIA:  Yes.

3              THE COURT:  Mr. Reed?

4              MR. REED:  Yes.

5              THE COURT:  Mr. Wolfe?

6              MR. WOLFE:  Yes.

7              THE COURT:  What I would like to do is simply put

8    that into a envelope with a federal return obviously and

9    give that to the clerk, 22 of them, and then if a juror

10   wants to pick that up, they can pick that envelope up -- and

11   they are all the same frankly -- and take it to their

12   employer, but I don't want to ask them who the employer is

13   and send it out to them.  Many of these jurors don't need to

14   do that.  Some are retired.  Others are post office

15   employees and probably don't need that approval.  I think

16   some are even school teachers.

17             Would that be acceptable to you, Mr. Wolfe?

18             MR. WOLFE:  Yes.

19             THE COURT:  Mr. Fleming?

20             MR. FLEMING:  Yes.

21             THE COURT:  Mr. Steward?

22             MR. STEWARD:  Yes.

23             THE COURT:  Mr. White?

24             MR. WHITE:  Yes.

25             THE COURT:  Mr. Harris?
```

1          MR. HARRIS:  Yes.

2          THE COURT:  Mr. Rosen?

3          MR. ROSEN:  Yes.

4          THE COURT:  Mr. Calabria?

5          MR. CALABRIA:  Yes.

6          THE COURT:  Mr. Reed?

7          MR. REED:  Yes.

8          THE COURT:  George.

9          MR. SCHROEDER:  George Schroeder with the U.S.

10   Marshal's.  I just wanted to clarify the U.S. Marshal's

11   position on in-custody witnesses that are restrained on the

12   stand.  Our policy is to have them fully restrained at all

13   times.

14          THE COURT:  Their hands will be free.  They will

15   have one leg just like the defendants shackled down, but

16   they will be able to get to the documents, et cetera, so

17   your policy is overridden.

18          Anything further this evening?

19          MR. WOLFE:  No, Your Honor.

20          MR. STEWARD:  No, Your Honor.

21          THE COURT:  Everybody be seated at 8:15 tomorrow.

22   The doors will be open at 8:00.  Have a nice evening.

23          (Proceedings concluded.)

24                    *     *     *

25       (At 5:45 p.m., proceedings were adjourned.)

70

CERTIFICATE


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.




                         _____ 8/8/07
                         SHARON SEFFENS, U.S. COURT REPORTER

*SHARON SEFFENS, U.S. COURT REPORTER*