1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,
          Plaintiff,

     vs.

                                   CR-02-938(C)
BARRY BYRON MILLS;                 DAY 3, VOL. 4
TYLER DAVIS BINGHAM;
CHRISTOPHER OVERTON
GIBSON; EDGAR WESLEY
HEVLE,

          Defendants.

---------------------------




REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

March 15, 2006




SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   DEBRA W. YANG
     United States Attorney
 4   STEVEN D. CLYMER
     Special Assistant United States Attorney
 5   Chief, Criminal Division
     STEPHEN WOLFE
 6   MICHAEL EMMICK
     TERRI FLYNN
 7   JOEY BLANCH
     Assistant United States Attorneys
 8   1400 United States Courthouse
     312 North Spring Street
 9   Los Angeles, CA  90012
     (213) 894-0511
10

11   For Defendant BARRY BYRON MILLS:

12   H. DEAN STEWARD
     LAW OFFICES OF H. DEAN STEWARD
13   107 Avenida Miramar, Suite C
     San Clemente, CA
14   (949) 481-4900

15   MARK F. FLEMING
     LAW OFFICES OF MARK F. FLEMING
16   433 "G" Street, Suite 202
     San Diego, CA  92101
17   (619) 652-9970

18   For Defendant TYLER DAVIS BINGHAM:

19   MICHAEL  V. WHITE
     LAW OFFICES OF MICHAEL V. WHITE
20   1717 Fourth Street, Third Floor
     Santa Monica, CA  90401
21   (310) 576-6242

22   WILLIAM S. HARRIS
     STEWART & HARRIS
23   1499 Huntington Drive, Suite 403
     South Pasadena, CA  91030
24   (626) 441-9300

25
```

```
1    For Defendant CHRISTOPHER OVERTON GIBSON:

2    KENNETH A. REED
     LAW OFFICES OF KENNETH A. REED
3    404 West 4th Street, Suite C
     Santa Ana, CA  92701
4    (714) 953-7400

5    For Defendant EDGAR WESLEY HEVLE:

6    BERNARD J. ROSEN
     LAW OFFICES OF BERNARD J. ROSEN
7    1717 Fourth Street, Suite 300
     Santa Monica, CA  90401
8    (310) 451-4577

9    DONALD J. CALABRIA
     LAW OFFICES OF DONALD J. CALABRIA
10   16133 Ventura Boulevard, Suite 600
     Encino, CA  91436
11   (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           I-N-D-E-X

 2   PLAINTIFF'S
     WITNESSES:        DIRECT     CROSS      REDIRECT      RECROSS
 3

 4   GLENN WEST           5

 5   PLAINTIFF'S
     EXHIBITS:                               MARKED        RECEIVED
 6

 7    (None)

 8   DEFENSE
     WITNESSES:        DIRECT     CROSS      REDIRECT      RECROSS
 9

10    (None)

11   DEFENSE
     EXHIBITS:                               MARKED        RECEIVED
12

13    (None)

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; WEDNESDAY, MARCH 15, 2006; 4:45 P.M.

2         (Previous proceedings reported by Deborah Parker in

3         Vol. 3.)

4              GLENN WEST, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

5                   DIRECT EXAMINATION (Continued)

6    BY MS. FLYNN:

7    Q    And was that after Mr. Keefer was murdered?

8    A    Yes.

9    Q    About how long after?

10   A    I would say -- I'm kind of blank on it.  It could have

11   been a week, two weeks.

12   Q    But shortly thereafter?

13   A    Yeah, it wasn't too long after.

14   Q    Let me back up one second.  You said that defendant

15   Mills had warned you that there was going to be a lockdown

16   because he had ordered Keefer to be murdered.

17        Why would there be a lockdown?  What happens after

18   somebody is murdered?

19   A    First off, the Bureau of Prisons thought Keefer was AB.

20   If they somebody dead that they think is AB, they don't know

21   what's going to happen, so they are going to lock everything

22   down, and on most murders, period, they lock it down at

23   least for a time being to see what's going on.

24   Q    In your experience as an inmate at the Bureau of

25   Prisons, the federal system, if an AB member is killed, do

1   they often lock down other AB members?

2   A    Oh, yeah.

3   Q    And is that to prevent any further violence?

4   A    Yes.

5   Q    At least that's your understanding?

6   A    Yes.

7   Q    When you had this conversation with William McKinney or

8   Puppet in the hole, what did he tell you?

9   A    He told me basically the same thing Barry did.  He said

10  he killed him because he was selling the knives to the

11  Mexicans, and then he said he had a kid help him do it,

12  Danny something.  There was a Pigpen and another kid helped

13  him.

14  Q    Another Pigpen, do you know that real name?

15  A    No, I don't.

16  Q    But a guy named Pigpen helped Mr. McKinney?

17  A    Yeah, and then the kid's name is Price or Pierce or

18  something like that.

19  Q    Does the name Stanley Pearson --

20  A    That's him.

21  Q    Is that who helped?

22  A    Yep.

23  Q    So Mr. McKinney told you it was Pigpen and Stanley

24  Pearson?

25  A    Yes.

1  Q    Did he tell you why he committed the murder?

2  A    Yeah, because Barry told him to do it behind the knife

3  thing.

4  Q    And did he tell you how the murder occurred?

5  A    Yeah.

6  Q    What did he tell you?

7  A    He said they went in there.  Pigpen was holding him.

8  Stan and Puppet were stabbing him, and Puppet accidentally

9  stabbed Pigpen during it.  Then he told me he was going to

10  have the kid go tell them that he witnessed Puppet do it.

11  He was saying he could get the kid out of it.

12  Q    Let me back up.

13          When you say the kid, is that Pigpen?

14  A    No, Stan.

15  Q    So Stan is referred to as the kid?

16  A    Yeah.

17  Q    So Mr. McKinney told you how the murder occurred?

18  A    Yeah.

19  Q    What did he tell you about getting the kid or

20  Mr. Pearson off?

21  A    He wanted Stan to basically rat on him.  Puppet told

22  him you do that and I will tell everybody you didn't really

23  rat, that I told you to do it, and we can get you off of

24  this, and then I got a way to get off later.  I told Puppet

25  you can't do that.  I don't care how many people you tell

1    that you told the kid to go tell somewhere down the line

2    somebody is going to kill him because they have heard the

3    story.

4    Q    Why would they kill him?

5    A    Because he ratted on Puppet.

6    Q    And why would Puppet want Mr. Pearson or the kid to do

7    that?

8    A    I have no idea.

9    Q    Mr. McKinney didn't tell you that?

10   A    No.

11   Q    Did you also have a conversation with Mr. Pearson, the

12   kid, about this?

13   A    Yeah.

14   Q    Where did that conversation take place?

15   A    Same place.

16   Q    In the hole?

17   A    Did it occur around the same time period?

18   A    On the same rec period.

19   Q    So shortly after the murder?

20   A    Yeah.

21   Q    How did you talk to Mr. Pearson?

22   A    I just told him don't listen to what Puppet is telling

23   you.  Do not go in there and tell them you did it.  I told

24   him Puppet was trying to look out for him, but it was not a

25   good move.

1    Q    What did Mr. Pearson tell you about the murder?

2    A    Basically the same thing.  He said when they grabbed

3    him Puppet started slinging the knife real crazy, and that's

4    when he hit Pigpen.

5    Q    Did you learn anything about why it was significant

6    that Pigpen got stabbed?

7    A    No.

8    Q    Was that a way from what you knew that BOP detected

9    that Pigpen was involved?

10             MR. STEWARD:  Objection, leading.

11             THE COURT:  Sustained.

12   BY MS. FLYNN:

13   Q    To your knowledge, did Pearson do what Mr. McKinney

14   wanted?

15   A    I don't believe so, no.

16   Q    I would like to turn to the murder of Richard

17   Andreasen.

18             THE COURT:  Would this be a good point then,

19   Counsel --

20             MS. FLYNN:  Yes, Your Honor.

21             THE COURT:  I would like to send the jury home if

22   possible.

23             Is that a logical breaking point for you?

24             MS. FLYNN:  Yes.

25             THE COURT:  First of all, I'm going to spend a few

1   moments with all of you and the jury for a minute.  A number

2   of you have asked and even if you hadn't asked all counsel,

3   the government and the defense, have agreed along with the

4   Court that we would like to provide a letter to your

5   employers or to whom you need, but obviously we have had to

6   be very careful in drafting the letter not to disclose too

7   much information about what you are sitting on.  By the same

8   token, I hope it's an official enough letter that it conveys

9   an appropriate amount of thanks to each of your employers or

10  for those of you who need something in hand.  The letter is

11  generally addressed.  It's not addressed to a specific

12  person nor is it addressed with to particular business or

13  organizational entity.  That's by stipulation of all

14  counsel.

15          If this doesn't suffice, if one of you has a

16  particular problem, then I want you to contact Lisa or

17  Christy in the next couple days and tell me.  I will do

18  something further if possible but only after I talk to

19  counsel.

20          Lisa, would you give these to each of the jurors

21  individually.  Now, the reason we are giving those to you is

22  obviously we can't mail them out, and I have left them in an

23  unsealed condition.

24          Is that acceptable to the government?

25          MS. FLYNN:  Yes, Your Honor.

1          THE COURT:  Is that acceptable to all the

2    defendants?

3          MR. STEWARD:  Yes, Your Honor.

4          MR. WHITE:  Yes, Your Honor.

5          MR. ROSEN:  Yes, Your Honor.

6          MR. REED:  Yes, Your Honor.

7          THE COURT:  If you would hand those out right now,

8    Lisa, so that's completed.

9          The second request you had this evening and even

10   yesterday was what is the schedule?  I will go through this

11   week.  It's obviously going to be tomorrow, which I'm losing

12   track of time.  Is tomorrow Thursday?  I live in this place,

13   so I don't know whether it's Saturday or Thursday, but it's

14   Thursday, and Friday we will be in session.

15         I will try to get you out a little bit on Fridays,

16   like 4:00 to beat the traffic jam, so we may shorten the

17   lunch hour even more.  I know there has been a little bit of

18   confusion.  We will do better tomorrow.  We will get you

19   down to that lunchroom and get you back up in a more orderly

20   fashion.  We have worked that out behind the scenes today.

21   We're kind of working out our processes.  Give us a little

22   bit of time, and we will perform very well.

23         The following week you will be in session on

24   Tuesday, Wednesday, Thursday and Friday.  Now, the week

25   after that I am going to be speaking to counsel tonight

1   whether they would like to be in session Monday and Tuesday
2   or Tuesday and Wednesday.  Let us have a discussion about
3   that this evening outside your presence.  The transportation
4   issues are already abundantly clear to me.
5          In the meantime, I will have an answer for you
6   concerning that week.  I am thinking about just drawing out
7   a calendar for the next month and a half taking us up to the
8   first week in May, but I really need to talk to the
9   government.  I really need to talk to the defense this
10  evening before I draw out that calendar because once we put
11  that in stone it's in concrete.
12         Beyond that -- that's as far as I want to go to
13  this evening, but you know Thursday and Friday this week,
14  and we will start again at 8:30 if possible, and we will go
15  to about this time, right around 5:00, and we will try to
16  find a logical breaking point.
17         Obviously, Mr. West, we couldn't finish you this
18  evening, so there is no reason to push through to 6:00.
19         Has anybody talked to anybody about the case so
20  far so I can start all over again?
21         Okay, please don't.  Just a gentle reminder.
22         You are admonished then not to discuss this matter
23  amongst yourselves nor to form or express any opinion
24  concerning the case.  Please leave your notepads on the seat
25  you are occupying.  Please have a nice evening.

```
 1              Mr. West, if you would remain for just a moment.
 2              (Jury not present.)
 3              THE COURT:  The jury is no longer present.
 4              Mr. West, Mr. White couldn't see you.  This
 5    monitor is now working.  I have spent hours with all of you
 6    trying to configure this courtroom to everybody's
 7    satisfaction, but this is the first witness who has been --
 8    you know, I don't know what the future holds.
 9              Mr. West, would you take that monitor and just
10    slide it this way for a moment.
11              MR. WHITE:  I can see him fine now.
12              THE COURT:  Is that better?
13              MR. WHITE:  Yes.
14              THE COURT:  Then that's what we will do.  We will
15    just put the monitor in that position.
16              Mr. West, thank you very much.  We will see you
17    tomorrow morning.
18              Now, the second thing is this morning I neglected
19    to get your consent -- I simply assumed with the second
20    playing of the tape in front of the jury that the court
21    reporter need not take a transcription of that.  You had
22    already waived that when we had the afternoon -- the lunch
23    session, but I just wanted to make sure that meets with your
24    consent.
25              Does it with you, Mr. Emmick?
```

1          MR. EMMICK:  Yes, Your Honor.

2          THE COURT:  Mr. Steward?

3          MR. STEWARD:  Yes.

4          THE COURT:  Mr. White?

5          MR. WHITE:  Yes.

6          THE COURT:  Mr. Calabria?

7          MR. CALABRIA:  Yes.

8          THE COURT:  Mr. Reed.

9          MR. REED:  Yes.

10          THE COURT:  I want to meet or put on the record

11  after you informally discuss an issue I have raised with you

12  concerning documents and evidence in this case in five

13  minutes or ten minutes --

14          Who is here from the "Los Angeles Times"?

15          MR. FLEMING:  I think he just left.

16          THE COURT:  Somebody go get him.

17          MR. FLEMING:  He left about a half-hour ago.

18          THE COURT:  Well, don't go get him.  He's too far

19  away.

20          Apparently competitiveness is raising its head,

21  but the whole reason for a media representative has been so

22  that the media had some immediate access if there was a

23  concern, and there weren't 15 phone calls coming to the

24  Court or the court administrator nor were any of you being

25  contacted.

1          Mr. McDonald was kind enough to volunteer, athough

2     he regrets that probably by now.  It was only for the

3     media's comfort so that they could have questions answered.

4     If the "Los Angeles Times" would like to assume that

5     responsibility, I think Mr. McDonald would be glad to give

6     that to them, but we'll see or any other editor who would

7     like to take his place.

8          Mr. McDonald, on the record, thank you very much.

9     I think it went about as smoothly as it could and kept the

10    security of the courtroom and kept a lot of phone calls from

11    the Court.

12         The witnesses for tomorrow are obviously Mr. West.

13         MS. FLYNN:  Yes.

14         THE COURT:  What problems are we going to

15    anticipate with Mr. West?  Is there something you would like

16    to meet with me in-camera about this evening, Mr. White?

17         MR. WHITE:  No, Your Honor.

18         MS. FLYNN:  I have an issue.  I want to

19    conditionally admit two exhibits.  Originally, defense

20    counsel were going to stipulate to some foundational issues.

21    We have three foundational witnesses to get in some

22    documents that were found in the cell of David Sahakian.

23         THE COURT:  I'm going to take them subject to a

24    motion to strike.  I will allow them at this time.

25         Those are for foundation like the lists, et

1   cetera, that are found during the searches?

2        MS. FLYNN:  Yes.  I'm going to have a witness come

3   in and say where he found those.

4        THE COURT:  You aren't going to stipulate to

5   those?

6        MR. STEWARD:  No.

7        THE COURT:  You can expect tomorrow you will get

8   them in subject to a motion to strike with a representation

9   that appropriate foundation can be laid.  Those documents

10  are -- those are the lists out of Mr. Bingham's --

11       MR. FLYNN:  Actually what they are -- specifically

12  for tomorrow is Exhibits 258 and 260.

13       THE COURT:  Let see what those are.  I thought

14  they were Mr. Bingham's --

15       Explain to me, although I can read the document --

16  it's obviously a letter concerning AB business -- where this

17  is found.

18       MS. FLYNN:  This was found in the cell of David

19  Sahakian I believe during the search in 2002, but I would

20  have to check my notes.

21       THE COURT:  How will you later lay the foundation

22  for this?

23       MS. FLYNN:  There are three witnesses.  The BOP

24  agent who seized it out of the cell gave it to the ATF agent

25  who will testify, and it was then sent to a special master

1  who pulled it out and turned it over.

2         THE COURT:  So, therefore, you will have to call

3  the special master, the agent who received it, and the BOP

4  person who retrieved it out of the cell.

5         MS. FLYNN:  Correct, and they will be Friday

6  morning.

7         THE COURT:  I will accept that subject to a motion

8  to strike.

9         THE COURT:  260 is --

10         MS. FLYNN:  Exact same thing.

11         THE COURT:  Subject to a motion to strike.  You

12  can expect that that will be before the jury tomorrow, not

13  finally introduced, but certainly Mr. West can testify to

14  that.

15         Any other problems that you foresee from the

16  government's standpoint?

17         MS. FLYNN:  Nothing else that I see, Your Honor.

18  I believe that's it.

19         THE COURT:  Okay.

20         After Mr. West, who will be the next witness?

21         MR. EMMICK:  Then we would be proceeding to the

22  Marzloff witnesses, some of whom have passed away, some of

23  whom have not been located, two that have been located, and

24  one, Mr. Miller, to the extent he is not just for Marzloff

25  but for a number of other victim murders.

1        THE COURT:  How are you going to start with the

2   presentation of that?  Are you going to start by reading the

3   transcript, and if you are, is there going to be somebody on

4   the stand responding?

5        MR. EMMICK:  Your Honor, I think it makes the most

6   sense to have kind of a responsive --

7        THE COURT:  I do, too.

8        MR. EMMICK:  One person reading one role and --

9        THE COURT:  That's acceptable to me.  It's

10  actually my preference.

11       So we are going to start into those transcripts

12  concerning the Marzloff murder.

13       MR. EMMICK:  Yes.

14       THE COURT:  What's your best guess in the Marzloff

15  murder -- I know there are 700 pages or --

16       MR. EMMICK:  Yes.

17       THE COURT:  But some of those people are

18  available.

19       MR. EMMICK:  Yes.

20       THE COURT:  So how much do you think you will

21  read.  Just your guesstimate.

22       MR. EMMICK:  I identified in some e-mail traffic

23  with defense counsel seven witnesses whom we were going to

24  be either calling as live witnesses or introducing their

25  transcripts.  We have located two of those seven, so they

1   would probably go into next week after Mr. Miller.  As to

2   the other five, I would guess that they are maybe 200 pages

3   or so, not a huge portion, perhaps 250.  Some of the

4   testimony is not particularly long, but some of it is.  I

5   could get a more accurate count if I went upstairs.

6           THE COURT:  Will Miller testify tomorrow?

7           MR. EMMICK:  I doubt it because I suspect the

8   West cross-examination will be --

9           THE COURT:  In other words, when we are done with

10  West, then we are moving into transcript reading for the

11  remainder -- at least tomorrow?

12          MR. EMMICK:  I think that's right.

13          THE COURT:  That gives everybody notice.

14          What problems are going to occur in light of that?

15  Mr. Fleming?

16          MR. FLEMING:  We actually discussed this at one of

17  our hearings.  We were asking for some advance notice of the

18  transcripts as to which ones would be read so that we could

19  go through them and address any evidentiary issues with Your

20  Honor beforehand.  I think that was our agreement, but we

21  don't yet know which transcripts are coming.  If they are

22  coming tomorrow, it's going to be tough tonight, but we will

23  go through the transcripts that the government identifies.

24          So I would like to know which transcripts

25  specifically.  We will spend tonight going through them, and

1   then at some point before they begin reading them, if we

2   have any objections, we would like a chance to argue those.

3        THE COURT:  Well, you will, but it's not going to

4   interfere with the jury.  We're going to do that tonight,

5   so I am going to recess now, and what time do you want to

6   meet?  8:00?  9:00?

7        Here is what I'm going to do.  I'm recessing, and

8   I'm going to plan right now 8:00.  If it's before that, you

9   notify me.

10       MR. WHITE:  Do you need both counsel?

11       THE COURT:  Well, if you want to have a designated

12  representative like Mr. Fleming or Mr. Steward and all of

13  you want to stipulate -- but right now I need every

14  defendant present.  I need every counsel present, so I will

15  take the bench after you have had a thoughtful discussion on

16  how you would like to spend your evening hours with me.  You

17  work it out.

18       We are going to take a recess.

19       (Recess.)

20       (Jury not present.)

21       THE COURT:  All counsel are present.  The

22  defendants and the government are present.

23       It's my understanding that all the defendants

24  would like to be excused this evening.  I need to get a

25  personal consent, especially from you, Mr. Mills.  The plan

1    this evening I have been informed is to work with Mr.

2    Fleming and Mr. Steward and Mr. Emmick on the Marzloff

3    transcripts.

4              Mr. Hevle, would you like to remain this evening,

5    or would you like to go back to Terminal Island?

6              DEFENDANT HEVLE:  I want to go back this evening.

7              THE COURT:  Your presence is not going to be

8    required.

9              Mr. Calabria, and, Mr. Rosen, have a nice evening.

10             Mr. Reed, and, Mr. Gibson, do you have any issues

11   this evening?

12             MR. REED:  No, Your Honor.

13             THE COURT:  Mr. Gibson, do you want to remain, or

14   would you like to be excused?

15             DEFENDANT GIBSON:  I want to go back.

16             THE COURT:  Okay.  You are excused.

17             Mr. Reed, have a nice evening.

18             Mr. Bingham.

19             DEFENDANT BINGHAM:  I'm out of here.

20             THE COURT:  You're excused.

21             Mr. White, and, Mr. Harris.

22             MR. WHITE:  We waive our presence.

23             THE COURT:  Have a nice evening.

24             Mr. Mills, you are the most important person on

25   this issue.  You are more than welcome to say.

1          DEFENDABNT MILLS:  I want to go back.

2          THE COURT:  Are you sure?

3          DEFENDABNT MILLS:  Yes.  I'm positive.

4          THE COURT:  All right.  Then you are excused for

5    this evening.

6          That's with Mr. Steward's consent and request?

7          MR. STEWARD:  Yes.

8          THE COURT:  And Mr. Fleming's request?

9          MR. FLEMING:  Yes.

10         THE COURT:  All right.  Then I don't think we need

11   a court reporter this evening.

12         *(At 5:30 p.m., proceedings were adjourned.)*

13                         -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

23

1                              -oOo-

2

3                           CERTIFICATE

4

5          I hereby certify that pursuant to Section 753,

6     Title 28, United States Code, the foregoing is a true and

7     correct transcript of the stenographically reported

8     proceedings held in the above-entitled matter and that the

9     transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12    Date:  March 15, 2006

13

14

15                                                    8/8/07

16    SHARON SEFFENS, U.S. COURT REPORTER

17

18

19

20

21

22

23

24

25