ORIGINAL

1

2          UNITED STATES DISTRICT COURT

3         CENTRAL DISTRICT OF CALIFORNIA

4               SOUTHERN DIVISION

5                   - - -

6    UNITED STATES OF AMERICA,
              Plaintiff,
7        vs.
                              CR-02-938(C)
8    BARRY BYRON MILLS;        DAY 5, VOL. 3
     TYLER DAVIS BINGHAM;
9    CHRISTOPHER OVERTON
     GIBSON; EDGAR WESLEY
10   HEVLE,

11            Defendants.

12   ----------------------------

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             Santa Ana, California

17              March 17, 2006

18

19

20            SHARON A. SEFFENS, RPR
              United States Courthouse
21            411 West 4th Street, Suite 1-1053
              Santa Ana, CA  92701
22            (714) 543-0870

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    DEBRA W. YANG
      United States Attorney
 4    STEVEN D. CLYMER
      Special Assistant United States Attorney
 5    Chief, Criminal Division
      MICHAEL EMMICK
 6    TERRI FLYNN
      Assistant United States Attorneys
 7    1400 United States Courthouse
      312 North Spring Street
 8    Los Angeles, CA  90012
      (213) 894-0511

 9

10    For Defendant BARRY BYRON MILLS:

11    H. DEAN STEWARD
      LAW OFFICES OF H. DEAN STEWARD
12    107 Avenida Miramar, Suite C
      San Clemente, CA
13    (949) 481-4900

14    MARK F. FLEMING
      LAW OFFICES OF MARK F. FLEMING
15    433 "G" Street, Suite 202
      San Diego, CA  92101
16    (619) 652-9970

17    For Defendant TYLER DAVIS BINGHAM:

18    MICHAEL  V. WHITE
      LAW OFFICES OF MICHAEL V. WHITE
19    1717 Fourth Street, Third Floor
      Santa Monica, CA  90401
20    (310) 576-6242

21    WILLIAM S. HARRIS
      STEWART & HARRIS
22    1499 Huntington Drive, Suite 403
      South Pasadena, CA  91030
23    (626) 441-9300

24

25
```

1   For Defendant CHRISTOPHER OVERTON GIBSON:

2   KENNETH A. REED
     LAW OFFICES OF KENNETH A. REED
3   404 West 4th Street, Suite C
     Santa Ana, CA  92701
4   (714) 953-7400

5   For Defendant EDGAR WESLEY HEVLE:

6   BERNARD J. ROSEN
     LAW OFFICES OF BERNARD J. ROSEN
7   1717 Fourth Street, Suite 300
     Santa Monica, CA  90401
8   (310) 451-4577

9   DONALD J. CALABRIA
     LAW OFFICES OF DONALD J. CALABRIA
10  16133 Ventura Boulevard, Suite 600
     Encino, CA  91436
11  (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                          INDEX

 2                                              PAGE

 3    PLAINTIFF'S
      WITNESSES:
 4

 5    Testimony read of
      DANIEL HOLLIDAY                              6
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; FRIDAY, MARCH 17, 2006; 1:30 P.M.

2          THE COURT:  We are back in session.  Counsel are

3    present.  The parties are present, and the government is

4    present.

5          (Jury present.)

6          THE COURT:  All right, the jury is present, and

7    all the alternates are present.

8          I received a note from one of you and some other

9    comments.  You are getting a little stir crazy already.

10   It's only been a week.  I am willing to give you your

11   freedom but on this condition.  You are all going out for

12   lunch outside the building, or you are all staying in, not

13   six of you go out and six stay in.  Talk about that amongst

14   yourselves.  Then some of you can go for a walk, exercise.

15   Some of you are smokers.  You are kind of confined with the

16   CFO's.  Maybe we should just try it.  If we do that, you

17   will need the strongest admonition.

18         There are so many eating places.  I want to know

19   where the attorneys are going each time so government

20   counsel and defense counsel -- I will tell you where they

21   are going, and that's not where you are going.  That way

22   they can have conversation.

23         I want you to have exercise.  I'm willing to

24   undertake that on a trial basis, but if there is any issue

25   or problem, then I'm going to bring you right back in.  I am

1    most concerned you might overhear a conversation, so talk

2    about that and tell me what you want to do.  If you are

3    inclined to do that, let's take it on a one-week trial basis

4    and see how it goes.  We have had you in the courthouse for

5    a week.  Let's put you outside for a week, but I still want

6    to keep the lunchtime to an hour and 15 minutes.

7              You are doing wonderfully, and I'm very proud of

8    you.  You are all lined up and ready to go at.  If you start

9    running around the countryside, if one of you don't show up,

10   I have to either excuse you, or I have to wait for you.  How

11   long do I wait?  15 minutes a day is a whole morning session

12   at the end of the week, so talk about that amongst

13   yourselves.  I want you to govern yourselves and tell me

14   what you need.

15             Counsel, if you would like to continue with Mr.

16   Mills's cross-examination in the Marzloff matter.

17             (The following portion was read:)

18   "BY MR. MILLS:

19   Q    Walking around?

20   A    I believe we were sitting on that little hill.  That is

21   where I ran into you.  There was probably a couple of people

22   sitting there.  Bartosh was probably there.  Miller hadn't

23   come up yet.

24   Q    But you and I met up on the yard prior to meeting

25   Mr. Marzloff?

7

1    A    Right.

2    Q    And we walked and discussed this?

3    A    Yes.

4    Q    At length?

5    A    Not at length.  You said, "We got to make sure we get

6    him down there."

7    Q    And both of us had knives on us at this time?

8    A    I had one, and I was pretty sure you had one.  You said

9    you did.

10   Q    Do you remember giving testimony contrary to this at

11   the grand jury?

12   A    About what?  You having a knife?

13   Q    No, about you meeting Marzloff first in the yard and

14   you and Marzloff walking around.

15   A    I'm pretty sure it was you I met first.

16   Q    Defendant's Exhibit No. 2, page 20, line 23, start

17   there and read over to the following page, 21, down to line

18   6.

19   A    Start at line 23?

20   Q    Yes.

21   A    I said, "Okay, which I all ready to go pick it up.  I

22   was told the night before to pick up a knife which I seen

23   them sharpening.  Anyway, after I left the recreation shack,

24   I went down to the yard.  Marzloff was walking by himself.

25   I waved him over.  We started talking.  Mills came up on the

1   other side just talking small talk.  There was no talk about

2   drugs, and I was wondering what is happening, and I tell

3   Marzloff, "Let's go down to the bathroom."

4          Question, let me ask you this --

5   Q     That is good enough.

6              This states that you met Marzloff first?

7   A     Like I really said, I can't really remember who I met

8   first.

9   Q     Then you don't really know who you met first?

10  A     I was pretty sure it was you.

11  Q     But the testimony you gave before the grand jury said

12  you met Marzloff first; is that right?

13  A     That is what I told them, right.

14  Q     Okay.  When we met up on the yard, where did we go in

15  the yard prior to going to the rec shack?

16  A     We walked up and down the passageway with Marzloff.

17  Q     You and I and Marzloff?

18  A     Right, us three.

19  Q     And this was after I come up and you and Marzloff and I

20  are walking around?

21  A     Me and you were walking around, and he walked up on us.

22  Q     Did you speak with Solomon in the yard?

23  A     Yeah.

24  Q     Who was present when you spoke with Solomon?

25  A     You, me -- I know he was with his cousin.  I was pretty

1   sure I was with you.  I believe we saw him before Marzloff

2   came and joined us.  I am not really positive, but I am

3   pretty sure, though.

4   Q    And there was quite a few inmates on the yard that day?

5   A    Quite a few, yes.

6   Q    A lot of people that could have seen us moving around?

7   A    Yes.

8   Q    When we went to the rec shack, who went to the rec

9   shack?

10  A    Me, you, Miller and Marzloff.

11  Q    We all walked in together?

12  A    Yeah.

13  Q    Do you recall if Bartosh was there?

14  A    He was up on the hill.

15  Q    Do you recall if you were wearing a headband that day?

16  A    No.

17  Q    You weren't?

18  A    I don't know.  I don't think so.

19  Q    Did Bartosh give you any extra clothing other than what

20  you described here in court?

21  A    A shirt and, I believe, a pair of pants.

22  Q    Green fatigue shirt?

23  A    Yeah.

24  Q    I had a green fatigue shirt?

25  A    I think so.  I don't know.  I can't remember.  I

1    believe so.

2    Q    But I might have had a T-shirt on?

3    A    I know you had a T-shirt on.

4    Q    These clothes, how were they brought out to the yard?

5    A    Bartosh brought yours out there.   I got mine the night

6    before.   He asked me to wear them.

7    Q    Where did you get them at?

8    A    Bartosh got them.

9    Q    The night before?

10    A    I believe so.

11    Q    In your block?

12    A    He doesn't live in my block.   I think I got them in the

13    yard.   I don't think he brought them out to the yard because

14    I was wearing a pair of shorts.

15    Q    When you came out to the yard, you was wearing a pair

16    of shorts?

17    A    No, that is what I am saying.   When I went back in, I

18    was wearing a pair of shorts.

19    Q    Do you recall ever testifying anywhere that you had

20    some clothes, and you put them on in the dining room prior

21    to going to the yard?

22    A    I might have put them on because I work in the dining

23    hall.

24    Q    Where would you put these clothes on in the dining

25    room?

1   A    Probably where work in the scullery if I were to do it.

2   Q    You don't know where you put the clothes on?

3   A    No.

4   Q    As I recall, you said there wasn't any inmates in the

5   building when we went in there.

6   A    Inside the recreation shack?

7   Q    Right.

8   A    There was an older guy in there.

9   Q    Any inmates working in the office?

10  A    No.

11  Q    None whatsoever?

12  A    Nobody was in there.

13  Q    Did Marzloff and I go into the bathroom area together

14  and you stand outside, or did you go in with Marzloff?

15  A    I went inside with Marzloff.

16  Q    I was standing outside?

17  A    You were inside the recreation shack, but you were in

18  like the sally fork to see -- it led straight into the

19  lavatory.

20  Q    But you and Marzloff walked in together?

21  A    I believe so, yes.

22  Q    And I came in later?

23  A    Right.  You came in right behind us.

24  Q    And what was the conversation at that time?

25  A    With who?

1   Q    Between any of us in there.

2   A    I told Marzloff go ahead and kick back.  He sat down on

3   the toilet.  We were talking a little bit.  I can't even

4   remember what about.  It was just talk, and all of a sudden

5   he said, "Where is Barry at?"

6              I said, "He went to go get the outfit."

7              He said, "Hey, come here a second," and that is

8   about all the conversation there was.

9   Q    But you and Marzloff walked in first together?

10  A    Yes.

11  Q    Who told Marzloff to take a seat on the commode?

12  A    I did.  Well, I didn't say sit down.  I said, "Just

13  kick on back."

14  Q    Do you recall making any testimony contrary to both of

15  those previous to this?

16  A    This afternoon?

17  Q    This afternoon.

18  A    Just to the prosecutor, Mr. Hendrix.

19  Q    You made a statement prior to that contrary to that?

20  A    Yeah, probably contrary to it if not the exact thing.

21  Q    Defendant's Exhibit No. 2, page 24, lines 2 through 4,

22  would you read those, please?

23  A    "Me and Mills went inside with Marzloff.  Barry told

24  him, 'Go ahead and have a seat.  I will be in in a second

25  with the outfit.'  I looked at Barry" --

1    Q    Okay, that is good.  Who told Mr. Marzloff to have a
2    seat?

3    A    Who told him that.

4    Q    Yes.

5    A    I believe I did.

6    Q    Did you testify here that I did?

7    A    Like I said, I can't remember what I said then.

8    Q    Do you remember the date when you gave your testimony,
9    Mr. Holliday?

10   A    September, I believe, wasn't it?

11   Q    It says August 26, 1980.

12   A    August.

13   Q    Would it be fair to assume that your memory would be
14   much better at that time than it would be at this time?

15   A    No, I feel it would be better at this time because I
16   was under a lot of stress then.  You will notice in the
17   testimony I stuttered quite a bit.  I was worried quite a
18   bit about a lot of different things.

19   Q    You understand the facts much better today?

20   A    Of course.  I have done more thinking about it.

21   Q    When Mr. Marzloff was sitting on the commode, where
22   were you standing?  Where were you at?

23   A    About a couple of feet from him, I guess, about
24   three feet, and then you walked in, and I backed up.

25   Q    You backed up when I walked in?

1    A    You asked me to come here a second, and I walked over

2    there.  You went inside, and I was standing in back of you.

3    There is not that much room in a commode.

4    Q    And I pulled this knife from my back?

5    A    Yes.

6    Q    From behind me?

7    A    Right.

8    Q    Did you get a good look at this knife?

9    A    Fairly well.

10   Q    Do you know this knife very well?

11   A    Well, the one in the picture has got a rag wrapped

12   around it, but the one you had didn't.

13   Q    It didn't?

14   A    No not that I can remember.

15   Q    Has that knife been changed since you see it today?

16   A    Well, the blade was long is really all I could see, but

17   I don't remember that there was a rag attached to it.  There

18   may have been.  All I was looking at was the blade when it

19   was coming down on the victim.

20   Q    Do you remember the details of this knife at all?

21   A    No.  It was double-edged.

22   Q    The biggest knife?

23   A    The biggest knife, right.

24   Q    With the cloth handle on it?

25   A    It has got it in the picture.  I don't remember the

1   cloth on it, but it has got one on it.

2   Q    Do you think the FBI has changed the handle from when

3   they found it to the way it is right now?

4   A    I don't know.  No, I don't think so.  Like I said, I

5   wasn't really looking at the handle.  I was looking at that

6   blade when it was coming down.

7   Q    Mr. Holliday, is this the knife you seen me pull out of

8   my back?

9   A    Yes.

10  Q    That is the knife?

11  A    Well, I can't say for sure because it is not a real

12  close detailed picture, but it looks like it.  It is the

13  toilet you threw it in right next to the victim.

14  Q    And it appears to have a white rag on the handle?

15  A    Yes, it does.

16  Q    Did you testify before the grand jury that it had a

17  different handle on it?

18  A    I don't know.  I don't even know.  I didn't think the

19  knife was mentioned on description.  It may have been.  I

20  can't remember.

21  Q    Did you state at that time that it had a big thick

22  rubber handle on it?  Do you recall making a statement like

23  that?

24  A    Possibly, yes.

25  Q    Does that appear to be a rubber handle?

1   A   No, but I remember seeing it before, and it had a

2   rubber handle on it. I can't remember when.

3   Q   Does it resemble a rubber handle?

4   A   No, no.  It has got a cloth wrapped around it, some

5   kind of cloth.

6   Q   But then it looked like it had rubber on it?

7   A   With the cloth on it?

8   Q   No, at the time you seen me pull it out from behind my

9   back.

10   A   No, prior to that.  I seen it sometime before.  I can't

11   remember when, but I seen it sometime before.

12   Q   What did it look like when you seen it before?

13   A   It looked like it had a rubber handle on it.

14   Q   When did you see it before?

15   A   You showed it to me.

16   Q   Where?

17   A   In the rec shack.

18   Q   The rec shack?

19   A   Not the rec shack but the video shack.  You told me

20   that the rubber on it would make sure it would leave no

21   prints on it.

22   Q   How long was this prior to the murder itself?

23   A   Pardon?

24   Q   How long was this prior to the murder itself?

25   A   What, the video shop?

1   Q    That I showed you that knife with the rubber handle and
2   told you it had a real good grip.
3   A    I believe it was the night before.
4   Q    The night before?
5   A    A couple of days before.  I don't remember.
6   Q    Just for the record, Defendant's Exhibit No. 2, page
7   24, lines 17 through 20, would you read those, please?
8   A    "Sitting there waiting.  I walked right behind Mills.
9   Mills reached in his back and pulled out a knife about this
10  long, about this wide, and a big old rubber, thick rubber
11  handle on it.
12  Q    Now, if I was standing here and you were behind me,
13  would it be about this far?
14  A    About that far away from where we are at right now.
15  Q    About four feet?
16  A    Somewhere around there.
17  Q    If I pulled a knife out of my back, you could get a
18  good look at it?
19  A    You already pulled it out before he even walked this
20  way.  You had it in your hand like this (indicating).
21  Q    I didn't pull it out when you were behind me?
22  A    No.
23  Q    I already had the knife out?
24  A    Yes.
25  Q    Before you were behind me?

1    A    Yes.  You were on the other side of the toilet stall

2    and said, "Come here a second."  I turned around and came

3    back, and you just kind of moved me out of the way and went

4    in.

5    Q    But you testified here that you walked behind me, and

6    then I pulled the knife out behind my back?

7    A    I was behind you.

8    Q    Okay, Mr. Holliday.  Did you hear any words spoken at

9    all?

10   A    From who?

11   Q    By myself or Mr. Marzloff.

12   A    Yes.

13   Q    What did you hear?

14   A    I heard Marzloff say, "Why, Barry?  Why?"  He repeated

15   it about five times, and then he stopped and said, "I didn't

16   do it, Barry," or something like that.

17   Q    Would you think about it and be real sure now?  As best

18   you recall, what was the conversation?

19   A    I am trying to remember right now.  I believe he

20   said -- you know, I can't remember.  I really can't

21   remember.  I don't want to say one thing and contradict

22   myself later.  I don't remember.

23   Q    Was he yelling?

24   A    Yes.

25   Q    Loudly?

1    A    Not real loud, just loud enough for us to hear him, I

2    guess.

3    Q    Loud enough that if there was anybody in the rec shack

4    they would have heard it?

5    A    Oh, sure.  The bathroom doesn't have no door on it.

6    Q    Mr. Holliday, are you familiar with the equipment room?

7    A    Yes.

8    Q    Is there a window leading from the equipment room into

9    the bathroom?

10   A    You mean where you can check things in and out?

11   Q    Right.

12   A    Sure, there is.

13   Q    Now, if someone was in that building in the equipment

14   room, would they have heard Mr. Marzloff screaming?

15   A    Oh, sure.

16   Q    Positively?

17   A    Yeah, but there was nobody in there.  We checked.

18   Q    We checked?

19   A    Pardon?

20   Q    We checked?

21   A    Yeah.

22   Q    Both of us or you?  Did you check personally?

23   A    Yeah.

24   Q    You checked personally?

25   A    Yeah.  We both walked up there and seen it was clear.

1    Q    Okay.  Thank you.

2         What were you doing when Mr. Marzloff was being

3    stabbed?

4    A    Standing there wondering why.

5    Q    Frozen?

6    A    Yeah.

7    Q    Shocked?

8    A    I would say that, yeah.

9    Q    You didn't understand what he was saying at all?

10   A    No.  It was either, "I didn't do it, Barry" or "Why,

11   Barry?"  One of the two.

12   Q    It could have been something else, though?

13   A    It could have been anything.  I am pretty sure those

14   would be the two that would be most likely what he would

15   say.

16   Q    That is most likely what he would say?

17   A    Well, yes.  I was standing right there, and it sounded

18   like it to me, and your name came out of his mouth quite a

19   few times.

20   Q    He said "Barry"?

21   A    Yes.

22   Q    You are positive of that?

23   A    I am positive of that.

24   Q    Once again, Defendant's Exhibit No. 2, page 26, lines 5

25   through 7, would you read those, please, sir?

1    A    "In his back and pulled a knife out.  I seen a foot go

2    up like this, and he goes, "Man, what is happening?  That is

3    all the word that were said."

4    Q    At the time you testified, that is all that was spoken?

5    A    I guess so.

6    Q    You didn't remember anything about Barry then?

7    A    Unh-unh.

8    Q    But today you are positive he was yelling "Barry"

9    several times?

10   A    Yes.

11   Q    Mr. Holliday, on what do you base your opinion that

12   when a person dies his muscles spasm.  Is this personal

13   experience?

14   A    Pardon?

15   Q    Is this personal experience?

16   A    From what?

17   Q    How do you base this opinion that when someone dies

18   their muscles spasm, and they start shaking?

19   A    Like an epileptic, I guess.

20   Q    Do you remember making a statement similar to, "I knew

21   he was dead because his body was spasming like a person does

22   when he dies?

23   A    He was.

24   Q    Is this what people do when they die?

25   A    I don't know.  It is what I have been told.

1   Q     It was an assumption then?

2   A     Yes.   I have never seen anyone die before except for

3   once.

4   Q     Okay.   After Mr. Marzloff was stabbed, I went over and

5   started washing up?

6   A     First, you threw the knife in the toilet, flushed it,

7   and then you started washing up.   I believe you took your

8   T-shirt off and started washing the blood off your hands and

9   face?

10  Q     Off my face?

11  A     You had a little bit up here (indicating).

12  Q     Did I have a lot of blood on me?

13  A     Just on your hands mostly.   That is all I could see.

14  They were all red.

15  Q     There wasn't enough blood where you noticed an

16  excessive amount of blood on me, all over me?

17  A     No, just all I could see mostly is your hands.   That is

18  all I was really looking at, and then I looked at your face,

19  and you had some on your face.

20  Q     At this time, you don't remember any hands being

21  covered with blood and blood all over me?

22  A     All over you?

23  Q     Well, all over my face and hands.

24  A     You had some on your face.   You had quite a bit on your

25  hands.

1   Q      My arms?

2   A      I don't know.  I seen your hands.  You had quite a bit

3   on will.

4   Q      But I had it on my face, too?

5   A      Not smeared.  There was just dots.

6   Q      Just dots?

7   A      Pretty decided dots.

8   Q      Were we wearing gloves at all -- was I wearing gloves?

9   Was there a struggle at all between Mr. Marzloff and myself

10  between this cubicle?

11  A      Not really.  He stuck his foot up, and you slid between

12  his feet.  There wasn't much of a struggle at all.

13  Q      Did you observe me trying to place myself against the

14  cubicle or anything with one hand?

15  A      No.  You grabbed his head and pulled it down and went

16  down on it.

17  Q      There was no real struggle at all in there then was

18  there?

19  A      No.

20  Q      Did you or I touch anything in there?

21  A      I might have touched the wall behind me because I was

22  leaning up against it, but I don't recall seeing you touch

23  anything except for the gauge where you turn on the water to

24  watch your hands off.  That is all I ever seen you touch.

25  You may have touched the side walls.  I don't know.

1    Q     You don't really recall if I did or not?

2    A     No.

3    Q     You didn't see me washing the faucets off after I had

4    washed my hands?

5    A     No.

6    Q     The shirt I was wearing, was it a long-sleeved shirt?

7    A     I can't even remember if you had one on.  You had a

8    T-shirt on, and that is about it.

9    Q     Did you testify here under examination by Mr. Hendrix

10   that both of us had shirts on?

11   A     I was pretty sure you had one on.  I couldn't say for

12   positive you had one on.  I said the same thing to him.  I

13   wasn't positive you had one on.

14   Q     But you don't know if I really had one of them green

15   shirts on or not?

16   A     No, but I imagine you would have.  No, I can't say for

17   positive you did.

18   Q     I must have had a coat on.

19   A     You could have had a lot of things on.  All I remember

20   is the killing itself mostly.  The details around it, I can

21   remember some, but clothing is no big thing to me.

22   Q     Would you see if I took something off and threw it?

23   A     Pardon?

24   Q     Did I take something off and throw it?

25   A     You took your T-shirt off, I think.

1   Q    Where did I throw this T-shirt?

2   A    Either in the trash can or on the floor.

3   Q    The trash can or on floor?

4   A    I am not sure.

5   Q    Didn't you testify earlier under cross by Mr. Hendrix

6   that I threw it on the floor as we left?

7   A    One of the two, either in the trash can or on the

8   floor.

9   Q    There is a trash can there?

10   A    Yeah, on the left-hand side wall as you are leaving.

11   Q    And I threw it in the trash can or on the floor?

12   A    I couldn't remember.  You either threw some papers in

13   the trash can, or you threw your T-shirt in.  I couldn't

14   remember which one.

15   Q    Could it have been some papers I was throwing?

16   A    In the trash can, sure.

17   Q    Then I might not even have thrown a shirt down at all?

18   A    When you left there, you didn't have a shirt on.

19   Q    So you just assumed I threw a shirt because I didn't

20   have a shirt on?

21   A    You can't hide a knife without someone seeing it if you

22   haven't got nothing protecting it.  Of course, you would

23   have a T-shirt or something on.

24   Q    But it wasn't a green shirt?

25   A    I don't know.

1          THE COURT:  Excuse me.  I didn't understand the

2    witness' response.

3          THE WITNESS:  I said I don't know.

4    BY MR. MILLS:

5    Q    You don't know if it was a green shirt?

6    A    No, I don't know if you had a green shirt on or not.  I

7    remember you had a T-shirt on.  I had one on.  You took it

8    off.  You either threw it in the trash can, or you threw it

9    over towards the right-hand side of the trash can.  I don't

10   know.

11   Q    Excuse me, Mr. Holliday.  What did you have on?

12   A    I had a T-shirt and a jacket on, but I did have a

13   T-shirt underneath the jacket?

14   A    And you had a jacket on?

15   A    Yes.

16   Q    You didn't have a green shirt on?

17   A    A green jacket, fatigue shirt.

18   Q    Government's Exhibits 29 and 30, one is a green fatigue

19   shirt, and one is green fatigue jacket.  Which one of these

20   was yours?

21   A    I don't know which one was mine, but it was like that

22   one (indicating).

23   Q    The shirt?

24   A    The shirt, right.

25   Q    Then this coat, was I wearing this coat?

```
 1   A    Not that I can remember, no.  Is that a coat?
 2   Q    Yes, it is a coat, sir.
 3   A    It isn't the same thing as that (indicating).
 4   Q    No, that is a shirt.  Excuse me.  It is  shirt.
 5   A    It looked like one.
 6   Q    Was I wearing that shirt?
 7   A    No, not that I can remember.  I don't know.  I remember
 8   you had a T-shirt on.
 9   Q    But we went to great lengths to get our clothes
10   together before we went in there?
11   A    Apparently so.  You did.  You are the one that
12   suggested me wearing an extra set of clothing.
13   Q    But you didn't see what I had on?
14   A    It was the day before.
15   Q    Now, this door was closed the entire time we was inside
16   the rec shack?
17   A    The front doors of the rec shack were.  They don't show
18   them in the pictures.
19   Q    And Buz Miller was standing out in front of the doors?
20   A    Yes, sir.
21   Q    As we left, I pushed the door open, and we went on out?
22   A    Someone pushed it open.
23   Q    What?
24   A    Someone pushed it open.  I assume it would have been
25   you because I followed you out.
```

1    Q    And you are assuming I pushed it open?

2    A    You were in front of me.  The dead man didn't.

3    Q    You don't know if Buz Miller opened the door?  He might

4    have opened the door?

5    A    It's possible.

6    Q    Someone else might have opened the door?

7    A    It is possible.

8    Q    Anyone could have opened the door?

9    A    Sure, but it looks like you because you were in front

10   of me.

11   Q    Mr. Holliday, I am not -- I am just trying to get to

12   the facts.

13   A    You are getting them as best I can give them to you.

14   Q    Could someone other than us three have opened that

15   door?

16   A    Not from inside, they couldn't.

17   Q    From outside?

18   A    They could have turned it and probably pulled it open.

19   Q    Buz Miller was outside?

20   A    Right.

21   Q    So he would have known if somebody else would have

22   opened the door?

23   A    Right.

24   Q    When we walked through the door, did you see anybody

25   else?

```
1    A    Standing by the door?

2    Q    Yes.

3    A    No.

4    Q    In the area that could have opened the door?

5    A    No.  As a matter of fact, I think when we came through

6    the doors, he was sitting on a park bench right next to the

7    front of the building.

8    Q    He was sitting down out there?

9    A    Yes.

10   Q    Okay, and what was Miller's job at that time?

11   A    He emptied trash cans.

12   Q    On the yard?

13   Q    No, in back of the yard.

14   Q    In regards to setting up alibis, this was my

15   suggestion?

16   A    Yes.

17   Q    And what kind of alibi did I suggest for myself?

18   A    I don't know, somebody that you knew probably that

19   would recognize you, and if the trial came along, they would

20   say you were on the yard all afternoon with them.

21   Q    Where at on the yard, doing what?

22   A    Playing handball, watching the baseball game -- I don't

23   know -- playing golf or running.

24   Q    I didn't really suggest any significant -- I mean

25   definite thing?
```

1    A    You asked me to try to get someone to say I was here at

2    this baseball game.

3    Q    But I didn't state exactly what my alibi was going to

4    be?

5    A    Not really.  More or less being out on the yard.

6    Q    Being on the yard?

7    A    Right.

8    Q    Anywhere on the yard?

9    A    That could be true.

10   Q    Just anybody to cover me?

11   A    Not near that bathroom.  I know that.

12   Q    Mr. Holliday, in regards to me approaching you, you

13   said that my motive at the time you believed was robbery.

14   This is what I expressed to you?

15   A    Yes.

16   Q    And Mr. Marzloff was a friend of yours?

17   A    Not a friend, an acquaintance.

18   Q    He arrived at the penitentiary the same day, and you

19   lived in a cell together?

20   A    For about a week, right.

21   Q    You just met me for a short period?

22   A    About a month or three weeks.

23   Q    Did Mr. Marzloff that you know of ever possess any

24   drugs while he was Atlanta?

25   A    While I was there?

1    Q    Yes.

2    A    He had some marijuana at one time.

3    Q    Heroin, large amounts?

4    A    No, but he talked about it.

5    Q    He talked about it?

6    A    When we were in the hole together.

7    Q    While you were in the hole with him?

8    A    When I first got there.

9    Q    When you first got there?

10   A    Yes.

11   Q    But you never seen him with any?

12   A    No.

13   Q    Do you believe he was going to get some drugs?

14   A    You hear a lot of things.  You believe it when you see

15   them.  When I see them, I believe them.

16   Q    But from his expressing it in the hole when you first

17   got there, did you believe he was going to get some?

18   A    No, not really.

19   Q    You didn't?

20   A    No.

21   Q    I was the one that came up with the idea he was going

22   to get some drugs?

23   A    No.  You told me that you found out through another guy

24   that was a friend of his that he was supposed to hit.

25   Q    Did I mention his friend at all by name?

```
1    A     I believe it was Ben Bryant.

2    Q     Bennie Bryant?

3    A     Yes.

4    Q     Bennie Bryant was on the yard at that time?

5    A     What, when he got killed?

6    Q     Yes.

7    A     No, he was locked up in segregation.

8    Q     How long had Bennie Bryant been locked up in

9    segregation?

10            THE COURT:  As of what time?

11            MR. MILLS:  Before the murder.

12            THE WITNESS:  I can't remember.  A couple of weeks

13   maybe.

14   BY MR. MILLS:

15   Q     And I would have had to have gotten this information a

16   couple of weeks in advance of the murder itself?

17   A     You were in the hole with him for the same murder.

18   They released you out there, and you killed that other guy.

19            MR. MILLS:  I object to that, Your Honor.

20            THE WITNESS:  You asked.

21            MR. MILLS:  No, I didn't ask.

22            THE WITNESS:  You asked how you got the

23   information.

24            THE COURT:  Would you read back the prior question

25   and answer, please?
```

1      (Whereupon, the reporter read back the prior
2  question and answer.)
3      THE COURT:  I believe the witness' answer was
4  responsive to your question.
5      MR. MILLS:  Okay.  Thank you.
6  BY MR. MILLS:
7  Q   Now, you state the purpose how you you got Mr. Marzloff
8  to come to the rec shack was luring him down there with
9  heroin, drugs?
10 A   Yeah.
11 Q   You did this the night before?
12 A   I don't know, a couple days before I told him about it,
13 to meet us down there.
14 Q   When did I tell you to ask him?
15 A   When did you ask me to ask him?
16 Q   Yes.
17 A   I think right after I got out of segregation.
18 Q   You can't recall which day, specific day, whether it
19 was two days before the murder when you spoke to Marzloff
20 and asked him to meet us at the rec shack on the yard?
21 A   Not the exact day, no.
22 Q   It wasn't the night before?
23 A   Possibly.
24 Q   If it was the night before, would you have remembered
25 that?

1   A    No, because that is when we went into the video shop,

2   the night before.  I got the change of clothing from Mike

3   the night before or the afternoon before.  I don't believe

4   it was the same day.  I believe it was set up a few days in

5   advance.

6   Q    You don't recall testifying that I instructed you to

7   speak to Mr. Marzloff the night before the killing and tell

8   him to meet us the next day on the yard at 12:00 o'clock?

9   A    I don't know if it was the night before or two days

10  before.  I don't really remember, but you it ask me to

11  approach him.

12  Q    Where were you the night before the murder?

13  A    The night before?  About what time?

14  Q    From dinner on.

15  A    I imagine I was you out on the yard for a while.  I

16  went to the video shop, and I went back to the cell block.

17  I can't remember.

18  Q    You don't recall speaking to Mr. Marzloff in the dining

19  room that night?

20  A    No.

21  Q    If I suggest to you that you testified before the grand

22  jury that you spoke to him the night before the murder,

23  would that refresh your memory?

24  A    What is that?

25  Q    If I suggested that you spoke to him the night before

1    the murder and asked him to meet us the next day at the rec

2    shack --

3    A    It is possible.

4    Q    It is possible?

5    A    Sure.

6    Q    Do you remember anything specifically, Mr. Holliday?

7    A    Not about that grand jury hearing, no.

8    Q    What is it about the grand jury that you don't recall?

9    A    If you want to bring that thing up, I will tell you one

10   thing, and it will say something different in the grand jury

11   hearing, but as far as the facts of what happened there at

12   that incident when the guy got killed, yeah, I remember what

13   happened.

14   Q    That is what I am trying to find out.

15   A    All the little bits and pieces that go before it and

16   come after, I can't remember the exact minute, hour, day,

17   second, and everything.  All I can remember is what took

18   place, not exactly when.  I know it wasn't no month before.

19   It was right within a few days of the murder happening.

20   Q    Was it the night before?

21   A    It is possible.  I don't know.

22   Q    Okay.  Later when we was in the segregation unit, there

23   was myself, Murray, Bartosh, and you in a cell?

24   A    We were all in the cell at one time, right.

25   Q    At this time, I conveyed to you that it was an Aryan

1   Brotherhood contract that had been passed to me via the

2   mail?

3   A    Yeah.

4   Q    Did I state the person that had forward the letter for

5   me?

6   A    Who it came from originally?

7   Q    Yes.

8   A    Yes, Tommy Silverstein.

9   Q    Who passed the letter to me?

10  A    You said a woman names Mary, I believe.

11  Q    You believe?

12  A    Yeah.

13  Q    It could have been somebody else?

14  A    It is possible, but I am pretty sure you said Mary.

15  Q    That's all I said, Mary?

16  A    Yeah.  I can't remember.  It was two years ago.  I

17  can't remember exactly what was said.

18  Q    But I could have said Janice, Jill, Alice?

19  A    It sounded like Mary to me.  You could have said

20  anything, but I am pretty sure you said Mary.

21  Q    Are you convinced enough to swear under oath that's

22  what I said?

23  A    I am under oath right now.

24  Q    And it was Mary I said and nothing more?

25  A    It might have been something else, but I am pretty sure

1   it was Mary.

2   Q    Okay, and the message I conveyed to you at that time --

3   do you remember what the gist of the message was?

4   A    No.

5   Q    Was there certain little phrases we used that sticks in

6   your mind?

7   A    Meaning what?

8   Q    I mean did I relate to you there was a certain little

9   message that had come to me, a certain little word or phrase

10  that meant a certain thing to me?

11  A    Yes.

12  Q    And what was that?

13  A    Tommy Silverstein wanted you to kill John Marzloff for

14  him.

15  A    Did I mention that he wrote through Mary that Marzloff

16  was headed my way and for me to send him to the bone yard.

17  Q    That sounds like it.

18  Q    That sounds like it?

19  A    Yeah.

20  Q    And bone yard doesn't really mean nothing to you.  It

21  could have been something else?

22  A    It sounded like graveyard.

23  Q    It sounded like graveyard?

24  A    I don't know.  I think I just told him bone yard a

25  little while ago when he asked the same question.  It could

1  have been to the hotel.  It could have been a lot of places
2  meaning the same thing.
3  Q    A lot of things.  They all mean the same thing?
4  A    No, no, no.  Similar things.
5  Q    So there is no one particular phrase I was referring to
6  that sticks in your mind that meant a certain thing?
7  A    No.
8  Q    Did you ever see this letter?
9  A    No.
10 Q    Are you aware of Bartosh or Murray, if they knew about
11 this letter?
12 A    Not to my knowledge.  You only mentioned it to me.
13 Q    How big a cell were we in, the four of us?
14 A    Pretty good size, about from this wall to where this
15 lady is sitting right there, from about where that table is
16 to about right here.
17 Q    There was four of us in that cell?
18 A    Yes.
19 Q    And as far as you know, you are the only person I
20 divulged this information to?
21 A    Well, you were speaking to me.  Now, if they overheard
22 us, which I don't really think they did -- I believe I am
23 the only one you said something to.
24 Q    They never mentioned it at all?
25 A    No.

1    Q    They never inquired as to why we were talking?

2    A    Not to my knowledge.  They might have done it at a

3    later time, but at that particular time when you told me,

4    they didn't say anything.

5    Q    I told you Mr. Marzloff had to be killed because Tom

6    Silverstein sent me word?

7    A    Yes.

8    Q    Do you know if Bartosh and Murray knew anything about

9    Ton Silverstein?

10   A    I don't think Murray had heard of him, but I believe

11   Mike Bartosh said something about he knew who he was.   He

12   never met him, though.

13   Q    Bartosh supplied the clothing in this murder?

14   A    Right.

15   Q    And to the best of your knowledge, he didn't have any

16   knowledge of what the motive was whatsoever?

17   A    No, unh-unh.

18   Q    But he knew that Mr. Marzloff was going to be killed

19   that day?

20   A    If you told him.  I don't know.  I have no idea.  I

21   don't know what conversation you had between you and him.

22   Q    Mr. Holliday, you testified in very intricate details

23   concerning the Aryan Brotherhood here today.

24   A    Not detailed, just common prison knowledge.

25   Q    Your knowledge of it?

1   A    Oh, sure.

2   Q    Are you a member of this group?

3   A    No.

4   Q    Have you ever claimed to be a member of this group?

5   A    No.

6   Q    Has law enforcement ever branded you as a member of

7   this group?

8   A    Yes.

9   Q    Is this a common occurrence for them to do this?

10  A    Sometimes.

11  Q    How do they accuse you of being a member?

12  A    I don't know.

13  Q    Is it on record that you are?

14  A    I don't know.  I really don't know.

15  Q    Do you know why you was placed in segregation when you

16  arrived in the penitentiary at Atlanta?

17  A    Uh-huh.

18  Q    Why is that?

19  A    Because they suspected I was a member of the Aryan

20  Brotherhood.

21  Q    Don't they basically do this to every person from

22  California ?

23  A    Yes, basically.

24  Q    It is almost a common thing if you are from California

25  and you are white you are an Aryan Brotherhood?

1    A    Not common.

2    Q    But it is pretty basic, though?

3    A    No, no.  They got to know a little bit about you.  When

4    they get their teletype, they know who you are before you

5    get there.

6    Q    If they have done any time in California?

7    A    Basically, sometimes.

8    Q    That pertains pretty much to the Mexicans, too?  If

9    they have done time in California, they are more or less

10   considered Mexican Mafia?  Everybody thinks that way?

11   A    No.  It is according to what they have done.  If they

12   have committed violent acts or whatever, then they consider

13   them that, but just out of the blue, no, not to my

14   knowledge.

15   Q    Have you committed numerous violent acts in the past?

16   A    Oh, no.

17   Q    Why did they consider you to be Aryan Brotherhood?

18   A    Probably my association with the Aryan Brotherhood when

19   I was in Folsom prison and while I was in Los Angeles County

20   Jail on my robbery and kidnapping charge.  They were right

21   there around me, a whole bunch of them.

22   Q    Mr. Holliday, you have come out pretty good on this

23   whole deal, haven't you?

24   A    How is that?

25   Q    Four months on a 40-year sentence and you have got all

1    the way out of segregation.  You are out of the Control

2    Unit, a year and a half program at the Control Unit?

3    A    Yes.

4    Q    Mr. Hendrix will go to the Parole Board for you?

5    A    If I ask for it for it.

6    Q    On your behalf?

7    A    Right.

8    Q    He believes you are rehabilitated?

9    A    I don't know what he believes.  I have never asked him.

10   Q    Did you appear before the IDC in regard to this murder

11   case?

12   A    Yes.

13   Q    And what were the findings of that committee?

14        MR. HENDRIX:  Your Honor, I don't think that has

15   any relevance.  If he wants to go into it, the government

16   will go into it as long as there is a full and probing

17   inquiry.

18        THE COURT:  I am going to sustain your objection

19   at this time, and if you want to be heard further on it

20   later, Mr. Mills, I will be glad to hear what you have to

21   say.

22        MR. MILLS:  All right.

23   BY MR. MILLS:

24   Q    Was this the reason you were ordered placed in the

25   Control Unit at Marion, Illinois?

1   A    What, for participating in the murder of John Marzloff?

2   Q    Yes.

3   A    That is what it was based upon, yes.

4   Q    That was the basic reason?

5   A    The IDC found us all guilty.

6   Q    And while you were waiting to go to the Control Unit,

7   were you housed somewhere else?

8   A    Yes, quite a few places.

9   Q    Where were you first housed at?

10  A    Ashland, Kentucky.

11  Q    Do you recall writing a letter to a congressman, Mr.

12  George Brown?

13  A    Yes, I did, George Brown, Jr.

14       MR. MILLS:  Your Honor, I would like this marked

15  for personal identification.

16       THE COURT:  All right.

17       (Whereupon, Defendant's Exhibit 3 was marked for

18  identification.)

19  BY MR. MILLS:

20  Q    Would you please look at Defendant's Exhibit No. 3 and

21  see if you can recognize that, Mr. Holliday?

22  A    That is my handwriting.

23  Q    Was that a letter written by you?

24  A    Is that what you wanted?

25  Q    Yes.

1    A    Yes.

2    Q    Mr. Holliday, I believe at the conclusion of yesterday

3    where we were is you had been sentenced to the Control Unit,

4    and you were awaiting an opportunity to arrive at the

5    Control Unit.

6            Now, when you were waiting to go to the Control

7    Unit, were you confined at FCI, Ashland, Kentucky?

8            THE COURT:   Just to refresh all our recollections,

9    what time period are we in?

10   BY MR. MILLS:

11   Q    Do you recall the time period, sir?

12   A    Probably July, somewhere around there.

13   Q    June, July?

14   A    June, July, August.

15   Q    Of 1979?

16   A    Right.

17   Q    At that time, did you write a letter to an official, a

18   congressman?

19   A    Yes.

20   Q    Do you recall his name?

21   A    Brown, Jr. or something like that.  Senator brown.

22   Q    Could I ask you to look at Defendant's Exhibit No. 3.

23   Is that the letter, sir?

24   A    Yes.

25   Q    And who is it?

1    A    Mr. Brown.

2    Q    George Brown?

3    A    Yeah, George Brown, Jr.

4    Q    Would you read this letter to the ladies and gentlemen

5    of the jury, please?

6    A    The whole letter?

7    Q    Yes, please.

8    A    "Dear Mr. Brown:  A friend of mine said you helped him

9    once in the past for being treated unfairly by the Bureau of

10   Prisons, as I am and have been since I entered the federal

11   system last April '79.

12          "I am a native of Long Beach, California, and

13   after being given a 40-year sentence for bank robbery and

14   kidnapping January 29, 1979, I was sent to USP Atlanta,

15   Georgia.  Two and one-half months after being sentenced --

16   while at Atlanta, I asked why I couldn't go to Lompoc,

17   California, because I don't know anyone outside of the state

18   of California.  My answer was, 'Handle it.  You're from

19   California, and you haven't got nothing coming from us.'  So

20   wouldn't work in their mills or go to school and just worked

21   at a kitchen job, but my counselor pulled me in his office

22   one day and told me I'd better start programming the way

23   'they' wanted me to or else I'd be shipped to Marion,

24   Illinois.

25          "Well, two weeks later, I was sound asleep and

1    arrested at 12:30 a.m. on May 21st, 1979, for murder of some

2    guy I had nothing to do with.  But after being convicted by

3    the Institution's Disciplinary Committee of this guy's

4    death, I find out later the staff at Atlanta didn't know who

5    did it, so a guy I will not name came to them and said he

6    saw me and three other California boys walk in the yard

7    shack, then walk out, but he did it to get a transfer out of

8    Atlanta.  He told me he was sorry, but he owed money and was

9    afraid he might get hurt if the debts weren't paid.

10            "So IDC found us guilty of the murder, and since

11   the evidence was too flimsy, the FBI couldn't charge us.  So

12   we were heard in front of a Larry DuBois of the Southeast

13   Regional office in Atlanta, George, on a Controlled Unit

14   hearing for Marion.  He found us guilty, and we couldn't

15   give a defense because they made up their minds someone had

16   to ride the beef, and since it's a one-side hearing, we

17   hadn't any kind of chance.

18            "We were then shipped out June 13th to four

19   different segregation units in four different institutions

20   to await an okay to be sent to Marion plus 60 days for the

21   alleged murder.  It usually takes at least a month for the

22   FBI to turn action over for the institution to act if they

23   decide to decline to prosecute.  It took five days on our

24   case.  It takes at least a month or longer to transfer

25   anyone to any prison.  It took 13 days -- no reason why we

1   were to be split up or where we were going.

2          "They didn't say anything till the morning we were

3   kidnapped.  I found out later that people in Atlanta came

4   forth us as to where we were at during the crime committed

5   on May 20, 1979, and since we were found guilty so quick,

6   they had to get us out of Atlanta as quick as possible.

7          "Well, for two-and-a-half months, since June 13,

8   1979, I have been in the segregation unit at Ashland,

9   Kentucky, waiting to be transferred to Marion H Unit.  I

10  have been told the reason why I have to wait so long is

11  because there is no bed space in H Unit, Marion, Illinois.

12  I received a letter through a friend saying that H Unit is

13  not full, and warden Martin of the FBI Ashland told me again

14  it was still full.  I talked to the captain a few days ago,

15  and he slipped and said I'll be here till my disciplinary

16  time is finished, which will be November 27, 1979.

17         "I have been blamed for things I really had

18  nothing to do with while here in segregation.  Some of the

19  things I did out of being mistreated, and here are some of

20  the reasons.  We don't get fed the same issue as population.

21  We are lucky to get a change of clean clothes every time we

22  shower.  We're supposed to get four hours a week exercise.

23  Last week I only received three hours, and it's happened

24  more than once.

25         "I haven't seen a decent meal come to me once

1    since I've been here.  People tell me the head cooks (free

2    men) have been known in the past to steal and take home all

3    the choice meat that we are supposed to get.  I have seen

4    steak one time in over two-and-a-half months, and it was the

5    size of a silver dollar.

6              "Plus when someone gets hurt and we yell for the

7    guards, it usually takes five or ten minutes before they

8    call an MTA.  A guy cut his wrists four days ago because he

9    couldn't handle the cruelty we are being treated with down

10   here in segregation.

11             "And everyone gets to exercise together.  I have

12   to exercise by myself.  Every time I start to tell these

13   people how to go their rights back, the captain or

14   lieutenant pulls me in his office and threatens me I'd

15   better take all their shit or else.

16             "I want to get out of this madhouse before I hurt

17   one of these cops.  I've been jumped twice since I've been

18   here, and I've been warned the next time it won't be so

19   easy.

20             "I admit I have done a few things to have gotten

21   some of the disciplinary time, but most of it I didn't do,

22   but blamed because they know I can't do a damn thing about

23   it.

24             "Plus I'd like to know why I was railroaded into

25   being designated for H Unit Marion when I had nothing to do

with that guy's murder.  There was no witnesses that seen me
do anything, but yet I am from California, and I have to
ride the beef.

"I know these people are holding me here until my
disciplinary time is over, and then I will have to do two
years on the H Unit program at Marion, Illinois, which is a
segregation unit.  But the whole time I stay here is dead
time.  I was sent here for something I didn't do at Atlanta,
and now I must pay for someone else's problem.  If I do not
leave soon, I cannot be responsible for my actions on staff.
It will come to that because I know they will get me out of
here if one of the their staff is injured, and I am not a
violent person, but this place is driving me crazy.

"Mr. Brown, could you get me out of here and send
me to Lompoc so I can see my family?  I'll wait patiently
for your answer as to get me out of here before I pick up
some more prison time.

"Even if I am supposed to do the two-year program
in H Unit segregation at Marion, Illinois, they can send me
to Marion, Illinois, to start it, but these people play a
screwed up game here.  They don't treat us right, and they
know they can get away with it.  I really doubt this will
make it out of the prison.  All my mail is read real good
before it goes out or comes in.  They claim it's security
reasons, and if you do get this, please try and help me out,

1    Mr. Brown.

2              "Respectfully, Earnest D. Holliday.

3              "I am making a duplicate of this" -- some of it

4    didn't come out.  "I doubt if you receive this, but if you

5    get this copy, you'll understand why."

6    Q    Okay.  The following page, sir, do you recognize this?

7    A    That is my handwriting.

8    Q    What is it?

9    A    It is an envelope addressed to Mr. George E. Brown,

10   Jr., Washington, D.C.

11   Q    And that is the envelope you addressed yourself?

12   A    Yes, sir.

13   Q    A copy of it?

14   A    Yes, it looks like it.

15             THE COURT:  What is the date of that letter?

16             THE WITNESS:  It is dated August 22.

17   BY MR. MILLS:

18   Q    Now, Mr. Holliday, when you stated in that letter, "I

19   had nothing to do with the murder," were you referring to

20   the murder of John Sherman Marzloff?

21   A    Yes.

22   Q    When you stated in that letter, "I was railroaded into

23   the Control Unit.  I had nothing to do with the guy's

24   murder."  Is that John Sherman Marzloff when you talk about

25   the guy's murder?

1   A    Yes.

2   Q    What does the word "railroad" mean to you?

3   A    It means I was blamed or something I didn't do.   I

4   didn't kill the guy.

5   Q    Did you express concern at the greath length of time

6   you were going to have to do in the Control Unit?

7   A    Two years.

8   Q    You was concerned about that two years?  That is a long

9   time to do in the Control Unit?

10  A    I was not concerned.  I just didn't feel I should be

11  going there for something I didn't do.

12  Q    Did you state in that letter, "This place is driving me

13  crazy"?

14  A    Yes, I did.

15  Q    And, "Mr. Brown, would you please send me out of here

16  to Lompoc so I can see my family"?

17  A    Yes.

18  Q    What is Lompoc?

19  A    It is the penitentiary out in California Lompoc,

20  California.

21  Q    And you stated in that letter, "The staff at Atlanta

22  didn't know who did it, so a guy I will not name came to

23  them and said he saw me and three other California boys walk

24  into the yard shack, then walk out, but he did it to get a

25  transfer out of Atlanta.  He told me he was sorry, but he

52

1    owed money, and he was afraid he might get hurt if his debts

2    weren't paid."

3              Did you state that in that letter?

4    A    Yes, I did.

5    Q    By "The staff at Atlanta doesn't know who did it," are

6    you referring to the murder of John Marzloff?

7    A    Who actually killed John Marzloff?

8    Q    Right.

9    A    They didn't know at the time, no.

10              MR. MILLS:  Your Honor, I would like to move at

11   this time Defendant's Exhibit No. 3 be entered into

12   evidence.

13              MR. HENDRIX:  No objection.

14              THE COURT:  It is admitted.

15   BY MR. MILLS:

16   Q    Would you look at this, please, sir, Defendant's

17   Exhibit No. 4?  Do you recognize it?

18   A    Yes.

19   Q    What is that?

20   A    It is an administrative remedy to Bureau of Prisons

21   BP-9.

22   Q    And that was initiated by you?

23   A    Hold on a second.  Yes.

24   Q    In response to the murder of John Sherman Marzloff?

25   A    Yes.

1    Q    Would you please read what you wrote there?

2    A    What I wrote?

3    Q    Yes?

4    A    All right.  "I am appealing the decision of a denial

5    for a BP-DIR-9, which was submitted 5/30/79 and returned to

6    me 6/26/79 which pertained to an incident report dated

7    5/20/79, Code 100.  The return answer BP-DIR-9 has Jack A.

8    Hanberry, Warden, typed at the bottom, but yet a Kenneth

9    Kreakinige signed it, not the warden as it is made out to

10   look as if the warden of USP Atlanta put special interests

11   in his investigation.

12           "Hanberry knew I was denied due process of law.

13   My rights were violated," and the response (Part B) of

14   BP-DIR-9 reads, "The IDC based their decision of guilty on

15   the substantial evidence contained in the incident report,

16   the investigation, and the information received from

17   'reliable' confidential sources.  How can Hanberry or

18   whoever wrote Part B say that the conviction at the IDC

19   hearing was based on substantial evidence contained in the

20   incident report?

21           "The incident report said I had been identified as

22   one of the four inmates who participated in said incident.

23   It does not clarify my particular participation, or it does

24   not have that I committed any crime, or did the confidential

25   informants say what my particular participation of the

54

1    murder was because I wasn't around when the murder happened,

2    or did the IDC prove me guilty.  They were using two

3    statements made by two inmates that made up a story so they

4    could get a transfer out of USP Atlanta.

5              "Requesting for relief:

6              "(1)  a complete reversal of all charges.

7              "(2)  an independent investigation by persons

8    other than staff members of USP Atlanta as to the

9    credibility of the alleged informants.

10             "(3)  to have all good time given back to me and

11   have my status at USP Atlanta prior to this incident

12   reinstated.

13             "Respectfully submitted, Ernest Holliday."

14   Q    And when you stated in there, "Because I wasn't around

15   when the murder happened," was you referring to the murder

16   of John Sherman Marzloff?

17   A    Yes.

18   Q    You wasn't around when the murder happened?

19   A    I was, but I am not under oath to write out a BP-9.

20   Q    They were using two statements made by two inmates that

21   made up a story so they could get a transfer out of Atlanta?

22   You said that?

23   A    I wrote that, yes.

24             MR. MILLS:  Your Honor, I would like to move at

25   this time that Defendant's Exhibit 4 be entered into

1    evidence.

2

3            MR. HENDRIX:  No objection.

4            THE COURT:  It is admitted.

5            MR. MILLS:  Thank you.

6    BY MR. MILLS:

7    Q    Were you suggesting in that letter, Mr. Holliday, that

8    there are some inmates that engage in these type of

9    manipulations to obtain transfers?  They give up information

10   and make up stories?

11   A    It sounded good, so I wrote it down so I could get out

12   from under it.

13   Q    Have you ever heard of this happening?

14   A    Sure.

15   Q    Making up bogus stories?  You have heard of inmates

16   doing this?

17   A    Telling what happened so they could get out of the

18   place, sure.

19   Q    Some of them didn't really know what was going on?

20   A    Well, I don't know.

21   Q    You have heard those rumors, haven't you?

22   A    Oh, sure.

23   Q    And would it be fair to assume these type of inmates

24   were basically seeking transfers to lesser security

25   institutions, a more comfortable place?

1    A    Sure.

2    Q    Maybe closer to their families?

3    A    Yeah.

4    Q    Or perhaps to even inititate an escape at a lesser

5    security institution?

6    A    It is possible, sure, anything.

7    Q    When you left Atlanta, where did you go, sir?  I mean,

8    did you go to Ashland, Kentucky?

9    A    To the U.S. Penitentiary in Terre Haute, Indiana.

10    Q    And while you were at the U.S. Penitentiary at Terre

11    Haute, Indiana, did you meet and share a cell with an inmate

12    names Charles Kell?

13    A    Yes, I did.

14    Q    And isn't this Mr. Charles Kell the brother of a

15    codefendant on your robbery and kidnap charge?

16    A    Yes.

17    Q    And isn't it true that you confided in Mr. Kell that

18    you were not responsible for the murder of John Sherman

19    Marzloff?

20    A    No.

21    Q    That you were in no way involved in the murder of John

22    Sherman Marzloff?

23    A    He never asked about it.  He knew it was none of his

24    business.

25    Q    Did you state further that we weren't even together at

57

```
 1    mid-day on the yard in Atlanta on May 20 1979?
 2    A    No.
 3    Q    While you were the United States Penitentiary in
 4    Terre Haute, Indiana, did you meet a Danny Cavanaugh?
 5    A    Yes.
 6    Q    Did you meet another inmate named Dennis Barron?
 7    A    Yes.
 8    Q    When you left the United States Penitentiary at
 9    Terre Haute, Indiana, where did you go then, sir?
10    A    Marion, Illinois.
11    Q    Approximately what date was this?
12    A    February of '80, I believe.
13    Q    And later at the Control Unit at Marion, Illinois, did
14    you again see Dennis Barron there?
15    A    No.  He was out at court.
16    Q    Did he arrive back later?
17    A    No.  I was already gone.
18    Q    You were gone when?
19    A    He was still gone on a jury trial on his murder case.
20    Q    You don't recall being on the Control Unit yard at
21    Marion, Illinois, and talking to Dennis Barron up on C Range
22    through a window?
23    A    He wasn't there when I was there.
24    Q    He wasn't there?
25    A    I couldn't be talking to him if he wasn't there.
```

1    Q    Thank you.  You arrived at the Control Unit in February

2    of 1980?

3    A    Right.

4    Q    How long after you arrived at the Control Unit did you

5    start talking to the FBI or other law enforcement personnel?

6    A    I don't really know.  They probably have the

7    investigation sheet.  I don't know.

8    Q    A month?

9    A    A couple of months.

10   Q    Two months at the most?

11   A    Yeah.  I don't know.

12   Q    Is the Control Unit at Marion, Illinois, a nice place?

13   A    No.

14   Q    Isn't it, in fact, the equivalent to Alcatraz, what

15   Alcatraz used to be?  Isn't it considered to be that today?

16   A    It took the place of Alcatraz.

17   Q    It's the highest security institution for the Federal

18   Bureau of Prisons?

19   A    Oh, yes.

20   Q    Would you explain basically for everybody what the

21   Control Unit is?

22   A    It is a housing unit for people that are found guilty

23   at IDC hearings, inmate disciplinary hearings, whatever

24   institution they were at for murdering other inmates,

25   murdering officers, assaulting officers, and escaping with

1    some kind of weapon.

2    Q    Are there other things, too?

3    A    I don't know.  That is the only ones I have heard

4    anyone mention.

5    Q    What are the conditions in the Control Unit?  How are

6    you housed?

7    A    When you are downstairs before you can go up on the

8    second tier, you are locked in your cell 23 hours a day.

9    You get to exercise one hour.  You eat in your cells like

10   any segregation.

11   Q    How many floors are there in the Control Unit?

12   A    Two.

13   Q    How many people do you generally come in contact with?

14   A    Every day?

15   Q    Every day.

16   A    I would say not contact as right next to each other,

17   but you can talk to people all day long, about 10 people.

18   Q    Ten people?

19   A    About ten people.

20   Q    And you spend 23 hours a day inside that cell?

21   A    Yes.

22   Q    It is more or less the end of the line for the

23   management problems within the Federal Bureau of Prisons?

24   A    That is where they put you.

25   Q    The last stop?

```
 1   A     Right.
 2   Q     How did you obtain this information while you were at
 3   the Control Unit at Marion, Illinois, that you were going to
 4   be killed?
 5   A     I don't really want to bring that up.
 6   Q     Was it an inmate?
 7   A     Yeah.  I don't want him getting killed.
 8   Q     Would you furnish that name to the Court, not me, but
 9   to the Court?
10   A     Sure.
11   Q     You would so this could be verified?
12   A     As long as they don't tell you.
13   Q     If they guarantee this witness protection --
14   A     I don't want to put him under protection.  I am sure he
15   didn't want to either.
16   Q     But will you give it to somebody who could verify it?
17   A     Sure.
18   Q     Mr. Procopio?
19   A     Yeah, I will tell him.
20         MR. MILLS:  Would it be proper for me to ask
21   Mr. Procopio --
22         THE COURT:  I will take any request you might have
23   in that regard at a future recess.
24         MR. MILLS:  Okay.  Thank you.
25   BY MR. MILLS:
```

1    Q    How did you recreate in the Control Unit, Mr. Holliday,

2    when you came out that one hour?

3    A    You come out of your cell, and you go into a little

4    side cage where there is a universal game.  You can play

5    handball if you have an exercise partner.  It is real small.

6    Q    And you were up on C Range?

7    A    Yes.

8    Q    And that is the range we were on together?

9    A    Yes.

10   Q    How many inmates were on your recreation group?

11   A    Four.

12   Q    Four?

13   A    Including myself.

14   Q    Right.

15        In your mind, why would I attempt to harm you,

16   Mr. Holliday?

17   A    Because I knew about this murder.  I was there.  I was

18   the eyewitness to it.

19   Q    So I wanted to harm you?

20   A    I imagine there is other reasons.

21   Q    That is what you thought?

22   A    That is what I found out, right.

23   Q    And you were laying down on a weight bench under some

24   weights?

25   A    Right.

1    Q    And you seen me reach behind my back and go for a knife

2    again?

3    A    I don't know what you were going for.   It looked like

4    it to me.

5    Q    It looked like it to you?

6    A    I didn't see the knife, no.

7    Q    You didn't see a knife?

8    A    No.

9    Q    Did I bring my hand out from behind my back?

10   A    Yes, when I came off of the weight bench.

11   Q    Where were these other inmates?

12   A    Standing around.

13   Q    Around the weight bench?

14   A    No, by the weight machine, right on the other side of

15   it.

16   Q    And there were three inmates and you by yourself?

17   A    You and two others and myself, sure.

18   Q    Did it look like all three of us were maybe in cahoots

19   together?

20   A    I knew you were, yeah.

21   Q    It appeared that way?

22   A    Sure.

23   Q    Was there an officer in the immediate area?

24   A    No.

25   Q    Well, then, Mr. Holliday, if I was going to harm you, I

63

1     and two other inmates, why did we stop?

2     A     I don't know.  Maybe you wanted to keep me down on that

3     weight bench so I wouldn't get up.

4     Q     Do you think the three of us could handle you?

5     A     I hope so, yeah.

6     Q     How long were you out on recreation after this before

7     we locked back up?

8     A     About a half-hour.

9     Q     We were out a half-hour.  Did we shower during this

10    time?

11    A     Yes, we did.

12    Q     Did anything else happen strange?

13    A     No.  There was an officer standing down at the other

14    end of the tier for the rest of the evening.

15    Q     For the rest of the half-hour we were there?

16    A     Right.

17    Q     He came up later?

18    A     Yes, just to observe.

19    Q     You didn't see a knife?

20    A     No.

21    Q     You don't know if anybody had a knife?

22    A     No, not really.

23    Q     You don't know if anybody was really trying to harm

24    you?

25    A     No.

1   Q    Do you believe this incident came to the attention of

2   other two fellows that was on recreation with us?

3   A    I am sure they knew about it.

4   Q    Mr. Holliday, in exchange for your testimony, have you

5   engaged in a negotiated plea with the government, with

6   Mr. Hendrix?

7   A    I would say that, yeah.

8            MR. MILLS:  Could I get this marked as Defendant's

9   Exhibit No. 5, please?

10           THE CLERK:  Yes.

11  BY MR. MILLS:

12  Q    Would you look at this, please, sir, Defendant's

13  Exhibit No. 5?  Can you identify that?

14  A    Yes.

15  Q    What is that, sir?

16  A    It is a negotiated plea agreement.

17  Q    Between you and Mr. Hendrix?

18  A    Yes.

19  Q    When did you enter into this plea agreement?

20  A    September, October, December.

21  Q    Of what year?

22  A    December of '80, I think.

23  Q    December of 1980, 11 months ago?

24  A    Yes.

25  Q    Have you been sentenced on this yet?

1    A    No.   I am awaiting sentence as soon as this trial is

2    over.

3    Q    You won't be sentenced on this plea until this trial is

4    over?

5    A    I don't know.   That is to my understanding.

6    Q    Isn't, in fact, this negotiated plea really hanging

7    over your head, Mr. Holliday?

8    A    Hanging?

9    Q    Hanging literally?

10   A    How is it hanging over my head?

11   Q    Is it not, in fact, an insurance policy by Mr. Hendrix

12   that you will testify to what you testified to because it is

13   to your best interests to do so?

14   A    I could have pled not guilty to it and took it to

15   trial.

16   Q    But you wouldn't have had this plea agreement would

17   you?

18   A    I don't know.

19   Q    How long have you been in prison, Mr. Holliday?

20   A    Federal prison?

21   Q    Yes.

22   A    Three years.

23   Q    Three years without being on the streets at all?

24   A    Yes.

25   Q    You started your sentence in January of 1979?

1    A    That is when I was sentenced.

2    Q    Do you yourself feel you are rehabilitated, sir?

3    A    No.

4    Q    Defendant's Exhibit No. 5, would you please read that

5    negotiated plea to the jury?

6    A    The whole thing?

7    Q    The negotiated plea.

8    A    "I, Ernest Danny Holliday, defendant, having received a

9    copy of the above numbered Information plead guilty to Count

10   One thereof.  The defendant and his counsel and counsel for

11   the United States subject to approval by the Court have

12   agreed upon a negotiated plea in this case.  The defendant

13   shall plead guilty to Count One.  Additionally, it is agreed

14   that" --

15   Q    Excuse me.  Instead of going through it, this is all

16   formality, the plea itself?

17   A    It is a negotiated plea agreement.

18             "It is hereby agreed by and between the

19   United States of America and Ernest Danny Holliday that in

20   exchange for truthful testimony at the trial of the

21   United States of America versus Barry Mills, et al., and a

22   guilty plea to Criminal Information No. 80-319, the

23   United States will:

24             "(A)  keep Danny Holliday housed in the Witness

25   Protection Program for the duration of his prison sentence.

```
 1              "(B)   prosecute Ernest Danny Holliday for a
 2       violation of Title 18, United States Code, Section 371,
 3       which carries a maximum penalty of five years in lieu of
 4       prosecuting him for other crimes that may have been
 5       committed on or about May 20, 1979, as regards the murder of
 6       John Sherman Marzloff in the United States Penitentiary in
 7       Atlanta.
 8              "(C)   I agree to a negotiated plea of three years
 9       to run concurrent to the 40-year sentence he is now serving.
10       After the defendant has testified truthful in the case of
11       United States versus Barry Mills, et al., I will transmit a
12       copy of the attached letter to the Parole Board.  This will
13       be done without consideration to the outcome of the case.
14              "This 18th day of December 1980."
15       Q    Okay.  Mr. Holliday, starting with Item (A) pertaining
16       to you being housed in the Witness Protection Program for
17       the duration of your sentence, have you ever heard society
18       express the opinion of prisons looking like country clubs,
19       prisoners having it real soft?
20       A    No.
21       Q    You have never heard anything to the effect that
22       prisons were becoming country clubs?
23       A    No.
24       Q    And the Witness Protection Program and the country
25       clubs don't go hand in hand?
```

1   A    You will have to explain that.  You mean the Witness

2   Protection Program itself is supposed to be a country club?

3   Q    No.  I am talking about there are prison prisons, and

4   then there are prisons that look like college campuses, and

5   there are prisons that have swimming pools and golf courses

6   and so on.

7   A    Oh, sure.

8   Q    And society refers to these swimming pools and golf

9   courses as country clubs.

10  A    I guess they could.  I imagine so, yeah.

11  Q    Compared to a regular penitentiary like Folsom.  You

12  were in Folsom Penitentiary?

13  A    Yes.

14  Q    Does Folsom have a golf course?

15  A    No.

16  Q    A swimming pool?

17  A    No.

18  Q    So, in you was in a penitentiary with a swimming pool

19  and a golf course, it would be very nice, wouldn't it?

20  A    It would be a little bit easier, sure.

21  Q    There is no penitentiary in the federal prison system

22  that is afforded more security than Marion, Illinois?

23  A    True.

24  Q    It is the max?

25  A    It is the max.

```
 1    Q    Now, I don't know where you have been housed since you
 2    have entered in this Witness Protection Program, but I do
 3    know for a short spell you were at MCC, I believe, the
 4    Metropolitan Correctional Center in San Diego, California.
 5    A    Yes.
 6    Q    And how was the MCC at San Diego, California, compared
 7    to the Control Unit at Marion, Illinois?
 8    A    Structurewise or inside?
 9    Q    Securitywise.
10    A    Not half as good as Marion I would say.
11    Q    Not half as secure?
12    A    No.
13    Q    Were you closer to your family?
14    A    Sure.
15    Q    It is a more relaxed atmosphere totally in that
16    facility?
17    A    Sometimes yeah.
18    Q    Now, No. (C) in that negotiated plea, would you read
19    that outloud to the jury, please, once again?
20    A    "I agree to a negotiated plea of three years to run
21    concurrent to the 40-year sentence he is now serving."
22    Q    What is a concurrent sentence, sir?
23    A    It runs together.
24    Q    It runs together with the sentence you are already
25    doing?
```

1   A     Yes.

2   Q     And how does this three-year concurrent sentence -- how

3   would it affect the 40-year sentence you are already doing?

4   A     When I go to the Parole Board, the Parole Board will

5   look at it just like a consecutive one.

6   Q     Will it extend your time?

7   A     As far as legal status goes, you mean to 43 years.

8   Q     Yes.

9   A     No.

10  Q     Isn't it a fact, Mr. Holliday, you won't do one more

11  day or one more minute with that three-year sentence?

12  A     Sure.

13  Q     Not one more minute?

14  A     You mean over 40?

15  Q     Over the sentence you are already doing.

16  A     I doubt very seriously I will do 40 years, but they

17  will look at it.  I know that.

18  Q     Well, you won't have to do the entire 40 years to even

19  feel the effect of that three-year sentence?

20  A     I don't know that to be true.

21  Q     You have already got almost three years in, don't you?

22  A     Yes.

23  Q     Now, in regards to that negotiated plea, will you read

24  that to the jury, please?

25  A     "After the defendant has testified truthful in the case

1   of United States versus Barry Mills, et al., I will transmit

2   a copy of the attached letter to the Parole Board.   This

3   will be done without consideration to the outcome of this

4   case."

5   Q    Now, who is going to determine whether you supplied

6   truthful testimony in the case of United States versus Barry

7   Mills?

8   A    These people right here, I imagine.

9   Q    If they find me not guilty, you didn't supply truthful

10  evidence.

11  A    I don't think that will come up, but if they find you

12  guilty, they find you guilty., but if they don't, that is

13  what they are here for.

14  Q    But if they elect to find me not guilty, will that

15  indicate you didn't supply truthful evidence?

16  A    No.   I don't know.   I am giving truthful testimony

17  right now the best I can do.

18  Q    Well, my question is who is going to determine that?

19  A    I have no idea.

20  Q    Would you read the attached letter to the jury, please,

21  sir?

22  A    "RE:   Ernest Danny Holliday.   To whom it may concern:"

23        Is the one you are talking about, the one to the

24  Parole Board?

25  Q    Yes, sir.

A      "In the case of United States versus Barry Mills, et
al., a murder case tried in the Northern District of
Georgia, the above-named cooperated with and testified for
the government.  This was a significant case and without the
cooperation of Mr. Holliday would have been a very difficult
one to try.  Mr. Holliday had to be placed in Witness
Protection to protect his life, because after his
cooperation became known, he was placed in a
life-threatening situation.

"Besides endangering his life, Mr. Holliday agreed
to plead guilty to conspiracy to commit robbery in this
matter.  As you know, this is a felony.  Mr. Holliday
originally felt that because of his cooperation he should be
granted immunity.  Because of the facts of the case, the
government was not in agreement with this.  The fact that
Mr. Holliday did plead to the charge, here again, the
government would submit is significant in evaluation of his
prospects for rehabilitation.  He, of course, did not have
to plead guilty.  However, he did plead guilty because he
was guilty and thereby demonstrated even further cooperation
with the government.  All of these facts argue well for
Mr. Holiday's chances for rehabilitation.

"The government does not condone Mr. Holliday's
illegal actions.  However, the government does recognize
that his subsequent cooperation is significant in evaluating

1   when or if he should be granted parole.  Although the

2   government will not presume to displace this Board's

3   authority, it does wish these facts to be considered in its

4   decision.  Mr. Holliday knows that the United States

5   Attorney's Office cannot guarantee him parole.  That is for

6   this board to decide.  The government would only note,

7   however, that whenever a parole date is considered, the

8   extent of the cooperation given should be a salient factor

9   in any final decision made.

10          "If this Parole Board should desire, I would be

11   willing to personally appear before it and elaborate further

12   on the above.  I have indicated to Mr. Holliday that I would

13   also be willing to appear at his request.

14          "Respectfully submitted, Richard W. Hendrix,

15   Assistant United States Attorney."

16   Q    He will appear on your behalf at the Parole Board if

17   you request it?

18   A    Yeah.

19   Q    What do you interpret that letter to say, Mr. Holliday?

20   What does it mean to you basically?

21   A    It means I cooperated with the government, testified

22   against you and whoever they want to file against on the

23   John Marzloff killing, and in return, they will be placing

24   me on the Witness Protection Program to serve out the

25   duration of my time under the program to protect my life,

74

1    and he would recommend to the Parole Board through that

2    letter to grant me a little bit of a push towards my return

3    to the community.

4    Q    If you testify in this case truthfully?

5    A    Truthfully.

6    Q    Do you plan on testifying in other cases regarding the

7    John Marzloff murder?

8    A    I have no idea.

9    Q    Do you know whether I am the only person that that has

10   been indicted in the John Marzloff murder?

11   A    No.

12          MR. MILLS:  Your Honor, at this time, I move

13   Defendant's Exhibit 5 be entered into evidence.

14          MR. HENDRIX:  No objection.

15          THE COURT:  It is admitted.

16   BY MR. MILLS:

17   Q    Now, Mr. Holliday, while you were at the MCC in

18   San Diego, California, did you attempt to escape?

19   A    Yes.

20   Q    Was anything removed from your cell?

21   A    Removed?  What do you mean?

22   Q    Did they come in and take any escape items out of your

23   cell?

24   A    Yes.

25   Q    What was that?

1  A    A rope.

2  Q    What were you going to do with this rope?

3  A    Climb down the side of the building.

4  Q    How were you going to do that?  How were you going to

5  leave?

6  A    Break the window out and climb out.

7  Q    Have you been charged with this escape attempt at all?

8  A    Yes.

9  Q    You have been charged.  Have you been sentenced on this

10 escape attempt?

11 A    I haven't been to court on it.

12 Q    Whether does this escape attempt happen?

13 A    Last year, December 24, Christmas Eve.

14 Q    Eleven months ago?

15 A    Eleven months ago.

16 Q    And while you were at the MCC in San Diego, California,

17 did you solicit some interviews with some newspaper

18 reporters?

19 A    No.

20 Q    Did any newspaper reporters interview you?

21 A    No.

22 Q    You don't recall telling a newspaper reporter for the

23 "San Diego Union" that the authorities told you they were

24 not going to cut your 40-year sentence for your testimony in

25 the upcoming trial, so you told them that you were going to

1   bulk in testifying, and they then told you if you did not

2   testify they would send you back to the Marion Control Unit?

3   A    No.

4   Q    You didn't tell that?

5   A    No.

6   Q    You didn't tell a newspaper reporter from this same

7   paper, the "San Diego Union," that while you were confined

8   in Los Angeles County Jail your life was threatened twice?

9   A    No.

10  Q    You didn't tell another reporter from the "San Diego

11  Union" that you were an active member of the Aryan

12  Brotherhood?

13  A    No.

14  Q    And that close to 300 people within the prison system

15  knew you personally?

16  A    No.

17  Q    And you didn't state to no reporter at any time that

18  you were shortly going to be send back to the Atlanta area

19  for coaching in the upcoming trial?

20  A    No, unh-unh.

21  Q    And did you tell a reporter that your attorney had told

22  you that there is nothing you can do if the Bureau of

23  Prisons decides to put you out in open population and allow

24  you to be killed?

25  A    No.

1    Q    You didn't complained of broken promises by authorities

2    in the Bureau of Prisons?

3    A    No.

4    Q    In regards to inmates on the Witness Protection

5    Program?

6    A    I didn't talk to a reporter.

7    Q    Are you familiar with this at all, sir?

8    A    Yeah, that is a newspaper article that came out of the

9    "San Diego Union," is it not?

10   Q    I don't know.  I am asking you, sir.

11            THE COURT:  Let's have that marked with an exhibit

12   number.

13            MR. MILLS:  It will be Defendant's Exhibit No. 6.

14   BY MR. MILLS:

15   Q    Defendant's Exhibit No. 6, do you recognize that,

16   Mr. Holliday?

17   A    Yes.

18            THE COURT:  The question is can he identify it.

19            Can you identify that?

20            THE WITNESS:  Yes.

21   BY MR. MILLS:

22   Q    And what is it?

23   A    It is a newspaper clipping that was taken out of the

24   "San Diego Union" I imagine right after Christmas.

25   Q    And you didn't neighboring any of those statements?

```
1    A    No.

2    Q    None whatsoever?

3    A    None whatsoever.

4    Q    While you were in the San Diego MCC, were you confined

5    in solitary confinement?

6    A    Yes.

7    Q    The entire time?

8    A    Not the entire time.  Most of the time I was there.

9    Q    Up until the escape?

10   A    No, I was on the witness block.

11   Q    Has the prosecutor, Mr. Hendrix, ever asked you if

12   would submit to an interview with or Ms. Kearns?

13   A    Yes.  Not him personally, no.

14   Q    He didn't ask you?  He has never asked you?

15   A    I was just asked that the other day, and it wasn't him

16   that asked me.

17   Q    Mr. Hendrix has never asked you?

18   A    No.

19   Q    Who did ask you?

20   A    Mr. Procopio there.

21              MR. MILLS:  I have no further questions of this

22   witness.

23              MR. HENDRIX:  I have a few on redirect, Your

24   Honor."

25              (End of portion being read.)
```

1          THE COURT:  Do you want a recess at this time?

2          MS. FLYNN:  Yes, Your Honor.

3          THE COURT:  You are admonished not to discuss this

4    case among yourselves or to form or express any opinions on

5    the case.  We will resume in a half-hour.

6          (Jury not present.)

7          THE COURT:  The jury is no longer present.

8          I am going to make the choice of finishing this

9    transcript regardless of what your feelings are so that all

10   this testimony is in at one time concerning Mr. Holliday.

11         We will be in recess.

12         (Recess.)

13         (Whereupon, Deborah Parker reported the following.

14         Proceedings.)

15                    *       *       *

16

17

18

19

20

21

22

23

24

25

1                          -oOo-

2

3                        CERTIFICATE

4

5          I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  March 17, 2006

13

14                                                    3/17/06

15              SHARON SEFFENS, U.S. COURT REPORTER

16

17

18

19

20

21

22

23

24

25