ORIGINAL

1

FILED
CLERK, U.S. DISTRICT COURT

AUG - 8 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

UNITED STATES OF AMERICA,
              Plaintiff,

     vs.                              CR-02-938(C)
                                      DAY 6, VOL. 4
BARRY BYRON MILLS;
TYLER DAVIS BINGHAM;
CHRISTOPHER OVERTON
GIBSON; EDGAR WESLEY
HEVLE,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

March 21, 2006

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

DOCKETED ON CM

2 0

5496

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   DEBRA W. YANG
     United States Attorney
 4   STEVEN D. CLYMER
     Special Assistant United States Attorney
 5   Chief, Criminal Division
     STEPHEN WOLFE
 6   MICHAEL EMMICK
     TERRI FLYNN
 7   Assistant United States Attorneys
     1400 United States Courthouse
 8   312 North Spring Street
     Los Angeles, CA   90012
 9   (213) 894-0511

10   For Defendant BARRY BYRON MILLS:

11   H. DEAN STEWARD
     LAW OFFICES OF H. DEAN STEWARD
12   107 Avenida Miramar, Suite C
     San Clemente, CA
13   (949) 481-4900

14   MARK F. FLEMING
     LAW OFFICES OF MARK F. FLEMING
15   433 "G" Street, Suite 202
     San Diego, CA   92101
16   (619) 652-9970

17   For Defendant TYLER DAVIS BINGHAM:

18   MICHAEL  V. WHITE
     LAW OFFICES OF MICHAEL V. WHITE
19   1717 Fourth Street, Third Floor
     Santa Monica, CA   90401
20   (310) 576-6242

21   WILLIAM S. HARRIS
     STEWART & HARRIS
22   1499 Huntington Drive, Suite 403
     South Pasadena, CA   91030
23   (626) 441-9300

24

25
```

```
 1   For Defendant CHRISTOPHER OVERTON GIBSON:

 2   KENNETH A. REED
     LAW OFFICES OF KENNETH A. REED
 3   404 West 4th Street, Suite C
     Santa Ana, CA  92701
 4   (714) 953-7400

 5   For Defendant EDGAR WESLEY HEVLE:

 6   BERNARD J. ROSEN
     LAW OFFICES OF BERNARD J. ROSEN
 7   1717 Fourth Street, Suite 300
     Santa Monica, CA  90401
 8   (310) 451-4577

 9   DONALD J. CALABRIA
     LAW OFFICES OF DONALD J. CALABRIA
10   16133 Ventura Boulevard, Suite 600
     Encino, CA  91436
11   (818) 990-0110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                          INDEX

 2                                                    PAGE

 3   PLAINTIFF'S
     WITNESS:              DIRECT      CROSS   REDIRECT   RECROSS
 4

 5   THOMAS LEROY MILLER
         (Continued)          5
 6
     PLAINTIFF'S
 7   EXHIBITS:                       MARKED          RECEIVED

 8   Exhibits 420-A and B                              26
     Exhibit 63, page 1                                29
 9   Exhibit 388                                       33
     Exhibit 62, page 1                                48
10   Exhibit 62, page 2                                49
     Exhibit 64                                        53
11
     DEFENSE
12   WITNESSES:             DIRECT    CROSS   REDIRECT   RECROSS

13    (None)

14

15   DEFENSE
     EXHIBITS:                      MARKED          RECEIVED
16
      (None)
17

18

19

20

21

22

23

24

25
```

*SHARON SEFFENS, U.S. COURT REPORTER*

```
 1    SANTA ANA, CALIFORNIA; TUESDAY, MARCH 21, 2006; 3:30 P.M.
 2              (Jury not present.)
 3              THE COURT:  We are back in session.  Counsel are
 4    present.  The defendants are present.  The government is
 5    present, and the witness is present.
 6              Please get the jury.
 7              (Jury present.)
 8              THE COURT:  The jury is present.  The alternates
 9    are present.  All counsel and the defendants and the witness
10    is still present.  The government is present.
11              Ms. Blanch, if you would like to continue with
12    direct examination.
13    THOMAS LEROY MILLER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
14              DIRECT EXAMINATION (Continued)
15    BY MS. BLANCH:
16    Q    Mr. Miller, I would like to direct your attention to
17    your stint in Lompoc that began in 1981 -- excuse me, your
18    time in Leavenworth in '83 and 84; is that correct?
19    A    I was there those two years, yes, and some more.
20    Q    And you already gave us a list of some Aryan
21    Brotherhood members who were there.
22              Were you friends with the Aryan Brotherhood who
23    was at Leavenworth?
24    A    Yes.
25    Q    Did you hang out with them every day?
```

1    A    Probably saw them every day.  I can't recall everybody

2    that was there.

3    Q    Did they talk about Aryan Brotherhood business in front

4    of you?

5    A    Yeah.

6    Q    Were you cellmates with an individual named Richard

7    Andreasen?

8    A    Yes.

9    Q    Who was he?

10   A    Rhino, he was just one of the guys there.

11   Q    Rhino was his nickname?

12   A    Yes.

13   Q    Did there ever come a time when you got information

14   that Rhino was not -- or Richard Andreasen was not in good

15   standing with the Aryan Brotherhood?

16   A    Yes, right after I got there.  I believe I got there

17   around March of 1983, the latter part of March 1983, and

18   within two weeks of my being there, there was a young -- a

19   Spanish guy there named Barney who belonged to the Mexican

20   Mafia that pulled me to the side --

21         MR. FLEMING:  Objection, hearsay.

22         THE COURT:  It depends upon what it is being used

23   for.  I'm going to stop the answer at that point.  Sustain

24   the last part of that objection, Counsel.  Strike from the

25   "young Spanish guy on."  The rest remains.

1    BY MS. BLANCH:

2    Q    Are you aware of a connection between the Aryan

3    Brotherhood and the Mexican Mafia?

4    A    Yes.

5    Q    What connection do they have?

6    A    They are allies.

7    Q    They work together?

8    A    Yes.

9    Q    Do they ever conduct hits together?

10   A    Yeah -- well, I have seen them together when I was in

11   San Quentin and then working together against a common

12   fellow, and then I have seen other instances where because

13   of the logistics and the location you might not have an AB

14   eligible -- able to get to somebody they are looking for in

15   a certain spot, but there may be some Mexican Mafia there,

16   and they will trade off.  Will you take this one for us, and

17   will take this one for you?

18        MR. REED:  Objection.  The answer is nonresponsive

19   to the question.  Move to strike the answer.

20        THE COURT:  The answer is responsive.  I am just

21   worried about the foundation.  I am going sustain right now

22   on foundational grounds, Mr. Reed.

23        I would like to know more about how he knows of

24   the link between the Mexican Mafia, the MA, and the AB.

25   BY MS. BLANCH:

```
 1   Q    How do you know about the link between the Mexican
 2   Mafia and the Aryan Brotherhood?
 3   A    Well, I have grown up among members of both gangs.  I
 4   have been to high-ranking Mafia members' homes here in
 5   Los Angeles.  I know of the --
 6   Q    Did you personally witness the Aryan Brotherhood and
 7   the Mexican Mafia working together?
 8   A    Yes.
 9   Q    And were you present when the Aryan Brotherhood members
10   had conversations with members of the MA?
11   A    Yes.
12   Q    Were you personally present when members of the Aryan
13   Brotherhood discussed asking the MA to conduct Aryan
14   Brotherhood business for them?
15   A    Yes.
16   Q    Can you explain then what the connection between the
17   Mexican Mafia and the Aryan Brotherhood is?
18   A    A history or just a brief --
19   Q    Just a brief summary.
20   A    It's just two prison gangs that look out for each other
21   because they are opposing other prison gangs and anybody
22   else who gets in their way.
23   Q    And they sometimes conduct common business?
24   A    Yes.
25   Q    Do you have any personal information about whether the
```

```
 1   Aryan Brotherhood would ask the Mexican Mafia to conduct
 2   business for them?
 3   A    Yes.
 4   Q    Did you know an individual at Leavenworth by the name
 5   of Barney?
 6   A    Yes.
 7   Q    Was he a member of the Mexican Mafia?
 8   A    Yes, he was.
 9   Q    Is it the same Mexican Mafia that worked together with
10   the Aryan Brotherhood?
11   A    Yes.
12   Q    And they commit crimes together?
13   A    Yes.
14   Q    And did this individual tell you any information about
15   Richard Andreasen and his status in the Aryan Brotherhood?
16            MR. FLEMING:  Objection, hearsay.
17            THE COURT:  Counsel, what's the purpose?  In other
18   words, it depends on whether it's hearsay, a nonhearsay
19   purpose?  What?
20            MS. BLANCH:  The purpose is to show what
21   Mr. Andreasen'S status in the Aryan Brotherhood was
22   considering that it came from a member of the MA who could
23   be considered a co-conspirator.
24            THE COURT:  A link doesn't mean necessarily  a
25   co-conspirator.  I don't know that you have that kind of
```

```
 1    foundation.  I'm going to ask you to move on.  I would like
 2    to take that outside the presence of the jury later this
 3    afternoon or this evening.  Obviously, the gentleman will be
 4    returning.
 5                MS. BLANCH:  That's fine, Your Honor.
 6    BY MS. BLANCH:
 7    Q    Are you aware of whether Mr. Andreasen was an Aryan
 8    Brotherwood member?
 9    A    No, not a hundred percent, no.
10    Q    Would he be considered an Aryan Brotherwood associate?
11    A    At the least, yes.
12    Q    What is your understanding of what an Aryan Brotherwood
13    associate would be?
14    A    Someone like me who enjoyed all the benefits of the
15    illicit drugs, whatever.  If they had some, they tossed it
16    my way.  There is a blanket of protection there.
17    Q    Let me ask you, Mr. Miller -- this is a little bit of a
18    tangent -- did you use drugs in prison?
19    A    Yes.
20    Q    Did your drug use affect your ability to recall
21    accurately anything that you are testifying about today?
22    A    No.
23    Q    So back to your definition of an Aryan Brotherwood
24    associate, would you consider yourself an Aryan Brotherwood
25    associate?
```

1    A    Yes.

2    Q    And what does that mean to you?

3    A    I have never been a member, but I was there.  If they

4    needed something, all they had to do was ask and vice-versa.

5    If I needed something, I would ask, hey, can you help me out

6    here?  Just part of the crew.

7    Q    As an Aryan Brotherhood associate, you hung out with

8    the Aryan Brotherhood members?

9    A    Yes.

10   Q    Could the same be said of Richard Andreasen?

11   A    Yes.

12   Q    Did there come a time when you became aware from the

13   Aryan Brotherhood members that Richard Andreasen was not in

14   good standing?

15   A    Yes.

16   Q    How did you learn that?

17   A    From the guy who killed him much later.

18   Q    You said that Richard Andreasen was killed?

19   A    Yes.

20   Q    Do you know when that happened?

21   A    It was in the last part of -- it was towards the end of

22   either '83 or 84.  It might have been 1983 I think.

23   Q    Was that while you were at USP Leavenworth?

24   A    Yes.

25   Q    Was it at the same time that Mr. Andreasen was your

1   cellmate?

2   A    Yes.

3   Q    Were you present when he was killed?

4   A    No.

5   Q    Did you know he was going to be killed ahead of time?

6   A    Only going back to what Barney had told me earlier.

7   Q    From the Aryan Brotherhood, did you know that he was

8   going to be killed ahead of time?

9   A    No.

10  Q    How did you find out that Richard Andreasen was killed?

11  A    The panic alarm went off, and they starting locking the

12  whole institution down.  Within moments, word came that

13  somebody just got killed in the hallway.

14  Q    Did you find out that that was Richard Andreasen?

15  A    Yes.

16  Q    How did you find out?

17  A    Somebody told me.  I don't know.  It could have been

18  staff because I was questioned I believe right after it

19  happened to see if I was involved in any way.

20  Q    Were you involved?

21  A    No.

22  Q    How did you find out who killed Richard Andreasen if

23  you ever found out?

24  A    Well, they did it in the main hallway in front of the

25  warden, associate warden, captain, and lieutenant.  You

```
 1   know, they were fighting cops and everything.  It was quite
 2   a -- it was the worst part of the morning.
 3   Q    Who was that?
 4   A    John Greschner and Ronnie Joe Chriswell.
 5   Q    Is John Greschner a member of the Aryan Brotherhood, or
 6   was he at that time?
 7   A    Yes.
 8   Q    Did you ever speak to any member of the Aryan
 9   Brotherhood about this murder?
10   A    Yes.
11   Q    Who did you speak with?
12   A    John Greschner.
13   Q    When was that?
14   A    1991.
15   Q    And where was that?
16   A    Marion, Illinois.
17   Q    Were you incarcerated at Marion in 1991?
18   A    Yes.
19   Q    Was John Greschner incarcerated there as well?
20   A    Yes.
21   Q    And you had the opportunity to speak?
22   A    Yes.
23   Q    What did he tell you about the Richard Andreasen murder
24   at that time?
25   A    He just wanted me to read the transcript.  He had this
```

1   idea that if he could get an affidavit -- they alleged a

2   Mr. X happened upon the scene at the crucial moment --

3   Q    Did he describe the murder to you?

4   A    He had me read the transcript and showed me the

5   pictures, and then he kind of elaborated on that.

6   Q    The transcript of his trial?

7   A    Yes.

8   Q    Do you know if he was convicted of the murder of

9   Richard Andreasen?

10  A    Yes.

11  Q    So when you talk about his transcripts, he showed you

12  the transcripts from that trial?

13  A    Yes.

14  Q    Did you read the description of the murder?

15  A    Yes.

16  Q    Did he tell you whether that description was correct or

17  not?

18  A    Yes.

19  Q    Was it a correct description?

20  A    He said it was pretty close.

21  Q    Can you describe the murder for me as Mr. Greschner

22  told you it occurred?

23  A    Or as I read?

24  Q    Well, as Mr. Greschner told you was an accurate

25  description.

A     Yes.

Q     Could you please do that?

        MR. FLEMING:  Objection.  I'm not clear on whether this is coming from what he have read or what was told to him.

        THE COURT:  Overruled.

        THE WITNESS:  John told me that the transcript described what had happened.  I believe he said, though, that when it started Ronnie Joe Chriswell was standing on the stairs that -- as you come out of the A and B cell house and C and D cell house, there is a big rotunda at Leavenworth.  That's why they call it the big top because of the rotunda on there.

        As you come out of the main housing area, there is a central hallway that starts down where you got have the main case manager, a commissary, Christian Services, the Lieutenant's Office, and you have got a Muslim worship place.

BY MS. BLANCH:

Q     This is taken from your personal experience?

A     Yes, and as you start to enter this hallway from the front of the -- coming from the cellhouse, there are two stairwells that swing up either way and go up to a second and a third floor.  It was on the stairway --

Q     "It" meaning the murder?

1    A    The murder started a few steps up the stairway where

2    Ronnie Joe Chriswell was taking Rhino up there.  For some

3    reason, he turned around, and he smacked him in the head

4    with a pipe.  He knocked him back down, and he fell down on

5    the ground, and that's when John jumped on him and stabbed

6    him 25 times.

7            THE COURT:  John is John Greschner?

8            THE WITNESS:  Yes.  Ronnie piped him, and John

9    stabbed him to death.

10            THE COURT:  We don't know first names.

11            THE WITNESS:  Ronnie Joe Chriswell hit him with

12    the pipe to knock him out or daze him.  Then John Greschner

13    stabbed him.  He sat on his back and stabbed him 25 times

14    while Ronnie Joe Chriswell was swinging mop wringers and

15    everything else at all the staff to keep them away.

16    BY MS. BLANCH:

17    Q    There was staff in the hallway at the time this

18    occurred?

19    A    Yes.  It was work call, a lot of people.

20    Q    And Ronnie Joe Chriswell was keeping the staff away

21    while Greschner stabbed Mr. Andreasen?

22    A    Yes.

23    Q    And Greschner confirmed to you that that was actually

24    what happened?

25    A    Yes.

1  Q    Did he tell you whether or not that was an Aryan

2  Brotherwood murder?

3  A    Yeah.

4  Q    What did he tell you?

5  A    He told me that he was mad that he had to make the move

6  because it should have been John Abel's job.

7  Q    Who was John Abel?

8  A    John Abel was the sponsor for Rhino, Richard Andreasen.

9        THE COURT:  Slow down for just a moment.  I want

10  to make certain who is making the statement.  Is it

11  Greschner or Chriswellhriswall to you?

12        THE WITNESS:  Greschner.  I had no conversations

13  with Chriswell.

14  BY MS. BLANCH:

15  Q    From your personal experience, Mr. Miller, do you know

16  who John Abel is?

17  A    Yes.

18  Q    Is he a member of the Aryan Brotherhood?

19  A    Yes.

20  Q    What does it mean for one Aryan Brotherhood member to

21  sponsor another person?

22  A    Well, if you need a cosigner to get a house, you got

23  somebody to sponsor you telling you, okay, I will sign on

24  dotted line.  I will stand good for this person.  I'll stand

25  in your stead if need be.  That's basically what it is.  You

1    are raising your hand saying this guy is all that and a bag

2    of chips I swear.

3    Q    So you said that John Abel sponsored Richard Andreasen.

4         What do you mean by that?

5    A    To get in the Aryan Brotherhood.

6    Q    So are you saying that Mr. Andreasen was at least an

7    Aryan Brotherwood prospect?

8    A    Yes.

9    Q    Why was John Greschner angry about having to kill

10   Mr. Andreasen?

11   A    Because he had been locked up in the penitentiary at

12   Marion for a long time, and he finally got out where he was

13   out among --

14   Q    When you said "he," you mean John Greschner?

15   A    John Greschner had been locked up in Marion, and he was

16   finally getting to an institution where he would be able to

17   get around, get some dope, go to the movies, go to the

18   commissary, go to the yard, be a part of the general

19   population instead of locked in your cell 23 hours a day or

20   whatever it is.

21   Q    So he was angry that he committed the murder because he

22   got locked down afterwards?

23   A    No, he was angry because it fell to him to have to do

24   it because the guy that he felt should have been done it

25   wasn't there to do it.  He found some way to get out.

19

```
1    Q    Who was the guy that Mr. Greschner felt should have
2    killed Andreasen?
3    A    John Abel.
4    Q    Why did he think John Abel should have been the one to
5    kill Richard Andreasen?
6    A    Because John Abel sponsored Richard Andreasen.
7    Q    For membership in the Aryan Brotherhood?
8    A    Yes.  He told them this is a good guy.
9    Q    According to Mr. Greschner, did that turn out to be
10   untrue?  Was Mr. Andreasen not a good guy?
11   A    No, not according to them.
12   Q    Do you know why the Aryan Brotherhood wanted to kill
13   Richard Andreasen?
14   A    At the time, no.
15   Q    At the time he was killed, you didn't know?
16   A    Yes.  Subsequently, I did find out.
17   Q    How did you find out?
18            MR. FLEMING:  Objection, hearsay.  Calls for a
19   hearsay response.
20            THE COURT:  I think it does, Counsel, doesn't it?
21            MS. BLANCH:  Well, I don't know.  I am trying to
22   find out who he found out from.
23            THE COURT:  Well, I'm afraid he's going to get
24   that mixed up and then start making a statement about what
25   occurred.
```

```
 1              MS. BLANCH:  I will rephrase.

 2              THE COURT:  The objection is sustained.

 3   BY MS. BLANCH:

 4   Q     Did any member of the Aryan Brotherhood tell you why

 5   Richard Andreasen was killed?

 6   A     Yes.

 7   Q     Who?

 8   A     John Greschner.

 9   Q     What did John Greschner tell you about why Richard

10   Andreasen was killed?

11   A     He handed me a piece of paper and told me read this --

12   a couple sheets of paper and told me to read this.  He said,

13   "That tells you everything right there."

14   Q     What was the piece of paper?

15   A     It was a police report of an interview with Richard

16   where he was trying to make a deal to get his girlfriend,

17   wife, or something to keep her out of the jail.  He was

18   trying to make some kind of deal to help his female

19   companion.

20   Q     Did the report suggest that Richard Andreasen was

21   cooperating with law enforcement?

22   A     At least willing to.

23   Q     Why would that get him in trouble with the Aryan

24   Brotherhood?

25   A     Well, because of all the things they are doing, they
```

1   don't want anybody telling on them.

2   Q     In your experience, if an inmate cooperates with law

3   enforcement, would that cause repercussions from the Aryan

4   Brotherhood?

5   A     I can't say that they would just go out and kill

6   anybody they thought was a rat just because they were a rat

7   because a lot of people telling them, but if it had

8   something directly to do with them, if they were involved

9   even in a peripheral way, they might take care of that

10  themselves.   A rat is a rat in prison.

11  Q     Did John Greschner tell you that this was the reason

12  that Richard Andreasen was killed?

13  A     Yes.

14  Q     Did he tell you why he felt John Abel should have been

15  the one to kill Richard Andreasen?

16  A     Yes.

17  Q     Why?

18  A     Because John sponsored him.

19  Q     Did he tell you whether John Abel knew that Richard

20  Andreasen was a snitch or a cooperator?

21  A     No.   He was mad that John had found a way to keep from

22  doing what he was supposed to do, and he was mad at John.

23  Q     And in Greschner's opinion, John Abel was supposed to

24  kill Richard Andreasen?

25  A     Yes.

1   Q    That would have been one of his responsibilities as an

2   Aryan Brotherhood member?

3   A    Yes.

4   Q    But John Abel didn't kill Richard Andreasen.   Right?

5   A    No.

6            MR. FLEMING:  Objection, leading?

7            THE COURT:  Sustained.

8            MS. BLANCH:  I'll rephrase.

9   BY MS. BLANCH:

10  Q    Did John Abel kill Richard Andreasen?

11  A    No.

12  Q    Why did Greschner kill him instead?

13  A    Because John Abel wasn't there.

14  Q    And Mr. Greschner was?

15  A    Yes.

16  Q    Did Mr. Greschner tell you that he had to kill Richard

17  Andreasen just because he there was

18  A    At what point in time?

19  Q    When he spoke to you, did he tell you why he was the

20  one to kill Richard Andreasen?

21  A    Are we talking about 1991 in Marion?

22  Q    Yes.

23  A    Yes.

24  Q    What did he say when he told you why he had been the

25  one to kill Richard Andresean?

1   A    Well, he was still pretty upset about it.  He was

2   cussing, and he was calling John all kinds of bad names.

3   "This is John's job.  You should have taken care of this.

4   It wasn't my job to do this.  He was supposed to do this,

5   and he found a way not to do it to kind of get out of the

6   picture and go to a hole or something, anything to be there

7   to do what he had to do.

8   Q    Did Greschner tell you why he had been the one to do

9   it?

10  A    He was the one that came down was the word and said he

11  had to go.

12  Q    Richard Andreasen had to go?

13  A    Yes.

14  Q    After Leavenworth, where did you go?

15  A    We are in the '80s now?  This is after the Andresean

16  murder?

17  Q    Yes.  After the Andresean murder, where did you go?

18  A    Around March '87 or so, I went back to Lompoc again?

19  Q    Were there any Aryan Brotherhood members there?

20  A    Yes.

21  Q    Who was there?

22  A    Eddie Hevle, Chris Gibson, Steve Hicklin, Phil Myers,

23  although I don't think Chris was a member at that time.

24  There was a guy named Kelly that they called Weasel.  I

25  think he was a prospect at that time.  My codefendant

1   Filkins was a prospect at that time when I was there.

2   Dallas may have been there at that time.

3   Q    You said Christopher Gibson was there at that time?

4   A    Yes.

5   Q    Can I turn your attention to Exhibit 420?

6   A    420?

7   Q    Yes.

8          MS. BLANCH:  Your Honor, can I retrieve the

9   original exhibit?

10         THE COURT:  Yes.

11  BY MS. BLANCH:

12  Q    Do you recognize these photographs?

13  Q    Who do they depict?

14         MR. FLEMING:  Objection, relevance.

15         THE COURT:  What's the relevance, Counsel, of this

16  photograph, 420?

17         MR. BLANCH:  Your Honor first of all, it shows

18  that Mr. Miller knew Mr. Gibson personally because these

19  were photographs that Mr. Miller brought to us.  Also, there

20  is inscription on the back of the photograph --

21         THE COURT:  You can ask him the question.

22  BY MS. BLANCH:

23  Q    Do you recognize these photographs?

24  A    Yes.

25  Q    How do you recognize them?

```
 1    A      It's my photograph.
 2               THE COURT:  Who?
 3               THE WITNESS:  It's my photograph.
 4    BY MS. BLANCH:
 5    Q      It belongs to you?
 6    A      It belongs to me.
 7    Q      Who does it depict?
 8    A      Chris Gibson and Doreen.  I don't know Doreen's last
 9    name.  That was his girlfriend.
10    Q      How did you get this picture?
11    A      He gave it to me.
12               MS. BLANCH:  Your Honor, I move Exhibit 420 into
13    evidence.
14               THE COURT:  Could I see the back of the
15    photograph?  Would you give that to Lisa for just a moment?
16    Lisa, could I see the back of that photograph?
17               THE COURT:  Mr. Reed, did you need to see the back
18    of these photographs?
19               MR. REED:  I have a copy.
20               THE COURT:  Any objection, Mr. Reed?
21               MR. REED:  To moving into evidence, no.
22               THE COURT:  420 will be received, two photos.
23               Should I make one 420-A and the other 420-B?  We
24    will mark that later on so you are not marking on the
25    photograph.
```

```
 1            MS. BLANCH:  Yes, Your Honor.

 2            (Exhibits 420-A and 420-B received.)

 3   BY MS. BLANCH:

 4   Q    This is 420-A.

 5            Mr. Miller, do you recognize this photograph?

 6   A    Yes.

 7   A    Who are the people depicted in that paragrath?

 8            MS. BLANCH:  May I publish?

 9   Q    Mr. Miller do you recognize this photograph?

10   A    Yes.

11   Q    Who is depicted in that photograph?

12   A    Chris Gibson and his female friend Doreen.

13   Q    I am going to turn it over onto the back.

14            Can you read that inscription?

15   A    "Buzz, well, now, hombre, regardless what you may think

16   we still love you, not really, ha, ha.  Below that is love

17   and respect, Chris and Doreen.

18   Q    In between the "love" and the "respect," do you see the

19   shamrock?

20   A    Yes.

21   Q    Is that a shamrock?

22   A    Yes.

23   Q    Does that have any meaning to you?

24   A    In what context?

25   Q    If you see a shamrock on this photograph, does it tell
```

1    you anything in particular about the Aryan Brotherhood?

2    A    Well, knowing Chris and knowing that he was up for

3    membership -- when he gave that to me, he was already a

4    member.  He had been made a member already.  I went out, and

5    I came back on a violation, and he gave this to me.  I had

6    been gone for like seven months, and in the interim period,

7    he had actually become a member.  He got his shamrock and

8    the three 6's there.

9    Q    These three 6's, is that also a symbol of the Aryan

10   Brotherhood?

11   A    Yes.  It's used, but by itself, no.  It doesn't mean

12   anything by itself.

13   Q    But in connection with the shamrock and the 666 and the

14   note from Chris, where does that lead to?

15   A    The AB.

16   Q    I am going to show you Exhibit 420-B.  Who is depicted

17   in that photograph?

18   A    Same two folks, Chris and Doreen.

19   Q    Chris Gibson?

20   A    Yes.

21   Q    I am going to turn it over.

22        Can you read that inscription?

23   A    "Buzz, here you go knucklehead.  Don't know why.  Just

24   don't want you to feel left out."

25   Q    While you are at Lompoc, did you know an individual

1    named Arva Lee Ray?

2    A    Yes.

3    Q    Was he a member of the Aryan Brotherhood?

4    A    Yes.

5    Q    What was his nickname?

6    A    Baby Ray.

7    Q    Do you have a nickname?

8    A    Yes.

9    Q    What is it?

10   A    Buzz.

11   Q    On these photographs I just showed you, when it says

12   "To Buzz," that's you?

13   A    "I have Fresno here and Buzz here."

14   Q    Back to Arva Lee Ray, that's Baby Ray?

15   A    Yes.

16   Q    Can I turn your attention to Exhibit 63?

17              MR. FLEMING:  Is that Volume 3?

18              MS. BLANCH:  Yes, Volume 3.

19   BY MS. BLANCH:

20   Q    On the first page of Exhibit 63, do you recognize this

21   photograph?

22   A    Yes.

23   Q    Who is that?

24   A    Baby Ray.

25              MS. BLANCH:  Your Honor, I would move the first

```
 1    page of Exhibit 63 into evidence.
 2              THE COURT:  Any objection?
 3              MR. FLEMING:  No objection.
 4              THE COURT:  It's received.
 5              (Exhibit 63, page 1, received.)
 6    BY MS. BLANCH:
 7    Q    Is that an accurate depiction of Arva Lee Ray?
 8    A    Yes.
 9    Q    You said that he was a member of the Aryan Brotherhood;
10    is that right?
11    A    Yes.
12    Q    Was he a member in good standing if you know?
13    A    When I first got there, yes, I think he was.
14    Q    Did you ever start hearing from members of the Aryan
15    Brotherhood that he was not a member in good standing?
16    A    Yes.
17    Q    What did they say?
18    A    Well, just grumblings about how he wasn't taking care
19    of business.  He had a homosexual lover that he was quite --
20    they were quite a torrid affair.  It was sickening really
21    the way he was out in public all the time.
22    Q    Do you know that individual's name?
23    A    Yes.
24    Q    What is it?
25    A    Dale Crone.
```

1   Q    Would that be LeRoy Dale Crone?

2   A    Yes.

3   Q    How did the Aryan Brotherhood feel about that

4   relationship if you know?

5   A    It looked bad.

6   Q    Why?

7   A    Well, an Aryan Brotherwood member sitting there kissing

8   a homosexual just doesn't look good.

9         MR. FLEMING:  If I may, I would like more of a

10  point of reference as to who he is hearing this from.  The

11  answer is vague as to "they."

12        MS. BLANCH:  I can ask him who he heard it from.

13        THE COURT:  Certainly.

14  BY MS. BLANCH:

15  Q    Who did you hear this from?

16  A    Eddie.

17  Q    When you say Eddie, do you mean Mr. Hevle?

18  A    Edgar Hevle, my cellmate Glenn Filkins.

19  Q    Was Mr. Filkins a member of the Aryan Brotherhood?

20  A    No, not at that point.

21  Q    Would he be considered an associate of the Aryan

22  Brotherhood?

23  A    Yes.

24  Q    Did you hear that -- did you hear any other members of

25  Aryan Brotherhood complaining about Baby Ray's relationship

1    with Mr. Crone?

2    A     Yes.

3    Q     Who?

4    A     Steve Hicklin.

5    Q     Anyone else?

6    A     I remember one conversation on the yard.  We were

7    sitting on the yard, just sitting out there.  I'm trying to

8    remember who was there.  Eddie was there.  Steve Hickman was

9    there.  I don't know if Phil Myers was there, maybe weasel.

10   Chris might have even been there.  I don't know.

11                THE COURT:  Who is Weasel?

12                THE WITNESS:  Kelly, another guy who was with the

13   AB.

14                THE COURT:  Who is Chris?

15                THE WITNESS:  Christopher Gibson.

16   BY MS. BLANCH:

17   Q     He may have been there.

18                Are you certain he was there, or you're not

19   certain?

20   A     I just know that there was a group, and I know for

21   certain a couple that --

22                MR. REED:  Objection --

23                THE COURT:  I'm going to strike the answer.

24   Reask the question.  Let's find out specifically who he

25   recalls being there.

1              I'm going to sustain your objection, Mr. Reed.

2    BY MS. BLANCH:

3    Q    Specifically, Mr. Miller, who do you remember having

4    that conversation with?

5    A    Glenn Filkins, Steve Hicklin, Edgar Hevle.

6    Q    Are Steve Hicklin and Edgar Hevle members of Aryan

7    Brotherhood?

8    A    Yes.

9    Q    You said Glenn Filkins was an associate of the Aryan

10   Brotherhood?

11   A    Well, he was on probationary period.  He was a

12   prospect.  He was up for membership.

13   Q    How well did you know Glenn Filkins?

14   A    Pretty good.

15   Q    Were you cellmates?

16   A    Yes.

17   Q    Can I turn your attention to Exhibit 388, Volume 6?  Do

18   you recognize this photograph?

19   A    Yes.

20   Q    Who is it?

21   A    Glenn Filkins.

22         MS. BLANCH:  Your Honor, I move to admit Exhibit

23   388.

24         THE COURT:  Any objection?

25         MR. FLEMING:  No objection.

```
 1          THE COURT:  Exhibit 388 is received, and I
 2   previously received Exhibit 63, which is the photo of Ray.
 3   388 is the photo of Mr. Filkins.
 4          (Exhibit 388 received.)
 5          MS. BLANCH:  May I publish, Your Honor?
 6          THE COURT:  You may.
 7   BY MS. BLANCH:
 8   Q    Mr. Miller, this is a photograph of Glenn Filkins?
 9   A    Yes.
10   Q    You say you know him pretty well.  What does that mean?
11   A    Well, anytime you share a small cell with somebody and
12   you have to take a crap in the same cell with them while
13   they are sitting there, you get pretty familiar with each
14   other.  I mean, you are in close quarters.  From about 10:00
15   at night until 6:00 in the morning or so, you are in those
16   quarters.  You're not sleeping the whole time in there, so
17   you actually get to know a lot about each other.
18   Q    You say you were aware that Filkins was an Aryan
19   Brotherhood prospect?
20   A    Yes.
21   Q    What does that mean?
22   A    He was up for membership.  He was on a probationary
23   period while they were checking him out.
24   Q    What would he have to do to actually get membership, if
25   you know?
```

1          MR. FLEMING:  Objection, speculation.

2          MS. BLANCH:  I'll rephrase, Your Honor.

3          THE COURT:  All right.

4   BY MS. BLANCH:

5   Q    Considering your knowledge of the Aryan Brotherhood and

6   you are familiarity with their members, what is the general

7   policy about what prospects have to do to get membership?

8          MR. REED:  Objection, assumes facts not in

9   evidence.

10         THE COURT:  Overruled.

11         You can answer that question.

12         THE WITNESS:  A lot of people have heard the

13  phrase blood in/blood out.  I think they used it on a movie

14  about the Mexican Mafia.  Basically, you have to spill blood

15  to get in, and you have got to spill your own to get out.

16         At one time back in the '60s and '70s, whenever

17  the Aryan Brotherhood stabbed somebody, they killed them

18  nine times out of ten, and when --

19         THE COURT:  I will strike the answer.  It's

20  nonresponsive.  The answer is stricken.

21  BY MS. BLANCH:

22  Q    If you know, what is the Aryan Brotherhood policy about

23  what has to be done to get membership in the Aryan

24  Brotherhood?

25  A    You have to kill someone or at least make a valiant

1    effort.

2    Q    Have you ever heard the phrase blood in/blood out?

3    A    Yes.

4    Q    Have you heard it in connection with the Aryan

5    Brotherhood?

6    A    Yes.

7    Q    What does in mean?

8    A    Spill blood to go into the gang.  Lose your own to get

9    out.

10   Q    From your experience with the Aryan Brotherhood, is

11   that an accurate statement of the Aryan Brotherhood?

12   A    Very accurate.

13   Q    Did Glenn Filkins ever tell you what he had to do to

14   get into the Aryan Brotherhood?

15   A    Eventually, yes.

16   Q    What did he tell you?

17   A    That he had to kill Baby Ray.

18   Q    Did he tell you which members of the Aryan Brotherhood

19   told him that he had to kill Baby Ray?

20   A    He told me that Phil Myers had received word from the

21   Commission that he had to go, and Phil Myers was another AB

22   member there.

23              MR. FLEMING:  Objection, double hearsay.

24              THE COURT:  Overruled.

25              Phil Myers is a member of the AB?

1            THE WITNESS:  Yes.

2            THE COURT:  Overruled.

3    BY MS. BLANCH:

4    Q    What is the Commission?

5            MR. FLEMING:  Objection, lack of foundation.

6            THE COURT:  Overruled.

7            THE WITNESS:  A Commission was set up to kind of

8    govern the gang.  They were recruiting and getting a lot of

9    new members in the federal system, and it was a little

10   separate from the state, the State of California here where

11   it originated.  They felt they needed some type of

12   organization.  All it was was just a bunch of single

13   entities running around, and they might have a common

14   purpose, but they had no cohesiveness, and by establishing a

15   Commission, they had a ruling party so to speak that gave

16   the marching orders.  Well, this is what you do.  This is

17   what you do.  This is what you do.

18   BY MS. BLANCH:

19   Q    When you say "they," do you mean the Aryan Brotherhood?

20   A    Yes.

21           THE COURT:  I want to get more foundation how he

22   knows this.  If he doesn't have the foundation, we will

23   strike that.  If he does have the foundation, we will find

24   out quickly now.

25   Q    How do you know about the Commission?

1    A    Of all the AB members I hang around.  They talk about

2    it.

3    Q    Do you remember anybody in particular?

4    A    Yes.

5    Q    Who?

6    A    Phil Myers, Glenn Filkins, Eddie Hevle, Chris Gibson,

7    Steve Hicklin.  There may be more.  Those names I just have

8    on the top of my head.

9    Q    Do you know who was on the Commission at the time

10   Filkins said that the Commission had given permission for

11   Baby Ray to be killed?

12   A    Yes.

13   Q    Who?

14   A    Barry and T.D.

15   Q    How do you know that?

16   A    That's what they said.  Barry and T.D. sent word.

17   Q    Once Glenn Filkins told you that the Aryan Brotherhood

18   Commission had okayed a hit on Baby Ray, what happened?  Was

19   he actually killed?

20   A    Yes.

21   Q    How did that happen?

22   A    Glenn Filkins and I went into his cell and strangled

23   him.

24   Q    Did anything happen before that?

25   A    Yes.

1   Q    Do you know what the Aryan Brotherhood plan was

2   initially to kill Baby Ray?

3   A    Yes.  It went on for some months.

4   Q    What was the first idea about how to kill Baby Ray?

5   A    To inject him with some rat poison or some kind of

6   poisoning.

7   Q    How do you know that?

8   A    They told me.

9   Q    The Aryan Brotherhoods who were there told you?

10  A    Yes.

11          MR. FLEMING:  Objection.

12          THE COURT:  Sustained.  Be more particular.  I

13  think the persons should be named by name.

14  BY MS. BLANCH:

15  Q    Which members of the Aryan Brotherhood told you about

16  the rat poison plan?

17  A    Phil Myers, Steve Hicklin, Edgar Hevle, and Glenn

18  Filkins.  It could have been a couple of other guys there

19  that heard the conversation but these guys specifically,

20  yes.

21  Q    These are people you actually remember?

22  A    Yes.

23  Q    Was the rat poison plan ever effected?

24  A    As far as Baby Ray goes, no.

25  Q    Do you know why not?

1    A    Well, they got it in and tried it on somebody else, and
2    it didn't work.
3    Q    Do you know who they tried it on?
4    A    A guy named Monster.
5    Q    Do you know Monster's actual name?
6    A    No.
7    Q    Do you know why the Aryan Brotherhood was trying to
8    kill Monster with rat poison?
9    A    Some slight somewhere.  I don't know.
10   Q    You don't know?
11   A    No.
12        MR. FLEMING:  Same objection. It's vague.
13        THE COURT:  Let's find out specifically.
14   Sustained.
15   BY MS. BLANCH:
16   Q    Did any members of the Aryan Brotherhood tell you why
17   they wanted to use poison on Monster?
18   A    Yes.
19   Q    Which members of the Aryan Brotherhood?
20   A    Phillip Myers, Glenn Filkins.  Those two for sure.
21   Q    Do you know if the rat poison worked?
22   A    No, it didn't.
23   Q    Do you know how the Aryan Brotherhood was able to get
24   rat poison into the prison?
25   A    I'm not sure it was rat poison, but it was some kind of

1    poison.  Yes, they got it in through the visiting room.

2           MR. FLEMING:  Objection, vague, as to "they got it

3    in through the visiting room."

4    BY MS. BLANCH:

5    Q    Do you know which members of the Aryan Brotherhood got

6    it in through the visiting room?

7    A    Yes.

8    Q    Who?

9    A    Phillip Myers.

10   Q    After the Aryan Brotherhood decided not to use the

11   poison on Baby Ray, did they come up with another plan?

12   A    Yes.

13   Q    Who came up with another plan?

14   A    I don't know.

15   Q    Who told you about the other plan?

16   A    Glenn Filkins.

17   Q    What was the other plan?

18   A    Give him a hot shot of heroin, an overdose of heroin.

19   Q    Was the Aryan Brotherhood able to obtain heroin?

20   A    Yes.

21   Q    Did you see the heroin they planned to use?

22   A    Yes.

23   Q    How did you see it?

24   A    Glenn Filkins showed it to me and asked me if I wanted

25   to try it to see how good it was.

1   Q    Did you try it?

2   A    Yes.

3   Q    Was it good enough to kill Baby Ray?

4   A    I didn't think so.

5   Q    Did they try it anyway?

6   A    Yes.

7          MR. FLEMING:  Objection as to they.

8          THE COURT:  Sustained.

9   BY MS. BLANCH:

10  Q    If you know did a member of the Aryan Brotherhood give

11  a hot shot of heroin to Baby Ray?

12  A    Yes.

13  Q    Who gave it to him?

14  A    Glenn Filkins.

15  Q    How do you know?

16  A    I was there.  He came to my cell to get the outfit, the

17  syringe to do it with.

18  Q    Then what happened?

19  A    He cooked it up in my cell.  He went downstairs where

20  Baby Ray was playing cards.  He told him to come on, and

21  they went up to Baby Ray's cell, Glenn and Ray did.  They

22  were in there for about three or four minutes, and then they

23  came out, and Baby Ray was pretty loaded.

24  Q    Did Baby Ray die from the heroin hot shot?

25  A    No.

1    Q     How do you know?

2    A     Because a short time after he was given the hot shot,

3    20 minutes, 30 minutes, Glenn told me, "Screw this.  I can't

4    wait on this.  I need your help."  He left my cell, and then

5    he came back, and that's when he came in holding some sheet

6    in his hands and told me, "I need your help.  I'm not

7    waiting on this."

8    Q     What did you do?

9    A     He wanted me to hold the knot while he braided a rope.

10   Q     Did he tell you what he planned to do with the rope?

11   A     Yes.

12   Q     What was he going to do?

13   A     Strangle Baby Ray.

14   Q     So what happened next?

15   A     He braided the rope.  He explained the plan to me of

16   how he wanted to do it, and then he went down and got Baby

17   Ray and went up to Baby Ray's cell.

18   Q     Glenn Filkins went to Baby Ray's cell?

19   A     Yes.  He went down and told Baby Ray just before this

20   that he needed to get up to his cell because he was sitting

21   down there, and he looked to loaded.  The cops were going to

22   get him if he was sitting there, so Baby Ray went up to his

23   cell.  As soon as he got up and went to his cell, he told

24   me, "I'm not waiting on this," and he came into my cell with

25   the sheet and braided the sheet.

1   Q    Glenn Filkins came into your cell?

2   A    Yes.

3   Q    What did you do?

4   A    I held the knot while he braided it, and once he was

5   done, we went up to Baby Ray's cell.

6   Q    You and Glenn Filkins both went to Baby Ray cell?

7   A    Yes.

8   Q    What happened when you got there?

9   A    Glenn had told me that when we go into the cell he

10   wanted me to stand by the doorway kind of blocking the

11   doorway while he went all the way to the back of the cell

12   which had a window.  If you are looking into the cell, on

13   the left wall is a bunk.  On the back wall is a window, a

14   light switch.  On the right wall -- the cells flip-flop back

15   and forth because of plumbing.  In this particular cell, on

16   the right-hand side at a 45-degree angle, I believe was a

17   toilet, a commode coming out, and usually the lockers are

18   over on the right wall.

19            When we went into the cell, he wanted me to stand

20   at the doorway as he went to the back of the cell and put

21   his back to the window so that he was standing over Baby Ray

22   as he was laying in bed this way (indicating).  He told me

23   as soon as he gets Baby Ray up and gets the garrote on him

24   just to jump on him and hold him.

25   Q    What is a garrote?

1    A    A strangling device.

2    Q    So what happened?

3    A    When we went, I stood by the door for a minute until he

4    told Baby Ray, "You got to get up.  The cops are coming.  If

5    they see you like this, they'll drag you to the hole."  Baby

6    Ray was pretty loaded, so it took him a minute to get up,

7    but as soon as he stood up, I saw Glenn pull the garrote and

8    go over his neck with it, and as soon as he did that, I just

9    kind of lunged and grabbed him.

10    Q    Could you demonstrate for the jury how the garrote

11    worked?

12    A    It was about this long, and he just kind of looped it

13    around the neck and pulled both ends (indicating).

14    Q    So it crossed in the back?

15    A    Yes.  It met in the back here with this side coming

16    around going out, and this side coming around and going out

17    the other end (indicating).  It was the same on both ends.

18    Q    Did baby Ray struggle?

19    A    Yes.

20    Q    What did he do?

21    A    He managed to get his right hand I believe up inside

22    the garrote.  He couldn't struggle a whole lot.  I weighed a

23    little bit more, and I was pretty much laying on top of him,

24    and Glenn was pulling him back as tight as he could.

25    Q    You were laying on top of him?  For what purpose?

1   A    Semi.   Just to keep his arms and his legs from flopping

2   around.

3   Q    You said Baby Ray got his fingers inside the garrote?

4   A    Yes.

5   Q    Was he able to pull the garrote out?

6   A    No.

7   Q    Did he get his fingers out of the garrote?

8   A    No.   He died with his fingers inside the garrote.

9   Q    So what happened next -- well, let me back up.   While

10  you and Glenn Filkins were strangling Baby Ray in his cell

11  did anyone come in?

12  A    Yes.

13  Q    Who?

14  A    The homosexual, Dale Crone or LeRoy Crone.

15  Q    What did Mr. Crone do?

16  A    He was trying to pull the garrote off.   He said, "What

17  are you doing?   What are you doing?"

18  Q    Was he successful?

19  A    No.   He probably only weighed 135 pounds.   He wasn't

20  very big.

21  Q    What did you do?

22  A    I put my foot in his stomach and slammed him against

23  the wall and told him to get the fuck out of there or he was

24  next.

25  Q    Did he leave?

46

```
 1    A     Yes.

 2    Q     Then what happened?  Did Baby Ray die?

 3    A     Oh, yes.

 4    Q     Once he was dead, what did you and Mr. Filkins do?

 5    A     Immediately or ensuing or --

 6    Q     Immediately.

 7    A     Glenn wanted to tie the garrote, so I just kind of put

 8   my finger on it after he -- he just pulled real tight.   I

 9   put my finger on it, and he tied like a bow in it and pulled

10   it tight.

11    Q     Around Baby Ray's neck?

12    A     Right, to keep it tied there secure.

13    Q     Why?

14    A     Just to make sure.

15    Q     Make sure what?

16    A     That he was dead.

17    Q     Then what happened?

18    A     He told me fix him up, so I --

19    Q     "He" meaning Glenn Filkins?

20    A     Glenn told me to fix it up, so I grabbed a blanket, and

21   I threw it over and made him look like he was sleeping on

22   his bed.

23    Q     Could I ask you to turn to Exhibit 62?  Do you

24   recognize these photographs?

25    A     Yes.
```

1    Q    Who are they?

2    A    That's Baby Ray.

3    Q    Before or after he died?

4    A    It looks like he is dead.

5    Q    The picture on the first page, is that how Baby Ray

6    looked when you left him?

7    A    No.  I think they actually moved him a little bit.  He

8    could have been exactly like that, but --

9    Q    Is that Baby Ray's bed?

10   A    Yeah, it looks like it, but it could be any bunk.  I

11   don't know.  It's close, but it's not the actual picture

12   that I have imprinted in my mind.

13   Q    But is that Baby Ray in the photograph?

14   A    Yes.

15   Q    Lying on a bunk?

16   A    Yes.

17   Q    Bed?

18   A    It looks like it.

19              MS. BLANCH:  Your Honor, I move to admit Exhibit

20   62.

21              THE COURT:  There are a number of photographs in

22   62.

23              MS. BLANCH:  Just the first page at this time.

24              THE COURT:  Any objection, Counsel?

25              MR. FLEMING:  No objection.

```
 1              THE COURT:  62 is received.

 2              (Exhibit 62, page 1, received.)

 3              MS. BLANCH:  May I publish, Your Honor?

 4              THE COURT:  You may publish it.

 5  BY MS. BLANCH:

 6  Q    Mr. Miller, is that a photograph of Baby Ray?

 7  A    Yes.

 8  Q    And that essentially how he looked when you left him?

 9  A    Basically, yes.

10  Q    If I can draw your attention to these fingers right

11  here which are slightly purple, are those the fingers that

12  he caught inside the garrote?

13  A    They could have been.  He had several fingers in from

14  the right side.  I didn't stay to see if any bruises or

15  anything showed up, so I don't know.  That's a good guess.

16  Q    Don't guess, please.

17  A    I'm saying it was his right hand that was up there.  I

18  would assume that's --

19  Q    If you can turn to -- if that's page one of Exhibit 62,

20  if you can look at page four.

21  A    Looking from the right side?

22  Q    Yes.

23  A    Yes.

24  Q    It's a photograph where he is facing to the right side,

25  and you can see the tattoos on his neck?
```

1    A    Yes.

2    Q    Is that a photograph of Baby Ray?

3    A    Yes.

4    Q    Do you recognize the tattoos on his neck?

5    A    Yes.

6    Q    Is that a symbol of the Aryan Brotherhood?

7    A    It's one of them, yes.

8         MS. BLANCH:  Your Honor, I would like to admit

9    Exhibit 62, page four.

10        THE COURT:  Any objection?

11        MR. FLEMING:  No objection.

12        THE COURT:  Exhibit 62, page 4, is received.

13        (Exhibit 62, page 4, received.)

14        THE COURT:  You may publish it, Counsel.

15   BY MS. BLANCH:

16   Q    Mr. Miller, if I can draw your attention to the

17   tattoos, do you see the 666 and then the twin lightning

18   bolts?

19   A    Yes.

20   Q    Do you recognize those tattoos?

21   A    Yes.

22   Q    What does the 666 mean?

23   A    Sign of the beast.

24   Q    Is it also a symbol of membership in the Aryan

25   Brotherhood?

1    A    Not by itself, no.

2    Q    But on Baby Ray?

3    A    Yes.

4    Q    What about the twin lightning bolts?  Is that a symbol

5    of the Aryan Brotherhood?

6    A    No.

7    Q    Do you know what they mean?

8    A    Nazi paraphernalia.

9    Q    If I can draw your attention to the line around his

10   neck, is that where the garrote was?

11   A    Yes.

12   Q    This line right here?

13   A    Yes.

14   Q    Once you and Mr. Filkins tied the garrote around Baby

15   Ray's neck and left him in the bed, what did you do?

16   A    Immediately after it happened, we just swung around

17   from one side of the unit down the tier to the other side so

18   we could stare across and watch just to make sure he wasn't

19   moving.  We went over to a guy's cell by the name of Red

20   Bennett and stayed there I believe for about five minutes.

21   Q    And then what?

22   A    We were convinced he was dead.

23   Q    Then what did you do?

24   A    At which point Glenn and I went back to the cell, and

25   he took the garrote off.

1    Q    Back to Baby Ray's cell?

2    A    No, he went back to Baby Ray's cell, and he took the

3    garrote off.  He told me to keep an eye.

4    Q    And then what?

5    A    He came back, and he told me he is missing a part of

6    it.

7    Q    A part of the garrote?

8    A    Yeah, and he wanted me to go find it.

9    Q    What did you do?

10    A    I went up and found it.

11    Q    What did you do you with it?

12    A    I flushed it down Baby Ray's toilet.

13    Q    Then what happened?  Were you ever arrested for Baby

14    Ray's murder?

15    A    Yes.

16    Q    Were you disciplined by the Bureau of Prisons?

17    A    Yes.

18    Q    Were you sent to the hole?

19    A    Yes.

20    Q    What about Mr. Filkins?  Was he sent to the hole?

21    A    Yes.

22    Q    Did you have an opportunity to speak with Mr. Filkins

23    while you were in the hole?

24    A    Yes.

25    Q    Did he tell you whether or not he had become a member

52

1    of the Aryan Brotherhood?

2    A     Yes.

3    Q     What did he say?

4    A     He said he was in.

5    Q     Can I turn your attention to Exhibit 64?

6    A     Yes.

7    Q     Do you recognize that?

8    A     Yes.

9    Q     What is it?

10   A     The ring on the left is a shamrock on a green-like

11   stone backfield that was made for him in the dental lab.

12   Q     When you say him, you mean Mr. Filkins?

13   A     Made for Glenn in the dental lab.

14   Q     Did you see Mr. Filkins wearing this ring?

15   A     Yes.

16   Q     When did you first see it -- let me rephrase.

17         Did you ever see Mr. Filkins wearing this ring

18   before he murdered Baby Ray?

19   A     No.

20   Q     Did you see it afterwards?

21   A     That night.

22   Q     The same night he murdered Baby Ray?

23   A     Yes.

24         MS. BLANCH:  I move to admit Exhibit 64.

25         THE COURT:  Any objection?

```
 1              MR. FLEMING:  No objection.

 2              THE COURT:  64 is received.

 3              (Exhibit 64 received.)

 4              MS. BLANCH:  May I publish?

 5              THE COURT:  You may.

 6     BY MS. BLANCH:

 7     Q    Is this the ring that you are talking about that I am

 8     indicating on the monitor?

 9     A    Yes.

10     Q    Could you explain again what that depicts?

11     A    It's a shamrock.  It's a three-petaled clover?

12     Q    Do you know how Glenn Filkins got that ring?

13     A    Yes.

14     Q    How?

15     A    The AB made it for him.

16     Q    How do you know?

17     A    Because the guy that was going to get it made for him

18     told him he was going to.

19              MR. FLEMING:  Objection to "The AB made it for

20     him."

21              THE COURT:  If you want more foundation, I'll

22     require it.

23              Do you want more foundation?

24              MR. FLEMING:  Yes, I do.

25              THE COURT:  I'll sustain it at this time.  More
```

```
 1    foundation about who the guy was, how he knows he's a member
 2    of AB, the conversations, where it took place.
 3    BY MS. BLANCH:
 4    Q    Do you know who gave this ring to Glenn Filkins?
 5    A    No.
 6    Q    Did Glenn Filkins tell you that members of the Aryan
 7    Brotherhood had given it to him?
 8    A    Yes.
 9    Q    But he didn't tell you who?
10    A    No.
11    Q    Do you know who made the ring?
12    A    Yes.
13    Q    Was he a member of the Aryan Brotherhood?
14    A    No.
15    Q    Did he make it on behalf of the Aryan Brotherhood?
16    A    He was paid to make it.
17    Q    How do you know?
18    A    He was given some dope.
19    Q    Do you know that man's name?
20    A    I believe it's Charles.  I don't know his last name.
21    Q    Where did Charles work?
22    A    The dental lab.
23    Q    Was he an inmate?
24    A    Yes.
25    Q    And he worked in the prison dental lab?
```

1   A     Yes.

2   Q     You said the Aryan Brotherhood paid him dope to make

3   this ring.  How do you know?

4   A     Glenn told me.

5   Q     Do you know why he was given this ring?

6   A     For membership.

7   Q     Do you know why he was given membership?

8   A     Yeah, because he just killed Baby Ray.

9   Q     Is there anything significant about the way Mr. Filkins

10  is wearing this ring?

11  A     Yeah.  He is trying to hide it.

12  Q     What do you mean by that?

13  A     He is not wearing it up so you can see it.

14  Q     You mean this is the inside of his hand?

15  A     That's the inside of his hand.  That's what it looks

16  like.

17  Q     After the Baby Ray murder, were you ever released from

18  prison?

19  A     Yes.

20  Q     When did you get out?

21  A     I believe it was April 6, 1990.

22  Q     Was that before or after you were prosecuted for the

23  Baby Ray murder?

24  A     Before.

25  Q     How long were you out?

```
1    A    Approximately seven months.

2    Q    Then what happened?

3    A    Dirty urine test and I went back.

4    Q    Is that a parole violation?

5    A    Yes.

6    Q    Where did you go?

7    A    USP Marion, Illinois.

8    Q    Did you get out again?

9    A    Yes.

10   Q    Then what happened?

11   A    I got another parole violation.

12   Q    Was that also a dirty urine test?

13   A    Yes.

14   Q    What happened?

15   A    Then almost four-and-a-half years later from the time

16   it happened -- they came and got me about four months after

17   I was out.  I was on parole and everything, and they

18   arrested me for this Baby Ray --

19   Q    During your first parole violation, you said you were

20   at Marion?

21   A    Yes.

22   Q    Did you meet with any members of the Aryan Brotherhood

23   at that time?

24   A    Yes.

25   Q    Who?
```

1   A    On my tier was Phillip Myers, John Greschner, Wayne

2   Bridgewater.  They were all on my tier that I can recall.

3   Q    Did there come a time when you were going to be moved

4   from Marion to Leavenworth?

5   A    Yes.  Nobody paroles from Marion.  It's just a policy

6   they have.  When you get within six months, they probably

7   send you to someplace else to go home.

8   Q    You knew you were about to leave for Leavenworth?

9   A    Yes.

10  Q    Did any member of the Aryan Brotherhood ask you to make

11  a message to Leavenworth?

12  A    Yes.

13  Q    Who asked you to take a message to Leavenworth?

14  A    John.

15  Q    John Greschner?

16  A    Yes.

17  Q    What was the message?

18  A    "It's a go on Puppet."

19  Q    Who was Puppet?

20  A    Puppet was an AB member that was kind of like a loose

21  canon.

22  Q    Was he housed at Leavenworth?

23  A    Yes.

24  Q    And John Greschner was an AB member also?

25  A    Yes.

1    Q     Was he a member of the Commission?

2    A     I don't know.  I never asked.  I don't recall ever

3    hearing that he was, but I'm not certain.

4    Q     What did you understand that message to mean?

5    A     There was a green light to kill him.

6    Q     What does a green light mean?

7    A     He had to go.  They were going to kill him.

8    Q     Do you know why?

9    A     Yes.

10   Q     How do you know why?

11   A     Well, I knew Puppet.

12   Q     Did anyone from the Aryan Brotherhood tell you why

13   there was a green light on Puppet?

14   A     Yes.

15   Q     Who told you?

16   A     John Greschner.

17   Q     What did he tell you?

18   A     He just told me the guy is a loose canon.  He has got

19   to go.  He is unpredictable.  He is not a team player

20   anymore.

21             THE COURT:  Counsel, we put a name with Puppet?

22   That can be asked so we have a proper name?  The jury is

23   going to have monikers and names to remember eventually.

24   BY MS. BLANCH:

25   Q     Who is Puppet?

1    A    William McKinney.

2    Q    So when they said -- when Mr. Greschner said "It's a go

3    on Puppet," that was an order to kill William McKinney?

4    A    Yes.

5    Q    Do you know who that message came from?

6    A    It came from John.

7              THE COURT:  I want to get a last name again.

8              THE WITNESS:  John Greschner.

9    BY MS. BLANCH:

10   Q    Do you know if he was speaking for the Aryan

11   Brotherhood or just individually?

12             MR. FLEMING:  Objection, lack of foundation?

13             THE COURT:  Sustained.

14   BY MS. BLANCH:

15   Q    Do you know?  Did he ever tell you?

16             THE COURT:  You can answer yes or no to that

17   question.

18             THE WITNESS:  There is in between on yes or no?

19             THE COURT:  No, there is no in between.

20             THE WITNESS:  Then I would have to say no.

21   BY MS. BLANCH:

22   Q    In your experience with the Aryan Brotherhood, what

23   would happen if John Greschner ordered another member of the

24   Aryan Brotherhood killed without permission from the Aryan

25   Brotherhood?

```
 1              MR. FLEMING:  Objection, lack of foundation.
 2              THE COURT:  What's missing in foundation?  He
 3    testified on numerous times that he was associated with
 4    certain members of the Aryan Brotherhood and knew their
 5    policies.  What's missing?
 6              MR. FLEMING:  I'll withdraw the objection.
 7              THE COURT:  Thank you.
 8              You can answer the question.
 9              THE WITNESS:  Would you repeat it?
10    BY MS. BLANCH:
11    Q     In your experience with the Aryan Brotherhood, what
12    would have happened if John Greschner had ordered a hit on
13    William McKinney or another member of the Aryan Brotherhood
14    without permission from the Aryan Brotherhood?
15    A     It's not going to happen.
16    Q     Why not?
17    A     Because you -- that's why they have a Commission so
18    that ABs aren't killing ABs.  You've got to have some kind
19    of order to your system, control.
20    Q     Do you know if there is a rule about getting
21    permission?
22    A     Oh, yeah.  You can't -- I was scared to death I was
23    going to get killed because I just helped kill an AB, even
24    though Eddie is my homeboy there, and I group up with him.
25    We have known each other for over 40 years.  I asked him "Am
```

1    I all right on this?" when I was in the hole.  He said,

2    "Don't worry about it.  You're okay."  If you are a

3    nonmember and you hurt one of them, you're in trouble.

4    Q     So with respect to the Baby Ray murder, or the Arva Lee

5    Ray murder, did you make sure that that was a murder that

6    was ordered by the Commission before you participated?

7    A     Absolutely.

8    Q     How did you make sure?

9    A     Because I was told by the Aryan Brotherhood members

10   there that it was a go.  This took a period of time.  It

11   started like in January of 1989.  The rumor started coming

12   out -- you know, the talk begins, and it wasn't until about

13   April or so that I believe they actually sent for word to

14   okay it.

15   Q     You're still talking about the Arva Lee Ray murder?

16   A     Right.  ABs don't just kill ABs off-the-cuff.  It just

17   doesn't happen.  So they had to wait for word from the

18   Commission.  They finally got word I believe in June, and

19   that's when they got serious about instituting their

20   different plans of attack.

21   Q     This is with respect to Baby Ray, Arva Lee Ray?

22   A     Yes.

23   Q     With respect to the William McKinney, or Puppet

24   McKinney, when John Greschner told you "It's a go on

25   Puppet," could he have been speaking as an individual?

1    A    No.

2    Q    Why not?

3    A    It's just not done.  I mean -- I guess he could have.

4    I don't know.

5    Q    What would have happened if he hadn't -- withdrawn.

6         When you got to Leavenworth, did you pass the

7    message?

8    A    Yes.

9    Q    Who did you pass the message to?

10   A    The people there at the time, Al Benton, Speedy West,

11   Larry Maze, who is not a member -- everybody else is a

12   member -- Mark Nyquist --

13   Q    Is he a member of the Aryan Brotherhood?

14   A    Yes.

15   Q    Let's go back and get this list.

16        You said Phil Myers.  Is a member of the Aryan

17   Brotherhood?

18   A    No, I don't believe I said Phil Myers.

19   Q    Who did you say?

20   A    I believe I said Speedy West, Al Benton --

21   Q    Was Speedy West a member of the Aryan Brotherhood?

22   A    Yes.

23   Q    Was Al Benton a member of the Aryan Brotherhood?

24   A    Yes.

25   Q    Who else did you tell?

1    A    Gene Bentley --

2    Q    Was he a member of the Aryan Brotherhood at that time?

3    A    Yes.   Mark Nyquist --

4    Q    Was he a member of the Aryan Brotherhood at that time?

5    A    Yes.

6    Q    Larry Maze, who like I said was not a member.  He was

7    an associate, and a couple of other people that were just

8    associates I think.   There was one other member, a guy from

9    the District of Columbia, and I can't remember his name.

10   Q    What specifically was the message that you passed to

11   those members of the Aryan Brotherhood at Leavenworth?

12   A    I just told them that John said that the fellow said

13   it's a go.

14   Q    What did you mean by it's a go?

15   A    Kill him.

16   Q    Did they understand that's what it meant?

17   A    Absolutely, yeah.

18   Q    Did you parole from Leavenworth?

19   A    Yes.

20   Q    When was that?

21   A    December 31, 1992.

22   Q    And were you eventually rearrested?

23   A    Yes.

24   Q    Were you eventually rearrested for the Arva Lee Ray

25   murder?

1    A    That was some years -- that was still a year and a half

2    away.  I actually went back -- I was only out a short time

3    after -- I got out New Year's Eve '92.  I was out like 51

4    day or something and came back for another six months.

5    Q    That was on the parole violation?

6    A    Yeah.

7    Q    Was that the parole violation you talked about earlier?

8    A    Yes.  That was the second one.

9    Q    After you got out on that parole violation, what

10   happened -- when did you get out on that parole violation?

11   A    Around August 15th or 16th, 1993.

12   Q    Were you eventually rearrested?

13   A    Yes.

14   Q    For what?

15   A    The homicide of Arva Lee Ray.

16   Q    Did you plead guilty to that murder?

17   A    Not to murder.  I pled guilty to aiding and abetting a

18   murder.

19   Q    Was Glenn Filkins also charged with the murder of Arva

20   Lee Ray?

21   A    Yes.

22   Q    Did you testify at that trial?

23   A    Yes.

24   Q    Did you receive anything for testifying at that trial?

25   A    Witness protection.

1    Q    Why did you need witness protection?

2    A    You would be dead if you were in an institution with

3    these guys if you tell on them.

4    Q    By "these guys," you are referring to the defendants?

5    A    Yes.

6    Q    Did you receive anything else?

7    A    May I have a time frame?

8    Q    Did you receive any sort of a sentencing break in

9    exchange for testifying against Glenn Filkins?

10   A    When I was first agreed to cooperate, I was given a

11   three-point reduction in the Sentencing Guidelines.

12   Q    Was that for acceptance of responsibility?

13   A    Yes, and that dropped me down from natural life to 30

14   years to life.

15   Q    When you were eventually sentenced, did the government

16   make a motion for a reduced sentence because of your

17   cooperation?

18   A    Yes.  They put in a motion called a 5K1.1 that allows

19   the judge to depart from whatever the norm is for Sentencing

20   Guidelines.

21   Q    And how much time were you actually sentenced on that

22   murder?

23   A    Fourteen years.

24   Q    Did you serve that time?

25   A    Yes.

1    Q    Did you eventually get out?

2    A    Yes.

3    Q    When you got out, did you go into the witness

4    relocation program called WITSEC?

5    A    Yes.

6    Q    What benefits did you get from the Witness Protection

7    Program or the Witness Security Program?

8    A    Well, I was safe.  The marshals are very good at what

9    they do.

10   Q    Did they give you a new identity?

11   A    Yes.

12   Q    Did they set you up with a new birth certificate?

13   A    No.

14   Q    What about a new Social Security number?

15   A    Yes.

16   Q    Did they set you up in a new apartment?

17   A    Well, I stayed in a motel or a hotel.  I was waiting

18   for some other things to fall in line before I actually got

19   a residence.

20   Q    Did they give you any money?

21   A    Yes.

22   Q    What other benefits did they give you?

23   A    They bought me a car.

24   Q    A used car?

25   A    Yes.

1   Q     What else?

2   A     They paid for the insurance the first month or so on

3   it.  When I left the program, they gave me something like

4   that $1,800 and change for traveling expenses.

5   Q     You eventually left the Witness Security Program?

6   A     Yes.

7   Q     Did you keep your new identity?

8   A     Yes.

9   Q     And is that a new identity you are using now?

10  A     Yes.

11  Q     And you said they gave you relocation expenses when you

12  left?

13  A     Yes.

14  Q     About how much was that?

15  A     I believe it was $1,800 and some change.  Also, when

16  you first go into the program --

17               MR. FLEMING:  Objection, no question pending.

18               THE COURT:  Is this in relation to money or --

19               THE WITNESS:  Yes.

20               THE COURT:  Overruled.

21               THE WITNESS:  At the time that you go into the

22  program, they will pick you up and take you someplace.  You

23  sit there for period of time while they pay you your rent,

24  and they give you a $45 per diem allowance to eat on or

25  whatever you have to do per day.  You usually get it like

1   for five days at a time.  I was subsisting on the $45 a day.

2   I had no transportation, no ID or anything, and I was

3   sitting in a strange town.  I stayed there for about a month

4   or so -- no, the first place was like four days, then a

5   month or so in the second one.  Then I went to another

6   place.  I won't give any locations, but it's what the

7   inmates would call the bat cave because you can't see out.

8   Q    It's just a secure location?

9   A    It's a secure location where you go through the process

10  of the new Social Security, new driver's license --

11              MR. REED:  Objection.  This is nonresponsive to

12  the question.  Move to strike the answer.

13              THE COURT:  It all has to do with benefits.

14  Overruled.

15              THE WITNESS:  One of the things is when you leave

16  the bat cave and you go to your final destination, they give

17  you $2,000, just pocket money for unforeseen expenses.

18  BY MS. BLANCH:

19  Q    Is that to help you set up a life under your new

20  identity?

21  A    Right.  They give you the $45 per diem, so you are

22  going to get your money to eat on, and they are paying your

23  rent in your hotel, motel, wherever it is you are staying,

24  while you are looking for the residence and what not.  The

25  $2,000 is kind of just fallback money in case of anything

1    that could arise.

2    Q     After you were paid those relocation expenses and you

3    dropped out of Witness Security Program, I am not asking you

4    where you went specifically, but did you move to a new

5    location that you subsequently determined was unsafe?

6    A     Yes.

7    Q     Why was it unsafe?

8            MR. REED:  Objection, relevance, 403(b).

9            THE COURT:  It depends.

10           MS. BLANCH:  Your Honor, he was given money for

11   moving again.

12           THE COURT:  Some of you have been interested in

13   the finances and what he received.  There may be some

14   disagreement, but --

15           MR. REED:  The fact he got money --

16           THE COURT:  Is this a universal objection by

17   everybody?

18           MR. FLEMING:  As to the reason why he had to move,

19   yes, but I would like to know more about the money he

20   received.

21           THE COURT:  Sustained as to your objection, Mr.

22   Reed.

23   BY MS. BLANCH:

24   Q     Were you eventually given some additional money to

25   relocate a second time?

1    A    Yes.

2    Q    How much money were you given?

3    A    Well, I was never given the money.  I needed money to

4    move into a house.  They wanted $3,285 to move in.

5    Q    Did the Marshal's pay some of that money to allow you

6    to move into a new location?

7    A    I don't believe it was the Marshal's.

8    A    I believe it was the U.S. Attorney's.

9    Q    The Victim Witness Program?

10   A    Right, out of their office.  Again, I don't know

11   exactly where the money came from, and I never saw it.  It

12   was never in my hand.  It went directly to the owner of the

13   home.

14   Q    They didn't give you cash?

15   A    No, no.  They also gave me $250 to rent a truck to make

16   the long drive and move the furniture.

17   Q    Were you given any additional benefits for cooperating

18   in this case?

19   A    I came down here last week anticipating that I was

20   going to be on the stand last week, and I was given $100

21   just for pocket money to eat on while I was down here.  I

22   think that's it.

23   Q    Without telling me the location or the name of the

24   family member, do you have a family member who is currently

25   in a state prison facility?

1    A    Yes.

2    Q    Was that family member given some protection because of

3    his connection with you?

4    A    Yes.

5    Q    Would you consider that a benefit for your cooperation?

6    A    Absolutely.

7    Q    Are you familiar with a Rule 35 motion?

8    A    Yes.  I think it's a 35(b), the one you are speaking

9    of.

10   Q    What is that motion?

11   A    That's a motion to -- I think it's a motion to vacate,

12   set aside, or modify a current sentence.

13   Q    Did you receive a Rule 35 motion or a sentence

14   reduction for your cooperation in this case?

15   A    Yes.

16   Q    How many days off did you get from your sentence

17   because of your cooperation?

18   A    Right around six months.

19   Q    Are you expecting any additional benefits because of

20   your cooperation now?

21   A    No.

22   Q    Are you already out from prison?

23   A    Yes.

24   Q    Do you have any additional sentence that you expect to

25   serve?

```
1   A    No.
2            MS. BLANCH:  Thank you.  I have no further
3   questions.
4            Actually, could you just give me one moment to
5   check with --
6            THE COURT:  Why don't you check with co-counsel.
7   Regardless, I think this would be a logical breaking point,
8   so we will start with the cross-examination tomorrow.  That
9   way you can check your notes this evening, and if you have
10  something you have forgotten, you can reopen in the morning,
11  and then we will start the cross.
12           MS. BLANCH:  Thank you.
13           THE COURT:  Once again, has anybody talked to
14  anybody about the case so we get to start all over again?
15           So you have been very good over the weekend.  Now
16  just a reminder, I have no options.  I promise you, so I
17  want to thank you very much for your efforts.
18           I want to also thank you for being so prompt.
19  It's very much appreciated.
20           One of you approached Christy.  There is something
21  at 4:00 on Thursday.  Therefore, I know that I will be
22  recessing at 4:00 on Thursday.  Whichever of the jurors have
23  that issue, I can work with you.  That half-hour is not
24  going to be a problem, so all of you should expect that at
25  4:00 on Thursday that one of you has something very, very
```

1   important, so at 4:00, we will be recessing.  I will tell

2   when you that comes us occasionally.

3           In the meantime, you are admonished not to discuss

4   this matter amongst yourselves nor to form or express any

5   opinion concerning the case.

6           We will see you at 8:30 tomorrow.  Please drive

7   safely.  You can leave your notebooks on your chairs.

8           (Jury not present.)

9           THE COURT:  Mr. Miller, thank you very much.  You

10  are excused.  We will see you tomorrow at 8:30.

11          Counsel, will you excuse me for just a minute?  I

12  need to get something.

13          (Recess.)

14          THE COURT:  We are back in session.  All counsel

15  are present.  The defendants are present.  The government is

16  present.

17          Mr. White, I want to go right back to the

18  transcripts involving Mr. Smith.  I listened to it over the

19  weekend as I represented to you I would.  In fact, I played

20  it twice.  In going through this, much of this transcript is

21  not impeachment.  The vast majority of this transcript in

22  fact is not impeachment.

23          It appears to me that what you are really after

24  may be the Manson thing starting on -- the reference to

25  "Charlie Manson," but I'm not certain.  I don't want to

1    presume what you want to either play or recall Mr. Smith

2    for.

3              So I think the appropriate way to do this is you

4    asked a bunch of questions about Mr. Smith.  You have a

5    daily transcript concerning those questions.  Why don't you

6    set forth through Mr. Harris -- Mr. Harris is glad to do

7    this.  I see him raising his hand and volunteering -- those

8    pages of the transcript by page number at least.

9              Mr. Harris, just the general subject matter.

10             Then why don't the two of you approach the

11   United States Attorney informally.  If you have a

12   stipulation and you want to replay it, so be it.  If you

13   don't and you want Mr. Smith called back, then pay them the

14   courtesy.  Ask Ms. Flynn when she can get him back.  I don't

15   want to break it up, but I don't want this the last witness

16   in the prosecution's case, so let's say within the next --

17   well, maybe just after April 11 when we come back.

18             MR. WHITE:  I do have those locations, and I was

19   going to suggest that maybe we just reach a stipulation.  We

20   don't need to bring Mr. Smith back.

21             THE COURT:  Well, it might be fun to bring him

22   back.  We don't know.

23             MR. WHITE:  That's true.

24             THE COURT:  I'm just teasing both of you and

25   having a little fun with you.  I'm amenable to doing

1  whatever you agree with the U.S. Attorney to do, but I don't
2  want to presume what portions you think are important and
3  why they are not redundant, and if it's the best to bring
4  Mr. Smith back in person or to simply play those portions
5  are or if you even want these portions at this late -- you
6  know, at this period of time -- you have all the options,
7  though.
8            So for time being, I am going to file this tape
9  and this transcript as exhibit number --
10           MR. HARRIS:  1005 I believe.
11           THE COURT:  Why don't you make sure.
12           THE CLERK:  1005 is the next number.
13           THE COURT:  So the tape and the transcript are
14  going to be 1005.
15           (Exhibit 1005 marked.)
16           THE COURT:  I am going to give this to Lisa.  She
17  is going to put that in a sealed condition, and then you
18  will call it back to my attention.
19           Ms. Flynn, Ms. Blanch, Mr. Emmick, is there
20  anything that we need to resolve for tomorrow?  Obviously
21  Mr. Miller is going to be with us for at least an hour, and
22  my guess is longer.  From your standpoint, is there anything
23  we need to resolve this evening for tomorrow?
24           MS. BLANCH:  I'm not sure what we need to resolve
25  for tomorrow.  We have got --

1          THE COURT:  Okay.  Then I will come back to you in

2     just a moment.

3          Ms. Flynn?

4          MS. FLYNN:  Nothing, Your Honor.

5          THE COURT:  In the military, the Marine Corp, this

6     is called a spit and growl session.  Tell me what's going

7     wrong from your perspective?  In other words, as a judge, we

8     have good days, bad days.  I don't know about the individual

9     rulings.  Those are the rulings.  But if there is something

10    we can be doing better -- you know, we keep adjusting along

11    the way.  What could be better?  Is WITSEC performing for

12    you?  Are there any problems in terms of the elmo?  What

13    else do you need for a clear presentation?

14         MS. BLANCH:  I think we are doing well.

15         MR. EMMICK:  We are okay.

16         THE COURT:  I will check with you in a week.  I am

17    checking in just to make sure that things are going for both

18    parties the best it can and not just presuming from the

19    judge's standpoint that it is.

20         Mr. Fleming, Mr. Steward, let me turn to the two

21    of you.  With short witnesses, I have no concern if you want

22    to cross-examine from where you are seated.  You have asked

23    a number of times, and if you want to remain seated -- for

24    goodness sakes, you are walking all the way up, but you

25    always have the option of that.  Just let me know.

1          Do you want me to continue to start with you?  By

2    starting with you on each occasion or looking to you, it

3    continually puts the focus on Mr. Mills.  If you want me to

4    mix up that order, I'm glad to start with Mr. Bingham or Mr.

5    Gibson or Mr. Hevle, but I want the defense team to tell me

6    that.  Right now the only thing I can do is see which of you

7    starts to rise, and then it dawns on me, gee, Mr. Steward is

8    going to cross-examine on behalf of Mr. Mills.  Mr. Fleming

9    is not.  If you want to continue that way, that's fine.

10          The same with Mr. White, Mr. Harris.  Whoever the

11   person I see rise is the person to start the

12   cross-examination.  If on occasion you want to remain

13   seated, if you have just a couple questions like with a

14   foundational witness, you have have my consent.  Just let me

15   know.  Otherwise, I am always looking around to see who and

16   what order.

17          I know you have worked out also on occasion that

18   sometimes, Mr. Steward, you will cross-examine on Mr. Mills,

19   but it's to the benefit of all the defendants, and Mr. Reed

20   and Mr. Calabria and Mr. Rosen choose not to.

21          Mr. Fleming, and, Mr. Steward, what can we do

22   better?

23          In other words, I'm going to check in every week

24   with you to make sure that your presentation is as best

25   presented as it can be.

1            MR. STEWARD:  We're fine.

2            MR. FLEMING:  I don't have any concerns.

3            THE COURT:  So far.

4            MR. FLEMING:  So far.

5            THE COURT:  Talk to you in a week.

6            Mr. White, Mr. Harris, what can we do better?  How

7    can we help with the presentation of this case?

8            MR. WHITE:  Other than the coffee and a hotel,

9    everything is fine.

10           THE COURT:  Mr. Rosen, Mr. Calabria, let me turn

11   to you gentlemen.  Is there something that we could be doing

12   better?

13           NR, ROSEN:  You're doing good.

14           THE COURT:  You're okay so far?

15           MR. CALABRIA:  Yes.

16           THE COURT:  Mr. Reed.

17           MR. REED:  I'm fine, Your Honor.

18           THE COURT:  Who will you call after Mr. Miller?

19           MS. BLANCH:  Danny Shoff, Your Honor.

20           THE COURT:  So you know Danny Shoff is the next

21   witness.  Danny Shoff could be awhile, but he may not be.

22           MS. BLANCH:  It will be short from the

23   government's perspective.

24           THE COURT:  So we have Miller tomorrow on

25   cross-examination.  Go over your notes this evening.  If you

1    see something that you have neglected, just tell me tomorrow

2    morning.   Then Danny Shoff.

3             Who is after Danny Shoff?

4             MS. BLANCH:   Danine Adams.

5             THE COURT:   Who is Danine Adams?

6             MR. HARRIS:   She is the Head of the Sacramento

7    Intelligence Unit for the BOP.

8             THE COURT:   What is she going to testify to?

9             MS. BLANCH:   She is going to be our expert witness

10   regarding what the BOP knew about the Aryan Brotherhood

11   prior to the establishment of H Unit.   She was at H Unit.

12            THE COURT:   So we are getting into H Unit?

13            MS. BLANCH:   I presume that will come up on cross,

14   Your Honor.

15            THE COURT:   But we are starting to get into H

16   Unit?

17            MS. BLANCH:   Yes.

18            THE COURT:   Technically, the rules are limited to

19   what you ask on direct.   I don't know how expansive the

20   defense is going to be on cross.   Tell me if you want me to

21   go strictly by the code, then cross is limited to direct,

22   but that also means that they are coming back.

23            MS. BLANCH:   Understood.

24            THE COURT:   You can let me know tomorrow.   I will

25   probably be able to tell by your objections.   I don't know

1    if you want to run people back and forth across the country

2    I just don't know.  If I allow them to go beyond on cross I

3    will reopen the door on redirect, and I'll reopen the door

4    on recross.

5         What you are seeing at the end of every

6    examination is I'm asking you check your notes.  Is there

7    anything further?  The reason for that is although the rules

8    say direct, cross, redirect, recross, as long as you don't

9    try to get the last word in in the same area that's been

10   covered and it's truly something in your notes that you

11   might have forgotten, I'm going to be pretty liberal and

12   progressive about that as long as you both stipulate.

13        Mr. Fleming.

14        MR. FLEMING:  Just so there aren't any surprises

15   tomorrow and so that the government has some heads-up about

16   what we intend to do, it's our general consensus that we're

17   not going to delve too deeply into H Unit until we are in

18   our case.  We think we want to put that evidence on at our

19   own speed in our own order, so if they're not going to touch

20   H Unit aside from maybe just introducing what H Unit is, I

21   don't think we are going beyond that.

22        THE COURT:  That way you will have a logical

23   presentation when you get into your case?

24        MR. FLEMING:  Yes.  As long as they are not going

25   to get into it, then we will wait and put it in where we

1   want to put it in in our case.

2           MS. BLANCH:  We don't tend to get into it

3   specifically.

4           THE COURT:  We will get the kind of understanding

5   we have already reached.  I mean, you may stray a couple

6   questions on both sides, but the point is tactically you

7   would like to get a clear presentation and not have it

8   chopped up, and you would like not to get into the depth of

9   H Unit at least at this time and save that for cross and

10  leading questions.

11          MS. BLANCH:  Yes.

12          THE COURT:  Well, we have some parameters that I

13  think are helpful.

14          Anything else?

15          MR. FLEMING:  No, Your Honor.

16          THE COURT:  Mr. Reed.

17          MR. REED:  Perhaps it's late in the day and I

18  didn't understand something.  How is it the subject of an

19  expert witness's testimony as to what the BOP knew prior to

20  H Unit -- how does that come in?  How does a person testify

21  to what the BOP knew before H Unit, which is what I think

22  the proffer was as to Danine Adams.  I think she can testify

23  about what she is doing now, but how can she talk about what

24  the BOP knew?

25          THE COURT:  Well, first of all, a foundation has

1   to be laid that some type of centralized file is kept, that

2   there is some type of centralized clearing house that's

3   kept.  I mean, that's the first issue before we ever allow

4   the testimony in.

5          MR. REED:  That's the reason I am asking because I

6   don't want to lay out that objection and the Court -- run

7   into a problem.

8          THE COURT:  Well, you don't want to make the

9   objection in front of the jury if you know what's coming.

10  That's the real essence of it, and I agree.

11         MR. REED:  That's it there.

12         THE COURT:  Because you don't want to look like

13  you are hiding anything, especially over a silly objection

14  if it's going to be met with -- you know, I'm overruling it,

15  so let's talk about that.  It seems to me mean minimally

16  that the government has to establish with this expert if the

17  person is an expert that there is some kind of clearing

18  house, that there is some type of centralization in

19  Sacramento.

20         MS. BLANCH:  Yes, although Ms. Adams has worked at

21  the ADX for a number of years and was responsible for

22  monitoring white gangs.

23         THE COURT:  Okay, so we are going to listen to her

24  foundation to start with.

25         MR. REED:  Then my next question is -- I don't

1  know that we need another expert on the AB to go through

2  all those other things that generally cop experts do, which

3  is I am assuming what she is going to do.

4          THE COURT:  I will be careful with that.  It won't

5  become redundant.

6          MR. REED:  I understand.  I'm not particularly

7  bothered with saying the BOP knew based on a document, and

8  then she must have known this or that.  I think the

9  government may want to limit that.  If they open the door, I

10 intend to keep it open wide is what I'm trying to say.

11         THE COURT:  I'm alerted to that.

12         MR. REED:  What she knows and what they knew by a

13 memo two days before --

14         THE COURT:  Have you been limited yet?

15         MR. REED:  No.

16         THE COURT:  Remember what I said at the beginning

17 of the case, that it was difficult for the judge since you

18 were so upfront with your defense to start deciding whether

19 this allegedly started in 1984 or 1986 or 1978, and I tried

20 to give all of you a hint that if you wanted to go back --

21 the government or the defense -- all the way to the 1960s

22 you could.  If an expert is called, I quite frankly don't

23 know where to limit that expert also because that expert may

24 come in and testify to "X," but you may want to ask

25 questions about Y, and that may fit.  I just have to hear

1    what is on direct examination, but I am not inclined to

2    start limiting either side.  There is too much material for

3    the judge to start guessing and parceling that out.

4           So you have got a pretty full carte blanche on

5    behalf of the government and your expert to come in, but you

6    have that equal carte blanche, Mr. Reed, on behalf of the

7    defense.  I don't know that I can going to pay too much

8    concern to the niceties of the different areas because when

9    a person comes in who is an expert on the AB, if you want to

10   get into narcotic trafficking, how extensive or not

11   extensive, if you want to get into whatever -- so let's just

12   see where that takes us.  I think it's not a concern right

13   now because I have limited either side.

14          MR. REED:  I just didn't want to run into the

15   12:00 objection, and the Court -- you actually told me this

16   last night, and that's basically why I'm doing this.

17          THE COURT:  You know I'm going to give both sides

18   pretty much an open door as long as it's within reason.

19          Anything else?

20          MR. WHITE:  We do have something we would like to

21   take up in-camera.

22          THE COURT:  Okay.  I have something with the

23   government also I need to take up in-camera, so I am going

24   to ask you to remain outside for just a moment.  I'm going

25   to clear the courtroom.  I'm going order that this be sealed

1   and the marshals not to convey any information to any

2   defense counsel on any other case.  This is in-camera now.

3           Then I have something in-camera for the

4   government.  I want to talk to them briefly about this.  I

5   just need one of you.  I don't need all of you.

6       *(At 5:45 p.m., proceedings were adjourned.)*

7                           -oOo-

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 21, 2006

SHARON SEFFENS, U.S. COURT REPORTER

SHARON SEFFENS, U.S. COURT REPORTER